1   Todd J. Dressel (State Bar No. 220812)
    CHAPMAN AND CUTLER LLP
2   595 Market Street, 26th Floor
    San Francisco, CA  94105
3   Telephone:    (415) 278-9088
    Facsimile:    (415) 541-0506
4   dressel@chapman.com

5

6   James E. Spiotto *(Pro Hac Vice Pending)*
    Ann E. Acker *(Pro Hac Vice Pending)*
7   James M. Heiser *(Pro Hac Vice Pending)*
    CHAPMAN AND CUTLER LLP
8   111 West Monroe Street
    Chicago, IL  60603
9   Telephone:    (312) 845-3000
    Facsimile:    (312) 516-1900
10  spiotto@chapman.com
    acker@chapman.com
11  heiser@chapman.com

12  Attorneys for Bank of Montreal, as Administrative Agent

13          **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
14                **SAN JOSE DIVISION**

15  | BANK OF MONTREAL, as Administrative Agent, | |
16  | Plaintiff | Case No. 11-CV-80133 MISC - EJD (HRL) |
17  | v. | MOTION FOR RULE TO SHOW CAUSE WHY JUDGMENT SHOULD NOT BE AMENDED TO ADD RESPONDENTS AS JUDGMENT DEBTORS |
18  | SK FOODS, LLC | |
    | Defendant. | |
19  | v. | Honorable Edward J. Davila |
20  | SK PM CORP. and FREDERICK SCOTT SALYER, as Trustee for the Scott Salyer Revocable Trust, FREDERICK SCOTT SALYER, in his Individual Capacity | Hearing Date:  January 13, 2012 |
21  | | Hearing Time: 9:00 a.m. |
22  | | Place:  Robert F. Peckham Federal Building |
23  | Respondents. | 280 South 1st Street |
    | | San Jose, CA  95113 |

24

25

26

27                                          MOTION FOR RULE TO SHOW CAUSE
                                            Case No. 11-CV-80133 MISC - EJD (HRL)
28

3016445.01.28.doc

**TABLE OF CONTENTS**

| SECTION | HEADING | PAGE |
|---|---|---|

NOTICE OF MOTION ....................................................................................................1

SUMMARY OF RELIEF SOUGHT AND ISSUES TO BE DECIDED .........................................1

POINTS AND AUTHORITIES IN SUPPORT OF MOTION......................................................2

    I.   BACKGROUND FACTS AND SUMMARY OF THE CHICAGO ACTION ................................2

    II.  CALIFORNIA LAW PERMITS THE COURT TO AMEND A JUDGMENT TO
          INCLUDE THE *ALTER EGO* OF THE JUDGMENT DEBTOR ...........................................4

    III. SK FOODS LLC IS THE *ALTER EGO* OF THE RESPONDENTS ....................................5

          A.    Unity of Interest and Ownership Exists Among the
                 Respondents and SK Foods LLC Under the "Single-
                 Enterprise Rule" ........................................................................6

          B.    The Respondents Failed to Adequately Capitalize SK Foods
                 LLC ..........................................................................................7

          C.    The Respondents Have Sole Ownership and Control of SK
                 Foods LLC .................................................................................9

          D.    Salyer Commingled Funds and Other Assets of
                 SK Foods LLC With Those of His Own....................................10

          E.    The Respondents Have Diverted Assets to the Detriment of
                 Creditors and Rendered SK Foods LLC a Mere Shell............11

                 1.   The Respondents Purported to Transfer the Businesses
                      Pledged to BMO to Salyer and His Daughters, and
                      Transferred Almost $4 Million to Secret Bank Accounts in
                      Liechtenstein and the West Indies ..................................12

                 2.   The Bankruptcy Court for the Eastern District of California
                      Has Found That There Was a Substantial Risk that Salyer
                      Would Dissipate Assets ...................................................15

           F.    The Respondents Failed to Maintain Arm's Length
                 Relationships with SK Foods LLC and Other Related Entities.............16

          G.    SK Foods LLC Has a Total Absence of Corporate Assets ....................17

H.   All Salyer-Controlled Entities Utilized the Same Employees ...............18

I.   Salyer Disregarded All Corporate Formalities ........................................19

J.   SK Foods LLC Used the Same Business Location as the
     Other Salyer Controlled Entities ...........................................................20

IV.   THE TOTALITY OF THE CIRCUMSTANCES SUPPORTS A FINDING OF *ALTER
      EGO* .........................................................................................................21

V.   INEQUITABLE RESULTS WOULD FOLLOW IF THE RESPONDENTS ARE
     SHIELDED ...................................................................................................21

VI.   THE RESPONDENTS CONTROLLED THE UNDERLYING LITIGATION ........................22

CONCLUSION ..........................................................................................................25

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

# TABLE OF AUTHORITIES

PAGE

**Cases**

*AE Rest. Assocs., LLC v. Giampietro (In re Giampietro)*, 317 B.R. 841 (Bankr. D. Nev. 2004) .................................................................................................................... 5

*Alexander v. Abbey of the Chimes*, 104 Cal. App. 3d 39 (Cal. Ct. App. 1980) .................... 5, 22

*Associated Vendors, Inc. v. Oakland Meat Co., Inc.*, 210 Cal. App. 2d 825 (Cal. Ct. App. 1962) ........................................................................................................ 6, 7, 16, 22

*Automotriz v. Resnick*, 47 Cal. 2d 792 (1957) ............................................................... 8

*Baize v. Eastridge Cos.*, 142 Cal. App. 4th 1293 (Cal. Ct. App. 2006)................................ 21

*Carr v. Barnabey's Hotel Corp.*, 23 Cal. App. 4th 14 (Cal. Ct. App. 1994) ......................... 5

*Claremont Press Publ'g Co. v. Barksdale*, 187 Cal. App. 2d 813 (Cal. Ct. App. 1960).......... 7, 8

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) ................................................................................................................ 16

*Dow Jones Co. v. Avenel*, 151 Cal. App. 3d 144 (Cal. Ct. App. 1984) ............................... 23

*Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conference Ctr. Bd.*, 41 Cal. App. 4th 1551 (Cal. Ct. App. 1996)................................................................................... 4

*Jack Farenbaugh & Son v. Belmont Constr., Inc.*, 194 Cal. App. 3d 1023 (Cal. Ct. App. 1987) ........................................................................................................... 5, 22

*Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220 (Cal. Ct. App. 1991) ................................................................................................................ 6

*Levander v. Prober*, 180 F.3d 1114 (9th Cir. 1999) ...................................................... 4

*Linco Serv., Inc. v. DuPont*, 239 Cal. App. 2d 841 (Cal. Ct. App. 1966)........................... 17

*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223 (Cal. Ct. App. 1999) ........................................................................................................ 7

*NEC Elec., Inc. v. Hurt*, 208 Cal. App. 3d 772 (Cal. Ct. App. 1989) ...................... 5, 15, 20, 22

*Pan Pac. Sash & Door Co. v. Greendale Park, Inc.*, 166 Cal. App. 2d 652 (Cal. Ct. App. 1958) ........................................................................................................ 18, 20

*Robbins v. Blecher*, 52 Cal. App. 4th 886 (Cal. Ct. App. 1997)...................................... 5

*RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir. 1985) ............................... 22

*Talbot v. Fresno-Pac. Corp.*, 181 Cal. App. 2d 425 (Cal. Ct. App. 1960) .......................... 7

*Thomson v. L.C. Roney & Co., Inc.*, 112 Cal. App. 2d 420 (Cal. Ct. App. 1952) .............. 10, 11

*Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269 (Cal. Ct. App. 1994) ................ 7

*Zoran Corp. v. Chen*, 185 Cal. App. 4th 799 (Cal. Ct. App. 2010) ................................... 7

**Other Authorities**

Cal. Civ. Proc. Code § 187 ................................................................................... 4, 5

Cal. Corp. Code § 17101(b) ................................................................................... 5

**Rules**

Fed. R. Civ. P. 69(a) ............................................................................................ 4

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on Friday, January 13, 2012, at the hour of 9:00 a.m., or as soon thereafter as counsel may be heard, the Plaintiff, Bank of Montreal, a Canadian chartered bank acting through its Chicago branch, as Administrative Agent for certain Lenders (*"BMO"* or the *"Agent"*), shall appear before the Honorable Edward J. Davila or before any other judge who may be sitting in his place and stead in Courtroom 1, Fifth Floor of the United States District Court for the Northern District of California, San Jose Division, 280 South 1st Street, # 4050, San Jose, California, and then and there present the attached **Motion for Rule to Show Cause Why Judgment Should Not Be Amended to Add SK PM Corp. and Frederick Scott Salyer, as Trustee for the Scott Salyer Revocable Trust, as well as Frederick Scott Salyer in his Individual Capacity** (the *"Respondents"*), as Judgment Debtors (the *"Motion"*), copies of which are attached and herewith served up on you.  NOW COMES BMO, and for its Motion, respectfully states as follows:[1]

## SUMMARY OF RELIEF SOUGHT AND ISSUES TO BE DECIDED

BMO seeks to hold Respondents SK PM Corp. and Frederick Scott Salyer, as Trustee for the Scott Salyer Revocable Trust, as well as in his individual capacity, liable for a judgment it obtained in the U.S. District Court for the Northern District of Illinois against a limited liability company, SK Foods LLC, that is the *alter ego* of the Respondents, based on well established provisions of the California Code of Civil Procedure.  Despite guaranteeing a $195 million loan, SK Foods LLC was inadequately capitalized, entered into numerous inappropriate related party transactions, and exhibited a total disregard for corporate

---

[1]   Due to the volume of evidence supporting the Motion, for the convenience of the Court, BMO has inserted Bates numbers onto each page of the exhibit appendix filed herewith. For each citation to the record, BMO has cited to the exhibit number and specific page of the exhibit appendix, together with a reference to the cited document where appropriate. Since the Motion is supported primarily with publicly filed documents in court proceedings, each document has been authenticated by the Declaration of James Heiser (the *"Heiser Dec."*) to which each exhibit is attached.

formalities.  As a result of these acts, as well as numerous fraudulent transfers to members of Salyer's immediate family and others, the Respondents have lost any legitimate claim to the corporate shield for this judgment, and may be held liable for its full amount.  As described below, the Respondents' conduct satisfies each of the elements for *alter ego* liability under applicable law.  As such, judgment should be entered against the Respondents in the full amount claimed.[2]

## POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### I.   BACKGROUND FACTS AND SUMMARY OF THE CHICAGO ACTION

The SK Foods family of businesses were Monterey, California-based producers and processors of tomato products.   On September 28, 2007, SK Foods L.P. and RHM Industrial/Specialty Foods, Inc. (collectively, the *"Borrowers"* or the *"Debtors"*) entered into that certain Amended and Restated Credit Agreement, dated as of September 28, 2007 (the *"Credit Agreement"*) with BMO, whereby certain Lenders, acting through BMO, agreed to provide up to $195 million in financing to the Borrowers.  (Ex. 2 at BMO 14.)  The Defendant in this matter, SK Foods LLC, guaranteed the Borrowers' obligations under this facility (the *"Guaranty"*), and pledged all of its personal property, which consisted primarily of the stock of certain foreign operations of the SK Foods "family" of companies, located in New Zealand, as collateral for its Guaranty.[3]  (*Id*. at BMO 109; Ex. 33 at 1209-10.)

SK Foods LLC is 45.55 percent owned by the Scott Salyer Revocable Trust and 54.45 percent owned by SK PM Corp.  (Ex. 27 at BMO 1006.)  In turn, Scott Salyer is both the Trustee of the Scott Salyer Revocable Trust (his living trust) and the 100 percent owner of SK PM Corp.  *Id*.  As such, Salyer controls 100 percent of SK Foods LLC.  Additionally,

---

[2]   While not the basis for imposing *alter ego* liability on the Respondents as such, the United States has also alleged in a criminal complaint that Salyer carried out a massive scheme of commercial bribery, antitrust, and mislabeling (an offense relating to false certifications of mold content in tomato products sold by Salyer's companies).  Salyer is currently under house arrest awaiting trial on these charges.

[3]   The background facts set forth herein are set forth in greater detail in the Declarations of Lawrence Mizera and Paul Forgue, attached hereto at Ex. 1 at BMO 001-013 and Ex. 5 at BMO 471-485, respectively.

SK PM Corp. is the general partner of SK Foods, L.P. and is liable for its debts, and SK Foods, L.P. is an obligor under the Credit Agreement upon which the judgment against SK Foods LLC is based. (Ex. 2 at BMO 109.) On May 7, 2009, the Borrowers filed for bankruptcy in the Bankruptcy Court for the Eastern District of California, and their case remains pending before the Honorable Robert S. Bardwil. Subsequent to the Borrowers' bankruptcy, in June 2009, BMO filed a Complaint in the U.S. District Court for the Northern District of Illinois, the parties' chosen venue (the *"Chicago Action"*), seeking judgment on SK Foods LLC's Guaranty of BMO's loan and to foreclose its interest in the Collateral, which consisted primarily of the stock of certain direct and indirect foreign subsidiaries located in New Zealand, called SK Foods International and Cedenco Foods, respectively. (Ex. 2 at BMO 142 (showing chart of pledged subsidiaries).) Despite SK Foods LLC actively litigating the case and raising a panoply of defenses which were rejected by the Chicago Court, a judgment in favor of BMO was entered on September 22, 2010 by the Honorable Joan B. Gottschall in the amount of approximately $128 million. (Ex. 32 at BMO 1203.) Judge Gottschall also issued an opinion and order which ordered the shares of the New Zealand companies foreclosed and authorized BMO to execute whatever documents were necessary to effectuate the transfer. (Ex. 33 at BMO 1204; 1210-11.) SK Foods LLC was subsequently held in contempt for its failure to respond to a court-ordered citation to discover assets, which has not been purged. (Ex. 31 at BMO 1202.)

Instead, the Respondents advanced a concerted and secret effort to transfer and conceal assets in order to hinder and delay BMO's efforts to liquidate its Collateral or otherwise collect on its judgment. As described below, evidence obtained from Salyer's criminal case and the Borrowers' bankruptcies reveals that Salyer and those acting on his behalf used these businesses as their "personal piggy bank" to pay millions of dollars for lavish personal expenses, including the use of jet aircraft and other travel expenses, as well as to pay millions in inappropriate expenses relating to the criminal investigation. Moreover, Salyer also caused any remaining proceeds of BMO's Collateral to be funneled into a complex web of foreign and

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

domestic trusts, partnerships, corporations and accounts held in the name of Salyer and his daughters to shield and conceal assets from BMO and other creditors.  These included the transfer of millions of dollars offshore to accounts in Liechtenstein and the West Indies.[4]

While the looting of BMO's Collateral described below (which occurred subsequent to the facts supporting the criminal allegations and is unrelated thereto) is likely sufficient standing alone to impose liability on the Respondents, the haphazard manner in which the Respondents operated SK Foods LLC independently allows an *alter ego* finding.  In light of the avalanche of facts below that support amending the judgment to add the Respondents as *alter ego* judgment debtors under California Code of Civil Procedure § 187, the Motion should be granted.

## II.   CALIFORNIA LAW PERMITS THE COURT TO AMEND A JUDGMENT TO INCLUDE THE *ALTER EGO* OF THE JUDGMENT DEBTOR

Rule 69(a) of the Federal Rules of Civil Procedure "empowers federal courts to rely on state law to add judgment-debtors."  *Levander v. Prober (In re Levander),* 180 F.3d 1114, 1120-21 (9th Cir. 1999).  California Code of Civil Procedure § 187 grants courts the authority to amend a judgment to add additional judgment debtors on the grounds that a person or entity is the *alter ego* of the original judgment debtor.  *See Hall, Goodhue, Haisley & Barker, Inc. v. Marconi Conference Ctr. Bd.,* 41 Cal. App. 4th 1551, 1554-55 (Cal. Ct. App. 1996).  Amending a judgment under § 187 to include *alter ego* judgment debtors is an equitable procedure, and is based on the theory that the court is not amending the judgment to add a new defendant, but is merely inserting the name of an entity that is properly responsible for the judgment.  *NEC Elec., Inc. v. Hurt,* 208 Cal. App. 3d 772, 778 (Cal. Ct. App. 1989) (finding

---

4    Although BMO does not rely on the substance of the criminal allegations for its *alter ego* claims, it is noteworthy that Salyer initially fled the country, attempting to gain residency in countries with no extradition treaty with the United States.  However, in early 2010, Salyer was apprehended by the FBI at JFK Airport and was initially denied bail as a flight risk.  He is now under house arrest at a location in Monterey, California.  The criminal charges against Salyer are docketed at Case No. 2:10-cr-00061-GEB-l in the United States District Court for the Eastern District of California.

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

1    § 187 did not apply because there was no defense for the purported judgment creditor to

2    control).

3         Amendment under § 187 requires that: (1) the new party be the *alter ego* of the old

4    party and (2) the new party controlled the litigation. *Alexander v. Abbey of the Chimes*, 104

5    Cal. App. 3d 39, 46-47 (Cal. Ct. App. 1980).   In a motion or rule to show cause to add

6    additional judgment debtors, the "greatest liberality" is encouraged in the interest of justice.

7    *See Carr v. Barnabey's Hotel Corp.*, 23 Cal. App. 4th 14, 20 (Cal. Ct. App. 1994) (involving

8    misnomer of defendant).   The evidence demonstrates that SK Foods LLC is the *alter ego* of the

9    Respondents and that the Respondents controlled the litigation.   Therefore, BMO's Motion

10   should be granted.[5]

11   **III.    SK FOODS LLC IS THE *ALTER EGO* OF THE RESPONDENTS**

12        Under the *alter ego* doctrine, "a court may disregard the corporate entity and treat the

13   corporation's acts as if they were done by the persons actually controlling the corporation."

14   *Robbins v. Blecher*, 52 Cal. App. 4th 886, 892 (Cal. Ct. App. 1997) (finding voluntary

15   dismissal of *alter ego* claim did not reflect on a party's innocence where underlying judgment

16   had been reversed).   Two conditions must be satisfied to invoke the *alter ego* doctrine.   First,

17   there must be "such unity of interest and ownership that the separate personalities of the

18   [business entity] and the individual no longer exist."   *Jack Farenbaugh & Son v. Belmont

19   Constr., Inc.*, 194 Cal. App. 3d 1023, 1032 (Cal. Ct. App. 1987).   Second, there must be an

20   inequitable result if the acts in question are treated as those of the corporation alone. *Id.*

21

22

23   [5]    For purposes of *alter ego* liability and piercing the corporate veil, a limited liability
     company is treated as if it were a corporation.  CAL. CORP. CODE § 17101(b) ("[a]
24   member of a limited liability company shall be subject to liability under the common
     law governing *alter ego* liability"); *see also Baize v. Eastridge Cos.*, 142 Cal. App. 4th
25   293 (Cal. Ct. App. 2006) (finding corporation *alter ego* of limited liability company).
     However, to the extent that Nevada law was applicable because that is the state where
26   SK Foods LLC was formed, it applies the same standard.  *See AE Rest. Assocs., LLC v.
     Giampietro (In re Giampietro)*, 317 B.R. 841, 845-47 (Bankr. D. Nev. 2004) (under
27   Nevada law, an LLC should be treated as a corporation for purposes of the "*alter ego*"
     doctrine).

**A.      Unity of Interest and Ownership Exists Among the Respondents and SK Foods LLC Under the "Single-Enterprise Rule"**

In California, "under the single-enterprise rule, liability can be found between sister companies." *Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 235 Cal. App. 3d 1220, 1249 (Cal. Ct. App. 1991). As stated in *Las Palmas,* "it would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit fraud and other misdeeds with impunity." *Id*. As such, the first requirement of *alter ego* liability is a "unity of interest and ownership" between the individual and corporation such that separate personalities no longer exist. *See Associated Vendors, Inc. v. Oakland Meat Co., Inc.*, 210 Cal. App. 2d 825, 837 (Cal. Ct. App. 1962) (finding inadequate capitalization was prerequisite to *alter ego* liability). In determining the existence of a "unity of interest and ownership," courts look for the presence of certain factors in the particular circumstances of each case. These well known factors include, *inter alia*:

1. commingling of funds and other assets, failure to segregate funds of the separate entities, or the unauthorized diversion of corporate funds or assets to other than corporate uses;

2. treatment by an individual of the assets of the corporation as his own;

3. the holding out by an individual that he is personally liable for the debts of the corporation;

4. the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities;

5. the identical equitable ownership in the two entities and identification of the equitable owners thereof with the domination and control of the two entities;

6. identification of the directors and officers of the two entities in the responsible supervision and management;

7. sole ownership of all of the stock in a corporation by one individual or the members of a family;

8. the use of the same office or business location;

9. the employment of the same employees and/or attorney;

10. the failure to adequately capitalize a corporation;

11. the total absence of corporate assets and undercapitalization;

12. use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation;

13. the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities;

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

14. the disregard of legal formalities and the failure to maintain arm's-length relationship among related entities;

15. use of the corporate entity to procure labor, services, or merchandise for another person or entity;

16. the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another;

17. the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and

18. the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Zoran Corp. v. Chen,* 185 Cal. App. 4th 799, 811-12 (Cal. Ct. App. 2010) *(citing Associated Vendors,* 210 Cal. App. 2d at 838-40). The long list of *alter ego* factors is not exhaustive and no single factor is determinative. *See Talbot v. Fresno-Pac. Corp.*, 181 Cal. App. 2d 425, 432 (Cal. Ct. App. 1960). Instead, a court must examine all the facts under the circumstances of each case to determine whether to apply the *alter ego* doctrine. *Id.* Here, the totality of the circumstances warrants the finding that a "unity of interest and ownership" exists as between SK Foods LLC, on the one hand, and the Respondents, on the other.

## B.   The Respondents Failed to Adequately Capitalize SK Foods LLC

The issue of undercapitalization is viewed as a "highly relevant factor" in finding *alter ego* liability. *See Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 251 (Cal. Ct. App. 1999) (disqualifying attorney after finding plaintiff corporation and subsidiary defendant should be treated as one entity); *see also Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 (Cal. Ct. App. 1994) (noting that inadequate capitalization is a "critical fact" to prevail on a claim of *alter ego* but reversing punitive damages because *alter ego* had not been litigated or decided below). "[T]he attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts." *Claremont Press Publ'g Co. v. Barksdale*, 187 Cal. App. 2d 813, 816 (Cal. Ct. App. 1960). Indeed, it is ancient law that a company's owners must act in good faith in risking enough unencumbered

capital to cover the business's prospective liabilities. *Automotriz v. Resnick,* 47 Cal. 2d 792, 797 (1957).  If the company's capitalization "is illusory or trifling compared with the business to be done and the risks of loss," a court may deny the separate entity privilege. *Id.*

Here, despite contrary representations to BMO, SK Foods LLC was apparently undercapitalized from the very beginning.  Recent discovery has revealed that SK Foods LLC never had more than $17,911.47 in its bank accounts to support a guarantee of a loan of almost $200 million.  (Ex. 23 at BMO 861-885.)  As such, but for monetary infusions from other entities controlled by the Respondents (which apparently never passed through SK Foods LLC's bank accounts), SK Foods LLC would have been unable to meet any of its financial obligations. *See Claremont Press*, 187 Cal. App. 2d at 816 (in finding the *alter ego* company was undercapitalized, the court dismissed the shareholder's advances of money to the company to pay bills as nothing more than "loans, made without agreement to subordinate them to the claims of other creditors").

Further evidence of SK Foods LLC's undercapitalization is demonstrated by the lack of any corporate assets.  Aside from its minimal cash, SK Foods LLC's only apparent asset is identified as its interest in SK Foods International, a New Zealand holding company which owned Cedenco Foods, a tomato processor located in New Zealand.  (Ex. 2 at BMO 142.)  However, as set forth below, Sayler undertook on at least two occasions to fraudulently transfer the New Zealand businesses to companies controlled by him and/or for the benefit of his daughters and gave no consideration to SK Foods LLC, the Guarantor.  While their fraudulent actions may have turned out to be ineffective, these actions demonstrate the *alter ego* liability of the Respondents.[6]

---

[6]   Additionally, SK Foods LLC had little to no operations outside of its relationship with the Borrowers.  March 8, 2010 Declaration of Shondale Seymour, ¶¶ 23 -30.  (Ex. 27 at BMO 983-84.)  Similarly, SK Foods LLC and other Salyer-controlled entities were never capitalized or operated for profit. *Id.*, ¶¶ 31-37.

**C.      The Respondents Have Sole Ownership and Control of SK Foods LLC**

The Scott Salyer Revocable Trust and SK PM Corp. together own 100 percent of SK Foods, LLC. (Ex. 27 at BMO 1006.)   In turn, Salyer is the sole managing member of SK Foods LLC, as trustee for the Scott Salyer Revocable Trust. (Ex. 24 at BMO 886.)   Also, Salyer owns 100 percent of SK PM Corp. (Ex. 27 at BMO 1006.)   In fact, with the exception of certain entities partially transferred to his daughters, Salyer ultimately owned and controlled all of the other SK Foods-related entities. *August 19, 2009 Dec. of Shondale Seymour*, ¶¶ 6-7 (Ex. 25 at BMO 889) and *March 8, 2010 Dec. of Shondale Seymour*, ¶¶ 4, 5 (Ex. 27 at BMO 980).   For example, as demonstrated by the "Salyer Enterprises" flow chart of related entities, Salyer ultimately owned these entities through the Scott Salyer Revocable Trust, his revocable living trust. (Ex. 27 at BMO 1006.)   As noted on this chart, Salyer also controlled each of these entities as the Manager, Officer, Director, Sole Shareholder or Trustee of each entity. *August 19, 2009 Dec. of Shondale Seymour*, ¶ 6.   (Ex. 25 at BMO 889.)   Further, in addition to being the manager of SK Foods LLC, Salyer directly and indirectly owns SK Foods LLC and has complete control over its business operations. (Ex. 27 at BMO 1006.)

Salyer also used his sole ownership to usurp corporate opportunities belonging to the other entities.   For example, in the course of the criminal investigation into Salyer's activities, the FBI interviewed personnel at Mechanics Bank who interacted with Salyer's accountant, Cary Collins, regarding certain overseas wire transfers.   Salyer's accountant allegedly told the account manager at Mechanics Bank that Salyer was wiring money to facilitate his individual purchase of Cedenco, the New Zealand operating company that is owned by SK Foods LLC. *FBI Larrick Report*.   (Ex. 26 at BMO 976.)   Collins allegedly stated that he and Salyer had created an offshore entity in the West Indies called Fast Falcon LLC so that they could purchase the New Zealand businesses without revealing their identity, as no person or entity affiliated with Salyer was permitted to acquire that business.   *Id*.   These statements were contrary to representations contained in the Credit Agreement which Salyer signed on behalf of

SK PM Corp. as general partner of SK Foods, L.P. (Ex. 2 at BMO 63, 109), as well as the other obligors thereunder.

### D.   Salyer Commingled Funds and Other Assets of SK Foods LLC With Those of His Own

At all relevant times, Salyer failed to maintain proper books and records and haphazardly shifted assets between entities based on their immediate cash needs or whatever was of instant benefit to Salyer. The Debtors initially attempted to reconcile these various intercompany transactions when their lenders started questioning these practices, but despite many months of attempting to track all such transactions and reconcile the books of the various entities, it was ultimately determined that it was not possible to do so. *March 8, 2010 Dec. of Shondale Seymour*, ¶¶ 86 - 90. (Ex. 27 at BMO 992-93.)

For example, the Debtors routinely made payments on invoices for liabilities incurred by other related entities, reimbursed related entities for costs spent on tenant improvements at the headquarters locations in Monterey, and provided funding to certain related entities to repay intercompany liability of other related entities with limited apparent benefit. *May 11, 2009 Dec. of Paul Forgue*, ¶ 17. (Ex. 5 at BMO 479-80.) Historically, there has been a significant number of related party transactions in which funds were diverted from the Debtors without an adequate explanation. *Id.* There are innumerable examples of other intercompany transfers for no legitimate reason. For example, in December 2006, $4 million from SK Foods was used to allow two other related entities, RHM and SK Aviation, to make tax prepayments. *March 8, 2010 Dec. of Shondale Seymour*, ¶ 74. (Ex. 27 at BMO 991.) Also, in April 2009, Salyer withdrew $1.7 million from a related entity and deposited those funds into his personal account. (*Id.* at ¶ 58 at BMO 987.)

This contrived system of transferring money is similar to the scheme analyzed in *Thomson v. L.C. Roney & Co., Inc.*, 112 Cal. App. 2d 420 (Cal. Ct. App. 1952). There, in granting a motion to amend the judgment against *L.C. Roney, Inc.* ("*LCR*") to add its *alter ego* Southwestern Development ("*Southwestern*"), the court noted: (1) Southwestern owned the

stock of LCR; (2) the officers of both companies were identical; (3) the sole president of both corporations had blanket authorization to take action that would bind Southwestern; (4) large sums of money were furnished to LCR by Southwestern without security and without the formality of a resolution authorizing such loans; (5) both companies had the same attorney; (6) the assets of LCR were sold to Southwestern but LCR received no consideration other than the recited cancellation of debts owed to Southwestern; and (7) LCR was left without assets and without the means to pay its debt to plaintiff. *See Id.* at 428-29. In light of those facts, the court found a "complete unity of ownership and interest" between the two companies and noted that the loans by Southwestern to LCR, without specific authorization by resolution of the directors of LCR, led to a legitimate inference of commingling of assets. *Id.* at 429. As described above, all of these factors are met in this case. In fact, what little cash SK Foods LLC did have came by virtue of a check deposit from the Debtors. (Ex. 23 at BMO 884.)

**E.    The Respondents Have Diverted Assets to the Detriment of Creditors and Rendered SK Foods LLC a Mere Shell**

The evidence demonstrates that the Respondents used SK Foods LLC as a mere shell and diverted SK Foods LLC assets to the detriment of creditors. In particular: (1) according to Salyer's personal accountant, the Respondents transferred the value of SK Foods LLC's main asset, its operating subsidiary in New Zealand, to a trust in the Cook Islands, an offshore bank secrecy jurisdiction (Ex. 14 at BMO 684); (2) also according to Salyer's personal accountant, the New Zealand holding company which controls the operating subsidiary was transferred to another Salyer-controlled entity called Monterey Peninsula Farming, LLC (*Collins Aff.* ¶ 2 (Ex. 34 at BMO 1212)); (3) the Respondents apparently transferred these valuable assets without the payment of any consideration; (4) the Respondents drained all of SK Foods LLC's cash after the Chicago Action was filed (Ex. 23 at BMO 883); and (5) the Respondents have failed and refused to pay a single dollar toward the indebtedness owed to BMO.

For example, in an affidavit filed in the Chicago action, Salyer's accountant avers that "In about January 2009, the stock of SK Foods, International, was transferred from

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

SK Foods, LLC, to Monterey Peninsula Farming, LLC." *Collins Aff.* ¶ 2 (Ex. 34 at BMO 1212). In subsequent email communications between Salyer and Salyer's accountant, dated July 11, 2009, the two discussed meeting with a banker at Valartis Bank in Zurich, Switzerland on July 17, 2009. (Ex. 3 at BMO 364.) Notably, Salyer's accountant mentions to Salyer that he had not "disclosed to Valartis any of the US legal activities," that the "[Cook Islands] trust and LLC were established solely for asset protection, and as a vehicle to operate the Australian and New Zealand corporations" and that "face time with Swiss bankers settles their nerves." *Id.*[7]

Additional communications revealed in the case suggest that Salyer and Salyer's accountant met in Europe in September 2009 in order to meet with a "wealth management" company in Zurich. (Ex. 3 at BMO 371.) Subsequent to the filing of the Chicago Action in June 2009, between June of 2009 and September of 2009, five wires totaling approximately $3,750,000 were made from three different accounts at Mechanics Bank to accounts overseas. (Ex. 3 at BMO 407-11.) As described below, these transfers were only the beginning of a concerted scheme by the Respondents to divert SK Foods LLC's assets, and other assets pledged to BMO.

> 1.   **The Respondents Purported to Transfer the Businesses Pledged to BMO to Salyer and His Daughters, and Transferred Almost $4 Million to Secret Bank Accounts in Liechtenstein and the West Indies**

On or about September 17, 2009 (which was shortly after Salyer was served with summons in BMO's Chicago Action), Salyer instructed his secretary to transfer funds from SK Foods LLC's accounts to an account in the name of another Salyer-controlled entity with a Bank of the West account, and then all of the funds were transferred to accounts at Mechanics Bank in San Francisco. *See FBI Aff.* ¶ 91-92 (Ex. 4 at BMO 468-69). These "wire transfer requests," which denote transfers from accounts in the names of various entities, including

---

[7]   The publicly available version of these emails have been redacted by the government. However, a privilege log produced by Salyer's accountant, Cary Collins, in another matter identifies this email as a communication between Salyer and Collins. *Cf.* (redacted email chain dated July 11, 2009; Collins Privilege Log, Pg. 26, No. 427). (Ex. 6 at BMO 545.)

defendant SK Foods LLC, total approximately $217,269.95. (Ex. 3 at BMO 342-53.) The SK Foods LLC portion is located at Ex. 3 at BMO 343. All of SK Foods LLC's cash was included in this transfer. *Id.* The funds were deposited into a different Mechanics Bank account in the name of SSC Farms II, LLC. (Ex. 3 at BMO 355.) An earlier email dated April 16, 2009, indicates that at least $1,500,000 was moved from Bank of the West accounts in the name of SSC Farms to the SSC Farms II account at Mechanics Bank. (Ex. 3 at BMO 355.) As such, the Respondents diverted or attempted to divert cash and assets (*e.g.,* SK Foods, International) out of SK Foods LLC to prevent it from being able to respond to the Judgment.[8]

All told, Salyer was apparently successful in transferring from the Mechanics Bank account $3.75 million to banks in Liechtenstein and the West Indies, at least some of which was property of SK Foods LLC that was pledged to BMO. (Ex. 3 at BMO 343; 407-11.) According to one of Salyer's attorneys, this money has apparently been placed under the control of Salyer's daughters' trusts. *Tr. of March 3, 2010 Proceedings* at 33 (Ex. 12 at BMO 672) ("As far as money overseas is concerned, the trustee for the children's estate has indicated in the letter he's willing to repatriate the money.")

Additionally, Salyer purported to transfer control of Cedenco Foods to his daughters' trusts. In an attempt to get Salyer released from jail on bail, Salyer's daughter and son-in-law, Stefanie (Salyer) Gallegly and John Matthew Gallegly, have stated in affidavits that Salyer purported to transfer the New Zealand businesses to trusts for the benefit of Salyer and his daughters. *See, Dec. of Stefanie Ann Gallegly* at ¶ 6 (Salyer wanted Cedenco for the benefit of himself and his daughters) (Ex. 10 at BMO 581); *Dec. of John Matthew Gallegly* at ¶ 5 (Salyer would do everything he could "to try and revive Cedenco for the financial benefit of himself and his daughters who have an ownership interest in the business.") (Ex. 9 at BMO 578). These insider transfers are null and void because these shares are subject to BMO's perfected

---

[8]   Salyer also ordered that approximately $812,000 be wired from Mechanics Bank to his then-girlfriend in Australia. (Ex. 3 at BMO 162, 397.)

security interest, and the official record of the New Zealand Companies Office shows that no valid transfer ever occurred. (Ex. 13 at BMO 680-83.) However, the fact that the Respondents purported to make such a transfer without documentation and without giving any consideration or obtaining consent from BMO demonstrates that Respondents have disregarded all formalities, abused the corporate form and that the corporate veil should be pierced.

In fact, in a July 10, 2009 email, Salyer's accountant claims that he had set up another limited liability company on the Island of Nevis in the West Indies "for asset protection and as a vehicle to operate the Australian and New Zealand corporations." (Ex. 3 at BMO 364.) The meaning of these statements came into greater focus recently when Salyer's accountant produced an email dated November 2, 2009 wherein he is attempting to assuage concerns raised by a banker who was questioning the ownership of SK Foods, International's operating subsidiary, Cedenco Foods, because the publicly available records of the New Zealand Companies Office (cited herein by BMO) showed that this company was ultimately owned by SK Foods, LLC, whose managing member is the Scott Salyer Revocable Trust. *Compare* (Ex. 13 at BMO 681-83) (showing Cedenco Foods (n/k/a "Ex Ced Foods" by virtue of the appointment of a liquidator) is owned by SK Foods International) *with* (*Id*. at BMO 680) (showing SK Foods International is owned by Defendant SK Foods, LLC). This email is of significant importance to this matter because Salyer's accountant claims that this company was transferred to a self-settled spendthrift trust in the Cook Islands, a remote haven for offshore asset protection schemes in the South Pacific which has minimal laws regarding fraudulent transfers. (Ex. 14 at BMO 684-88.) Collins claims that the transfer was made to benefit Salyer and his children. *Id*.

An additional twist regarding the New Zealand entities is a purported Note that recently surfaced. The Note was issued by SK Foods International, the New Zealand holding company owned by the Defendant, which holds the operating subsidiaries in New Zealand. (Ex. 17 at BMO 713-15.) This Note, purportedly issued in 2006, was executed by Salyer on behalf of SK Foods International in favor of the "SSC&L 2007 Trust." *Id*. Also, a purported "Debt

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

Assignment Agreement" recently surfaced where Salyer signed for all parties.  (Ex. 18 at BMO 716-19.)  This agreement purported to create additional liabilities for Cedenco to an entity called "SSC&L 2007 Trust."  *Id.*  Given that the Debt Assignment Agreement is dated November 1, 2006 and the trust is the SSC&L 2007 Trust, it is unclear whether the Debt Assignment Agreement and the Note were backdated.  Although these transfers have been characterized as "loans," there is a notable absence of any ordinary appropriate loan documents and/or promissory notes, or any discussion of these "loans" in the Debtors' consolidated books and records.  *See NEC Elecs.*, 208 Cal. App. 3d at 776 (in finding that the sole shareholder was the *alter ego* of his company, the court noted that though the shareholder had provided "loans" of large sums of money to the company, these "loans" were not documented through ordinary loan documents or reflected in corporate minutes).  Additionally, Salyer executed that certain Accounts Receivable Set Off Agreement dated March 24, 2009, wherein Salyer purported to terminate certain liabilities of the SSC&L 2007 Trust to SK Foods, L.P.  (Ex. 40 at BMO 1297.)  This transaction, entered into on the eve of bankruptcy, was an apparent attempt by Salyer to frustrate creditor claims relating to this indebtedness and preempt claims against his personal trust in bankruptcy.[9]

### 2. The Bankruptcy Court for the Eastern District of California Has Found That There Was a Substantial Risk that Salyer Would Dissipate Assets

In a memorandum opinion dated June 1, 2010, the Bankruptcy Court for the Eastern District of California found that in light of its prior findings regarding Salyer's attempts to transfer a valuable piece of equipment used in the tomato business called a "Drum Line," as well as other injunctions issued against Salyer-controlled entities, there was a "real risk" of the transfer and dissipation of assets.  *Mem. Op.* at 9.  (Ex. 19 at BMO 728.)

Additionally, the Bankruptcy Court has made findings of fact that there was a likelihood of success on the claims that this Defendant, and other Salyer-controlled entities,

---

[9]   One of the more outrageous revelations is that this trust stood for the initials of the trust's beneficiaries: Scott (Salyer), Stefanie, Caroline (*i.e.*, Salyer's daughters) and "Louis," who was purportedly Salyer's dog.

made transfers for no or inadequate consideration while they were insolvent. *Apr. 5 Findings of Fact* at ¶ 44 (Ex. 20 at BMO 769) (noting that "Defendants have shown their willingness to sell assets, even in the face of this Court's orders in the Drum-Line Litigation. Moreover, the Trustee has submitted evidence of transfer of assets to overseas accounts."); ¶ 48 (*Id.*) ("With respect to other assets, the Trustee likewise claims an interest in those assets and seeks their return, yet the Defendants are transferring those assets overseas to a variety of countries."); ¶ 51 (Ex. 20 at BMO 770) ("[I]t is certainly in the public interest to prevent fraudulent transfers of assets for the purpose of avoiding the claims of creditors, especially where the individuals involved have a track record of doing so").[10]

## F.    The Respondents Failed to Maintain Arm's Length Relationships with SK Foods LLC and Other Related Entities

The failure to maintain arm's length relationships among related entities is a factor in imposing *alter ego* liability. *See Associated Vendors*, 210 Cal. App. 2d at 840. This factor is present in this case. This case presents a complete absence of corporate formalities. Salyer did not deal with SK Foods LLC or any of the other related entities at arm's length. Money was transferred back and forth whenever an entity needed money, not necessarily when it was due under a contract or when the affiliate provided some good or service. *June 9, 2009 Dec. of Shondale Seymour*, ¶ 7 (Ex. 35 at BMO 1218). Payment of inter-company obligations was frequently deferred and 'caught-up' at various intervals, often at the end of a tax year. *Id.* at ¶ 13 (*Id.* at BMO 1219). Also, the pricing of products or services provided by one entity to another was not negotiated, but rather, was set by Salyer who controlled both parties. In some instances, Salyer retroactively reset prices. *March 8, 2010 Dec. of Shondale Seymour*, ¶¶ 54-55 (Ex. 27 at BMO 987).[11]

---

[10]    Prior misconduct in hiding or depleting assets is "extremely relevant to the concern that [defendant] might conceal or dissipate assets." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (properly considered in granting injunctive relief).

[11]    For example, near the end of 2008, when two related entities were losing money, Salyer unilaterally changed the terms of the contracts so that another entity was charged additional amounts. Indeed, in many instances, the related companies did not have any written contracts with each other. For instance, although one Salyer entity provided

Also, as the Borrowers and SK Foods LLC were defaulting on their obligations to BMO, the Respondents continued to use BMO's Collateral to fund operating "expenses," which often included payments to insiders and funding of the legal defense in the criminal investigation. *Declaration of Paul Forgue*, ¶ 17 (Ex. 5 at BMO 479-80). For example, during 2008 and the first months of 2009, the Borrowers had paid, *inter alia*, almost $4 million in legal fees for the criminal investigation, $1.7 million for use of a private jet (Salyer himself is a licensed jet pilot) that was owned by SK Aviation (a related entity), and over $1 million in costs classified as "travel, entertainment and marketing." *Id*. During this time, Salyer also increased his salary by 60 percent and the salary of his daughter by 225 percent. *Id*. While BMO was unable to analyze every transaction, approximately $16 million had been transferred out of the Borrowers to non-borrower affiliates, controlled by Salyer. *Id*.

### G.   SK Foods LLC Has a Total Absence of Corporate Assets

By virtue of the transfers identified above, SK Foods LLC has no remaining assets whatsoever. Any assets of value (*i.e.*, its ownership interest in the New Zealand businesses which purportedly had significant value when the Guaranty was given and its cash) are alleged to have been transferred to other Salyer-controlled entities between January 2009 and November 2009. SK Foods LLC apparently received no payments in consideration for these transfers. (Ex. 23 at BMO 861-885.) Further, SK Foods LLC has failed to respond to any attempts to ascertain details regarding its assets, and the U.S. District Court for the Northern District of Illinois has found SK Foods LLC to be in contempt of court for refusing to respond to a citation to discover assets. (Ex. 31 at BMO 1202.) As such, an inequitable result would follow should SK Foods LLC be deemed a separate entity for purposes of the outstanding $128 million judgment. *See Linco Serv., Inc. v. DuPont*, 239 Cal. App. 2d 841, 844 (Cal. Ct. App. 1966) (the failure of corporate organizers to provide a sound financial basis for the

---

certain fiber drums and rail transloading for SK Foods, there was no contract describing the terms of this relationship. Similarly, there was no contract with the relevant Salyer entity for the use of the computer system. *March 8, 2010 Declaration of Shondale Seymour*, ¶ 38. (Ex. 27 at BMO 985.)

business they operate can be a factor in determining whether the continued recognition of the corporation as a separate entity would work an injustice). Having drained or attempted to drain SK Foods LLC of its assets, the Respondents cannot maintain the benefits of the corporate shield.

### H.    All Salyer-Controlled Entities Utilized the Same Employees

The fact that all of the Salyer-controlled entities, including SK Foods LLC, shared the same workforce further supports a finding of *alter ego* liability. *See Pan Pac. Sash & Door Co. v. Greendale Park, Inc.*, 166 Cal. App. 2d 652, 657 (Cal. Ct. App. 1958) (in finding *alter ego* liability, the court noted that both companies shared some of the same employees). The Debtors and the other Salyer-controlled entities, including SK Foods LLC, shared the same management personnel. Shondale Seymour served as CFO of the Debtors and of various Affiliated Entities. *June 9, 2009 Dec. of Shondale Seymour*, ¶ 1 (Ex. 35 at BMO 1216). Lisa Crist was Executive Vice President of Administration of the Debtors and various Affiliated Entities. *May 8, 2009 Dec. of Lisa Crist*, ¶ 1 (Ex. 36 at BMO 1266). Steve King, Debtors' former Vice President of Operations, also provided senior management oversight for other entities. *August 19, 2009 Dec. of Lisa Crist*, ¶ 4 (Ex. 30 at BMO 1129). Similarly, Richard Emmett, SK Foods' former Vice President of Ag Operations, also provided senior management oversight for certain affiliates. (*Id.*)   Jeanne Johnston was responsible for business development matters for all of Salyer's companies, including marketing materials and also served as Mr. Salyer's executive assistant for all matters relating to the Salyer family's entities. *March 8, 2010 Dec. of Shondale Seymour*, ¶ 45 (Ex. 27 at BMO 986). Most management salaries were paid by the Debtors, even though they performed services for other entities. *Id.* at ¶¶ 39-50. (BMO 985-986.) Importantly, Seymour, Crist, King, and, of course, Salyer, were all authorized signatories on SK Foods LLC's bank accounts. (Ex. 37 at BMO 1287-1291.)

Individuals in the Debtors' accounting department also performed accounting functions for many of the Defendants. *June 9, 2009 Dec. of Shondale Seymour*, ¶ 2 (Ex. 35 at BMO 1216). This included accounting functions for the related entities' real estate. *Id.*, ¶ 4.

Also, SK Foods' IT department performed IT functions for the Affiliated Entities. *August 19, 2009 Dec. of Dan Kline*, ¶¶ 7, 8 (Ex. 29 at BMO 1091). As of January 2009, with the exception of one administrative staff and a few farm hands, all other administrative and operations support were provided for and paid for by the Debtors. *August 19, 2009 Dec. of Shondale Seymour*, ¶ 8 (Ex. 25 at BMO 890).

Additionally, records of the various entities were stored and maintained together. Paper records of the fifteen various entities were stored at SK Foods' places of business or in storage units under SK Foods' control. *See October 9, 2009 Memorandum Decision*, p. 11 (Ex. 28 at BMO 1077). Electronic documents for all of Salyer's companies were stored on computer systems owned and maintained by SK Foods. (*Id.*) For instance, electronic documents related to insurance were maintained in a folder on the public drive entitled "Admin/Insurance." Similarly, electronic documents related to human resources activities were stored on the same public drive under the folder "Admin/HR." Financial records from year 2007 and beyond for many of the Defendants were similarly stored in a folder entitled "2007 Monthly Closings." Again, documents relating to numerous entities were contained within this folder. *See August 19, 2009 Dec. of Dan Kline*, ¶ 15 (Ex. 29 at BMO 1092-93). All Defendants used SK Foods email addresses and the SK Foods.com domain name. *August 19, 2009 Dec. of Shondale Seymour*, ¶ 4 (Ex. 25 at BMO 889). The Debtors' employees had unfettered access to all of these records. *October 9, 2009 Memorandum Decision*, p. 11 (Ex. 28 at BMO 1077). The Debtors' employees regularly accessed these records for the benefit of, and at the specific request of, other Salyer-controlled entities. *Id.* at pp. 12-14 (BMO 1078-1080). There is simply no meaningful way to untangle SK Foods LLC's affairs from those of the Respondents and other Salyer-controlled entities, and SK Foods LLC should be disregarded under California's "single enterprise rule."

## I.      Salyer Disregarded All Corporate Formalities

The disregard of corporate formalities is another "critical fact" in claiming *alter ego* liability. *See Tomaseli*, 25 Cal. App. 4th at 1285. In this case, the disregard of corporate

formalities was so extreme that they actually triggered a "suspicious activities" alert at Salyer's bank on August 17 and August 31, 2009. *FBI Larrick Report* (Ex. 26 at BMO 975). The report was allegedly triggered because of the sizable amount of certain checks ($2,243,684 and $955,000), and because they were being deposited by Salyer's accountant into the accountant's own personal checking account. (*Id.*) Salyer's accountant had apparently opened a new account in his own individual name with a wire transfer of almost $3.2 million in proceeds of certain tax refunds (allegedly property of BMO) associated with Salyer's companies. (*Id.*) Later, the FBI's report indicated that this money was transferred via outgoing wires to the "Fast Falcon LLC" account in the West Indies, as well as to Lichtenstein. (*Id.*)

Salyer transferred these funds without any proper documentation and for his own benefit. In an email dated September 12, 2009, Salyer expresses his displeasure with the fact that money had not yet been sent to his overseas account and said "Keep trying or we move to another Bank that knows how to send wires." *See Redacted email chain dated September 12, 2009* (Ex. 3 at BMO 387); *Collins Privilege Log*, ¶ 108 (Ex. 6 at BMO 500) (showing email was between Salyer and his accountant, Collins). All told, Salyer's accountant is alleged to have sent approximately $3,750,000.00 on Salyer's behalf, at least some of which was looted funds from BMO's Collateral, to bank accounts established in Liechtenstein and the West Indies. (Ex. 3 at BMO 407-411.) Handwritten notations contained in Salyer's personal diary also indicate that he intended to have the "Fast Falcon $" distributed at some point to him. (Ex. 3 at BMO 383.) These actions further support *alter ego* liability for Respondents. *See NEC Elec.*, 208 Cal. App. 3d at 776 (court noted that the sole shareholder of the judgment debtor was "loaned" large sums of money from the company, yet, these "loans" were not documented or reflected in the corporate minutes).

### J.      SK Foods LLC Used the Same Business Location as the Other Salyer Controlled Entities

The use of the same business location by SK Foods LLC and the other Salyer-controlled entities is further evidence of *alter ego* liability. *See Pan Pac. Sash*, 166 Cal. App.

2d at 657 (in finding *alter ego* liability, the court noted that both companies' corporate offices were located at the same premises). The records of the Nevada Secretary of State show that SK Foods LLC was located at the same premises in Monterey, California as numerous other Salyer-controlled entities (*Compare* (Ex. 24 at BMO 886) *with* (Ex. 3 at BMO 342-53)). Further, based on the consistently minimal balances of SK Foods LLC's bank accounts and the lack of any checks paid on account of rent or other expenses, it appears that SK Foods LLC never paid any rent for this space or any other business expense. (Ex. 23 at BMO 861-85.)

## IV.   THE TOTALITY OF THE CIRCUMSTANCES SUPPORTS A FINDING OF *ALTER EGO*

The twelve factors discussed above support a finding that a "unity of interest and ownership" exists among Salyer, various Salyer-controlled entities and SK Foods LLC. To be sure, courts have found *alter ego* liability under far less compelling circumstances. For example, in *Baize v. Eastridge Cos.*, 142 Cal. App. 4th at 1293 (Cal. Ct. App. 2006), the court of appeals affirmed the amendment of a judgment to add an *alter ego* corporation where the plaintiff had obtained a judgment against The Eastridge Companies, LLC (*"TEC"*), a company owned by two individuals who owned another company, TECLA Development Corporation (*"TECLA"*). *Id.* at 298. In finding TECLA was the *alter ego* of TEC, the trial court took note that: (1) the president of TECLA was also the CEO of TEC; (2) TECLA was wholly owned by the owners of TEC; (3) both TEC and TECLA were represented by the same attorneys; (4) TECLA operated out of the same offices used by TEC; and (5) TEC and TECLA shared the same employees. *See Id.* at 299. Those facts, taken together, "support[ed] a finding that TECLA and TEC [were] one and the same." *Id.* As described above, all of the relevant factors suggest that SK Foods LLC and Salyer are "one and the same."

## V.   INEQUITABLE RESULTS WOULD FOLLOW IF THE RESPONDENTS ARE SHIELDED

The second prong of the *alter ego* test is that "inequitable results will follow if the corporate separateness is respected." Among the various inequitable acts, courts have held that bad faith makes it inequitable for the *alter ego* to hide behind the corporate form. *See Robbin*, 52 Cal. App. 4th at 892. Bad faith exists in situations involving: (1) "the manipulation of

assets and liabilities between entities so as to concentrate the assets in one and the liabilities in the other;" and (2) "the diversion of assets from the corporate entity to another person or entity to the detriment of creditors." *See Associated Vendors*, 210 Cal. App. 2d at 840. An additional factor supporting the existence of an inequitable result is the use of the corporation as a mere shell or conduit for a single business that is conducted by the *alter ego*. *Id*. at 839. While the above-described scheme was done in bad faith and is clearly inconsistent with a market-driven business failure, the Ninth Circuit has noted that a finding of bad faith is not required for a finding of *alter ego* liability. *See, RRX Industries, Inc. v. Lab-Con, Inc.* 772 F.2d 543, 546 (9th Cir. 1985) ("A finding of bad faith, however, is not prerequisite to the application of the *alter ego* doctrine under California law.")[12]

Given the numerous fraudulent transfers, the shocking fraudulent scheme described above and SK Foods LLC's contumacious conduct in the Chicago Action, BMO respectfully submits that this matter is nothing like a routine business failure and that entering judgment against the Respondents individually is appropriate. As discussed in detail above, permitting the Respondents to hide behind SK Foods LLC's corporate shell would lead to an inequitable result, particularly where the Respondents have managed to deplete of all SK Foods LLC assets while leaving all its liabilities to BMO intact.

## VI.   THE RESPONDENTS CONTROLLED THE UNDERLYING LITIGATION

"Control of the litigation sufficient to overcome due process objections may consist of a combination of factors, usually including the financing of the litigation, the hiring of attorneys, and control over the course of the litigation." *NEC Elecs.*, 208 Cal. App. 3d at 781. As a practical matter, the "control of the litigation" standard contemplates "some active defense of the underlying claim." *Id.; see, e.g., Jack Farenbaugh*, 194 Cal. App. 3d at 1031 (amending judgment where *alter ego* was present at trial and was 50 percent shareholder of original judgment debtor); *Alexander*, 104 Cal. App. 3d at 46 (finding sufficient evidence for

---

[12]   When confronted by a subordinate, Salyer is alleged to have responded "You can take your ethics book and shove it up your ass . . . We will lie to anyone outside the circle, but not to each other." *FBI Aff.* ¶ 78 (Ex. 3 at BMO 239).

amendment of judgment where appellant shareholder participated in the litigation as chief operating officer of defendant corporation).  Here, the Respondents directly and indirectly owned all of SK Foods LLC and hatched a scheme to loot SK Foods LLC so that BMO's judgment cannot be satisfied.

Courts have found sufficient control existed under similar circumstances as those here. *See, e.g., Dow Jones Co. v. Avenel*, 151 Cal. App. 3d 144, 151 (Cal. Ct. App. 1984) (upholding post-judgment *alter ego* determination and noting "Gerard Avenel was chief executive officer of Communimark. He was charged with knowledge of its affairs.  The attorneys representing appellants are the same ones who represented Communimark."). Here, Salyer, through the Scott Salyer Revocable Trust, was the sole manager of SK Foods LLC. (Ex. 24 at BMO 886.) As previously noted, Salyer was the registered agent and sole managing member for SK Foods LLC. (Ex. 24 at BMO 886.)  Also, in response to a subpoena, SK Foods LLC's registered agent, CT Corporation, produced documents revealing that Salyer personally was the recipient of all documents served upon SK Foods LLC through its registered agent. (Ex. 41 at BMO 1305-06.)

In addition to the knowledge of SK Foods LLC's affairs charged to Salyer, which should be itself sufficient to show control, the evidence suggests that Salyer controlled the Chicago Action through his attorneys.  For example, Paul Pascuzzi of the law firm of Felderstein, Fitzgerald, Willoughby & Pascuzzi LLP represents Scott Salyer as well as the Scott Salyer Revocable Trust in the Debtors' bankruptcy cases and related adversary proceedings.  (Ex. 38 at BMO 1292-93.)  Although a formal appearance was not made by Pascuzzi, Salyer's accountant has given affidavit testimony indicating that Pascuzzi was controlling the Chicago Action on behalf of Salyer. *Collins Aff.* ¶ 6 (Ex. 34 at BMO 1213).

Additionally, another member of Salyer's legal team, Donald Putterman of the San Francisco office of the law firm of Kasowitz, Benson, Torres & Freidman LLP, proffered an affidavit in the Chicago Action on various matters, including the identity of individuals Putterman claimed would give testimony in the Chicago case. *Sept. 14, 2009 Putterman*

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

*Dec.* ¶ 3-6 (Ex. 39 at BMO 1295). Putterman gave this affidavit "pursuant to a general representation of Mr. Scott Salyer and those affiliated entities designated by him." *Id.* at ¶ 1. Given Putterman's "general representation" of Salyer and his affiliated entities, and his giving affidavit testimony in the Chicago Action in an attempt to defeat BMO's claims on Salyer's behalf, it is clear that Salyer was directing the Chicago Action.

A third member of Salyer's legal team, Gary Perry, wrote to counsel for BMO on February 2, 2011 on behalf of SK Foods LLC and pursuant to his representation of Salyer, claiming that "steps are presently underway" to comply with the Court's ordered citation to discover assets in the Chicago Action. (Ex. 42 at BMO 1311). However, no such steps were ever taken, and SK Foods LLC was subsequently held in contempt of court. (Ex. 31 at BMO 1202.) As such, the Respondents had sufficient control of the Chicago Action.[13]

Further, SK PM Corp. is 100 percent owned by Salyer and purportedly owns 54.45 percent of SK Foods LLC. (Ex. 27 at BMO 1006.) As such, it is nominally in between the chain of ownership between SK Foods LLC and Salyer. To the extent that it has any assets, and has not yet become defunct, it should be held liable to BMO. Alternatively, SK PM Corp. is also the general partner of SK Foods, L.P., who is indebted to BMO as original Borrower on the debt guaranteed by SK Foods LLC. (Ex. 2 at BMO 109.) As the general partner of a limited partnership, it can be held liable under this theory as well.

Finally, property in a revocable living trust is subject to claims of creditors of the settlor-debtor during the debtor's lifetime to the extent of the debtor's power of revocation. CAL. PROBATE CODE § 18200. Scott Salyer's revocable living trust also is an intermediate entity in the ownership chain for SK Foods LLC. (Ex. 27 at BMO 1006.) As such, to the extent that the Scott Salyer Revocable Trust and/or SK PM Corp. have any assets, they are properly subject to BMO's claims.

---

[13] Moreover, notwithstanding attorney Perry's representations regarding compliance with the Court's orders in the Chicago Action, Salyer subsequently caused all documents sent by the registered agent to be returned as undeliverable, showing further contempt for the Court in the Chicago Action. (Ex. 41 at BMO 1300).

CONCLUSION

The evidence is abundantly clear that SK PM Corp., the Scott Salyer Revocable Trust, and Salyer are the *alter ego* of SK Foods LLC and may be held responsible for the judgment at issue. In the interest of justice, and to avoid an inequitable result, BMO respectfully requests that the Court grant this Motion and amend the judgment to add Frederick Scott Salyer, the Scott Salyer Revocable Trust and SK PM Corp. as *alter ego* judgment debtors.

WHEREFORE, Bank of Montreal, as Administrative Agent, respectfully requests that the Motion be granted, that the Court find that SK PM Corp., the Scott Salyer Revocable Trust and Salyer are the alter egos of SK Foods LLC, enter judgment against SK PM Corp., the Scott Salyer Revocable Trust, and Salyer jointly and severally for the full amount of the judgment, and that the Court grant such other and further relief as it deems just and equitable.

Dated: June 27, 2011

James E. Spiotto
Ann E. Acker
Todd J. Dressel
James M. Heiser
CHAPMAN AND CUTLER LLP


_____/s/ Todd J. Dressel_____
Todd J. Dressel
Attorneys for Bank of Montreal

MOTION FOR RULE TO SHOW CAUSE
Case No. 11-CV-80133 MISC - EJD (HRL)

**EXHIBIT A**

Todd J. Dressel (State Bar No. 220812)
CHAPMAN AND CUTLER LLP
595 Market Street, 26th Floor
San Francisco, CA 94105
Telephone:   (415) 278-9088
Facsimile:   (415) 541-0506
dressel@chapman.com

James E. Spiotto (*Admitted Pro Hac Vice*)
Ann E. Acker (*Admitted Pro Hac Vice*)
James M. Heiser (*Admitted Pro Hac Vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL 60603
Telephone:   (312) 845-3000
Facsimile:   (312) 516-1900
spiotto@chapman.com
acker@chapman.com
heiser@hapman.com

Attorneys for Bank of Montreal, as Administrative Agent

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| BANK OF MONTREAL, as Administrative Agent,<br><br>                    Plaintiff<br><br>        v.<br><br>SK FOODS, LLC<br><br>                    Defendants. | Case No. 11-CV-80133 MISC - EJD (HRL)<br><br>[PROPOSED] ORDER GRANTING MOTION FOR RULE TO SHOW CAUSE WHY JUDGMENT SHOULD NOT BE AMENDED TO ADD RESPONDENTS AS JUDGMENT DEBTORS |

Plaintiff, Bank of Montreal, a Canadian chartered bank acting through its Chicago branch, as Administrative Agent for certain Lenders ("*BMO*" or the "*Agent*"), came before the Court upon its Motion for Rule to Show Cause Why Judgment Should Not Be Amended to Add SK PM Corp. and Frederick Scott Salyer, as Trustee for the Scott Salyer Revocable Trust as well as Frederick Scott Salyer in his Individual Capacity (the "*Respondents*"), as Judgment Debtors (the "*Motion*").

[PROPOSED] ORDER

After consideration of the briefs and evidence presented, the oral arguments of counsel, and good cause appearing, IT IS HEREBY ORDERED THAT:

1.      Judgment is hereby entered against SK PM Corp. and Frederick Scott Salyer, as Trustee for the Scott Salyer Revocable Trust, as well as Salyer in his individual capacity, in the amount of $128,256,391.00, together with accrued and unpaid interest thereon at the legal rate and further accruing fees, advances, and other expenses which may be paid out by BMO;

2.      Salyer is hereby ordered to repatriate, assemble and turn over to BMO all assets belonging to SK Foods LLC which have been transferred abroad;

3.      Within two weeks of entry of this Order, Salyer is required to sit for an appropriate examination by BMO regarding the transfers identified herein and all matters related thereto;

4.      Within two weeks of entry of this Order, Salyer is required to provide an accounting relating thereto; and

5.      This Court shall retain jurisdiction to enforce the provisions of this Order and the judgment entered herewith.

IT IS SO ORDERED.

Dated: July __, 2011

_____
United States District Judge