# EXHIBIT 43

## GENERAL ASSIGNMENT AND TRANSFER

## OF MEMBER INTERESTS OF

## SK FOODS, LLC

---

For valuable consideration, receipt of which is acknowledged hereby, SK

FOODS, L. P., a California limited partnership ("Assignor"), hereby assigns and

transfers to the assignees and transferees identified on the schedule attached hereto as

Exhibit "A" and incorporated herein by this reference, all of its right, title and interest in

the outstanding member interests of SK FOODS, LLC, a Nevada limited liability

company effective as of November 1, 2006.

<u>"Assignor"</u>

SK FOODS, L. P., a California limited partnership

By:    SK PM CORP., a California corporation,
General Partner

By: _____
F. SCOTT SALYER,
Chief Executive Officer

**SHARP_CH15 001387**

**EXHIBIT "A"**

**ASSIGNEES AND TRANSFEREES**

|  |  |  | Interest In Assignor |
|---|---|---|---|
| 1. | Scott Salyer, Trustee of the Scott Salyer Revocable Trust, dated July 9, 1984 | - | 44.55% |
| 2. | SK PM CORP, a California corporation | - | 54.45% |
|  | Interest Transferred | 99% |  |

**SHARP_CH15 001388**

# EXHIBIT 44

**SK FOODS AUSTRALIA PTY LTD**

**ACN/ARBN:  099 245 735**

**SHARE/OPTION TRANSFER JOURNAL FOR THE PERIOD 11 JANUARY 2002 TO 01 NOVEMBER 2006**

| Date Entered | Transaction Details | | | Number |
|---|---|---|---|---|
| 01/11/2006 | *From:* | Name | SK FOODS LP | 55 |
| | *To:* | Name | SK PM CORPORATION | |
| | | Certificate No | 4 | |
| | Security | | ORD - ORDINARY SHARES FULLY PAID | |
| 01/11/2006 | *From:* | Name | SK FOODS LP | 45 |
| | *To:* | Name | SALYER, SCOTT <A/C SCOTT SALYER REVOCABLE TRUST > | |
| | | Certificate No | 5 | |
| | Security | | ORD - ORDINARY SHARES FULLY PAID | |

# EXHIBIT 45

version 07-01

**SK Foods, LP**
**A-07 Engagement Review Memo - Audit v07-01**
**June 30, 2007**

We have re-read the planning memorandum and reviewed the working papers, including programs and questionnaires, related to the critical audit areas and unusual accounting matters in connection with our audit of the consolidated financial statements of SK Foods LP and subsidiaries for the year ended June 30, 2007.

## Changes Subsequent to Planning

There have been no significant changes to the audit plan subsequent to planning.

## Delegation of Engagement Review

Significant portions of the review was delegated by the Engagement Reviewer, Mr. Nutley, to Mr. Roger Coutts. Due to scheduling conflicts and client delays, certain work was completed by Roger, and reviewed by Dan. This work did not impact his role in delegated engagement review.

## Consideration of Fraud Risk Factors

During the planning, we identified fraud risk factors relating to covenant compliance (fraud risk financial reporting). We also identified inherent risk factors in revenue recognition (bill and holds, although typical for industry), inventory, the natural related party transactions from integrated operations and client turnover. As result of the identification of these risk factors, our overall response was to increase the involvement of the audit senior manager in all phases, and set tolerable errors and scopes at a lower level. The detail procedures documented in SAS 99 memo were completed as planned.

## Critical Audit Areas Including Significant Findings or Issues

As anticipated, the critical audit areas were AR and revenue, inventories, FIN46(R) and bank financing.

For AR, we sent confirms of individually significant (ISI) customers balances with $9.8 million (40% of trade AR total $21 mil) and CMA sampled another 34 on invoice item basis. We received 1 of ISI and 29 of the sample confirms (exceptions not significant, differences were tested or projected as errors). Alternative procedures performed on all non-responses, primarily to cash receipts. The 2 ISI non-response customers, Kraft and B & G Foods, totaled $4.3 million. We tested subsequent cash receipts for substantially all of these 2 balances. We concluded the results were sufficient to support AR. SK does not typically have an allowance for bad debts. We tested total AR subsequent cash receipts on some of the more significant balances outstanding greater than 60 days (approx $1.7 million or 9% of trade A/R). A/R turn remains fairly consistent and 90% is less than 30 days outstanding, there does not appear to be any material collection issues.

For Revenue, there are significant Bill & Hold (B&H) contracts for bulk paste and diced tomato product, which is very typical for this industry. This activity is generally focused after the packing season in October. Per our expectations there was still bill and hold inventory on hand and bill and hold receivables recorded as of October 2006 had been collected. There were no significant new bill and hold contracts subsequent to October 2006. MA sent confirmations to customers confirming bill and hold inventory on hand to test for understatement of the customers inventory. In addition to the significant cash receipt testing above, we examined contracts and evaluated revenue recognition as proper under GAAP guidance. We also examined the major packaged products contracts (eg cans, plastic and glass processed tomato sauces and salsa's). Analytical procedures included comparison to volumes in inventory rollforwards and

Page 1 of 3

pricing to contracts and invoices.

For Inventory, we observed client counts at all 3 SK locations on various dates subsequent to year-end. We did not observe at year-end because the client did not decide to change their year-end until after June 30, 2007. MA went out and made test counts and then reconciled them to inventory counts as of the date of the observation. Then MA was able to roll back inventory to June 30, 2007. Due to the confusion surrounding the inventory counts MA took many additional counts and observed 100% of the Lemoore location.

We compared valuation of finished goods to last years audit work. There was minimal production after 10/31/07. As expected, costs of finished goods were consistent with 10/31/07 valuation. Each years pack is substantially completed by 10/31 each year. Cans and plastic are packaged from the pack through the year. Overhead from 11/1 to 6/30 of the processing facilities is primarily preparation for the next seasons pack starting in the summer. The Company accumulates these cost in the excel costing model. Some costs are charged to the period with the majority carried on the balance sheet as unapplied overhead. We compared costs accumulated to general ledger accounts and prior year costs and found them consistent. We tested recoverability of unapplied overhead by reviewing prior year revenue and costs. Current year costs would have been recoverable based on historical experience and market for bulk tomato products has risen for the 2007 pack. We concluded unapplied overhead costs would be recovered from 2007 pack.

A full analysis of the Company's relationships for FIN46(R) was performed in the prior year. The client completed analysis of the Farms Group, concluding while they were VIE's, the owners (Scott Salyer and daughter trusts) were the primary beneficiaries, not SK. We concurred and obtained Admin consultation. Colusa and Aviation were concluded to be VIE's with SK as the primary beneficiary and were consolidated. There have been no significant reconsideration events in the current year that would cause consolidation under FIN 46(R).

Effective November 1, 2006 the Company distributed their investments in the New Zealand and Australia subsidiaries to the Partners at the carrying value of the investments. In addition, the Company sold receivables due from the subsidiaries to a revocable trust. See analysis at A-19.05.

Subsequent to year-end the Company entered into an Amended and Restated credit agreement with Harris Bank. The new amendment increased both the term loan and the revolver to $100,000,000 and modified the covenant requirements. We obtained the new agreements and disclosed the subsequent event in the footnotes to the financial statements.

## Unusual Accounting Matters

Due to client staffing issues and workload, a high number of adjustments were identified during the audit. Most related to inventory and majority were identified by the client during their closing process. Most all audit identified adjustments were made. We concluded client was able to accomplish accurate reporting and our audit work was sufficient to identify material errors.

## Control Deficiencies Identified

During the course of the audit we encountered several audit adjustments and passed audit adjustments. These adjustments were the result of three observations, there is not a CFO, there is not enough qualified accounting staff and over reliance on Excel spreadsheets. All of these matters were deemed to be material weaknesses and were reported in the SAS 112 letter.

## Final Materiality Judgment

**Page 2 of 3**

MA00000037

The preliminary estimate of materiality for planning purposes was $750,000. This amount remains appropriate for a final judgment of materiality.

## Passed Adjustments

As detailed on A-03.01, the audit disclosed possible adjustments not made that, if recorded, would increase net income $564k (including reversals from prior year), decrease current assets $781k, decrease non-current assets by $272k and decrease current liabilities by $317k. The client has decided not to record these differences on the basis the effect is not material. We concur in that conclusion. Our evaluation included an acknowledgment of Firm policy at AS 140. and consideration whether the individual and cumulative effect of the passed adjustments and unposted differences represented potential reportable conditions or evidence a fraud may exist (we concluded they did not).

## Final Analytical Review

We have analytically reviewed the final financial statements and believe they conform to our expectations and indicate no usual relationships or results that have not been subjected to appropriate audit procedures.

## Consultation

Consultation was performed for the EDP review performed by Northwest Consulting summarized at A-18. There were no other transactions or circumstances that required consultation pursuant to QC 140B.

## Conclusion

Based on our review, we are satisfied that the working papers were adequately prepared and reviewed and that they support our unqualified opinion on the consolidated financial position of SK Foods LP and subsidiaries as of June 30, 2007 and the results of operations and cash flows for the period then ended in compliance with Firm and professional standards.

|  | Name | Date |
|---|---|---|
| Preparer: | /s/ Roger Coutts | 1/10/08 |
| In Charge: | /s/ | |
| Engagement Reviewer: | /s/ Dan Nutley | 1/10/08 |
| Concurring Reviewer: | /s/ Randy Fenich | 1/14/08 |
| Other Reviewer: | /s/ | |

**Page 3 of 3**

MA00000038

# EXHIBIT 46

**Wayne Boos**

| | |
|---|---|
| **From:** | Shondale Seymour <ShondaleS@skfoods.com> |
| **Sent:** | Tuesday, July 31, 2007 5:37 PM |
| **To:** | Wayne Boos |
| **Cc:** | David Hay; Abigail Pike |
| **Subject:** | FW: Issues for discussion |

Wayne,

I spoke w/ Nick and Harry this afternoon regarding the items below. Nick said he was planning a trip out on August 20th to meet w/ you and I to move these forward as much as possible. They would like to have everything settled before their fiscal year-end of 10/31/07. What is your schedule?

I let him know that everything is being reviewed but there are some items below that are very specific to tax issues, which I would be directing to you and the team there.

I've added comments below as comments were discussed.

Abbie, I've included you as some of these items may impact the outcome of the consolidated financials. The intent is to spin off all foreign entities into a different company such that there is not the tie to SKF and therefore no consolidation. These will spin off as of the end of May 2007.

Shondale


**From:** Nick Frankish [mailto:NICK@cedenco.co.nz]
**Sent:** Tuesday, July 24, 2007 5:36 PM
**To:** Shondale Seymour
**Cc:** Richard Lawrence; David Hay; Harry Heath
**Subject:** Issues for discussion


Hello Shondale

As you are aware David Hay passed on your details to me. I understand you are managing the finance function for SKF at present.

We have a number of issues that we need to get feedback on from the SK Foods side of the business. I will outline them below and suggest we make time shortly to discuss these by phone

- Tax balance dates

    Currently we have tax balance date of December 31 in the NZ and Australian entities, in line with US entities. As this is different from our book balance date it creates a very substantial extra workload for no benefit. I have spoken to Wayne Boos on changing this in NZ/Aust to match book. He is ok with this as long as we can provide info required for the US returns for December (email attached). We would like your signoff to proceed with a change in tax balance date. **Since we are not consolidating on a go-forward basis (intention here), then I am ok w/ this. Need input and approval from tax.**

- Book balance dates / change in ownership structures

    We have heard from Scott/ David that SKF is looking to change its balance dates to June 30, and to separate the ownership of the NZ/Aust subsidiaries from SKF to a Scott Salyer trust. Can you confirm the position here and for our understanding advise the background for these changes. From the NZ/Aust perspective we need to consider the impact of

1

these changes, and whether we should also align to the same book balance date. I don't think the change in ownership will affect NZ/Aust entities. **Yes, this is true on change in year-end. Yes, moving foreign entities to a different ownership structure**.

- Restructure Australian entities

This structure needs review as it was setup when CAP had 2 separate owners with 1 based in NZ and 1 based in Aust. Now it is all owned by SKF. Currently there are 2 holding companies and 1 operating entity. SKFA owns 50% of CAP and owns 100% of CJVA. CJVA also owns 50% of CAP. CAP is a partnership and is the operating entity. **Definitely makes sense....original reason for the separate entities is no longer needed nor utilized, so one entity makes sense from reporting and management perspective....not sure of tax impact.**

We **have consulted with Deloitte** and propose that we liquidate CJVA, the impact is that CAP folds into SKFA and SKFA becomes the only remaining entity and the operating entity (trading as Cedenco Australia).

This provides massive savings for us in costs of compliance, audits, tax, and overall management time. It can also be achieved prior to our next book balance day. We would like your signoff to proceed with this rationalisation. We will also need Banks to consent. **I think it is a good idea....any neighs?**

SS Farms Australia Pty Ltd would remain.

- Transfer Pricing

The intercompany loans between SKF and SKFA / CAP (loans up and loans back) provide some transfer pricing issues in Australia. Specifically there is a USD5.5m loan from CAP to SKF, and a USD11m loan from SKF to SKFA. We see benefit in only having one nett loan from SKFA to SKF of USD5.5m. **Can we net these for US book purposes and if so, what is the tax impact? It doesn't make much sense to have a due to/from between the 2 companies with different balances. I may not have all the pieces of this puzzle, but it definitely makes sense. Nick was saying that the higher debt creates more interest expense and there are issues w/his taxing authority on the intercompany interest expense.**

- Aviation / Management fees

The NZ/ Aust bank group is currently in breach of bank covenants. The bank is currently reviewing our facilities. So that you are aware we think that going forward the Banks will restrict the payment of all dividends and intercompany expenses and balances, until we are no longer in breach. We will keep you informed. **I explained that we are in the same situation and are only being charged for usage. Steve King and I spoke today about taking the total budget for next year and determining the total hours to be charged to each entity, determining the amount due to SKV for each and then dividing by 12. Charge each entity on a straight-line basis for billing and then compare the actual usage for the quarter to the bills and do a settlement check to / from SKV. This will definitely make acctg easier and then we can show the usage calcs and billings. In the meantime Nick may not be able to pay the bill and will just put the $$ on the books as an expense/accrual.**

As some of these items are pressing I suggest we try and teleconference next Monday (4pm US time), Tuesday (11am NZ/Time) ?

Regards

Nick


*Nick Frankish*
*CFO*
*Cedenco Foods*

2

*L2, 12 Heather Street, Parnell, Auckland, New Zealand*
*DDI: 64-9-362-0803; cell: 64-27-451-3632*
*office: 64-9-362-0800; fax: 64-9-362-0806*
*mailto:nick@cedenco.co.nz*
*www.cedenco.co.nz*

<<RE: Tax balance days>>

3

# EXHIBIT 47

**Wayne Boos**

| | |
|---|---|
| **From:** | Darrell Carlis |
| **Sent:** | Thursday, August 16, 2007 7:12 PM |
| **To:** | Wayne Boos |
| **Subject:** | SK Foods |

Wayne,

Attached is a memo regarding the SK Restructuring. It is a draft. The section on FIN 46 is really just notes at this point that I have assembled. I have not put together a conclusion on that matter yet.

**Darrell L. Carlis**

**Boos & Associates | Firm Director**

Fig Garden Financial Center
5260 North Palm Avenue. Suite 120 | Fresno. California 93704-2216
Direct: 1.559.436-3184 | Main: 1.559.449.7688 | Fax: 1.559.449.1934
E-mail: dcarlis@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

1

Boos & Associates

# Memo

| | |
|---|---|
| Date: | July 24, 2007 |
| To: | SK Foods Tax File |
| Prepared By: | Darrell Carlis |
| Reviewed By: | |
| Subject: | Potential Restructuring of Foreign Entity Ownership |

**Facts**

SK Foods L.P., ("SKLP") a US limited partnership, owns an interest in two foreign entity groups, one located in New Zealand and the other in Australia. See the attached entity chart for a detail of the entity relationships and ownership. Basically the New Zealand group is owned by SK Foods LLC, a Nevada LLC. In turn this entity is owned 99% by SK Foods LP and 1% by Scott Salyer. The Australian group is owned by SK Foods Australia Pty Ltd., an Australian partnership, which in turn is owned 99% by SK Foods LP and 1% by Scott Salyer. For the year ended October 31, 2006 these foreign entities are included in the SKLP consolidated financial statements due to the majority ownership by SKLP. This is required by Accounting Research Bulletin ("ARB ) No. 51. The inclusion of these entities in the financial statement causes additional costs and delays in issuing the financial statements for SKLP. These entities are independent operations from SKLP also (i.e. there are no significant inter-company purchases and sales). However there are loans from SKLP to these entities to fund operations. The bank requires financial statements for SKLP, but doesn't need the operations of the foreign entities included. There would be a cost savings to SKLP and the foreign entities if they were not included in SKLP's financial statements.

**Query**

Is it possible to restructure the foreign entity ownership so they are not longer required to be included in the financial statements of SKLP? Assuming we can get them out consolidation required by ARB 51, would the revised ownership avoid consolidation under Financial Interpretation 46 (R), Consolidation of Variable Interest Entities ("VIEs") even though they may not be owned by SKLP any longer.

**Discussion**

## US Tax Consequences

Since SKLP owns 99% of SK Foods LLC and SK Foods Australia Pty Ltd, those partnership interests could be distributed to the partners of SKLP, namely SKPM Corporation a 55% owner and Scott Salyer a 45% owner.  This would not change the ultimate ownership nor income/loss pass through from these entities.  However it would move the companies out of direct ownership by SKLP.   This should be a tax free transaction from the viewpoint of US taxes.

The general rule on distributions to partners from a partnership, regardless of whether it is a current or liquidating distribution,  is that gain is recognized by that partner only to the extent the amount of money (or the FMV of marketable securities) distributed exceeds the partner's basis in the partnership interest immediately before the distribution [IRC Sec. 731(a)(1); Reg. 1.731-1(a)(1)]. . Receiving property other than money or marketable securities treated as money generally does not trigger gain to the partner unless there is a disproportionate distribution of assets as noted below. This is true even if the value of the property exceeds the partner's basis in his interest. Because of the carryover basis rules, gains on distributed property are deferred until the distributee partner disposes of the property.

Any distribution that is not a liquidating distribution is treated as a current distribution .  If the partner continues to own any interest in the distributing partnership, the distribution is not considered liquidating.   A partner does not recognize gain or loss when the partnership distributes non-cash property unless there is (1) a disproportionate distribution of Section 751 assets, (2) a distribution of contributed property to which IRC Sec. 704(c)(1)(B) applies, (3) a distribution subsequent to a contribution of appreciated property to which IRC Sec. 737 applies (4) a distribution of marketable securities under IRC Sec. 731(c) , or (5) a distribution deemed to be part of a disguised sale transaction. Basically there is no gain or loss on a current distribution unless there is a deemed sale or exchange of assets (where an interest in one asset is exchanged for another).

Since the current proposed distribution would be a pro-rata distribution to the partners in SKLP, Section 751 would not apply.  Section 761(e) treats a distribution of a partnership interest as an exchange for purposes of §708, §743, and any other provision in subchapter K specified in regulations. Regulations have not included §751(a) within the scope of §761(a), notwithstanding that §§743(b) and 751(a) generally were intended to apply in tandem. Without the application of §761(e), a distribution of a lower-tier partnership interest is subject to §751(b).  The Service has only provided limited guidance regarding the distribution of partnership interests, but it is relatively clear that §751(b) should not apply to a distribution of lower-tier partnership interests by an upper-tier partnership that preserves each upper-tier partner's direct or indirect interests in §751(b) property. In that context, §751(b) does not apply by its terms.

For purposes of the basis adjustment rules, any distribution of a partnership interest is treated as an exchange [ IRC Sec. 761(e) ]. Thus, when a partnership distributes an interest in *another* partnership to a partner, the transaction is considered an exchange.

The Code and regulations specifically mention two types of transactions that are included in the definition of a sale or exchange under IRC Sec. 708 : (1) a sale or exchange to another member of the partnership [ Reg. 1.708-1(b)(1)(ii) ], and (2) a distribution of a partnership interest (such as a distribution of a partnership interest by a corporation or partnership) [ IRC Sec. 761(e) ].

The sale or exchange of 50% or more of a partnership's capital and profits interests terminates the partnership for tax purposes. Reg 1.708-1 provides that the old partnership is treated as transferring all of its assets to a new partnership, and then distributing the new partnership's interests in liquidation. Thus, the partnership's basis in its assets is carried over. Any partner with a special basis adjustment in the terminated partnership continues to have a special basis adjustment in the new partnership. The optional basis adjustment will apply to the acquiring partner's share of partnership assets immediately before the deemed distribution. The termination of the partnership terminates the Section 754 election, and the new partnership must make its own Section 754 election, if desired, to apply to any future transfers or distributions.

In the current fact pattern, the distribution of the partnership interest to the partners would cause a 708(b)(1)(b) technical termination.  Some of the consequences of such a termination include:

> The basis of assets carries over to the new partnership

> The holding period of assets carry over

> Fixed asset remaining basis must be depreciated as new property

> A short period return is generally filed for the period up to the change

> New tax accounting elections must be made by the deemed new partnership

> The EIN of the old partnership is retained by the new partnership

A carryover basis rule generally applies to property distributed to a partner other than in liquidation of the partner's entire interest.  The partner's basis of property received in a nontaxable distribution is thus generally the same as the property's adjusted basis to the partnership immediately before the distribution unless the partners basis is less. Therefore the basis of the distributed property is the lesser of the SKLP's basis in the distributed property, or the Partner's remaining outside basis in their partnership interest under IRC Sec. 732(a).

Liabilities associated with the distributed partnership interest should not create problems as the allocation of those will not change. Their may be deemed relief, but the assumption will be in the same amount resulting in no impact.

**US Tax Consequences of Foreign Partnership – SK Australia**

The US rules of partnerships apply to the Foreign partnerships, so the above analysis will be applicable to SKA's restructuring also.

**Foreign Tax Consequences**

Since the ultimate ownership of the Foreign entities will still be the same, one would think that there would be no tax consequences from the transactions in Australia or New Zealand. However, a final determination will need to be made by SKLP's foreign entity's accountants.

A preliminary review of the BNA Tax Management Portfolio indicates that the loss carryovers (if any) would not be lost under the change in ownership rules as the rules look to the ultimate ownership in this situation which would not change.

**FIN 46 (R) Considerations**

Even though the restructuring will remove the foreign entities from under the ownership of SKLP, the rules under FIN 46 must be reviewed to determine if the foreign entities would still be included in the consolidation under that interpretation. Generally FIN 46 provides that financial statements should include the consolidated financial results of all entities in which the reporting interest has a controlling financial interest. It looks beyond majority voting interests to other ways that an entity may have a controlling financial interest. The key to FIN 46 is to determine if the reporting entity has a variable interest in another entity, and whether such interest is will absorb a majority of the that entity's expected losses or expected residual returns. Currently Colusa Canning and SK Aviation are required to be included with SKLP due the rules under FIN 46. An analysis has not been performed for the foreign entities as they are required to be consolidated under ARB 51, due to the majority ownership interest by SKLP. However if the entities are restructured as noted above ARB 51 would not be applicable. Therefore a FIN 46 analysis would be required.

A variable interest is an ownership, contractual, or other pecuniary interest in an entity whose fair value changes with changes in the fair value of the entity's net assets. A variable interest may be explicit or implicit. Examples of explicit variable interests in an entity include an equity interest in the entity, a guarantee of debt, or a loan to the entity. As of October 31, 2006 SKLP has significant loans due from SK Food International ("SKFI") and SK Foods Australia ("SKFA") These loans are considered variable interest because as the assets of the SKFI and SKFA change, it affects the value of the loan

payable to SKLP.  In other words, if the companies lose money, this will affect the companies' credit ratings and thus the loan payable.  Unsecured loans have more inherit risks than secured loans. Unsecured loans are generally subordinate to all other interests except equity making them subject to high risks.  Equity is generally exposed to the greatest amount of risk of loss.

The rules apply to all entities including one member LLC's.  Even though they may be considered a non-entity for income tax purposes, it is a legal entity to which the Interpretation applies.

**Sufficiency of Equity** – If an entity's equity is not sufficient to finance its activities on it own, the entity is considered a VIE because it is assumed it must rely on another party for financial support. The sufficiency of equity can be demonstrated using any of the qualitative or quantitative methods:

> **Qualitative Methods**
>
> Non-recourse Financing method – the entity can obtain non-recourse, investment grade financing from an unrelated party, without additional subordinated financial support.
>
> Similar Entity Method – the entity has as much equity as a similar entity that finances it operations with no additional subordinated financial support.
>
> Other facts and circumstances method- based on other facts and circumstances, the entity demonstrated that it can finance it activities without additional subordinated financial support.
>
> **Quantitative Methods**
>
> Expected Losses method – the entity's equity is greater that it's expected losses.

Equity is defined to include all equity interests that are required to be reported as equity in the entity's financial statements (equity is based on GAAP).  There is a threshold test called the 10% equity rule.  Equity below 10% of total assets presumes that equity is not sufficient without additional financial support.  The 10% test is not very meaningful because even if it exceeds 10%, one of the tests above must still be met.

It should be noted that even if an entity passes the sufficiency of equity method, it may still be considered a VIE based on other factors (i.e. equity holders lack typical characteristics such as decision making abilities, do not absorb losses, etc.).

**Nick Frankish Questions**

Tax balance dates

Currently we have tax balance date of December 31 in the NZ and Australian entities, in line with US entities. As this is different from our book balance date it creates a very substantial extra workload for no benefit. I have spoken to Wayne Boos on changing this in NZ/Aust to match book. He is ok with this as long as we can provide info required for the US returns for December (email attached). We would like your signoff to proceed with a change in tax balance date.

This is not a problem, we will still have to report under the US rules for the entities which means we will be reporting on a calendar year due to the owner's tax year ends.

Book balance dates / change in ownership structures

We have heard from Scott/ David that SKF is looking to change its balance dates to June 30, and to separate the ownership of the NZ/Aust subsidiaries from SKF to a Scott Salyer trust. Can you confirm the position here and for our understanding advise the background for these changes. From the NZ/Aust perspective we need to consider the impact of these changes, and whether we should also align to the same book balance date. I don't think the change in ownership will affect NZ/Aust entities.

Right now we are not proposing a change in the ultimate ownership of the entities, just moving them up one level.  From my reading this should not impact any loss carryforwards.

Restructure Australian entities

This structure needs review as it was setup when CAP had 2 separate owners with 1 based in NZ and 1 based in Aust. Now it is all owned by SKF. Currently there are 2 holding companies and 1 operating entity. SKFA owns 50% of CAP and owns 100% of CJVA. CJVA also owns 50% of CAP. CAP is a partnership and is the operating entity.

We *have consulted with Deloitte* and propose that we liquidate CJVA, the impact is that CAP folds into SKFA and SKFA becomes the only remaining entity and the operating entity (trading as Cedenco Australia).

This provides massive savings for us in costs of compliance, audits, tax, and overall management time. It can also be achieved prior to our next book balance day. We would like your signoff to proceed with this rationalisation. We will also need Banks to consent.

There is no trigger of US taxes on this transaction since the entities being rolled up are Disregarded for US purposes and are essentially considered a subsidiary of SKA anyways.

Transfer Pricing

The intercompany loans between SKF and SKFA / CAP (loans up and loans back) provide some transfer pricing issues in Australia. Specifically there is a USD5.5m loan from CAP to SKF, and a USD11m loan from SKF to SKFA. We see benefit in only having one nett loan from SKFA to SKF of USD5.5m.

I don't see this creating any US income tax issues on this matter.  They would just need an agreement to offset the loans.

# EXHIBIT 48

## Wayne Boos

**From:**      Scott Salyer <scotts@skfoods.com>
**Sent:**      Tuesday, August 21, 2007 12:27 PM
**To:**        Wayne Boos
**Subject:**   RE: Intercompany accounts

Unacceptable ..

SS

**From:** Wayne Boos [mailto:wboos@booscpa.com]
**Sent:** Tuesday, August 21, 2007 9:39 AM
**To:** Scott Salyer
**Subject:** RE: Intercompany accounts

One additional option they brought up today is do an audit for SK with qualified opinion, leaving out foreign entities. They stated Harris bought off for $500m company leaving off $100 subs. However, still some additional analysis that would need to be done for audit, but not nearly what we are doing now.

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 | Fresno, California 93704
Phone (Main): 1.559.449-7688 | Phone (Direct): 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Scott Salyer [mailto:scotts@skfoods.com]
**Sent:** Tuesday, August 21, 2007 9:03 AM
**To:** Wayne Boos
**Subject:** RE: Intercompany accounts

Let me discuss with Mark but equity would be held by SK , leaving them in the audit trail ..

Mark is researching Fin 46 from Washington experts to get the correct read and opinion .

SK is not going to write off investment ,as suggested by MA ( due to NZ loosing $ for 1 yr ) .

Scott

1

**From:** Wayne Boos [mailto:wboos@booscpa.com]
**Sent:** Tuesday, August 21, 2007 8:05 AM
**To:** Scott Salyer; Mark McCormick; David Hay
**Cc:** Shondale Seymour
**Subject:** RE: Intercompany accounts

Scott, would it be an option to convert some or all of the SKI/SKA debt to equity prior to the spin off. I am not suggesting, just want to see if this is even a possibility from SK's standpoint.

Wayne

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 : Fresno, California 93704
Phone (Main): 1.559.449-7688 | Phone (Direct). 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Scott Salyer [mailto:scotts@skfoods.com]
**Sent:** Monday, August 20, 2007 9:01 PM
**To:** Wayne Boos; Mark McCormick; David Hay
**Cc:** Shondale Seymour
**Subject:** RE: Intercompany accounts

I'll just change auditors !!

They can run that up their pole ,,,

Scott

**From:** Wayne Boos [mailto:wboos@booscpa.com]
**Sent:** Monday, August 20, 2007 8:09 PM
**To:** Scott Salyer
**Cc:** Shondale Seymour
**Subject:** RE: Intercompany accounts

Scott,

2

Shondale, Nick and I had good meeting today. We spent most of afternoon discussing your favorite topic FIN 46 consolidation with Moss Adams. We have another call in am to discuss a different possible approach with partner. A few options at this point.

1. Distribute ownership of foreign entities to Scott/SKPM (prorata). This should be non-taxable. Leave intercompany debt from SKI/SKA on SK Foods books. This will provide for continuation of "double-dip" interest expense strategy in NZ/AUS. However, appears MA leaning towards requiring FIN 46 consolidation, due to current thin capitalization of NZ group (primarily due to recent losses). Although still pursuing this option as likely best scenario.

2. Distribute ownership same as in 1, however prior to distribution convert some (amount to be determined) of debt to equity. Assuming we convert enough debt to satisfy MA we may avoid FIN 46. However, tax cost in permanent lost tax interest expense deduction in NZ and Australia debt forgiven. ALso may impact SK's ongoing balance sheet as reduced receivable from SKI/SKA.

3. Distribute ownership same as in 1 yet have Scott assume SKI/SKA note from SK Foods. So SK end up with note from Scott. MA thinks may get out of FIN 46 issue but they need to think about and run up flag pole, thus basis for our call tommorrow. However, they also stated would need to audit collectibility of receivable from Scott which may entail looking at other entities, personal etc. Similiar possibilty if Scott were to buy ownership from SK, yet MA may need formal valuation.

4. Have SKI/SKA payback all our some of debt (to extent necessary to satisfy FIN 46 issues).

4. Obtain refinancing for SKI/SKA note from outside parties.

5. Continue same course. Leave foreign entities in SK consolidated group.

We will now more in morning based upon our call. In the meantime if any comments re: the above please advise.

Wayne

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue. Suite 120 ¡ Fresno, California 93704
Phone (Main): 1.559.449-7688 | Phone (Direct): 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Scott Salyer [mailto:scotts@skfoods.com]
**Sent:** Monday, August 20, 2007 11:58 AM
**To:** Wayne Boos; Shondale Seymour; David Hay
**Cc:** Terry Andersen; Darrell Carlis
**Subject:** RE: Intercompany accounts

3

Wayne

Please send me a report on today's progress .
We need time lines for all parties to follow .

Scott

4

# EXHIBIT 49

| | |
|---|---|
| **From:** | Scott Salyer <scott@first organization.com> |
| **Sent:** | Wednesday, August 29, 2007 9:22 AM |
| **To:** | Wayne Boos <wboos@booscpa.com>; 'mmccormick@fnhfarms.com'; Mark McCormick <markmc@skfoods.com>; gary@garyperrylaw.com |
| **Subject:** | RE: Assest Transfer Documents |

Wayne

I will destroy Cedenco documents , they have been distributed to MA and others .
You , Nick and Gary were supposed to have approved documents .

This is unacceptable to have me sign them and then at a later date say they should be destroyed .

Have you informed Gary that you No longer approve documents or did you even look at them before they we sent for signature ?

Fix this asap or I'll go elsewhere ,,,,,,,,

Scott

**From:** Wayne Boos [mailto:wboos@booscpa.com]
**Sent:** Wednesday, August 29, 2007 8:58 AM
**To:** Scott Salyer
**Cc:** gary@garyperrylaw.com; Shondale Seymour; Jeanne Johnston
**Subject:** FW: Assest Transfer Documents

Scott, the attached document related to foreign entities needs to be revised. As reflected THIS IS TAXABLE. I had anticipated a pro-rata spin off to each member of SK (you and SKPM). This was my email last week. Please destroy all documents related to this. These will need to be revised.

Note that the Blackstone documents are fine.

Let me know if any questions or comments.

Wayne

**Wayne W. Boos CPA**
_____

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 | Fresno, California 93704
Phone (Main): 1.559.449.7688 | Phone (Direct): 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any

**SHARP_CH15 000275**

# EXHIBIT 50

| From: | Wayne Boos <wboos@booscpa.com> |
|---|---|
| Sent: | Wednesday, August 29, 2007 8:58 AM |
| To: | Scott Salyer <scotts@skfoods.com> |
| Cc: | gary@garyperrylaw.com; Shondale Seymour <ShondaleS@skfoods.com>; Jeanne Johnston <jeanne.johnston@skfoods.com> |
| Subject: | FW: Assest Transfer Documents |
| Attach: | Asset Transfers 8-27-07.pdf |

Scott, the attached document related to foreign entities needs to be revised. As reflected THIS IS TAXABLE. I had anticipated a pro-rata spin off to each member of SK (you and SKPM). This was my email last week. Please destroy all documents related to this. These will need to be revised.

Note that the Blackstone documents are fine.

Let me know if any questions or comments.

Wayne

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 | Fresno, California 93704
Phone (Main): 1.559.449-7688 | Phone (Direct): 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**SHARP_CH15 000268**

# EXHIBIT 51

| From: | Scott Salyer <scott@first organization.com> |
|---|---|
| Sent: | Thursday, September 13, 2007 6:31 PM |
| To: | Dan Nutley <Dan.Nutley@mossadams.com>; Mark McCormick <markmc@skfoods.com> |
| Subject: | RE: Making Cendenco not subject to FIN46R |

This won't work ..

Try again , can't drop equity by $ 37 m

SS

**From:** Dan Nutley [mailto:Dan.Nutley@mossadams.com]
**Sent:** Thursday, September 13, 2007 4:33 PM
**To:** Mark McCormick; Scott Salyer
**Subject:** Making Cendenco not subject to FIN46R

The simplest way to make Cedenco not subject to FIN46R is to distribute both SKFLP's Notes Receivable and Stock investment in the Cedenco entities to the partners. This is not a practical solution because we understand it leads to a significant tax liability.

We have developed another idea to accomplish the same thing. It is consistent the original proposal of SKFLP selling the Cedenco related assets to Scott.

Consider SKFLP distributing the Cedenco stock to the partners. Hopefully there is enough basis to make this a nontaxable event.

Then SKFLP would sell the Notes Receivable to the partners in exchange for Notes Receivable from the partners. Suggest the Notes Receivable would be reported like a stockholder receivable in a corporation and classified as a contra to partner's equity. This classification would reduce an auditors need to be intrusive into the partners financial position.

To simplify financial reporting for the eight months ended June 30, 2007 suggest all this be made effective November 1, 2006. This would eliminate including Cedenco in the income statement.

Attached is a proforma consolidating balance sheet as if this had been done at 10/31/06. This is unique structure and will take some consideration by all parties.

If this is interesting to you we will need to involve tax and legal counsel.

Look forward to your thoughts.

Dan

Dan Nutley
Partner
Moss Adams, LLP
Office: 209 955 6108
Cell: 209 481 0631
dan.nutley@mossadams.com

CONFIDENTIALITY NOTICE: This email and any attachments are for the sole use of the intended recipient(s) and contain information that may be confidential and/or legally privileged. If you have received this email in error, please notify the sender by reply email and delete the message. Any disclosure, copying, distribution or use of this communication by someone other than the intended recipient is prohibited.

SHARP_CH15 000280

# EXHIBIT 52

**From:**     Scott Salyer <scott@first organization.com>
**Sent:**     Friday, September 14, 2007 7:09 AM
**To:**     Dan Nutley <Dan.Nutley@mossadams.com>; Mark McCormick
     <markmc@skfoods.com>
**Subject:**     RE: Making Cendenco not subject to FIN46R

They are not relying on it But distributing out over a third of equity is not what they had in mind ..

Can't see how a qualified opinion works either ..

SS

---

**From:** Dan Nutley [mailto:Dan.Nutley@mossadams.com]
**Sent:** Friday, September 14, 2007 5:47 AM
**To:** Scott Salyer; Mark McCormick
**Subject:** RE: Making Cendenco not subject to FIN46R

Sorry.

We have been told the banks do not rely on the foreign investments and in fact prefer financial statements without the foreign subsidiaries consolidated. In another situation we considered the banks specifying in their loan agreements they want financial statements in accordance with generally accepted accounting except for application of FIN46R to the foreign subsidiaries and making the audit report in accordance with GAAP as requested by the lenders. The client elected to have an "except for FIN46R" audit report instead, so we never finished the analysis  Is this option of a report based on GAAP as specified in lending agreements an option to pursue?  Can't be sure it would work without further analysis than we did for the other client.

Dan

Dan Nutley
Partner
Moss Adams, LLP
Office: 209 955 6108
Cell: 209 481 0631
dan.nutley@mossadams.com

---

**From:** Scott Salyer [mailto:scotts@skfoods.com]
**Sent:** Thursday, September 13, 2007 6:31 PM
**To:** Dan Nutley; Mark McCormick
**Subject:** RE: Making Cendenco not subject to FIN46R

This won't work ..

Try again , can't drop equity by $ 37 m

SS

---

**From:** Dan Nutley [mailto:Dan.Nutley@mossadams.com]
**Sent:** Thursday, September 13, 2007 4:33 PM
**To:** Mark McCormick; Scott Salyer
**Subject:** Making Cendenco not subject to FIN46R

The simplest way to make Cedenco not subject to FIN46R is to distribute both SKFLP's Notes Receivable and Stock investment in the Cedenco entities to the partners.  This is not a practical solution because we understand

SHARP_CH15 000281

it leads to a significant tax liability.

We have developed another idea to accomplish the same thing.  It is consistent the original proposal of SKFLP selling the Cedenco related assets to Scott.

Consider SKFLP distributing the Cedenco stock to the partners.  Hopefully there is enough basis to make this a nontaxable event.

Then SKFLP would sell the Notes Receivable to the partners in exchange for Notes Receivable from the partners.  Suggest the Notes Receivable would be reported like a stockholder receivable in a corporation and classified as a contra to partner's equity.  This classification would reduce an auditors need to be intrusive into the partners financial position.

To simplify financial reporting for the eight months ended June 30, 2007 suggest all this be made effective November 1, 2006.  This would eliminate including Cedenco in the income statement.

Attached is a proforma consolidating balance sheet as if this had been done at 10/31/06.  This is unique structure and will take some consideration by all parties.

If this is interesting to you we will need to involve tax and legal counsel.

Look forward to your thoughts.

Dan

Dan Nutley
Partner
Moss Adams, LLP
Office: 209 955 6108
Cell: 209 481 0631
dan.nutley@mossadams.com

**CONFIDENTIALITY NOTICE:**  This email and any attachments are for the sole use of the intended recipient(s) and contain information that may be confidential and/or legally privileged.  If you have received this email in error, please notify the sender by reply email and delete the message.  Any disclosure, copying, distribution or use of this communication by someone other than the intended recipient is prohibited.

**CONFIDENTIALITY NOTICE:**  This email and any attachments are for the sole use of the intended recipient(s) and contain information that may be confidential and/or legally privileged.  If you have received this email in error, please notify the sender by reply email and delete the message.  Any disclosure, copying, distribution or use of this communication by someone other than the intended recipient is prohibited.

SHARP_CH15 000282

# EXHIBIT 53

## AMENDED AND RESTATED SECURITY AGREEMENT

This Amended and Restated Security Agreement (the *"Agreement"*) is dated as of September 28, 2007, among SK Foods, L.P., a California limited partnership (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"* and, individually, a *"Borrower"*), and the other parties executing this Agreement under the heading *"Debtors"* (the Borrowers and such other parties, along with any parties who execute and deliver to the Agent an agreement substantially in the form attached hereto as Schedule G, being hereinafter referred to collectively as the *"Debtors"* and individually as a *"Debtor"*), each with its mailing address as set forth in Section 14(b) below, and Bank of Montreal, a chartered bank of Canada (*"BMO"*), with its mailing address as set forth in Section 14(b) below, acting as administrative agent hereunder for the Secured Creditors hereinafter identified and defined (BMO acting as such administrative agent and any successor or successors to BMO acting in such capacity being hereinafter referred to as the *"Agent"*).

## PRELIMINARY STATEMENTS

A.    The Borrowers, the other Debtors, BMO, individually and as Agent, and such other Lenders (as defined below) have entered into an Amended and Restated Credit Agreement dated as of September 28, 2007 (such Amended and Restated Credit Agreement, as the same may be amended or modified from time to time, including amendments and restatements thereof in its entirety, being hereinafter referred to as the *"Credit Agreement"*), pursuant to which BMO and other banks and financial institutions and letter of credit issuers from time to time party to the Credit Agreement (BMO, in its individual capacity, and such other banks and financial institutions being hereinafter referred to collectively as the *"Lenders"* and individually as a *"Lender"* and such letter of credit issuers being hereinafter referred to collectively as the *"L/C Issuers"* and individually as an *"L/C Issuer"*) have agreed, subject to certain terms and conditions, to extend credit and make certain other financial accommodations available to the Borrowers (the Agent, the L/C Issuers, and the Lenders, together with affiliates of the Lenders with respect to Hedging Liability and Funds Transfer and Deposit Account Liability referred to below, being hereinafter referred to collectively as the *"Secured Creditors"* and individually as a *"Secured Creditor"*).

B.    In addition, one or more of the Debtors may from time to time be liable to the Lenders and/or their affiliates with respect to Hedging Liability and/or Funds Transfer and Deposit Account Liability (as such terms are defined in the Credit Agreement).

C.    The Borrowers and certain of their subsidiaries, as Debtors, heretofore executed and delivered to the Agent that certain Security Agreement dated as of November 1, 2006 (such Security Agreement, as the same has been amended and supplemented, being hereinafter referred to as the *"Prior Security Agreement"*) pursuant to which certain Debtors granted the Agent a lien on and continuing security interest in certain personal property of such Debtors described therein as collateral security for, among other things, (i) all indebtedness, obligations and liabilities of

2311261.01.07.doc
1627843

the Debtors under that certain Credit Agreement dated as of November 1, 2006, as amended from time to time (the *"Prior Credit Agreement"*), by and among the Borrowers, the guarantors party thereto, BMO, individually and as agent and the lenders party thereto, and (ii) all Hedging Liability and Funds Transfer and Deposit Account Control Account Liability (as such terms are defined therein);

D.    As a condition to extending credit or otherwise making financial accommodations available to or for the account of the Borrowers under the Credit Agreement, the Secured Creditors require, among other things, that each Debtor grant to the Agent for the benefit of the Secured Creditors a lien on and security interest in the personal property and fixtures of such Debtor described herein subject to the terms and conditions hereof; and , in connection therewith, that the Prior Security Agreement be amended and restated in its entirety to read as set forth in this Agreement.

E.    SK Foods owns, directly or indirectly, equity interests in each other Debtor (other than Colusa Canning) and SK Foods provides each of the other Debtors with financial, management, administrative, and technical support which enables such Debtors to conduct their businesses in an orderly and efficient manner in the ordinary course.

F.    Each Debtor will benefit, directly or indirectly, from credit and other financial accommodations extended by the Secured Creditors to the Borrowers.

NOW, THEREFORE, for good and valuable consideration, receipt whereof is hereby acknowledged, the parties hereto agree as follows:

*Section 1.    Terms defined in Credit Agreement.*  Except as otherwise provided in Section 2 below, all capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.  The term "Debtor" and "Debtors" as used herein shall mean and include the Debtors collectively and also each individually, with all grants, representations, warranties, and covenants of and by the Debtors, or any of them, herein contained to constitute joint and several grants, representations, warranties, and covenants of and by the Debtors; *provided, however,* that unless the context in which the same is used shall otherwise require, any grant, representation, warranty or covenant contained herein related to the Collateral shall be made by each Debtor only with respect to the Collateral owned by it or represented by such Debtor as owned by it.

*Section 2.    Grant of Security Interest in the Collateral.*  As collateral security for the Secured Obligations defined below, each Debtor hereby grants to the Agent for the benefit of the Secured Creditors a lien on and security interest in, and right of set-off against, and acknowledges and agrees that the Agent has and shall continue to have for the benefit of the Secured Creditors a continuing lien on and security interest in, and right of set-off against, all right, title, and interest of each Debtor, whether now owned or existing or hereafter created, acquired or arising, in and to all of the following:

(a)    Accounts;

BMO 001339

(b)     Chattel Paper;

(c)     Instruments (including Promissory Notes);

(d)     Documents;

(e)     General Intangibles (including Payment Intangibles and Software, patents, trademarks, tradestyles, copyrights, and all other intellectual property rights, including all applications, registration, and licenses therefor, and all goodwill of the business connected therewith or represented thereby);

(f)     Letter-of-Credit Rights;

(g)     Supporting Obligations;

(h)     Deposit Accounts;

(i)     Investment Property (including certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts);

(j)     Inventory;

(k)     Equipment (including all software, whether or not the same constitutes embedded software, used in the operation thereof);

(l)     Fixtures;

(m)     Commercial Tort Claims (as described on Schedule F hereto or on one or more supplements to this Agreement);

(n)     Rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which is represented by, arises from, or relates to any of the foregoing;

(o)     Monies, personal property, and interests in personal property of such Debtor of any kind or description now held by any Secured Creditor or at any time hereafter transferred or delivered to, or coming into the possession, custody or control of, any Secured Creditor, or any agent or affiliate of any Secured Creditor, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

(p)     Supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of such Debtor to retrieve the same from

BMO 001340

third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained;

      (q)    Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and

      (r)    Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing being herein sometimes referred to as the *"Collateral"; provided, however,* in the absence of an Event of Default that has occurred and is continuing, liens on the Voting Stock of Foreign Subsidiaries shall not be perfected. All terms which are used in this Agreement which are defined in the Uniform Commercial Code of the State of Illinois as in effect from time to time *("UCC")* shall have the same meanings herein as such terms are defined in the UCC, unless this Agreement shall otherwise specifically provide. For purposes of this Agreement, the term (a) *"Receivables"* means all rights to the payment of a monetary obligation, whether or not earned by performance, and whether evidenced by an Account, Chattel Paper, Instrument, General Intangible, or otherwise, and (b) *"Subsidiary Interests"* means all equity interests held by such Debtor in its subsidiaries, whether such equity interests constitute Investment Property or General Intangibles under the UCC.

      *Section 3.    Secured Obligations.* This Agreement is made and given to secure, and shall secure, the prompt payment and performance of (a) any and all indebtedness, obligations, and liabilities of the Debtors, and of any of them individually, to the Secured Creditors, and to any of them individually, under or in connection with or evidenced by the Credit Agreement or any other Loan Documents, including, without limitation, all obligations evidenced by the Notes of the Borrowers or any one of them heretofore or hereafter issued under the Credit Agreement, all obligations of the Borrowers or any of them to reimburse the Secured Creditors for the amount of all drawings on all Letters of Credit issued pursuant to the Credit Agreement and all other obligations of the Borrowers or any one of them under all Applications for Letters of Credit, all obligations of the Debtors, and of any of them individually, with respect to any Hedging Liability, all obligations of the Debtors, and of any of them individually, with respect to any Funds Transfer and Deposit Account Liability, and all obligations of the Debtors, and of any of them individually, arising under any guaranty issued by it relating to the foregoing or any part thereof, in each case whether now existing or hereafter arising (and whether arising before or after the filing of a petition in bankruptcy and including all interest accrued after the petition date), due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired and (b) any and all expenses and charges, legal or otherwise, suffered or incurred by the Secured Creditors, and any of them individually, in collecting or enforcing any of such indebtedness, obligations, and liabilities or in realizing on or protecting or preserving any security therefor, including, without limitation, the lien and security interest granted hereby (all of the indebtedness, obligations, liabilities, expenses, and charges described above being hereinafter referred to as the *"Secured Obligations"*). Notwithstanding anything in this

Agreement to the contrary, the right of recovery against any Debtor under this Agreement (other than the Borrowers to which this limitation shall not apply) shall not exceed $1.00 less than the lowest amount that would render such Debtor's obligations under this Agreement void or voidable under applicable law, including fraudulent conveyance law.

Section 4.    *Covenants, Agreements, Representations and Warranties*.   The Debtors hereby covenant and agree with, and represent and warrant to, the Secured Creditors that:

(a)    Each Debtor is duly organized and validly existing in good standing under the laws of the jurisdiction of its organization. Each Debtor is the sole and lawful owner of its Collateral, and has full right, power, and authority to enter into this Agreement and to perform each and all of the matters and things herein provided for. The execution and delivery of this Agreement, and the observance and performance of each of the matters and things herein set forth, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Debtor or any provision of any Debtor's organizational documents (*e.g.*, charter, articles or certificate of incorporation and bylaws, articles or certificate of formation or organization and limited liability company operating agreement, partnership agreement or similar organizational documents) or any covenant, indenture or agreement of or affecting any Debtor or any of its property or (ii) result in the creation or imposition of any lien or encumbrance on any property of any Debtor except for the lien and security interest granted to the Agent hereunder. Each Debtor's organizational registration number (if any) is set forth under its name under Column 1 on Schedule A.

(b)    Each Debtor's respective chief executive office is at the location listed under Column 2 on Schedule A attached hereto opposite such Debtor's name; and such Debtor has no other executive offices or places of business other than those listed under Column 3 on Schedule A attached hereto opposite such Debtor's name. The Collateral owned or leased by such Debtor is and shall remain in such Debtor's possession or control at the locations listed under Columns 2 and 3 on Schedule A attached hereto opposite such Debtor's name (collectively for each Debtor, the *"Permitted Collateral Locations"*). If for any reason any Collateral is at any time kept or located at a location other than a Permitted Collateral Location, the Agent shall nevertheless have and retain a lien on and security interest therein. The Debtors own and shall at all times own all Permitted Collateral Locations except to the extent otherwise disclosed under Columns 2 and 3 on Schedule A. No Debtor shall move its chief executive office or maintain a place of business at a location other than those specified under Columns 2 or 3 on Schedule A or permit the Collateral to be located at a location other than a Permitted Collateral Location, in each case without first providing the Agent 30 days prior written notice of such Debtor's intent to do so; *provided* that each Debtor shall at all times maintain its chief executive office, and unless otherwise specifically agreed to in writing by the Agent, Permitted Collateral Locations in the United States of America and, with respect to any new chief executive office on place of business or location of Collateral such Debtor shall have taken all action requested by the Agent to maintain the lien and security interest of the Agent in the Collateral at all times fully perfected and in full force and effect.

BMO 001342

(c)     Each Debtor's legal name and jurisdiction of organization is correctly set forth under Column 1 on Schedule A of this Agreement.  No Debtor has transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule B attached hereto.  No Debtor shall change its jurisdiction of organization without the Agent's prior written consent.  No Debtor shall change its legal name or transact business under any other trade name without first giving 30 days' prior written notice of its intent to do so to the Agent.

(d)     The Collateral and every part thereof is and shall be free and clear of all security interests, liens (including, without limitation, mechanics', laborers' and statutory liens), attachments, levies, and encumbrances of every kind, nature, and description and whether voluntary or involuntary, except for the lien and security interest of the Agent therein and other Liens permitted by Section 8.8 of the Credit Agreement (herein, the *"Permitted Liens"*).  Each Debtor shall warrant and defend the Collateral against any claims and demands of all persons at any time claiming the same or any interest in the Collateral adverse to any of the Secured Creditors.

(e)     Each Debtor shall promptly pay when due all taxes, assessments, and governmental charges and levies upon or against such Debtor or any of the Collateral, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith by appropriate proceedings which prevent attachment of any lien resulting therefrom to, foreclosure on or other realization upon any of the Collateral and preclude interference with the operation of such Debtor's business in the ordinary course and such Debtor shall have established adequate reserves therefor.

(f)     No Debtor shall use, manufacture, sell or distribute any Collateral in violation of any statute, ordinance or other governmental requirement. No Debtor shall waste or destroy the Collateral or any part thereof or be negligent in the care of use of any Collateral. Each Debtor shall perform in all material respects its obligations under any contract or other agreement constituting part of the Collateral, it being understood and agreed that the Secured Creditors have no responsibility to perform such obligations.

(g)     Subject to Sections 5(c), 6(a), 7(b), 7(c), and 8(c) hereof and the terms of the Credit Agreement (including, without limitation, Section 8.10 thereof), no Debtor shall, without the Agent's prior written consent, sell, assign, mortgage, lease, or otherwise dispose of the Collateral or any interest therein.

(h)     Each Debtor will insure its Collateral consisting of tangible personal property against such risks and hazards as other companies similarly situated insure against, and including in any event loss or damage by fire, theft, burglary, pilferage, and loss in transit in amounts and under policies containing loss payable clauses to the Agent as its interest may appear (and, if the Agent requests, naming the Agent as additional insureds therein) by insurers reasonably acceptable to the Agent. All premiums on such insurance shall be paid by the Debtors and the policies of such insurance (or certificates

-6-

therefore) delivered to the Agent. All insurance required hereby shall provide that any loss shall be payable notwithstanding any act or negligence of the relevant Debtor, shall provide that no cancellation thereof shall be effective until at least 30 days after receipt by the relevant Debtor and the Agent of written notice thereof, and shall be reasonably satisfactory to the Agent in all other respects. In case of any material loss, damage to or destruction of the Collateral or any part thereof, the relevant Debtor shall promptly give written notice thereof to the Agent generally describing the nature and extent of such damage or destruction. In case of any loss, damage to or destruction of the Collateral or any part thereof, the relevant Debtor, whether or not the insurance proceeds, if any, received on account of such damage or destruction shall be sufficient for that purpose, at such Debtor's cost and expense, will promptly repair or replace the Collateral so lost, damaged, or destroyed, except to the extent such Collateral, is not necessary to the conduct of such Debtor's business in the ordinary course. In the event any Debtor shall receive any proceeds of such insurance, such Debtor shall immediately pay over such proceeds of insurance to the Agent which will thereafter be applied to the reduction of the Secured Obligations (whether or not then due) or held as collateral security therefor, as the Agent may then determine or as otherwise provided for in the Credit Agreement; *provided, however,* that the Agent agrees to release such insurance proceeds to the relevant Debtor for replacement or restoration of the portion of the Collateral lost, damaged or destroyed if, but only if, (i) at the time of release no Default or Event of Default exists, (ii) written application for such release is received by the Agent from the relevant Debtor within 30 days of the receipt of such proceeds, and (iii) the Agent has received evidence reasonably satisfactory to it that the collateral lost, damaged or destroyed has been or will be replaced or restored to its condition immediately prior to the loss, destruction or other event giving rise to the payment of such insurance proceeds. Each Debtor hereby authorizes the Agent, at the Agent's option, to adjust, compromise, and settle any losses under any insurance afforded at any time after the occurrence and during the continuation of any Default or Event of Default, and such Debtor does hereby irrevocably constitute the Agent, its officers, agents, and attorneys, as such Debtor's attorneys-in-fact, with full power and authority after the occurrence and during the continuation of any Default or Event of Default to effect such adjustment, compromise, and/or settlement and to endorse any drafts drawn by an insurer of the Collateral or any part thereof and to do everything necessary to carry out such purposes and to receive and receipt for any unearned premiums due under policies of such insurance. Unless the Agent elects to adjust, compromise, or settle losses as aforesaid, any adjustment, compromise, and/or settlement of any losses under any insurance shall be made by the relevant Debtor subject to final approval of the Agent (regardless of whether or not an Event of Default shall have occurred) in the case of losses exceeding $50,000. All insurance proceeds shall be subject to the lien and security interest of the Agent hereunder.

UNLESS THE DEBTORS PROVIDE THE AGENT WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THIS AGREEMENT, THE AGENT MAY PURCHASE INSURANCE AT THE DEBTORS' EXPENSE TO PROTECT THE AGENT'S INTERESTS IN THE COLLATERAL. THIS INSURANCE MAY, BUT NEED NOT, PROTECT ANY INTERESTS IN THE COLLATERAL. THE COVERAGE PURCHASED BY THE AGENT MAY NOT PAY ANY CLAIMS THAT ANY

BMO 001344

DEBTOR MAKES OR ANY CLAIM THAT IS MADE AGAINST SUCH DEBTOR IN CONNECTION WITH THE COLLATERAL. THE DEBTORS MAY LATER CANCEL ANY SUCH INSURANCE PURCHASED BY THE AGENT, BUT ONLY AFTER PROVIDING THE AGENT WITH EVIDENCE THAT THE DEBTORS HAVE OBTAINED INSURANCE AS REQUIRED BY THIS AGREEMENT. IF THE AGENT PURCHASES INSURANCE FOR THE COLLATERAL, THE DEBTORS WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AND ANY OTHER CHARGES THAT THE AGENT MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE SECURED OBLIGATIONS SECURED HEREBY. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE THE DEBTORS MAY BE ABLE TO OBTAIN ON THEIR OWN.

      (i)     Each Debtor will at all times allow the Secured Creditors and their respective representatives free access to and right of inspection of the Collateral at such reasonable times and intervals as the Agent or any other Secured Creditor may designate and, in the absence of any existing Default or Event of Default, with reasonable prior written notice to the relevant Debtor.

      (j)     If any Collateral is in the possession or control of any agents or processors and the Agent so requests, such Debtor agrees to notify such agents or processors in writing of the Agent's lien and security interest therein and instruct them to hold all such Collateral for the Agent's account and subject to the Agent's instructions. Each Debtor shall, upon the request of the Agent, authorize and instruct all bailees and other parties, if any, at any time processing, labeling, packaging, holding, storing, shipping, or transferring all or any part of the Collateral to permit the Secured Creditors and their respective representatives to examine and inspect any of the Collateral then in such party's possession and to verify from such party's own books and records any information concerning the Collateral or any part thereof which the Secured Creditors or their respective representatives may seek to verify. As to any premises not owned by a Debtor wherein any of the Collateral is located, the relevant Debtor shall, at the Agent's request, cause each party having any right, title or interest in, or lien on, any of such premises to enter into an agreement (any such agreement to contain a legal description of such premises) whereby such party disclaims any right, title and interest in, and lien on, the Collateral and allows the removal of such Collateral by the Agent and is otherwise in form and substance acceptable to the Agent.

      (k)     Each Debtor agrees from time to time to deliver to the Agent such evidence of the existence, identity, and location of the Collateral and of its availability as collateral security pursuant hereto (including, without limitation, schedules describing all Receivables created or acquired by such Debtor, copies of customer invoices or the equivalent and original shipping or delivery receipts for all merchandise and other goods sold or leased or services rendered by it, together with such Debtor's warranty of the genuineness thereof, and reports stating the book value of its Inventory and Equipment by major category and location), in each case as the Agent may request. The Agent shall have the right to verify all or any part of the Collateral in any manner, and through any

BMO 001345

medium, which the Agent considers appropriate (including, without limitation, the verification of Collateral by use of a fictitious name), and each Debtor agrees to furnish all assistance and information, and perform any acts, which the Agent may require in connection therewith. Each Debtor shall promptly notify the Agent of any Collateral which such Debtor has determined to have been rendered obsolete, stating the prior book value of such Collateral, its type and location.

(l)    Each Debtor shall comply in all material respects with the terms and conditions of all leases, easements, right-of-way agreements, and other similar agreements binding upon such Debtor or affecting the Collateral or any part thereof, and all orders, ordinances, laws, and statutes of any city, state, or other governmental entity, department, or agency having jurisdiction with respect to the premises wherein such Collateral is located or the conduct of business thereon.

(m)    Schedule C attached hereto contains a true, complete, and current listing of all patents, trademarks, tradestyles, copyrights, and other intellectual property rights (including all registrations and applications therefor) owned by each of the Debtors as of the date hereof that are registered with any governmental authority. The Debtors shall promptly notify the Agent in writing of any additional intellectual property rights acquired or arising after the date hereof, and shall submit to the Agent a supplement to Schedule C to reflect such additional rights (provided any Debtor's failure to do so shall not impair the Agent's security interest therein). Each Debtor owns or possesses rights to use all franchises, licenses, patents, trademarks, trade names, tradestyles, copyrights, and rights with respect to the foregoing which are required to conduct its business. No event has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any such rights, and the Debtors are not liable to any person for infringement under applicable law with respect to any such rights as a result of its business operations.

(n)    Schedule F attached hereto contains a true, complete and current listing of all Commercial Tort Claims held by the Debtors as of the date hereof, each described by referring to a specific incident giving rise to the claim. Each Debtor agrees to execute and deliver to the Agent an agreement in the form attached hereto as Schedule H, or in such other form reasonably acceptable to the Agent, promptly upon becoming aware of any Commercial Tort Claim of such Debtor arising after the date hereof (provided any Debtor's failure to do so shall not impair the Agent's security interest therein).

(o)    Each Debtor agrees to execute and deliver to the Agent such further agreements, assignments, instruments, and documents, and to do all such other things, as the Agent may deem necessary or appropriate to assure the Agent its lien and security interest hereunder, including, without limitation, (i) such financing statements, and amendments thereof or supplements thereto, and such other instruments and documents as the Agent may from time to time require in order to comply with the UCC and any other applicable law, (ii) such agreements with respect to patents, trademarks, copyrights, and similar intellectual property rights or the Agent may from time to time require to comply with the filing requirements of the United States Patent and Trademark Office

and the United States Copyright Office, and (iii) such control agreements with respect to all Deposit Accounts, Investment Property, Letter-of-Credit Rights, and electronic Chattel Paper, and to cause the relevant depository institutions, financial intermediaries, and issuers to execute and deliver such control agreements, as the Agent may from time to time require. Each Debtor hereby agrees that a carbon, photographic, or other reproduction of this Agreement or any such financing statement is sufficient for filing as a financing statement by the Agent without notice thereof to such Debtor wherever the Agent in its sole discretion desires to file the same. Each Debtor hereby authorizes the Agent to file any and all financing statements covering the Collateral or any part thereof as the Agent may require, including financing statements describing the Collateral as "all assets" or "all personal property" or words of like meaning. The Agent may order lien searches from time to time against each Debtor and the Collateral, and the Debtors shall promptly reimburse the Agent for all costs and expenses incurred in connection with such lien searches. In the event for any reason the law of any jurisdiction other than Illinois becomes or is applicable to the Collateral or any part thereof, or to any of the Secured Obligations, each Debtor agrees to execute and deliver all such agreements, assignments, instruments, and documents and to do all such other things as the Agent in its sole discretion deems necessary or appropriate to preserve, protect, and enforce the lien and security interest of the Agent under the law of such other jurisdiction. Each Debtor agrees to mark its books and records to reflect the lien and security interest of the Agent in the Collateral.

(p)     On failure of any Debtor to perform any of the covenants and agreements herein contained, the Agent may, at its option, perform the same and in so doing may expend such sums as the Agent may deem advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, liens, and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Agent may be compelled to make by operation of law or which the Agent may make by agreement or otherwise for the protection of the security hereof. All such sums and amounts so expended shall be repayable by the relevant Debtor immediately without notice or demand, shall constitute additional Secured Obligations secured hereunder, and shall bear interest from the date said amounts are expended at the rate per annum (computed on the basis of a 360 day year for the actual number of days elapsed) determined by adding 2.0% per annum to the Base Rate from time to time in effect plus the Applicable Margin from time to time in effect for Base Rate Loans under the Revolving Credit, with any change in such rate per annum as so determined by reason of a change in said Base Rate to be effective on the date of such change in said Base Rate (such rate per annum as so determined being hereinafter referred to as the *"Default Rate"*). No such performance of any covenant or agreement by the Agent on behalf of any Debtor, and no such advancement or expenditure therefor, shall relieve the Debtor of any default under the terms of this Agreement or in any way obligate any Secured Creditor to take any further or future action with respect thereto. The Agent, in making any payment hereby authorized, may do so according to any bill, statement, or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax

-10-

lien or title or claim. The Agent, in performing any act hereunder, shall be the sole judge of whether any Debtor is required to perform the same under the terms of this Agreement. The Agent is hereby authorized to charge any account of the relevant Debtor maintained with any Secured Creditor for the amount of such sums and amounts so expended.

*Section 5. Special Provisions Re: Receivables.* (a) As of the time any Receivable owned by a Debtor becomes subject to the security interest provided for hereby, and at all times thereafter, such Debtor shall be deemed to have warranted as to each and all of such Receivable that all warranties of such Debtor set forth in this Agreement are true and correct with respect to each such Receivable; that each such Receivable and all papers and documents relating thereto are genuine and in all respects what they purport to be; that such Receivable is valid and subsisting; that no such Receivable is evidenced by any Instrument or Chattel Paper unless such Instrument or Chattel Paper has theretofore been endorsed by such Debtor and delivered to the Agent (except that, prior to the occurrence of an Event of Default and thereafter until otherwise notified by the Agent, such Debtor will not be required to endorse and deliver to the Agent any such Instrument or Chattel Paper if and only so long as the aggregate outstanding balance of all such Instruments and Chattel Paper not so endorsed and delivered to the Agent hereunder is less than $50,000 at any one time outstanding); that no surety bond was required or given in connection with such Receivable or the contracts or purchase orders out of which the same arose; that the amount of the Receivable represented as owing is the correct amount actually and unconditionally owing, except for normal cash discounts on normal trade terms in the ordinary course of business; and that the amount of such Receivable represented as owing is not disputed and is not subject to any set-offs, credits, deductions, or countercharges other than those arising in the ordinary course of such Debtor's business which are disclosed to the Agent in writing promptly upon such Debtor becoming aware thereof.

(b) Without limiting the foregoing, if any Receivable arises out of a contract with the United States of America, or any state or political subdivision thereof, or any department, agency or instrumentality of any of the foregoing, each Debtor agrees to notify the Agent and, at the Agent's request, execute whatever instruments and documents are required by the Agent in order that such Receivable shall be assigned to the Agent and that proper notice of such assignment shall be given under the federal Assignment of Claims Act (or any successor statute) or any similar state or local statute, as the case may be.

(c) Unless and until an Event of Default occurs, any merchandise or other goods which are returned by a customer or account debtor or otherwise recovered may be resold by a Debtor in the ordinary course of its business as presently conducted in accordance with Section 7(b) hereof; and, during the existence of any Event of Default, such merchandise and other goods shall be set aside at the request of the Agent and held by the relevant Debtor as trustee for the Secured Creditors and shall remain part of the Secured Creditors' Collateral. Unless and until an Event of Default occurs, the Debtors may settle and adjust disputes and claims with its customers and account debtors, handle returns and recoveries, and grant discounts, credits, and allowances in the ordinary course of its business as presently conducted for amounts and on terms which the relevant Debtor in good faith considers advisable; and, during the existence of any Event of Default, at the Agent's request, the Debtors shall notify the Agent promptly of all returns and recoveries and, on the Agent's request, deliver any such merchandise or other goods to the

BMO 001348

Agent. During the existence of any Event of Default, at the Agent's request, the Debtors shall also notify the Agent promptly of all disputes and claims and settle or adjust them at no expense to the Agent, but no discount, credit or allowance other than on normal trade terms in the ordinary course of business as presently conducted shall be granted to any customer or account debtor and no returns of merchandise or other goods shall be accepted by any Debtor without the Agent's consent. The Agent may, at all times during the existence of any Event of Default, settle or adjust disputes and claims directly with customers or account debtors for amounts and upon terms which the Agent considers advisable.

(d) Unless delivered to the Agent or its agent, all tangible Chattel Paper and Instruments shall contain a legend acceptable to the Agent indicating that such Chattel Paper or Instrument is subject to the security interest of the Agent contemplated by this Agreement.

*Section 6. Collection of Receivables.* (a) Except as otherwise provided in this Agreement, the Debtors shall make collection of all Receivables and may use the same to carry on its business in accordance with sound business practice and otherwise subject to the terms hereof.

(b) Upon the occurrence of any Default or Event of Default, whether or not the Agent has exercised any of its other rights under other provisions of this Section 6, in the event the Agent requests any Debtor to do so:

(i) all Instruments and tangible Chattel Paper at any time constituting part of the Receivables or any other Collateral (including any postdated checks) shall, upon receipt by such Debtor, be immediately endorsed to and deposited with the Agent; and/or

(ii) such Debtor shall instruct all customers and account debtors to remit all payments in respect of Receivables or any other Collateral to a lockbox or lockboxes under the sole custody and control of the Agent and which are maintained at one or more post offices selected by the Agent.

(c) Upon the occurrence and during the continuation of any Default or Event of Default, whether or not the Agent has exercised any of its other rights under the other provisions of this Section 6, the Agent or its designee may notify the relevant Debtor's customers and account debtors at any time that Receivables or any other Collateral have been assigned to the Agent or of the Agent's security interest therein, and either in its own name, or such Debtor's name, or both, demand, collect (including, without limitation, through a lockbox analogous to that described in Section 6(b)(ii) hereof), receive, receipt for, sue for, compound and give acquittance for any or all amounts due or to become due on Receivables or any other Collateral, and in the Agent's discretion file any claim or take any other action or proceeding which the Agent may deem necessary or appropriate to protect or realize upon the security interest of the Agent in the Receivables or any other Collateral.

(d) Any proceeds of Receivables or other Collateral transmitted to or otherwise received by the Agent pursuant to any of the provisions of Sections 6(b) or 6(c) hereof may be handled and administered by the Agent in and through a remittance account or accounts

-12-

maintained at the Agent or by the Agent at a commercial bank or banks selected by the Agent (collectively the *"Depositary Banks"* and individually a *"Depositary Bank"*), and each Debtor acknowledges that the maintenance of such remittance accounts by the Agent is solely for the Agent's convenience and that the Debtors do not have any right, title, or interest in such remittance accounts or any amounts at any time standing to the credit thereof. The Agent may, after the occurrence and during the continuation of any Default or Event of Default, apply all or any part of any proceeds of Receivables or other Collateral received by it from any source to the payment of the Secured Obligations (whether or not then due and payable), such applications to be made in such amounts, in such manner and order, and at such intervals as the Agent may from time to time in its discretion determine, but not less often than once each week. The Agent need not apply or give credit for any item included in proceeds of Receivables or other Collateral until the Depositary Bank has received final payment therefor at its office in cash or final solvent credits current at the site of deposit acceptable to the Agent and the Depositary Bank as such. However, if the Agent does permit credit to be given for any item prior to a Depositary Bank receiving final payment therefor and such Depositary Bank fails to receive such final payment or an item is charged back to the Agent or any Depositary Bank for any reason, the Agent may at its election in either instance charge the amount of such item back against any such remittance accounts or any Deposit Account of any Debtor subject to the lien and security interest of this Agreement, together with interest thereon at the Default Rate. Concurrently with each transmission of any proceeds of Receivables or other Collateral to any such remittance account, upon the Agent's request, the relevant Debtor shall furnish the Agent with a report in such form as the Agent shall require identifying the particular Receivable or such other Collateral from which the same arises or relates. Unless and until a Default or an Event of Default has occurred and is continuing, the Agent will release proceeds of Collateral which the Agent has not applied to the Secured Obligations as provided above from the remittance account from time to time promptly after receipt thereof. Each Debtor hereby indemnifies the Secured Creditors from and against all liabilities, damages, losses, actions, claims, judgments, costs, expenses, charges, and attorneys' fees suffered or incurred by any Secured Creditor because of the maintenance of the foregoing arrangements; *provided, however*, that no Debtor shall be required to indemnify any Secured Creditor for any of the foregoing to the extent they arise solely from the gross negligence or willful misconduct of the Person seeking to be indemnified. The Secured Creditors shall have no liability or responsibility to any Debtor for the Agent or any Depositary Bank accepting any check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement whatsoever or be responsible for determining the correctness of any remittance.

Section 7.  *Special Provisions Re: Inventory and Equipment.* (a) Each Debtor shall at its own cost and expense maintain, keep, and preserve the Inventory in good and merchantable condition and keep and preserve its Equipment in good repair, working order, and condition, ordinary wear and tear excepted, and, without limiting the foregoing, make all necessary and proper repairs, replacements, and additions to its Equipment so that the efficiency thereof shall be fully preserved and maintained.

(b)  Each Debtor may, until an Event of Default has occurred and is continuing and thereafter until otherwise notified by the Agent, use, consume, and sell the Inventory in the ordinary course of its business, but a sale in the ordinary course of business shall not under any

BMO 001350

circumstance include any transfer or sale in satisfaction, partial or complete, of a debt owing by such Debtor.

(c)    Each Debtor may, until an Event of Default has occurred and is continuing and thereafter until otherwise notified by the Agent, sell Equipment to the extent permitted by Section 8.10 of the Credit Agreement.

(d)    As of the time any Inventory or Equipment of a Debtor becomes subject to the security interest provided for hereby and at all times thereafter, such Debtor shall be deemed to have warranted as to any and all of such Inventory and Equipment that all warranties of such Debtor set forth in this Agreement are true and correct with respect to such Inventory and Equipment; and that all of such Inventory and Equipment is located at a location set forth pursuant to Section 4(b) hereof. Each Debtor warrants and agrees that none of its Inventory is or will be consigned to any other person without the Agent's prior written consent.

(e)    Upon the Agent's or the Secured Creditors' request, each Debtor shall at its own cost and expense cause the lien of the Agent in and to any portion of the Collateral subject to a certificate of title law to be duly noted on such certificate of title or to be otherwise filed in such manner as is prescribed by law in order to perfect such lien and will cause all such certificates of title and evidences of lien to be deposited with the Agent.

(f)    Except for Equipment from time to time located on the real estate described on Schedule D attached hereto or as otherwise hereafter disclosed to the Agent and the Secured Creditors in writing, none of the Equipment is or will be attached to real estate in such a manner that the same may become a fixture.

(g)    If any of the Inventory is at any time evidenced by a document of title, such document shall be promptly delivered by the relevant Debtor to the Agent except to the extent the Agent specifically requests such Debtor not to do so with respect to any such document.

*Section 8.    Special Provisions Re: Investment Property, Subsidiary Interests and Deposits.* (a) Unless and until an Event of Default has occurred and is continuing and thereafter until notified to the contrary by the Agent pursuant to Section 10(d) hereof:

(i)    each Debtor shall be entitled to exercise all voting and/or consensual powers pertaining to its Investment Property and Subsidiary Interests, or any part thereof, for all purposes not inconsistent with the terms of this Agreement, the Credit Agreement or any other document evidencing or otherwise relating to any Secured Obligations; and

(ii)    each Debtor shall be entitled to receive and retain all cash dividends paid upon or in respect of its Investment Property and Subsidiary Interests subject to the lien and security interest of this Agreement.

(b)    All Investment Property (including all securities, certificated or uncertificated, securities accounts, and commodity accounts) and Subsidiary Interests of the Debtors on the date hereof is listed and identified on Schedule E attached hereto and made a part hereof. Each

-14-

Debtor shall promptly notify the Agent of any other Investment Property or Subsidiary Interests acquired or maintained by such Debtor after the date hereof, and shall submit to the Agent a supplement to Schedule E to reflect such additional rights (provided any Debtor's failure to do so shall not impair the Agent's security interest therein). Certificates for all certificated securities now or at any time constituting Investment Property or Subsidiary Interests and part of the Collateral hereunder shall be promptly delivered by the relevant Debtor to the Agent duly endorsed in blank for transfer or accompanied by an appropriate assignment or assignments or an appropriate undated stock power or powers, in every case sufficient to transfer title thereto, including, without limitation, all stock received in respect of a stock dividend or resulting from a split-up, revision or reclassification of the Investment Property or Subsidiary Interests or any part thereof or received in addition to, in substitution of or in exchange for the Investment Property or Subsidiary Interests or any part thereof as a result of a merger, consolidation or otherwise. With respect to any uncertificated securities or any Investment Property or any Subsidiary Interests held by a securities intermediary, commodity intermediary, or other financial intermediary of any kind, at the Agent's request, the relevant Debtor shall execute and deliver, and shall cause any such issuer or intermediary to execute and deliver, an agreement among such Debtor, the Agent, and such issuer or intermediary in form and substance satisfactory to the Agent which provides, among other things, for the issuer's or intermediary's agreement that it will comply with such entitlement orders, and apply any value distributed on account of any Investment Property or any Subsidiary Interests, as directed by the Agent without further consent by such Debtor. The Agent may, at any time after the occurrence and during the continuation of any Default or Event of Default, cause to be transferred into its name or the name of its nominee or nominees any and all of the Investment Property hereunder.

(c)    Unless and until a Default or an Event of Default has occurred and is continuing, each Debtor may sell or otherwise dispose of any of its Investment Property to the extent permitted by the Credit Agreement, *provided* that, except to the extent permitted by the Credit Agreement, no Debtor shall sell or otherwise dispose of any capital stock or other equity interest in any direct or indirect Subsidiary hereunder without the prior written consent of the Agent. After the occurrence and during the continuation of any Default or Event of Default, no Debtor shall sell all or any part of its Investment Property without the prior written consent of the Agent.

(d)    Each Debtor represents that on the date of this Agreement, none of its Investment Property or Subsidiary Interests consists of margin stock (as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System) except to the extent such Debtor has delivered to the Agent a duly executed and completed Form U-1 with respect to such stock. If at any time the Investment Property or Subsidiary Interests or any part thereof consists of margin stock, the relevant Debtor shall promptly so notify the Agent and deliver to the Agent a duly executed and completed Form U-1 and such other instruments and documents reasonably requested by the Agent in form and substance satisfactory to the Agent.

(e)    Each Debtor represents and warrants to, and agrees with, the Agent as follows: (i) as of the date hereof, the Subsidiary Interests listed and described on Schedule E hereto constitute the percentage of the equity interest in each Subsidiary set forth thereon owned by such Debtor; (ii) as of the date hereof, copies of the certificate or articles of incorporation and by-laws, certificate or articles of association and operating agreement, and partnership agreement

of each Subsidiary (each such agreement being hereinafter referred to as an *"Organizational Agreement"*) heretofore delivered to the Agent are true and correct copies thereof and have not been amended or modified in any respect other than as stated therein, and (iii) without the prior written consent of the Agent, each Debtor will not agree to any amendment or modification to any Organizational Agreement which would in any manner adversely affect or impair the Subsidiary Interests of such Debtor or reduce or dilute the rights of such Debtor with respect to any Subsidiary Interests, such Debtor to promptly take any action requested by the Agent with respect to any of such actions done without such prior written consent. Each Debtor shall perform when due all of its material obligations under each Organizational Agreement.

(f)     Notwithstanding anything to the contrary contained herein, in the event any Investment Property or any Subsidiary Interests is subject to the terms of a separate security agreement in favor of the Agent, the terms of such separate security agreement shall govern and control unless otherwise agreed to in writing by the Agent.

(f)     All Deposit Accounts of the Debtors on the date hereof are listed and identified (by account number and depository institution) on Schedule E attached hereto and made a part hereof. Each Debtor shall promptly notify the Agent of any other Deposit Account opened or maintained by such Debtor after the date hereof, and shall submit to the Agent a supplement to Schedule E to reflect such additional accounts (provided any Debtor's failure to do so shall not impair the Agent's security interest therein). With respect to any Deposit Account maintained by a depository institution other than the Agent, and as a condition to the establishment and maintenance of any such Deposit Account except as otherwise permitted by the Credit Agreement, such Debtor, the depository institution, and the Agent shall execute and deliver an account control agreement in form and substance satisfactory to the Agent which provides, among other things, for the depository institution's agreement that it will comply with instructions originated by the Agent directing the disposition of the funds in the Deposit Account without further consent by such Debtor.

Section 9.     *Power of Attorney.*  In addition to any other powers of attorney contained herein, each Debtor hereby appoints the Agent, its nominee, and any other person whom the Agent may designate as such Debtor's attorney-in-fact, with full power and authority to sign such Debtor's name on verifications of Receivables and other Collateral; to send requests for verification of Collateral to such Debtor's customers, account debtors, and other obligors; to endorse such Debtor's name on any checks, notes, acceptances, money orders, drafts, and any other forms of payment or security that may come into the Agent's possession; to endorse the Collateral in blank or to the order of the Agent or its nominee; to sign such Debtor's name on any invoice or bill of lading relating to any Collateral, on claims to enforce collection of any Collateral, on notices to and drafts against customers and account debtors and other obligors, on schedules and assignments of Collateral, on notices of assignment and on public records; to notify the post office authorities to change the address for delivery of such Debtor's mail to an address designated by the Agent; to receive, open, and dispose of all mail addressed to such Debtor; and to do all things necessary to carry out this Agreement. Each Debtor hereby ratifies and approves all acts of any such attorney and agrees that neither the Agent nor any such attorney will be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct. The foregoing powers of

attorney, being coupled with an interest, are irrevocable until the Secured Obligations have been fully paid and satisfied and the commitments of the Lenders to extend credit to or for the account of the Borrowers and each of them have expired or otherwise have been terminated.

*Section 10.   Defaults and Remedies.*  (a) The occurrence of any one or more of the events or the existence of any one or more conditions specified as an "Event of Default" under the Credit Agreement shall constitute an *"Event of Default"* hereunder.

(b)   Upon the occurrence of any Event of Default, the Agent shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Agent may, without demand and, to the extent permitted by applicable law, without advertisement, notice, hearing or process of law, all of which each Debtor hereby waives to the extent permitted by applicable law, at any time or times, sell and deliver any or all Collateral held by or for it at public or private sale, at any securities exchange or broker's board or at the Agent's office or elsewhere, for cash, upon credit or otherwise, at such prices and upon such terms as the Agent deems advisable, in its discretion.  In the exercise of any such remedies, the Agent may sell the Collateral as a unit even though the sales price thereof may be in excess of the amount remaining unpaid on the Secured Obligations.  Also, if less than all the Collateral is sold, the Agent shall have no duty to marshal or apportion the part of the Collateral so sold as between the Debtors, or any of them, but may sell and deliver any or all of the Collateral without regard to which of the Debtors are the owners thereof.  In addition to all other sums due any Secured Creditor hereunder, each Debtor shall pay the Secured Creditors all costs and expenses incurred by the Secured Creditors, including attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Secured Obligations or in the prosecution or defense of any action or proceeding by or against any Secured Creditor or any Debtor concerning any matter arising out of or connected with this Agreement or the Collateral or the Secured Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute).  Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Debtors in accordance with Section 14(b) hereof at least 10 days before the time of sale or other event giving rise to the requirement of such notice; *provided, however,* no notification need be given to a Debtor if such Debtor has signed, after an Event of Default hereunder has occurred, a statement renouncing any right to notification of sale or other intended disposition.  The Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  Any Secured Creditor may be the purchaser at any such sale.  Each Debtor hereby waives all of its rights of redemption from any such sale. The Agent may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Agent may further postpone such sale by announcement made at such time and place.  The Agent has no obligation to prepare the Collateral for sale.  The Agent may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and each Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

BMO 001354

(c)     Without in any way limiting the foregoing, upon the occurrence of any Event of Default hereunder, in addition to all other rights provided herein or by law, (i) the Agent shall have the right to take physical possession of any and all of the Collateral and anything found therein, the right for that purpose to enter without legal process any premises where the Collateral may be found (provided such entry be done lawfully), and the right to maintain such possession on the relevant Debtor's premises (each Debtor hereby agreeing, to the extent it may lawfully do so, to lease such premises without cost or expense to the Agent or its designee if the Agent so requests) or to remove the Collateral or any part thereof to such other places as the Agent may desire, (ii) the Agent shall have the right to direct any intermediary at any time holding any Investment Property or other Collateral, or any issuer thereof, to deliver such Collateral or any part thereof to the Agent and/or to liquidate such Collateral or any part thereof and deliver the proceeds thereof to the Agent (including, without limitation, the right to deliver a notice of control with respect to any Collateral held in a securities account or commodities account and deliver all entitlement orders with respect thereto), (iii) the Agent shall have the right to exercise any and all rights with respect to all Deposit Accounts of each Debtor, including, without limitation, the right to direct the disposition of the funds in each Deposit Account and to collect, withdraw, and receive all amounts due or to become due or payable thereunder, and (iv) each Debtor shall, upon the Agent's demand, assemble the Collateral and make it available to the Agent at a place designated by the Agent.  If the Agent exercises its right to take possession of the Collateral, each Debtor shall also at its expense perform any and all other steps requested by the Agent to preserve and protect the security interest hereby granted in the Collateral, such as placing and maintaining signs indicating the security interest of the Agent, appointing overseers for the Collateral and maintaining Collateral records.

(d)     Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, all rights of the Debtors to exercise the voting and/or consensual powers which they are entitled to exercise pursuant to Section 8(a)(i) hereof and/or to receive and retain the distributions which they are entitled to receive and retain pursuant to Section 8(a)(ii) hereof, shall, at the option of the Agent, cease and thereupon become vested in the Agent, which, in addition to all other rights provided herein or by law, shall then be entitled solely and exclusively to exercise all voting and other consensual powers pertaining to the Investment Property and/or to receive and retain the distributions which such Debtor would otherwise have been authorized to retain pursuant to Section 8(a)(ii) hereof and shall then be entitled solely and exclusively to exercise any and all rights of conversion, exchange or subscription or any other rights, privileges or options pertaining to any Investment Property as if the Agent were the absolute owner thereof including, without limitation, the rights to exchange, at its discretion, all Investment Property or any part thereof upon the merger, consolidation, reorganization, recapitalization or other readjustment of the respective issuer thereof or upon the exercise by or on behalf of any such issuer or the Agent of any right, privilege or option pertaining to any Investment Property and, in connection therewith, to deposit and deliver the Investment Property or any part thereof with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Agent may determine.  In the event the Agent in good faith believes any of the Collateral constitutes restricted securities within the meaning of any applicable securities laws, any disposition thereof in compliance with such laws shall not render the disposition commercially unreasonable.

(e)    Without in any way limiting the foregoing, each Debtor hereby grants to the Secured Creditors a royalty-free irrevocable license and right to use all of such Debtor's patents, patent applications, patent licenses, trademarks, trademark registrations, trademark licenses, trade names, trade styles, copyrights, copyright applications, copyright licenses, and similar intangibles in connection with any foreclosure or other realization by the Agent or the Secured Creditors on all or any part of the Collateral to the extent permitted by law. The license and right granted the Secured Creditors hereby shall be without any royalty or fee or charge whatsoever.

(f)    The powers conferred upon the Secured Creditors hereunder are solely to protect their interest in the Collateral and shall not impose on them any duty to exercise such powers. The Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Agent accords its own property, consisting of similar type assets, it being understood, however, that the Agent shall have no responsibility for (i) ascertaining or taking any action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Agent has or is deemed to have knowledge of such matters, (ii) taking any necessary steps to preserve rights against any parties with respect to any Collateral, or (iii) initiating any action to protect the Collateral or any part thereof against the possibility of a decline in market value. This Agreement constitutes an assignment of rights only and not an assignment of any duties or obligations of the Debtors in any way related to the Collateral, and the Agent shall have no duty or obligation to discharge any such duty or obligation. Neither any Secured Creditor nor any party acting as attorney for any Secured Creditor shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct.

(g)    Failure by the Agent to exercise any right, remedy or option under this Agreement or any other agreement between any Debtor and the Agent or provided by law, or delay by the Agent in exercising the same, shall not operate as a waiver; and no waiver shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated. The rights and remedies of the Secured Creditors under this Agreement shall be cumulative and not exclusive of any other right or remedy which any Secured Creditor may have. For purposes of this Agreement, an Event of Default shall be construed as continuing after its occurrence until the same is waived in writing by the Agent.

Section 11.    *Application of Proceeds*. The proceeds and avails of the Collateral at any time received by the Agent after the occurrence and during the continuation of any Event of Default shall, when received by the Agent in cash or its equivalent, be applied by the Agent in reduction of, or held as collateral security for, the Secured Obligations in accordance with the terms of the Credit Agreement. The Debtors shall remain liable to the Secured Creditors for any deficiency. Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Borrowers, as agent for the Debtors, or to whomsoever the Agent reasonably determines is lawfully entitled thereto.

Section 12.    *Continuing Agreement*. This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Secured Obligations, both for principal and interest, have been fully paid and satisfied and the commitments of the Lenders

BMO 001356

to extend credit to or for the account of the Borrowers and each of them under the Credit Agreement have expired or otherwise have been terminated.  Upon such termination of this Agreement, the Agent shall, upon the request and at the expense of the Debtors, forthwith release its liens and security interests hereunder.

Section 13.   The Agent.  In acting under or by virtue of this Agreement, the Agent shall be entitled to all the rights, authority, privileges, and immunities provided in the Credit Agreement, all of which provisions of said Credit Agreement (including, without limitation, Section 11 thereof) are incorporated by reference herein with the same force and effect as if set forth herein in their entirety.  The Agent hereby disclaims any representation or warranty to the Secured Creditors or any other holders of the Secured Obligations concerning the perfection of the liens and security interests granted hereunder or in the value of any of the Collateral.

Section 14.   Miscellaneous.  (a) This Agreement cannot be changed or terminated orally. This Agreement shall create a continuing lien on and security interest in the Collateral and shall be binding upon each Debtor, its successors and assigns and shall inure, together with the rights and remedies of the Secured Creditors hereunder, to the benefit of the Secured Creditors and their successors and permitted assigns; provided, however, that no Debtor may assign its rights or delegate its duties hereunder without the Agent's prior written consent.  Without limiting the generality of the foregoing, and subject to the provisions of the Credit Agreement, any Lender may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise.

(b)   Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below (or, if no such address is set forth below, at the address of the relevant Debtor as shown on the records of the Agent), or such other address or telecopier number as such party may hereafter specify by notice to the other given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt.  Notices hereunder shall be addressed:

to the Debtors at:

1175 19th Avenue
LeMoore, California 93245
Attention:  Stacey Alexander
Telephone: (559) 924-6535
Telecopy:   (559) 924-0178

to the Agent at:

115 South LaSalle Street
Chicago, Illinois 60603
Attention:  Food Group
Telephone:  (312) 461-3776
Telecopy:  (312) 765-8095

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt

BMO 001357

requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section.

(c)     In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall to such extent be construed as not containing such provision, but only as to such jurisdictions where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.  Without limiting the generality of the foregoing, in the event that this Agreement shall be deemed to be invalid or otherwise unenforceable with respect to any Debtor, such invalidity or unenforceability shall not affect the validity of this Agreement with respect to the other Debtors.

(d)     The lien and security interest herein created and provided for stand as direct and primary security for the Secured Obligations of the Borrowers arising under or otherwise relating to the Credit Agreement as well as for the other Secured Obligations secured hereby.  No application of any sums received by the Secured Creditors in respect of the Collateral or any disposition thereof to the reduction of the Secured Obligations or any part thereof shall in any manner entitle any Debtor to any right, title or interest in or to the Secured Obligations or any collateral or security therefor, whether by subrogation or otherwise, unless and until all Secured Obligations have been fully paid and satisfied and all commitments to extend credit to or for the account of the Borrowers and any one of them under the Credit Agreement have expired or otherwise terminated.  Each Debtor acknowledges and agrees that the lien and security interest hereby created and provided are absolute and unconditional and shall not in any manner be affected or impaired by any acts of omissions whatsoever of any Secured Creditor or any other holder of any Secured Obligations, and without limiting the generality of the foregoing, the lien and security interest hereof shall not be impaired by any acceptance by any Secured Creditor or any other holder of any Secured Obligations of any other security for or guarantors upon any of the Secured Obligations or by any failure, neglect or omission on the part of any Secured Creditor or any other holder of any of the Secured Obligations to realize upon or protect any of the Secured Obligations or any collateral or security therefor.  The lien and security interest hereof shall not in any manner be impaired or affected by (and the Secured Creditors, without notice to anyone, are hereby authorized to make from time to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any of the Secured Obligations or of any collateral or security therefor, or of any guaranty thereof, or of any instrument or agreement setting forth the terms and conditions pertaining to any of the foregoing.  The Secured Creditors may at their discretion at any time grant credit to the Borrowers or any one of them without notice to the other Debtors in such amounts and on such terms as the Secured Creditors may elect without in any manner impairing the lien and security interest created and provided for.  In order to realize hereon and to exercise the rights granted the Secured Creditors hereunder and under applicable law, there shall be no obligation on the part of any Secured Creditor or any other holder of any Secured Obligations at any time to first resort for payment to the Borrowers or any other Debtor or to any guaranty of the Secured Obligations or any portion thereof or to resort to any other collateral, security, property, liens or any other rights or remedies whatsoever,

-21-

and the Secured Creditors shall have the right to enforce this Agreement against any Debtor or its Collateral irrespective of whether or not other proceedings or steps seeking resort to or realization upon or from any of the foregoing are pending.

(e)     In the event the Secured Creditors shall at any time in their discretion permit a substitution of Debtors hereunder or a party shall wish to become a Debtor hereunder, such substituted or additional Debtor shall, upon executing an agreement in the form attached hereto as Schedule G, become a party hereto and be bound by all the terms and conditions hereof to the same extent as though such Debtor had originally executed this Agreement and, in the case of a substitution, in lieu of the Debtor being replaced.  Any such agreement shall contain information as to such Debtor necessary to update Schedules A, B, C, D, E, and F hereto with respect to it.  No such substitution shall be effective absent the written consent of the Agent nor shall it in any manner affect the obligations of the other Debtors hereunder.

(f)     This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument.  Each Debtor acknowledges that this Agreement is and shall be effective upon its execution and delivery by such Debtor to the Agent, and it shall not be necessary for the Agent to execute this Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(g)     This Agreement shall be deemed to have been made in the State of Illinois and shall be governed by, and construed in accordance with, the laws of the State of Illinois.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(h)     Upon the execution and delivery of this Agreement by the Borrowers, the other Debtors and the Agent, this Agreement shall supersede all provisions of the Prior Security Agreement as of such date.  Each Debtor hereby agrees that, notwithstanding the execution and delivery of this Agreement, the liens and security interests created and provided for under the Prior Security Agreement continue in effect under and pursuant to the terms of this Agreement for the benefit of all of the Secured Obligations secured hereby.  Nothing herein contained shall in any manner affect or impair the priority of the liens and security interests created and provided for by the Prior Security Agreement as to the indebtedness and obligations which would otherwise be secured thereby prior to giving effect to this Agreement.

(i)     Each Debtor hereby submits to the non-exclusive jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois state court sitting in the City of Chicago, Illinois, for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby.  Each Debtor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient form.  EACH DEBTOR AND, BY ACCEPTING THE BENEFITS OF THIS AGREEMENT, EACH SECURED CREDITOR HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING

BMO 001359

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGES TO FOLLOW]

BMO 001360

IN WITNESS WHEREOF, each Debtor has caused this Amended and Restated Security Agreement to be duly executed and delivered as of the date first above written.

*"DEBTORS"*

SK FOODS, L.P.

> By: SK PM Corp.
> Its: General Partner
>
> By _____
> Name _____
> Title: _____

SK FOODS, LLC

> By _____
> Name _____
> Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

> By _____
> Name _____
> Title _____

Accepted and agreed to in Chicago, Illinois, as of the date first above written.

BANK OF MONTREAL, as Agent

> By _____
> Name _____
> Title _____

-24-

IN WITNESS WHEREOF, each Debtor has caused this Amended and Restated Security Agreement to be duly executed and delivered as of the date first above written.

"DEBTORS"

SK FOODS, L.P.

    By: SK PM Corp.
    Its: General Partner


    By _____
       Name _____
       Title: _____


SK FOODS, LLC


By _____
    Name _____
    Title _____


RHM INDUSTRIAL/SPECIALTY FOODS, INC.


By _____
    Name _____
    Title _____

Accepted and agreed to in Chicago, Illinois, as of the date first above written.

    BANK OF MONTREAL, as Agent


    By _____
       Name:  C. Scott Place
       Title:   Director

-24-

## SCHEDULE A

### LOCATIONS

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| NAME OF DEBTOR (AND STATE OF ORGANIZATION AND ORGANIZATIONAL REGISTRATION NUMBER) | CHIEF EXECUTIVE OFFICE (AND NAME OF RECORD OWNER OF SUCH LOCATION) | ADDITIONAL PLACES OF BUSINESS AND COLLATERAL LOCATIONS (AND NAME OF RECORD OWNER OF SUCH LOCATIONS) |
| SK Foods, L.P. (California limited partnership Org No. 9236500009) | 1175 19th Avenue LeMoore, California 93245 ✓ (SK Foods, L.P.) | 1175 19th Avenue Lemoore, California 93245 ✓ (SK Foods, L.P) |
| | | 2170 Hanson Way Suite B Woodland, California 95695 ✓ |
| | | 6229 Myers Road Williams, California 95987-5800 ✓ (SK Foods-Colusa) |
| | | Grand Warehouse 435 W, Ohio Street Chicago, Illinois 60624 ✓ |
| | | AWL 750 John Wollum Drive Jackson, Ohio 45640 ✓ |
| | | Terminal 7825 Rappahannock Ave. Jessup, Maryland 20794 |
| | | Hanson 61834 E. Red Arrow Highway Hartford, Michigan 49057 ✓ |
| SK Foods, LLC (Nevada limited liability company Org No. LLC2882-2001) | 6100 Neil Road, #500 Reno, Nevada 89511 | |
| RHM Industrial/Specialty Foods, Inc. (California corporation, #C1588083) | 1175 19th Ave. LeMoore, California 93245 ✓ | 6229 Myers Road Williams, California 95987 ✓ |

## SCHEDULE B

## OTHER NAMES

A.    PRIOR LEGAL NAMES

SK Foods, L.P.                              None.
SK Foods, LLC                             None.
RHM Industrial/Specialty Foods, Inc.      NAAS Foods, Inc.
                                          Colusa County Canning Co.

B.    TRADE NAMES

RHM Industrial/Specialty Foods, Inc.      Colusa Canning

## SCHEDULE C

## INTELLECTUAL PROPERTY RIGHTS

None.

BMO 001365

## SCHEDULE D

## REAL ESTATE LEGAL DESCRIPTIONS

1.     SK Foods, L.P. property located in LeMoore, Kings County, CA described as follows:

### [LEGAL TO BE INSERTED]

2.     SK Foods, LLC has no fixtures.

3.     RHM Industrial/Specialty Foods, Inc. property located in Colusa County, CA described as follows:

Certain land in Colusa County, California more particularly described as follows:

*Parcel No. 1*:  Parcel No. 1 as shown on that certain Parcel Map of a portion of Section 32, Township 15 North, Range 2 West, M.D.B.&M., said parcel map being filed June 6, 1975, in Book 1 of Parcel Maps, at page 130.

Excepting therefrom the above described parcel the following:  A portion of Section 32, Township 15 North, Range 2 West, M.D.B.&M., Colusa County, California, more particularly described as follows:

Beginning at the southeasterly corner of Parcel No. 1 of Parcel Map filed in Book 1 of Parcel Maps at page 130, Colusa County Records, said point being on the southerly line of Section 32, Township 15 North, Range 2 West, M.D.B.&M.; thence from said point of beginning and along southerly line of said Parcel No. 1, North 89 degrees 53'41" West, 39.98 feet; thence leaving said southerly line of Parcel No. 1, North 00 degrees 08'19" West, 781.79 feet; thence south 89 degrees 53'41" East, 39.98 feet; south 00 degrees 08'19" West, 781.79 feet to the point of beginning.

*Parcel No. 2*:  A portion of Section 32, Township 15 North, Range 2 West, M.D.B.&M., Colusa County, California, more particularly described as follows:

Beginning at the southwesterly corner of Parcel No. 2 of Parcel Map filed in book 1 of Parcel Maps, at page 130, Colusa County Records, said point being on the easterly right of the way of the Southern Pacific Railroad; thence from said point of beginning and along said easterly right of way of the Southern Pacific Railroad, north 27 degrees 30'05" West 188.62 feet; thence leaving said easterly right of way of the Southern Pacific Railroad, south 89 degrees 53'41" east 1533.71 feet; thence south 00 degrees 08'19" West 167.15 feet to the northerly line of parcel No. 1 of said parcel map filed in Book 1 of Parcel Maps, at page 130; thence along said northerly line of Parcel No. 1 North 89 degrees 43'41" West, 1446.20 feet to the point of beginning.

Excepting therefrom all oil, gas, minerals, and other hydrocarbon substances underlying and within the boundaries of said property, together with the right of ingress and egress to obtain and remove same, as reserved in Deed from Claire Louise Reynolds, Trustee of the Floyd Meyers March Trust, under Trust Agreement dated December 10, 1976 and amendment thereto dated April 15, 1977, recorded February 28, 1983 in Book 526, Page 404 of Colusa County Records.

*Parcel No. 3*:  All oil, gas, minerals, and other hydrocarbon substances underlying and within the boundaries of the following described as reserved in Deed of Colusa Canning Company, a corporation to Claire Louise Reynolds, Trustee, etc., dated April 4, 1983, recorded February 28, 1983 in Book 526, Page 405, Official Records, described as follows:

A portion of Section 32, Township 15 North, Range 2 West, M.D.B.&M., Colusa County, California, more particularly described as follows:

Beginning at the southeasterly corner of Parcel No. 1 of Parcel Map filed in Book 1 of Parcel Maps at page 130, Colusa County Records, said point being on the southerly line of Section 32, Township 15 North, Range 2 West, M.D.B.&M.; thence from said point of beginning and along southerly line of said Parcel No. 1, North 89 degrees 53'41" West, 39.98 feet; thence leaving said southerly line of Parcel No. 1, North 00 degrees 08'19" West, 781.79 feet; thence south 89 degrees 53'41" East, 39.98 feet; south 00 degrees 08'19" West, 781.79 feet to the point of beginning.

Together with the right of ingress and egress to obtain and remove same

BMO 001367

## SCHEDULE E

### INVESTMENT PROPERTY AND DEPOSITS

A.   INVESTMENT PROPERTY

      None.

B.   SUBSIDIARY INTERESTS

| NAME OF DEBTOR | NAME OF SUBSIDIARY | JURISDICTION OF ORGANIZATION | PERCENTAGE OF DEBTOR'S INTEREST |
|---|---|---|---|
| SK Foods, L.P. | SK Foods, LLC | Nevada | 99% |
| | SK Foods Australia PTY LTD | Australia | 99.01% |
| SK Foods, LLC | SK Foods International | New Zealand | 100% |

C.   DEPOSITS

      1.   Bank of the West - Payroll account, Account No. 087-000774,
           Money Market - Bank of the West, Account No. 087-000782
           Account Officer - Pam Rutter (559-582-4381)

      2.   Mid Penn - Savings Account, Account No. 108032603,
           Mid Penn - Checking Account, Account No. # 108032601
           Account Officer - Chales Banovac  (650-614-5760)

**[Confirm deposits above and name of Debtor for each such deposit]**

      3.   Debtor: SK Foods, L.P.
           Harris N.A., Account Nos. 398-760-9 & 398-797-1

      4.   Debtor: RHM Industrial/Specialty Foods, Inc.
           Bank of the West
           230 West 7th Street
           Hanford, California  93230
           Account Number: 087-001541
           Purpose: Checking - Accounts Payable
           Account Number: 087-004107
           Purpose: Checking - Payroll

5.   Debtor: RHM Industrial/Specialty Foods, Inc.
     Bank of America
     338 West D Street
     LeMoore, California  93245
     Account Number: 0587642643
     Purpose: Vending Machine Proceeds - Eventually donated to 3rd Party Charity

BMO 001369

## SCHEDULE F

## COMMERCIAL TORT CLAIMS

None.

BMO 001370

## SCHEDULE G

### ASSUMPTION AND SUPPLEMENTAL SECURITY AGREEMENT

THIS AGREEMENT dated as of this _____ day of _____, 20__ from [**new Debtor**], a _____ **corporation/limited liability company/partnership** (the *"New Debtor"*), to Bank of Montreal ( *"BMO"*), as administrative agent for the Secured Creditors (defined in the Security Agreement hereinafter identified and defined) (BMO acting as such agent and any successor or successors to BMO in such capacity being hereinafter referred to as the *"Agent"*).

### PRELIMINARY STATEMENTS

A. WHEREAS, SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"* and, individually, a *"Borrower"*) and certain other parties have executed and delivered to the Agent that certain Amended and Restated Security Agreement dated as of September 28, 2007 (such Amended and Restated Security Agreement, as the same may from time to time be amended, modified or restated, including supplements thereto which add additional parties as Debtors thereunder, being hereinafter referred to as the *"Security Agreement"*), pursuant to which such parties (the *"Existing Debtors"*) have granted to the Agent for the benefit of the Secured Creditors a lien on and security interest in the Existing Debtors' Collateral (as such term is defined in the Security Agreement) to secure the Secured Obligations (as such term is defined in the Security Agreement).

B. The Borrowers provide the New Debtor with substantial financial, managerial, administrative, and technical support and the New Debtor will benefit, directly and indirectly, from credit and other financial accommodations extended by the Secured Creditors to the Borrowers.

NOW, THEREFORE, FOR VALUE RECEIVED, and in consideration of advances made or to be made, or credit accommodations given or to be given, to the Borrowers by the Secured Creditors from time to time, the New Debtor hereby agrees as follows:

1. The New Debtor acknowledges and agrees that it shall become a "Debtor" party to the Security Agreement effective upon the date the New Debtor's execution of this Agreement and the delivery of this Agreement to the Agent, and that upon such execution and delivery, all references in the Security Agreement to the terms "Debtor" or "Debtors" shall be deemed to include the New Debtor. Without limiting the generality of the foregoing, the New Debtor hereby repeats and reaffirms all grants (including the grant of a lien and security interest), covenants, agreements, representations, and warranties contained in the Security Agreement as amended hereby, each and all of which are and shall remain applicable to the Collateral from time to time owned by the New Debtor or in which the New Debtor from time to time has any rights. Without limiting the foregoing, in order to secure payment of the Secured Obligations, whether now existing or hereafter arising, the New Debtor does hereby grant to the Agent for the

benefit of the Secured Creditors, and hereby agrees that the Agent has and shall continue to have for the benefit of the Secured Creditors a continuing lien on and security interest in, among other things, all of the New Debtor's Collateral (as such term is defined in the Security Agreement), including, without limitation, all of the New Debtor's Accounts, Chattel Paper, Instruments, Documents, General Intangibles Letter-of-Credit Rights, Supporting Obligations, Deposit Accounts, Investment Property, Inventory, Equipment, Fixtures, Commercial Tort Claims, and all of the other Collateral described in Section 2 of the Security Agreement, each and all of such granting clauses being incorporated herein by reference with the same force and effect as if set forth herein in their entirety except that all references in such clauses to the Existing Debtors or any of them shall be deemed to include references to the New Debtor. Nothing contained herein shall in any manner impair the priority of the liens and security interests heretofore granted in favor of the Agent under the Security Agreement.

2.     Schedules A (Locations), Schedule B (Other Names), Schedule C (Intellectual Property Rights), Schedule D (Real Estate), Schedule E (Investment Property, Subsidiary Interests and Deposits), and Schedule F (Commercial Tort Claims) to the Security Agreement shall be supplemented by the information stated below with respect to the New Debtor:

SUPPLEMENT TO SCHEDULE A

| NAME OF DEBTOR (AND STATE OF ORGANIZATION AND ORGANIZATIONAL REGISTRATION NUMBER) | CHIEF EXECUTIVE OFFICE (AND NAME OF RECORD OWNER OF SUCH LOCATION) | ADDITIONAL PLACES OF BUSINESS AND COLLATERAL LOCATIONS (AND NAME OF RECORD OWNER OF SUCH LOCATIONS) |
|---|---|---|
| | | |
| | | |

SUPPLEMENT TO SCHEDULE B

| NAME OF DEBTOR | PRIOR LEGAL NAMES AND TRADE NAMES OF SUCH DEBTOR |
|---|---|
| | |

SUPPLEMENT TO SCHEDULE C

INTELLECTUAL PROPERTY RIGHTS

_____

_____

SUPPLEMENT TO SCHEDULE D

REAL ESTATE LEGAL DESCRIPTIONS

_____

_____

SUPPLEMENT TO SCHEDULE E

INVESTMENT PROPERTY, SUBSIDIARY INTERESTS AND DEPOSITS

_____

_____

SUPPLEMENT TO SCHEDULE F

COMMERCIAL TORT CLAIMS

_____

_____

3.    The New Debtor hereby acknowledges and agrees that the Secured Obligations are secured by all of the Collateral according to, and otherwise on and subject to, the terms and conditions of the Security Agreement to the same extent and with the same force and effect as if the New Debtor had originally been one of the Existing Debtors under the Security Agreement and had originally executed the same as such an Existing Debtor.

4.    All capitalized terms used in this Agreement without definition shall have the same meaning herein as such terms have in the Security Agreement, except that any reference to the term "Debtor" or "Debtors" and any provision of the Security Agreement providing meaning to

-3-

BMO 001373

such term shall be deemed a reference to the Existing Debtors and the New Debtor. Except as specifically modified hereby, all of the terms and conditions of the Security Agreement shall stand and remain unchanged and in full force and effect.

5.   The New Debtor agrees to execute and deliver such further instruments and documents and do such further acts and things as the Agent may reasonably deem necessary or proper to carry out more effectively the purposes of this Agreement.

6.   No reference to this Agreement need be made in the Security Agreement or in any other document or instrument making reference to the Security Agreement, any reference to the Security Agreement in any of such to be deemed a reference to the Security Agreement as modified hereby.

7.   This Agreement shall be governed by and construed in accordance with the State of Illinois (without regard to principles of conflicts of law).

[INSERT NAME OF NEW DEBTOR]


By _____
   Name _____
   Title _____


Accepted and agreed to as of the date first above written.

BANK OF MONTREAL, as Agent


By _____
   Name _____
   Title _____

BMO 001374

## SCHEDULE H

### SUPPLEMENTAL SECURITY AGREEMENT

THIS AGREEMENT (this *"Agreement"*) dated as of this _____ day of _____, 20__ from **[Debtor]**, a _____ **corporation/limited liability company/partnership** (the *"Debtor"*), to Bank of Montreal, (*"BMO"*), as administrative agent for the Secured Creditors (defined in the Security Agreement hereinafter identified and defined) (BMO acting as such agent and any successor or successors to BMO in such capacity being hereinafter referred to as the *"Agent"*).

### PRELIMINARY STATEMENTS

A.    SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"* and, individually, a *"Borrower"*) and certain other parties have executed and delivered to the Agent that certain Amended and Restated Security Agreement dated as of September 28, 2007 (such Security Agreement, as the same may from time to time be amended, modified or restated, being hereinafter referred to as the *"Security Agreement"*), pursuant to which such parties have granted to the Agent for the benefit of the Secured Creditors a lien on and security interest in the Collateral to secure the Secured Obligations (as such term is defined in the Security Agreement).

B.    Pursuant to the Security Agreement, the Debtor granted to the Agent, among other things, a continuing security interest in all Commercial Tort Claims.

C.    The Debtor has acquired a Commercial Tort Claim, and executes and delivers this Agreement to confirm and assure the Agent's security interest therein.

NOW, THEREFORE, FOR VALUE RECEIVED, and in consideration of advances made or to be made, or credit accommodations given or to be given, to the Borrowers by the Secured Creditors from time to time, the Debtor hereby agrees as follows:

1.    In order to secure payment of the Secured Obligations, whether now existing or hereafter arising, the Debtor does hereby grant to the Agent for the benefit of the Secured Creditors, and hereby agrees that the Agent has and shall continue to have for the benefit of the Secured Creditors a continuing lien on and security interest in the Commercial Tort Claim described below:

(Insert description of the Commercial Tort Claim by referring to a specific incident giving rise to the claim)

2.    Schedule F (Commercial Tort Claims) to the Security Agreement is hereby amended to include reference to the Commercial Tort Claim referred to in Section 1 above. The Commercial Tort Claim described herein is in addition to, and not in substitution or replacement for, the Commercial Tort Claims heretofore described in and subject to the Security Agreement,

and nothing contained herein shall in any manner impair the priority of the liens and security interests heretofore granted by the Debtor in favor of the Agent under the Security Agreement.

3.    All capitalized terms used in this Agreement without definition shall have the same meaning herein as such terms have in the Security Agreement, except that any reference to the term "Collateral" and any provision of the Security Agreement providing meaning to such term shall be deemed to include the Commercial Tort Claim referred to in Section 1 above.  Except as specifically modified hereby, all of the terms and conditions of the Security Agreement shall stand and remain unchanged and in full force and effect.

4.    The Debtor agrees to execute and deliver such further instruments and documents and do such further acts and things as the Agent may deem necessary or proper to carry out more effectively the purposes of this Agreement.

5.    No reference to this Agreement need be made in the Security Agreement or in any other document or instrument making reference to the Security Agreement, any reference to the Security Agreement in any of such to be deemed a reference to the Security Agreement as modified hereby.

6.    The Debtor acknowledges that this Agreement shall be effective upon its execution and delivery by the Debtor to the Agent, and it shall not be necessary for the Agent to execute this Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

7.    This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois (without regard to principles of conflicts of law).

[INSERT NAME OF DEBTOR]


By _____
    Name _____
    Title _____

BMO 001376

# EXHIBIT 54

| From: | Dan Nutley <Dan.Nutley@mossadams.com> |
|---|---|
| Sent: | Thursday, September 20, 2007 3:27 PM |
| To: | Mark McCormick <markmc@skfoods.com> |
| Subject: | Selling Cedenco Interco debt |

The concept of distributing Cedenco stock and selling the intercompany debt to a third removes SKFLP from any relationship with Cedenco. Scott's or the Trust's guarantee of the debt would not involve SKFLP. This would solve FIN46 accounting considerations.

Chances are a third party lender could not make a transaction effective 11/1/06. Suggest the transactions be first with Scott or the Trust and then currently funded by a third party lender. As long as the funding is completed during the audit, auditors would not have to evaluate collectibility of the note from Scott or the Trust.

Dan

Dan Nutley
Partner
Moss Adams, LLP
Office: 209 955 6108
Cell: 209 481 0631
dan.nutley@mossadams.com

From: Mark McCormick [mailto:markmc@skfoods.com]
Sent: Thursday, September 20, 2007 2:33 AM
To: Dan Nutley; Shondale Seymour
Subject: Msg. frt,om MMM

Sorry ... did it again.

I have a physical exam this morning with my doctor. I'll be out of pocket until mid-morning. Dan, I 'll give you a call at your office at my first opportunity.

Best,

Mark

-------- ......................................................................................................... ............

**CONFIDENTIALITY NOTICE:** This email and any attachments are for the sole use of the intended recipient(s) and contain information that may be confidential and/or legally privileged. If you have received this email in error, please notify the sender by reply email and delete the message. Any disclosure, copying, distribution or use of this communication by someone other than the intended recipient is prohibited.

**SHARP_CH15 000283**

# EXHIBIT 55

| | |
|---|---|
| **From:** | Shondale Seymour <shondales@first organization.com> |
| **Sent:** | Thursday, September 27, 2007 9:51 AM |
| **To:** | david@antipodes99.com; Mark McCormick <markmc@skfoods.com> |
| **Cc:** | Chad Pinter <chadp@skfoods.com>; 'wboos@booscpa.com' |
| **Subject:** | Cedenco spin-off |

I was talking w/ Wayne last pm and I mentioned the Cedenco spin-off.  I told him I thought some of the dates had changed and that we were taking some of the transactions back from 5/31/07 to 11/1/06 to eliminate as much activity from Cedenco being considered during the 6/30/07 audit.

I understood from Wayne that this may create some additional work for the tax returns that will be filed on Oct 15th, so I told Wayne to check w/ you to get the details.....my details are all blurring together right now as I'm focusing on 6/30/07 and not on Cedenco.  So, when you get the call, you'll understand why.

ss

**SHARP_CH15 000287**

# EXHIBIT 56

| From: | Scott Salyer <scott@first organization.com> |
|---|---|
| Sent: | Thursday, September 27, 2007 6:49 AM |
| To: | Wayne Boos <wboos@booscpa.com>; Mark McCormick <markmc@skfoods.com> |
| Subject: | RE: Cedenco Spin-off |

Wayne

Plan was changed in order to avoid Fin 46 issue .
MA said they could not audit SK and meet time line for stub period if CED was still in SK.

So the plan is to do a note exchange with a 3rd party ( Bank ) and pull CED out .
Paper work is not complete .

Scott

**From:** Wayne Boos [mailto:wboos@booscpa.com]
**Sent:** Wednesday, September 26, 2007 8:48 PM
**To:** Scott Salyer; Mark McCormick
**Cc:** Shondale Seymour; Darrell Carlis
**Subject:** Cedenco Spin-off

Scott/Mark, I was talking with Shondale and she was mentioning latest plan is to spin off Cedenco/Australia as of Nov 1, 2006. Is this correct? I thought this was as of 5/31. I will need to know as this will impact calendar year 2006 tax returns we are currently preparing due Oct 15th. Have the documents been prepared yet?

Thanks
Wayne

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 | Fresno, California 93704
Phone (Main): 1.559.449.7688 | Phone (Direct): 1.559.436-3181
Fax: 1.559.449.1934 | Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**SHARP_CH15 000286**

# EXHIBIT 57

| From: | Mark McCormick <markmc@first organization.com> |
| From: | Mark McCormick <markmc@first organization.com> |
| Sent: | Wednesday, October 10, 2007 7:21 AM |
| To: | Scott Salyer <scotts@skfoods.com> |
| Subject: | FW: Msg. from Mark McCormick re: SK Foods / Cedenco |

See below...

I have not worked through the math and do not fully understand the transaction as it is proposed.   But having said that ...here is one possible solution to the FIN 46 issue set forth by Mike Hom at Ventana Group.   Assuming that this is economically viable,  we would have to disclose this to BMO, and to the ANZ / Bank of Australia folks in advance etc...

---

**From:** Michael Hom [mailto:mhom@ventana-group.com]
**Sent:** Wednesday, October 10, 2007 6:48 AM
**To:** Mark McCormick
**Subject:** RE: Msg. from Mark McCormick re: SK Foods / Cedenco

Mike,

You know we are a direct bridge lender.  We could issue a bridge loan with a draw down schedule. This is how it would work.

1.  We issued a commitment to buy the A/R with a factoring loan advance.  We buy it for 75% of the face value (the Company gets to write down the loan difference at this time).  The Company pays a transaction fee of 10.5% for the right to buy it back at the face value within one year (Company gets the right to write off the cost as professional fees). The amount advanced will have a coupon of 10%.
2.  Company accepts terms and we issue loan docs with a draw down scheduled.  We will then buy the A/R.  At closing we will then advance them $3,000,000 as part of the drawdown (Technically they get the money back that they paid for in the transaction fee).  We will issue monthly statements.
3.  The Company could use then use our loan commitment as an asset (it passes mustard with GAP, because the commitment from us is collateralized by the A/R).  At the end of the year the Company exercises it right to buy back the A/R.

We will take credit for the bridge and make a press release. This would take care of the deal as a arms length transaction.

Michael


Michael Hom
Senior Vice President
The Ventana Group
750 Menlo Ave Ste 340
Menlo Park CA 94025
T: 650.566.8555x111
F: 650.566.8554

**SHARP_CH15 000291**

C: 650.504.3114
E: mhom@ventana-group.com

**From:** Mark McCormick [mailto:markmc@skfoods.com]
**Sent:** Wednesday, October 10, 2007 1:50 AM
**To:** Michael Hom
**Subject:** RE: Msg. from Mark McCormick re: SK Foods / Cedenco

Mike,

We are certainly willing to pay fees to facilitate the transaction.  What I am trying to point out is that we don't require 30 million in cash to change hands between the parties.

mmm

**From:** Michael Hom [mailto:mhom@ventana-group.com]
**Sent:** Wednesday, October 10, 2007 12:08 AM
**To:** Mark McCormick
**Subject:** RE: Msg. from Mark McCormick re: SK Foods / Cedenco

Mark,

I have forward to several of our hedge funds.  What do you need to make this a real deal?

Michael

Michael Hom
Senior Vice President
The Ventana Group
750 Menlo Ave Ste 340
Menlo Park CA 94025
T: 650.566.8555x111
F: 650.566.8554
C: 650.504.3114
E: mhom@ventana-group.com

**From:** Mark McCormick [mailto:markmc@skfoods.com]
**Sent:** Wednesday, October 03, 2007 4:27 PM
**To:** mhom@ventana-group.com
**Cc:** Scott Salyer
**Subject:** FW: Msg. from Mark McCormick re: SK Foods / Cedenco

Mike,

Further to my e-mail below ....  We are not expecting any cash to change hands.  This is purely a paper transaction.

mmm

**From:** Mark McCormick
**Sent:** Wednesday, October 03, 2007 4:02 PM
**To:** 'mhom@ventana-group.com'

**SHARP_CH15 000292**

**Cc:** Scott Salyer
**Subject:** Msg. from Mark McCormick re: SK Foods / Cedenco

Mike,

As we discussed earlier this week, SK Foods, LP is owed (net) about $30 million US from a related company (Cedenco) which is based in New Zealand and Australia. You should note that all of the companies I will refer to are ultimately owned by one person, Scott Salyer. There are no minority owners and no other board members in any of the companies. Scott Salyer is the sole shareholder and board member. The majority of the balance owed by Cedenco to SK Foods, LP is due to various intercompany transactions (of an operational nature) between the companies over the past several years. There is no immediate demand for repayment of either the principal or the interest. In fact, the intercompany amounts are subordinated to ANZ Bank in New Zealand. All of the companies have years and years of historical audited financial statements available.

So here's the deal ... under US GAAP, FIN 46 forces these entities to consolidate their financial statements due to the size of the intercompany balance. The companies have no legal or financial basis for consolidation other than through the interpretation of FIN 46 by the auditors, Moss Adams. The consolidated financials are extremely confusing to SK Foods banker's, BMO Capital Markets. There are several exceptions to the GAAP rules under FIN 46. One of the exceptions relates to banks. Our request is that we want to sell our intercompany balance owed to SK Foods to a bank at book value at the end of the fiscal year. Doing so allows SK Foods to avoid the rules of FIN 46 and not consolidate the financial statements of SK Foods, LP and Cedenco in the audit. SK Foods, LP would buy the balance owed from Cedenco back from the bank in the new fiscal year. Certainly, SK Foods would pay a banking fee to facilitate the transaction.

When I talked to Peter a few days ago and described the issue, he told me that Deloitte & Touche structured these deals for ConAgra (while Peter was employed at ConAgra) to accomplish the very same thing. Peter was very familiar with the transaction and asked that I write this e-mail to you to further describe our request. In summary, we need to find a bank or Wall Street firm that will facilitate the transaction.

You should know that Cedenco is audited by Deloitte in New Zealand. I'm going to call the audit partner at Deloitte and see if I can find their internal research and documentation on this issue.

Best,

Mark

Mark M. McCormick
Executive Vice President – Treasurer

SK Foods, LP
Executive Offices
200 Sky Park Drive
Monterey, CA 93940

Office   (831) 655 – 5400
Fax      (831) 655 – 5906
Cell     (408) 608 – 9321

SHARP_CH15 000293

BMO 001383