

1  KEKER & VAN NEST LLP
   JOHN W. KEKER - #49092
2  ELLIOT R. PETERS - #158708
   BRIAN L. FERRALL - #160847
3  710 Sansome Street
   San Francisco, CA  94111-1704
4  Telephone:  (415) 391-5400
   Facsimile:  (415) 397-7188
5
   SEGAL & KIRBY LLP
6  MALCOLM S. SEGAL - #075481
   770 L Street, Suite 1449
7  Sacramento, CA  95814
   Telephone:  (916) 441-0828
8  Facsimile:  (916) 446-6003

9  Attorneys for Defendant
   FREDERICK SCOTT SALYER
10

11

12                  UNITED STATES DISTRICT COURT

13                EASTERN DISTRICT OF CALIFORNIA

14                     SACRAMENTO DIVISION

15

16  UNITED STATES OF AMERICA,          Case No. 2:10-CR-0061-LKK (GGH)

17                      Plaintiff,     **DECLARATION OF BRIAN L. FERRALL**
                                       **IN SUPPORT OF REPLIES RE:**
18       v.                            **SUPPRESSION MOTIONS AND**
                                       **MOTION FOR RECONSIDERATION**
19  FREDERICK SCOTT SALYER,
                                       Date:      August 2, 2011
20                      Defendant.     Time:      9:15 a.m.
                                       Courtroom: 4, 15th Floor
21                                     Judge:     Hon. Lawrence K. Karlton

22                                     Date Comp. Filed:     February 18, 2010

23                                     Trial Date: April 17, 2012

24

25

26

27

28

569228.03

I, BRIAN L. FERRALL, declare and state that:

1.    I am an attorney licensed to practice law in the State of California and am a partner at the law firm of Keker & Van Nest LLP, counsel for Defendant, Frederick Scott Salyer, in the above-captioned action.  I am duly admitted to practice law before this Court.  Except where expressly stated, I have knowledge of the facts set forth herein, and if called to testify as a witness thereto, could do so competently under oath.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt of a memorandum of the May 22, 2008 interview of Jeff Beasley (USAO-005227, 005233).

3.    Attached hereto as **Exhibit 2** is a true and correct copy of an FBI memorandum of the October 18, 2006 interview of Anthony Manuel (USAO-002178-179).

4.    Attached hereto as **Exhibit 3** is a true and correct copy of a September 19, 2008 FBI memorandum of information provided by Anthony Manuel on various dates (USAO-004324-325).

5.    Attached hereto as **Exhibit 4** is a true and correct copy of an FBI memorandum of the December 11, 2008 telephone contact with Anthony Manuel (USAO-003475-476).

6.    Attached hereto as **Exhibit 5** is a true and correct copy of an FBI memorandum of the March 23, 2007 interview of Anthony Manuel (USAO-002276-277).

7.    Attached hereto as **Exhibit 6** is a true and correct copy of an FBI memorandum of the March 29, 2007 interview of Anthony Manuel (USAO-002279).

8.    Attached hereto as **Exhibit 7** is a true and correct copy of an FBI memorandum of the April 16, 2008 execution of a search warrant on the Salyer residence in Pebble Beach, CA prepared by Brian M. Wickham (USAO-003857-858).

9.    Attached hereto as **Exhibit 8** is a true and correct copy of an Evidence Recovery Log and Roll Call List related to the April 16, 2008 search of the Salyer residence (USAO-135581-582).

1

569228.03

10.     Attached hereto as **Exhibit 9** is a true and correct copy of the Declaration of Ronan P. Byrne filed August 10, 2010 in support of the Response to Motion to Suppress Statements.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of an FBI 302 memorandum of the April 16, 2008 interview of Scott Salyer prepared by Ronan P. Byrne (USAO-003700-702).

12.     Attached hereto as **Exhibit 11** is a true and correct copy of the Declaration of Brian M. Wickham filed August 10, 2010 in support of the Response to Motion to Suppress Statements.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of the Cross-Complaint in re *SK Foods, LP v. McClaran*, Fresno Co. Superior Court Case No. 07 CE CG 03677, filed January 7, 2008.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of excerpts of the September 28, 2007 Amended and Restated Credit Agreement between SK Foods, L.P., Bank of Montreal and Lasalle Bank, attached as Exhibit 1 to the Declaration of Lawrence A. Mizera *in re SK Foods, L.P.*

15.     Attached hereto as **Exhibit 14** is a true and correct copy of the Search Warrant and Affidavit of Special Agent Paul S. Artley, to search locations in Monterey, California issued April 14, 2008 (USAO-000749-888).

16.     Attached hereto as **Exhibit 15** is a true and correct copy of an FBI Receipt of Property Seized during the April 16, 2008 search of SK Foods, Inc. corporate office on Sky Park Drive in Monterey, California (USAO-132979-983).

17.     Attached hereto as **Exhibit 16** are true and correct copies of articles entitled "International Sales Spice Up Heinz Results" (Forbes.com on May 29, 2008); "Kraft to focus on 10 brands overseas: int'l chief" (Reuters.com, Sept. 3, 2008) and "General Mills to keep

2

569228.03

1  expanding international unit" (USAToday.com, Sept. 22, 2008).

2      18.    Attached hereto as **Exhibit 17** is a true and correct copy of a transcription of a

3  June 12, 2008 recorded telephone call between Randy Rahal and Scott Salyer prepared by my

4  office.  I have reviewed the audio files of the wiretap and this excerpt accurately reflects the

5  conversation, to the best of my ability to understand the words.

6

7      I declare under penalty of perjury under the laws of the State of California that the

8  foregoing is true and correct and that this declaration was executed on July 15, 2011 in

9  San Francisco, California.

10         BRIAN L. FERRALL

DECLARATION OF BRIAN L. FERRALL IN SUPPORT OF REPLIES RE: SUPPRESSION MOTIONS AND
MOTION FOR RECONSIDERATION
CASE NO. 2:10-CR-0061-LKK (GGH)
BMO 001576

569228.03

AO 93 (Rev. 5/85) Search Warrant

# United States District Court

__NORTHERN__    **DISTRICT OF**    __CALIFORNIA__

In the Matter of the Search of
(Name, address or brief description of the person or property to be searched))

SK Foods--Corporate Office
200 Sky Park Drive
Monterey, California 93940

SEALED BY ORDER
OF THE COURT

**SEARCH WARRANT**

CASE NUMBER:

## 08-70216 HR

TO: __Paul Artley, Special Agent, FBI__ and any Authorized Officer of the United States

Affidavit(s) having been made before me by __Paul Artley, Special Agent, FBI__ who has reason to
Affiant

believe that ☐ on the person of or ☑ on the premises known as (name, description and/or location)

SK Foods--Corporate Office
200 Sky Park Drive, Monterey, California 93940

in the __Northern__ District of __California__ there is now
concealed a certain person or property, namely (describe the person or property)

Please see Attachment B-1

which constitutes evidence of a crime; contraband; fruits of a crime; property used to commit a crime
(state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rule of Criminal Procedure)

of a criminal violation(s) of Title __18__, United States Code, Section(s) 371, 1343, 1346, 1341, 1952, 1962, *1832, 1344, and*
I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property *Title 21, United*
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this *States Code,*
warrant. *Section 331,*
YOU ARE HEREBY COMMANDED to search on or before __4/24/08__ *and Title 15,*
Date *United States Code*
(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and *Section 1.*
making the search (in the daytime--6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established), and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to __Any US Magistrate Judge__ as required by law.
U.S. Judge or Magistrate Judge

__4/14/08 at 1:52 PM__ at __San Jose, California__
Date and Time Issued    City and State

__HOWARD R. LLOYD, U.S. MAG. JUDGE__
Name and Title of Judicial Officer    Signature of Judicial Officer

AO 93 (Rev. 2/90) Search Warrant

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is true and detailed account of the person or property taken by me on the warrant.

_____

Subcribed, sworn to, and returned before me this date.

_____   _____
U.S. Judge or Magistrate                                    Date

USAO-000750

ATTACHMENT A-1

Location to be searched:

**Corporate Office of SK FOODS, located at 200 Sky Park Drive, Monterey, California 93940**

Further described as: a two story commercial building/hanger which is located on the tarmac of the Monterey, California airport. The building is tan and brown in color with tinted windows. The number "200" is on the front of the building. The building has a side entrance with double doors and white letters indicating "200 Sky Park Drive Executive Offices." The rear of the building, which is located on the tarmac of the airport, has a large door which opens to house aircraft.

Including, if present at that location, vehicles under the dominion and control of Scott Salyer or Alan Huey; a "Hawker" jet and a "Cessna" aircraft; and the person of Scott Salyer, a white male,

-1-

USAO-000751

ATTACHMENT B-1

Items to be seized from the Corporate Office of SK FOODS, located
at 200 Sky Park Drive, Monterey, California 93940

I.    DEFINITIONS

A.    The "Relevant Time Period" for items to be seized, unless
      otherwise indicated, is from January 1, 2004 through and
      including the date of the execution of this Search Warrant.

B.    The term "Bribe Recipients" as used herein includes known
      and suspected bribe recipients identified as follows:

      Michael Chavez
      Patrick Coe
      Joel Delira
      George McMillion
      Dennis Poydence
      Charles Puff
      Bill Thomas
      Robert Turner
      James Wahl
      Robert Watson

C.    The term "SK Personnel" as used herein includes personnel of
      SK Foods and personnel of Intramark identified as follows:

      Tanya Arazi
      Jeff Beasley
      Beth Clair
      Lisa Crist
      Jennifer Dahlman
      Rick Emmett
      Mark Grewal
      Alan Huey
      Kathy Kania
      Steve King
      Glen Long
      Tony Manuel
      Glen McClaran
      Mark McCormick
      Michael Poretti
      Randall Rahal   (herein RAHAL)
      Karen Rinehart
      Frederick "Scott" Salyer (herein SALYER)
      Maryanne Stucker
      Richard Washburn

-1-

D.   The term "Competitors" as used herein includes:

Ingomar
Morning Star
Los Gatos
Rio Bravo
Greg Pruett
Rodger Wasson
Stuart Woolf

E.   The term "Customers" as use herein includes:

Agusa
B&G Foods
Barilla
Better Baked Foods
Campbell's Soup
Chelton House
Clement Pappas
Conagra
Dairy Farmers of America
Del Monte
Frito-Lay
Hatch Chile Company
Heinz
Kraft
Lidestri Foods
Manning Farms
McCain Foods
McCormick
Nation Pizza Products
Pacific Coast Producers
Quest International
Red Gold
Safeway
San Antonio Farms
UBF/IFS Food Solutions
White Oak Frozen Foods

F.   The term "SK Foods" as used herein includes the following
     related entities regardless of legal structure, e.g., sole
     proprietorship, partnership or corporation:

SK FOODS
Cedenco
Intramark
Intramark, USA
California Tomato Export Group (CTEG)

-2-

USAO-000753

Blackstone Ranch
NAAS Foods
RHM Industrial Specialty
S&D Farms
S&R Farms
Salyer American Fresh Foods
SK PM
SKF Canning
SS Farms
SK Aviation
SKF Aviation
SS Farms
SSC Farms/Farming
SSC Investments
World Tomato Alliance (WTA)

G.   **The term "Document" as used herein includes the following:**

Any written, recorded, or graphic material including
but not limited to: memoranda, reports, letters, notes,
electronic mail, other electronic correspondence, other
communications recorded in any form or medium, notes,
minutes, transcripts, contracts, legal agreements,
checks, check registers, statements, ledgers, records
of financial matters or commercial transactions,
appointment books, calendars, notebooks, and diaries,
including data in PDAs, maps, diagrams, graphs, charts,
drawings, publications, photographs, photocopies,
computer printouts, tallies, tabulations, summaries,
file folders, file tabs, folder tabs, mailing
envelopes, facsimile transmission cover sheets, and any
other proof or indicia of mailing.  The term "document"
includes drafts and copies, bills of lading, invoices,
and purchase orders.  The term "document" includes all
data (including metadata) stored in electronic form or
accessible through computer or other information
retrieval systems, together with instructions and all
other materials necessary to use or interpret this
data.

II.   **ITEMS TO BE SEIZED**

A.   **General Items**

1.   Calendars, appointment books, planners, diaries, journals or
     other books reflecting the appointments, meetings, notes or
     schedules of SALYER, RAHAL, or other SK Personnel during the
     Relevant Time Period including leather bound books engraved

-3-

USAO-000754

with "SK Foods" to include the book marked "2008" (green in color) as well as books marked 2005, 2006, 2007.

2.    Travel and expense vouchers, reservations, receipts, and related documents reflecting travel during the Relevant Time Period by SALYER or Alan HUEY.

3.    Laptop computers in possession of, assigned to, or used by SALYER, HUEY, JEFF BEASLEY, MICHAEL PORETTI, STEVE KING, and Jennifer DAHLMAN.

4.    Certificates of incorporation, partnership agreements, by-laws, minutes, certificates of stock or partnership interests,  filings with the California Secretary of State, and other documents reflecting the organizational structure, owners, and officers of any of SK Foods and the related companies identified herein.

B.    **Documents Relating to Bribes/Kickbacks**

1.    Documents reflecting or relating to payments (in cash, check, or property) between SALYER, RAHAL, SK FOODS, INTRAMARK, or any SK FOODS company to any Bribe Recipient, any family member of a Bribe Recipient, or to any other entity for the direct or indirect benefit of a Bribe Recipient.

2.    Documents reflecting agreements between SALYER, RAHAL, and SK FOODS company INTRAMARK, or any SK Personnel and any Bribe Recipient, any family member of a Bribe Recipient, or any other entity in a position to directly or indirectly benefit a Bribe Recipient.

3.    Documents reflecting communications or contacts, including notes, memoranda, correspondence, reports, e-mails, relating to any meetings or conversations between SK Personnel and any Bribe Recipient, or among any SK Personnel about any Bribe Recipient.

4.    Any documents containing, reflecting or referring to any code of conduct for SK FOODS or any of the Customers' employees including employee handbooks or other records relating to bribery, kickback and conflict-of-interest policies.

5.    All proprietary, confidential, non-public or internal documents, including contracts, bidding proposals, financial statements, pricing information, recipes, customer lists, documents relating to the production process or plant

-4-

USAO-000755

configurations or operations, which appear to be the property of a Competitor or a Customer.

6. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to Agusa from January 1, 2004 to present.

7. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to B&G Foods from January 1, 2004 to present, including the sale of chile, jalapeno products in 2007.

8. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to ConAgra from January 1, 2004 to present, including the sale of 10 million pounds of tomato product to Con Agra Europe in December 2006.

9. Fax records between 6/15/07 to 6/22/07 to or from INTRAMARK, SK FOODS, and ConAgra.

10. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to Frito-Lay from January 1, 2004 to present.

11. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to Kraft from January 1, 2004 to present.

12. Records relating to product returned to SK Foods from Kraft Foods in 2008 as a result of the presence of metal shavings, including any documents regarding Lots 07091113 through 07091118.

13. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to Safeway from January 1, 2004 to present.

14. Records relating to offer, attempted sale, sale, billing, shipment, or collection of payment for any product by SK FOODS to Hatch from January 1, 2004 to present.

C. **Documents Relating to Fraudulent Product Labeling**

1. Handwritten lab registers, lab register data sheets, lab sheets, daily production sheets, production process records maintained pursuant to 21 CFR §§ 113.100(e), 114.100(e), lab results registers, pick lists, pick list exception reports, and certificate of analysis (COA) reports and any other

-5-

USAO-000756

reports which reflect actual or altered listings of lot numbers and corresponding tomato solids known as "bricks" (Natural Tomato Soluble Solids "NTSS"); ph; acidity; mold; color; and bostwick (viscosity), whether product is produced by SK Foods, or is produced by another company, and any records which reflect changes or alterations to such records, or multiple versions of such records, or any electronic equipment upon which such data can be stored.

2.  Any equipment which can be used to produce, alter, or print bin labels and any device or documents, including electronically stored documents, from which data can be transmitted to produce, alter or print bin labels.

3.  Any documents, including those electronically stored, reflecting communication between Jennifer DAHLMAN, Alan HUEY or other SK Personnel regarding the production, printing, altering or falsification of lab results, label specifications or COA's.

4.  Records reflecting any altering or falsification of lab results registers, bin labels or COAs to meet contract specifications.

5.  Documents related to sales contracts which include the contract specifications for the following: "bricks" (Natural Tomato Soluble Solids "NTSS"); ph; acidity; mold; color; and bostwick (viscosity).

6.  Any shipping documents related to shipment of tomato paste with falsified or altered lab results registers, bin labels or COAs.

7.  Any records related to the rejection or return of product to SK FOODS including records reflecting the reason for the return, the return shipping, and the current location of the returned product.

8.  Product guarantees or other representations that product meets, conforms to, or exceeds any type of USDA guidelines, FDA level (such as Federal Defect Action levels or HACCP (Hazard Analysis and Critical Point), as well as any documents reflecting the possessor's awareness of the requirement for these guidelines or specifications.

9.  Records of any communications with, or among SK Personnel, about the Federal Drug Administration (FDA) or United States Department of Agriculture (USDA) concerning Federal Defect

-6-

USAO-000757

Action Levels or compliance with other FDA or USDA rules, regulations, policies, or guidelines.

D.  **Documents Relating to Bill and Hold Fraud**

1.  Records relating to "Bill and Hold" contracts including: communications by or among SK Personnel; contracts; records of allocation or assignment of lots or bins to particular contract; invoices; records of payment; and records of tracking, shipment, movement, location of bins.

2.  Records of communication among SK Foods Personnel relating to reservation, holding, assignment or allocation of any inventory to Bill and Hold contracts; the presence of inventory on SK FOODS premises of any "Bill and Hold" inventory; or records related to any efforts to circumvent a "Bill and Hold" contractual obligation.

3.  Communications by SK Foods Personnel in which they conveyed or confirmed to a Customer or a banking institution that "Bill and Hold" inventory was present on SK Foods' premises and / or was otherwise being held for Customer.

4.  Inventory records showing or listing quantities and types of products present on the premises at SK FOODS facilities.

5.  Records reflecting yearly (or monthly) production of types and quantities of product, and yearly (or monthly) shipment or delivery of types and quantities of product for relevant time period.

E.  **Documents Relating to Bank Fraud, Proceeds**

1.  Records including loan applications, loan agreements, contracts, covenants, audit reports, financial statements, consulting reports and other records provided to, or prepared for, banks or other lending institutions by SK Foods, SK Foods Personnel, or on behalf of SK Foods, for the purpose of obtaining a loan or financial benefit to SK Foods.

2.  Any document purporting to list or represent assets owned by SK FOODS including representations regarding inventory.

3.  Samples of banking or financial records for the purpose of identifying bank and investment/brokerage accounts or other institutions with whom SK Foods has engaged in wire

-7-

USAO-000758

transfers, deposits, loans, and other financial transactions.

4.  Federal Income Tax returns of SK FOODS and INTRAMARK for tax years 2004 to 2007, notices from the IRS, and any responses thereto.

F.  **Documents Relating to Antitrust Violations**

1.  Documents, including notes, memoranda, correspondence and reports relating to any agreements, meetings, conversations, or other communications or contacts, occurring at California Tomato Group (CTEG) or World Tomato Alliance (WTA) events or otherwise, between or among officers, directors, employees, or agents (including Intramark)of SK FOODS and any officer, director, employee or agent of Ingomar Packing(including Greg Pruett), and Los Gatos Tomato Products (including Stuart Woolf), relating to bids or prices for paste or diced tomatoes to be submitted to prospective customers located in the United States.

2.  All appointment records, diaries, calendars, notebooks, and other documents used to record schedules, meetings, conversations or other events by or for SALYER, MCCLARAN, and RAHAL.

3.  All address books (including electronic address books, such as devices commonly referred to as electronic organizers), message logs, or other indicia of notation of messages and telephone numbers and calls of SALYER, MCCLARAN and RAHAL with Greg PRUETT and/or Stuart WOOLF.

4.  All expense records prepared by or for SALYER, McCLARAN and RAHAL relating to contacts or communications with PRUETT and WOOLF or attendance at CTEG and/or WTA meetings.

5.  All customer lists or spreadsheets showing customers of SK FOODS, INGOMAR Packing, or LOS GATOS Tomato Products.

6.  All documents relating to any price, bid, price quotation, or proposal to Barilla, ConAgra, Del Monte, Frito-Lay, Golden State Foods, Heinz, Kraft, Little Lady Foods, Nestle and Safeway for the sale of tomato-based products, regardless of which company submitted the bid price quotation or proposal.

G.  **Computers and Electronic Storage**

-8-

1.    Computer hardware, meaning any and all computer equipment
      including any electronic devices which are capable of
      collecting, analyzing, creating, displaying, converting,
      storing, concealing, or transmitting electronic, magnetic,
      optical, or similar computer impulses or data. Included
      within the definition of computer hardware is any data
      processing hardware (such as central processing units and
      self-contained laptop or notebook computers); internal and
      peripheral storage devices (such as fixed disks, external
      hard disks, floppy disk drives and diskettes, tape drives
      and tapes, optical and compact disk storage devices, and
      other memory storage devices); peripheral input/output
      devices (such as keyboards, printers, scanners, plotters,
      video display monitors, and optical readers); related
      communications devices (such as modems, cables and
      connections, recording equipment, RAM and ROM units,
      acoustic couplers, automatic dialers, speed dialers,
      programmable telephone dialing or signaling devices, and
      electronic tone generating devices); and any devices,
      mechanisms, or parts that can be used to restrict access to
      such hardware (such as physical keys and locks).

      The agents searching for such information are authorized to
      seize such computer(s) as may contain any items or documents
      identified herein and remove them to a laboratory setting
      for a sufficient period of time, not to exceed thirty (30)
      days absent a court-authorized extension, to obtain access
      to, and search for, and recover files and records described in
      the foregoing paragraphs.

3.    Any electronic information or data, stored in any form,
      which has been used or prepared for use either for periodic
      or random backup (whether deliberate, inadvertent, or
      automatically or manually initiated), of any computer or
      computer system. The form such information might take
      includes, but is not limited to, floppy diskettes, fixed
      hard disks, removable hard disk cartridges, tapes, laser
      disks, CD-ROM disks, video cassettes, and other media
      capable of storing magnetic or optical coding.

4.    Any electronic storage device capable of collecting,
      storing, maintaining, retrieving, concealing, transmitting,
      and using electronic data, in the form of electronic
      records, documents, and materials, including those used to
      facilitate interstate communications. Included within this
      paragraph is any information stored in the form of
      electronic, magnetic, optical, or other coding on computer
      media or on media capable of being read by a computer or
      computer- related equipment, such as fixed disks, external

                              -9-

USAO-000760

hard disks, removable hard disk cartridges, floppy disk
drives and diskettes, tape drives and tapes, optical storage
devices, laser disks, or other memory storage devices.

5.   Computer software, meaning any and all information,
     instructions, programs, or program codes, stored in the form
     of electronic, magnetic, optical, or other media, which is
     capable of being interpreted by a computer or its related
     components.  Computer software may also include data, data
     fragments, or control characters integral to the operation
     of computer software, such as operating systems software,
     applications software, utility programs, compilers,
     interpreters, communications software, and other programming
     used or intended to be used to communicate with computer
     components.

6.   Computer-related documentation, meaning any written,
     recorded, printed, or electronically-stored material which
     explains or illustrates the configuration or use of any
     seized computer hardware, software, or related items.

7.   Computer passwords and data security devices, meaning any
     devices, programs, or data -- whether themselves in the
     nature of hardware or software -- that can be used or are
     designed to be used to restrict access to, or to facilitate
     concealment of, any computer hardware, computer software,
     computer-related documentation, or electronic data records.
     Such items include, but are not limited to, data security
     hardware (such as encryption devices, chips, and circuit
     boards); passwords; data security software or information
     (such as test keys and encryption codes); and similar
     information that is required to access computer programs or
     data or to otherwise render programs or data into usable
     form.

8.   Any records or documents pertaining to accounts held with
     Internet Service Providers.

H.   **Computer Search Procedure**

1.   In executing this warrant, the government must begin by
     ascertaining  whether all or part of a search of a device or
     media that stores data electronically (collectively, the
     "device") that is authorized by this warrant reasonably can
     be completed at the site within a reasonable time.  If the
     search reasonably can be completed on site, the government
     will remove the device from the site only if authorized by
     law because removal is (1) necessary to preserve evidence,

-10-

USAO-000761

or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2.   If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3.   The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for off site examination - unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime, or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device in which data is stored electronically.

4.   If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten (10) calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5.   The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than thirty (30) calendar days after the initial execution of the warrant. Within thirty (30) calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime.  Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy -  and to delete from any devices or storage media or copies that it has retained or

-11-

USAO-000762

made - copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime. The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6. In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item - or any data contained in any searched or seized item - and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

-12-

USAO-000763

## AFFIDAVIT OF SPECIAL AGENT PAUL S. ARTLEY
### IN SUPPORT OF SEARCH WARRANTS

### TABLE OF CONTENTS

I.   BACKGROUND AND EXPERTISE OF AFFIANT . . . . . . . . . . . 1

II.  INTRODUCTION . . . . . . . . . . . . . . . . . 3

     A.   Criminal Statutes . . . . . . . . . . . . . . 3

     B.   Summary of Investigation . . . . . . . . . . 7

III. NATURE OF APPLICATION . . . . . . . . . . . . . . 10

IV.  PROBABLE CAUSE TO BELIEVE EVIDENCE OF CRIMES WILL
     WILL BE FOUND AT REQUESTED LOCATIONS . . . . . . . . . 10

     A.   Background . . . . . . . . . . . . . . . 10

          1.   Witness #1 . . . . . . . . . . . . . . . . 14

          2.   Interception of Wire Communications . . . . . 18

     B.   Commercial Bribery . . . . . . . . . . . . . 18

          1.   Information from Witness #1 . . . . . . . . 18

          2.   Evidence of Payments to Individuals Depriving
               Their Employers of Honest Services . . . . . . 24

               a)   Agusa . . . . . . . . . . . . . . 24

               b)   B&G Foods . . . . . . . . . . . . 26

               c)   ConAgra . . . . . . . . . . . . . 28

               d)   Del Monte . . . . . . . . . . . . 29

               e)   Frito-Lay . . . . . . . . . . . . 31

               f)   Kraft . . . . . . . . . . . . . . 34

               g)   Pacific Coast Producers . . . . . . . . 36

               h)   Safeway . . . . . . . . . . . . . 37

          3.   Other Evidence of Bribery . . . . . . . . 40

               a)   Wire Interception . . . . . . . . . 40

USAO-000764

      b)    Bank Records . . . . . . . . . . . . . . 40

      c)    Tax Returns . . . . . . . . . . . . . . 41

   4.   **Documents Relevant to Bribery Allegations** . . 41

C.  **Fraudulent Product Labeling** . . . . . . . . . . . 42

   1.  **Allegations in Civil Lawsuit** . . . . . . . . 45

   2.  **Information From Witness #1** . . . . . . . . 47

   3.  **Recordings/Wire Interception** . . . . . . . . 56

   4.  Documents Relevant to Fraudulent
      **Product Labeling** . . . . . . . . . . . . . . 58

D.  **Antitrust Violations** . . . . . . . . . . . . . 60

   1.  **Information from Witness #1** . . . . . . . . 62

   2.  **Recordings/Wire Interception** . . . . . . . . 67

   3.  **Documents Relevant to Antitrust Violations** . . 73

E.  **"Bill and Hold" Fraud** . . . . . . . . . . . . 76

   1.  **Fraud on Customers** . . . . . . . . . . . 76

      a)    Wire Interceptions . . . . . . . . . . 77

      b)    Information from Witness #1 . . . . . . 78

   2.  **Bank Fraud / Misrepresentations of Inventory** . 79

   3.  **Documents Relevant to Bill and Hold Fraud** . . 80

F.  **Theft of Confidential Information** . . . . . . . . 81

G.  **Fraud to Induce Customers to Sign Contracts** . . . . 85

H.  **Other Items** . . . . . . . . . . . . . . . . . 88

I.  **Locations Where Documents Are Kept** . . . . . . . 89

-ii-

USAO-000765

      1.    Sky Park Drive Corporate Office . . . . . . . 90

      2.    New Ryan Ranch Corporate Offices . . . . . . . 92

      3.    Residence of Scott Salyer . . . . . . . . . 93

      4.    Documents At Multiple Locations . . . . . . . 97

   J.  Individuals and Entities Listed in Attachment . . . 102

V.   EVIDENCE OF POTENTIAL DESTRUCTION, CONCEALMENT,
     OR ALTERING OF EVIDENCE . . . . . . . . . . . . . 105

VI.  REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS . . . . 107

   A.  Seizure Request . . . . . . . . . . . . . 107

   B.  Search Procedure . . . . . . . . . . . . . 117

VII. REQUEST FOR SEALING . . . . . . . . . . . . . . . 121

VIII. CONCLUSION . . . . . . . . . . . . . . . . . . 121

BMO 001594

USAO-000766

### AFFIDAVIT OF SPECIAL AGENT PAUL S. ARTLEY
### IN SUPPORT OF SEARCH WARRANTS

I, Paul S. Artley, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

## I. BACKGROUND AND EXPERTISE OF AFFIANT

1.   I have been an FBI Special Agent for approximately twelve years.  Prior to becoming an FBI special agent, I received a bachelor's degree in Accounting, became a certified public accountant (CPA) and was employed by a public accounting firm.

2.   Following my training at the FBI Academy, I received over 200 hours of training in various aspects of criminal investigation as well as attending classes and seminars dealing specifically with white collar crime, money laundering, and various aspects relating to various financial investigative techniques and related financial investigations.

3.   I am currently assigned to the FBI Sacramento Division. For approximately the past nine years, I have been assigned to investigate white collar crime matters which include mail fraud, wire fraud, bank fraud and money laundering.  I have also investigated individuals and organized crime groups who used sophisticated methods to launder their illicit proceeds. I have been the lead case agent on at least 50 fraud or economic crime investigations, have participated in at least 50 search warrants

-1-

in white collar investigations, and have interviewed numerous witnesses and defendants about methods of committing and concealing economic crimes.

4.   Since August 2005, I have been one of several agents assigned to the investigation of Randall RAHAL and SK Foods, which is being conducted jointly by the FBI, the Internal Revenue Service Criminal Investigation Division (IRS); the Office of Inspector General, Food and Drug Administration (FDA); and the Department of Justice, Antitrust Division.

5.   Based on my personal participation in this investigation, including my review of documents, electronic communications, surveillance, the interception of wire communications, interviews and my discussions with other investigating agents, I am familiar with the facts and circumstances of this investigation.  The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers and agents with whom I have spoken, or whose reports I have reviewed.  Since this affidavit is being submitted for the limited purpose of securing authorization to conduct search warrants at specific locations, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation to obtain authorization to search the herein described locations.  The opinions and conclusions set forth below are based on my training

-2-

USAO-000768

and experience as an FBI agent, my discussions with other law
enforcement officers, and my participation in this investigation.

II.   **INTRODUCTION**

    A.   **Criminal Statutes**

    6.   I certify that the FBI, in conjunction with the IRS,
FDA, and Antitrust Division is conducting an investigation into
various criminal offenses by Randall RAHAL and others, including,
but not limited to:

    **Title 18, United States Codes, Section 371** (conspiracy to
commit offense against the United States):

> If two or more persons conspire either to commit any
> offense against the United States . . . and one or more
> of such persons do any act to effect the object of the
> conspiracy, each shall be fined under this title or
> imprisoned not more than five years, or both;

    **Title 18, United Sates Code, Sections 1343 and 1346** (honest
services wire fraud):

> Whoever, having devised or intending to devise any
> scheme or artifice to defraud, or for obtaining money
> or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to
> be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any
> writings, signs, signals, pictures,. or sounds for the
> purpose of executing such scheme ir artifice, shall be fined
> under this title or imprisoned not more than 20 years, or
> both.

    Under section 1346, the term "scheme or artifice to defraud"
includes a scheme or artifice to defraud another of the
intangible right of honest services.

    **Title 18, United States Code, Section 1341** (mail fraud):

BMO 001597                                        USAO-000769

Whoever, having devised or intending to devise any
scheme or artifice to defraud, or for obtaining money
or property by means of false or fraudulent pretenses,
representations, or promises, . . . for the purpose
of executing such scheme or artifice or attempting so
to do, places in any post office or authorized
depository for mail matter, any matter or thing whatever
to be sent or delivered by the Postal Service, or
deposits or causes to be deposited any matter or thing
whatever to be sent or delivered by any private or
commercial interstate carrier, or takes or receives
therefrom, any such matter or thing, or knowingly causes to
be delivered by mail or such carrier according to the
direction thereon, or at the place at which it is directed
to be delivered by the person to whom it is addressed, any
such matter or thing, shall be fined under this title or
imprisoned not more than 20 years, or both.

**Title 18 United States Code, Section 1952** (Interstate travel

in aid of racketeering):

Whoever travels in interstate or foreign commerce or
uses the mail or any facility in interstate or foreign
commerce, with intent to  –

(1) distribute the proceeds of any unlawful activity;
or
* * *

(3) otherwise promote, manage, establish, carry on,
or facilitate the promotion, management, establishment,
or carrying on, of any unlawful activity, and
thereafter performs or attempts to perform–

(A) an act described in paragraph (1) or (3) shall be
fined under this title, imprisoned not more than 5 years,
or both.

"Unlawful activity" under the statute includes bribery in

violation of state law.

**Title 18, United States Codes, Section 1962(c) and (d)**

(conducting and conspiring to conduct the affairs of an

enterprise, which enterprise was engaged in, and the activities

-4-

of which affected, interstate or foreign commerce):

> (c) It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection
> of unlawful debt.

"Racketeering activity" includes violations of state

commercial bribery statutes including California Penal Code §

641.3, and violations of the wire, mail and fraud acts indictable

under 18 U.S.C. §§ 1341, 1343, 1344, & 1952.  Subsection (d)

proscribes conspiracies to violation section (c).

**Title 18, United States Code, Section 1832** (theft of trade

secrets):

> Whoever, with intent to convert a trade secret, that
> is related to or included in a product that is produced
> for or placed in interstate or foreign commerce, to the
> economic benefit of anyone other than the owner thereof,
> and intending or knowing that the offense will, injure
> any owner of that trade secret, knowingly –

>> (1) steals, or without authorization appropriates,
>> takes, carries away, or conceals, or by fraud, artifice
>> or deception obtains such information;
>> (2) without authorization copies, duplicates, sketches,
>> draws, photographs, downloads, uploads, alters,
>> destroys, photocopies, replicates, transmits, delivers,
>> sends, mails, communicates, or conveys such
>> information;
>> (3) receives, buys, or possesses such information,
>> knowing the same to have been stolen or appropriated,
>> obtained, or converted without authorization;
>> (4) attempts to commit any offense described in
>> paragraphs (1) through (3); or
>> (5) conspires with one or more other persons to commit
>> any offense described in paragraphs (1) through (3),
>> and one or more of such persons do any act to effect
>> the object of the conspiracy,

> shall, except as provided in subsection (b), be fined under

BMO 001599

USAO-000771

this title or imprisoned not more than 10 years, or both.

**Title 18, United States Code, Section 1344** (bank fraud):

Whoever knowingly executes, or attempts to execute, a scheme
or artifice –

> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits,
> assets, securities, or other property owned by, or
> under the custody and control of, a financial
> institution, by means of false and fraudulent
> pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not
more than 30 years, or both.

**Title 21, United States Code, Section 331** (misbranded and

adulterated foods):

> The following acts and the causing thereof are
> prohibited:
>
> > (a) The introduction or delivery for introduction
> > into interstate commerce of any food, drug,
> > device, or cosmetic that is adulterated or
> > misbranded.
> > (b) The adulteration or misbranding of any food,
> > drug, device, or cosmetic in interstate commerce.
> > (c) The receipt in interstate commerce or any
> > food, drug, device, or cosmetic that is
> > adulterated or misbranded, and the delivery or
> > proffered delivery thereof for pay or otherwise.

Under section 342, "adulterated" food includes food that

bears any filthy substance or is otherwise unfit for food, or if

damage or inferiority has been concealed in any manner.  Under

section 343, "misbranded" food includes food that has labeling

that is false or misleading in any particular.  Under section

333(a), any person who violates section 331 shall be imprisoned

for not more than one year or fined not more than $1,000, or

-6-

BMO 001600

USAO-000772

both.   If the offense is committed with intent to defraud or

mislead, such person shall be imprisoned for not more than three

years or fined not more than $10,000, or both.

**Title 15, United States Code, Section 1** (antitrust

violations):

> Every contract, combination in the form of trust or
> otherwise, or conspiracy, in restraint of trade or
> commerce among the several States, or with foreign
> nations, is declared to be illegal. Every person
> who shall make any contract or engage in any
> combination or conspiracy hereby declared to be
> illegal shall be deemed guilty of a felony, and, on
> conviction thereof, shall be punished by fine not
> exceeding $100,000,000 if a corporation, or, if any
> other person, $1,000,000, or by imprisonment not
> exceeding 10 years, or by both said punishments, in
> the discretion of the court.

These offenses are being carried out in the Eastern District

of California, the Northern District of California, the District

of New Jersey, and elsewhere.

**B.   Summary of Investigation**

7.   As set forth more fully below, our investigation

indicates that Randall RAHAL works on behalf of SK FOODS which

sells tomato products, such as diced tomatoes and bulk tomato

paste which is used as an ingredient in finished products such as

soups and sauces.   SK Foods customers include large corporate

customers such as Kraft Foods and Frito-Lay.   Our investigation

has developed probable cause to believe that RAHAL and others at

SK Foods are paying bribes to the purchasing managers of its

customers to ensure that these customers will purchase tomato

BMO 001601

USAO-000773

products from SK FOODS rather than from competitors of SK Foods.

8.   We also have probable cause to believe that RAHAL and others at SK FOODS have entered into understandings with two of SK FOODS' competitors, INGOMAR and LOS GATOS, to fix prices, rig bids, and allocate customers.

9.   In addition, we have probable cause to believe that RAHAL and some of the other individuals at SK FOODS are also engaged in the sale of adulterated food in violation of 21 U.S.C. § 342(a).  Specifically, evidence indicates SK Foods has provided product to its customers that does not meet Food and Drug Administration (FDA) and/or United States Department of Agriculture (USDA) guidelines for mold content.

10.   In addition, we have probable cause to believe that SK FOODS has knowingly sold product to customers that does not meet customer specifications and has falsified its internal documents and the labels on the product to make the product appear as if it meets customer specifications.

11.   We have also developed evidence that SK FOODS is defrauding its customers and lenders by accepting advance payment for product that the customer believes is being held at SK FOODS on its behalf when, in fact, the product is not held or reserved for those customers.  We believe SK FOODS may also be making representations that they own this inventory on bank loan applications, thereby falsely representing its assets.

12.   We have also developed evidence that the subjects

-8-

USAO-000774

defraud customers by making false representations or providing

false documentation in order to induce them to sign contracts

with SK FOODS.  In addition, we have developed evidence that the

subjects wrongfully obtain proprietary information from

competitors.

13.  By these schemes, SK FOODS and those acting on its

behalf are defrauding the various customer-companies buying the

tomato products: by bribing the purchasing managers of those

companies; agreeing with SK Foods' competitors to fix prices, rig

the bids submitted to those customers, and allocate customers;

providing customers with mislabeled product which is moldy or

otherwise inferior to the product as ordered by the customer and

as represented to the customer by false documents and false

labels on bins; and, accepting advance payment from its customers

to hold inventory for the customers when the company does not

intend to set-aside or reserve any product in its inventory for

those customers.

14.  By receiving these bribes for their own personal

benefit, the purchasing managers for SK Foods' customer-companies

are acting in their own personal interest rather than in the

interest of their employers.  Therefore, those purchasing

managers and SK FOODS and RAHAL are depriving the customer-

companies of the honest services of their own purchasing

managers.

/ / /

-9-

USAO-000775

III. **NATURE OF APPLICATION**

15.   This application is submitted in support of warrants to search and seize computers and documents as described in Attachments B-1, B-2, and B-3 on the following premises as more fully described in Attachments A-1, A-2 and A-3 hereto:

1)   SK Foods - Corporate Office
     200 Sky Park Drive
     Monterey, California 93940

2)   SK Foods - Corporate offices
     Ryan Ranch office park
     21 Lower Ragsdale Drive
     Monterey, California 93940

3)   Residence of Scott Salyer
     3903 Ronda Road
     Pebble Beach, California 93953

16.   Search warrants are simultaneously being sought for three additional locations in the Eastern District of California and one location in the District of New Jersey.

IV. **PROBABLE CAUSE TO BELIEVE EVIDENCE OF CRIMES WILL BE FOUND AT REQUESTED LOCATIONS**

A.   **Background**

17.   The SK FOODS website at www.skfoods.com indicates that SK FOODS was established in 1990.  The website states, "SK FOODS is a leading grower and processor of tomato products for manufacturers, retail and food service marketers."  The website states that in 2003 SK FOODS became the sole owner of Cedenco Foods Ltd., with locations in New Zealand and Australia.

18.   On the "About Us" tab on the website, under "Contact", it shows SK FOODS - Colusa Canning at 6229 Meyers Road, Williams,

-10-

USAO-000776

California 95987.  It shows SK FOODS Executive Offices at 200 Sky
Park Drive, Monterey, CA 93940.  It also shows SK FOODS - Lemoore
Plant with a P.O. Box in Lemoore, California.  A linked website
for Colusa Canning indicates a "contact" tab for SK FOODS
Corporate Headquarters at 1175 19th Avenue, Lemoore, California
93245, and a tab for the SK FOODS Sales Office with a telephone
number of 209-599-1171.

19.  In April 2007, SK FOODS acquired Salyer American Fresh
Foods, which, according to the website is "one of the largest
fresh produce suppliers to corporate and retail customers
nationwide."  Salyer American is based in Salinas, California,
has operations in California and Arizona, and markets products
under the American Classic brand.

20.  On the SK FOODS executive management team page, Scott
SALYER is listed as the chief executive officer; Glen MCCLARAN
was formerly listed as president; Jeff BEASLEY is listed as vice
president for industrial sales; Michael PORETTI is listed as the
vice president for canning sales; Tony MANUEL is listed as vice
president for international sales; Lisa CRIST is listed as the
vice president for human resources and safety; Glenn LONG is
listed as the vice president for research and development and
quality; STEVE KING is listed as vice-president of operations;
Rick EMMETT is vice-president of agricultural operations; and
Alan HUEY is listed as the vice president for strategic planning.

21.  Since February 2007, BEASLEY, MANUEL and PORETTI work

-11-

USAO-000777

out of a SK FOODS Sales office at 1408 West Main, Suite B, Ripon, California.  I have verified this address from an SK FOODS internal phone list.  SALYER and HUEY have offices in Monterey, California.  When MCCLARAN was president, he worked at the corporate headquarters in Lemoore, California.  The plants (Lemoore and Williams) and sales office are located in the Eastern District of California.

22.  On 10/4/07, I was informed by a current SK Foods employee (identified below as Witness #1) that SK Foods had recently leased another property in Monterey, California.  An internet search confirmed that SK Foods signed a lease for approximately 20,000 square feet in a single story building at 21 Lower Ragsdale Drive, Monterey, California.  The business location is situated in a business park known as "Ryan Ranch."

23.  Agents intercepted a phone call between Randall RAHAL and Jeanne Johnston (SK FOODS secretary) on 03/21/08 in which Johnston told RAHAL that Scott SALYER wanted to make sure RAHAL came to the grand opening of the Ryan Ranch office on 04/18/08.  When RAHAL asked Johnston if they had moved into the new office space yet, Johnston replied that they had moved into it the prior Monday.  FBI Surveillance of the address on March 24, 2008, confirmed the building is occupied and a sign, "SK Foods" is in front of the building.

24.  The legal and ownership structure of SK FOODS is unknown.  The 2004 tax return for SALYER revealed numerous

-12-

USAO-000778

entities from which SALYER derived significant (over $1.5
million) interest income.  These entities include:  SK FOODS LP;
SS Farms, LLC; Salyer American Fresh Foods; SK PM; SSC Farming
LLC; and SKF Aviation.  In addition, public documents reveal that
SALYER has an interest or is an officer in the following
companies:  S&R Farms; S&D Farms; RHM Industrial Specialty; SSC
Farms; SKF Canning; SSC Investments; NAAS Foods; and Blackstone
Ranch.  SALYER's intent in establishing multiple entities and his
percentage of ownership in each entity is unknown at this time.
However, it is believed that these entities may be a part of, or
subsidiaries of, SK FOODS.  For example, public filings for SK PM
list SALYER as the CEO.  The type of business is listed as tomato
processing plant  The address listed is 1175 19th Avenue,
Lemoore, CA 93245.  As such, it appears to be a part of the SK
FOODS enterprise.  Another company, Blackstone Ranch, lists
SALYER as CEO and agent for process.  The type of business is
listed as farming. The address listed is P.O. Box 160, Lemoore,
CA, the same address listed on SALYER's tax return.

      25.  In addition, in January 2008, former SK Foods President
Glen McCLARAN and former SK Foods, Chief Financial Officer Karen
RINEHART, filed a counter-suit against SK Foods and SALYER
alleging that SALYER and RAHAL used SK Foods, SK Aviation, SS
Farms, SSC Farming, Blackstone Ranch, and Salyer American Fresh
Foods as corporate fictions to conduct business mixed with
personal financial affairs so much so that the corporations were

                           -13-

USAO-000779

the alter egos of SALYER and RAHAL.  (SK Foods originally
initiated suit against the former executives alleging that they
improperly paid themselves severance when they resigned from the
company.  McCLARAN and RINEHART counter-claimed that they were
obliged to resign because of their discovery of "a culture of
dishonesty, and illegal practices which he refused to participate
in.").  Therefore, for purposes of this affidavit and the search
warrant requested herein, the term "SK FOODS" will be used to
refer to the entities named above.

26.  Public databases show that INTRAMARK was founded in
1990 by Randall RAHAL who is listed as the president of the firm.
The firm's business is listed as being a wholesaler of food
ingredients, including tomato products, and an importer of juice
concentrates.  INTRAMARK operates out of leased office space at
220 Kinderkamack Road, Westwood, New Jersey, 07675.  As detailed
more below, although RAHAL has physical office space in New
Jersey, it appears that he conducts business on behalf of SK
FOODS which is located in the Eastern District of California and
elsewhere.

### 1.  Witness #1

27.  Morning Star Packing Company ("Morning Star") is a
major competitor of SK FOODS.  Morning Star is one of the world's
largest processors of tomatoes and tomato products with
facilities throughout the Eastern District of California and
elsewhere.  According to the founder/owner of Morning Star, about

-14-

BMO 001608

USAO-000780

95% of the tomatoes in the country are processed in California.
For the last several years, over 2 billion pounds of tomato paste
have been produced annually with a market value at current
average prices of over $800 million dollars.  The "paste" that is
referred to herein is sold to companies which use it as an
ingredient for their manufacturing of finished, end-products such
as ketchup, sauces, salsa, soups, or juices.  Of the bulk tomato
paste produced, Morning Star produces approximately 40% of the
U.S. market.  Morning Star's owner estimates that the
corresponding percent of the U.S. tomato paste market for
competitors are: INGOMAR-16%, SK FOODS-14%, LOS GATOS-11%.
INGOMAR and LOS GATOS are also located in California.

28.  Don Vilfer of Vilfer & Associates, a private
investigative firm, was hired by Morning Star in 2005 to
investigate embezzlement/theft by a former employee.  Vilfer
provided information gathered in the course of his investigation
to the FBI.  Until 2001, Vilfer was a FBI Special Agent in the
Sacramento Division.  Vilfer was a former supervisor of the
affiant prior to his departure.

29.  The private investigative firm uncovered a series of
frauds committed by a former employee of Morning Star who now
works at SK FOODS (hereinafter referred to as Witness #1).  From
1997 to January 31, 2005, while employed by Morning Star, Witness
#1 set up several shell companies for the purpose of diverting to
himself money owed to Morning Star by its customers.  In

-15-

BMO 001609

USAO-000781

addition, Witness #1 stole sensitive proprietary information from Morning Star prior to leaving Morning Star to work for SK FOODS, in February 2005. Witness #1 is still currently employed by SK FOODS as a vice-president in sales.

30. A federal search warrant was authorized by U.S. Magistrate Judge Dale A. Drozd on August 3, 2006, and executed shortly thereafter at the residence of Witness #1. That search warrant resulted in the discovery of evidence confirming Witness #1's scheme to defraud his original employer, Morning Star. Witness #1 began providing information to the FBI on 8/8/06, and has continued to cooperate with the government in return for consideration on federal criminal charges to be filed against him in the Eastern District of California. No charges have yet been filed against Witness #1. Witness #1 has been represented by an attorney in the course of his cooperation with the government. The possible criminal charges faced by Witness #1 include mail fraud, wire fraud and money laundering in violation of Title 18 United States Code, Sections 1341, 1343 and 1957. The investigation indicated that Witness #1 defrauded Morning Star through a variety of different schemes from 1997 to January 31, 2005, including, but not limited to:

a)  Setting up fictitious (front) companies and diverting money owed Morning Star to the front companies created by Witness #1.
b)  Creating fraudulent documentation to divert money owed to legitimate customers of Morning Star to one of the front companies.
c)  Using the front companies to engage in self-dealing by extending credit and selling

-16-

USAO-000782

        products from Morning Star to his front
        companies at substantially discounted rates.
d)  Using front companies to launder proceeds
        from a kickback scheme engaged in with a
        broker of Morning Star.

31.  Bank records relating to transactions which were conducted by Witness #1, which were obtained and analyzed by investigating agents, show that Witness #1 caused a loss to Morning Star which may exceed $1 million.  Based on current federal sentencing guidelines, Witness #1 could be subject to four or five years in federal prison.  In addition to the ongoing case against Witness #1, he has prior arrests for battery and corporal injury to spouse.  According to criminal records, Witness #1 has never been formally charged in the domestic violence cases due to lack of sufficient evidence.

32.  Witness #1 stands to benefit from a prolonged investigation in which we utilize his information and services because, in addition to being at liberty, he will continue to earn money (including possible bonuses for longer retention periods) while employed at SK FOODS.

33.  The information provided by Witness #1 thus far relating to the schemes detailed below has been corroborated to the extent possible and has not been shown to be untruthful.

34.  Witness #1 has admitted that he downloaded information from Morning Star prior to his departure from the company and that he e-mailed and gave a hard copy of some Morning Star information to RAHAL and/or BEASLEY.

BMO 001611

USAO-000783

35.   During the course of the investigation, Witness #1 has provided information to me relating to the schemes detailed below.   Witness #1 has been admonished by me not to access any information from his employer which is not accessible to him in the usual performance of his regular duties at SK Foods.

### 2.   Interception of Wire Communications

36.   On 6/4/07, the Honorable Lawrence K. Karlton, United States District Judge, authorized 30 days of interception of wire communications over the business telephone of INTRAMARK and the cellular telephone used by Randall RAHAL.   On 7/5/07, the Honorable Lawrence K. Karlton authorized another 30 days of interception of wire communications over the business telephone of INTRAMARK and the cellular telephone used by Randall RAHAL.

37.   On February 21, 2008, the Honorable Lawrence K. Karlton authorized another 30 days of interception of wire communications over the business telephone of INTRAMARK and the cellular telephone used by Randall RAHAL.   On March 24, 2008, the Honorable Lawrence K. Karlton authorized another 30 days of interception of wire communications over the business telephone of INTRAMARK and the cellular telephone used by Randall RAHAL.

### B.   Commercial Bribery

### 1.   Information from Witness #1

38.   Witness #1 stated that the industry is set up to try to prevent bribes from occurring by having companies like SK FOODS competitively bid for contracts with its customers.   However,

-18-

according to Witness #1, RAHAL told him in July 2005 that bribes
were commonly paid because this was really the way the business
world worked and that you could do no business internationally
unless you paid someone.  Witness #1 stated that bribes were paid
by SK FOODS to get market share and to have an inside person feed
you information and represent your interests at the customer
company.

39.  According to Witness #1, in October 2004, he was
recruited to join SK Foods by Randall RAHAL through Jeff BEASLEY,
who currently works at SK FOODS and who, like Witness #1, also
previously worked at Morning Star.  RAHAL told Witness #1 that he
is part owner of SK FOODS.  In January 2008, former SK Foods
President Glen McClaran and former SK Foods Chief Financial
Officer Karen Rinehart, filed a counter-suit against SK Foods and
SALYER alleging that RAHAL "was and is an owner, principal and
partner of SK Foods."  Witness #1 decided to work for SK FOODS
because of the money and bonuses that were offered.  Prior to
leaving Morning Star, RAHAL asked Witness #1 to get confidential
information from Morning Star including customer lists,
contracts, pricing information, recipes and other information.
Witness #1 obtained the information from his former employer and
provided it to Randall RAHAL in an email attachment and in hard
copy.  The private investigative firm uncovered evidence that,
just prior to leaving Morning Star to work for SK FOODS, Witness
#1's laptop logged the copying to compact disc of over 5,000

-19-

USAO-000785

files.

40.   After Witness #1 began to work for SK FOODS in January,
2005, he had a meeting with RAHAL at which Witness #1 took notes
of the meeting.  RAHAL told Witness #1 to not write down anything
at any meeting they had.  Witness #1 understood this to mean that
RAHAL did not want a record kept of who was present or what was
discussed.

41.   RAHAL told Witness #1 that he works with SK FOODS
through his own company, INTRAMARK.  RAHAL told Witness #1 that
he oversees some of the SK FOODS accounts including Kraft, Heinz,
McCormick, Frito Lay, Safeway, ConAgra, Pacific Coast Producers,
McCain Foods, Barilla, Better Baked Foods, Clement Pappas and
others listed below.  Trash recovered from RAHAL's Intramark
business location in New Jersey in June 2005 by the private
investigative firm contained documents from some of these
companies.  RAHAL told Witness #1 he did not want anyone else at
SK FOODS to interact with the representatives from those
companies.

42.   Since 2/1/05, when Witness #1 joined SK Foods, RAHAL
instructed Witness #1 on numerous occasions to let RAHAL know if
anyone needed to be "paid off" to get their company's business
and RAHAL would take care of it.

43.   Witness #1 stated that Jeff BEASLEY and Michael PORETTI
both told him that RAHAL had told them about paying bribes.
Witness #1 stated Scott SALYER was present with Witness #1,

-20-

BMO 001614

USAO-000786

RAHAL, and others many times when RAHAL discussed bribes that
occurred.

44.   RAHAL told Witness #1, when in the presence of others,
that he makes payoffs through his company INTRAMARK so as to
insulate SK FOODS from any fallout or lawsuits if he (RAHAL) ever
gets caught or sued.

45.   Witness #1 stated RAHAL told Witness #1 and others that
he identifies the customers he can get to take bribes by dropping
a $100 bill and picking it up and saying, "You must have dropped
this, is it yours?"  If the individual says "yes," RAHAL knows
they are open to a "business offer."  Witness #1 understood
"business offer" to mean bribe.

46.   RAHAL told Witness #1 that RAHAL gets access to the bid
prices which are submitted to the customer-companies by SK FOODS'
competitors from the bribe-recipients at the customer-companies.
Witness #1 stated the advantage of having the competitor's bid
information is to allow RAHAL to determine what he will bid on
behalf of SK FOODS by knowing what his competitors are bidding.
He (RAHAL) usually will not submit the lowest or highest bid but
can sometimes still win the bid despite being the highest bidder
depending on who the purchasing  company/individual is.

47.   RAHAL told Witness #1 that after the first payment is
made to someone, their loyalty is to you and you can take
advantage of the relationship.

48.   Witness #1 provided me with a four page document

-21-

USAO-000787

listing the date, location, description, identification of people present, and comments regarding numerous instances that RAHAL or others talked about RAHAL paying off individuals at SK FOODS's customer companies and/or receiving competitors' bid information from such individuals.  Witness #1 prepared the document from notes he had made on a pad of paper, on his day planner, or on the Outlook computer program.  In addition, through the course of the investigation, Witness #1 also provided information regarding individuals believed to be bribe recipients of RAHAL and/or the name of the companies whose accounts RAHAL oversees on behalf of SK FOODS.  The name of the bribe recipient, company and location (if known) are listed below:

     a)   <u>Individuals Believed To Be Bribe Recipients</u>

| <u>NAME</u> | <u>COMPANY</u> | <u>LOCATION</u> |
| --- | --- | --- |
| Michael CHAVEZ | SAFEWAY* | PLEASANTON, CA |
| Pat COE | CON AGRA | OAKDALE, CA |
| Joel DELIRA | AGUSA | LEMOORE, CA |
| George MCMILLION | PACIFIC COAST | WOODLAND, CA |
| Robert TURNER | B&G FOODS | PARSIPPANY, NJ |
| James WAHL | FRITO-LAY | PLANO, TX |
| Robert WATSON | KRAFT | CHICAGO, IL |

* formerly employed at Safeway

     b)   <u>Other SK Foods Accounts Overseen By Rahal</u>

| <u>CONTACT</u> | <u>COMPANY</u> |
| --- | --- |
| Bill THOMAS | BARILLA |
| Sue LNU | BETTER BAKED FOODS |
| Pete HUFF | CAMPBELL SOUP |
| Charlie JACKSON | CHELTON HOUSE |
| Charles PUFF | CLEMENT PAPPAS |
| Unknown | DAIRY FARMERS OF AMERICA |
| Dennis POYDENCE | DEL MONTE |
| Dan POLAND | HEINZ |

BMO 001616

USAO-000788

| | |
|---|---|
| Unknown | LIDESTRI FOODS |
| Unknown | MANNING FARMS |
| Unknown | McCAIN FOODS |
| Unknown | McCORMICK |
| Unknown | NATION PIZZA PRODUCTS |
| Unknown | QUEST INTERNATIONAL |
| Lynch BENNETT | RED GOLD |
| Unknown | SAN ANTONIO FARMS |
| Unknown | UBF/IFS FOOD SOLUTIONS |

49. Witness #1 provided me with a computer printout listing labeled "Brokerage Register" from SK FOODS showing payments being made to INTRAMARK on behalf of most of the companies listed above.

50. Personal payments to individual purchasing managers made by an outside company seeking to obtain a contract raises an inference that the purchasing manager is not providing honest services to his employer. I have obtained copies of Code of Conduct policies for B&G Foods, ConAgra Foods, Frito-Lay (Pepsico), Kraft, and Safeway. I have personally reviewed these policies and found that employees of companies are deemed to have a duty to their employers to avoid conflicts of interest and to avoid accepting anything of value which may influence their objectivity on behalf of the company. In addition, the Kraft policy also provides that employees can never use a competitor's confidential or proprietary information. In other words, employees, such as purchasing managers, who accept bribes would be depriving their employers of their honest services by acting for their own financial gain rather than acting in their employer's best interest.

-23-

USAO-000789

///

## 2.   Evidence of Bribe Payments to Individuals Depriving Their Employers of Honest Services

### a)   Agusa

51.   On 7/11/07, a call was intercepted between RAHAL and Witness #1 in which RAHAL talked to Witness #1 regarding Joel DELIRA (Agusa), an SK FOODS customer whose contract Witness #1 oversees.   WITNESS #1 informed RAHAL that Joel from Agusa gave him a call and wants to get another ½ million pounds of "cold brick" (a type of paste) right away.   RAHAL responded, "So, we got an order for 500 and he wants another 5?   Well, I am coming to see him next week and I was going to give him 500 bucks for his 500,000 pounds, then I will just give him $1,000."   RAHAL told WITNESS #1, "I am paying him $1,000 per a million pounds, that's the deal, so when you talk to him, tell him I will be in next week to see him."

52.   On 7/13/07, agents intercepted a call in which RAHAL stated to SALYER, "I got to see my friend Joel over at Agusa, he's now my best friend, and give him something.   He told me, he's doing exactly what he told me, he's rejecting that Chinese paste left and right."   SALYER responded, "Perfect, but it's small volumes."   RAHAL responded, "I know, but we started at zero volume and I don't think we'll ever be a big player in there, I don't think the Mendios (owners of Agusa) will ever let us be a big player, unless there's a catastrophe."   SALYER stated, "unless they start rejecting everybody else's paste, too."   RAHAL

-24-

USAO-000790

replied, "you never know what can happen, a little bit of money in the right place can do." SALYER stated, "I've heard about that type of shit happening, sample bags thrown away, results changed, there's all kinds of shit can happen."

53. On 7/18/07, agents intercepted a call from RAHAL in which he told Witness #1 he planned on meeting with DELIRA from Agusa. RAHAL asked WITNESS #1 about the type and amount of product sold to Agusa. RAHAL stated, "the total amount now we have booked, that we've got sold to Agusa, is one million two hundred thousand pounds. Correct?" WITNESS #1 replied, "Yes, that's what we have that he said that he was gonna do is five hundred and another seven." RAHAL then stated, "Cause I'm paying him on a million two then, right?" WITNESS #1 replied "Yes." RAHAL concluded the conversation by stating, "O.K. I just wanted to make sure. If I give him money, I want to make damn sure what the hell I'm paying him for."

54. Based on the interception of the call above, agents conducted surveillance later on 7/18/07 and witnessed RAHAL meet with Delira at a restaurant in Lemoore, California. During the meeting, agents photographed RAHAL handing DELIRA a Bank of America envelope. RAHAL was overheard telling DELIRA, "put that in your pocket" and words to the effect, "the more you can give me, the more you will get. . . I don't need it, you do." At the end of the conversation, RAHAL asked DELIRA to provide him with a list of his sales customers and the contract prices.

-25-

USAO-000791

///

    b) <u>B&G Foods</u>

55. Witness #1 stated Robert TURNER is the individual at B&G Foods with whom Randall RAHAL deals.  Witness #1 provided me with a copy of a business card for TURNER.  The business card states "Robert C. TURNER, Jr. C.P.M." is the "Corporate Purchasing Manager" at B&G Foods.  TURNER's business address is in Parsippany, New Jersey and his direct telephone number is 973-630-6470.

56. On 10/3/06, at the SK FOODS sales office in Stockton, Michael PORETTI told Witness #1 and BEASLEY that he just had a phone conversation with RAHAL in which RAHAL said he had just paid Bob (Robert) TURNER of B&G FOODS $15,000 to secure the contract for B&G FOODS to buy products from SK FOODS.

57. Bank records for Intramark show Intramark checks made out to "Vicki TURNER, 43 Bedminister Road, Randolph, New Jersey 07869." for the period January 2004 through August 2007.  Four checks totaling $5,000 were issued.  The checks appear to be signed by RAHAL.  A public database lists an address for Robert TURNER of 43 Bedminister Road, Randolph, New Jersey 07869.  This address also appears on the joint, married tax return filed in 2004 by Robert and Vicki Turner.  I believe that RAHAL is attempting to conceal the true recipient of the payment by making the check out to Turner's spouse.

58. The 2004 and 2005 tax returns for Robert and Vicki

-26-

USAO-000792

TURNER show, in addition to Robert TURNER'S earnings at B & G Foods, "other income" of $1,000 each year. This amount appears to be consistent with the amount of money paid to Vicki TURNER from RAHAL through INTRAMARK for those years. Because we do not have tax returns for 2006 yet, we cannot determine whether a $15,000 payment was reported. I have reviewed TURNER's tax returns and there appears to be no 1099 issued to TURNER from INTRAMARK for 2006.

59. On 6/8/07, a call was intercepted between RAHAL and Bob TURNER, purchasing manager for B&G Foods. RAHAL and TURNER agreed to "split the penny" on chile contracts. I believe this means that TURNER would receive a kickback of ½ cent per pound of the total quantity of chile peppers and jalapenos that B&G Foods purchased from SK Foods. RAHAL would also receive a ½ cent per pound. RAHAL told TURNER, "I don't know how big your chile purchase is, but it can be a lot of money. It's your kids' education."

60. On 7/12/07, in an intercepted call, RAHAL told TURNER, "I just want to make sure that you know that you're getting half of that 13 million pounds. That's yours." TURNER replied, "All right." RAHAL then stated, "that's a penny on 13 is $130,000. So you're getting half of that . . . make no bones about it." TURNER replied, "Okay." RAHAL then told TURNER that he would pay TURNER, "once that money starts, comes in, I don't care how you take it."

-27-

USAO-000793

c)   ConAgra

61.   Witness #1 stated Pat COE is the individual at ConAgra
with whom Randall RAHAL deals.   Witness #1 provided me with a
copy of a business card for COE.   The business card states
"Patrick J. COE" is the "Director of Agricultural Operations" at
ConAgra.   COE's business address is in Oakdale, California with a
business telephone of 209-848-7339.

62.   On 12/11/06, at a meeting at the SK FOODS sales office
in Stockton, California, Randall RAHAL stated in the presence of
Witness #1, Jeff BEASLEY, and Michael PORETTI that Pat COE gave
RAHAL the ConAgra bid information from SK FOODS' competitors
including Morning Star, Rio Bravo, and INGOMAR Packing over the
phone.   On 1/31/07, in a conversation recorded by Witness #1 at a
food industry conference in Sacramento, California, Randall RAHAL
told other SK FOOD employees that he was having lunch with Pat
COE to get the bid information, to "see the written word."   On
that day, I observed RAHAL and COE leaving the Sheraton Hotel in
Sacramento, CA in a dark blue van driven by COE.

63.   On 12/15/06, while working at the SK FOODS Sales office
in Stockton, California, Witness #1 overheard Jeff BEASLEY
talking on the phone.   After the call, BEASLEY told Witness #1
and Michael PORETTI he had just been talking to Randall RAHAL.
Jeff BEASLEY told Witness #1 and Michael PORETTI that RAHAL sold
10 million pounds of paste to ConAgra EUROPE for .50 per pound.
///

-28-

According to BEASLEY, RAHAL said he got the paste from ConAgra
USA.  According to BEASLEY, RAHAL told BEASLEY he agreed to pay
Pat COE .01 per pound on the deal.  PORETTI asked BEASLEY if Pat
COE takes kickbacks.  BEASLEY said COE "does but he doesn't."
BEASLEY stated COE is paid cash through RAHAL's personal bank
account.  BEASLEY had told Witness #1 on another occasion that
RAHAL pays for the care of COE's handicapped son.  I have
corroborated that COE has a son and has incurred significant
medical expenses.  COE's tax return reflects that he has two
sons.  His tax return also reflects medical expenses paid of
approximately $12,400 and $13,700 in 2003 and 2004, respectively.
The only earnings reflected on COE's tax return come from his
wages at ConAgra.  No other earnings are reported.

64.  In January 2008, there were arrangements made for SK
Foods to purchase several million pounds of leftover paste from
ConAgra so that SK Foods could sell it to A.R. Russo, an Italian
company for a higher price.  On January 10, 2008, in a phone call
that Witness #1 received in his office but was not able to
record, RAHAL told Witness #1 that SK Foods would not make as
much money as originally thought because RAHAL had to pay Pat COE
a little bit, i.e., a kickback.

d)  Del Monte

65.  On 7/6/07, agents intercepted a call between RAHAL and
Jeff BEASLEY (SK FOODS) in which they discussed Denny POYDENCE.
Witness #1 provided me with a copy of a business card for

-29-

USAO-000795

POYDENCE.  The business card states that "Denny Poydence" is the
"Senior Buyer for Fruits, Fruit Juices and Vegetables" at Del
Monte Foods.

66.  In that call, BEASLEY asked RAHAL if POYDENCE "would
want to get on the program."  RAHAL replied, "Denny POYDENCE is
on the program, not with me, with my brothers."  RAHAL stated,
"Denny was definitely on the payroll" with RAHAL's brothers.
RAHAL stated that POYDENCE had known RAHAL's brothers long before
POYDENCE knew (Randy) RAHAL.  He also stated that his brothers
"do business" with POYDENCE on apple juice and juice concentrate
and had been doing so "for years."

67.  BEASLEY then asked, "What happens if you put him on the
program?"  RAHAL replied, "I can do it, we can get that Del Monte
business."  RAHAL then told BEASLEY that they would have to meet
with POYDENCE.  BEASLEY stated he would "try to get something
going with Denny" by setting up a meeting between RAHAL, BEASLEY
and POYDENCE.  RAHAL told BEASLEY, "he's a survivor and he knows
how to play this game . . . you know a thousand dollars in his
pocket for every million pounds, that turns out to be, you know
that's ten grand on ten million pounds."

68.  A few days later, on July 10, 2007, SALYER and RAHAL
discussed Denny POYDENCE.  RAHAL stated, "Denny's gonna need a
retirement program.  So, it's a perfect fit for me."  SALYER
asked RAHAL, "How fast are you going to reel in that fish?"
RAHAL replied, "probably by the time the coffee comes that'll be

-30-

USAO-000796

done." RAHAL was referring to a dinner meeting he had scheduled
with POYDENCE. SALYER stated, "I want that sucker on speed reel.
You know that big electric reel. Whew . . . " Based on
monitored conversations, we believe RAHAL, BEASLEY and POYDENCE
did not meet at that time due to a scheduling conflict.

     e)  <u>Frito-Lay</u>

    69. Witness #1 stated that James WAHL is the individual at
Frito-Lay with whom RAHAL deals. Witness #1 provided me with a
copy of a business card for WAHL. The business card states
"James R. WAHL, Jr." is the "Manager, New Products & Analysis
Ingredients Purchasing" at Frito-Lay, Inc. WAHL's business
address is in Plano, Texas and the phone number listed is 214-
353-2341.

    70. On 3/14/05, at a marketing meeting, in the presence of
Witness #1, Scott SALYER, Jeff BEASLEY and Alan HUEY in Lemoore,
California, RAHAL made a lot of comments about "his guy" at Frito
Lay and said that Jim WAHL (purchasing manager for Frito Lay)
would do anything RAHAL asked him to. RAHAL stated he had WAHL
in his pocket.

    71. On or about 7/11/05, Witness #1 was told by Jeff
BEASLEY that BEASLEY had been at a marketing meeting in Lemoore,
California, with Alan HUEY and Randall RAHAL within the last two
weeks. During the meeting, RAHAL told BEASLEY the guy at Kraft
got $1,000 per 1 million pounds (referring to Robert WATSON,
discussed in more detail below). Jeff BEASLEY told Witness #1

-31-

USAO-000797

that he thought others like JIM WAHL at Frito-Lay were paid the same as WATSON.  Witness #1 estimated the Kraft and Frito Lay contracts were between 45-60 million pounds of contracted tomato paste and diced tomatoes per year.

72.  On 01/29/07, in a conversation recorded by Witness #1 at a food conference in Sacramento, California, Randall RAHAL talked about a bid offered to Frito Lay from Morning Star.  RAHAL stated that all they got protecting SK FOODS are me and Jim WAHL.

73.  Bank records for Intramark from January 2004 through August 2007 obtained and analyzed in the course of this investigation, show Intramark checks totaling approximately $56,000 being paid to James R. WAHL, JR., 3205 Drexel Drive, Dallas, TX.  The checks appear to be written on a quarterly basis and range from $2,500 to $4,000.  I have reviewed the checks and in the memo section is usually written "Brokerage" along with a particular quarter for the year.  However, in the memo section of checks written in 2006, the words "art payment" also appear.  The checks appear to be signed with RAHAL's name.

74.  WAHL's tax returns from 2004 and 2005 show, in addition to his earnings at Frito-Lay, $11,000 and $14,000, respectively, of gross receipts for a consulting business.  WAHL received 1099s from INTRAMARK which were the same as the amount WAHL claimed as gross earnings from his consulting business.

75.  On March 3, 2008, agents intercepted a phone call in which WAHL and RAHAL discussed RAHAL suppling Frito Lay with

-32-

USAO-000798

jalapenos.  During that call, RAHAL stated "I'll tell you what it is working good, is White Oak and this jalapeno thing, and the money is now coming in."  WAHL responded, "OK, good."  RAHAL concluded, "So Maryanne will be here Wednesday . . . we'll just keep doing that, she wants to do it the same way she did before." It is believed that in this call, RAHAL was telling WAHL that since the payment was coming into RAHAL for the jalapenos, Maryanne Stucker, his bookkeeper, would be sending WAHL his "payment" in the same manner that she pays him for the bribes/kickbacks on the tomato contracts.

76.  On March 26, 2008, agents intercepted a call in which Maryanne Stucker (INTRAMARK bookkeeper) received an incoming call at the Intramark office from Jim WAHL who instructed Maryanne to send the package from Intramark to him at Frito Lay.  WAHL stated that the package should be sent to 7701 Legacy Drive, Plano, TX 75024.  Two minutes later, RAHAL made an outgoing call on his cell phone to Jim WAHL.  RAHAL asked why WAHL was having the package sent to his office at Frito Lay.  WAHL responded, "So I can get it and put it in, because my bank is over here anyway." RAHAL replied, "Maryanne will put return address of her house in Jersey, and UPS it, it'll have Maryanne's name on it."  RAHAL said WAHL should have the package by tomorrow, but he was not comfortable sending it to WAHL at his office at Frito Lay but added "you do what you want."  Based on the context of the call, it appears RAHAL was concerned that someone at Frito-Lay would discover the illegal kickback payment being made to WAHL.

-33-

USAO-000799

Moreover, the affirmative act of concealment of using his bookkeeper's name and home address further demonstrates RAHAL's desire to avoid detection or disclosure of the payment and further evidences his consciousness of guilt.

       f)  <u>Kraft</u>

77. Witness #1 stated Robert (Bob) WATSON is the senior purchasing manager at Kraft and is the individual at Kraft with whom Randall RAHAL deals. According to Witness #1, on 2/15/05, at a conference in San Francisco, California, Randall RAHAL, in the presence of Witness #1, Scott SALYER, Alan HUEY, and Jeff BEASLEY, RAHAL talked negatively about how dumb the "monkey" at Kraft was and stated that he afraid of being found out. RAHAL stated the guy at Kraft always felt better when he was offered a little more money. Witness #1 stated RAHAL was referring to BOB WATSON. Witness #1 understood RAHAL to mean that WATSON was afraid someone at Kraft (WATSON's own employer) would find out WATSON was accepting bribes from RAHAL. I have reviewed RAHAL's credit card statements and confirmed he was in San Francisco, CA on 2/15/05.

78. On or about 7/11/05, Witness #1 was told by Jeff BEASLEY that BEASLEY had been at a marketing meeting in Lemoore, California, with Alan HUEY and Randall RAHAL. According to BEASLEY, RAHAL told BEASLEY the person at Kraft got $1,000 per 1 million contracted pounds of tomato paste and diced tomatoes. Jeff BEASLEY told Witness #1 that he thought others like JIM WAHL

-34-

USAO-000800

at Frito-Lay were paid the same.  Witness #1 estimated the Kraft and Frito Lay contracts were between 45-60 million pounds of contracted tomato paste and diced tomatoes per year.  I have reviewed RAHAL's credit card statements and confirmed he was in San Francisco, CA and Fresno, California (near Lemoore) around 7/11/05.

79.  Bank records for Intramark from January 2004 through August 2007 show Intramark checks being paid to Robert L. WATSON, 301 Wood Creek Road, Apt. 513, Wheeling, IL 60090.  The checks appear to be written on a quarterly basis and range from $3,000 to $17,253.  From looking at the checks, I can see that "Brokerage" is usually written in the memo section along with a particular quarter of the year and sometimes indicate "tomato paste" or "bill and hold."  The checks appear to be signed with RAHAL's name.  Since 2004, there were checks totaling approximately $134,000 written from INTRAMARK bank accounts to WATSON.  WATSON did not report $23,000 received from INTRAMARK on his 2004 tax return.  However, in 2005 and 2006, WATSON received 1099s from INTRAMARK for $26,000 and $50,000, respectively and reported these amounts as income on his tax return.

80.  Bank records for Intramark show that on 12/24/04, an Intramark check for $2,000 made out to Randall RAHAL was cashed.  In the memo section of the check, it stated, "reimburse check paid to Bob Watson."  This amount was not included in the amounts noted above.

-35-

BMO 001629

USAO-000801

81.  On 6/6/07, in an intercepted telephone conversation between RAHAL and WATSON (Kraft), RAHAL was talking about an invoice from Kraft that needed to be paid.  RAHAL told WATSON, "you and I got money in there."  I believe this means once Kraft paid its "bill," RAHAL would kickback some of the proceeds to WATSON.  In a call later that day, RAHAL and WATSON discussed buying health insurance for WATSON's daughter.  RAHAL said he checked about putting WATSON's daughter on his payroll, but thought it would be cheaper for her to go out and get the best insurance she can on her own and RAHAL could pay for it as soon as they make the deal.  Based on the history of the investigation and the context of the conversation, I believe RAHAL was offering to pay a kickback to WATSON in the form of paying for the health insurance of WATSON's daughter.

82.  On 7/12/07, in an intercepted telephone conversation between RAHAL and WATSON (Kraft), RAHAL told WATSON that RAHAL was going to wait on sending a check to WATSON until he received some more invoices from Kraft so RAHAL could send WATSON a bigger check.

83.  On 7/26/07, in an intercepted telephone conversation between RAHAL and WATSON (Kraft), RAHAL told WATSON that he just mailed out a check for $17,000 to him.  Bank records confirm that a check dated 7/25/07 from INTRAMARK to WATSON for $17,253 was cashed.

g)  Pacific Coast Producers

-36-

USAO-000802

84.   On or about 8/19/05, Michael PORETTI told Witness #1 about a sales meeting PORETTI had with RAHAL on 8/19/05 in Stockton, California.   RAHAL told PORETTI he had paid George MCMILLION, a buyer at Pacific Coast Producers, to provide information to RAHAL and to purchase product from SK FOODS. PORETTI told Witness #1 he was taken aback by this and hoped RAHAL would not ask him to make any payoffs because he would refuse.   He further stated that he was not going to risk his credibility for a reputation like RAHAL's.   I have reviewed RAHAL's credit card statements and confirmed he was in Stockton, California on 8/19/05.

85.   On 2/28/08, agents intercepted a call in which RAHAL told SALYER that he might hire MCMILLION to work for SK FOODS at some point in the future.   RAHAL told SALYER, "I'm just not ready to bring George here, first of all, George is a fucking crook. Second of all, I need him where he is right now."   SALYER replied, "Crooks are handy on the inside."   RAHAL responded, "as long as they're your crooks.   Remember that, they gotta be your crooks.   We've gotta few, I've gotta list."   SALYER stated, "yeah, they're the only ones I like.   Our crooks."

   h)   <u>Safeway</u>

86.   Witness #1 stated Michael CHAVEZ is the individual at Safeway with whom Randall RAHAL deals.   Witness #1 provided me with a copy of a business card for CHAVEZ.   The business card states that Michael CHAVEZ is the "Group Manager, Strategic

-37-

USAO-000803

Sourcing" at Safeway.  In September 2007, Witness #1 was told by RAHAL that CHAVEZ was leaving Safeway.

87.  On 7/27/05, Witness #1 drove with RAHAL to Walnut Creek, California where they were to meet with Michael CHAVEZ, a purchasing manager at SAFEWAY, and other SAFEWAY officials. During the drive, RAHAL told Witness #1 that he has been "taking care" of CHAVEZ.  As they arrived for their meeting with CHAVEZ, RAHAL opened his briefcase to make sure he had an envelope for CHAVEZ.  RAHAL told Witness #1 it was a "little bonus" for CHAVEZ since CHAVEZ arranged this meeting so SK FOODS could get the SAFEWAY business.  Witness #1 said the envelope was white and about 3/4" to 1" thick.  After the meeting, RAHAL asked Witness #1 to wait in the car while RAHAL met privately with CHAVEZ. Witness #1 believed RAHAL met privately with CHAVEZ to deliver the envelope because when RAHAL returned, he opened his brief case and the witness saw that the envelope was gone.  Moreover, on the drive back, RAHAL told Witness #1 how this was really the way the business world worked and if Witness #1 needed to do this, let him know and he would take care of it.  I have reviewed RAHAL's credit card statements and they indicate that he was in Walnut Creek, California on 7/27/05.

88.  Agents have reviewed bank records for Intramark and found an Intramark check for $1,000 payable to Randall RAHAL on 7/13/05.  In the memo section of the check is written, "Brokerage-Chavez."  The check appears to be signed by RAHAL.  I

-38-

USAO-000804

believe it is probable that RAHAL cashed the check to get cash to give to CHAVEZ on 7/27/05 as a bribe.  I base this belief on Witness #1's account of RAHAL's meeting with CHAVEZ, the fact that the check was made out to RAHAL two weeks prior to meeting with CHAVEZ, and the fact that BEASLEY previously told WITNESS #1 that RAHAL pays some bribe recipients in cash.

89.  Bank records for Intramark also show an Intramark check for $1,000 was paid to Randall RAHAL on 12/5/05.  In the memo section of the check is written, "Brokerage Mike Chavez."

90.  On 6/6/07, on an intercepted call, RAHAL talked to SALYER about meeting with CHAVEZ for lunch.  RAHAL told SALYER, "He [CHAVEZ] don't give a shit about lunch, you know what he cares about."  Agents later intercepted a call in which RAHAL called CHAVEZ and asked him if he wanted to meet for lunch. CHAVEZ told RAHAL it was up to him.  RAHAL then told CHAVEZ he had wanted to be able to bring CHAVEZ something but had not gone to the bank.  RAHAL told CHAVEZ that he would meet with him the next time he was in town.

91.  Agents conducted surveillance on 7/19/07 of the Walnut Creek BART station.  At approximately 5:00 p.m., RAHAL exited the Walnut Creek BART station, purchased a hot dog in the parking lot, and waited at the front of the station.  At approximately 5:15 p.m., RAHAL entered a vehicle registered to Michael CHAVEZ and driven by an individual matching the DMV photo of CHAVEZ, the purchasing manager for Safeway.  Chavez drove to a parking lot

-39-

USAO-000805

and stayed there for 15 minutes.  He then dropped RAHAL back off
at BART and Chavez went home.

###   3.   Other Evidence Of Bribery

#####        a)   Wire Interception

92.  On 7/11/07, agents intercepted a call in which RAHAL
told BEASLEY, "I wrote checks today almost $65,000, end of June,
going into third quarter." RAHAL added, "between Watson, Jim
Wahl, I had lunch with Bob Turner, he had a big chunk . . . we
got another 500,000 pounds out of Joel, so he'll get a thousand
bucks that I'll bring with me, over at Agusa, Tony got another
order from him for 500,000 pounds and Mike Chavez, I'm gonna see
him in Walnut Creek on Thursday." Based upon the history of the
investigation, the prior calls, and the context of the calls, I
understood RAHAL to be saying that he had written checks to
several buyers for kickback payments and would be coming to
California the following week to make payments to Mike CHAVEZ at
Safeway and Joel DELIRA at Agusa.

#####        b)   Bank Records

93.  Grand jury subpoenas were issued for bank records of
RAHAL's personal bank account and INTRAMARK's (business) bank
account.

94.  Other than the reimbursement check to WATSON noted
above, RAHAL's personal bank account records did not show any
money being paid directly to any of the individuals identified
above.  There were some checks made to "cash" as well as cash

-40-

USAO-000806

withdrawals.

95.  Based on the INTRAMARK (<u>business</u>) bank records for the
period from 12/01/03 to 08/31/07, approximately $200,000 in
checks were issued from INTRAMARK payable to Bob WATSON, James
WAHL, Bob TURNER, and personal checks to Randall RAHAL with
Michael CHAVEZ noted in the memo section.

### c)   Tax Returns

96.  Tax returns show that James WAHL, Bob WATSON and Robert
TURNER reported payments received from RAHAL through INTRAMARK as
consulting income on some tax return filings.  However, others
such as Pat COE of Con-Agra and Mike CHAVEZ of Safeway did not
report payments received from RAHAL on their tax return.  This
information is consistent with the information Jeff BEASLEY told
Witness #1 that Bob WATSON, Jim WAHL and Bob TURNER get paid as
consultants through INTRAMARK but Pat COE, Mike CHAVEZ and George
MCMILLAN get paid by RAHAL in cash.  BEASLEY told Witness #1 that
he did not know how others were paid.

### 4.   Documents Relevant to Bribes/Kickbacks

97.  Based on the information detailed above, the following
documents, which are included among those listed in Attachments
B-1, B-2 and B-3, will provide evidence relating to bribes and/or
kickbacks.

98.  Specifically, we seek records reflecting payment
between SK FOODS and INTRAMARK or any bribe recipients, as
defined in Attachments B-1, B-2 and B-3, including payments in

BMO 001635

USAO-000807

cash, check, property or benefits, i.e., health insurance for
family members, hiring of ghost employees, for the benefit of any
of the Bribe Recipients as defined in Attachments B-1, B-2, and
B-3, by Randall RAHAL, INTRAMARK and/or companies controlled by
RAHAL or SALYER, including the SK FOODS entities listed herein.
We also seek documents reflecting communications between RAHAL
and SK FOODS personnel or among SK Foods personnel about payments
to the Bribe Recipients.

99.   We also seek records of contracts or agreements between
SK FOODS and INTRAMARK and any company at which an identified
Bribe Recipient is currently employed or was previously employed.
Specifically, we seek, among other things, records relating to SK
FOODS selling 10 million pounds of product to Con Agra Europe in
December 2006 (Coe kickback) and records relating to SK FOODS
selling product to B&G Foods in 2007 (Turner kickback).

100.   There is probable cause to believe these documents can
be located at the search locations listed in Attachments A-1, A-2
and A-3.   Witness #1 stated to me that while contracts with the
companies employing the bribe recipients are typically stored at
RAHAL's office in New Jersey, copies of all contracts can be
found in Huey's office in Monterey.   Communications among SK
personnel regarding these contracts can be found at any location
at which SK personnel are present.

C.   **Fraudulent Product Labeling**

101.   SK FOODS is subject to the United States Standards for

-42-

USAO-000808

Grades of Canned Tomato Paste as established by the United States
Department of Agriculture (USDA).  In addition,  SK FOODS is
subject to Title 21, Code of Federal Regulations, which allows
the Food and Drug Administration (FDA) to establish maximum
levels of natural or unavoidable defects in foods for human use
that present no health hazard.  These levels are referred to as
"Food Defect Action Levels."  These levels represent limits at
which FDA will regard food product "adulterated" and subject to
enforcement action under the Food, Drug and Cosmetic Act.

102.  Based on interviews conducted with individuals in the
tomato processing industry, tomato paste processors must test
their food product to ensure the product complies both with
applicable laws and customer specifications.  To that end, the
companies provide their customers with a Certificate of Analysis
(COA) which list the grading factors which are tested to ensure
the product that is being sold conforms both to the customer
specifications and applicable laws and regulations of the USDA
and FDA.

103.  When soliciting for bids, each customer provides the
companies with their specifications as to acceptable levels of
characteristics of the product they want to buy.  The
characteristics will vary depending on the specifications needed
for the purchaser to make their finished product.  For example, a
buyer who wants to use the SK FOODS paste to make a dark, thick
steak sauce may want different specifications than a buyer who

-43-

BMO 001637

USAO-000809

will use the SK FOODS paste to make tomato juice.  Paste is
typically tested for a variety of factors including bricks
(solids) also known as Natural Tomato Soluble Solids (NTSS), ph,
acidity, mold, color and bostwick (viscosity).  A COA may list
all these characteristics.  A "bin label" (equivalent to a bar
code label affixed to each bin) will typically only show the
percentage of solids (NTSS) and the size of the screen (sieve)
through which the tomatoes were processed.

104.  According to Witness #1 and others in the tomato
processing industry with whom I have spoken, the documentation of
the quality and specifications of a particular lot of tomato
paste is a continual process.  As the product is being produced
in the factory, a sample of the product is taken every hour.
Every hour of production is considered a "lot."  Each lot is
given a lot number for traceability purposes.  All food product
produced is required to have traceability standards in the event
of a USDA/FDA recall.  Based on a review of internal documents
provided by Witness #1, the lot number for SK FOODS is an 8 digit
number that corresponds to the date and hour produced (year,
month, day, hour produced).

105.  Witness #1 stated that three sample bags are usually
retained at the factory for each one hour production run (lot).
The sample bags are aseptically sealed.  Two of the sample bags
are retained at the plant in case there are questions about the
lot.  One of the sample bags is used for testing at the company's

-44-

USAO-000810

lab located inside the plant.  The results of the testing are hand-written on a lab register which contains the original "data sheets" or "daily production sheets" kept in the lab at the plant.  According to the Code of Federal Regulations, 21 C.F.R. §§ 113.100(e) & 114.100(e), copies of the production process records, which include the hand written "lab sheets," are to be retained for three years.

106.  The information from the hand-written sheets is then input into the SK Foods computer system.  Once the information is input into the computer system, a "lab results register" is printed.  In theory, the computer-printed register is supposed to correspond exactly to the original hand-written lab register data sheet.

107.  In the proper course, true information from the lab results register is then fed into the Certificate of Analysis (COA) report.  The COA report is provided to the customer when the product is shipped.  It is provided to the shipper/trucker along with the bill of lading and other shipping documents.  Depending on the customer, the COA is also sent with the invoice for the shipment.  The COA and invoices are either faxed or mailed depending on the customer.

### 1.   Allegations in Civil Lawsuit

108.  In the cross-complaint filed against SK Foods and SALYER in January 2008 (Superior Court of California, County of Fresno, Case No. 07 CE CG 03677), former SK Foods President

-45-

USAO-000811

McCLARAN and former SK Foods, Chief Financial Officer Karen
RINEHART alleges that the illegal activities at SK Foods included
SALYER and other SK FOODS employees mislabeling tomato paste
products so that inferior products could be sold for more money
and so that SK FOODS could meet all its customer demands.
McCLARAN alleges that in April and May 2007, Alan HUEY and SALYER
explained the procedure of mislabeling the product, changing
Quality Control (QC) information, and using customers' "bill-and-
hold" inventory.  HUEY told McCLARAN that this was standard
practice in the industry.  McCLARAN states in his cross-complaint
that he refused to participate.

109.  McCLARAN further alleges that in May 2007, McCLARAN
and another employee were discussing the inventory shortage at SK
FOODS when SALYER stated, "You can solve all your problems with a
label printer."

110.  McClaran further alleges that he spoke with Jennifer
DAHLMAN, an SK FOODS employee, who had reported to McCLARAN that
she was instructed by HUEY when to change labels when orders came
in for product that was not in inventory, "DAHLMAN explained that
when inventory was short for a superior product, SK Foods
routinely re-labeled their products to reflect a higher tomato
paste content than it actually contained or re-labeled high mold
unsaleable product after the customer had already been provided
with a QC analysis."

111.  McCLARAN further alleges in his cross-complaint that

-46-

USAO-000812

on June 7, 2007, he told SALYER that he did not agree with this culture and SALYER responded, "You can take your ethics book and shove it up your ass.  We have always manipulated inventory and will continue to.  We will lie to anyone outside the circle, but not to each other."

### 2.   Information From Witness #1

112.  Witness #1 reports that Randall RAHAL, Scott SALYER and others at SK FOODS are changing labels on food products and distributing adulterated food products, specifically, tomato paste with high mold content, in violation of 21 U.S.C. § 342(a)(3).  It is unlawful to introduce or cause the introduction into interstate commerce an adulterated food with the intent to defraud or mislead.  21 U.S.C. §§ 331(a), 333(a)(2).

113.  Witness #1 informed me that he was present at a meeting of the SK management team which took place over June 6-8, 2005, when RAHAL told HUEY to change the labels from conventional to organic because SK FOODS was short on organic paste.  HUEY responded that would be illegal and said that he was not going to risk it.  Witness #1 states that RAHAL was mad but let it drop "because too many other people were present."

114.  Witness #1 stated that the internal SK Foods documents reflecting the amount of organic paste actually produced by SK Foods during the last production season (2007) was significantly less than is shown on documents reflecting the amount of supposedly "organic" paste that was shipped from SK Foods.

-47-

USAO-000813

Witness #1 stated that the lot production records would show the contents of the paste that was sent out labeled "organic."

115. During an interview in June 2007, Witness #1 told me that Rick Emmett, vice-president of agricultural operations, who works at the Williams plant, previously told Witness #1 that "whatever you want on the tag, we'll put it on there."

116. Witness #1 explained to me that, to fill an order, an SK Foods customer service representative in Ripon will print out a "pick list exception report" which lists a series of lot numbers with their various quality control factors including mold content. This report will identify those lots that are the "exceptions" to the customer's specification. According to Witness #1, as part of the criminal conduct, Jennifer Dahlman or another SK Foods employee will falsely alter the quality control factors or specifications on the computer to make the pick list show that all the selected bins meet the customer's specifications. Once changed in the computer, the false information will then also be printed on any future reports, the COA, and the bin label if necessary (bin label would typically only need to be changed if the percentage of solids or the screen size was falsified).

117. On 05/03/07, Witness #1 met with Jennifer Dahlman at the SK Foods plant in Lemoore, California. They discussed the manner in which Dahlman changed computer records to match a customer's specifications. Dahlman stated to Witness #1 that if

-48-

USAO-000814

the product on the list does not meet the customer's specifications when it was produced, Dahlman manually changes the specifications in the computer to match the customer's specifications. These alterations are repeated in COAs and labels. Witness #1 reported to me that Dahlman said the only way anyone can determine the true specifications is from the hard copies of the lab results which are kept in the quality control lab manager's office at the factories in Lemoore and Williams.

118.   Dahlman told Witness #1 that every day there is something to change. Dahlman told Witness #1 that things are sometimes changed at the time of shipment. Dahlman told Witness #1 that she knows it is illegal for SK Foods to be re-labeling its product. Dahlman told Witness #1 that the reason she is in her position is because she tried to give some of her duties away to others but other people would not agree to do what Dahlman did.

119.   In January 2007, Witness #1 told me that Randall RAHAL had told him that SK FOODS was purchasing moldy tomato paste from other tomato processors and mixing it in with SK Foods good paste so that the SK Foods customers would not notice. The mixing of a food containing defects above the current defect action level with other food is not permitted and renders the final food adulterated within the meaning of the act regardless of the defect level of the final food. 21 C.F.R. § 110.110(d). I have been informed by FDA employees that different countries have

-49-

different thresholds for the amount of mold they will permit to
be present in their tomato paste products.  Generally, the amount
of mold permissible in tomato products is higher for exported
products than for domestic products.  It has been explained to me
that paste which is acceptable for export to a foreign country
may be not be acceptable for use in a consumer product in the
United States.

120.  During the month of January 2007, Witness #1 provided
me with copies of emails which he received in the normal course
of his employment with SK Foods.  The e-mails show that SK FOODS
purchased a quantity of high mold tomato paste from INGOMAR,
another tomato paste company.  In an email exchange with Greg
PRUETT of INGOMAR, Scott SALYER stated that this product would be
exported.  However, Witness #1 provided me copies of internal SK
FOODS inventory documents showing that SK FOODS subsequently
falsified their internal records to reflect that the moldy
product met FDA guidelines governing sales within the US when, in
fact, it did not meet those standards.  FDA officials informed me
on 4/4/07 that, although they do not believe the mold levels in
the paste poses a health risk, primarily because the mold is
"dead," its distribution constitutes a violation of 21 U.S.C.
342(a) because it nonetheless contains "filth."

121.  On 04/19/07, Witness #1 provided me with a label from
the high mold paste which SK FOODS purchased from INGOMAR.  The
INGOMAR label was taken off of a bin at an SK FOODS shipping

BMO 001644

USAO-000816