

location.  Witness #1 was told by another SK FOODS employee that
INGOMAR'S labels were taken off the bins and replaced with SK
FOODS labels.

122.  Witness #1 stated the mold count is not typically
listed on the bin label.  Mold count is contained on the COA, a
separate document which is provided to the customer but not
affixed to the bin.  Dahlman subsequently told Witness #1 that an
Excel spreadsheet on the computer in her office contains the true
COA of the moldy paste SK Foods bought from Ingomar in Spring
2007.

123.  Witness #1 reported to me that DAHLMAN told Witness #1
that she regularly changes computer records or bin labels to
falsely reflect whatever specifications the customer ordered.
For example, with the INGOMAR paste that was purchased above,
Witness #1 stated that the product purchased from Ingomar was 26%
and 28% NTSS (Natural Tomato Soluble Solids - a classification on
tomato paste) and SK FOODS sold it as 31% NTSS.  Witness #1
stated a customer pays more for 31% than 26% or 28% paste because
it takes more tomatoes to produce a higher NTSS factor.  Witness
#1 stated that SK FOODS regularly falsifies the NTSS which is
being sold to its customers to make it appear they are giving the
customer the higher-priced, higher-solids product.  DAHLMAN told
Witness #1 that she gets her instructions to change labels from
Alan HUEY.

124.  Food is deemed to be misbranded if, among other

-51-

USAO-000817

things, its labeling is false or misleading in any particular.
21 U.S.C. § 343(a).  The term "labeling" means all labels and
other written, printed or graphic material upon any food article
or its containers or wrappers, or any such material accompanying
such food article.  21 U.S.C. § 321(m).  It is unlawful to
introduce or cause the introduction into interstate commerce of a
misbranded food with the intent to defraud or mislead.  21 U.S.C.
§§ 331(a), 333(a)(2).  It is likewise unlawful to do anything to
a food while it is held for sale after shipment in interstate
commerce that results in the food being misbranded with the
intent to defraud and mislead.  21 U.S.C. §§ 331(k), 333(a)(2).

113.  Witness #1 stated that each individual contract states that
SK FOODS will provide product that is USDA Grade A paste because
some of the companies require this grade if they sell product in
the school lunch program.

125.  On 10/23/07, Witness #1 was at the SK FOODS plant in
Williams, California.  Witness #1 picked up five sample bags of
product from production runs "lots" that had mold and/or color
readings that were outside of the FDA and/or USDA guidelines.
Witness #1 selected the lots based on a review of the lab results
register in the SK FOODS computer system.  Witness #1 provided me
with the five sample bags of product and I had them tested at the
USDA lab.  Of the tomato paste sampled (3 bags), all the product
was found to be substandard or failed to meet the criteria for
"USDA Grade A."  Witness #1 states that SK FOODS represents to

-52-

USAO-000818

its customers that SK FOODS product is USDA Grade A.

126.  Witness #1 told me that, at the end of the 2007 production season (which ended in early October 2007), the product quality was really bad because the quality of the tomatoes was bad at the end of the season.  Normally, if the producer receives bad product from the growers, he will not accept it.  However, SK Foods was over-obligated to its numerous contracts and used the bad quality tomatoes anyway.  Witness #1 stated SK Foods asked for substantial discounts from its farmers.  Witness #1 stated the farmers will take it because otherwise they will get nothing.  As a result of the bad quality tomatoes, a large amount of tomato paste produced near the end of the production system was also of bad quality.  Specifically, some of the product produced had a mold content that exceeded the federal defect action level for mold.

127.  On 12/11/07, Witness #1 provided me with the lab results registers for the 2007 production season from both of the SK FOODS production plants (Lemoore and Colusa).  The registers are dated 10/09/07.  Witness #1 stated the registers were run right after the production and that most of the data should be accurate and reflect the true lab results of the process.  Witness #1 stated there may be a few lots which had already been changed in cases where a customer had already ordered product.

128.  I have reviewed the lab results registers provided by Witness #1.  The lab results registers provide the lot number for

-53-

USAO-000819

the batch of product that was produced along with the corresponding lab results of different things that were tested including mold. Based on my review, I was able to identify 751 lots of product produced that had a mold reading exceeding the federal defect action level and, as such, it would be illegal to sell this product for use in the United States.

129. Witness #1 stated that most of the product containing high mold and bad color that was produced during the 2007 production season (July - October 2007) has already been shipped out from SK FOODS to predominantly U.S. customers. Witness #1 stated that SK FOODS tries to ship the worst of the product first to get it out of the plants.

130. Witness #1 informed me that customers have also rejected SK Foods paste because it contains sand, cotton stalks, is low in color, or has an incorrect pH. On March 6, 2008, agents intercepted a call in which BEASLEY told RAHAL about two customers who were formalizing claims against SK Foods because their product had cotton stalks in it. BEASLEY told RAHAL, "I know what to do with all this cotton stalk shit, we send it to ConAgra for this fire roasted thing, maybe it will burn up in the fire (laughing)." RAHAL laughingly replied, "that's a great idea Jeff, let's push it."

131. Witness #1 reported to me that, on 2/20/08, Witness #1 was told by Jeff BEASLEY that Kraft had rejected three rail cars of SK Foods tomato paste because Kraft had detected metal

-54-

USAO-000820

shavings in the paste.  Witness #1 was also told by BEASLEY that
Con Agra had rejected one to two rail cars for the same reason.

132.  Witness #1 explained that the presence of metal
shavings is a common concern in the industry because there is
metal machinery with moving parts used both at SK Foods where the
basic tomato product is produced and also at the customer factory
where they  make end-products like spaghetti sauce or barbecue
sauce.  Witness #1 stated that customers have metal detectors at
the plant that should sound an alarm if they detect the presence
of metal.  When that happens, a thorough investigation is
typically done at the customer's plant to ensure the metal is not
coming from its own production system.

133.  Steve King, SK FOODS Vice President, called Witness #1
and told him that the product rejected by Kraft and ConAgra will
be sent back to SK FOODS.  King instructed Witness #1 to allocate
the returned product to ASF (Authentic Specialty Foods), another
SK FOODS customer.  King told Witness #1 that SK FOODS was short
on product for ASF and would use the rejected paste with the
metal shavings in their Lemoore plant where SK FOODS makes the
"La Victoria" brand salsa for ASF.

134.  Witness #1 provided me with a picture from ConAgra
which show the metal fragments which were found in the product
provided by SK FOODS and the pieces appear to be 1/4 inch in
size.  On 2/29/08, Witness #1 emailed me with reports showing the
product that was returned from Kraft because it contained metal

-55-

BMO 001649

USAO-000821

fragments.   The reports show that the lots which were returned to

SK FOODS were Lots 07091113 through 07091118.   Witness #1 has

been unable to identify the product that was returned from

ConAgra.   Witness #1 was told by King that the rejected product

would remain at Central Valley Shippers, a shipping company used

by SK FOODS which is located on a railroad line near the SK FOODS

Lemoore, California factory.

135.   Witness #1 stated that any product that has metal

fragments is a violation of HACCP (Hazard Analysis and Critical

Control Points), a food safety prevention procedure, and should

be destroyed.   The FDA has informed me that it would need further

analysis to determine whether the severity of the metal shavings

would render this product "adulterated."

136.   Witness #1 told me that, when discussing re-using the

rejected product, Jeff BEASLEY told Witness #1 "you can go to

jail for that stuff."   BEASLEY told Witness #1 that if Steve King

says to use the rejected product, "that's his deal."

### 3.   Recordings/Wire Interceptions

137.   Witness #1's information about mislabeling has been

corroborated from consensual recordings made by Witness #1 of

RAHAL, SALYER, MCCLARAN, and HUEY.   Specifically, on a recording

on 2/28/07, HUEY told Witness #1 that they have not quite figured

out which customer the high mold paste is going to.

138. On the same recording discussed above, RAHAL and SALYER

talked about a different occasion on which they intentionally

-56-

BMO 001650

USAO-000822

delivered product to Safeway that did not meet the specifications
Safeway had paid for and Safeway did not catch it until the last
load of 25 truckloads.  SALYER stated, "We're changing labels
faster than the printers can run."  RAHAL stated, "I got a label
maker in my office."  SALYER stated, "When it comes to this type
of manipulation, you don't need to know about this."

139.  On 6/5/07, on an intercepted call, RAHAL talked to
BEASLEY about a problem Kraft was having at one of its factories.
RAHAL said that no one knows what product was sent out but that
it may have been product that was relabeled, i.e., falsely
labeled to appear to meet the customer's specifications.  RAHAL
stated he did not know how sophisticated the people at Kraft
were.  BEASLEY told RAHAL that SK FOODS had been shipping the
same stuff to McCormick and he had his fingers crossed.  Based on
the history of the investigation and the context of the call, it
appears BEASLEY was saying that he hoped no one at McCormick
would figure out that the product SK FOODS sent them did not meet
the specifications McCormick has ordered and paid for.

140.  On June 6, 2007, agents intercepted a call in which
RAHAL told Glen LONG, SK FOODS vice president for research and
quality, that once the COA is changed and the product is
relabeled, DAHLMAN is the only one who knows what the delivered
product actually is.  Other calls intercepted in June 2007 reveal
that RAHAL instructed several SK FOODS people to have Glen LONG,
make up a reason why Kraft is having problems with its production

-57-

BMO 001651

USAO-000823

process because RAHAL did not want to draw any attention to the fact SK FOODS sent Kraft mis-labeled product.

141.  On 6/11/07, a call was intercepted between RAHAL and SALYER.  RAHAL told SALYER that DAHLMAN was "very good at changing labels and getting that type of stuff done. . . that's the kind of person I need from my support side."  SALYER agreed with RAHAL and stated, "yeah, she's been trained.  We can't train new people like that.  And you're sure as hell ain't going to get Glen (McCLARAN-former SK FOODS president)- Glen's got his CPA hat on.  He's talking about integrity to me."  As stated above, McCLARAN resigned from SK Foods in June 2007.

142.  On 03/12/08, agents intercepted a call between RAHAL and PORETTI in which they discuss the problems SK FOODS is having with the quality of the product that is sent to SK FOODS' customers.  In referring to ConAgra, RAHAL stated, "We pack garbage for them anyway, they always take it, but we've hit new lows."  PORETTI told RAHAL, "You know, Randy, we don't send a COA that's true."  RAHAL replied, "Steve (KING) just continues to make crap cause he can get away with it."

### 4. Documents Relevant Fraudulent Product Labeling

143.  Based on the information above, I believe that the following documents, which are included among those listed in Attachments B-1, B-2, and B-3, are the types of documents which provide evidence of fraud resulting from producing adulterated product and product mislabeling: documents related to contracts

-58-

USAO-000824

between SK FOODS and Customers which include the contract specifications for "bricks" (Natural Tomato Soluble Solids "NTSS"); ph; acidity; mold; color; and bostwick (viscosity); the handwritten lab registers, lab register data sheets, lab sheets, production process records maintained pursuant to 21 CFR §§ 113.100(e), 114.100(e), lab results registers, pick lists, pick list exception reports, and certificate of analysis (COA) reports and any other reports which reflect actual or altered listings of lot numbers and corresponding tomato solids known as "bricks" (Natural Tomato Soluble Solids "NTSS"); ph; acidity; mold; color; and bostwick (viscosity), any records which reflect changes or alterations to such records, and any equipment which can be used to produce, alter, or print bin labels.

144.  In addition, Dahlman told Witness #1 that all of the changes she makes are in a notebook in her office.  Dahlman attaches the printouts of the changes she makes.  Witness #1 has observed Dahlman writing in a spiral notebook in her office at the Lemoore facility.

145.  Witness #1 stated that when product is rejected by a buyer and returned, SK FOODS will typically use the rejected product as an ingredient in one of a few finished end-products (e.g., La Victoria salsa) that SK FOODS contracts to produce at SK FOODS own facilities.  Witness #1 stated that the "batch formula sheets," which are kept in the production area of the plants, will show which lots of inferior paste were used to

BMO 001653

USAO-000825

produce a finished goods product.

146.    There is probable cause to believe that such documents
will be found at the locations identified in Attachments A-1, A-2, and A-3.  The original lab registers are located in each plant
lab in Lemoore and Williams.  In addition, the label makers are
located at each plant in Williams and Lemoore.  Most of the
documents relating to altered specification, including DAHLMAN's
notebook, are likely be found in Dahlman's office in the Lemoore
plant.  Documents belonging to Mr. Emmett who told Witness #1
that all he had to do was ask to have labels changed, can be
found in his office in Williams.  The contracts which list the
customer's specifications and any documents related to complaints
about the product can probably be found at the customer service
office in Ripon, the sales office in Lemoore, or the corporate
offices in Monterey.  Moreover, communications among SK FOODS
personnel about these issues will be found at all three
locations.

D.   **Antitrust Violations**

147.    The evidence I have reviewed provides probable cause
to believe that tomato processors, including SK FOODS, INGOMAR,
and LOS GATOS, have conspired to fix prices, rig bids, allocate
customers, and defraud customers in an attempt to maintain and
increase the price of processed tomato paste and diced tomatoes
sold in the United States.  The evidence I have reviewed also
indicates that the above-named companies are encountering

-60-

USAO-000826

difficulties in policing their agreements to fix prices, rig bids and allocate customers due to lack of trust that each is abiding by the agreements. I am informed by the Antitrust Division attorneys participating in this investigation that such difficulties commonly occur in antitrust cases.

148. Section 1 of the Sherman Act, 15 U.S.C. §1, makes unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations..." Thus, the Sherman Act prohibits every conspiracy, agreement, understanding, plan or scheme, between two or more horizontal competitors, to (a) fix prices; (b) rig bids; or (c) allocate customers or territories. All such agreements are illegal, even if never carried out or if unsuccessful. The agreement itself is the crime.

149. I understand that price fixing can exist in many forms, including agreeing to hold prices firm, reducing or eliminating discounts, adopting a standard formula for computing prices, setting a price range, or adhering to minimum prices, among others. Bid rigging involves competitors agreeing in advance who will submit the winning bid for a contract. Bid rigging can take many forms. One form of bid rigging is known as bid suppression - in which competitors agree to refrain from bidding so that the designated winning competitor's bid will be successful. Another form of bid rigging involves complementary

-61-

USAO-000827

bidding.  In a complementary bidding scheme, competitors agree to submit bids higher than the designated winning bidder's price or containing special terms that will not be acceptable to the buyer.  Market division occurs when competitors agree to allocate customers, territories, or market share among themselves.  It is the agreement to act together that constitutes the crime. Whether the agreement is actually carried out or whether it succeeds or fails does not matter.

### 1.  Information from Witness #1

150.  Witness #1 has been providing information to me since August 8, 2006. Information provided by Witness #1 provides probable cause to believe that SK FOODS, INGOMAR, and LOS GATOS have agreed to allocate customers, rig bids, and fix processed tomato product prices within a certain price range.  The information that Witness #1 has provided thus far relating to the schemes detailed below has been corroborated to the extent possible and has been shown to be truthful.

151.  According to Witness #1, SK FOODS, INGOMAR, and LOS GATOS joined together to form the CALIFORNIA TOMATO EXPORT GROUP in order to export tomato products.  I confirmed with public records that, on February 6, 2006, the Department of Commerce issued CTEG an export trade certificate, which permits CTEG's members to meet and reach agreements to jointly market their products being exported to foreign markets.  Department of Commerce regulations, however, specifically prohibit the

-62-

participating companies from discussing anything related to
prices for the domestic market.

152.  There is probable cause to believe that price-fixing
agreements were reached between Randall RAHAL, Scott SALYER, Glen
McCLARAN of SK FOODS; Greg PRUETT of INGOMAR; and Stuart WOOLF of
LOS GATOS.  There is probable cause to believe that most of these
agreements were reached during CTEG meetings.

153.  Witness #1 told me that, on or about 4/12/06, there
was a CTEG meeting attended by Scott SALYER of SK FOODS, Stuart
WOOLF of LOS GATOS and Greg PRUETT of INGOMAR.  In addition,
RAHAL, Witness #1, and other SK FOODS employees were in
attendance.  Witness #1 states he was present when RAHAL and
other individuals generally discussed trying to agree on prices
for their domestic sales.  In addition, they discussed customer
information regarding price quotes and quantities for customers.
Witness #1 stated that they also discussed the "downside" price,
i.e., an agreed-upon floor for domestic prices.

154.  Witness #1 told me that, on or about 2/16/07, SK
FOODS' JEFF BEASLEY told Witness #1 that LOS GATOS' WOOLF was not
happy with INGOMAR's PRUETT because PRUETT's bid prices to a
customer were lower than the agreed-to prices.  BEASLEY told
Witness #1 that PRUETT agreed with WOOLF and SALYER to hold the
prices at $.38/lb, but PRUETT said he would have to lower the
price if Morning Star or some other competitor was lower.

155.  Witness #1 told me that he received a telephone call

-63-

USAO-000829

from Glen McCLARAN on 2/26/07.  The call was not recorded because
McCLARAN called Witness #1 at a time when Witness #1 did not have
a recorder with him.  In that call, McCLARAN told Witness #1 that
McCLARAN had attended a CTEG meeting on SALYER's behalf on
Sunday, 2/25/07.  According to McCLARAN, WOOLF from LOS GATOS and
PRUETT from INGOMAR discussed how the group was supposed to be
sticking to a $.38/lb price upon which they had agreed.  McCLARAN
relayed to Witness #1 that PRUETT then told McCLARAN he was
hesitant about making a commitment on a price because of his core
customers and because he didn't want excess capacity.  Based on
my involvement in this investigation and the context of the
conversation, I understand PRUETT to be saying that he was
reluctant to charge the agreed-to price because it might cause
PRUETT to lose traditional customers and leave INGOMAR with
unsold tomato paste.

    156.  McCLARAN also told Witness #1 that McCLARAN told WOOLF
and PRUETT that if we're going to do pricing, everyone is on pins
and needles because of rumors people are quoting low prices and
not sticking to the $.38 price.  McCLARAN told Witness #1 that
McCLARAN had conveyed the following to PRUETT and WOOLF:  If
we're going to do this right, we need to develop a matrix and
decide whose customers are whose.  For example, Con Agra is SK
Foods' core customer, so INGOMAR and LOS GATOS should not
underbid on that customer; we're fighting against one another, we
should be more focused on competing for Morning Star customers

-64-

USAO-000830

and not our own.  We need to work on communication.  Although Witness #1 could not remember his conversation with McCLARAN verbatim, I have restated his recollection of the conversation in the manner in which he conveyed it to me.

157.  On or about 3/8/07, Witness #1 told me that he spoke to McCLARAN on the phone about McCLARAN's conference call with WOOLF and PRUETT.  According to Witness #1, McCLARAN said that the three agreed that they cannot stick to $.38/lb as a result of contracts signed by Morning Star and Rio Bravo.

158.  On or about 4/11/07, Witness #1 provided me with a document titled "estimated tomato paste usage-matrix."  Witness #1 told me that he and SK FOODS vice-president Jeff BEASLEY had prepared the spreadsheet at the request of former company president McCLARAN.  McCLARAN told Witness #1 that he wanted the spreadsheet so that when he met with CTEG members, he would know the core customers of each member.  Upon reviewing the document, I note that it includes domestic customers such as Heinz, Kraft, and General Mills.  Although the law allows organizations such as CTEG to make agreements to jointly market products for export to foreign countries, it forbids agreements regarding domestic pricing and market allocation.

159.  According to Witness #1, McCLARAN met with BEASLEY and Witness #1 in Ripon, California to discuss the matrix prior to meeting with PRUETT and WOOLF at WOOLF's Fresno, California office.

-65-

USAO-000831

160.   According to Witness #1, on or about 4/25/07 he overheard Jeff BEASLEY talking on the phone.  The SK FOODS Sales facility where Witness #1 and BEASLEY work is small; there are four offices and a conference room.  Although each sales representative has an office, their offices are small and each office has a large window which allows the sales representatives to see one another.  In addition, Witness #1 stated that he could hear what the others in the office are saying.  After BEASLEY's call, BEASLEY told Witness #1 that RAHAL called from Chicago, where he and SALYER were meeting with Kraft's purchasing manager, Bob Watson.  RAHAL told BEASLEY to contact PRUETT because RAHAL wanted to know what INGOMAR will bid for the Kraft contract.

161.   Witness #1 stated that on 4/27/07, he overheard BEASLEY talking on the phone.  After the call BEASLEY told Witness #1 that RAHAL said he (RAHAL) was told by Kraft's Watson that Morning Star's Greg Wuttke offered Kraft a price of $.35/lb on tomato paste.  RAHAL told BEASLEY that Watson informed RAHAL that Kraft would still buy from SK FOODS at $.36/lb. as long as bids from the other processors did not go below $.36/lb.  RAHAL told BEASLEY to make sure INGOMAR's PRUETT offered $.36/lb. to Kraft.  Based on my understanding and knowledge of this case and the context of the call, RAHAL was telling BEASLEY to make sure INGOMAR did not bid less than $.36/lb.

162.   Witness #1 was told by McCLARAN that McCLARAN instead of BEASLEY called PRUETT at INGOMAR and told him SK FOODS' bid to

-66-

USAO-000832

Kraft and what INGOMAR should bid.  McCLARAN told Witness #1
PRUETT agreed to not bid lower than $.36/lb. on the Kraft
contract.

163.  Witness #1 told me that on 5/16/07 he spoke to RAHAL
by phone and RAHAL told him that PRUETT bid $.365/lb. on the
tomato paste for the Kraft contract.  RAHAL told Witness #1 not
to tell anybody about the bids and that he plans to increase SK
FOODS' paste bid to match INGOMAR's bid.

## 2.  Recordings/Wire Interception

164.  On 2/28/07, at the direction of law enforcement,
Witness #1 recorded an in person conversation between himself ,
McCLARAN and others.  He asked McCLARAN whether McCLARAN had
spoken to WOOLF and PRUETT because the price was going down to
"$.36, .35, .34," when CTEG members agreed to hold the price at
$.38/lb. minimum.  McCLARAN told Witness #1 that he spoke to
WOOLF and PRUETT and they assured him that they were "still up
there" with the prices.  WOOLF and PRUETT told him that it is
Morning Star that is driving down the prices.  McCLARAN then told
Witness #1 that he is concerned about PRUETT more than WOOLF
because "he has more free capacity."

165.  On 3/22/07, at the direction of law enforcement,
Witness #1 recorded a phone conversation between himself and
McCLARAN about a recent CTEG meeting with eight participants,
including WOOLF and PRUETT.  McCLARAN stated that the CTEG
members decided that they "should not hurt each other,"

-67-

BMO 001661

especially for their best customers and when they are not competing with Morning Star. CTEG members also decided that they should work within "the price range that [they] have been talking about all along." McCLARAN also stated that he told the CTEG members that when each company is putting together a deal, the format should be the following: "a net price with, you know, adjustors for a term contract and you know, based on some sort of a CTGA price and, you know, gas level, and then add on a $90 bin deposit." McCLARAN stated that the CTEG members responded to the format by saying, "Yep, that's our format, that's what we're doing. Everybody's agreed." McCLARAN also stated that he suggested to WOOLF and PRUETT that they should develop a matrix and allocate the customer base to specific companies to assure the parties adhere to the CTEG price.

166. I have verified through the website www.ctga.org that CTGA refers to the California Tomato Growers Association, which represents certain tomato grower members in negotiating with tomato processors. Based on my involvement in this investigation and the context of the conversation, my understanding is that participants in the CTEG meetings may be using the CTGA published pricing information as a starting point in a formula for determining prices for processed tomatoes.

167. On 04/30/07, Witness #1 asked BEASLEY if he was going to the CTEG meeting. BEASLEY responded that he was not going to be involved "while you guys fix prices."

-68-

168.   On 6/6/07, a call was intercepted between RAHAL and
BEASLEY.  In that conversation, RAHAL reported that SK FOODS
would not be getting a contract for Little Lady Foods to purchase
paste from SK FOODS for the upcoming year.  In this call, BEASLEY
reported to RAHAL that the reason SK FOODS was not getting the
Little Lady contract is because LOS GATOS had offered Little Lady
a lower price than SK Foods.  BEASLEY told RAHAL that Glen
McCLARAN had called Stuart WOOLF of LOS GATOS and McCLARAN
assured BEASLEY that WOOLF had "held his ground" with Little
Lady.  BEASLEY stated that McCLARAN was going to give WOOLF a
call and "see what the hell is going on."

169.   On 7/3/07, a call was intercepted between RAHAL and
SALYER in which they discussed Heinz, an SK FOODS customer.
SALYER told RAHAL that Heinz appeared to be interested in having
SK FOODS and its competitors bid for a Heinz contract on diced
tomatoes.  RAHAL told SALYER to call Greg PRUETT (INGOMAR) to
make sure he was not back-dooring and coming in at a low price -
presumably meaning there was some expectation INGOMAR and SK
FOODS would bid in the same price range.

170.   On 12/11/07, Witness #1 told me that Scott SALYER was
creating another trade association to be called the World Tomato
Alliance (WTA).  Members of the WTA include CTEG members (SK
FOODS, LOS GATOS, and INGOMAR), Merko, and Cedenco.  According to
Witness #1, the purposes of this organization include fixing
domestic and international prices of processed tomato products

-69-

BMO 001663

USAO-000835

and allocating customers.

171. On 1/17/08, Witness #1 recorded a meeting in Pebble
Beach with employees of SK FOODS, including Scott SALYER and
Randall RAHAL. At the meeting, while discussing pricing, SALYER
stated that CTEG has an upcoming conference call on Monday where
"they're going to want to know about pricing." SALYER then asked
if he should tell CTEG ".45?"

172. At the same meeting above, SALYER told his salespeople
that he needs "a list of shit accounts from you guys" he could
give to Roger Wasson, a consultant for CTEG, and Wasson was
"going to put them together and circulate them back around." The
group then stated that a bad customer for SK FOODS may not be a
bad customer for another CTEG member. According to Witness #1,
SALYER requested the list of accounts from sales employees who
handle only domestic customers. Based on my understanding and
knowledge of this case and the context of the conversation,
SALYER wanted the list of accounts to allocate domestic accounts
to other CTEG members.

173. At the same meeting above, SALYER stated that he was
putting together INGOMAR, Merko, and LOS GATOS, and that he was
dragging them along "to make sure they are sold out." SALYER
stated they are the first ones to drop prices because they make
their money on the farms. SALYER discussed putting everyone in
the same room to "hold these guys together and put everybody in
the same group" and stated that they are "more and more open to

-70-

USAO-000836

talking about customers that they're - that we're not chartered to talk about.  So we put a little spin on it."  Because Merko is not a member of CTEG, it is the understanding that SALYER was referring to the planned WTA group meeting.  Based on my involvement in this investigation and the context of the conversation, my understanding is that SALYER's reference to "making sure they are sold out" relates to allocating sales volume in order to ensure that certain producers would not have excess volume.  Eliminating excess volume reduces the incentive to lower prices.  Further, based on my involvement in this investigation and the context of the conversation, my understanding is that SALYER's reference to CTEG members being open to talking about customers whom they are not "chartered to talk about" appears to be a reference to discussions about domestic customers.

174.  At the same meeting above, RAHAL then stated, "Keep your friends close, and your enemies closer."  SALYER then discussed the WTA, stating he wanted to have an impact on the world so that the five to six companies in WTA are not competing against each other.

175.  Pursuant to an Order signed by the Honorable Lawrence K. Karlton on February 4, 2008, agents conducted audio and visual surveillance of the WTA meeting which occurred on that date within the premises known as the Trinity Room, second floor, Hyatt Regency Hotel, Sacramento, CA.  Attendees at the meeting

-71-

USAO-000837

included Scott SALYER, Greg PRUETT, Stuart WOOLF, Duncan Blake,
Richard Lawrence, and others unknown.  At that meeting, SALYER,
PRUETT, WOOLF, and others generally discussed, among other
things, domestic U.S. customers (including Heinz and Red Gold),
their individual production capacities for the upcoming year, the
individual companies' plans for allotting their production for
domestic or foreign sales, and some discussion of domestic
prices, and the costs and prices of the mutual competitors.
While SALYER, PRUETT, and WOOLF engaged in these discussions,
they did not appear to reach a specific agreement to fix specific
prices.  Based on my understanding and knowledge of this case and
the context of the conversations, my understanding is that these
discussions among the larger WTA group (including "newcomers"
Merco and Cedenco as well as some lower-level staff of the
individual companies) were preliminary and may have been for the
purpose of fact-gathering or exploring the participation of new
participants.  SALYER, PRUETT and WOOLF (the traditional CTEG
members) may have held back on voicing their agreement or
intentions in front of the newcomers and staff.

176.  In 2/6/08, I spoke to Witness #1 after Witness #1 had
a conversation with Randall RAHAL and Scott SALYER.  The meeting
between RAHAL, SALYER, and Witness #1 occurred at a hotel in
Sacramento, California during a conference.  SALYER told Witness
#1 that he had just come out of a CTEG meeting that morning with
Greg PRUETT and Stuart WOOLF where SALYER was given some prices

-72-

USAO-000838

that the other two companies would be charging various customers including at least one domestic customer. During this meeting in the hotel lobby, SALYER then got out his leather-bound planner book and referred to it as he relayed details of the meeting to Witness #1.

177. On March 26 2008, agents intercepted a call which RAHAL received on his office phone from BEASLEY. RAHAL and BEASLEY discussed an earlier call RAHAL had with SALYER. RAHAL relayed to BEASLEY that "[SALYER] wants power and he wants control because in his real life he has no power and no control . . . So the one place he can control he thinks is the sales force. Just like he controls Greg PRUETT and Stuart WOOLF on CTEG. Which is what he was bragging to me about. 'I wrote it on a piece of paper. This is the price.' I said you've been writing the price on a piece of paper for the last three years and yet have they followed that price? So, I wouldn't hold my breath on that." BEASLEY responded, "It ain't that God damn price domestically."

178. Based on the history of this investigation, my consultation with attorneys from the antitrust division, and the context of the call, I believe RAHAL was saying that the CTEG members reached an agreement about a particular fixed price but the other parties to the agreement have cheated on their agreement.

### 3. **Documents Relevant to Antitrust Violations**

-73-

USAO-000839

179.   Based on the information detailed above, the following documents, which are among those included in Attachments B-1, B-2, and B-3, could provide evidence of antitrust violations: documents, including notes, memoranda, correspondence and reports relating to any agreements, meetings, conversations, or other communications or contacts, occurring at California Tomato Export Group (CTEG) or WTA events or otherwise, between or among officers, directors, employees, or agents (including INTRAMARK) of SK FOODS and any officer, director, employee or agent of INGOMAR Packing and LOS GATOS Tomato Products; appointment records, diaries, calendars, notebooks, and other documents used to record schedules, meetings, conversations or other events by or for SALYER, MCCLARAN, and RAHAL, PRUETT and WOOLF; address books (including electronic address books, such as devices commonly referred to as electronic organizers), message logs, or other indicia of notation of messages and telephone numbers and calls of SALYER, McCLARAN and RAHAL; expense records prepared by or for SALYER, McCLARAN and RAHAL relating to contacts or communications with PRUETT and WOOLF or attendance at CTEG meetings; customer lists of SK FOODS, INGOMAR Packing, and LOS GATOS Tomato Products; final or draft bid files, proposals, purchase orders, contracts, correspondence, estimate work sheets and other cost and profit estimate documents used to prepare bids or quotes for tomato paste or diced tomatoes submitted to prospective customers located in the United States.

-74-

USAO-000840

180.   In my nine years of experience investigating white
collar crime matters I have been responsible for receiving and
reviewing documents either voluntarily produced or obtained
through compulsory process, such as grand jury subpoenas and
search warrants, from corporate and individual subjects of the
investigations.  I have also spoken with attorneys and paralegals
with the Antitrust Division, who have extensive experience in
investigating possible price fixing, bid rigging, and customer
allocation agreement among competitors.  Two of these individuals
have in excess of 25 years each of such experience with the
Antitrust Division.  Based upon my experience in investigating
white collar crime matters, and the experience of the Antitrust
Division personnel investigating similar crimes, the types of
documents evidencing price fixing, bid rigging, and customer
allocation agreements set forth in Attachments B-1, B-2, and B-3,
usually are found at companies similar in size and operation to
SK FOODS and INTRAMARK.  There is probable cause to believe,
based upon information received during the numerous
investigations that I and the Antitrust Division personnel have
participated in, that the documents contained in Appendix B are
commonly prepared and maintained by most companies in the
ordinary course of their business and that such documents are
stored in corporate offices in filing cabinets, storage boxes, or
electronically on computers for several years.  Furthermore, some
of the documents, notably expense reports and financial

-75-

USAO-000841

documents, must be maintained for use in preparing federal and
state income taxes and for use in the event of an audit.  The IRS
informs business taxpayers to maintain records for a minimum of
three years.  IRS Publication 583 (Rev. January 2007).
Accordingly, there is probable cause to believe that the
documents listed in Attachments B-1, B-2, and B-3 were utilized
or created during the period June 1, 2005 to the present and are
located at the locations listed in Attachments A-1, A-2 and A-3.

     E.   **"Bill and Hold" Fraud**

        1.   **Fraud on Customers**

    181.   Witness #1 states that a common practice in the
industry is to have a customer prepay for its inventory and have
it held by the producer, such as SK FOODS, until the product is
needed by the customer.  This practice is referred to as "bill
and hold."  Because the customer often does not have space to
store the product, the producer stores it until it is needed by
the customer.  Because the product is prepaid, the common
practice is for the customer to record the product on its
financial statements as an asset (prepaid product) that it
already owns.

    182.   Based on the information set forth below, it appears
SK FOODS accepts money from customers and records the sale but
then does not reserve the product, i.e., they sell it to other
customers, thereby defrauding the customer who believes they have
product readily available.  According to Witness #1 and

-76-

USAO-000842

information obtained through the interception of calls, it
appears that when product is needed for a customer, SK FOODS
either takes it from another customer's allotment, produces it
anew (if it is still during production season), or purchases the
product from elsewhere.  Although we are not aware whether this
practice has yet resulted in a financial loss to a customer, I
believe SK FOODS's potential inability to meet "bill and hold"
demands may be a motive for SK FOODS to purchase substandard
paste (as noted in the high mold paste purchase from INGOMAR
above) or for re-labeling paste that does not meet customer
specifications.  Even if SK FOODS can meet its contractual
demands by purchasing substitute product on the open market,
fraud nonetheless results if customers pre-pay for high quality,
unadulterated paste and are instead given cheaper sub-standard
paste that may contain mold, metal shavings, or at a minimum,
does not meet the specifications the customers paid for.

### a)  Wire Interceptions

183.  On 06/21/07, a call was intercepted between RAHAL and
WATSON (Kraft).  RAHAL stated, "SK FOODS is breaking the law
taking it from people who've already prepaid for it and putting
your sticker and shipping it."  RAHAL stated, "I'm stealing it
from Heinz and ConAgra and a little bit from Campbell's . . .they
don't know it. . . only per person who knows this is you and me,
BEASLEY and Alan HUEY (SK FOODS)."  WATSON replied, "that's fine,
that's good."

-77-

BMO 001671

USAO-000843

184.   On 6/28/07, a call was intercepted between RAHAL and
Bill Thomas, a Barilla purchasing agent.  RAHAL told the
individual that General Mills (an SK FOODS customer) prepays for
their product under the "bill and hold" concept.  RAHAL told the
individual that he "steals" product from General Mills and that
he and MCCLARAN (former SK FOODS president) clashed over the
issue and MCCLARAN quit.  AS previously noted, MCCLARAN quit SK
FOODS in June 2007.

185.   On 03/07/08, RAHAL called Charlie JACKSON, an employee
of SK FOODS' customer, Chelton House, and informed him that SK
Foods had under-packed the fire roasted product.  RAHAL told
JACKSON, "All the product has been sold and paid for by Tyson
[believed to be an SK FOODS customer] so they took title to it by
paying for it early.  I'm trying to take that away from them,
without telling them, that's against the law, that's stealing."
RAHAL told JACKSON that it might be easier for RAHAL to steal one
load (roughly 1,000 cases).  RAHAL stated the product is bill and
hold, explaining to Jackson, "we pack for them (Tyson), they paid
us for it . . . it sits in our factory, they don't take it, I
mean, it's not at their factory.  They just release against that
contract that they think they've paid for.  So, there is a
danger."

### b)   Information from Witness #1

186.   On 07/25/07, Witness #1 stated he was contacted by an
SK FOODS employee at the Lemoore, California plant who told

-78-

USAO-000844

Witness #1 that a representative from Barilla, one of SK FOODS'
customers, was coming to the Lemoore plant to inspect Barilla's
"bill and hold" inventory.  Witness #1 stated that, at that time,
SK FOODS was supposed to be holding approximately 10 million
pounds of product which Barilla had already paid for.  Witness #1
contacted HUEY who told Witness #1 that the labels would be
changed at the factory to reflect what Barilla's customer
specifications were.  On the day of the inspection by the
customer, DAHLMAN, who works at the Lemoore facility, provided
Witness #1 with a computer generated printout that falsely
represented that the product which would be shown to the Barilla
representative was within Barilla's specifications.

### 2.  Bank Fraud / Misrepresentations of Inventory

187.  In addition to SK FOODS defrauding its Customers
regarding the prepaid inventory, it appears that SK FOODS is also
defrauding its lenders by not disclosing the amount of inventory
that SK FOODS owes to its customers, which would limit their
ability to obtain bank financing.  I have learned through witness
interviews and the interception of wires that SK FOODS was in the
process of, and recently received, a line of credit from several
banks.

188.  On 7/6/07, a call was intercepted between RAHAL and
Lisa CRIST (SK FOODS VP).  They discussed SK FOODS getting
financing from the banks and the costs incurred by SK FOODS to
hire consultants to provide information to the banks.  RAHAL

-79-

USAO-000845

stated, "that's the problem, the banks don't believe our
information anymore because Scott (SALYER) used (Richard)
Washburn and Mark Grewal (former SK FOODS employees) to fudge the
numbers."

189.  RAHAL and CRIST then discussed how SK FOODS needs to
hire a new CFO.  RAHAL stated, "My accountants told me, 'do not
hire a CFO that is a CPA.'  Because you will have the same
problem you had with Glen [MCCLARAN].  They will not lie.  They
will not stick their neck out because of fiduciary laws . . . so
you've got to get a CFO who is not a CPA.  Or he's a crook . . .
and I told that to Scott."  CRIST replied, "that's good to know."
RAHAL told CRIST that if SK FOODS hired a CFO who was a CPA, they
could "jeopardize their license and themselves."  RAHAL
continued, "they (CPA's) are not going to fudge numbers, or play
games, or lie.  They won't overstate inventories."  CRIST
replied, "yeah, yeah."  RAHAL stated that SALYER had said he felt
that MCCLARAN "might be the wrong guy, he won't play the game.
And, sure enough, if that wasn't the case."

### 3. Documents Relating to Bill and Hold Fraud

190.  Based on the information above, I believe that the
following documents, which are included among those listed in
Attachments B-1, B-2 and B-3, are the types of documents which
provide evidence of the "bill and hold" fraud: contracts,
invoices, records of payment, records of communication among SK
Foods personnel relating to efforts to set-aside "Bill and Hold"

-80-

USAO-000846

inventory or efforts to circumvent a "Bill and Hold" contractual
obligation, communications by SK Foods Personnel in which they
conveyed or confirmed to a customer or a banking institution that
"Bill and Hold" inventory was present on SK Foods' premises and /
or was otherwise being held for a customer.

191.  Based on the information above, I believe that the
following documents, which are included among those listed in
Attachments B-1, B-2, and B-3, are the types of documents which
can provide evidence of potential misrepresentations to banking
institutions regarding ownership of inventory: loan applications,
loan agreements, contracts, covenants, audit reports, financial
statements, consulting reports and other records provided to, or
prepared for, banks or other lending institutions by SK Foods, SK
Foods Personnel, or on behalf of SK Foods, for the purpose of
obtaining a loan or financial benefit to SK Foods; or any
document purporting to list or represent assets owned by SK FOODS
including representations regarding inventory.

**F.    Theft of Confidential Information**

192.  As part of their pattern of criminal activity, RAHAL
and SK FOODS have wrongfully obtained proprietary documents of
competitors.  At RAHAL's request, Witness #1 turned over some
sensitive information he had acquired while working at Morning
Star to BEASELY and/or RAHAL in e-mail and hard copy.

193.  Witness #1 reported to me that, during an SK FOODS
management meeting on 06/07/07, MCCLARAN stated that SALYER had

-81-

USAO-000847

acquired Morning Star's internal financial records. When Witness #1 asked how SALYER got them, PORETTI said SALYER got them from Chris Rufer's (Morning Star's owner) driver, Eric CHILDS (phonetic).

194. There are also several instances in which SK Foods and/or RAHAL have obtained copies of a competitor's contract or pricing information. Witness #1 provided me with one such contract which he stated he had received from Jeff BEASLEY. The contract, dated 2/15/07, between SK Foods' competitor, INGOMAR, and Agusa, covered the contract period 2007-2009.

195. In another example, RAHAL and SK Foods used another employee to wrongfully obtain a contract between its competitor, Morning Star, and a potential customer, Heinz. In June 2007, RAHAL hired Beth CLAIR, another former Morning Star employee, to oversee SK FOODS' customer service representatives. In 8/7/07, after CLAIR accepted RAHAL's offer of employment but before she began to work at SK Foods, Witness #1 was at the SK Foods office in Ripon, when SALYER and RAHAL came by to pick up a copy of a Morning Star and Heinz contract which Clair had obtained for them from Morning Star.

196. More recently, on 04/02/08, agents intercepted a telephone conversation between RAHAL and HUEY, in which RAHAL said, "WATSON is sending me the offer from Chris Rufer (Morning Star) by fax, but not from his (WATSON's) office and not from his (WATSON's) personal fax. He's going to go outside and try to

-82-

USAO-000848

send it to me.  Do you want me to send that?  Who do you want me
to send that to?"  HUEY replied, "send it to me."  RAHAL stated,
"that's as far as it goes then."

197.  Later the same day, RAHAL called WATSON and told
WATSON to fax Morning Star's bid information to RAHAL's home
"where you sent the last time" and provided WATSON with the fax
number for RAHAL's wife.  RAHAL stated, "I don't want you to send
it here. Send it not from your office."  In a call later the same
day, RAHAL told WATSON, "I think it would be better for you to
mail that instead of faxing it even though you're faxing it from
your home.  I'll give you my address and you can mail it to me."
RAHAL then provided WATSON with his home address.  Based on the
context of the call, it appears RAHAL, WATSON and HUEY are aware
that it is wrong for WATSON to be giving the competitor's
proprietary information to RAHAL for SK FOODS' benefit.  Their
effort to affirmatively conceal the sender and recipient
demonstrates their consciousness of guilt.

198.  On April 4, 2008, agents intercepted a call to RAHAL
made by HUEY from HUEY's phone at SK FOODS.  HUEY told RAHAL that
Morning Star was raising the prices on its bids in the market
place.  RAHAL stated, "WATSON (Kraft) is mailing me the offer"
that Morning Star made to Kraft.  RAHAL stated, "he (WATSON) is
not even going to fax it and I think that's smart; as soon as I
get it, I'll shoot it over to you."

199.  RAHAL then told HUEY that he also had the bid that

-83-

BMO 001677

USAO-000849

Morning Star had made to Barilla.  RAHAL asked, "Are you ready?
Because I don't want to send this by e-mail to anybody."  RAHAL
then told  HUEY the specific details of Morning Star's bid to
Barilla over the phone.  Presumably, HUEY was writing down the
details as RAHAL gave them to him and it is likely that such a
document may be found in Huey's office.  I believe that RAHAL's
reluctance to send the wrongfully obtained competitor's bid
information over the e-mail demonstrates his consciousness of
guilt.

200.  On April 7, 2008, Witness #1 forwarded an e-mail to
me. The Morning Star bid prices which had been submitted to
Frito-Lay was sent as an attachment to the e-mail.  The e-mail
trail indicated that James WAHL from Frito-Lay had sent the bid
information to RAHAL; RAHAL had forwarded it to Alan HUEY with a
"cc" copy to Witness #1, Jeff Beasley, and Scott SALYER.

201.  We also believe the conspirators have wrongfully
obtained information about the customer-companies which buy
product from SK FOODS.  As detailed above, on 7/18/07 when agents
watched RAHAL hand DELIRA a Bank of America envelope at a
restaurant in Lemoore, California, the agents heard, among other
things, RAHAL ask DELIRA to provide him with a list of his Agusa
sales customers and the Agusa contract prices.

202.  After that meeting, a phone call was intercepted
between RAHAL and DELIRA in which RAHAL asked for the
"information" to be sent to him via email.  RAHAL also asked for

-84-

USAO-000850

financial statements for DELIRA's employer, Agusa.  After DELIRA expressed hesitation, RAHAL stated "it won't go anywhere.  I'll look at it and I'll destroy it."

203.  On 08/22/07, I reviewed a contract between Agusa and Ingomar, one of SK FOODS competitors, which Witness #1 had obtained from BEASLEY who had received it from RAHAL.  RAHAL had informed Witness #1 that RAHAL obtained the contract from Joel DELIRA of Agusa.

204.  We seek to recover documents, whether on paper or transmitted and / or stored electronically, which are the property of, or contain proprietary information of, SK Foods competitors.  Specifically, as outlined in Attachments B-1, B-2, and B-3, we seek documents including financial statements, bidding proposals, pricing information, recipes, customer lists, and contracts belonging to another Competitor or Customer as defined in Attachments B-1, B-2 and B-3.

### G.   Fraud to Induce Customers to Sign Contracts

205.  I have learned from witnesses that tomato producers such as SK FOODS typically compete with other tomato processing companies through a competitive bid process.  Some contracts are for a one year period, others are multi-year contracts.  ConAgra is one of SK FOODS' largest customers and the purchasing manager for ConAgra (Pat COE) is believed to accept kickbacks from RAHAL. ConAgra's contract with SK FOODS was up for renewal in June 2007. I believe SK FOODS made fraudulent misrepresentations to ConAgra

-85-

BMO 001679

USAO-000851

in order to induce ConAgra to sign a 3 year contract.

206.  On 6/15/07, a call was intercepted between RAHAL and
COE in which COE told RAHAL that ConAgra was reluctant to sign
the 3 year contract with SK FOODS because Hatch (presumably the
Hatch Chile Company which manufactures Mexican foods), a
competitor of ConAgra and another SK FOODS customer, was selling
their finished tomato product at a lower price and people at
ConAgra believed that SK FOODS must be selling the paste
ingredient to Hatch for a cheaper price.

207.  COE asked RAHAL if he could get a copy of Hatch's
invoice so COE could show it to people at his company.  COE
reasoned RAHAL could release the internal SK FOODS documents
because he was a broker and not an employee of SK FOODS.  RAHAL
told COE that was the reason RAHAL kept INTRAMARK as a separate
entity.

208.  Intercepted calls revealed that RAHAL then contacted
several SK FOODS employees to have them create a "bogus invoice
backdated" falsely showing an inflated price that SK FOODS was
selling to Hatch.  In one of the intercepted calls, RAHAL stated,
"I don't know who you talk to, all I'm telling you is this is
what I want.  I want a copy of an invoice faxed to my office.
That's gonna show how . . . I don't even know how we invoice
these people.  Do we invoice them on a case or do we just break
it down?  If we give them a case price then take the god damn
case price and double it and . . . it's gotta be done by hand

-86-

USAO-000852

manually." Jeff BEASLEY (SK FOODS employee) responded, "It's gotta be in the computer. It's gotta be computer-generated so it don't look fake." RAHAL responded, "Fine, but it's gotta be a computer-generated, bogus invoice. I've done it before with Washburn (former SK FOODS employee). They know how to do it."

209. In an intercepted call between RAHAL and SALYER several days later, RAHAL and SALYER discussed the bogus invoice and the value of Jennifer DAHLMAN, who is believed to have created the invoice. Within approximately one week of creating the invoice, ConAgra signed the three-year contract with SK FOODS.

210. In a series of intercepted calls on another matter, RAHAL told Mike PORETTI that PORETTI needed to go along with RAHAL and tell the B&G Foods representatives that SK FOODS had been forced to increase the price that it charged B&G Foods for their product because the growers were charging a higher price to SK FOODS. However, the product SK FOODS provided to B&G Foods was grown on fields owned by SK FOODS.

211. On 6/20/07, in an intercepted call between RAHAL and PORETTI, RAHAL told PORETTI, "We can make up invoices. We can do all kinds of things like that."

212. Based on the information above, I believe that the following documents, which are included among those listed in Attachments B-1, B-2 and B-3, are the types of documents which can provide evidence of fraudulent misrepresentations to

-87-

USAO-000853

customers: SK FOODS invoices for Hatch; records which reflect the creation of false invoices or other records; and fax records between INTRAMARK, SK FOODS, and/or CON AGRA between 6/15/07 to 6/22/07; and communications between or among RAHAL, SALYER, and other SK FOODS Personnel relating to the creation of fictitious invoices.

### H. Other Items

213.   Witness #1 has informed me that he has observed both RAHAL and SALYER carrying a briefcase and has seen them open their briefcases to retrieve documents during substantive business meetings.   During June 2007, agents observed RAHAL carrying a briefcase into the corporate offices of SK Foods.

214.   Witness #1 also reports that SALYER carries a leather-bound book with him in which SALYER writes things down during business meetings.   Witness #1 stated that, to the best of recollection, he has never seen SALYER not have this book with him during a business meeting.   Witness #1 states that he has consistently observed SALYER write things in this book.   Witness #1 described the book as a lined leather bound book with blank lined pages.   The company name "SK Foods" is engraved on the front cover.   Witness #1 stated that the book has the year and SALYER's name engraved on the front cover.   Witness #1 stated that certain employees are given a book annually from the company.   Witness #1 stated that the book SALYER is using for 2008 is green in color.   Witness #1 has seen SALYER carrying

-88-

USAO-000854

similar books in prior years.  Witness #1 believes SALYER keeps

the current year book with him at all times but does not know

where SALYER's prior years books are located.  Because of

SALYER's consistent habit of writing in the books during

meetings, we believe these books constitute business records and

contain notes or writings relevant to the criminal actions set

forth herein.

215.  Witness #1 reported to me that, on 2/6/08, when SALYER

spoke to Witness #1 in the hotel lobby after the CTEG meeting,

SALYER got out this book and referred to it as he relayed details

of the meeting to Witness #1.  That particular meeting is

believed to have involved discussion of price-fixing in violation

of Title 15.  It is believed SALYER's book would provide evidence

of not only this meeting but other meetings where illegal

activity was discussed.

216.  Depending on the time the search warrant is executed,

I believe the briefcase may be located in SALYER's offices or

home in the Northern District of California.  However, if SALYER

happens to be at any of the SK facilities in the Eastern District

of California at the time of search warrant execution, the

briefcase and the book may be located in one of the SK Foods

facilities, in his car, or on his person (if he is carrying it).

I.   **Locations Where Documents Are Kept**

217.  The SK FOODS facilities in the Northern District of

California include two corporate offices: a two story commercial

-89-

USAO-000855

building and airplane hangar at the Monterey airport, with an
address of 200 Sky Park Drive, Monterey, California, and the new
single story commercial office building in the "Ryan Ranch"
office park at 21 Lower Ragsdale Drive, Monterey, California.
(As noted above, a formal office-opening ceremony for the "Ryan
Ranch" office is scheduled for April 18, 2008, but surveillance,
intercepted telephone communications, and information from
Witness #1 all indicate that SK FOODS executives are already
occupying and working in that office space, and have been for
some weeks).  In addition, Scott SALYER, the owner and CEO of SK
FOODS, resides at 3903 Ronda Road, Pebble Beach, California.

218.  In the Eastern District of California, SK FOODS has
two production facilities ("plants") in Lemoore and Williams.
There is also an office in Ripon, which is also in the Eastern
District of California, where BEASLEY, PORETTI, and Witness #1
work.  It is anticipated that search warrants will be executed at
the three Eastern District locations simultaneously with the
execution in the Northern District of the search warrants sought
in this affidavit.

### 1.   Sky Park Drive Corporate Office

219.  The SK FOODS corporate headquarters office at 200 Sky
Park Drive at the Monterey airport is the location at which SK
FOODS CEO Scott SALYER, and Vice President for Strategic Planning
Alan HUEY have their offices.  They have worked from that
location for at least several years.  Witness #1 has reported

-90-

USAO-000856

numerous discussions with these persons while they were at the
Sky Park office, and some  intercepted conversations between
RAHAL and both SALYER and HUEY have been calls into or out of the
Sky Park office.  I know from information obtained from Witness
#1 that these persons utilize computers in the course of their
work.

220.  On June 6, 2007, surveillance by FBI Special Agents at
200 Sky Park Drive observed a vehicle at that location which DMV
records indicates is registered to Scott SALYER.  Based on
surveillance of the SK Corporate Office located at 200 Sky Park
Drive, Monterey, California, I know that the office is located at
the Monterey airport and the rear of the office building appears
to be a hangar which opens up onto the tarmac of the runway at
the airport.  Witness #1 stated that SALYER has a "Hawker" jet
and a "Cessna" that he stores in the hangar at that location.
Interception of phone calls between RAHAL and SALYER indicate
that SALYER works from the planes and utilizes the planes to both
conduct business and to take SALYER to locations for the purpose
of conducting business.  As such, it is likely that the planes
may contain documents or other instrumentalities relevant to the
crimes set forth in this affidavit.  If there are any planes on
the premises of 200 Sky Park Drive at the time of the search, it
is requested that authority be given to search the planes.

221.  Based on all of the above, I have probable cause to
believe that in the corporate offices at Sky Park drive, will be

-91-

USAO-000857

found evidence of instrumentalities of the crimes set forth in this affidavit, specifically documents and items handled by Scott SALYER and Alan HUEY, and other executive function records, including financial records, bidding documents, contracts, documents relating to re-labeling and bill-and-hold inventory manipulation, documents relating to CTEG and coordination with INGOMAR and Los GATOS concerning prices, bids and market allocation, corporate organizational records, tax records, and other items as described on Attachment B-1 hereto.

### 2.   New Ryan Ranch Corporate Office

222.  As noted above, SK FOODS recently obtained new, larger office space in a single story office building at 21 Lower Ragsdale Drive, in Monterey, California.  Although Witness #1 has not yet personally visited the Ryan Ranch office, information obtained from Witness #1, intercepted telephone calls, and surveillance establish that SK FOODS executives are currently operating from that location.  The building is at the end of a cul-de-sac, and agents conducting surveillance have noted a large SK FOODS sign on the building and cars in the parking lot.

223.  Witness #1 stated that Mark McCORMICK, the Chief Financial Officer for SK FOODS, and about four other accounting personnel have their offices at the Ryan Ranch office.  Witness #1 has also indicated that Alan HUEY will have an office at the "Ryan Ranch" location.  It may be that HUEY is currently in the process of relocating files from the Sky Park Drive corporate

-92-

BMO 001686

USAO-000858

office to the Ryan Ranch office.

224.  Based on all of the above, and because the CFO and accounting staff for SK FOODS are located at the Ryan Ranch office, I have probable cause to believe that in the corporate offices at the Ryan Ranch office park at Lower Ragsdale Drive will be found evidence of instrumentalities of the crimes set forth in this affidavit, specifically accounting records including contracts, inventory documents, bank credit applications, corporate organizational records, tax records, travel and expense vouchers and records, scheduling information, and other items as described on Attachment B-2 hereto.

### 3.  **Residence of Scott Salyer**

225.  Scott SALYER, CEO of SK FOODS, resides at a two story residence in Pebble Beach, California.  Fidelity Title company database as of 4/9/08 indicate that 3903 Ronda Road, Pebble Beach, California is owned by Scott SALYER; Scott SALYER Revocable Trust.  The transaction history of the property indicates that there was a grant deed filed on 9/10/07 transferring the property from Blackstone Ranch to SALYER and his trust.  Public records indicate Blackstone Ranch is an active corporation which lists Scott SALYER as CEO and Alan HUEY as agent for service.

226.  Witness #1 has told me that he knows that Scott SALYER regularly works out of his home because Witness #1 would often receive emails past midnight and SALYER would not work in the

-93-

USAO-000859

office that late.  Witness #1 stated that Jeanne Johnston,

SALYER's secretary, told Witness #1 that when SALYER did come

into the office, he would normally arrive after 9 a.m.  Witness

#1 stated SALYER is often conducting business in the middle of

night from his home with Richard Lawrence, who, according to the

SK FOODS website, is the managing director of Cedenco, the

company SK FOODS owns in Australia and New Zealand (18 to 20

hours difference, respectively).  Also, SALYER often conducts

business from his home with Duncan Blake of Merco, who is located

in Turkey (9 hours difference).  In February 2008, SALYER

announced the formation of WTA with Blake, WOOLF, and PRUETT.

Source stated that the purpose of WTA was to lock up the market

of international customers and influence prices.

227.  Witness #1 provided the affiant with emails showing

that SALYER conducted business transactions via email in the

early hours of the morning (between the hours of 12:00 am and

8:00 a.m.).

228.  Witness #1 also told me that RAHAL will sometimes stay

at SALYER's home when he comes to town.  When RAHAL was in Pebble

Beach, California on 01/17/08 for an SK Foods Strategic Planning

Meeting, a vehicle matching the description of the vehicle rented

by RAHAL was observed at SALYER's home at 3903 Ronda Road.  In

addition, Witness #1 stated he has learned that Richard Lawrence

of Cedenco stays at SALYER's home when he comes to the United

States.  Witness #1 provided the affiant with a schedule of

-94-

USAO-000860

events from SK FOODS for a convention occurring in early February
2008.   On Sunday, February 3, 2008, the schedule noted "10 a.m.
Depart for SFO to pick-up Richard Lawrence, return to Monterey-
Super Bowl Party at Ronda."   Ronda is the name of the street
where SALYER's home in Pebble Beach is located.   On Monday,
February 4, 2008, the agenda noted that SALYER and Lawrence flew
to the convention in Sacramento.   On a recently-intercepted call
between RAHAL and other individuals, RAHAL discussed plans for
traveling to Monterey on April 17, 2008 and staying with Scott in
Pebble Beach.

229.   In an intercepted call between RAHAL and SALYER on
07/03/07, RAHAL asked SALYER where he was staying, SALYER
responded that he had stayed at Ronda with David Haye.   Based on
information obtained from intercepted calls, Haye is a consultant
from New Zealand who came to assist SALYER with SK FOODS
operations and financial operations prior to and more so, upon
the departure of SK FOODS former president, Glen McClaran.

230.   Witness #1 has not been to SALYER's home but was told
by Jeff BEASLEY, who has been to SALYER'S home, that SALYER does
meet customers at his home.   Witness #1 also saw an agenda for a
meeting at one time indicating a barbeque with a customer at
SALYER's home.   According to Witness #1, SALYER has met with
representatives from ConAgra and/or Carriage House at his house.
Witness #1 did not know the date of the last meeting.

231.   Based on the intercepted calls described below, it

-95-

USAO-000861

appears that SALYER also conducts and consummates business transactions at his home.  These transactions appear to be illegal in nature with known bribe recipients.  For example, on 06/08/07, there were several intercepted calls in which RAHAL was with SALYER at his home conducting business transactions.  There were a series of calls between RAHAL and Bob TURNER (B&G Foods). RAHAL told TURNER that SALYER told RAHAL to call him because they were negotiating with the farmers "right now" and wanted to formalize the B&G contract for peppers.  TURNER was unsure how much B&G had budgeted for its pepper purchase.  RAHAL told TURNER that SALYER had checked the number (it is unknown if SALYER referenced a document or the computer to "check" the number). During the call, RAHAL told TURNER that he would increase the bid that SK Foods was making to B&G Foods by one penny and that RAHAL would "split the penny" with him.  RAHAL told TURNER, "it can be a lot of money...it's your kid's education."

232.  Later on 6/08/07, RAHAL called COE, the purchaser at ConAgra.  RAHAL told COE he was at SALYER's home and discussed the ConAgra contract.  RAHAL discussed one of ConAgra's competitors and how SK FOODS would break the contract with the competitor if ConAgra made up the difference in product.

233.  As indicated elsewhere in this affidavit, Glen McClaran, the former president of SK FOODS, who is countersuing the company, alleged that SALYER and RAHAL used SK FOODS and its entities as corporate fictions to conduct business mixed with

-96-

USAO-000862

their personal financial affairs.  There is evidence to support
the fact that some of the business and financial affairs of the
company are mixed.  Witness #1 stated that when he was paid his
2005 bonus from SK FOODS in 2006, he was paid only one-half of
the agreed amount.  Witness #1 called RAHAL who said he would
take care of it.  Later, Witness #1 stated SALYER gave Witness #1
an envelope containing a check.  Witness #1 stated that the check
was written on SALYER's personal Bank of the West bank account.
It is more than likely that personal bank account information
would be located in SALYER's home.  Based on all of the above, I
have probable cause to believe that SALYER's home at Ronda Road
will contain evidence of instrumentalities of the crimes set
forth in this affidavit.

234.  Based on all of the above, including the evidence that
Scott SALYER regularly does business from his home relating to a
variety of schemes described in the affidavit, I have probable
cause to believe that in his residence and on the computers
located there at Ronda Road will be found evidence of and
instrumentalities of the crimes set forth in this affidavit,
specifically communications with other SK Foods employees
relating to various criminal activities, notes of meetings,
travel and scheduling documents, documents relating to payments
of bribes and manipulation and re-labeling of inventory, and
other items as described on Attachment B-3 hereto.

4.   <u>Documents at Multiple Locations</u>

-97-

USAO-000863

235. Given that the duties of personnel in this corporation
change over time, given that their location changes over time,
and given that the nature of the business requires the same
documents, e.g., bids, contracts, to pass through many hands,
there is probable cause to believe that the documents requested
herein could be found at any one of the locations listed in
Attachments A-1, A-2, and A-3.

236. The SK FOODS corporation is somewhat fluid as to which
functions are performed at which locations, thereby affecting
where documents may be found. For example, Scott SALYER, the CEO
of SK Foods, lives in the Northern District of California but
frequently travels to the facilities in the Eastern District of
California. As noted above, according to Witness #1, he has two
planes which he uses to travel around the facilities within the
state, and Witness #1 also reported to me that SALYER conducts
business on the planes. Witness #1 reported to me that SALYER
frequently brings documents with him to the various facilities to
conduct meetings. Thus, documents originating in SALYER's
possession could be found at any the of the SK FOODS facilities.

237. For example, Witness #1 reports that when McCLARAN was
president of the company, financial records were maintained at
his office in Lemoore. However, Witness #1 stated that the new
controller, Mark McCORMICK and some SK Foods accounting personnel
will now be working out of the new location at "Ryan Ranch," so
accounting records, financial records, bank applications, and

-98-

USAO-000864

other such records are likely to be located in both places.

238.   While originals of certain documents will be found in a specific location, altered versions of the originals or copies may also be found in other locations as well.   For example, there is probable cause to believe that the "pick list" exception reports are in the sales office in Ripon where the customer service representative runs the first report.   However, there is probable cause to believe that copies are located in Lemoore where Jennifer DAHLMAN alters those reports.   In addition, given DAHLMAN's statement that she gets her re-labeling instructions from HUEY, there is probable cause to believe that copies will be found in HUEY's offices in Monterey - either the Sky Park Drive address or the new office at Ryan Ranch.

239.   Witness #1 reported to me that documents regarding complaints about already-delivered product, e.g., COAs, shipment records, or original lab registers, will be found at Lemoore for product produced in Lemoore and at Williams for product that was originally produced in Williams.   However, according to Witness #1, the final decisions to resolve issues about return or replacement of rejected (misbranded or adulterated) product, even from Williams, are handled by Steve KING or Glen LONG, who both work in Lemoore.

240.   There is also probable cause to believe that while bid documents are located in the sales office in Ripon, there is also probable cause to believe that copies or versions of the bids

BMO 001693

USAO-000865

will be found in the corporate offices in Monterey, at both the
Sky Park Drive and Ryan Ranch locations.  Witness #1 reported to
me that all bids are approved by Alan HUEY who enters the
information into a spread sheet to determine profit margins
before bids are approved.  Copies of these records may be
included in the accounting records in the Ryan Ranch office.

241.  There is probable cause to believe that, while
finalized contracts are kept in the sales office in Ripon,
according to Witness #1 HUEY also keeps a copy of the final
contracts in his office in Monterey, and thus copies of these
documents may be in either or both of the Sky Park and Ryan Ranch
offices.  There is thus probable cause to believe that documents
regarding bids and contracts will be found at multiple locations.

242.  With respect to stolen proprietary information, there
is probable cause that documents or records containing such
information will be found at multiple locations, e.g., the Sky
Park Drive office in Monterey (Morning Star's financial
information SALYER got from Rufer's driver); the Sky Park Drive
or Ryan Ranch office (Morning Star's bid to Barilla given to HUEY
over the phone at HUEY's office); Ripon (Morning Star's Frito-Lay
bid information relayed in e-mail to sales personnel in Ripon).

243.  Each version of these documents, particularly if they
are different, may constitute evidence of a crime.  Thus, based
on information received from Witness #1 and recorded
conversations there is probable cause to find them at more than

-100-

USAO-000866

one location.  Based on my training and experience, there is
evidentiary value in obtaining multiple copies of documents to
show whether particular individuals had possession of the
documents to determine whether they were personally aware of, or
responsible for, the criminal acts.

244.  In my nine years of experience investigating white
collar crime matters, I have been responsible for receiving and
reviewing documents either voluntarily produced or obtained
through compulsory process, such as grand jury subpoenas and
search warrants, from corporate and individual subjects of the
investigations.  Based upon my experience in investigating white
collar crime matters the types of documents evidencing the
criminal acts under investigation in this matter as set forth in
Attachments B-1, B-2, and B-3, usually are found at companies
similar in size and operation to SK FOODS and INTRAMARK.  There
is probable cause to believe, based upon information received
during the numerous investigations that I have participated in,
that the documents contained in Attachments B-1, B-2, B-3, are
commonly prepared and maintained by most companies in the
ordinary course of their business and that such documents are
stored in corporate offices in filing cabinets, storage boxes, or
electronically on computers for several years.  Furthermore, some
of the documents, notably expense reports and financial
documents, must be maintained for use in preparing federal and
state income taxes and for use in the event of an audit.  The IRS

-101-

USAO-000867

informs business taxpayers to maintain records for a minimum of
three years.  IRS Publication 583 (Rev. January 2007).
Accordingly, there is probable cause to believe that the documents
listed in Attachments B-1, B-2, B-3, were utilized or created
during the period January 1, 2004 to the present and are located
at the locations listed in Attachments A-1, A-2, and A-3.

J.  **Individuals and Entities Listed in Attachment**

245.  In the course of the investigation, I have identified
each of the individuals listed in the definition of "Bribe
Recipients" in section I.B. of Attachments B-1, B-2, and B-3, as
a person who has been discussed by RAHAL in connection with bribe
payments or prospective bribe payments.  All of them are
purchasing officials with companies that are customers or
potential customers of SK FOODS.  There is affirmative evidence,
described above, that all of the persons listed there, except
Dennis POYDENCE, Charles PUFF, and Bill THOMAS, have previously
received bribes through RAHAL.  As noted above, a call was
intercepted in which RAHAL and BEASLEY discuss whether POYDENCE
could be put "on the program."  According to Witness #1, at a
convention in Chicago in November 2005, RAHAL met privately with
PUFF and did want anyone else to join him in the meeting.
Witness #1 believes that RAHAL may have paid PUFF a bribe at the
time or discussed a bribe, because after that meeting RAHAL
stated that he sold more paste to Clement Pappas at a very good
price.  According to recently intercepted telephone discussions

-102-

USAO-000868

between RAHAL and THOMAS, THOMAS is providing competitor

information to RAHAL, which is similar to the conduct in which

other bribed purchasing managers have engaged.

246.   In the course of the investigation, I have identified

each of the individuals listed in the definition of "SK

Personnel" in section I.C. of Attachments B-1, B-2, and B-3, as

employees or former employees of an SK FOODS entity or of

Intramark who had communications relevant to the criminal

activity described in this affidavit.   All of these individuals

are referred to previously in this affidavit, except Tanya ARAZI

and Kathy KANIA.   ARAZI is an office manager for Intramark who

had frequent telephone conversations with RAHAL about his

activities.   KANIA is RAHAL's secretary and has frequently

discussed RAHAL'S business with him on intercepted calls.   As

noted above,  Glenn McCLARAN and Karen RINEHART are former senior

employees of SK FOODS who have filed a civil counter-suit

alleging various illegal conduct including mis-labeling.   Beth

CLAIR, as noted above, is a customer service representative for

SK FOODS who was lured to SK FOODS by RAHAL from a competitor.

The other individuals listed there, in addition to RAHAL, are

current or recent employees of SK FOODS entities whom I have

determined in the course of this investigation have had

communications during the time period January 1, 2004 to the

present relating to the criminal activity described above.

247.   In the course of the investigation, I have identified

-103-

USAO-000869

the four companies and three individuals listed as "Competitors"

of SK FOODS in section I.D. of Attachments B-1, B-2, and B-3, as

persons or entities who are also in the business of processing

tomatoes and producing and selling tomato paste for the domestic

U.S. market.  All of these entities and persons are referenced

above in this affidavit.  Of the individuals, Greg PRUETT is a

senior officer at INGOMAR, Stuart WOOLF is a senior officer at

LOS GATOS, and Rodger WASSON is a consultant for CTEG.  As

described above, there is evidence that SK FOODS officials have

attempted to fix prices, and engage in other illegal anti-

competitive behavior with these entities and persons.

Morningstar and Rio Bravo are competitors which, as noted above,

may have had bid information disclosed to SK FOODS as a result of

corrupt relationships between SK FOODS personnel and customer

companies.

248.  In the course of the investigation, I have identified

each of the companies listed as "Customers" of SK FOODS in

section I.E. of Attachments B-1, B-2, and B-3, as a company which

purchases tomato paste or other processed foods from SK FOODS.

Many of these companies are customers whose accounts with SK

FOODS are handled by Randall RAHAL.  As noted above, RAHAL is, or

is attempting to, make corrupt payments to the purchasing

managers of most or all of the companies whose accounts he

handles.  Other listed entities are companies that appear to be

victims of product mislabeling by SK FOODS, or "bill and hold"

-104-

USAO-000870

fraud by SK FOODS.  All of these companies are referenced in this
affidavit.

249.  As noted above at paragraphs 24-26 of this affidavit,
SK FOODS consists of several entities which appear to own
different facilities.  In addition, Scott SALYER, who appears to
be the principal owner of SK FOODS, also owns several other
interlocking or related companies that are involved in the food
processing business.  Each of the entities listed in section I.F.
of Attachments B-1, B-2, and B-3, are entities which have been
identified in the course of this investigation as part of SK
FOODS or which are owned by Scott SALYER or an entity controlled
by SALYER, and which is also in the food processing business.
Accordingly, persons employed by these businesses, or assets
owned by them, are likely involved in the criminal activities
described herein.

**V.   EVIDENCE OF POTENTIAL DESTRUCTION, CONCEALMENT,
       OR ALTERING OF EVIDENCE**

250.  There is evidence that the conspirators may destroy
items which could be used to incriminate them.  Witness #1
reports that, on 05/16/07, in an unrecorded call, RAHAL called
him stating that he had obtained a copy of bids made to Kraft by
a competitor of SK Foods.  RAHAL told Witness #1 that he faxed
the competitor's bid information to BEASLEY with instructions to
BEASLEY to destroy the faxed information after it was used to
prepare SK Foods' bid to Kraft.  BEASLEY told Witness #1 that
RAHAL asked BEASLEY to destroy the information.  BEASLEY stated

-105-

USAO-000871

to Witness #1, however, that he did not intend to destroy it because keeping a copy would be his "insurance" that he'll never get fired.

251.   On 06/15/07, agents intercepted a call between Randall RAHAL and Pat Coe (ConAgra).  Coe explained that people in his company believed that Coe had failed to obtain a good price for ConAgra from SK Foods and that SK Foods had sold the same product to another company, Hatch, for much less.  COE asked RAHAL to send him a copy of the Hatch invoice so COE could show them that RAHAL/SK FOODS had not given Hatch a lower price than they gave to ConAgra.  RAHAL told Coe he could get him an invoice but told him to be careful with it.  Coe told RAHAL that he could "shred" the document.  In a later call that day, RAHAL told Coe he would get an invoice to him but told Coe he could show it to Coe's boss and "then rip it up."  Subsequent intercepted calls revealed that RAHAL then contacted several SK FOODS employees to have them create a "bogus invoice backdated" falsely showing that SK FOODS was selling product to Hatch for a falsified higher price.

252.   On 3/13/08, agents intercepted a phone call between RAHAL and Jeff BEASLEY in which they discussed the civil cross-complaint filed by former SK Foods president, Glen McClaran.  RAHAL told BEASLEY that McCLARAN was suing because SK Foods was being run unlawfully.  He reported that McCLARAN had claimed in the lawsuit that SK Foods changed COAs (Certificates of Analysis).  RAHAL told BEASLEY that McCLARAN "nailed us, and your

-106-

USAO-000872

name is in it [the lawsuit]." BEASLEY told RAHAL, "I gotta get my computer cleaned." RAHAL asked BEASLEY if he had a virus on his computer. BEASLEY responded, "No, take some files off of it that don't need to be on it."

253. Witness #1 reports that on an earlier occasion, he was present when SALYER stated that he is not worried about what anyone can get off his computer system because he would toss the computer under the wheels of an 18-wheeler.

## VI.   REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

### A.   Seizure Request

254. As stated above, Witness #1 has provided me with documents which relate to the various fraud schemes described herein. I have observed that most of the documents including e-mails, COA's, lab results register, exception lists, bin labels, contracts, invoices, shipping documents, and other documents including customer specifications are created or stored on computers.

255. According to Witness #1, SK FOODS has a server for their computers which is located at the Lemoore, California facility. According to Witness #1, the server is linked to the other SK Foods facilities in Williams, California; the sales office in Ripon, California; and the offices in Monterey, California. Additionally, the SK FOODS server can be accessed from another location, such as an employee's home via a personal computer.

-107-

USAO-000873

256.   Witness #1 stated that laptops are given to all salespeople and other key management people at SK FOODS including Scott SALYER, Alan HUEY, Michael PORETTI, Jeff BEASLEY, Steve KING, and others.   Witness #1 stated that most of the laptops have docking stations in the SK Foods offices that synchronize with the company server.   However, Witness #1 stated that there is a way for the laptop user to deactivate the synchronization if they choose to.   Information stored on those laptops is only transferred to the SK Foods server when the user activates the synchronization after logging onto the server from a remote location.   For example, Witness #1 stated to me that he has spoken on the phone with Jennifer DAHLMAN when she was at her home and she stated that she was making changes at that time, presumably on a portable laptop computer.   Alternatively, the information on the laptop should be transferred to the server when the laptop user inserts their laptop into the docking station - if the user has not deactivated that feature.   For example, if a laptop user made changes on their laptop at night at home or at a time when they were not hooked up to server, those changes would not be stored on the company's server until or unless the user accessed the server and activated the synchronization feature.   Thus, it is likely that the laptop computers will contain information that is not duplicative of information stored on the server.

257.   Witness #1 stated that SALYER carries a laptop

-108-

USAO-000874

computer frequently.  Witness #1 believes SALYER works from his home because Witness #1 often receives emails from SALYER after midnight.

258.  Witness #1 stated that he has seen SALYER carry a laptop computer frequently inside his briefcase.  He has seen SALYER use the computer during substantive business meetings.  He has seen SALYER access and review financial information on his laptop computer during substantive meetings.

259.  Based upon information from Witness #1, review of documents, and my training and experience, I have learned that conspirators communicate the details of their scheme via email. I have also learned through experience and conversations with other special agents that individuals keep personal information, including financial information, on computers used for business and/or personal reasons.  Therefore, by this affidavit I am seeking authority to search for any of the records set forth in Attachments B-1, B-2 and B-3 to this affidavit that may be stored on computers at the premises to be searched.  The terms "records" and "documents" as used in Attachments B-1, B-2 and B-3 include all of the items of evidence set forth in Attachments B-1, B-2 and B-3 in whatever form and by whatever means such records, documents or materials, their draft or modifications, may have been created or stored, including but not limited to any hand made form (such as writing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs,

-109-

or any information on an electronic or magnetic storage device,
such as floppy diskettes, hard disks, backup tapes, CD-ROMS,
optical discs, printer buffers, smart cards, memory calculators,
electronic dialers, Bernoulli drives, or electronic notebooks, as
well as printouts or readouts from any such magnetic storage
devices).

260.   I know that computer hardware, software, documentation
passwords and data security devices may be important to a
criminal investigation in two respects: (1) the objects
themselves may be evidence of a crime and (2) they may serve as
storage devices for information relating to crimes.   Rule 41 of
the Federal Rules of Criminal Procedure permits the government to
search and seize property that constitutes evidence of the
commission of a criminal offense.

261.   Based upon information related to me on January 8,
2008, by Alan Russell Schmidt, Information Technology Specialist
(ITS) and Computer Forensic Examiner (CFE) and Computer Analysis
Response Team (CART) Coordinator for the Sacramento Division of
the Federal Bureau of Investigation, I know that digital evidence
can be stored on a variety of systems and magnetic, optical and
mechanical storage devices including, but not limited to, hard
disk drives, floppy disks, CD-ROMs, DVD-ROMs, magnetic tapes,
magneto optical cartridges, personal digital assistants, pagers
and memory chips.   ITS/CFE Schmidt has informed me that CFE's of
the FBI will be available during the execution of this search

-110-

USAO-000876

warrant to ensure that any computer systems are properly shut down and packaged for transport.   FBI Personnel will also instruct me on the proper manner in which to safely transport any seized digital media to a secure Evidence Storage Facility.

262.   We are seeking authorization to seize computers and equipment.   However, it is our intention to attempt to mirror, image or make a copy of the computer hard drives on site and seize computers and equipment only if the on-site efforts are unsuccessful for some unanticipated reason.

263.   While it is my intention to minimize the obtrusiveness of this search warrant, the Sacramento Division CART Lab has informed me that it will be necessary to shut down any computer systems found during the execution of the search warrant in order to forensically protect the imaging process. This would include any stand-alone computers, servers and/or any other networked computers. It will also be necessary to terminate any internal and external network connections.   It may take an extended period of time, generally a few hours, to safely image a computer system in the field.   If the CFE and/or Case Agent determine the evidence cannot be reasonably imaged on-site and will need to be seized and processed in the CART Lab, the following procedure will be adhered to.

264.   Any computers or computer systems, as defined in Attachments B-1, B-2 and B-3, found at the search locations will not be searched in any manner while the agents are at the search

-111-

USAO-000877

locations. Rather, with the assistance of FBI CART Personnel,
any computers or computer systems found at the search locations
will be seized, transported from the scene, imaged at the
Sacramento Division CART Lab, and examined. This procedure is
justified for two reasons. First, as set forth above, there is
sufficient probable cause to show the Court that the computers
and computer systems constitute evidence of the commission of a
criminal offense, and/or were used as the means of committing a
criminal offense. Second, searching computers and computer
systems is a highly technical process that requires specific
expertise, equipment and software. There are a multitude of
different types of computers manufactured today, many of which
use proprietary hardware and software during the creation of any
user data. It is impracticable for the law enforcement community
to have all the proper adapters, cables, cords and other hardware
devices necessary to consistently link law enforcement forensic
equipment with all known and unknown computer systems on an
immediate basis while searching "on-site." Much of this
specialized equipment is available, but may need to be acquired
in order to conduct a proper forensic examination.

265. There are literally thousands of different software
programs that can be commercially purchased and installed on a
user's computer system. As computer security has become an
ever-increasing priority to many consumers, much of today's
commercially available software is developed for, or provides,

-112-

USAO-000878

data security and encryption, which makes it difficult to afford
an accurate representation of any digital evidence confronted
with on-site.  Moreover, it is not feasible for a Computer
Forensic Examiner to be familiar with every software program,
past or present, now commercially available. It may be necessary
for a CFE to train with a particular type of software in order to
fully understand the capabilities of that software.

266.  In order to safeguard the integrity of a computer
forensic examination, it is imperative that the CFE first make a
complete image of the original digital evidence before conducting
a forensic examination.  The CFE must ensure that any images made
are forensically sound and that these forensic images can be
fully restored, if necessary. There are numerous pitfalls that
can seriously hamper the integrity of the imaging process while
on-site.  For example, to make a forensically sound image of
targeted original digital evidence, the CFE must ensure that
there is an adequate uninterruptible power supply.  Digital
evidence is extremely fragile and susceptible to power
interruptions or power surges.  It is not always practical for a
CFE to bring backup power supplies into the field.

267.  Additionally, it may be necessary for the CFE to have
unrestricted access to the original digital evidence during the
course and scope of the forensic examination.  There are numerous
operating systems now being used by consumers.  Some of these
operating systems include, but are not limited to, DOS, Windows

-113-

USAO-000879

3x, Windows 9x, Windows NT, Windows 2000, Macintosh, Linux, Unix, Novell and PICK.  These operating systems use different file structures, different partition formatting and different file commands.  Moreover, many of these operating systems are "hardware" specific.  This means that a restored image of original digital evidence may not be "bootable" or "viewable" without the actual original hardware.  This would prevent the CFE from viewing the restored digital image in a manner consistent with the structure of the original digital evidence.  This problem is especially acute when dealing with operating systems like Linux, Unix, MAC and Novell.

268.  These problems are accentuated by the fact that it is possible for a user to have two or more different operating systems on the same piece of original digital evidence.  This severely hampers the CFE's ability to image this type of original digital evidence on-site due to certain software limitations.  This type of problem generally requires that the imaging process take place in a controlled environment, such as the Sacramento Division FBI CART Lab.  Once this procedure is completed, a CFE can then safely conduct most types of requested examination using this newly created "image" file without fear of damaging, destroying, adding or altering any files or operating system components of the original digital evidence.

269.  It is also very difficult in today's computer environment to "search" for specific data while on-site.  To

-114-

USAO-000880

conduct any type of digital "search" without using a forensically created image predisposes multiple forensic problems.  It may literally take hours, if not days, to appropriately search a medium to large size hard drive for any desired data.  For example, a search for the word "kill" during a homicide investigation could find thousands of positive hits, due to the fact "kill" is a valid computer command related to the ending of an otherwise innocuous computer process.

270.  Computers can be difficult to examine even if no serious effort is used to conceal or protect its digital contents.  A complete forensic search is not limited to examining files normally displayed by the operating system.  It also includes the expansion of compressed data and the recovery of deleted file data.  It involves the areas on a computer hard drive that the computer system recognizes as being "in use" as well as those areas that the computer system deems "available for use."  This search may involve an examination of "slack" space, which is the information at the end of a sector or cluster beyond the end of the "current" usage.  Finally, the complete examination would address "orphaned" data, portions of files left behind by earlier operating system activity.  All of these areas require operating specific tools and techniques to access the data.

271.  It is also very easy for a computer user to conceal data or other types of digital evidence through a number of

-115-

USAO-000881

methods, including the use of innocuous or misleading filenames
and extensions.  For example, files with the extension "jpg" are
digital image files.  A moderately sophisticated computer user,
however, can easily change the .jpg file extension to "txt" or
"dll" in order to conceal or mislead law enforcement into
thinking the digital image is actually a text or system file.
While it is may be possible for a CFE to notice this during a
properly controlled forensic examination, it is difficult for
that same CFE to detect this concealment during an on-site
examination.  For example, the Windows 9x Operating System,
installed right out of the box, would itself contain over 20,000
different system files. A devious user could then alter any
improper files so as to make them appear to be legitimate files.

272.  The problems noted above are compounded by the fact
that the volume of data stored on a typical computer system is so
large that it would be unrealistic to search for specific data
while conducting an on-site examination.  For example, a single
megabyte of storage space is the equivalent of 500 double-spaced
pages of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of
text.  Computer hard drives are now capable of storing more than
60 gigabytes of data and are commonplace in new desktop
computers.

273.  Additional problems are created by the growing use of
destructive programs or "booby traps."  These programs can

-116-

USAO-000882

destroy or alter data if certain forensic procedures are not scrupulously followed.  Since digital evidence is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as the Sacramento Division FBI CART Lab, is essential to conducting a complete and accurate examination of any digital evidence.  This problem mandates that all examinations need to take place using only a forensic image of the original digital evidence.  Finally, there is also a growing use of military-grade encryption by consumer and commercial computer users.  These encryption programs, which are low or no cost, are widely available and allow users to encrypt specific data with just a few keystrokes.  These encryption problems are accentuated by other newer technologies, like steganography, which allows a user to conceal information within other files. It is difficult to detect the use of this technology without a proper forensic examination and the ability to look at the entire image of the subject digital evidence.

274.  For the reasons set forth above, I respectfully request that I be allowed to seize all computers and computer systems, as defined in Attachments "B-1", "B-2", and "B-3", and transport them to the Sacramento Division FBI CART Lab for a proper forensic examination including imaging and searching.

**B.  Search Procedure**

275.  In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or

-117-

USAO-000883

media that stores data electronically (collectively, the
"device") that is authorized by this warrant reasonably can be
completed at the site within a reasonable time.  If the search
reasonably can be completed on site, the government will remove
the device from the site only if authorized by law because
removal is (1) necessary to preserve evidence, or (2) if the item
is contraband, a forfeitable instrumentality of the crime, or
fruit of crime.

276.  If the government determines that a reasonable search
as authorized in this warrant cannot be completed at the site
within a reasonable period, the government must determine whether
all or part of the authorized search can be completed by making a
mirror image of, or in some other manner duplicating, the
contents of the device and then completing the search of the
mirror image off site (e.g., at a computer crime laboratory).

277.  The government may remove from the search location a
device only if the device cannot be searched reasonably on site,
or by mirror-imaging or otherwise duplicating its contents for
off site examination - unless authorized by law to remove the
device because (1) removing the device is necessary to preserve
evidence, or (2) the device is contraband, a forfeitable
instrumentality of the crime, or fruit of crime.  The government
also may remove from the site any related equipment (e.g.,
keyboards or printers) or documents (e.g., system operating or
software manuals) that reasonably appear to be necessary to

-118-

USAO-000884

conduct an off-site search of a device in which data is stored electronically.

278.  If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten (10) calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

279.  The government must complete an off-site search of a computer of device that agents removed in order to search for evidence of crime as promptly as practicable and no later than thirty (30) calendar days after the initial execution of the warrant.  Within thirty (30) calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime.  Within a reasonable period, not to exceed sixty (60) calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made - copies of any data that are outside the scope

-119-

USAO-000885

of the warrant but that were copied or accessed during the search
process, unless, under the law, the government may retain the
copies (1) to preserve evidence, or (2) because the copies are
contraband, a forfeitable instrumentality of the crime, or fruit
of crime.  The deadlines set forth in this paragraph may be
extended by court order for good cause shown.

280.  In conducting the search authorized by this warrant,
whether on site or off site, the government must make all
reasonable efforts to use methods and procedures that will locate
and expose only those categories of files, documents, or other
electronically stored information that are identified with
particularity in the warrant while, to the extent reasonably
practicable, minimizing exposure or examination of irrelevant,
privileged, or confidential files.

281.  The terms of this warrant do not limit or displace any
person's right to file a motion for return of property under
F.R.Cr.P. 41(g).  Nor does the issuance of this warrant preclude
any person with any interest in any seized item from asking the
government to return the item or a copy of it.

282.  The government must promptly notify the judge who
authorized issuance of the search warrant (or, if that judge is
unavailable, to the general duty judge) if a dispute arises about
rights or interests in any seized or searched item – or any data
contained in any searched or seized item – and that dispute
cannot be resolved informally.  The government must deliver a

-120-

USAO-000886

copy of this written notification to any person known to assert
any such right or interest.

VII.   **REQUEST FOR SEALING**

283. It is respectfully requested that this Court issue an
Order sealing, until further order of this Court, all papers
submitted in support of this Application, including the
Application and Affidavit.  Sealing is necessary because the
items and information to be seized are relevant to an ongoing
investigation, and premature disclosure of the contents of this
Affidavit and related documents may have a negative impact on
this continuing investigation and may jeopardize its
effectiveness.  This is a broad investigation involving many
subjects, and it is anticipated that numerous interviews will be
conducted and numerous grand jury subpoenas will be served in the
near future.  Witnesses are likely to be summoned to give
testimony to the grand jury.  Premature disclosure of the
contents of this affidavit may cause some persons to withhold
information, to alter grand jury testimony, or to attempt to
intimidate cooperating witnesses or potential witnesses.  Sealing
is particularly appropriate where, as set forth above, there is
affirmative evidence that the subjects of the investigation will
alter or destroy evidence.

VIII.  **CONCLUSION**

284. Based on the foregoing facts, I have reason to believe
that evidence, fruits, and instrumentalities of violations of 18

-121-

USAO-000887

U.S.C. § 371; 18 U.S.C. § 1343; 18 U.S.C. § 1346; 18 U.S.C. §

1341; 18 U.S.C. § 1952; 18 U.S.C. § 1962(c) and (d); 18 U.S.C. §

1832; 18 U.S.C. § 1344;  21 U.S.C. § 331; and 15 U.S.C. § 1, as

set forth in Attachments B-1, B-2, and B-3, will be found at the

following SK FOODS facilities as more fully described in

Attachments A-1, A-2 and A-3 hereto:

    1)    SK Foods - Corporate Office
           200 Sky Park Drive
           Monterey, California 93940

    2)    SK Foods - Corporate offices
           Ryan Ranch office park
           21 Lower Ragsdale Drive
           Monterey, California 93940

    3)    Residence of Scott Salyer
           3903 Ronda Road
           Pebble Beach, California 93953

Accordingly, I respectfully request that warrants be issued for

those locations authorizing the search and seizure of the items

described in Attachments B-1, B-2, B-3.

Paul S. Artley
Special Agent, FBI

Sworn to before me
this ___ day of April 2008

HONORABLE HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF CALIFORNIA

-122-

USAO-000888