# EXHIBIT 114

**177 PAGES**

Gregory C. Nuti (CSBN151754)
E-Mail: gnuti@schnader.com
Kevin W. Coleman (CSBN 168538)
E-Mail: kcoleman@schnader.com
Natalie Bush-Lents (CSBN 253124)
E-Mail: nbush-lents@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California  94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for
Chapter 11 Trustee, Bradley D. Sharp

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| IN RE:<br><br>SK FOODS, L.P., A CALIFORNIA LIMITED PARTNERSHIP,<br><br>    DEBTOR.<br><br>_____<br><br>BRADLEY D. SHARP, et al.,<br><br>        Plaintiff,<br><br>    vs.<br><br>SKPM CORP., INC., SSC & L 2007 TRUST, MONTEREY PENINSULA FARMS, LLC, FREDRICK SCOTT SALYER AKA SCOTT SALYER IN HIS CAPACITY AS TRUSTEE OF THE SCOTT SALYER REVOCABLE TRUST AND TRUSTEE OF THE SSC&L 2007 TRUST, SCOTT SALYER REVOCABLE TRUST, FAST FALCON, LLC, HENRY JOHN HEATH, AND DOES 1-5,<br><br>        Defendants. | **Case No. 09-29162-D-11**<br><br>**Chapter 11**<br><br><br><br>**Adv. Pro. No. 11-2337**<br><br>**DC No. SH-1**<br><br><br>**DECLARATION OF GREGORY C. NUTI IN SUPPORT OF** *EX PARTE* **MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:    September 1, 2011<br>Time:    10:00 a.m.<br>Place:   Courtroom 34<br>         501 I Street, 6th Floor<br>         Sacramento, CA  95814<br><br>Judge:   Hon. Robert S. Bardwil |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3584201_1

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

BMO 001905

I, Gregory C. Nuti, declare as follows:

1.      I am an attorney at law and duly licensed to practice before all of the courts in the state of California.  I am a partner with the law firm of Schnader Harrison Segal & Lewis LLP, counsel of record in this action for Bradley D. Sharp (the "Trustee"), the duly appointed and acting chapter 11 trustee for the estate of SK Foods, L.P. ("SK Foods") and RHM Industrial/Specialty Foods, Inc. ("RHM", and collectively, the "Debtors").  Except as otherwise noted, I have personal knowledge of the facts set forth in this Declaration, and, if called as a witness, could and would testify competently to such facts under oath.

2.      I submit this declaration in support of the Trustee's *Ex Parte* Motion for a Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction.

**EVIDENCE RELATING TO IRREPARABLE HARM**

**Violation of the Drum Line Injunction**

3.      The Trustee is concerned that without, at a minimum, a preliminary injunction and a receiver, Salyer and his cohorts will dissipate the assets subject to these proceedings at their earliest opportunity.  They have already exhibited a willingness to defy this Court's orders on numerous occasions.

4.      On May 9, 2011, the Court issued its Memorandum Decision in *Sharp v. CSSS, L.P.*, adversary proceeding no. 09-2543 ("Drum Line Action") denying a motion for summary judgment on the Trustee's contempt motion against Larry Lichtenegger (the "Memorandum Decision").  As the Court and parties are well aware, the contempt proceedings involve the shipment of the so-called Drum Line to New Zealand in violation of this Court's temporary restraining order and preliminary injunction issued in the Drum Line Action.  I request that the Court take judicial notice of the Memorandum Decision, attached hereto as **Exhibit 1**.

5.      On August 24, 2009, this Court issued its order restraining and prohibiting movement of the Drum Line outside of California.  Memorandum Decision, p. 2, lines 13-17.  "It is undisputed that on August 24, 2009, the day of the [TRO] hearing, the drum line was in the Port of Oakland awaiting documentation that would allow it to be exported, and it did not leave the Port of Oakland for New Zealand until a week later, August 31."  *Id.*, p. 2, lines 17-21.  Thus,

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3584201_1

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1    this Court has already determined its orders have been violated; the only thing left to do is to

2    specifically identify the parties responsible and their level of culpability.  Obviously, those

3    potentially responsible include Scott Salyer, Cary Collins and others.  These are some of the

4    people acting for the Farming Entities and Fast Falcon.

5    **Violations of the Substantive Consolidation and Quiet Title Injunction**

6    **False Accountings and Unauthorized Payments**

7    6.    In March 2010, this Court also issued an injunction prohibiting various Salyer

8    related entities ("Farming Entities") from disposing or dissipating their assets in connection with

9    the Trustee's complaints for substantive consolidation and quiet title.  The parties stipulated in

10    October 2010 to allow one of the Farming Entities, SSC Farming, to sell a piece of land on the

11    condition that the sale proceeds would be held in an account subject to the injunction[1].  The

12    injunction further provided that SSC could pay only certain specifically identified operating

13    expenses and required SSC to provide an accounting for any such payments.  I understand from

14    my dealings with opposing counsel Cary Collins prepared the accounting and wrote the checks.

15    I am also informed that Cary Collins is "involved in assisting Mr. Salyer with legal

16    representation on behalf of Mr. Salyer and his entities."  Attached as **Exhibit 2** is a copy of

17    correspondence from Collins' Australian counsel to the Trustee's Australian counsel.  Robert

18    Pruett signed the checks for SSC Farming.

19    7.    The accounting for the period of October 2010 through December 31, 2010 failed

20    to disclose the first three payments made to Collins & Associates totaling $353,000.00.  The

21    ending balance for December 31, 2010 was falsified to overstate the account balances to further

22    conceal the payments.  They did not contemporaneously provide the bank records so we were

23

24

---

25    [1]    The injunction has been modified by agreement on several occasions.  First, it was
       modified to allow the sale of the land.  It was further modified pursuant to the District
26    Court's order on remand to allow the Farming Entities to pay their counsel.  Because SSC
       was the only entity with liquid assets, only SSC's counsel could receive payments.
27    Finally, we further agreed to allow the Farming Entities to lease portions of their land to
       be farmed, with the rental proceeds becoming subject to the injunction.

28

PHDATA 3584201_1

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

BMO 001907

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  unable to immediately compare the accounting to the bank statements.  This accounting further

2  misidentified a $15,000 payment to Scott Salyer as fees paid to the "Farm Manager."

3          8.      On January 24, 2011, it appears Cary Collins deposited $353,000.00 into the

4  account to cover the earlier violations.  At the time, we were negotiating with Salyer over various

5  issues, including the payment of attorneys' fees from the sale proceeds and to allow the Farming

6  Entities to lease a portion of their remaining land to Eric Mireles.  In conjunction with these

7  negotiations, we pressed our demands for a full accounting of the funds, which I assume

8  prompted the reimbursement.  We received the accounting for January 2011 in early February

9  2011; it failed to disclose the deposit.

10          9.      On February 2, 2011, Collins, Pruett, et. al. paid two checks to Collins &

11  Associates totaling $461,969.  In early March 2011, when they provided us the accounting for

12  February 2011, they misidentified these payments as going to Gary Perry for legal fees.  On

13  March 11, 2011, I wrote to Van Durrer, another of the attorneys representing Scott Salyer in

14  these proceedings, questioning the authority for the Payments, asking for evidence in support

15  thereof, and demanding return of the Payments pending receipt of such evidence.  Attached as

16  **Exhibit 3** is a copy of my letter.

17         10.    On March 15, 2011, Mr. Durrer responded, wherein he agreed that the Payments

18  would be reversed.  Attached as **Exhibit 4** is a copy of Mr. Durrer's letter (redacted to eliminate

19  unrelated settlement discussions).

20         11.    On March 18, 2011, Mr. Durrer provided a deposit slip indicating that the

21  Payments had been returned to SSC Farming's account.  Mr. Durrer has never provided any

22  evidence to support the Payments in the first instance.  Attached as **Exhibit 5** is a copy of Mr.

23  Durrer's e-mail and the deposit slip.

24  **Failure To Collect Amounts Owing From Eric Mireles, Nature Fresh Farms and**

25  **Green Barn Farms**

26         12.    On Friday, May 27, 2011, I was contacted by Warren Felger, an attorney

27  representing a watermelon farmer, TD Farms.  Mr. Felger informed me that his client, in early

28  February 2011, obtained a sublease from Mr. Mireles for land subject to the Preliminary

4

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   Injunction and has planted a watermelon crop on that land.  However, upon further investigation,

2   the farmer determined that Mr. Mireles does not have any rights to the sublet parcels.  Mr.

3   Mireles leases some of the land subject to the Preliminary Injunction, but not the land that he

4   purported to sublet to the watermelon farmer.  This issue came to light when the watermelon

5   farmer applied for and was denied water rights based upon his defective title.  Therefore, Mr.

6   Felger's client is occupying the land without any authorization either under the Second Amended

7   Injunction or from the Defendants who own the property, i.e. SSC Farms I and SSC Farms II.  I

8   was further informed that TD Farms paid rent in advance to Mireles in excess of $250,000.  We

9   continue to investigate where these funds went.

10          13.     Also on May 27, 2011, after my conversation with Mr. Felger, Todd Truitt

11   contacted my partner, Michael Carlson, seeking a further modification of the Preliminary

12   Injunction to increase the land leased to Eric Mireles to include the land already planted with the

13   watermelon crop.  I responded to Mr. Truitt requesting additional information, including what

14   agreements were already in place and an accounting of the rental proceeds.  Van Durrer, Mr.

15   Truitt's colleague, responded that SSC Farms I and SSC Farms II had not entered into any

16   agreements to lease the land, nor did they receive any funds, which was only a partial response to

17   my inquiry.  Attached as **Exhibit 6** is a true and correct copy of an e-mail regarding these

18   communications.

19          14.     Thereafter, we engaged in protracted negotiations with the Farming Entities'

20   counsel and Mr. Felger over the terms of a lease between TD Farms and the Farming Entities.

21   Although the parties appeared to have agreed upon acceptable lease terms, the Farming Entities

22   ultimately failed to sign the lease.

23          15.     Finally, the July Accounting provided on August 13, 2011 disclosed, among other

24   issues to be raised when appropriate, that the Farming Entities had failed to collect any rent from

25   Eric Mireles or his companies.  Attached as **Exhibit 7** is a copy of my letter to the Farming

26   Entities' counsel regarding this issue (with other issues redacted).  On August 17, 2011, I

27   received an e-mail from Dean Gloster of Farella Braun + Martell, LLP, new counsel for the

28   Farming Entities, informing me that two separate sets of checks received from Mr. Mireles had

NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
RE PRELIMINARY INJUNCTION

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   bounced, thus the Farming Entities had yet to receive payment.  Attached as **Exhibit 8** is a true

2   and correct copy of the e-mail (with discussion of other issues redacted).  I have not received any

3   update on the issue.

4       **Purported Transfer of Australian Equity to Monterey Peninsula Farming, LLC and**

5       **Fast Falcon, LLC**

6       16.     Through discovery produced by Cary Collins in the Chapter 15 proceedings, I

7   obtained documents purporting to transfer interests in the stock of SK Foods Australia and New

8   Zealand from SKPM Corporation, Inc. and the Scott Salyer Revocable Trust to Monterey

9   Peninsula Farming effective January 17, 2009, and further purporting to transfer the stock from

10  Monterey Peninsula Farming to Fast Falcon, LLC effective June 29, 2009 (the "Fast Falcon

11  Transfer Documents").  Attached hereto as **Exhibit 9** is a true and correct copy of the Fast

12  Falcon Transfer Documents.

13              **EVIDENCE RELATING TO SUCCESS ON THE MERITS**

14      17.     On August 18, 2011, the Australian Liquidator took the 2004 exam of Dan Nutley

15  of Moss Adams in the Chapter 15 recognition proceedings of the Australian Liquidation of

16  Cedenco.  Moss Adams prepared the Debtors' financial statements for the period ending June 30,

17  2007, which is the first reporting period disclosing the purported transfer of the Cedenco Assets.

18  Attached here to as **Exhibit 10** is a true and correct copy of the transcript of that examination

19  including the deposition exhibits referenced in the excerpts below ("Nutley Depo").

20      18.     As support for their claims that SK Foods transferred the Australian Assets, the

21  Defendants rely upon the Debtors' audited financial statements for the period ending June 30, 2007

22  prepared by Moss Adams.  However, Moss Adams was never provided with any underlying legal

23  documents evidencing a transfer on November 1, 2006, or at any other time.  In preparing the audited

24  financial statements, Moss Adams solely relied upon a management representation letter, discussions

25  with SK Foods management and counsel, and journal entries generated by the Debtors:

26      Q   Okay.  If I could draw your attention to the second page [of deposition exhibit 20].

27          It's marked at the bottom page 2 of 3. About two-thirds of the way down, or a little past

28          halfway down, and I'll just read it, "Effective November 1, 2006, the company distributed

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
RE PRELIMINARY INJUNCTION**

1    their investments in the New Zealand and Australia subsidiaries to the partners at the

2    carrying value of the investments."   Can you tell me what documents you reviewed to

3    have an understanding of that statement?

4    A   There were a series.  I can't recollect the documents as I sit here today.

5    Q   Well, let me perhaps use some categories.  *Did you ever see legal transaction*

6    *documents?*

7    A   *No.*

8    Q   Can you tell me the nature of what documents that you saw?

9    MR. PETERSEN:  Objection.  It's vague and ambiguous.

10   BY MR. CHRISTMAS:

11   Q   You can answer.

12   A   *I don't have a specific recollection of documents beyond the client representation*

13   *letter that we received from the company and management.*  Nutley Depo, pp. 27:line 9-

14   28: line 7 (emphasis added).

15       19.     Mr. Nutley further admits that the documentation of the purported transaction

16   could not have been completed on November 1, 2006 and that he relied upon the client's

17   representations:

18   Q   With respect to the distribution of the partners of the ownership interest in the

19   Cedenco entities, is it your understanding that as of November 1, 2006, there were

20   written documents or there was an oral agreement?

21   MR. PETERSEN:  Objection.  No foundation, calls for speculation.  It's vague and

22   ambiguous.

23   THE WITNESS:  My understanding is the transaction was effective November 1st.  The

24   time frame at which that conclusion decision was made, I don't remember.

25   BY MR. CHRISTMAS:

26   Q   But isn't it a fact that the actual structure was still being discussed in the fall of 2007

27   in the e-mails that we've seen?

28   A   Yes.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

BMO 001911

1    Q   So do you know when the actual date of the oral understanding, if that's what you

2    believe it to be, occurred?

3    A   No.

4    Q   Did you ever see any signed transaction documents that confirmed the distribution of

5    the ownership of the Cedenco entities?

6    A   I saw the general entries that management prepared.  I saw our client representation

7    letter from management saying that the transaction was effective November 1st.

8    Q   Is that the extent of what you saw to confirm the effectiveness of the transfer of the

9    equity ownership?

10   A   Yes.

11   Q   Okay.  And I'll ask you the same question with respect to the transfer of the debt.  Are

12   the only documents that you saw the client representation letter and the adjusted journal

13   entries?

14   A   Yes.  You know, in terms of documents, the financial statements are documents, also,

15   that discuss and disclose all of this.  But in the sense I left them out, they're documents.

16   Nutley Depo, pp. 69:line 4-70:line 9.

17        20.    On August 16, 2011, the Australian Liquidator took the 2004 exam of Scott Dye

18   of Stoughton Davidson in the Chapter 15 recognition proceedings of the Australian Liquidation

19   of Cedenco.  Stoughton Davidson prepared the Debtors' financial statements for the period

20   ending June 30, 2008, which is the reporting period immediately after the Moss Adams report.

21   Attached here to as **Exhibit 11** is a true and correct copy of the transcript of that examination

22   ("Dye Depo").

23        21.    According to Mr. Dye's testimony, Stoughton Davidson relied upon the Moss

24   Adams report and did not review the underlying legal documents purporting to effectuate a

25   transfer of the Cedenco Assets:

26        Q.  Did you have occasion to review any of the underlying transaction documents that

27        affected the change of the owner, of the alleged change in owner of the Australian and

28        New Zealand companies?

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

8

A.  Are you referring to the legal documents that would have been drawn back in 2006 or '7 when this occurred?

Q.  That's correct.

A.  No, I have not.

Q.  And similarly, the transaction that involved the intercompany debt with respects to the irrevocable trust that you're talking about, did you see any of the legal documents?

A.  Not that I recall.

Dye Depo, p. 22, lines 4-17.

22.    Later, upon examination by Kelly Woodruff, counsel for the Salyer Entities, Mr. Dye confirms they relied solely on Moss Adams' audit:

Mr. Dye, you are here testifying on behalf of Stoughton Davidson, correct?

A.  That is correct.

Q.  And as you sit here today, are you prepared to testify to the extent that Stoughton Davidson has any knowledge about the assignment, transfer, distribution or sale of any ownership interest in SK Foods Australia?

A.  The only knowledge we have was that this is a transaction that occurred November 1st, 2006, prior to our audit and, in fact, almost a full year prior to audit, was included in the audit prior to us, and we would not go back and look at documents and transactions that occurred in prior periods, particularly when they've been audited by a firm such as Moss Adams.

Q.  Okay.  Thank you.  And are you, as you sit here today, prepared to testify on behalf of Stoughton Davidson about the transfer of shares or other ownership interests in SK Foods Australia, by SK Foods Limited Partnership, which is the California limited partnership that's in bankruptcy here, to the Scott Salyer revocable trust and SKPM corporation effective November 1, 2006?

MR. CHRISTMAS:  Alleged transfer.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

9

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

1    THE WITNESS:  Again, our only knowledge of that is from the prior year audit

2    conducted by Moss Adams indicating that that transfer took place on November 1st,

3    2006.  We relied on Moss Adams' audit.

4    BY MS. WOODRUFF:

5    Q.  And as you sit here today are you prepared to testify on behalf of Stoughton Davidson

6    concerning any assignment, transfer, distribution or sale of any debt of SK Foods

7    Australia owing to SK Foods Limited Partnership?

8    A.  Again, any knowledge we have of that relates to the prior audit that we relied on.

9    Dye Depo, pp. 50, line 6 – 51, line 11.

10   23.      On August 15, 2011, the Australian Liquidator took the 2004 exam of Wayne

11   Boos in the Chapter 15 recognition proceedings of the Australian Liquidation of Cedenco.  Mr.

12   Boos was SK Foods' and Salyer's tax accountant.  Attached here to as **Exhibit 12** is a true and

13   correct copy of the transcript of that examination, including deposition exhibit 104 which is

14   referenced in the excerpt below ("Boos Depo").

15   24.      Mr. Boos analyzed the tax aspects of the purported transfers.  Boos Depo, p. 26,

16   lines 1-17.  Yet, he never saw the legal documents effecting the transaction:

17   BY MR. CHRISTMAS:

18   Q.  But it appears that you asked Mr. McCormick --let's see.  On Exhibit 104 you asked

19   Mr. McCormick whether he had received anything from Moss Adams.  Do you know

20   what was being sought from Moss Adams?

21   A.  I believe it's the signed documents for the transfer, the debt assignment agreement,

22   and likely the distribution.  I just don't think we ever received them.

23   Q.  That was my next question, is whether or not those materials were ever received from

24   Moss Adams, to your knowledge.

25   A.  No, and I think this is like the last of this-- unless you're going to pull some more out

26   I'm not aware of, I don't know where, but I think the last part of this, because Mark left,

27   resigned, SK Foods shortly thereafter, and then SK filed for bankruptcy.

28   Boos Depo, pp. 111, lines 4-19.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3584201_1

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

25.     On August 17, 2011, the Australian Liquidator took the 2004 exam of Lisa Crist in the Chapter 15 recognition proceedings of the Australian Liquidation of Cedenco.  Ms. Crist was Director of human resources and environmental health and safety for SK Foods.  Attached here to as **Exhibit 13** is a true and correct copy of the transcript of that examination, including deposition exhibit 42 which is referred to in the excerpt below ("Crist Depo").

26.     On March 28, 2008, unsigned execution copies of the 2008 Transfer Documents appear for the first time.  They were e-mailed from Gary Perry's office to Lisa Crist.  Crist Depo., p. 34-35.  Crist does not recall why she received the 2008 Transfer Documents.  *Id*. Shortly, thereafter Crist travelled to Australia and New Zealand from March 30 through April 8, 2008.  *See* Sharp_CH15 000969, attached to the Declaration of Bradley D. Sharp, filed herewith. Although Scott was in Australia and New Zealand at the same time, it is clear that Crist did not have Salyer sign any documents during her trip:

Q.  Did you ultimately obtain signatures of any documents that were in furtherance of this e-mail?

A.  During this trip I don't believe that I was able to get Scott's signature.  I think that he signed them when he was back in the U.S., whatever they were.  I may have carried an envelope with the documents that Nick needed signed, but I don't remember Scott actually signing them during that trip.  I think it was handled when he got back to the states.

Crist Depo, p. 41, lines 5-13.

27.     On Thursday, August 25, 2011 at 2:40 PM, I sent an email to Dean Gloster of Farella Braun and Martel, requesting clarification regarding his letter to me (appended to the e-mail) whether his firm represents Fast Falcon LLC, as was indicated on the request for notice filed in Sharp v. SKPM Corp., adversary proceeding number 11-2337 and as indicated by other actions taken by his firm in various proceedings..  As of 6:00 PM on August 30, 2011, I have not received a response to the email.  A true and correct copy of the email is attached hereto as **Exhibit 14**.

11

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

BMO 001915

1    I declare under penalty of perjury under the laws of the United States of America and the

2    State of California that the foregoing is true and correct to the best of my knowledge and belief.

3    Executed this 30th day of August, 2011 in San Francisco, California.

4

5    /s/  *Gregory C. Nuti*

6    Gregory C. Nuti

7

8

9

10

11

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PHDATA 3584201_1

**NUTI DECLARATION ISO EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

BMO 001916

# EXHIBIT 14

BMO 001917

# EXHIBIT 1

BMO 001918

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***POSTED ON WEBSITE***
***NOT FOR PUBLICATION***

FILED

MAY - 9 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re:                                          ) Case No. 09-29162-D-11
                                                )
SK FOODS, L.P.,                                 )
                                                )
                                                )
                    Debtor.                     )
_____)
                                                )
BRADLEY D. SHARP, Chapter 11                    ) Adv. Pro. No. 09-2543-D
Trustee,                                        )
                                                ) Docket Control No. BW-1
                    Plaintiff,                  )
                                                )
v.                                              )
                                                )
CSSS, LP, a California limited                  ) DATE:  April 27, 2011
partnership,                                    ) TIME:  10:00 a.m.
                                                ) DEPT:  D
                    Defendant.                  )
_____)

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

**MEMORANDUM DECISION**

On January 20, 2010, Bradley D. Sharp, the plaintiff in this adversary proceeding and trustee in the underlying chapter 11[1] case of SK Foods, L.P. (the "trustee"), filed a motion for an order to show cause why the defendant CSSS, LP, dba Central Valley Shippers ("CVS"), Monterey Peninsula Farms LLC, Scott Salyer, Gerard Rose, and Larry Lichtenegger ("Lichtenegger")

_____

1. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1   should not be held in contempt for violation of a temporary

2   restraining order and preliminary injunction issued earlier by

3   this court (the "contempt motion"). On March 21, 2011,

4   Lichtenegger filed a motion for summary judgment on the contempt

5   motion, Docket Control No. BW-1 (the "Motion"). The Bank of

6   Montreal ("BMO"), which has acquired the trustee's claims in this

7   adversary proceeding by assignment, opposes the Motion. For the

8   reasons set forth below, the court will deny the Motion.[2]

9                     I.   BACKGROUND

10      This adversary proceeding concerns certain items of

11   equipment and machinery the parties refer to as a drum line and

12   the events leading up to its being transported to New Zealand in

13   August of 2009. On August 24, 2009, this court issued an order

14   restraining and enjoining CVS, its officers, agents, servants,

15   employees, and attorneys, and those in active concert or

16   participation with them from moving the drum line to any location

17   outside of California (the "TRO"). It is undisputed that on

18   August 24, 2009, the day of the hearing, the drum line was in the

19   Port of Oakland awaiting documentation that would allow it to be

20   exported, and that it did not leave the Port of Oakland for New

21   Zealand until a week later, August 31.

22   / / /

23   / / /

24

25 _____

26     2.  In a tentative ruling issued prior to the hearing, the
court expressed its view that the Motion was covered by the stay
of proceedings issued by the district court. Lichtenegger's

27   counsel argued at the hearing, as in the papers, that the Motion
is not covered by the stay. Upon further consideration, the

28   court finds that it can resolve the Motion without testimony of
Scott Salyer or his criminal defense attorney.

BMO 001920

## II.   ANALYSIS

### A.   Lichtenegger's Version of Events

Lichtenegger contends he "knew nothing about the Drum Line before [the trustee] applied for the TRO"[3] and that he "had no involvement with any of [the] activities" by which the drum line was moved from the premises of CVS (in Selma, California), consigned to a carrier, and ultimately shipped to New Zealand. Memo, 1:14-2:2.  The events of Friday, August 21, through Monday, August 24, 2009 are critical to the resolution of the Motion. Lichtenegger alleges this series of communications:

• The trustee's counsel called CVS's attorney, Gerard Rose, on Friday and told him he would be filing an application for a TRO and would be appearing on Monday, August 24, at 11:00 a.m. on the application.

• Rose was going to be on vacation on August 24 and asked Lichtenegger to make a special appearance on behalf of CVS to oppose the application.  Lichtenegger said he would if he could resolve a scheduling conflict.

• Lichtenegger had a telephone conversation on Friday, August 21, with Rose and Malcolm Segal, criminal defense attorney for Scott Salyer, the principal of the debtor in this case, SK Foods, L.P., to discuss the TRO hearing, during which Segal informed Lichtenegger the drum line had already shipped -- on August 20.

/ / /

/ / /

_____

3.   Memorandum in Support of Larry J. Lichtenegger's Motion for Summary Judgment, filed March 21, 2011 ("Memo"), 1:13-14.

1      • At Rose's request, Lichtenegger called the trustee's

2    counsel and left the voicemail message quoted below.[4]

3      • Lichtenegger spoke later that afternoon with the trustee's

4    counsel, who "was very aggressive and refused to discuss the

5    situation with him," Memo, 6:10-11, and who immediately filed a

6    declaration that included a transcript of Lichtenegger's earlier

7    voicemail message.

8      • Lichtenegger decided by Monday morning, August 24, "not to

9    get involved," cancelled the Court Call appearance he had earlier

10   arranged, left a voicemail message for the trustee's counsel that

11   he would not be appearing, and did not appear at the hearing.

12     • Lichtenegger "had no involvement with the Drum Line or the

13   export process after the TRO issued."

14         In other words, according to Lichtenegger, his involvement

15   with the drum line was limited to his being asked to make a

16   single special appearance and ultimately declining to make that

17   appearance.  "When [Lichtenegger] did not appear [at the

18   hearing], his engagement was at an end . . . .  [BMO] produces no

19   evidence that Lichtenegger was asked (until weeks later) to

20   perform any other service for CVS."[5]

21              Lichtenegger purposefully refused to appear on
              behalf of CVS the morning of the TRO hearing.  He took
22            no further actions on behalf of CVS. [Note.]  He chose
              to remove himself from that association before the
23            injunction was even issued, and any facts linking him
              with CVS after August 21 are so attenuated that it will

24

_____

25

          4.  No one has suggested a reason why Rose did not make this
26   call himself if, as discussed below, Lichtenegger's role was to
     be limited to making a special appearance at the hearing.

27

          5.  Reply Memorandum in Support of Larry Lichtenegger's
28   Motion for Summary Judgment, filed April 20, 2011 ("Reply"), 6:8-
     10.

- 4 -

1   be impossible for [BMO] to show by clear and convincing
    evidence that Lichtenegger *acted on behalf of* CVS in
2   any capacity.

3   Reply, 6:11-15, emphasis in original.

4   **B.   Lichtenegger's Greater Involvement**

5       The court finds that Lichtenegger's involvement with Salyer,

6   CVS, and/or the drum line, both before and after the TRO was

7   issued, was nowhere near as circumscribed as he contends.   First,

8   on Friday, August 21, before the TRO hearing the following

9   Monday, he left a message for the trustee's counsel advising that

10  he had been asked to make a special appearance.   However, rather

11  than leaving it at that, he added, "I wanted to inform you that

12  I've investigated and confirmed that the drums [sic] shipped on

13  Thursday -- they are already gone.   That makes your application

14  for a TRO moot.   You may have other issues, but not a TRO."[6]

15      With those words, Lichtenegger went well beyond actions that

16  might be expected from someone whose role is limited to

17  considering whether to make a special appearance.   Quite the

18  contrary, they went directly to the substance of the application

19  for the TRO.   They were clearly designed to convince the

20  trustee's counsel that his application for a TRO was too late.

21  In fact, had the trustee's counsel relied on those words, as

22  Lichtenegger almost certainly intended him to, he might have

23  foregone the hearing altogether and lost any chance of preventing

24  the shipment of the drum line.[7]   Lichtenegger's present

25  ────────────────

26      6.   Larry J. Lichtenegger's Documentary Evidence in Support
    of Motion for Summary Judgment, filed March 21, 2011 ("LDE"), 70.

27
        7.   In fact, when the trustee's counsel returned his call
28  later that day, Lichtenegger again said he understood the drum
    line had shipped the previous day and "requested that the hearing

- 5 -

1  contention -- that he did not represent any person or entity in
2  connection with the drum line -- appears disingenuous in light of
3  this language.

4      Next, it appears Lichtenegger did not have a firm basis on
5  which to "confirm" to the trustee's counsel that the drum line
6  had already shipped.  He has testified he left the voicemail
7  message at 3:16 p.m. on Friday.  BMO Exhibits, 000713.  At 3:29
8  p.m. that day, he was copied with an e-mail from Segal to Salyer
9  stating, "I just spoke to Larry [Lichtenegger] and Gerard [Rose].
10 If the goods have already shipped, the TRO application is
11 mooted."  BMO Exhibits, 000276, emphasis added.  At 3:31 p.m.
12 that day, Lichtenegger e-mailed a single line to Salyer:
13 "Confirm drums shipped on Thursday?"  Id., 000277.  On Sunday,
14 August 23, Salyer e-mailed Lichtenegger, "Equipment does not ship
15 out until Wednesday earliest."  Id., 000278.  And seven minutes
16 later, "Departs Thursday."  Id., 000280.[8]

17     Despite this new knowledge, which directly contradicted what
18 he had "confirmed" to the trustee's counsel, Lichtenegger
19 testified as follows on September 1, 2009, the day after the drum
20 line actually shipped, concerning his decision not to appear at
21 the August 24 hearing:

22         Over the weekend [August 22-23], I debated the
        usefulness of my appearance in light of my conflict
23         with the deposition [the scheduling conflict referred

24 _____

25 be continued as there was no longer an emergency."  Exhibit
   Appendix in Support of Plaintiff's Opposition to the Motion of
26 Larry Lichtenegger for Summary Judgment, filed April 13, 2011
   ("BMO Exhibits"), 000713.

27     8.  Lichtenegger did not submit these e-mails with the
28 Motion and made no mention of them; they were submitted by BMO in
   its opposition.  Lichtenegger does not deny receiving them.

- 6 -

1       to above], the non-schedule notification by Courtcall
2       [a call Friday afternoon informing him the TRO hearing
    was not on calendar], and the fact that the drum line
    had already shipped and the hearing was a non-event.  I
3       decided that my appearance at the hearing, if in fact
    one would occur, was useless as there was nothing I
4       could do to aid the court or any of the parties in this
    dispute.

6   BMO Exhibits, 000713-714.

7       The court need not determine at this time Lichtenegger's

8   truthfulness in making that statement on September 1 in light of

9   Salyer's two e-mails to him on August 23.  The court also need

10  not decide whether Lichtenegger's failure to correct his earlier

11  misinformation to the trustee's counsel -- misinformation he knew

12  the trustee's counsel had conveyed to the court in a declaration

13  -- gives rise to liability.  Indeed, Lichtenegger contends, and

14  the court might later determine, that he was precluded by duties

15  to a client (although he claims he had none) or by the attorney-

16  client privilege from divulging the new information.  For present

17  purposes, the court finds that these e-mails raise serious

18  questions about the credibility of Lichtenegger's present

19  contentions that his role was limited to deciding whether to make

20  a special appearance, and that as such, he could not have been

21  covered by the TRO.[9]

22      But Lichtenegger did not stop there.  He did not, as he

23  contends, have "only one possible engagement -- to specially

24

25      9.  The Salyer e-mails of August 23 also raise questions
26  about the credibility of Lichtenegger's present testimony that
"[a]t all times relevant to this motion, my only understanding
27  was that the drum line had been shipped from CVS's control and
the shipment could no longer be stopped."  Declaration of Larry
28  J. Lichtenegger in Support of Motion for Summary Judgment, filed
March 21, 2011, 2:13-14.

1   appear at the hearing." Reply, 9:11-12. A series of e-mails on

2   August 24 and 25, 2009, among Salyer and various attorneys,

3   including Lichtenegger, leads to the conclusion that, far from

4   divorcing himself from the process and the players after the TRO

5   hearing, Lichtenegger remained very much involved.

6       Beginning on Monday, August 24, Salyer and a group of

7   attorneys, including Lichtenegger, exchanged a series of e-mails

8   in which it was suggested that Lichtenegger contact the attorney

9   for Olam, an entity that had by that time purchased the debtor's

10  business operations from the estate, and threaten to sue Olam if

11  it would not return certain property. Lichtenegger responded by

12  asking for the name and phone number of Olam's attorney. He

13  agreed with Putterman that they needed to think carefully about

14  their approach "because of the possible effect on the subcon

15  case" (presumably the trustee's substantive consolidation

16  action), LDE 196, and stated that he "wanted to be sure of entity

17  separation before [he] called [Olam's attorney]." Id.

18      Lichtenegger then expressed confusion about the drum line

19  versus certain "color sorters," stating,

20          I thought the drum line was shipped out already and was
            the subject of the TRO on Monday. Could be just my
21          confusion. Help. Left a message for Scott [Salyer],
            but he has not responded.[10]
22

23  Putterman's response was not to the point, and Lichtenegger

24  replied, "I'll find out." LDE 195.

25      For purposes of this Motion, the court need not determine

26  what person or entity Lichtenegger was representing in these

27

28  _____
            10. LDE, 195-196.

                        - 8 -

1  exchanges, whether these or other discussions or e-mails

2  concerned the drum line or something else, or whether

3  Lichtenegger played any role in the transfer of the drum line

4  after the TRO was issued.  For present purposes, the court

5  concludes from these e-mails that Lichtenegger continued to play

6  some significant role with Salyer and/or his attorneys

7  immediately after the TRO was issued and before the drum line

8  actually left the Port of Oakland, a role he now attempts to

9  repudiate.

10                    **III.   CONCLUSION**

11         For the reasons discussed above, the court cannot conclude

12  that there are no genuine issues of material fact with respect to

13  Lichtenegger's role in the events leading up to the drum line

14  being shipped out of California.  As a result, the court cannot

15  conclude that Lichtenegger is entitled to judgment on the

16  contempt motion as a matter of law.  <u>See</u> <u>Celotex v. Catrett</u>, 477

17  U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).

18         For the reasons set forth above, the Motion will be denied.

19  The court will issue an appropriate order.

20
   Dated:  __May 9__ , 2011          _Robert Bardwil_____
21                                     ROBERT S. BARDWIL
22                                     United States Bankruptcy Judge

23

24

25

26

27

28

                              - 9 -

1          **CERTIFICATE OF MAILING**

2          I, Andrea Lovgren, in the performance of my duties as Deputy
   Clerk to the Honorable Robert S. Bardwil, caused to be mailed by
3   ordinary mail a true copy of the attached document to each of the
   parties listed below:

4

5   Kevin Coleman
   Michael Carlson
6   Schnader Harrison Segal & Lewis
   One Montgomery Street, Suite 2200
7   San Francisco, CA 94104- 5501

8   Andrea Miller
   Nageley Meredith & Miller
9   8001 Folsom Blvd., Suite 100
   Sacramento, CA 95826

10

   Paul Pascuzzi
11   Felderstein Fitzgerald
       Willoughby & Pascuzzi
12   400 Capitol Mall, Suite 1450
   Sacramento, CA 95814

13

   James Banks
14   James Moses
   Banks & Watson
15   813 Sixth Street, Suite 400
   Sacramento, CA 95814-2403

16

   Bank of Montreal
17   c/o James Spiotto
   Chapman and Cutler
18   111 W Monroe Street
   Chicago, IL 60603

19

   Marc Levinson
20   Orrick, Herrington & Sutcliffe
   400 Capitol Mall
21   Sacramento, CA 95814

22   DATE: May 9, 2011

23                          _Andrea Lovgren_
                          Deputy Clerk

24

25

26

27

28

# EXHIBIT 2

BMO 001929

sarvaas**ciappara**
lawyers

Our Ref: PRS 2111244
Your Ref:

25 August 2011

**BY EMAIL**

Ms Jill Milburn
Duncan Cotterill
Lawyers
Level 18, 39 Martin Place
SYDNEY  NSW  2000

Email: j.milburn@duncancotterill.com

Dear Sirs

**Cary Collins ats Bradley Sharp re Cedenco JV Australia Pty Ltd (In Liquidation)
Federal Court at Sydney NSD 1068/2011**

We refer to your letter dated 23 August 2011.

We draw your attention to the following:

- On 15 July 2011 your client issued a motion in United States Bankruptcy Court Eastern District of California, Sacramento Division, Case Number 09/29162-D-11 and on the same day your client swore a declaration with exhibits in respect of that motion.  We understand that the motion was listed for hearing on 17 August 2011.

- The submissions in the motion and the evidence of Mr Sharp in his declaration covers the same subject matter as your affidavit sworn 1 July 2011 in the within Federal Court Proceedings.  This evidence also includes material that was not included in your evidence.

- The declaration of Sharp sworn 15 July 2011 further exhibits documents which includes documents marked 'Sharp_CH15' which we are instructed are from a production of documents made by your client on 9 May 2011 in response to a request for a production of documents by Sheahan and Lock.  We have been sent from the United States some 6 folders of documents which constitute some but not all of this production.  Many of the documents in this production cover the subject matter of your affidavit and include documents not exhibited to either your affidavit or the declaration of your client.  Your client has been in possession of these

**SARVAAS CIAPPARA**   ABN: 62 379 944 778
Level 20, 15 Castlereagh Street, Sydney NSW 2000
**T:** (02) 9221 1290   **F:** (02) 9221 1240   **E:** mail@sclaw.com.au

Liability limited by a scheme approved under Professional Standards Legislation

documents for some period of time and it is fair and reasonable that we have an opportunity to review these documents carefully before advising our client and preparing his evidence.

- Last week Mr Sheahan was in California at the hearing of depositions which included evidence in relation to some of the subject matter of your affidavit. Your client and his legal advisors were involved in these depositions. Our client was also involved in assisting Mr Salyer and with legal representation on behalf of Mr Salyer and his entities. This is the reason for the liquidators' delay in putting on evidence and it would be unfair for your client to take advantage of our client's involvement in the same procedure.

- Our client has made arrangements to travel to Australia in early September 2011 in order to meet with us personally and to provide instructions in relation to the documents outlined above and preparation of his evidence. In circumstances where your client has had the luxury of preparing the proceedings without time pressure and where our client is located overseas, it is not unreasonable for our client to have a small period of additional time to prepare his evidence.

- In addition, your affidavit deposes to your belief that our client engaged in conduct "*to help facilitate fraud*" (paragraph 16). This is a most serious allegation. Our client completely rejects this allegation. Without in any way conceding that your evidence in this regard is admissible, our client is entitled to meet with us in person in Australia to provide instructions and to receive advice.

- These proceedings involve the proof of debt lodged by our client. If our client's proof is upheld the only prejudice by reason of this delay would appear to be to our client in delay in receiving his outstanding fees.

In light of the above we request that you reconsider your position and consent to our client's proposal that he have until 9 September to file and serve his evidence.

In the event that your client does not consent and we are required to put on an affidavit in respect of the reasons for additional time our client reserves the right to tender this letter to the court and the to seek costs of and incidental to preparing that affidavit.

Yours faithfully
**SARVAAS CIAPPARA**

**Paul Sarvaas**
sarvaas@sclaw.com.au

CC:   Ms Megan Walters
        DMAW Lawyers
        Level 3, 80 King William Street
        ADELAIDE  SA  5000

# EXHIBIT 3

BMO 001932



ONE MONTGOMERY STREET SUITE 2200
SAN FRANCISCO, CA 94104-5501
415.364.6700 FAX 415.364.6785 schnader.com

March 11, 2011

Gregory C. Nuti
Direct Dial 415-364-6717
Direct Fax 415-364-6785

**VIA E-MAIL AND FIRST-CLASS MAIL**

Van C. Durrer II Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071-3144

Re:     **In re SK Foods**

Dear Van:

On March 7, 2011, we received the attached accounting from SSC Farming for January and February 2011 ("Accounting"). The Accounting discloses payments totaling over $510,000 on account of "Gary Perry Legal Fees Per Court Order."

We assume that the Court Order referenced is Judge Bardwil's Amended Preliminary Injunction filed January 20, 2011("Amended Injunction"). As you know, Judge Bardwil issued the Amended Injunction in response to Judge Karlton's ruling on the appeal of the original Preliminary Injunction. Judge Karlton directed that the injunction should be modified to allow counsel for the non-debtor entities to receive payment for their fees. Judge Karlton was specific in his ruling that he "is in no way authorizing the payment of Salyer's attorneys' fees for his criminal defense with assets in the possession of non-debtor entities." Order dated December 9, 2010, footnote 1. Consistent with this notion, Judge Bardwil amended the Preliminary Injunction "to allow each defendant to pay reasonable attorney's fees and costs *for services rendered to that particular defendant in connection with this adversary proceeding and the bankruptcy case.*" Amended Injunction, ¶ 2 (emphasis added). This issue was thoroughly discussed by the parties both during negotiations and on the record at the hearing.

Prior to receiving the Accounting, we were not aware that Mr. Perry had been representing SSC Farming. He had not signed any pleadings in connection with the adversary proceedings. He has not made an appearance before either the Bankruptcy Court or the District Court in these matters. To my knowledge, he has not once spoken to anyone in my firm during the almost two (2) years these cases have been pending. Further, the Amended Injunction was a

Schnader
ATTORNEYS AT LAW

Van C. Durrer II Esq.
March 11, 2011
Page 2

product of lengthy litigation, including motion practice[1], numerous hearings and extensive
negotiations among the parties.  At no time during any of these proceedings was it disclosed that
Mr. Perry was representing SSC Farming and would be seeking payment under the Modified
Injunction.  Finally, Mr. Perry received in excess of $510,000, while SSC Farming's lead
counsel, Nagely Meredith & Miller received $347,000; a shocking disparity given the
inconspicuous nature of Mr. Perry's purported representation.  Under these circumstances the
Trustee seriously questions whether the payments to Mr. Perry are authorized under the terms
and spirit of the Modified Injunction.

Mr. Perry's purported representation of SSC Farming creates an additional issue in that
any representation adverse to the Debtors creates a direct conflict.  The Trustee has recently
discovered that Mr. Perry represented both SK Foods and RHM for many years, extending at
least through the date of the petition, on matters directly related to the issues raised in the
adversary proceedings.  Thus, Mr. Perry may be prohibited from receiving fees under any
circumstances.

If Mr. Perry believes he has a legitimate claim for payment, the Trustee is willing to
consider any such evidence.  However, in the meantime the Trustee hereby demands that Mr.
Perry immediately return to SSC Farming all payments received.  If the funds are not returned by
the close of business on Wednesday, March 16, 2011, the Trustee will seek an appropriate
remedy from the Bankruptcy Court.

Sincerely

Gregory C. Nuti

GCN/ljb

cc:   Bradley D. Sharp
      Jamie Dreher, Esq.
      James Spiotto, Esq.
      Paul Pascuzzi, Esq.
      Malcolm Segal, Esq.
      James Keowen, Esq.
      Kevin Coleman, Esq.

---

[1]   Andy Miller's and Paul Pascuzzi's firms were the only parties seeking payment in the
      motions brought before Judge Bardwil.

# EXHIBIT 4

BMO 001935

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA 90071-3144
—
TEL: (213) 687-5000

FAX: (213) 687-5600

www.skadden.com

DIRECT DIAL
(213) 687-5200
DIRECT FAX
(213) 621-5200
EMAIL ADDRESS
VAN.DURRER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

March 15, 2011

Gregory C. Nuti
Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501

RE: In re SK Foods, Case No. 09-29162

Dear Greg:

I am writing in response to your March 11 letter regarding the referenced matter and the payment to Mr. Perry. As discussed with you on March 10, the day before you sent your letter, the payment to Mr. Perry is in the process of being reversed. I am advised that it will be re-deposited into the account containing the remaining Colusa sale proceeds by the end of this week. The reason for the delay is that the funds were deposited into an investment account and it takes a few days of logistics to re-direct the funds. We will provide written confirmation that this has occurred no later than the next regular accounting due to the Trustee, although I will make every effort to expedite such verification.

For the record, however, I wish to be clear concerning the reasoning behind reversing this payment. First, it is my view that tremendous progress has been made in these cases on several fronts; namely, parties are actually discussing issues rather than litigating every point, rational agreements are being struck on a recurring basis and the framework of a resolution to this case is actually written on a piece of paper. Second, I respect the Trustee's inquiry regarding this payment. I do wish to point out, however, that the absence of a signature on a pleading or an appearance in court would not be dispositive as to whether an attorney had rendered services to a defendant in connection with this bankruptcy case, within the meaning of the Amended Injunction.

Mr. Gregory C. Nuti
March 15, 2011
Page 2

That said, the payment has been reversed for the time being so that any discomfort would not become an insurmountable obstacle to continued progress. If any payment to Mr. Perry will be made in the future, we will sit down with you and explain it and provide supporting information as to how such payment would be consistent with the Amended Injunction. In the absence of an agreement, we will seek appropriate relief from the court. In sum, I am not in favor of tails wagging dogs—there has been too much of that in this case to date, as far as I can tell.

To that end, let this also confirm that the proposed Jacobo Management Agreement is acceptable, subject to our final review of the budget—that may take a day or so longer. We have leases with Mr. Mirales for review on the other parcels and will share them with the Trustee as soon as they are approved by Mr. Mirales. My understanding is that the Trustee is amenable to paying certain water charges in connection with the final approval of those leases, and we appreciate that.

# REDACT

There has also been a suggestion that at least some depositions in the chapter 15 process take place so as to aid the parties in understanding the underlying facts as a preparation for a further mediation. These are all constructive ideas that should be pursued further. I think it would be useful to schedule a call to discuss.

Please let me know if that makes sense and when you might be available. Please do not hesitate to contact me if you have any questions.

Sincerely,

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

Van C. Durrer II
Attorneys for Scott Salyer, individually and as trustee of the Scott Salyer Revocable Trust

cc:     Michael M. Carlson
        Bradley D. Sharp
        Jamie Dreher

641907.01-Los Angeles Server 2A - MSW

# EXHIBIT 5

BMO 001938

**Nuti, Gregory**

| | |
|---|---|
| **From:** | Durrer II, Van C [Van.Durrer@skadden.com] |
| **Sent:** | Friday, March 18, 2011 4:18 PM |
| **To:** | Barry, Linda; 'Sarah Head' |
| **Cc:** | 'Bradley D. Sharp'; 'Jamie Dreher'; 'James E. Spiotto'; 'Paul Pascuzzi Esq.'; 'Malcolm Segal'; 'James C. Keowen'; Coleman, Kevin; Nuti, Gregory |
| **Subject:** | RE: SK Foods (Case #09-29162) |
| **Attachments:** | ltr to Judge McManus 3-15-11.PDF; 20110318161308334.pdf |

All,

As Mr. Nuti promised in his letter attached, attached is also a receipt confirming that the funds have been redeposited, without prejudice.

Van

REDACT

1

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
*************************************************
=====================================================================

BMO 001940

 METRO UNITED BANK

**TRANSACTION RECEIPT**

ALL TRANSACTIONS ARE SUBJECT TO VERIFICATION AND THE TERMS AND CONDITIONS OF ACCOUNT
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL
TRANSACTION NUMBER, DATE AND AMOUNT OF DEPOSIT OR PAYMENT ARE SHOWN BELOW

```
Vanness
0704    10 03/18/11      8015:45
DDA Deposit
Acct# 560165702        $510,408.41
```

**Thank you for banking with us.**

**THIS IS YOUR RECEIPT. PLEASE RETAIN UNTIL VERIFIED TO YOU BANK STATEMENT**

# EXHIBIT 6

**Nuti, Gregory**

| | |
|---|---|
| **From:** | Carlson, Michael M. |
| **Sent:** | Tuesday, July 26, 2011 9:24 PM |
| **To:** | Todd Truitt |
| **Cc:** | Van C. Durrer II; Bradley Sharp; Nuti, Gregory |
| **Subject:** | TDO lease |

Todd,

Brad Sharp was contacted today by the principal of TDO. There is a serious chance that he will walk away from his investment if this deal doesn't close soon. That does not seem in anyone's interest and Brad would like to know the status. Let me know if I should be communicating with Mr Johns instead of you on this.

Best regards,

Mike Carlson

1

# EXHIBIT 7

BMO 001944

# Schnader
### ATTORNEYS AT LAW

ONE MONTGOMERY STREET   SUITE 2200
SAN FRANCISCO, CA 94104-5501
415.364.6700   FAX 415.364.6785   schnader.com

August 15, 2011

Gregory C. Nuti
Direct Dial 415-364-6717
Direct Fax 415-364-6785
E-mail: gnuti@schnader.com

Mark D. Petersen
Farella Braun & Martel LLP
Russ Building
235 Montgomery Street
San Francisco, CA 94104

> Re:   ***SK Foods, L.P., In Re RHM Industrial/Speciality Foods, Inc.,***
> **U.S. Bankruptcy Court for the Eastern Dist. Of California**
> **Case No. 09-29162, Chapter 11**

Dear Mr. Petersen:

Thank you for the July Accountings for the Farming Entities, which you provided to Mike Carlson on August 13.

# REDACT

The Accountings for SSC Farms I and SSC Farms II raise another issue, however, because both of those Accountings show a zero balance at July1, 2011. It was our understanding that those accounts had a total of approximately $34,000 in them.

The February 16, 2011 amendment to the Preliminary Injunction allowed SSC Farms I & II to lease land subject to the Preliminary Injunction (the "Leased Premises") to two entities owned by Eric Mireles (Green Barn Farms and Nature's Fresh Farms). *See* Stipulation and Order Further Modifying Preliminary Injunction, dated February 16, 2011, ¶ 4. The proceeds of those leases were subject to the Preliminary Injunction and were to be held in separate accounts by each lessor and not commingled with SSC Farming's Sales Proceeds. *Id.* Semi-annual rent was due under the leases on March 27 (three days after the lease was signed). *See* Master Lease of Agricultural Land Agreement between SSC Farms I and Nature's Fresh Farms, dated March 24, 2011, at ¶ 3; Master Lease of Agricultural Land Agreement between SSC Farms II and Green Barn Farms, dated March 24, 2011, at ¶ 3. For SSC Farms I, the rent due was $12,492; for SSC

Schnader Harrison Segal & Lewis LLP

NEW YORK   PENNSYLVANIA   CALIFORNIA   WASHINGTON, DC   NEW JERSEY   DELAWARE

PHDATA 3525522_1



**S c h n a d e r**
ATTORNEYS AT LAW

Mark D. Petersen
August 15, 2011
Page 2

Farms II, the rent was $21,975.48. *Id.* So, there should have been $34,467.48 in these two entities accounts by March 27. We have never been given an accounting to show the expenditure of any of these funds, see February 16 Order ¶ 8; January 20 Order at ¶ 3, so we assumed they have not been spent. Could you please let us know what happened to this $34,000?

Also, I note that both Accountings show returned checks from AG Wise, Inc., for Lease Payments. Given the amounts and the descriptions, I assume these are the second semi-annual payments due on July 31 from Mr. Mireles' two entities. I would appreciate it if you could confirm this.

Very truly yours,

Gregory C. Nuti

GCN/wr

PHDATA 3525522_1

BMO 001946

# EXHIBIT 8

BMO 001947

## Nuti, Gregory

| | |
|---|---|
| **From:** | DGloster@fbm.com |
| **Sent:** | Wednesday, August 17, 2011 3:47 PM |
| **To:** | Nuti, Gregory |
| **Cc:** | MPetersen@fbm.com |
| **Subject:** | SK Foods:  Farming entity accounting |
| **Attachments:** | Ltr to Farella dtd 8-15-11.pdf; 20110817150145916.pdf |

Greg—

I'm responding to your attached August 15, 2011 letter to my partner Mark Petersen.



I've asked our clients to verify the accounting (and I'll get you an update later this week if our current understanding is mistaken), but regarding your question about the account balance and tenant payments, our understanding is that Mr. Mireles did not make the original payments when due (and there was some difficulty because of the trustee's failure to approve payment to the water district.)  After that, two sets of checks were bounced—the first set of two checks, and then a set of two replacement checks.   So there was a zero balance in the account as of July 1, 2011, because Mireles had not actually paid the $34,000.  I'm new to the case and, again, I will confirm that this week, but payment was not received from Mr. Mireles's entities because the checks either were not actually delivered or bounced.

We will be in contact with Mr. Mireles's lawyer about getting replacement checks that would clear.

**Dean M. Gloster**
Attorney at Law

**Farella Braun + Martel LLP**
RUSS BUILDING
235 MONTGOMERY STREET
SAN FRANCISCO / CA 94104

1

# EXHIBIT 9

BMO 001949

# BILL OF SALE
## 54.45% STOCK OF SK FOODS AUSTRALIA AND NZ

SKPM CORPORATION, INC., ("Seller"), for consideration of Five Hundred Forty Four Thousand Five Hundred Dollars and No Cents ($544,500.00), the receipt of which is hereby acknowledged in the form of an installment note from MONTEREY PENINSULA FARMING, LLC ("Buyer") does sell, assign, transfer and convey and has delivered unto Buyer, and or its successors and assigns, all of Seller's rights, title and interests in and to that certain property as set forth below. SKPM Corporation and the Scott Salyer Revocable Trust, Scott Salyer, Trustee are each owners of SK Foods, LLC. Accordingly the subsidiaries discussed below have been consolidated for sale.

54.45% of the stock of the following foreign corporations:

SK Foods Australia Pty. Ltd. and related, subsidiary entities, and

SK Foods International (New Zealand) and related, subsidiary entities

Buyer understands that an investment in the Shares being transferred hereby ("Shares") is speculative and involves a high degree of risk, and that the Shares have not been registered or qualified under the Securities Act of 1933, as amended, the securities laws of the State of California or any other applicable blue sky laws, and that neither the Securities and Exchange Commission nor any other government office or agency have approved or disapproved the Shares or passed upon or endorsed the merits of the offering for sale of the Shares. Buyer represents and warrants that it (or its Trustee) is an experienced investor in unregistered and restricted securities of private companies and/or in closely held investments and companies; that it (or its Trustee) has such knowledge and experience in business and financial matters as to be capable of evaluating the merits and risks of an investment in the Shares; and that it has evaluated this investment in light of its experience and agrees that Buyer will accept the substantial risks of its investment in the Shares.

Buyer acknowledges that there are substantial restrictions on the transferability of the Shares, that there is no public market for the Shares and none is expected to develop, and that, accordingly, it may not be possible for him or her to liquidate his or her investment in the Company. Buyer is acquiring the Shares for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Shares. Buyer has no contract, undertaking, agreement or arrangement to sell or otherwise transfer or dispose of the Shares or any portion thereof to any other person, and no other person will have any direct or indirect beneficial interest in or right to the Shares.

Buyer represents and warrants that it has: (a) made its own investigation of the Shares, including all matters pertaining to the value of the Shares, the Company, and the real and personal property owned by the Company, the assets and liabilities of the Company, the title to and physical condition of the Company's real property, and federal, state, county, and city laws, ordinances, rules and regulations affecting the ownership, leasing, and operation of the Company's property; (b) has not received or relied upon any representation or warranty of Seller concerning the condition or value of the Shares, the Company or the Company's property; and (c) had full opportunity to ask all questions of Seller and its agents and to review all documents and other relevant information concerning the Shares, the Company, and the Company's property that Buyer deems relevant in evaluating the risks of purchasing the Shares, and that all such questions and all such information have been fully and completely answered or made available to Buyer to its full satisfaction.

Buyer shall indemnify and hold harmless Seller and any of its employees, agents, attorneys, and registered representatives who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or

Collins 000127

BMO 001950

## BILL OF SALE
## 54.45% STOCK OF SK FOODS AUSTRALIA AND NZ

omission to represent or state facts made by Buyer herein, against losses, liabilities, and expenses (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by the indemnified person in connection with that action, suit, or proceeding.

Seller denies and disclaims any express or implied representation or warranty concerning the value of the Shares or the operation, condition or value of the Company or the Company's property. Buyer accepts the Shares transferred hereby AS IS.

IN WITNESS WHEREOF, MONTEREY PENINSULA FARMING, LLC has executed this BILL OF SALE effective as of January 17, 2009.

SKPM CORPORATION, INC.:

ACCEPTED:

MONTEREY PENINSULA
FARMING, LLC:

Page 2 of 2

Collins 000128

## BILL OF SALE
## 45.55% STOCK OF SK FOODS AUSTRALIA AND NZ

SCOTT SALYER REVOCABLE TRUST, SCOTT SALYER, TRUSTEE, ("Seller"), for consideration of Four Hundred Fifty Five Thousand Five Hundred Dollars and No Cents ($455,500.00), the receipt of which is hereby acknowledged in the form of an installment note from MONTEREY PENINSULA FARMING, LLC ("Buyer") does sell, assign, transfer and convey and has delivered unto Buyer, and or its successors and assigns, all of Seller's rights, title and interests in and to that certain property as set forth below. SKPM Corporation and the Scott Salyer Revocable Trust, Scott Salyer, Trustee are each owners of SK Foods, LLC. Accordingly the subsidiaries discussed below have been consolidated for sale.

    45.55% of the stock of the following foreign corporations:

    SK Foods Australia Pty. Ltd. and related, subsidiary entities and

    SK Foods International (New Zealand) and related, subsidiary entities

Buyer understands that an investment in the Shares being transferred hereby ("Shares") is speculative and involves a high degree of risk, and that the Shares have not been registered or qualified under the Securities Act of 1933, as amended, the securities laws of the State of California or any other applicable blue sky laws, and that neither the Securities and Exchange Commission nor any other government office or agency have approved or disapproved the Shares or passed upon or endorsed the merits of the offering for sale of the Shares. Buyer represents and warrants that it (or its Trustee) is an experienced investor in unregistered and restricted securities of private companies and/or in closely held investments and companies; that it (or its Trustee) has such knowledge and experience in business and financial matters as to be capable of evaluating the merits and risks of an investment in the Shares; and that it has evaluated this investment in light of its experience and agrees that Buyer will accept the substantial risks of its investment in the Shares.

    Buyer acknowledges that there are substantial restrictions on the transferability of the Shares, that there is no public market for the Shares and none is expected to develop, and that, accordingly, it may not be possible for him or her to liquidate his or her investment in the Company. Buyer is acquiring the Shares for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Shares. Buyer has no contract, undertaking, agreement or arrangement to sell or otherwise transfer or dispose of the Shares or any portion thereof to any other person, and no other person will have any direct or indirect beneficial interest in or right to the Shares.

    Buyer represents and warrants that it has: (a) made its own investigation of the Shares, including all matters pertaining to the value of the Shares, the Company, and the real and personal property owned by the Company, the assets and liabilities of the Company, the title to and physical condition of the Company's real property, and federal, state, county, and city laws, ordinances, rules and regulations affecting the ownership, leasing, and operation of the Company's property; (b) has not received or relied upon any representation or warranty of Seller concerning the condition or value of the Shares, the Company or the Company's property; and (c) had full opportunity to ask all questions of Seller and its agents and to review all documents and other relevant information concerning the Shares, the Company, and the Company's property that Buyer deems relevant in evaluating the risks of purchasing the Shares, and that all such questions and all such information have been fully and completely answered or made available to Buyer to its full satisfaction.

    Buyer shall indemnify and hold harmless Seller and any of its employees, agents, attorneys, and registered representatives who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative,

Collins 000129

BMO 001952

## BILL OF SALE
### 45.55% STOCK OF SK FOODS AUSTRALIA AND NZ

or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by Buyer herein, against losses, liabilities, and expenses (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by the indemnified person in connection with that action, suit, or proceeding.

Seller denies and disclaims any express or implied representation or warranty concerning the value of the Shares or the operation, condition or value of the Company or the Company's property. Buyer accepts the Shares transferred hereby AS IS.

IN WITNESS WHEREOF, MONTEREY PENINSULA FARMING, LLC has executed this BILL OF SALE effective as of January 17, 2009.


SCOTT SALYER REVOCABLE
TRUST, SCOTT SALYER,
TRUSTEE:


ACCEPTED:


MONTEREY PENINSULA
FARMING, LLC:

Collins 000130

BMO 001953

## BILL OF SALE
## MONTEREY PENINSULA FARMING, LLC
### FOREIGN STOCK HOLDINGS
### TO FAST FALCON, LLC

Monterey Peninsula Farms, LLC, ("Seller"), for consideration of One Million Dollars and No Cents ($1,000,000.00), the receipt of which is hereby acknowledged in the form of an installment note from Fast Falcon, LLC ("Buyer") does sell, assign, transfer and convey and has delivered unto Buyer, and or its successors and assigns, all of Seller's rights, title and interests in and to that certain property as set forth below:

100.00% of the stock of the following foreign corporations:

SK Foods Australia Pty. Ltd. and related, subsidiary entities, and

SK Foods International (New Zealand) and related, subsidiary entities

Buyer understands that an investment in the LLC being transferred hereby ("Units") is speculative and involves a high degree of risk, and that the Units have not been registered or qualified under the Securities Act of 1933, as amended, the securities laws of the State of California, or any other applicable blue sky laws, and that neither the Securities and Exchange Commission nor any other government office or agency have approved or disapproved the Units or passed upon or endorsed the merits of the offering for sale of the Units. Buyer represents and warrants that it (or its Trustee) is an experienced investor in unregistered and restricted securities of private companies and/or in closely held investments and companies; that it (or its Trustee) has such knowledge and experience in business and financial matters as to be capable of evaluating the merits and risks of an investment in the Units; and that it has evaluated this investment in light of its experience and agrees that Buyer will accept the substantial risks of its investment in the Units.

Buyer acknowledges that there are substantial restrictions on the transferability of the Units, that there is no public market for the Units and none is expected to develop, and, accordingly, it may not be possible to liquidate the investment in the Company. Buyer is acquiring the Units for investment purposes for its own account only and not with a view to or for sale in connection with any distribution of all or any part of the Units. Buyer has no contract, undertaking, agreement or arrangement to sell or otherwise transfer or dispose of the Units or any portion thereof to any other person, and no other person will have any direct or indirect beneficial interest in or right to the Units.

Buyer represents and warrants that it has: (a) made its own investigation of the Units, including all matters pertaining to the value of the Units, the Company, and the real and personal property owned by the Company, the assets and liabilities of the Company, the title to and physical condition of the Company's real property, and federal, state, county, and city laws, ordinances, rules and regulations affecting the ownership, leasing, and operation of the Company's property; (b) has not received or relied upon any representation or warranty of Seller concerning the condition or value of the Units, the Company or the Company's property; and (c) had full opportunity to ask all questions of Seller and its agents and to review all documents and other relevant information concerning the Units, the Company, and the Company's property that Buyer deems relevant in evaluating the risks of purchasing the Units, and that all such questions and all such information have been fully and completely answered or made available to Buyer to its full satisfaction.

Buyer shall indemnify and hold harmless Seller and any of its employees, agents, attorneys, and registered representatives who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by Buyer herein, against losses, liabilities, and expenses (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by the indemnified person in connection with that action, suit, or proceeding.

Collins 000131

BMO 001954

BILL OF SALE
MONTEREY PENINSULA FARMING, LLC
FOREIGN STOCK HOLDINGS
TO FAST FALCON, LLC


Seller denies and disclaims any express or implied representation or warranty concerning the value of the Units or the operation, condition or value of the Company or the Company's property. Buyer accepts the Units transferred hereby AS IS.


IN WITNESS WHEREOF, FAST FALCON, LLC has executed this BILL OF SALE effective as of JUNE 29, 2009.


MONTEREY PENINSULA
FARMS, LLC,
GERARD A. ROSE, TRUSTEE OF
THE CAROLINE G. SALYER 1999 TRUST
THE STEFANIE A. SALYER 1999 TRUST,              _____
AS MEMBERS:


ACCEPTED:


FAST FALCON, LLC,
SCOTT SALYER,
MANAGER:                                        _____

Collins 000132

BMO 001955

# EXHIBIT 10

BMO 001956

# In The Matter Of:

## *In re: CEDENCO JV AUSTRALIA PTY LTD, et al.,*

_____

## *DAN NUTLEY - Vol. 1*
### *August 18, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


In re:

CEDENCO JV AUSTRALIA PTY LTD, et al.,
(In Liquidation),

       Debtors in Foreign Proceedings.
_____



DEPOSITION OF DAN NUTLEY

Sacramento, California

Thursday, August 18, 2011



Reported by:
JODI L. BOSETTI
CSR No. 11316, RPR
JOB No. 437324

DAN   NUTLEY  -  8/18/2011

---

Page 2

1          UNITED STATES BANKRUPTCY COURT
2       FOR THE NORTHERN DISTRICT OF CALIFORNIA
3
4    In re:
5    CEDENCO JV AUSTRALIA PTY LTD, et al.,
     (In Liquidation),
6
            Debtors in Foreign Proceedings.
7
8    _____
9
10
11
12      Deposition of DAN NUTLEY, taken on behalf of
13   John Sheahan and Russell Lock, as Joint Liquidators of
14   the Debtors in Foreign Proceedings, at 400 Capitol
15   Mall, Suite 1800, Sacramento, California, beginning
16   at 9:30 a.m. and ending at 12:47 p.m., on Thursday,
17   August 18, 2011, before JODI L. BOSETTI, Certified
18   Shorthand Reporter No. 11316.
19
20
21
22
23
24
25

---

Page 3

1    APPEARANCES:
2
3    For John Sheahan and Ian Lock, as Joint Liquidators of
     the Foreign Proceedings:
4
        NIXON PEABODY LLP
5       BY:  ROBERT N.H. CHRISTMAS
        Attorney at Law
6       437 Madison Avenue, 18th Floor
        New York, New York, 10022
7       (212) 940-3000
        rchristmas@nixonpeabody.com
8
9    For the Non-Debtor Salyer Entities:
10      FARELLA BRAUN & MARTEL LLP
        BY:  MARK D. PETERSEN
11      Attorney at Law
        235 Montgomery Street
12      San Francisco, California 94104
        (415) 954-4400
13      mpetersen@fbm.com
14
15   For Brad Sharp, Chapter 11 Trustee of SK Foods:
16      SCHNADER HARRISON SEGAL & LEWIS LLP
        BY:  GREGORY C. NUTI
17      Attorney at Law
        One Montgomery Street, Suite 2200
        San Francisco, California 94104-5501
18      (415) 364-6717
        gnuti@schnader.com
19
20   For Creditors Committee:
21      DOWNEY BRAND
        BY:  JAMIE P. DREHER
22      Attorney at Law
        621 Capitol Mall, 18th Floor
23      Sacramento, California 95814
        (916) 444-1000
24      jdreher@downeybrand.com
25

---

Page 4

1    APPEARANCES (Continued):
2
3    For Bank of Montreal:
4       CHAPMAN AND CUTLER LLP
        BY:  SCOTT A. LEWIS
5       Attorney at Law
        111 West Monroe Street
6       Chicago, Illinois 60603-4080
        (312) 845-3010
7       slewis@chapman.com
        (Appeared telephonically)
8
9    For Deponent:
10      MOSS-ADAMS LLP
        BY:  SCOTT KALLANDER
11      Attorney at Law
        999 Third Avenue, Suite 3300
12      Seattle, Washington 98104
        (206) 302-6839
13      scott.kallander@mossadams.com
14
15   Also Present:

        JOHN SHEAHAN
16
17
18
19
20
21
22
23
24
25

---

Page 5

1                   INDEX
2    WITNESS                 EXAMINATION
3    DAN NUTLEY
4
5        BY MR. CHRISTMAS              8
6
7              EXHIBITS
8    DEPOSITION                    PAGE
9    Exhibit 1  Notice of Deposition        13
10   Exhibit 2  Subpoena for Rule 2004 Examination   13
11   Exhibit 3  Promissory Note dated 2-25-02      13
12   Exhibit 7  SK Foods LP AM 214 Basic Client    18
           Information, General v04-11a,
13         October 31, 2006
14   Exhibit 8  Document titled "General Assignment   20
           and Transfer of Shares of SK Foods
15         Australia Proprietary Limited"
16   Exhibit 9  Share Certificate          20
17   Exhibit 10  Share Certificate          20
18   Exhibit 11  Standard Transfer Form       20
19   Exhibit 12  Standard Transfer Form       20
20   Exhibit 13  SK Foods Share/Option Transfer    21
           Journal for the period 11 January
21         to 01 November 2006
22   Exhibit 15  Document titled "SK Food Related    22
           Parties June 30, 2007"
23
     Exhibit 16  Work paper             23
24
25

2 (Pages 2 to 5)

DAN  NUTLEY - 8/18/2011

Page 6

1   EXHIBITS (Continued):
2
3   Exhibit 17  SK Foods Reconciliation Account        26
        2668 as of 6/30/07
4
    Exhibit 20  A-07 Engagement Review Memo - Audit    26
5        v07-01, June 30, 2007
6   Exhibit 22  Document titled "Disposition           37
        Foreign Entities, 6-30-07"
7
    Exhibit 23  Document titled "Description           48
8        Cedenco Entities 6-30-07"
9   Exhibit 30  E-mail chain                           49
10  Exhibit 31  E-mail dated 9-13-07 with an           53
        attachment
11
    Exhibit 33  E-mail chain                           59
12
    Exhibit 35  E-mail string                          60
13
    Exhibit 36  E-mails                                63
14
    Exhibit 38  SK Foods Journal Entry for fiscal      64
15       period month end 6-30-07
16  Exhibit 42  E-mail dated 11-15-07                  66
17  Exhibit 41  E-mail dated 11-8-07                   67
18  Exhibit 49  Australian and New Zealand entities    70
        FIN 46 Evaluation June 30, 2007
19
20  Exhibit 54  Client representation letter           72
        related to the audit for the month
        end June 30th, 2007
21
    Exhibit 93  Fax with a signature page attached     72
22
    Exhibit 57  Client representation letter dated     73
23       1-15-08
24  Exhibit 55  Cover letter with the Debt             77
        Assignment Agreement attached
25

Page 7

1   EXHIBITS (Continued):
2
3   Exhibit 56  Independent Auditor's Report and       83
        Consolidated Financial Statements
4        for the eight months ending June
        30, 2007
5
    Exhibit 65  Special Purpose Financial Report       89
6        for the financial year ended
        10-31-08
7
    Exhibit 68  Bill of Sale                           90
8
    Exhibit 69  Bill of Sale                           90
9
    Exhibit 71  Loan Confirmation                      91
10
    Exhibit 72  Loan Confirmation dated 2-26-09        92
11
    Exhibit 74  Accounts Receivable set Off            93
12       Agreement
13  Exhibit 75  E-mail string                          94
14  Exhibit 82  Bill of Sale Monterey Peninsula        98
        Farming, LLC
15
    Exhibit 95  E-mails                                100
16
17
18
19
20
21
22
23
24
25

Page 8

1        Sacramento, California, Thursday, August 18, 2011
2              9:30 a.m. - 12:47 p.m.
3
4              DAN NUTLEY,
5   having been administered an oath, was examined and
6   testified as follows:
7
8              EXAMINATION
9   BY MR. CHRISTMAS:
10     Q   Good morning, Mr. Nutley.  As I think you
11  know, my name is Robert Christmas.  I'm with the law
12  firm Nixon Peabody.  I represent the Chapter 15
13  liquidators -- or the liquidators in these Chapter 15
14  cases.  I'm going to be asking you a series of
15  questions.
16         Just to set the table, have you ever been
17  deposed before?
18     A   Yes.
19     Q   So you understand, I think, the procedure.
20  You and I can't speak at the same time, otherwise the
21  court reporter will not be able to take us down.
22         The court reporter can't record nods or other
23  nonverbal communications, so you'll have to speak to
24  indicate your answer.  If you don't understand my
25  questions at any time, obviously just say so.

Page 9

1          Are you taking any medications today that
2   would interfere with your ability to remember and
3   retell events?
4      A   No.
5      Q   And do you have any physical or mental
6   condition that interferes with your memory?
7      A   No.
8      Q   Can you tell me your address?
9      A   Business address or personal address?
10     Q   Sure, business address is fine.
11     A   3121 West March Lane, Suite 100, Stockton,
12  California 95219.
13     Q   What post-high school degrees, if any, do you
14  possess?
15     A   Bachelor of Arts degree from University of
16  the Pacific.
17     Q   And what year did you receive that degree?
18     A   1972.
19     Q   Okay.  And do you have any professional
20  licenses?
21     A   Yes.
22     Q   And what are those?
23     A   Certified public accountant in the State of
24  California.
25     Q   So just briefly, since your graduation from

                                    3 (Pages 6 to 9)

DAN NUTLEY - 8/18/2011

Page 10

1 college, have you practiced as a CPA continuously
2 since that point in time?
3    A Yes.
4    Q And can you tell me what firms you have
5 practiced with and during what years?
6    A From 1976 through 1985 I was with the firm of
7 Fox & Company.
8    Q Where is that?
9    A Stockton, California.
10    Q Okay.
11    A From 1985 through 1999 I was with the firm of
12 Grant Thornton, and from 1999 through current, with
13 the firm of Moss-Adams.
14    Q '99 through the current date?
15    A Yes.
16    Q Okay. And what office of Grant Thornton did
17 you work?
18    A Stockton, California.
19    Q During the last five years is your practice
20 primarily as an auditor or are there other services
21 you provide, or could you describe that?
22    A Primarily as an auditor.
23    Q Do you recall when you first became
24 acquainted with the entities associated with the
25 Salyer family?

Page 11

1    A No.
2    Q Do you recall the first engagement that your
3 firm had for any of the Salyer family interests?
4    A To audit the financial statements for SK
5 Foods for the year ending October 31st, 2006.
6    Q And were you the partner with whom the
7 relationship originated?
8    A Yes.
9    Q And how were you contacted to initiate the
10 engagement?
11    A We were contacted by the company to respond
12 to a request for a proposal.
13    Q They put out an RFP?
14    A I don't remember.
15    Q Okay. And who was your first contact?
16    A Stacy Alexander.
17    Q And do you recall her title?
18    A No.
19    Q And did your firm complete the audit for the
20 year ending October 31, 2006?
21    A Yes.
22    Q And did your firm issue unqualified financial
23 statements for that year?
24    A An unqualified report on the financial
25 statements.

Page 12

1    Q An unqualified report, okay.
2    And what was your understanding of why the
3 company needed to have audited financial statements?
4    A For use of the banks.
5    Q And do you know the identity of the banks?
6    A Bank of Montreal.
7    Q And do you know that to be the sole bank or
8 was it a lead bank?
9    A I don't remember.
10    Q Okay. Are you familiar with the accounting
11 firm of Stout & Davidson?
12    A Yes.
13    Q I'll represent to you that on some of their
14 materials there is a logo that says part of the
15 Moss-Adams network or connection. Is that familiar to
16 you?
17    A Not their letterhead, no.
18    Q Is there an affiliation between accounting
19 firms that you're aware of that is connected to your
20 firm?
21    A No. Well, the affiliation is called Praxity.
22    Q How do you spell that?
23    A P-R-A-X-I-T-Y.
24    Q Okay. And what is the function of the
25 affiliation?

Page 13

1    MR. PETERSEN: Objection. That's vague and
2 ambiguous.
3 BY MR. CHRISTMAS:
4    Q You can answer.
5    A It's when each of our firms would like to do
6 work in another region where we don't have offices.
7 We work with the firm in that region to provide the
8 services.
9    MR. CHRISTMAS: This is 3.
10    (Deposition Exhibit 1, Exhibit 2, and
11    Exhibit 3 marked.)
12 BY MR. CHRISTMAS:
13    Q Mr. Nutley, the court reporter has handed to
14 you Exhibit 3 to your deposition. Do you recognize
15 this document?
16    A No.
17    Q Have you ever seen this document?
18    A Not that I remember.
19    Q Okay. Were you aware that there was an
20 intercompany indebtedness -- well, withdrawn. I'll
21 rephrase it.
22    Are you familiar with the existence of
23 Australian and New Zealand direct or indirect
24 subsidiaries of SK Foods LP?
25    A Yes.

4 (Pages 10 to 13)

DAN   NUTLEY - 8/18/2011

Page 14

1    Q   And how did you come to learn of those
2  subsidiaries?
3    A   In gaining an understanding of the ownership
4  structure of SK Foods.
5    Q   From whom did you learn of their existence?
6    A   I can't remember specifically.
7    Q   Was there a reason why you needed to know
8  about those entities?
9    A   Yes.
10    Q   Can you tell me why?
11    A   They were included in the consolidated
12  financial statements of SK Foods.
13    Q   Before we get any further, let me just do a
14  little housekeeping.  If you could turn to the other
15  exhibits that are before you, Mr. Nutley, Exhibits 1
16  and 2.  The first has on the front the notice of
17  deposition, just indicating where this deposition is
18  taking place.
19        I want to draw your attention to the second
20  document as part of Exhibit 1 and also to Exhibit 2.
21  Just turn to Exhibit 1, to the third page in.  That is
22  the subpoena, as well as the one on the other side,
23  which is also a subpoena.  One is to you and one is to
24  your firm.
25        Have you seen these documents before?

Page 15

1    A   Yes.
2    Q   Have you reviewed them?
3    A   Yes.
4    Q   Okay.  And is it your understanding that you
5  and your firm had an obligation to produce documents
6  responsive to those subpoenas?
7    MR. PETERSEN:  Objection.  Calls for a legal
8  conclusion.
9  BY MR. CHRISTMAS:
10    Q   You can answer to your understanding.
11    THE WITNESS:  Yes.
12  BY MR. CHRISTMAS:
13    Q   Did you and your firm conduct searches for
14  documents responsive to the deposition?
15    A   Yes.
16    Q   And can you tell me what repository or
17  repository of documents you reviewed or if you
18  actually delegated it to be delegated and what
19  repositories they looked at?
20    A   We looked at our system where we file client
21  records.
22    Q   Okay.  Is that a virtual system?  Are these
23  scanned documents or is it hard copy?
24    A   It's electronic documents.
25    Q   So you looked in your electronic document

Page 16

1  file?
2    A   Yes.
3    Q   Okay.  Where else did you look?
4    A   E-mail records.
5    Q   Okay.  And was that done by manually looking
6  through people's e-mail and boxes or was there some
7  other method used?
8    A   Manually.
9    Q   And do you recall who the custodians of
10  e-mails were?
11    MR. PETERSEN:  Objection.  Vague as to time.
12  BY MR. CHRISTMAS:
13    Q   Whose e-mail boxes did you look at?
14    A   I looked at the e-mail boxes of each of the
15  persons involved in providing service to SK Foods.
16    Q   And can you tell me who those individuals
17  were?
18    A   I could come up with a couple of them.  I'm
19  not sure, comprehensive at this moment, I can remember
20  all that I looked at.
21    Q   Tell me what you remember.
22    A   It would be Abigail Pike, Roger Kutz.
23    Q   Okay.
24    A   Eileen Jacobson.
25    Q   Okay.

Page 17

1    A   And my own.
2    Q   So we have the electronic records, the
3  e-mail, and in and out boxes.  What other repositories
4  did you review?
5    A   We have a limited number of paper files we
6  retain in connection with an audit, and I looked at
7  those.
8    Q   And is that the extent of the repositories
9  you looked in?
10    A   There would be senior auditors' e-mail files
11  I would have looked at and inquired of them, but I
12  don't recollect the specific names as I sit here.
13    Q   And before the deposition commenced your
14  counsel handed me a document that had been located
15  after the initial production.
16    MR. CHRISTMAS:  For counsel's knowledge, we're
17  using a bit of an unconventional exhibit-numbering
18  system.  We'll call this Exhibit 54.  If the court
19  reporter could mark it.
20  BY MR. CHRISTMAS:
21    Q   And while we have it in front of us, I'll
22  just ask you, Mr. Nutley, do you recognize this
23  document?
24    A   Yes.
25    Q   Can you tell me what it is?

5 (Pages 14 to 17)

BMO 001962

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN   NUTLEY - 8/18/2011

Page 18

1    A  It's the transmittal of the signature page to
2  the client representation letter for the audit for the
3  eight months ending June 30th, 2007.
4    Q  And it was transmitted -- do you have a
5  recollection of receiving it?
6    A  Yes.
7    Q  And do you know who the sender was by name?
8    A  The name is on the page.  I don't know the
9  person.
10    MR. CHRISTMAS:  This is 7.
11    (Deposition Exhibit 7 marked.)
12  BY MR. CHRISTMAS:
13    Q  Mr. Nutley, the court reporter has handed you
14  a document marked as Exhibit 7 to your deposition.  It
15  appears to be a seven-page document.  Can you identify
16  this document?
17    A  It looks like one of our documents we used
18  for documenting understanding of a client that is
19  headed "Related to the October 31st, 2006 audit."
20    Q  So is this a form of gathering information
21  prior to the audit?  Is that what the purpose of this
22  document is?
23    A  No.
24    Q  Can you tell me the purpose?
25    A  During the course of the audit.

Page 19

1    Q  And if I can draw your attention to the
2  paragraph right above the paragraph numbered 5 on
3  page 1.  There's a reference there to FIN 46.  In
4  layperson's terms, can you tell us what FIN 46 is,
5  just briefly.
6    A  FIN 46 is an interpretation of accounting
7  standards relating to consolidation of entities into a
8  reporting entity.
9    Q  The second sentence of that paragraph says,
10  and I'll just read it, "This will be the first
11  reporting year that FIN 46 applies to the company."
12  Do you know who made the determination that FIN 46
13  applied to SK Foods LP?
14    A  No, not specifically.
15    Q  Do you recall when FIN 46 became fully
16  effective?
17    A  Not the specific date, no.
18    Q  But you're aware that it was issued and then
19  had a transition period, if I'm understanding it
20  correctly?
21    A  Yes.
22    Q  Do you know when it became mandatory?
23    A  It's been a while ago.  No, not as I sit
24  here.
25    MR. CHRISTMAS:  We'll just mark a bunch of these

Page 20

1  at once.
2    (Deposition Exhibit 8, Exhibit 9,
3    Exhibit 10, Exhibit 11, and Exhibit 12
4    marked.)
5  BY MR. CHRISTMAS:
6    Q  Mr. Nutley, the court reporter has handed you
7  a series of documents, and primarily I'm going to be
8  asking you whether you've seen these documents before.
9    First, if we could turn to Exhibit 8, the
10  document that has in its title "General Assignment and
11  Transfer of Shares of SK Foods Australia Proprietary
12  Limited."  Have you ever seen this document?
13    A  Not that I recollect.
14    Q  Have you ever seen it in an unsigned version?
15    A  Not that I can recollect.
16    Q  Okay.  You can set that document aside.  We
17  can now turn to Exhibit 9.  Have you ever seen this
18  document titled "Share Certificate"?
19    A  Not that I can recollect.
20    Q  Let's go to Exhibit 10.  Have you ever seen
21  this document that is titled "Share Certificate"?
22    A  Not that I can recollect.
23    Q  Okay.  And document 11, if you could turn to
24  that.  Have you ever seen this document that is titled
25  "Standard Transfer Form"?

Page 21

1    A  No, not that I can recollect.
2    (Deposition Exhibit 13 marked.)
3  BY MR. CHRISTMAS:
4    Q  And if you could turn to Document 13.
5    A  Yes.
6    Q  Have you ever seen this document titled
7  "Standard Transfer Form"?
8    A  No.
9    Q  Oh, I think you had them reversed.
10    MR. PETERSEN:  Robert, did you say 13?
11    MR. CHRISTMAS:  12.  I meant to refer to 12.
12    THE WITNESS:  Not that can I recollect.
13  BY MR. CHRISTMAS:
14    Q  And 13?
15    A  Not that I can recollect.
16    Q  Are you aware of the existence of a
17  forbearance agreement between SK Foods and its
18  lenders?
19    A  Not the specific agreement as I sit here
20  today.
21    Q  Did you ever have reason to review that
22  agreement?
23    A  I don't have a specific recollection of
24  reviewing it.
25    Q  Would it refresh your recollection if I gave

6 (Pages 18 to 21)

DAN  NUTLEY - 8/18/2011

Page 22

1 you the effective date of the document as May 17,
2 2007?
3    A  No, that doesn't refresh my recollection.
4    MR. CHRISTMAS:  Mark this as 15.
5       (Deposition Exhibit 15 marked.)
6 BY MR. CHRISTMAS:
7    Q  Mr. Nutley, the court reporter has handed you
8 Exhibit 15 to your deposition.  Do you recognize this
9 document?
10    A  Yes.
11    Q  Can you tell me what this document is?
12    A  It is part of our work papers.
13    Q  Okay.  And what is the purpose of this
14 document?
15    A  To -- page 1 or the first page of the
16 document is not numbered in the way that it's printed.
17 The first page of the document summarizes the source
18 of information for the related party footnote
19 disclosures.
20    Q  And the second page?
21    A  And the second page discloses the composition
22 of prepaids and journal entries that were posted that
23 led to some of the ending balances.
24    Q  Okay.  So if I understand your first answer,
25 the first page discloses the source of information?

Page 23

1    A  It -- yes, there are source references, yes.
2    Q  Tell me where the source references are on
3 the page.
4    A  On the left side of the page, under the
5 heading "Work Paper."
6    Q  Okay.
7    MR. CHRISTMAS:  This is 16.
8       (Deposition Exhibit 16 marked.)
9 BY MR. CHRISTMAS:
10    Q  Mr. Nutley, the court reporter has handed you
11 Exhibit 16 to your deposition.  Can you tell me what
12 this document is.
13    A  This is one of our work papers accumulating
14 general ledger account groups into lead sheet
15 classifications.
16    Q  Can you explain that for mere mortals?
17    A  How you group the financial information to
18 roll up into the financial statement.
19    Q  If I could draw your attention to the set of
20 figures that are under the heading "Group D, Notes
21 Receivable Related Party."  Can you tell me what that
22 refers to, related party?
23    A  That refers to receivables from related
24 parties.
25    Q  In the course of the engagement, did it come

Page 24

1 to your attention that there were intercompany
2 receivables between the Australian and New Zealand
3 companies on the one hand and the U.S. company?
4    A  Yes.
5    Q  And can you tell me how that came to your
6 attention?
7    A  As a part of the examination of the accounts.
8    Q  And can you tell me what you recall about the
9 nature of the notes?  Do you know anything about the
10 payors, in other words, which subsidiaries owed what
11 to whom?
12    A  Not as I sit here today.
13    Q  Do you recall what review was done, if any,
14 of the collectability of any of the intercompany
15 receivables?
16    A  Yes.
17    Q  Can you first identify which receivables were
18 reviewed for collectability?
19    A  I've described them Cedenco receivables.
20    Q  And can you tell me what procedures were
21 followed to verify their collectability?
22    A  We looked at the underlying financial
23 statements of the related entities.
24    Q  So these were financial statements prepared
25 of the payor companies?

Page 25

1    A  Yes.
2    Q  And, to your knowledge, they had their own
3 auditors?
4    A  Yes.
5    Q  Do you recall who those auditors were?
6    A  Deloitte.
7    Q  And I interrupted your answer.  If you could
8 continue to explain the procedures that were followed.
9    A  We need to discuss time frame --
10    Q  Okay.
11    A  -- on these also, I think.
12    Q  For the year ending 10-31-2006, let's talk
13 about that one first.  Go ahead.
14    A  Yeah.  We acquired the financial statements
15 of the related entities.  They were audited financial
16 statements.  We reviewed those financial statements.
17 We acquired analysis from management of the company
18 regarding the subsidiaries.  We acquired consolidating
19 work papers that included these amounts.
20    Q  Was that from the prior auditor?
21    A  From management of the company.  Prepared the
22 consolidated work papers.  And we traced those numbers
23 into consolidating the financials into the
24 consolidating work papers, reviewed the foreign
25 currency translation.  That's what I recollect as I

7 (Pages 22 to 25)

Merrill Corporation - San Francisco

800-869-9132                        www.merrillcorp.com/law

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN   NUTLEY - 8/18/2011

Page 26

1  sit here.
2     Q  Can you explain what you mean by foreign
3  currency translation?
4     A  The underlying financial statements of the
5  Cedenco entities prepared in their local currencies
6  that have to be translated into U.S. dollars for U.S.
7  financial reporting.
8     Q  And would it be fair to say that is because
9  the financial statements you were preparing were in
10 U.S. dollars?
11    A  Yes.
12    MR. CHRISTMAS:  This is 17.
13    (Deposition Exhibit 17 marked.)
14    MR. CHRISTMAS:  I'm going to set that document
15 aside for the moment.  I'm going to table that for a
16 minute.  Let's do Exhibit 20.
17    (Deposition Exhibit 20 marked.)
18 BY MR. CHRISTMAS:
19    Q  This is 20.  Mr. Nutley, the court reporter
20 has handed you Exhibit 20 to your deposition.  Do you
21 recognize this document?
22    A  Yes.
23    Q  Can you tell me what it is?
24    A  It's the engagement and review memo we
25 prepare in the course of our audits.

Page 27

1     Q  What is the date of this; do you know?
2     A  There are a number of dates on the memo.
3     Q  What is the significance of the dates at the
4  end, next to the words "preparer, engagement review,"
5  or concurring "reviewer"?
6     A  Those are the dates that each of the persons
7  signed off their concurrence with the content of this
8  memo.
9     Q  Okay.  If I could draw your attention to the
10 second page.  It's marked at the bottom page 2 of 3.
11 About two-thirds of the way down, or a little past
12 halfway down, and I'll just read it, "Effective
13 November 1, 2006, the company distributed their
14 investments in the New Zealand and Australia
15 subsidiaries to the partners at the carrying value of
16 the investments."
17    Can you tell me what documents you reviewed
18 to have an understanding of that statement?
19    A  There were a series.  I can't recollect the
20 documents as I sit here today.
21    Q  Well, let me perhaps use some categories.
22 Did you ever see legal transaction documents?
23    A  No.
24    Q  Can you tell me the nature of what documents
25 that you saw?

Page 28

1     MR. PETERSEN:  Objection.  It's vague and
2  ambiguous.
3  BY MR. CHRISTMAS:
4     Q  You can answer.
5     A  I don't have a specific recollection of
6  documents beyond the client representation letter that
7  we received from the company and management.
8     Q  Did you ever receive any documents from a
9  gentleman named Gary Perry?
10    A  There was an unsigned document that he
11 provided me in the course of our discussions.
12    Q  Okay.  Do you recall the nature of that
13 document?
14    A  I believe it was a draft of a trust
15 agreement.
16    Q  Do you know what trust it was to be for?
17    A  It was a revocable trust, is my recollection.
18    Q  And do you know if that trust ever became
19 effective?
20    A  I never saw a signed document.
21    Q  Okay.  But apart from seeing or not seeing a
22 signed document, do you know if the trust became
23 effective?
24    A  We have representations regarding the trust.
25    Q  Okay.  Do you know the name of the trust?

Page 29

1     A  Not as I sit here.
2     Q  Do you recall if the name of the trust
3  included the initials SSC&L, C ampersand L?
4     A  No, I do not.
5     Q  Do you recall a trust called the Scott Salyer
6  revocable Trust?
7     A  Yes.
8     Q  Is that the trust to which you've been
9  referring?
10    A  I don't remember the specific name of the
11 trust I'm referring to.
12    Q  And moving to the second sentence of the
13 paragraph that we were just looking at in Exhibit 20,
14 the next sentence says, "In addition, the company sold
15 receivables due from the subsidiaries to a revocable
16 trust."
17    And I'll ask you the same question about
18 that.  Did you ever see any documents that would
19 support that statement?
20    A  Yes.
21    Q  Can you tell me what you saw?
22    A  A client representation letter.
23    Q  Did you ever see any underlying legal
24 transactional documents that would effect -- in other
25 words effect, e-f-f-e-c-t -- the transaction that is

Merrill Corporation - San Francisco

800-869-9132                     www.merrillcorp.com/law

BMO 001965

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN NUTLEY - 8/18/2011

Page 30

1 referred to in that sentence?
2   MR. PETERSEN: Objection. Vague and ambiguous.
3   THE WITNESS: No, not that I can recollect.
4 BY MR. CHRISTMAS:
5   Q  Do you recall the identities of the payors on
6 the receivables referred to in that sentence?
7   A  They were the Cedenco entities.
8   Q  And it says they were sold. Do you know who
9 the purchaser was, if that was the case?
10   A  The revocable trust.
11   Q  So these were -- if I understand what you've
12 been saying, these were payables to SK Foods LP; is
13 that correct?
14   A  Yes.
15   Q  After the transaction that is referred to in
16 this second sentence here, can you describe the payor
17 and payees in terms of chain of identification of
18 those entities?
19   MR. PETERSEN: Can I hear the question back,
20 please.
21 BY MR. CHRISTMAS:
22   Q  Let me maybe make it clear.
23     The initial structure, as I understand it
24 from your testimony, is that there were payables from
25 the Australian and New Zealand subsidiaries to SK

Page 31

1 Foods?
2   A  Yes.
3   Q  Now, by a sale, there is now another party in
4 that relationship, so can you describe your
5 understanding of who the payees and payors were after
6 that sale?
7   MR. PETERSEN: The question is vague and
8 ambiguous.
9 BY MR. CHRISTMAS:
10   Q  Do you understand the question?
11   A  I am a little vague on payee on payor. Can
12 we stick with payable and receivable?
13   Q  Okay, sure.
14   A  Okay. The SK Foods had a receivable from the
15 revocable trust, therefore they were the payor or
16 payable. They had the payable to SK Foods.
17   Q  And did that continue to be the case after
18 the sale?
19   A  That was the case after the sale, yes.
20   Q  So what is your understanding of what was
21 sold?
22   A  The intercompany receivables.
23   Q  Okay. So did that change the identity of who
24 was paying -- who had the obligation to pay?
25   A  Yes.

Page 32

1   Q  So who was the payor?
2   A  The revocable trust.
3   Q  So the revocable trust was then the payor to
4 SK Foods LP to your understanding?
5   A  They had the payable obligation.
6   Q  They had the obligation, okay.
7     To your understanding, then, tell me if I'm
8 wrong, did the Cedenco entities then have the
9 obligation to pay the trust under the way this was
10 structured?
11   MR. PETERSEN: Objection to the extent it calls
12 for a legal conclusion.
13 BY MR. CHRISTMAS:
14   Q  Just your understanding.
15   A  As an accountant with an understanding, yes.
16   Q  Do you know the terms of payment for the
17 revocable trust's obligation to pay?
18   A  Not as I sit here.
19   Q  Did you ever look at that?
20   A  Not that I recollect.
21   Q  Were you aware if there were any payables
22 owed by SK Foods LP to the Cedenco entities?
23   MR. PETERSEN: Objection. Vague as to time.
24 BY MR. CHRISTMAS:
25   Q  What year are we talking about? For the

Page 33

1 period ending June 30, 2007?
2   A  I don't have a specific recollection.
3   Q  Okay. Do you know if as part of this sale
4 transaction referred to in the second sentence of this
5 paragraph, that those obligations, do you know if they
6 were part of the sale transaction?
7   A  I'm not certain specifically what obligations
8 you're referring to.
9   Q  Well, are you aware that during this fiscal
10 year there were payables owed from the U.S. company
11 back to the Australian and New Zealand companies?
12   A  I'm aware there were some transactions during
13 the course of the year. I'm not aware of specific
14 balances at year-end.
15   Q  What I'm asking is whether those payables
16 were also part of the sale transactions referred to in
17 this document?
18   MR. PETERSEN: Objection. No foundation.
19 BY MR. CHRISTMAS:
20   Q  If you know.
21   A  I am hesitant to answer without knowing the
22 specific payables you're referring to. If you could
23 draw my attention, that might be more responsive.
24   MR. CHRISTMAS: Did we mark 17?
25   MR. PETERSEN: Yeah.

9 (Pages 30 to 33)

DAN   NUTLEY - 8/18/2011

Page 34

BY MR. CHRISTMAS:
1
2    Q   Perhaps this document will help.  If I could
3  draw your attention to Exhibit 17.  Do you recognize
4  this document?
5    A   Yes.
6    Q   Can you tell me what it is?
7    A   It's tracking the intercompany receivables.
8    Q   Can you explain to me the line items on this
9  document?
10    A   This is accumulating the data of what was the
11  account balances and some other composition that was
12  being transferred.
13    Q   And what is the purpose of this document?  Is
14  it to show a transaction or to just accumulate the
15  totals?
16    A   It's to accumulate the totals for the amount
17  presented on the financial statement.
18    Q   Now, the first number on there, 7 --
19  approximately $7.7 million, do you have an
20  understanding as to what that number represents?
21    A   It was the beginning balance in that specific
22  account.
23    Q   Do you know what that account was?
24    A   Not as I sit here.
25    Q   Could it be a foreign exchange account?

Page 35

1    MR. PETERSEN:  Objection.  Calls for speculation.
2    THE WITNESS:  I don't know.
3  BY MR. CHRISTMAS:
4    Q   Do you know what the reference is there to
5  investment in SK Foods LLC is, most of the way down
6  the chart?
7    A   Other than what it says, no.
8    Q   And how about investment in SK Foods
9  Australia?
10    A   Same answer.
11    Q   Okay.  Does this document show the --
12  withdraw that.  Let me rephrase it.
13       Does this document give effect to the sale
14  that we were referring to in the last exhibit?
15    MR. PETERSEN:  Objection.  It's vague and
16  ambiguous as to "give effect."
17  BY MR. CHRISTMAS:
18    Q   Do you know what I mean?  Do you understand
19  the question?
20    A   No.
21    Q   Okay.  Is this document meant to display the
22  facts as they existed after the sale of the
23  receivables?
24    A   It summarizes to the ending balance after the
25  sale of the receivables.

Page 36

1    Q   So this calculation that is displayed in this
2  document assumes that the sale is taking place?
3    A   Yes.
4    Q   Okay.  So returning to my question of a few
5  moments ago, did the sale include payables by SK Foods
6  back to the Cedenco entities?
7    A   There are payables, yes.
8    Q   Can you identify those on this page?
9    A   There are lines, I/C payable Cedenco
10  Australia.
11    Q   Give the corresponding amounts for the
12  record.
13    A   $5,499,980.
14    Q   Any others?
15    A   I/C payables Cedenco Australia, 3,199,978.
16    Q   Okay.  Any others?
17    A   Those are the two payables that are listed.
18    Q   Do you know if this sale transaction
19  encompassed all of the intercompany debt between the
20  Cedenco entities and SK Foods?  And when I say
21  intercompany, I mean both the amounts owed from the
22  Cedenco entities up to the U.S. entity and the amounts
23  owed by the U.S. entity back to the Cedenco companies?
24    MR. PETERSEN:  Objection.  No foundation.
25  BY MR. CHRISTMAS:

Page 37

1    Q   You can answer.
2    A   No, it does not include all of the amounts.
3    Q   Which ones were excluded?
4    A   I would have to look through the work papers
5  to identify.  But I have one specific recollection
6  related to the receivable that Aviation held from the
7  Cedenco entities.
8    Q   I was just focusing on SK Foods LP.  Go
9  ahead.
10    A   From a reporting perspective, SK Foods LP
11  includes SK Aviation.
12    Q   We were looking at Exhibit 20.  And if you
13  could pull that back out, page 2, back to that
14  paragraph.  There is a reference at the end of that
15  paragraph to "See analysis at A-19.05."  Do you see
16  that there?
17    A   Yes.
18    Q   Can you tell me what that reference is to?
19    A   It's to a work paper number.
20    MR. CHRISTMAS:  This is 22.
21    (Deposition Exhibit 22 marked.)
22  BY MR. CHRISTMAS:
23    Q   Mr. Nutley, the court reporter has handed you
24  Exhibit 22 to your deposition.  Do you recognize this
25  document?

10 (Pages 34 to 37)

DAN  NUTLEY - 8/18/2011

Page 38

1    A  Yes, yes.
2    Q  Okay.  And can you tell me what it is?
3    A  It's a memo in our work papers.
4    Q  Is this the work paper that is referred to in
5  the prior one that we just looked at?
6    A  The number is not on this work paper, so I
7  can't say with certainty.
8    Q  Who prepared this page?
9    A  I'm not certain as I sit here.
10   Q  What is the purpose of this page?  Can you
11  tell me?
12   MR. PETERSEN:  Objection.  No foundation.
13   THE WITNESS:  It's a memo to describe the
14  disposition of foreign entities.
15  BY MR. CHRISTMAS:
16   Q  Okay.  Did you assist in preparing this
17  document?
18   A  Yes.
19   Q  And how do you assist in preparing it?
20   A  I don't know the details of my role in
21  preparing it, but I was involved in preparing it.
22   Q  Okay.  Now let's, if we could -- do you agree
23  with what is stated in this document?
24   A  Yes.
25   Q  Now, perhaps could you give us some history

Page 39

1  here.  You had testified earlier that FIN 46, looking
2  at a document, this was the first year that FIN 46
3  became applicable to SK Foods; is that correct?
4    A  No.
5    Q  It's not?
6    A  No.
7    Q  Can you elaborate on that?
8    A  It became effective for the year ending
9  October 31st, 2006.
10   Q  Okay.
11   A  This work paper is referring to the eight
12  months ending June 30, 2007.
13   Q  The first paragraph refers to a change in the
14  fiscal year.  So the fiscal year changed during the
15  course of your -- did it change during the course of
16  your audit, or how did that come about; do you know?
17   A  Management of the company made a decision
18  that it would be better to report their operations on
19  fiscal year-end June 30th.
20   Q  So were you involved in assisting the
21  management of SK Foods in determining how it was going
22  to respond to FIN 46?
23   MR. PETERSEN:  Objection.  Vague as to time.
24  BY MR. CHRISTMAS:
25   Q  When did you first have discussions with

Page 40

1  management of SK Foods LP about responding to FIN 46?
2    A  I don't have a specific recollection.
3    Q  Okay.  Were you involved in determining the
4  structure of how the company was going to respond FIN
5  46 the first time it became effective?
6    A  I'm not sure I understand the question.
7    Q  Well, do you know what they did to respond to
8  FIN 46?
9    MR. PETERSEN:  Objection.  Vague as to time.
10  BY MR. CHRISTMAS:
11   Q  When FIN 46 first became applicable to SK
12  Foods LP, do you know what they did during that first
13  fiscal year that it became applicable?
14   A  They studied the professional standards, read
15  the professional standards, looked at the organization
16  and reached an assessment as to which would be the
17  appropriate entities to be -- how the related entities
18  would be treated under FIN 46.
19   Q  And what did they decide was going to be the
20  treatment?
21   A  The conclusion was the two entities.  SK
22  Foods was the primary beneficiary, and those two
23  entities would need to be consolidated with SK Foods.
24  And there are a series of other entities, and the
25  conclusion was that SK Foods was not the primary

Page 41

1  beneficiary and those would not be included in the
2  consolidated group.
3    Q  So which were the entities that were not
4  going to be included?
5    A  It's a string of related entities.  I don't
6  remember all of the names as I sit here today.
7    Q  Were they Australian and New Zealand
8  entities?
9    A  No.
10   Q  What country of origin were they?
11   A  U.S.
12   Q  Focusing on the Australian and New Zealand
13  companies, did management determine that it was going
14  to change the ownership of the Australian and New
15  Zealand companies in response to FIN 46?
16   MR. PETERSEN:  Objection.  Calls for speculation.
17   THE WITNESS:  I don't have a recollection of
18  that.
19  BY MR. CHRISTMAS:
20   Q  Do you know if the ownership of the
21  Australian and New Zealand companies was changed in
22  any of the periods for which Moss-Adams did the audit?
23   A  Yes.
24   Q  Okay.  What year did that take effect in?
25   A  Effective November 1st, 2006.

11 (Pages 38 to 41)

DAN NUTLEY - 8/18/2011

Page 42

1    Q   And do you recall discussing with Mr. Salyer,
2   if you did, how to structure that change in ownership?
3    A   No, not specifically Mr. Salyer.
4    Q   Anybody else?
5    A   Management of the company.
6    Q   Can you recall anyone specifically?
7    A   Ms. Seymour and Mr. McCormick. I believe
8   Mr. Salyer was present for one conversation.
9    Q   And were there alternatives presented by
10  anybody in terms of how to structure the transfer of
11  ownership?
12   MR. PETERSEN: Objection. Vague as to time and
13  the question is vague and ambiguous.
14  BY MR. CHRISTMAS:
15   Q   You can answer.
16   A   Yes.
17   Q   Okay. And do you recall who -- were you one
18  of the people who presented alternative structures?
19   A   Yes.
20   Q   Okay. Can you recall what any of those were?
21   A   Focusing on structures that there was the
22  possibility of distributing all of the receivables and
23  the ownership interest to the partners. And there was
24  the possibility of distributing -- well, what was
25  ultimately done, distributing the ownership interest

Page 43

1   and distributing the receivables. Those are two that
2   I recollect.
3    Q   Okay. Now, do you know why the first --
4   well, let me ask you this question.
5        Do you know which of those two was ultimately
6   chosen?
7    A   Yes, the distribution of the ownership
8   interest and the sale of the receivables.
9    Q   That's the second one, I believe --
10   A   Yes.
11   Q   -- that you just listed.
12       Do you know why the first one was not chosen?
13   A   Management told me that if the first method
14  were used, that it would create a tax liability for
15  the partners of SK Foods.
16   MR. CHRISTMAS: Mr. Lewis.
17   MR. LEWIS: Yes.
18   MR. CHRISTMAS: We heard some beeping.
19   MR. LEWIS: I don't know what that was.
20   MR. CHRISTMAS: Okay.
21   MR. LEWIS: I'm still here, though.
22   MR. CHRISTMAS: Okay. All right.
23  BY MR. CHRISTMAS:
24   Q   Was there any particular reason that the
25  transfer of ownership occurred, to your knowledge?

Page 44

1   Was it in response to FIN 46 or was it in response to
2   FIN 46 and anything else or do you know?
3    MR. PETERSEN: Objection. Calls for speculation.
4    MR. LEWIS: Objection. Calls for speculation.
5   BY MR. CHRISTMAS:
6    Q   I'm just asking you what you know.
7    A   And my understanding with the switch of the
8   fiscal year-end, the financial reporting, with the
9   inclusion of the foreign subsidiaries, became much
10  more complicated.
11   Q   Okay.
12   A   And management believed that that
13  complication would give them reporting difficulties.
14   Q   Okay. Do you know if anyone outside of SK
15  Foods also believed that reporting would then be
16  greater -- have a greater complication, anyone not
17  associated with the companies?
18   MR. LEWIS: Objection. Lack of foundation.
19   MR. PETERSEN: Calls for speculation.
20  BY MR. CHRISTMAS:
21   Q   You can answer.
22   A   Not that I recollect.
23   Q   Do you recall if any -- did you ever learn
24  that any of the lenders wished to have the non-U.S.
25  entities put outside of the financial statements?

Page 45

1    A   My recollection is that management --
2    MR. LEWIS: Objection. Lack of foundation.
3   BY MR. CHRISTMAS:
4    Q   I'm just asking you what you know.
5    A   My recollection is that management told me
6   that the lenders didn't need the foreign reporting
7   subsidiaries included.
8    Q   Who told you that?
9    A   I don't have a recollection of a specific
10  person.
11   Q   Did you ever have any direct discussions with
12  any members of the lending group for SK Foods?
13   MR. PETERSEN: Objection. Vague and ambiguous as
14  to lending group.
15  BY MR. CHRISTMAS:
16   Q   Well, you testified earlier that you
17  believe -- if I have it correct, that you understand
18  that Bank of Montreal was a lender to SK Foods,
19  correct?
20   A   Yes.
21   Q   Were you aware of any other lenders to SK
22  Foods?
23   A   Not as I sit here today.
24   MR. LEWIS: Objection. Lack of foundation.
25  BY MR. CHRISTMAS:

12 (Pages 42 to 45)

DAN   NUTLEY - 8/18/2011

---

Page 46

1    Q   Did you ever have any communications with any
2  of the representatives with the Bank of Montreal
3  during the course of any of your audits?
4    A   Yes.
5    Q   And can you tell me in what connection you
6  had those communications?
7    A   I don't have the specific people and times,
8  but it was during the course of the audit you wind up
9  talking to lenders. I know I met lending officers.
10   Q   Did you ever have any communications with
11 representatives of the lenders regarding whether or
12 not the foreign subsidiaries, the Cedenco subsidiaries
13 were to be included in the financial statements?
14   A   Not that I can recollect as I sit here today.
15   Q   Do you recall ever having any communications
16 with representatives of the lenders regarding the
17 distribution of the shares in the foreign entities to
18 the partners?
19   MR. PETERSEN:  Objection.  Sorry.  It's vague and
20 ambiguous as to lenders.  He's only testified as to
21 one lender.
22 BY MR. CHRISTMAS:
23   Q   Okay.  The MO.
24   A   Okay, not as I sit here today.
25       If we're moving on to a new exhibit, can I

---

Page 47

1  take a break?
2    MR. CHRISTMAS:  Of course.
3        (Recess.)
4  BY MR. CHRISTMAS:
5    Q   We've discussed off the record that the
6  witness recalls some additional information about one
7  of my questions.  Do you want to go ahead, Mr. Nutley?
8    A   Yeah.  The journal entries the company
9  prepared to record the transfer of the ownership
10 interest and the receivables.
11   Q   So this was -- this is a supplement to your
12 response to my question as to what documents you saw
13 which supported the statement in -- do you know where
14 we were?
15   A   Exhibit 22.
16   Q   So it's with respect to that document.
17   A   Yes.
18   Q   So the sentence, "SKFLP has decided to
19 distribute the shares in the foreign entities to the
20 partners," so these are adjusting journal entries that
21 you saw in connection with that transaction?
22   A   Yes.
23   Q   Okay.  And who prepared those adjusting
24 journal entities?
25   A   Management of the company.  I don't recall

---

Page 48

1  specifically.
2    MR. CHRISTMAS:  This is 23.
3        (Deposition Exhibit 23 marked.)
4  BY MR. CHRISTMAS:
5    Q   Mr. Nutley, the court reporter has handed you
6  Exhibit 23 to your deposition, a document with the
7  title "SK Foods LP Description Cedenco Entities,
8  6-30-07."  Can you tell me what this document is?
9    A   It's a document from our work papers
10 describing the Cedenco entities.
11   Q   And at the bottom -- at the bottom, the last
12 paragraph, is there a reference to the distribution of
13 the ownership interests?
14   A   Yes.
15   MR. PETERSEN:  Objection.  The document speaks
16 for itself.
17 BY MR. CHRISTMAS:
18   Q   Did you have a role in preparing this
19 document?
20   A   Yes.
21   Q   Can you tell me what that role was?
22   A   Reviewing it.
23   Q   And do you agree with the statements in this
24 document?
25   A   Yes.

---

Page 49

1    Q   Who is Abigail Pike?
2    A   She's a senior manager with Moss-Adams.
3    Q   And what was her role in the audit for --
4  well, let's start with the first audit.  The first
5  audit was -- and I apologize.
6        Did the time period change in -- well, what
7  time period was the first audit?
8    A   The first examination was for the year ending
9  October 31st, 2006.
10   Q   Okay.  So for that one she -- what was her
11 role, if any?
12   A   She was a senior manager on the engagement.
13   Q   And did she have a role in the second audit?
14   A   No, limited role in the second audit.
15   MR. CHRISTMAS:  Okay.  Let's do 30.
16       (Deposition Exhibit 30 marked.)
17 BY MR. CHRISTMAS:
18   Q   Mr. Nutley, I've handed you a document that
19 has been marked as Exhibit 30 to your deposition,
20 which is a series of e-mails, starting with an e-mail
21 dated August 21, 2007, at 5:02 p.m. from Ms. Pike to
22 Mr. Boos, Darrell Carlis, Ms. Seymour and others, and
23 a copy to you, and there are subsequent e-mails.
24       Focusing first on the e-mail from Ms. Pike,
25 do you recall -- well, let me withdraw that and

13 (Pages 46 to 49)

Merrill Corporation - San Francisco

800-869-9132                      www.merrillcorp.com/law

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN  NUTLEY - 8/18/2011

Page 50

1  rephrase that.
2      Is she addressing FIN 46 there?
3      MR. PETERSEN:  Objection.  Calls for speculation,
4  no foundation.  The document speaks for itself.
5      THE WITNESS:  Do you want me to answer?
6  BY MR. CHRISTMAS:
7      Q  Yeah, okay.  I didn't know we were on hold.
8      A  The subject line says that it's addressing
9  FIN 46.
10     Q  Do you have any recollection of discussing
11 the matters which she's addressing in her e-mail with
12 her?
13     A  No.
14     Q  At this point in time in August of 2007, what
15 is the status of the, if you know, the decision by
16 firm management to transfer the ownership of the
17 Cedenco companies?
18     A  I don't know.
19     Q  Do you recall ever discussing with Ms. Pike
20 the substance of the next e-mail from Ms. Seymour to
21 Ms. Pike, where Ms. Seymour says, "We're going to have
22 it tough to get through this, any more suggestions"?
23     A  No.
24     Q  Now, do you recall whether Mr. Salyer had
25 expressed any unhappiness with your firm's services at

Page 51

1  any point in time?
2      A  Yes.
3      Q  Do you recall when he did that?
4      A  No.
5      Q  Do you recall in what connection he did that?
6      A  No.
7      Q  Did he ever express it to you directly?
8      A  Yes.
9      Q  And was that by telephone or in person?
10     A  In person.
11     Q  Do you recall what he said?
12     A  Only one part of the conversation.
13     Q  Okay.  What do you recall?
14     A  That we were about ready to be pushed off the
15 edge of the cliff.
16     Q  You mean discharged?
17     A  I don't know what he meant by that.  It was
18 colorful, that's why I remember it.
19     Q  Do you know what he was referring to?
20     A  His displeasure with us.
21     Q  Do you know what the focus of his displeasure
22 was?
23     A  No, not as I sit here today.
24     Q  What was the last period that Moss-Adams
25 performed an audit for SK Foods LP?

Page 52

1      A  The eight months ending June 30th, 2007.
2      Q  Do you recall if Moss-Adams was ever asked to
3  perform the audit for the following year?
4      A  Yes.
5      Q  And did Moss-Adams ultimately perform that
6  audit?
7      A  No.
8      Q  Can you tell me your understanding as to why?
9      MR. LEWIS:  Objection.  Lack of personal
10 knowledge.
11 BY MR. CHRISTMAS:
12     Q  You can answer.
13     A  We had staffing constraints and we were not
14 satisfied with our relationship with the company.
15     Q  And in what ways were you -- was Moss-Adams
16 not satisfied?
17     A  In our experience, it was a hard audit to
18 work on and the company did not emphasize the audit
19 process, which made it difficult to complete the work.
20     Q  What do you mean by the company didn't --
21 well, let me try the first answer.
22      Why was it a hard audit?
23     A  Because the company didn't emphasize working
24 with the auditors.
25     Q  What do you mean by emphasize?

Page 53

1      A  They weren't focused on preparing schedules
2  and being responsive to audit requests.
3      MR. CHRISTMAS:  This is 31.
4      (Deposition Exhibit 31 marked.)
5  BY MR. CHRISTMAS:
6      Q  Mr. Nutley, I've handed the court reporter a
7  document marked Exhibit 31 to your deposition.  I'm
8  going to ask you a series of questions.  Well, first
9  let me ask you to identify the document.  Do you
10 recognize this document?
11     A  Page 1 I recognize.
12     Q  How about the attachment?
13     A  No, I do not recognize that.
14     Q  And is this an e-mail that you authored and
15 sent -- well, an e-mail that you sent on
16 September 13th, 2007, at 4:30 p.m.?
17     MR. KALLANDER:  The first page?
18     MR. CHRISTMAS:  The first page.
19     THE WITNESS:  Yes, that is what is described on
20 the document.
21 BY MR. CHRISTMAS:
22     Q  And this is your e-mail?
23     A  Yes.
24     Q  Now that we've identified it, if you can read
25 it and I'm going to ask you a series of questions

14 (Pages 50 to 53)

DAN NUTLEY - 8/18/2011

Page 54

1  about it.
2      A  Yes.
3      Q  Okay.  And the first line, I believe you
4  touched on this earlier.  The first paragraph relates
5  to one method of addressing FIN 46.  And is this the
6  one that you identified previously as distributing
7  both the notes receivable and the ownership?
8      A  Yes.
9      Q  And you say here, "This is not a practical
10  solution because we understand it leads to a
11  significant tax liability."  What was the basis of
12  your understanding that it leads to a significant tax
13  liability?
14      A  Communications with management.
15      Q  Okay.  Do you know if Mr. Boos ever weighed
16  in on that issue?
17      A  No.
18      Q  Do you know who Mr. Boos is?
19      A  Yes.
20      Q  And can you tell me who Wayne Boos is?
21      A  He's a partner/owner of a CPA firm in Fresno
22  who did the tax work for SK Foods.
23      Q  Who was the primary person at -- if there was
24  one, at Moss-Adams who was leading the efforts to
25  address FIN 46?

Page 55

1      MR. PETERSEN:  Objection.  Vague as to time.
2      THE WITNESS:  It varies in time frame.
3  BY MR. CHRISTMAS:
4      Q  Okay.  Then tell me.
5      A  For the year ending October 31st, 2006,
6  Abigail Pike did most of the analysis.
7      Q  Okay.  And then for the following, I'll call
8  it the stub period.
9      A  The short period?
10      Q  The short period.
11      A  It would be Roger Kutz and myself.
12      Q  So moving back to the document.  The second
13  paragraph says, "We have developed another idea to
14  accomplish the same thing."  Where you referenced
15  there "We have developed," who is the "we"?
16      A  It would be myself, Roger, discussions with
17  mark McCormick and Ms. Seymour.
18      Q  And who is Mr. McCormick?
19      A  He was -- I don't remember his title.
20      Q  Well, what did you understand his areas of
21  responsibilities were?
22      A  My understanding is he's responsible for
23  finance and some aspects of general management of the
24  company, is my understanding.
25      Q  Moving to the third sentence, there's a

Page 56

1  reference to where you say, "Hopefully there's enough
2  basis to make this a nontaxable event."  Do you know
3  whether or not there was sufficient basis so that the
4  distribution of the Cedenco stock was an untaxable
5  event?
6      A  No.
7      Q  Do you recall ever having any discussions
8  about that?
9      A  No.
10      MR. PETERSEN:  Just so I'm clear, your answer is
11  you don't know whether there was sufficient basis?
12      THE WITNESS:  I don't recall having a discussion.
13  BY MR. CHRISTMAS:
14      Q  In the fourth sentence -- or fourth
15  paragraph, rather, you say, "Suggests the notes
16  receivable would be reported like a stockholder
17  receivable in a corporation and classified as a contra
18  to partner's equity.  This classification would reduce
19  an auditor's need to be intrusive into the partners
20  financial position."
21      Do you recall any discussions as to whether
22  or not there was a desire by SK Foods management that
23  auditors not be intrusive into the partner's financial
24  position?
25      A  Yes.

Page 57

1      Q  Okay.  And with whom -- who expressed that on
2  behalf of SK Foods LP?
3      A  Ms. Seymour and Mr. McCormick.
4      Q  And do you recall what Ms. Seymour said?
5      A  No, not specifically.
6      Q  How about Mr. McCormick?
7      A  No.
8      Q  Was your suggestion about the reporting in
9  that second sentence of paragraph 4 acceptable to the
10  management of SK Foods?
11      A  No.
12      Q  Why not?
13      A  I don't know.
14      Q  So let me break that down.  Is that because
15  they do not agree with the classification or is it
16  because the ultimate structure did not reflect what
17  you're suggesting there?
18      MR. PETERSEN:  Objection.  Calls for speculation,
19  no foundation.
20      THE WITNESS:  They told me it was not acceptable.
21  BY MR. CHRISTMAS:
22      Q  Which, the classification or the proposal for
23  the structure?
24      A  The classification.
25      Q  Okay.  Did they say why it wasn't acceptable?

15 (Pages 54 to 57)

DAN  NUTLEY - 8/18/2011

Page 58

1    A  Not that I remember.
2    Q  And the following paragraph, which is 1, 2,
3  3, 4, 5, you say there -- I believe I'm reading this
4  correctly.  You're suggesting that the effective date
5  of the distribution of the equity of the partners and
6  the disposition of the debt be made effective
7  November 1, 2006.  Have I read that correctly?
8    A  These are receivables, not debt.
9    Q  Okay.  I call them debt; you call them
10  receivables.  We're talking about the same thing.
11    A  I just want to make sure we have clarity.
12    Q  Understood.
13       What was the purpose of making it effective
14  November 1, 2006?
15    A  The next sentence describes it.  Quoting,
16  "This would eliminate including Cedenco in the income
17  statement."
18    Q  Now, your next paragraph says, "Attached is a
19  pro forma consolidating balance sheet as if this had
20  been done at 10-31-06."  The attachment, which it
21  bears a sequential Bates number as if it were the
22  attachment to this e-mail, is that not the attachment
23  to your e-mail?
24    A  I don't know as I sit here.
25    Q  Okay.  Do you have any reason to doubt that

Page 59

1  that was the attachment to your e-mail?
2    MR. PETERSEN:  Objection to the extent that it's
3  inconsistent with his prior statement that he does not
4  recall the document.
5  BY MR. CHRISTMAS:
6    Q  I'm just asking you if you have any reason to
7  question it.
8    A  No.
9    MR. CHRISTMAS:  This is 33.
10    (Deposition Exhibit 33 marked.)
11  BY MR. CHRISTMAS:
12    Q  Mr. Nutley, the court reporter has handed you
13  Exhibit 33 to your deposition, which is a series of
14  e-mails containing, first, the e-mail that we had
15  looked at of September 13, 2007, in the prior exhibit.
16       And now, at the top is an e-mail which
17  appears to be from Mr. Salyer dated September 13,
18  2007, at 6:31 p.m.  Do you see that?
19    A  Yes.
20    Q  Do you recall receiving the e-mail from
21  Mr. Salyer in this exhibit?
22    A  Yes.
23    Q  And what he says there is this won't work,
24  try again.  Can't drop equity by $37 m."  Do you
25  know -- to your understanding, to what is he referring

Page 60

1  there?
2    MR. PETERSEN:  Calls for speculation.
3  BY MR. CHRISTMAS:
4    Q  I'm just asking for your understanding.
5    A  To the suggestion described below.
6    Q  What would drop equity by 37, it looks like
7  million dollars?
8    MR. PETERSEN:  Objection.  Calls for speculation.
9    THE WITNESS:  I don't know the validity of that
10  number of at all.
11  BY MR. CHRISTMAS:
12    Q  But you recall receiving the e-mail?
13    A  Yes.
14    Q  Did you have a discussion with Mr. Salyer
15  about what he wrote about there?
16    A  No.
17    Q  Do you know if you responded to this e-mail?
18    A  Not that I remember.
19    MR. CHRISTMAS:  This is 35.
20    (Deposition Exhibit 35 marked.)
21  BY MR. CHRISTMAS:
22    Q  Mr. Nutley, the court reporter has handed you
23  Exhibit 35 to your deposition, which is, again, a
24  series of e-mails, which it appears to me adds to the
25  last exhibit a response by you dated September 14,

Page 61

1  2007, at 5:47 a.m.
2       Am I correct in rading this, that the e-mail
3  directly above the e-mail from Mr. Salyer of
4  September 13, 2007, at 6:30 is your response to the
5  e-mail that we looked at in your last answer?
6    A  Yes, that's what it appears to be.
7    Q  Okay.  So you didn't have a telephone
8  conversation, I take it, in response to his last
9  e-mail?  Is this how you responded, this e-mail?
10    A  This is a response.
11    Q  Okay.  And can you tell me what you -- what
12  you're conveying to him?
13    MR. PETERSEN:  Objection.  The document speaks
14  for itself.
15    THE WITNESS:  Yeah, it's written out in the
16  document.
17  BY MR. CHRISTMAS:
18    Q  Well, let me just ask you one thing in
19  particular about this.  It says in the first sentence,
20  "We have been told the banks do not rely on the
21  foreign investments and, in fact, prefer financial
22  statements without the foreign subsidiaries
23  consolidated."
24       Who told you that?
25    A  I don't remember.

16 (Pages 58 to 61)

Merrill Corporation - San Francisco

BMO 001973

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN  NUTLEY - 8/18/2011

Page 62

1    Q  Okay.  Now, I believe that this e-mail was
2  not produced in your document production.  Do you know
3  why that was?
4    A  I didn't locate it in my e-mail files.
5    Q  Does Moss-Adams maintain an archive of older
6  e-mails in any way?
7    A  I don't know.
8    Q  Did you inquire as to whether Moss-Adams
9  maintains an archive of older e-mails in the process
10  of responding to the subpoena?
11    A  I don't remember.
12    Q  Do you know if anyone else assisted you in
13  reviewing -- obtaining e-mails in response to the
14  subpoena?
15    A  Yes.
16    Q  Okay.  Who did?
17    A  We discussed earlier the people on staff that
18  I contacted and looked at their files.
19    Q  Did they do their own search or did you do
20  the search?
21    A  They did their own.
22    Q  Can you think of any reason why this e-mail
23  would not have been produced?
24    A  It may have been deleted.
25    Q  Do you know how many years Moss-Adams keeps

Page 63

1  its e-mails?
2    A  No.
3    MR. KALLANDER:  Can we go off record real quick?
4    MR. CHRISTMAS:  Yes.
5    (Recess.)
6    MR. CHRISTMAS:  This is 36.
7    (Deposition Exhibit 36 marked.)
8  BY MR. CHRISTMAS:
9    Q  Mr. Nutley, do you recall in the process of
10  SK Foods formulating its response to FIN 46, whether
11  or not there was a discussion of a structure for
12  addressing the payables through using the involvement
13  of a third-party lender?
14    A  Yes.
15    Q  Can you tell us what that structure involved?
16    A  I don't think it ever got to the point of a
17  structure being designed.
18    Q  Can you explain at least the basic concept?
19    A  It was pretty vague to me, but Mark McCormick
20  was trying to develop a vague concept of somehow these
21  receivables being held by a third party.
22    Q  And is that what is being addressed in this
23  e-mail?
24    The court reporter has handed you Exhibit 36
25  to your deposition, which is a series of e-mails, and

Page 64

1  the second one appears to be one from you.  And do you
2  recognize this e-mail?
3    A  Yes.
4    Q  Okay.  And in there, in the second paragraph,
5  there's a reference to a third-party lender.  Is that
6  what you were just referring to?
7    A  Yes.
8    Q  Okay.  Do you recall if any third-party
9  lenders were identified?
10    A  No.
11    MR. CHRISTMAS:  This is 38.
12    (Deposition Exhibit 38 marked.)
13  BY MR. CHRISTMAS:
14    Q  Mr. Nutley, the court reporter has handed you
15  Exhibit 38 to your deposition.  Do you recognize this
16  two-page document?
17    A  Yes.
18    Q  Can you tell me what it is?
19    A  It's a prepared-by-client journal entry.
20    Q  And what is the purpose of the journal
21  entries that are reflected on this page -- in this
22  document, rather?
23    MR. PETERSEN:  Objection.  The document speaks
24  for itself, calls for speculation.
25  BY MR. CHRISTMAS:

Page 65

1    Q  You can answer.
2    A  The journal entry transfers the ownership
3  interest in the foreign subsidiaries.
4    Q  So when you testified earlier that one of the
5  documents you had seen that supported the conclusion
6  that the ownership of the Cedenco subsidiaries had
7  been transferred, is this the journal entry to which
8  you were referring?
9    A  This is one of them, yes.
10    Q  Now, there's some text boxes that appear to
11  be superimposed over the document.  Are those text
12  boxes created by Moss-Adams?
13    A  Yes.
14    Q  Do you know who prepared those?
15    Let's start with the one in the upper left.
16  Do you know what the purpose of that notation is?
17    A  To describe what that journal entry is.
18    Q  Okay.  And how about the one in the middle of
19  the page?
20    A  Again, just describing the journal entry.
21    Q  Okay.  And the signatories at the bottom, are
22  those SK Foods people or Moss-Adams people?
23    A  SK Foods.
24    Q  Other than the text boxes, are there any
25  other notations on this page that you can see that

17 (Pages 62 to 65)

DAN NUTLEY - 8/18/2011

Page 66

1  were made by Moss-Adams?
2      A  No, not that I can see.
3      MR. CHRISTMAS:  This is 42.
4         (Deposition Exhibit 42 marked.)
5  BY MR. CHRISTMAS:
6      Q  Mr. Nutley, the court reporter has handed you
7  Exhibit 42 to your deposition, which is an e-mail from
8  -- appears to be an e-mail from Mr. McCormick to you
9  with copies to Mr. Hay and Mr. Salyer.
10        Now, he says here, "It looks like all of the
11  pieces are in place to resolve the FIN 46 issue."  Do
12  you know what Mr. McCormick's role was in attempting
13  to resolve the FIN 46 issue?
14      A  He was one of our main contacts of the
15  financial reporting audit.
16      Q  Okay.  And as of November 8, 2007, do you
17  know what had been decided by the management of the
18  firm in terms of the structure of the response to FIN
19  46?
20      A  No.
21      Q  At this point in time, how frequently were
22  you in contact with Mr. McCormick?
23      A  Weekly.
24      Q  Weekly.  And was that in person or by e-mail?
25      A  By telephone, primarily.

Page 67

1      MR. CHRISTMAS:  Let me do 41.  I think we got out
2  of order.
3         (Deposition Exhibit 41 marked.)
4  BY MR. CHRISTMAS:
5      Q  Mr. Nutley, the court reporter has handed you
6  Exhibit 41 to your deposition, which is an e-mail from
7  Mark McCormick on which you are copied.  He says in
8  this e-mail that, "I have been in daily contact with
9  Dan Nutley."  Do you agree or disagree with that
10  statement?
11      MR. PETERSEN:  Looking at 42 now or 41?
12      MR. CHRISTMAS:  41.
13      MR. PETERSEN:  Hang on a second.
14      MR. KALLANDER:  41 doesn't talk about daily
15  contact.
16      MR. PETERSEN:  What I was just handed, it's not
17  41.  It's the one that starts, "It looks like all of
18  the pieces are in place to resolve the FIN 46 issue."
19      MR. NUTI:  November 8 is 41 and November 15 is
20  42.  Let's go off the record.
21         (Recess.)
22      MR. CHRISTMAS:  I had erroneously referred to
23  Exhibit 41 in the question that I had asked
24  Mr. Nutley.
25  BY MR. CHRISTMAS:

Page 68

1      Q  Referring to Exhibit 42, Mr. McCormick says,
2  "I have been in daily contact with Mr. Nutley."  Were
3  you in daily contact or do you agree with that, or
4  not?
5      A  Not that I can remember.
6      Q  Mr. Nutley, in your view as an auditor, can a
7  transaction be effective prior to the execution of the
8  relevant legal documents?
9      MR. PETERSEN:  Objection.  Incomplete
10  hypothetical, calls for speculation.
11  BY MR. CHRISTMAS:
12      Q  You can answer.
13      A  Yes.
14      Q  And can you explain your answer?
15      MR. PETERSEN:  Same objections.
16      THE WITNESS:  You have verbal agreements and you
17  have written agreements.
18  BY MR. CHRISTMAS:
19      Q  So a verbal agreement could be effective
20  prior to the execution of a written document?
21      A  Yes.
22      Q  With respect to the distribution of the
23  partners of the ownership interest in the Cedenco
24  entities, is it your understanding that as of
25  November 1, 2006, there were written documents or

Page 69

1  there was an oral agreement?
2      MR. PETERSEN:  Objection.  No foundation, calls
3  for speculation.  It's vague and ambiguous.
4      THE WITNESS:  My understanding is the transaction
5  was effective November 1st.  The time frame at which
6  that conclusion decision was made, I don't remember.
7  BY MR. CHRISTMAS:
8      Q  But isn't it a fact that the actual structure
9  was still being discussed in the fall of 2007 in the
10  e-mails that we've seen?
11      A  Yes.
12      Q  So do you know when the actual date of the
13  oral understanding, if that's what you believe it to
14  be, occurred?
15      A  No.
16      Q  Did you ever see any signed transaction
17  documents that confirmed the distribution of the
18  ownership of the Cedenco entities?
19      A  I saw the general entries that management
20  prepared.  I saw our client representation letter from
21  management saying that the transaction was effective
22  November 1st.
23      Q  Is that the extent of what you saw to confirm
24  the effectiveness of the transfer of the equity
25  ownership?

18 (Pages 66 to 69)

Merrill Corporation - San Francisco

BMO 001975

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN NUTLEY - 8/18/2011

Page 70

1    A  Yes.
2    Q  Okay.  And I'll ask you the same question
3  with respect to the transfer of the debt.  Are the
4  only documents that you saw the client representation
5  letter and the adjusted journal entries?
6    A  Yes.  You know, in terms of documents, the
7  financial statements are documents, also, that discuss
8  and disclose all of this.  But in the sense I left
9  them out, they're documents.
10   Q  Thank you for your answer.
11     MR. CHRISTMAS:  This is 49.
12     (Deposition Exhibit 49 marked.)
13 BY MR. CHRISTMAS:
14   Q  Mr. Nutley, the court reporter has handed you
15 Exhibit 49 to your deposition, which is a seven-page
16 document.  Do you recognize this document?
17   A  Yes.
18   Q  Can you tell me what it is?
19   A  It's our documentation or evaluation of the
20 Australian and the New Zealand entities, whether they
21 were subject to the FIN 46 accounting.
22   Q  So is this a blank form of questionnaire in
23 which information is interposed into various fields,
24 or how is this prepared?
25   A  Yes.  It's a form of inquiry where the

Page 71

1  auditor responds to the questions to work them through
2  the decision.
3    Q  You had a standard form for FIN 46 in which
4  the name of the client and the other personalized
5  information is then filled in; do I understand you
6  correctly?
7    A  Yes.
8    Q  The standard form, did that come from an
9  outside entity or service or was it worked up and
10 created by Moss-Adams?
11     MR. PETERSEN:  Objection.  Calls for speculation.
12     THE WITNESS:  I don't know.
13 BY MR. CHRISTMAS:
14   Q  Do you know if this document was part of your
15 document production?
16   A  No, I don't.
17   Q  Do you know who prepared this document?
18   A  No, not as I sit here.
19   Q  Let me just ask you a little bit about the
20 audit file.  How is the audit file maintained for this
21 engagement?
22   A  Electronically.
23   Q  Electronically, okay.  Is this part of the
24 audit file?
25   A  Yes.

Page 72

1    Q  Do you know why the date of November 1, 2006,
2  was chosen as opposed to any prior date or subsequent
3  date?
4    A  Yes.
5    Q  Can you tell me why?
6    A  It was the sentence in the e-mail that
7  describes the need to include the income statement.
8  If you didn't use November 1st, you would have had to
9  include the Australian entities if you used any later
10 date.
11     MR. CHRISTMAS:  Okay.  This is 54.
12     (Deposition Exhibit 54 marked.)
13     MR. CHRISTMAS:  For the record, the one that we
14 had marked at the beginning of the deposition as
15 marked as 54, it should be marked as 93.
16     (Deposition Exhibit 93 marked.)
17     MR. PETERSEN:  The one at the beginning of the
18 day?
19     MR. CHRISTMAS:  The one that was produced this
20 morning.
21     MR. NUTI:  We're changing Exhibit 54 to 93?
22     MR. CHRISTMAS:  Yes.  I apologize.
23 BY MR. CHRISTMAS:
24   Q  Mr. Nutley, the court reporter has handed you
25 Exhibit 54, which is a ten-page document.  Can you

Page 73

1  tell me what this document is?
2    A  This is the client representation letter
3  related to the audit for the month end June 30th,
4  2007.
5    Q  And what is the purpose of this letter?
6    A  To document in writing a series of
7  representations made that management has made to us during
8  the course of the audit.
9    Q  And is this something that your firm requires
10 as a matter of policy, or what's the reason for this
11 letter?
12   A  As I previously described, to document the
13 representations made during the course of the audit.
14   Q  And does your firm -- did your firm rely on
15 the representations in this letter?
16   A  Yes.
17   Q  Now, could you turn to the signature page.
18 And do you recognize that signature?
19   A  It's represented to be Scott Salyer's
20 signature.
21   Q  Do you know if a subsequent letter was
22 prepared and added additional signatories?
23   A  No.
24     MR. CHRISTMAS:  Let's do 57.
25     (Deposition Exhibit 57 marked.)

19 (Pages 70 to 73)

BMO 001976

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN   NUTLEY - 8/18/2011

Page 74

1  BY MR. CHRISTMAS:
2     Q  Mr. Nutley, the court reporter has handed you
3  Exhibit 57 to your deposition, which is a ten-page
4  unsigned document.  Do you recognize this document?
5     A  Yes.
6     Q  Can you tell me what it is?
7     A  It's the client representation letter.
8     Q  Can you turn to the last page.  Can you tell
9  me why, if you know, on this version there are two
10  additional signatories, Mr. McCormick and Ms. Shondale
11  Seymour on this document?
12     A  Because they're executives responsible for
13  the financial reporting and we get their signatures as
14  well on the signature letter.
15     Q  Did you receive the first version of this
16  with Mr. Salyer's signature and then subsequently
17  request a version with all three signatures or were
18  they circulated at the same time?
19     A  We sent a file to SK Foods management
20  requesting them to complete the representation letter
21  printed on their letterhead.
22     Q  And did you prepare this representation
23  letter?
24     A  The files.
25     MR. PETERSEN:  When you say this representation

Page 75

1  letter --
2  BY MR. CHRISTMAS:
3     Q  Okay, 54.
4     A  Yes.
5     Q  And how about 57?
6     A  Yes.  It comes from the same file.
7     Q  Okay.  54 is dated December 21, 2007 and 57
8  is dated January 15, 2008.  Do you know why -- well,
9  let me ask you.  Other than the signature page, were
10  there any other necessary revisions to the letter?
11     A  Not to my knowledge.
12     Q  Okay.  So then am I correct in understanding
13  that the only purpose of resending this document was
14  to get the additional two signatures?
15     A  I don't believe the document was re-sent.
16     Q  But the date was changed?
17     A  Yes.
18     Q  Okay.  So do you believe the client changed
19  the date?
20     A  Yes.
21     Q  Could you turn to page 7 of Exhibit 57.  If
22  you could look about two-thirds down the page, and
23  I'll just read it into the record.  It says there, "We
24  have distributed our investments in foreign
25  subsidiaries (Cedenco entities) to the partners and

Page 76

1  sold the net-related intercompany receivables to a
2  revocable trust with common ownership with the company
3  effective November 1, 2006."
4     With respect to the statements in that
5  sentence, did Moss-Adams rely entirely on this
6  representation letter or were there any -- was there
7  any review or procedures performed to verify that
8  statement?
9     A  We reviewed the journal entries that the
10  company recorded and then we had discussions with the
11  company, this is what they did.
12     Q  With respect to the net-related intercompany
13  receivables to an irrevocable -- well, let me just
14  refer to it, the net-related intercompany receivables,
15  were there any procedures performed with respect to
16  the collectability of the net-related intercompany
17  receivables?
18     A  Yes.
19     Q  Tell me what they were.
20     A  We looked at the underlying financial
21  strength of the ownership of the entities.
22     Q  Is there a working paper that relates to
23  those procedures?
24     A  I would have to go back and look.
25     Q  Would you expect that there would be one?  Go

Page 77

1  ahead.
2     A  I'll have to consider that.
3     Q  Would it ordinarily be your practice, if
4  review of financial statements occurred that you
5  described, that there would be audit papers relating
6  to those procedures?
7     A  Your procedures are documented in your files.
8     Q  Do you know if they were part of the document
9  production?
10     A  No, I do not.
11     MR. CHRISTMAS:  Can we just take another brief
12  break?
13     MR. KALLANDER:  Sure.
14     (Recess.)
15     (Deposition Exhibit 55 marked.)
16  BY MR. CHRISTMAS:
17     Q  Mr. Nutley, the court reporter has handed you
18  a document marked as Exhibit 55.  It's a letter
19  followed by a document titled "Debt Assignment
20  Agreement."
21     First, have you ever seen this letter?
22     A  Not that I recollect.
23     Q  Can you turn to the attachment, the debt
24  assignment agreement.  If you could take a look at
25  that document.  Tell me if you've ever seen this

20  (Pages 74 to 77)

DAN  NUTLEY - 8/18/2011

1  document.
2      A  No, not that I recollect.
3      Q  Okay.  If you could turn to the last page.
4  And do you see the signature block there?
5      A  Yes.
6      Q  Okay.  You had testified earlier in relation
7  to the transfer of the debt, if you'll recall, of
8  the -- well, you used the word -- let me get the right
9  word -- payables.
10     MR. KALLANDER:  Receivables.
11     THE WITNESS:  Receivables.
12  BY MR. CHRISTMAS:
13     Q  Okay, the receivables from owing to SK Foods
14  LP from the Cedenco entities, and you referenced a
15  trust that became involved in that with respect to
16  those receivables.  Is the SSC&L Trust the trust to
17  which you were referring?
18     A  I don't remember.
19     MR. PETERSEN:  Objection.  Asked and answered,
20  misstates his prior testimony.
21     THE WITNESS:  I don't remember the specific name.
22  BY MR. CHRISTMAS:
23     Q  Can we go back to the first paragraph -- or
24  the first page of the debt assignment agreement.  The
25  signature block is at variance with the name at the

1  top.  And the name at the top is "SSC&L 2007 Trust."
2  Is that the trust to which you were referring?
3      A  I don't remember.
4      Q  Do you know if those -- the entity signing
5  and the entity described in the first paragraph of the
6  document are the same entity?
7      A  No, I do not.
8      MR. PETERSEN:  Calls for speculation.
9  BY MR. CHRISTMAS:
10     Q  Setting aside the name of the trust that is
11  involved with the receivables due from the Australian
12  and New Zealand companies -- I'll just refer to it
13  then as the trust -- was that a revocable trust, to
14  your knowledge?
15     A  My understanding was it was a revocable
16  trust.
17     Q  And are there specific issues involved in
18  auditing a revocable trust if it has an obligation
19  that is then ultimately reflected on the balance
20  sheet?
21     MR. PETERSEN:  Objection.  It's vague and
22  ambiguous.
23     THE WITNESS:  I would have to give that some
24  additional consideration.
25  BY MR. CHRISTMAS:

1      Q  Well, the financial statements, if I
2  understand it correctly, reflected the financial
3  statements of SK Foods for the eight-month period
4  ending June 30, 2007, reflected a receivable from the
5  trust that we've defined earlier; is that correct?
6      A  Yes.
7      Q  Okay.  And do you recall whether the amount
8  reflected in the financial statements was the full
9  face amount of the debt or whether it was discounted
10  in any way?
11     A  I am not aware of any discounting.
12     Q  Was there any reserve established by the
13  company for that financial period as a reserve for the
14  uncollectibility of that debt?
15     A  Not that I'm aware of.
16     Q  Okay.  As part of preparing the financial
17  statements, did Moss-Adams review the recoverability
18  of that receivable that was on the financial
19  statement?
20     A  Yes.
21     MR. LEWIS:  Objection.  Personal knowledge.
22  BY MR. CHRISTMAS:
23     Q  Do you know personally what was done to
24  review the collectibility of that amount?
25     A  Yes.

1      Q  Okay.  Can you tell me?
2      A  We looked at the underlying assets of
3  Mr. Salyer.
4      Q  Okay.  And how was the information presented
5  to you about the underlying assets of Mr. Salyer?
6      MR. PETERSEN:  Objection.  It's vague and
7  ambiguous.
8      THE WITNESS:  We had -- in our work papers we had
9  financial statements for his related entities, and I
10  reviewed those financial statements for their
11  substance.
12  BY MR. CHRISTMAS:
13     Q  Do you know if those were part of the
14  document production?
15     A  I don't think so.
16     Q  Did that process of review also involve
17  looking at the assets of the trust itself?
18     MR. LEWIS:  Objection.  Lack of personal
19  knowledge.
20  BY MR. CHRISTMAS:
21     Q  You can answer.
22     A  No.
23     Q  And is there a reason you don't -- with a
24  revocable trust you don't look at the assets of the
25  trust?

21 (Pages 78 to 81)

DAN NUTLEY - 8/18/2011

Page 82

1    A  I would have to consider that.
2    Q  If the trust is one entity, on the other
3  hand -- or on the one hand, why, as an auditor, would
4  you look at the assets of Mr. Salyer to review the
5  collectability of that amount?
6    A  My understanding was that Mr. Salyer's assets
7  stood behind the revocable trust.
8    Q  And how did you gain that understanding?
9    A  Conversations with Gary Perry.
10    Q  Did Mr. Perry provide anything in writing to
11  confirm what you just said?
12    A  No.
13    Q  Who was it who provided the financial
14  statements of the related entities of Mr. Salyer that
15  were reviewed?
16    A  I don't know.  I do know American Salyer's
17  were provided by Mr. McCormick.  I do have specific
18  knowledge of that.  The others I don't know.
19    Q  Salyer American Foods, is that -- what entity
20  are you referring to?
21    A  I may not have the name correct, the produce
22  company.
23    Q  After analysis of the information that
24  Moss-Adams received regarding the collectibiliy of the
25  receivable from the trust, was Moss-Adams satisfied

Page 83

1  that the receivable was fully collectible?
2    A  Yes.
3    MR. CHRISTMAS:  56.
4      (Deposition Exhibit 56 marked.)
5  BY MR. CHRISTMAS:
6    Q  Mr. Nutley, the court reporter has handed you
7  Exhibit 56 to your deposition.  Do you recognize this
8  document?
9    A  Yes.
10    Q  Can you tell me what it is?
11    A  The financial statements for SK Foods for the
12  eight months ending June 30, 2007.
13    Q  Turn to page 3.  Is this the final version,
14  to your knowledge, of the report?
15    A  Yes.
16    Q  Can you turn to note 1, which is on page 8 of
17  the document.  Now, at this point in time the
18  statements are issued as of January 15, 2008; is that
19  correct?
20    A  The auditor's report is dated January 15,
21  2008.
22    Q  And did the financial statements have a
23  separate date or --
24    A  The financial statements --
25    MR. PETERSEN:  Objection.  The question is vague

Page 84

1  and ambiguous.
2  BY MR. CHRISTMAS:
3    Q  Do you remember consider the report on the
4  front to be separate from the financial statements?
5    A  Yes.
6    Q  And why is that?
7    A  The financial statements are the company's
8  financial statements.  The auditor's report is
9  Moss-Adams's report.
10    Q  Understood.
11      As of the date of the report, if we could
12  turn to -- withdrawn.  Let me fix this question.
13      On page 8, could you move to the -- if I
14  could draw your attention to the third paragraph,
15  about five lines from the bottom.  And it says there,
16  "The partnership distributed the investments in
17  foreign subsidiaries to the partners effective
18  November 1, 2006, and sold the partnership's
19  intercompany receivables to a revocable trust with
20  common ownership with the partnership."
21      With respect to the first statement in that
22  sentence, by this point in time was there anything
23  beyond the adjusting journal entries and the client
24  representation letter that Moss-Adams had reviewed to
25  determine the correctness of that first clause of that

Page 85

1  sentence?
2    A  Discussions with management --
3    Q  Okay.
4    A  -- in the course of the audit.
5    Q  And I'll ask you the same question with
6  respect to the second clause of that sentence.  Was
7  there anything other than the client representation
8  letter and the adjusting journal entries that
9  Moss-Adams had reviewed to determine the accuracy of
10  that second clause?
11    A  Discussions with management, and legal
12  counsel and Mr. Perry were conversing with him as
13  well.
14    Q  If we could turn to -- apart from -- just as
15  a general matter, and I'm going to expand it to the
16  entirety of the financial statements, apart from the
17  management representation letter, what documents did
18  you have to rely on to issue the financial statements
19  from SK Foods?
20    A  There's a whole file of documents, hundreds.
21    Q  Has that file been produced, to your
22  knowledge?
23    A  That file was reviewed to identify items that
24  you requested in production.
25    Q  Can you turn to note 8 in the financial

22 (Pages 82 to 85)

DAN   NUTLEY - 8/18/2011

Page 86

1   statements, which starts on page 16, I believe, of the
2   internal number.
3         Can you point to me where in this note, if I
4   have the right place, the receivable from the trust,
5   as we had defined it earlier in your testimony, is
6   reflected?
7      A  It's on page 17.
8      Q  Okay.  And what is the amount that is
9   reflected as the receivable from the trust?
10     A  18,293,000.
11     Q  Okay.  There's also a reference there to an
12  irrevocable trust.  Do you see that there?
13     A  Yes.
14     Q  Do you know the identity of that trust?
15     A  Not the specific name as I sit here.
16     Q  Do you know the purpose of that trust?
17     MR. PETERSEN:  Objection.  Calls for speculation,
18  no foundation.
19  BY MR. CHRISTMAS:
20     Q  You can answer.
21     A  Not as I remember today.
22     Q  Just as a matter of housekeeping, Exhibit 93
23  that we had renumbered, did you receive, ultimately,
24  a -- if you could turn to that.
25        We saw previously Mr. Salyer's signature to

Page 87

1   the client representation letter.  Does this document
2   reflect that you received signatures for the other
3   signatories to the client representation letter?
4      A  Yes.
5      Q  Okay.  Now, you testified previously that
6   another firm took over from yours to prepare the next
7   set of financial statements for the following fiscal
8   year after June 30, 2007.  Did you have -- did
9   Moss-Adams have any contact with that?
10     MR. LEWIS:  Objection.  Lack of personal
11  knowledge.
12     THE WITNESS:  Yes.
13  BY MR. CHRISTMAS:
14     Q  And what was the name of the firm?
15     A  Stout & Davidson.
16     Q  And do you recall, did you personally receive
17  any contact from them in transitioning the work?
18     A  Yes.
19     Q  And who contacted you?
20     A  I don't remember the person's name.
21     Q  Okay.  Do you recall what you were -- were
22  you requested to provide any documents to Stout &
23  Davidson?
24     A  Yes.
25     Q  Okay.  And do you recall what they requested

Page 88

1   you provide?
2      A  No.
3      Q  Did the subject -- do you recall having any
4   discussions with anyone at Stout & Davidson about the
5   prior year's audit?
6      A  Yes.
7      Q  Okay.  Do you recall who you had those
8   discussions with?
9      A  I don't remember the name.
10     Q  Okay.  Do you recall the topics of the
11  conversations?
12     A  Successor auditor inquiries.
13     Q  Do you recall whether the subject matter of
14  note 1 of the financial statements ever came up in
15  those conversations?
16     A  No.
17     Q  Were documents ultimately provided to Stout &
18  Davidson?
19     A  Yes.
20     Q  Who was responsible at Moss-Adams for
21  gathering and providing those documents?
22     A  I was.
23     Q  Did you keep a log or any other record of
24  what documents were provided to Stout & Davidson?
25     A  I don't know.

Page 89

1      Q  It is the practice of Moss-Adams, when
2   another firm succeeds Moss-Adams, to keep a log of
3   what documents are provided to the successor
4   accounting firm?
5      A  Not that I'm aware of.
6      Q  Do you recall if there were any e-mail
7   communications between Moss-Adams and Stout &
8   Davidson?
9      A  No.
10     MR. CHRISTMAS:  65.
11        (Deposition Exhibit 65 marked.)
12  BY MR. CHRISTMAS:
13     Q  Mr. Nutley, the court reporter has handed you
14  Exhibit 65 to your deposition.  Have you ever seen
15  this document before?
16     A  Not that I recollect.
17     Q  Okay.  Have you ever seen any financial
18  statements of SK Foods Australia Proprietary Limited?
19     A  Yes.
20     Q  And do you recall what years were covered by
21  the financial statements that you saw?
22     A  October 31st, 2006.
23     Q  Now, do you see the date on the front of this
24  document?
25     A  Yes.  This is October 31st, 2008.

23 (Pages 86 to 89)

DAN  NUTLEY  -  8/18/2011

Page 90

1    Q  Could I draw your attention to page 2 of the
2  document.  And further drawing your attention to the
3  top part of page 2, where on the left column there are
4  the words "Holding company" and the right column "SK
5  Foods LP."
6        Now, as of October 31, 2008, was SK Foods LP
7  the owner of SK Foods Australia Proprietary Limited to
8  your understanding?
9    MR. PETERSEN:  Objection.  Calls for a legal
10  conclusion, calls for speculation.
11    THE WITNESS:  I have no idea.
12  BY MR. CHRISTMAS:
13    Q  But the Moss-Adams financial statements, am I
14  correct in understanding, reflected a different owner
15  of the Cedenco entities from SK Foods LP; is that
16  correct?
17    A  As of June 30th, 2007.
18    Q  To your knowledge, did the ownership of the
19  Cedenco entities change back to SK Foods LP?
20    A  I have no knowledge.
21    MR. CHRISTMAS:  68.
22       (Deposition Exhibit 68 marked.)
23    MR. CHRISTMAS:  Let's mark 69 while we're at it.
24       (Deposition Exhibit 69 marked.)
25  BY MR. CHRISTMAS:

Page 91

1    Q  Mr. Nutley, the court reporter has handed you
2  Exhibits 68 and 69 to your deposition.  Do you
3  recognize either of these documents?
4    A  No.
5    Q  You've never seen them before?
6    A  No.
7    MR. CHRISTMAS:  Let's mark 71.
8       (Deposition Exhibit 71 marked.)
9  BY MR. CHRISTMAS:
10    Q  Mr. Nutley, the court reporter has handed you
11  Exhibit 71 to your deposition.  Do you recognize this
12  document?
13    A  No.
14    Q  Okay.  Could you read it over.
15    A  Yes, I did.
16    Q  Oh, you did?
17    A  Uh-huh.
18    Q  Does this document, in terms of the identity
19  of the intercompany -- you use the word "receivables,"
20  so I'll use that.
21    A  Yes.
22    Q  Does this confirm your understanding of the
23  structure of the receivables originally owing from the
24  Cedenco entities?
25    MR. PETERSEN:  Objection.  Calls for speculation.

Page 92

1  The document speaks for itself, may call for a legal
2  conclusion.  And he's testified that he's never seen
3  the document before, so I don't see how you can ask
4  him to testify about what the document says.
5    THE WITNESS:  It's beyond a period of time that I
6  have knowledge of the events.
7  BY MR. CHRISTMAS:
8    Q  So you -- withdrawn.
9        Well, if we could roll back to the previous
10  year.  With respect to the previous year, is it your
11  understanding that the SSC&L Trust was the entity that
12  owed the receivables to SK Foods LP?
13    A  I don't --
14    MR. PETERSEN:  Objection.  It's vague and
15  ambiguous.  He's never testified to a knowledge of the
16  SSC&L Trust.
17    THE WITNESS:  I don't recollect the name of the
18  revocable trust.
19  BY MR. CHRISTMAS:
20    Q  Can you turn to Exhibit 72.
21    MR. NUTI:  I need a copy of that, Robert.
22    MR. CHRISTMAS:  Sorry.
23       (Deposition Exhibit 72 marked.)
24  BY MR. CHRISTMAS:
25    Q  Have you ever seen this document before?

Page 93

1    A  No.
2    MR. CHRISTMAS:  This is 74.
3       (Deposition Exhibit 74 marked.)
4  BY MR. CHRISTMAS:
5    Q  Mr. Nutley, the court reporter has handed you
6  Exhibit 74 to your deposition.  Have you ever seen
7  this document before?
8    A  No.
9    Q  Let me ask you another question.  First, if I
10  could draw your attention to the entities that are
11  named in the first paragraph of this document.  You
12  see there that Cedenco Foods Limited, a New Zealand
13  Company, is in the first paragraph?
14    A  Yes.
15    Q  Have you ever seen a document similar to this
16  in which SK Foods Australia is listed in the first
17  paragraph?
18    A  No.
19    Q  Have you seen an unsigned version of this
20  document?
21    A  No.
22    Q  Or have you ever seen an unsigned
23  investigation form of this document in which SK Foods
24  Australia is listed in the first paragraph?
25    A  No.

24  (Pages 90 to 93)

Merrill Corporation - San Francisco
800-869-9132                        www.merrillcorp.com/law
BMO 001981
e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN  NUTLEY - 8/18/2011

Page 94

1     MR. CHRISTMAS: This is 75.
2        (Deposition Exhibit 75 marked.)
3  BY MR. CHRISTMAS:
4     Q  Mr. Nutley, the court reporter has just
5  handed you a document marked as Exhibit 75 to your
6  deposition, which is a series of e-mails, starting
7  with an e-mail from a Nick Frankish of April 3, 2009,
8  2:35 p.m., and ends at the top with an e-mail from
9  Mr. McCormick, dated April 5, 2005, 8:39 p.m.
10     First let me ask you, have you ever seen --
11  withdrawn.
12     Who is Mr. Frankish, if you know?
13     A  I know the name.
14     Q  Okay.  Anything beyond the name?
15     A  I believe he was a financial officer of
16  Cedenco.
17     Q  Okay.  Did you ever have any conversations
18  with Mr. Frankish?
19     A  Not sure.
20     Q  Do you see Mr. McCormick at the top there
21  says, "Dan and Gary originated these transactions at
22  the time that notes were transferred to the SSC&L
23  Trust."  Would you agree with his use of the word
24  "originated"?
25     A  No.

Page 95

1     Q  Can you tell me, if you would look at Mr. --
2  if you would look at the e-mail immediately below, can
3  you tell me what your role was in the transactions
4  that are referred to in Mr. Frankish's e-mail of
5  April 5, 2009?
6     MR. PETERSEN: Objection.  It's vague and
7  ambiguous.  The document speaks for itself.
8     THE WITNESS: I have to study the document.  It
9  looks -- there's a whole series of questions here.
10  BY MR. CHRISTMAS:
11     Q  Could you just look at the first e-mail.
12     A  Which is the first e-mail, please?
13     Q  I'm sorry.  The one immediately below
14  Mr. McCormick's.
15     A  From Mr. Frankish?
16     Q  Yes.
17     MR. PETERSEN: Objection.  It mischaracterizes
18  the document.  That's not the first e-mail.
19  BY MR. CHRISTMAS:
20     Q  I mean the one that is on the first page of
21  the exhibit.
22     A  What would you like me to do?
23     Q  Could you read the e-mail first.
24     A  All right.  Do you want me to continue
25  reading on to the second page?

Page 96

1     Q  Yes, please.
2     A  Yes, I've read it.
3     Q  If we could turn back to the actual first
4  e-mail now, now that you've read that.
5        Do you see line 3?
6     MR. NUTI: Robert, can you say the to, from, and
7  the date and the time so we know exactly which one
8  you're talking about.
9     MR. CHRISTMAS: Yes, of course.  We're talking
10  now about the initial e-mail in this chain, which is
11  dated April 3, 2009, at 2:35 p.m.
12     MR. NUTI: Thank you.
13  BY MR. CHRISTMAS:
14     Q  Now, if you turn to the page that is
15  Bates-numbered Chapter 15, 1303 at the bottom.  Is
16  that where you are?
17     A  Uh-huh.
18     Q  Okay.  Item No. 3 under the chart on that
19  page, in sort of the legend -- yeah, your counsel has
20  pointed it out to you.
21     Do you know what is represented there by
22  "minority interest"?  Do you recall if there was an
23  amount that reflected any kind of loss or discount
24  relating to minority interest?
25     MR. PETERSEN: Objection.  No foundation, calls

Page 97

1  for speculation.
2     THE WITNESS: I recollect there are minority
3  interests in the financials.  I don't recollect this
4  one specifically.
5  BY MR. CHRISTMAS:
6     Q  Okay.  Did you ever provide any information
7  to the auditors of the Cedenco entities in Australia
8  or New Zealand?
9     A  Not that I recollect.
10     Q  Did they ever provide any information to you?
11     A  Yes.
12     Q  And did they provide it directly or through
13  SK Foods?
14     A  Through management of SK Foods.  I'm sorry,
15  there is one -- there are two letters.  You're asking
16  me about Australia?
17     Q  Yes.
18     A  Okay.  There's one letter from the auditors
19  from Australia in the 10-31-06 audit file related to
20  their statement of independence related to Cedenco
21  Foods, That was given to us directly.
22     Q  And what does that refer to, a statement of
23  independence?
24     A  An auditor needs to be independent of their
25  clients.  And when you're dealing with auditors in a

Merrill Corporation - San Francisco

800-869-9132                    www.merrillcorp.com/law

BMO 001982

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN  NUTLEY - 8/18/2011

Page 98

1  financial statement, you need to be satisfied that
2  they are independent related to the entity they are
3  reporting upon.
4      Q   Okay.  You can put that exhibit aside.
5      MR. CHRISTMAS:  This is 82.
6          (Deposition Exhibit 82 marked.)
7  BY MR. CHRISTMAS:
8      Q   Mr. Nutley, the court reporter has handed you
9  Exhibit 82 to your deposition.  Have you ever seen
10  this copy before?
11      A   No.
12      Q   Mr. Nutley, can you tell me if, to your
13  knowledge, Moss-Adams is involved in any litigation
14  with any of the banks who lent money to SK Foods LP?
15      A   I have no knowledge of that.
16      Q   Is Moss-Adams involved in any litigation with
17  the trustee of SK Foods LP.
18      A   I have no knowledge of it.
19      MR. CHRISTMAS:  I'm finished.
20          EXAMINATION
21  BY MR. NUTI:
22      Q   I just have a follow-up on one issue.
23          In response to one of the questions of
24  support for the transactions we were talking about and
25  focusing on, you mentioned that Gary Perry provided

Page 99

1  some information to Moss-Adams in support of those
2  transactions; is that correct?
3      A   I had multiple conversations with Gary Perry.
4      Q   Did he provide any written legal opinion as
5  to the transactions?
6      A   No.
7      Q   Everything was all oral?
8      A   Yes.  He sent me a draft -- I already
9  testified I believe he sent my a draft of the
10  revocable trust.  But it was unsigned, so I didn't
11  retain it.
12      Q   So nothing beyond that in writing from
13  Mr. Perry on the issue?
14      A   No.
15      MR. NUTI:  I have no other questions.
16          EXAMINATION
17  BY MR. PETERSEN:
18      Q   Mr. Nutley, I just have a few questions.  If
19  you could look back at Exhibit 75.  This is the series
20  of e-mails dated in April of 2009.
21      A   Yes.
22      Q   Have you got that in front of you?
23      A   Yes.
24      Q   Have you ever seen any of these before?
25      A   No.

Page 100

1      Q   I just wanted to be clear about that.
2      MR. PETERSEN:  I would like to mark this as next.
3  It may have been marked in another deposition.
4      MR. CHRISTMAS:  This is going to be 94.  No, no.
5  It's 95.
6          (Deposition Exhibit 95 marked.)
7  BY MR. PETERSEN:
8      Q   The document that has been marked as
9  Exhibit 95, Mr. Nutley, is a one-page document, and it
10  looks like there are two e-mails on there, the first
11  being at the bottom from Mr. McCormick, apparently to
12  you, and then one at the top.
13          Would you look at this and tell me if you've
14  ever seen this before.
15      A   Yes.
16      Q   You recall receiving the e-mail from
17  Mr. McCormick?
18      A   Yes.
19      Q   And that's your response to him on
20  December 17?
21      A   Yes.
22      Q   Okay.  And you wrote there, "Yes, transfer
23  needs to be effective 11-1-06," correct?
24      A   Yes.
25      Q   What did you mean by that statement?

Page 101

1      A   That the transfer of the shares and the
2  interco receivables needed to be effective
3  November 1st, 2006.
4      Q   Why did you believe they needed to be
5  effective November 1, 2006?
6      A   To accomplish the company's strategy of not
7  having to consolidate the Cedenco entities in the
8  June 30, 2007, financial statements.
9      Q   So if the transfer had been effective at any
10  date after November 1, 2006, then it would have had to
11  have been reflected in the consolidated financial
12  statements?
13      A   Any activity of the underlying subsidiaries
14  after October 31st, 2006, would then have to be
15  consolidated because the ownership still existed in
16  your hypothetical.
17      Q   Okay.  If could you look back at Exhibit 56,
18  which is the Moss-Adams final report.  Do you have
19  that in front of you now?
20      A   Yes.
21      Q   On page 8, I think Mr. Christmas was asking
22  you some questions about the third paragraph there.
23  And maybe two sentences -- or three sentences from the
24  bottom of that paragraph, where it says, "The
25  partnership distributed the investments in foreign

26 (Pages 98 to 101)

BMO 001983

e8816721-bbfc-4f39-a3a6-e801e7b4f481

DAN  NUTLEY - 8/18/2011

Page 102

1 subsidiaries to the partners effective November 1,
2 2006, and sold the partnership's intercompany
3 receivables to a revocable trust with common ownership
4 of the partnership."
5      You recall he asked you questions about that?
6    A  Yes.
7    Q  This is the same point you were describing in
8 the e-mail of Exhibit 95 that we were just looking at;
9 is that correct?
10   A  The effective date, yes.
11   Q  Mr. Christmas asked you, with regard to this
12 document, about what you had been provided from the
13 company that reflected or verified this transfer
14 effective November 1, 2006.  Do you recall those
15 questions?
16   A  Yes.
17   Q  And I know you said that adjusting journal
18 entries and that you spoke to management, and the
19 financial statements themselves; is that correct?
20   A  Yes, and the client representation letter.
21   Q  Right, the client representation letter.  Was
22 that, from your perspective, satisfactory for what you
23 needed to be comfortable about the effectiveness of
24 that transaction?
25   A  Yes.

Page 103

1    MR. PETERSEN:  I have nothing further.
2    MR. CHRISTMAS:  Nothing else.
3    THE REPORTER:  Did anybody want copies?
4    MR. NUTI:  Yes.
5    MR. CHRISTMAS:  Off the record.
6    MR. KALLANDER:  Mr. Nutley will review and sign
7 the deposition.
8    MR. PETERSEN:  Copy, please.
9    MR. KALLANDER:  I do not need a copy.
10   MR. LEWIS:  Pat Lewis from Bank of Montreal.  I
11 would like a copy of the transcript, please.
12 //
13 //
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1
2
3
4
5
6
7
8
9
10     I, DAN NUTLEY, do hereby declare under
11 penalty of perjury that I have read the foregoing
12 transcript; that I have made any corrections as appear
13 noted, in ink, initialed by me, or attached hereto; that
14 my testimony as contained herein, as corrected,
15 is true and correct.
16     EXECUTED this _____ day of _____,
17 20___, at _____, _____.
         (City)        (State)
18
19
20
21
22     _____
       DAN NUTLEY
23
24
25

Page 105

1      I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken
4 before me at the time and place herein set forth; that
5 any witnesses in the foregoing proceedings, prior to
6 testifying, were duly sworn; that a record of the
7 proceedings was made by me using machine shorthand which
8 was thereafter transcribed under my direction; that the
9 foregoing is a true record of the testimony given.
10      Further, that if the foregoing pertains to
11 the original transcript of a deposition in a Federal
12 Case, before completion of the proceedings, review of
13 the transcript [X] was [ ] was not requested.
14      I further certify that I am neither
15 financially interested in the action nor a relative or
16 employee of any attorney or party to this action.
17      IN WITNESS WHEREOF, I have this date
18 subscribed my name.
19
20 DATED: _____
21
22
23     _____
       JODI L. BOSETTI
24     CSR NO. 11316, RPR
25

27 (Pages 102 to 105)

BMO 001984

e8816721-bbfc-4f39-a3a6-e801e7b4f481

version 07-01

**SK Foods, LP**
**A-07 Engagement Review Memo - Audit v07-01**
**June 30, 2007**

We have re-read the planning memorandum and reviewed the working papers, including programs and questionnaires, related to the critical audit areas and unusual accounting matters in connection with our audit of the consolidated financial statements of SK Foods LP and subsidiaries for the year ended June 30, 2007.

## Changes Subsequent to Planning

There have been no significant changes to the audit plan subsequent to planning.

## Delegation of Engagement Review

Significant portions of the review was delegated by the Engagement Reviewer, Mr. Nutley, to Mr. Roger Coutts. Due to scheduling conflicts and client delays, certain work was completed by Roger, and reviewed by Dan. This work did not impact his role in delegated engagement review.

## Consideration of Fraud Risk Factors

During the planning, we identified fraud risk factors relating to covenant compliance (fraud risk financial reporting). We also identified inherent risk factors in revenue recognition (bill and holds, although typical for industry), inventory, the natural related party transactions from integrated operations and client turnover. As result of the identification of these risk factors, our overall response was to increase the involvement of the audit senior manager in all phases, and set tolerable errors and scopes at a lower level. The detail procedures documented in SAS 99 memo were completed as planned.

## Critical Audit Areas Including Significant Findings or Issues

As anticipated, the critical audit areas were AR and revenue, inventories, FIN46(R) and bank financing.

For AR, we sent confirms of individually significant (ISI) customers balances with $9.8 million (40% of trade AR total $21 mil) and CMA sampled another 34 on invoice item basis. We received 1 of ISI and 29 of the sample confirms (exceptions not significant, differences were tested or projected as errors). Alternative procedures performed on all non-responses, primarily to cash receipts. The 2 ISI non-response customers, Kraft and B & G Foods, totaled $4.3 million. We tested subsequent cash receipts for substantially all of these 2 balances. We concluded the results were sufficient to support AR. SK does not typically have an allowance for bad debts. We tested total AR subsequent cash receipts on some of the more significant balances outstanding greater than 60 days (approx $1.7 million or 9% of trade A/R). A/R turn remains fairly consistent and 90% is less than 30 days outstanding, there does not appear to be any material collection issues.

For Revenue, there are significant Bill & Hold (B&H) contracts for bulk paste and diced tomato product, which is very typical for this industry. This activity is generally focused after the packing season in October. Per our expectations there was still bill and hold inventory on hand and bill and hold receivables recorded as of October 2006 had been collected. There were no significant new bill and hold contracts subsequent to October 2006. MA sent confirmations to customers confirming bill and hold inventory on hand to test for understatement of the customers inventory. In addition to the significant cash receipt testing above, we examined contracts and evaluated revenue recognition as proper under GAAP guidance. We also examined the major packaged products contracts (eg cans, plastic and glass processed tomato sauces and salsa's). Analytical procedures included comparison to volumes in inventory rollforwards and

Page 1 of 3

MA00000036

EXHIBIT NO. 20
8-18-11
J. BOSETTI, CSR 11316
Nutley

pricing to contracts and invoices.

For Inventory, we observed client counts at all 3 SK locations on various dates subsequent to year-end. We did not observe at year-end because the client did not decide to change their year-end until after June 30, 2007. MA went out and made test counts and then reconciled them to inventory counts as of the date of the observation. Then MA was able to roll back inventory to June 30, 2007. Due to the confusion surrounding the inventory counts MA took many additional counts and observed 100% of the Lemoore location.

We compared valuation of finished goods to last years audit work. There was minimal production after 10/31/07. As expected, costs of finished goods were consistent with 10/31/07 valuation. Each years pack is substantially completed by 10/31 each year. Cans and plastic are packaged from the pack through the year. Overhead from 11/1 to 6/30 of the processing facilities is primarily preparation for the next seasons pack starting in the summer. The Company accumulates these cost in the excel costing model. Some costs are charged to the period with the majority carried on the balance sheet as unapplied overhead. We compared costs accumulated to general ledger accounts and prior year costs and found them consistent. We tested recoverability of unapplied overhead by reviewing prior year revenue and costs. Current year costs would have been recoverable based on historical experience and market for bulk tomato products has risen for the 2007 pack. We concluded unapplied overhead costs would be recovered from 2007 pack.

A full analysis of the Company's relationships for FIN46(R) was performed in the prior year. The client completed analysis of the Farms Group, concluding while they were VIE's, the owners (Scott Salyer and daughter trusts) were the primary beneficiaries, not SK. We concurred and obtained Admin consultation. Colusa and Aviation were concluded to be VIE's with SK as the primary beneficiary and were consolidated. There have been no significant reconsideration events in the current year that would cause consolidation under FIN 46(R).

Effective November 1, 2006 the Company distributed their investments in the New Zealand and Australia subsidiaries to the Partners at the carrying value of the investments. In addition, the Company sold receivables due from the subsidiaries to a revocable trust. See analysis at A-19.05.

Subsequent to year-end the Company entered into an Amended and Restated credit agreement with Harris Bank. The new amendment increased both the term loan and the revolver to $100,000,000 and modified the covenant requirements. We obtained the new agreements and disclosed the subsequent event in the footnotes to the financial statements.

## Unusual Accounting Matters

Due to client staffing issues and workload, a high number of adjustments were identified during the audit. Most related to inventory and majority were identified by the client during their closing process. Most all audit identified adjustments were made. We concluded client was able to accomplish accurate reporting and our audit work was sufficient to identify material errors.

## Control Deficiencies Identified

During the course of the audit we encountered several audit adjustments and passed audit adjustments. These adjustments were the result of three observations, there is not a CFO, there is not enough qualified accounting staff and over reliance on Excel spreadsheets. All of these matters were deemed to be material weaknesses and were reported in the SAS 112 letter.

## Final Materiality Judgment

Page 2 of 3

MA00000037

The preliminary estimate of materiality for planning purposes was $750,000. This amount remains appropriate for a final judgment of materiality.

### Passed Adjustments

As detailed on A-03.01, the audit disclosed possible adjustments not made that, if recorded, would increase net income $564k (including reversals from prior year), decrease current assets $781k, decrease non-current assets by $272k and decrease current liabilities by $317k. The client has decided not to record these differences on the basis the effect is not material. We concur in that conclusion. Our evaluation included an acknowledgment of Firm policy at AS 140 and consideration whether the individual and cumulative effect of the passed adjustments and unposted differences represented potential reportable conditions or evidence a fraud may exist (we concluded they did not).

### Final Analytical Review

We have analytically reviewed the final financial statements and believe they conform to our expectations and indicate no usual relationships or results that have not been subjected to appropriate audit procedures.

### Consultation

Consultation was performed for the EDP review performed by Northwest Consulting summarized at A-18. There were no other transactions or circumstances that required consultation pursuance to QC 140B.

### Conclusion

Based on our review, we are satisfied that the working papers were adequately prepared and reviewed and that they support our unqualified opinion on the consolidated financial position of SK Foods LP and subsidiaries as of June 30, 2007 and the results of operations and cash flows for the period then ended in compliance with Firm and professional standards.

|  | Name | Date |
|---|---|---|
| Preparer: | /s/ Roger Coutts | 1/10/08 |
| In Charge: | /s/ | |
| Engagement Reviewer: | /s/ Dan Nutley | 1/10/08 |
| Concuring Reviewer: | /s/ Randy Fenich | 1/14/08 |
| Other Reviewer: | /s/ | |

Page 3 of 3

MA00000038

BMO 001987

January 15, 2008

Moss Adams LLP
3121 March Lane
Stockton, California

We are providing this letter in connection with your audit of the consolidated balance sheet of SK Foods, LP (a California limited partnership), and its subsidiaries (collectively, the "Company"), as of June 30, 2007 and for the eight month period then ended for the purpose of expressing an opinion as to whether the consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of SK Foods, LP and its subsidiaries in conformity with accounting principles generally accepted in the United States of America. We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, as of the date of this letter, the following representations made to you during your audit.

1.  The financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America.

2.  We have made available to you all—

    a.  Financial records and related data.

    b.  Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

3.  There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices, except as discussed in number 15 under bank compliance.

4.  There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5.  We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

6.  We have no knowledge of any fraud or suspected fraud affecting the entity involving—

EXHIBIT NO. 57
8-18-11
J. BOSETTI, CSR 11316

MA00000039

Moss Adams LLP
Page 2

    a. Management,

    b. Employees who have significant roles in internal control, or

    c. Others where the fraud could have a material effect on the financial statements.

7. We have no knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators or others.

8. The Company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities, except the subsequent bank refinancing discussed below.

9. We believe that the effects of the uncorrected financial statement misstatements summarized in the schedule below are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

### SUMMARY OF UNCORRECTED FINANCIAL STATEMENT MISSTATEMENTS

| Account # | Account Description | Debit | Credit |
|---|---|---|---|
| **Proposed JE # 1** | | | |
| To pass on recording an adjustment for $60K known and $562,500 projected errors of expense improperly recorded to CIP. | | | |
| 5470-01-590 | RENT/LEASE-GENERAL | 622,500 | |
| 1520-00-000 | CONSTRUCTION IN PROGRESS | | 622,500 |
| Total | | 622,500 | 622,500 |
| | | | |
| **Proposed JE # 6** | | | |
| To pass on an adjustment to legal expense for refund received from O'Melveny & Myers in Aug 2007. | | | |
| 1205-00-000 | ACCOUNTS RECEIVABLE | 122,321 | |
| 8720-80-800 | LEGAL SERVICES -GENERAL | | 122,321 |
| Total | | 122,321 | 122,321 |
| | | | |
| **Proposed JE # 20** | | | |
| To pass on write-off of various accrued receivables. | | | |
| 4000-50-000 | PRODUCT SALES - FOB PLANT | 482,560 | |
| 1130-00-000 | ACCOUNTS RECEIVABLE | | 482,560 |
| Total | | 482,560 | 482,560 |
| | | | |
| **Proposed JE # 25** | | | |
| To pass on recording an adjustment to write off receivable from Lidestri resulting from product claim/return. | | | |
| 4160-50-000 | CLAIMS & ALLOWANCES | 56,000 | |
| 1200-00-000 | ACCOUNTS RECEIVABLE | | 56,000 |
| Total | | 56,000 | 56,000 |

MA00000040

Moss Adams LLP
Page 3

### SUMMARY OF UNCORRECTED FINANCIAL STATEMENT MISSTATEMENTS-continued

| Account # | Account Description | Debit | Credit |
|---|---|---|---|
| **Proposed JE # 26** | | | |
| To pass on recording S&H sales made to Michelina's in July that should have been recorded as of 6/30/07 | | | |
| 1200-00-000 | ACCOUNTS RECEIVABLE | 652,400 | |
| 4200-50-000 | COGS COMMODITY - PLANT | 319,836 | |
| 4200-51-000 | COGS COMMODITY - PLANT | 108,579 | |
| 1328-00-000 | FG INV OP OVERHEAD @ STD | | 428,415 |
| 4000-50-000 | PRODUCT SALES - FOB PLANT | | 121,866 |
| 4000-51-000 | PRODUCT SALES - FOB PLANT | | 530,534 |
| Total | | 1,080,815 | 1,080,815 |
| **Proposed JE # 27** | | | |
| To pass on recording an entry to accrue invoices in accordance with GAAP related to services and goods received during the month of June but that were not recorded in the G/L until July. | | | |
| 1315-00-000 | UNAPPLIED OVERHEAD | 155,956 | |
| 2130-00-000 | ACCOUNTS PAYABLE - ACCRUED | | 155,956 |
| Total | | 155,956 | 155,956 |
| **Proposed JE # 28** | | | |
| To pass on recording an adjustment to eliminate liability related to the issuance of the 6/30/07 payroll that should have been posted when payroll checks were issued on 6/29. | | | |
| 2200-00-000 | ACCRUED PAYROLL | 687,196 | |
| 1019-00-000 | SKF PR-BKWEST-087000774 | | 473,202 |
| 1460-00-000 | FRINGE PROVISION | | 213,994 |
| Total | | 687,196 | 687,196 |
| **Proposed JE # 29** | | | |
| CCC PAJE entry to pass on reversing travel expense that should not have been expensed in fiscal period 2007 | | | |
| 1418-00-000 | PRE-PAID TRAVEL SERVICES | 107,500 | |
| 8441-80-800 | TRAVEL SERVICES | | 107,500 |
| Total | | 107,500 | 107,500 |
| **Proposed JE # 30** | | | |
| To pass on adjusting ending SK bulk paste inventory for an unidentified variance in her unit cost (year-end versus beginning of year) | | | |
| 4200-50-000 | COGS COMMODITY - PLANT | 351,650 | |
| 1320-00-000 | FG INV COMMODITY @ STD | | 351,650 |
| Total | | 351,650 | 351,650 |

MA00000041

Moss Adams LLP
Page 4

**SUMMARY OF UNCORRECTED FINANCIAL STATEMENT MISSTATEMENTS-continued**

| Account # | Account Description | Debit | Credit |
|---|---|---|---|
| **Proposed JE # 31** | | | |
| To pass on recording an adjustment to write-off accounts receivable at 9/30/07 related to customer short pays (B&G and Kraft) that were written off subsequent to year end. | | | |
| 4160-50-000 | CLAIMS & ALLOWANCES | 26,940 | |
| 1200-00-000 | ACCOUNTS RECEIVABLE | | 26,940 |
| Total | | 26,940 | 26,940 |
| **Proposed JE # 36** | | | |
| To pass on recording the fair value of the BMO interest rate swap. | | | |
| 1710-50-000 | OTHER LONG TERM ASSETS | 351,000 | |
| 9960-80-900 | OTHER MISCELLANEOUS INCOME | | 351,000 |
| Total | | 351,000 | 351,000 |

MA00000042

Moss Adams LLP
Page 5

10. The following have been properly recorded or disclosed in the financial statements:

    a.  Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties.

    b.  Guarantees, whether written or oral, under which the Company is contingently liable.

    c.  Significant estimates and material concentrations known to management that are required to be disclosed in accordance with the AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties*. [Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.]

       Significant estimates include the allowance for doubtful accounts and accrued losses under contractual sales commitments. Material concentrations include certain customer sales and accounts receivable.

11. We are responsible for the fair presentation of the additional consolidating information accompanying the basic consolidated financial statements that are presented for the purpose of additional analysis of the basic financial statements.

12. There are no—

    a.  Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b.  Possible illegal acts brought to the attention of management.

    c.  Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Financial Accounting Standards Board (FASB) Statement No. 5, Accounting for Contingencies.

    d.  Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by FASB Statement No. 5.

13. The Company is party to various legal matters arising in the normal course of business. Management does not believe the outcome of these matters will have a material adverse effect on the Company's financial position or results of operations. Management believes the RICO claims have no merit and will vigorously defend the Company against such claims.

14. The Company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, except as disclosed in the financial statements under debt and leases.

MA00000043

Moss Adams LLP
Page 6

15. The Company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance, except for the following:

As of June 30, 2007, the Company was out of compliance with loan covenants. Subsequent to year-end the Company entered into an Amended and Restated Credit Agreement, dated September 28, 2007, increasing the loan commitment and modifying the loan covenants. As of the date of this letter, the Company is in compliance with the loan covenants as specified in the September 28, 2007 amendment.

16. We have disclosed to you any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal year ended June 30, 2007 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

17. With regard to the fair value measurements and disclosures of certain assets, liabilities, and specific components of equity, we believe that:

   a. The measurement methods, including the related assumptions, used in determining fair value were appropriate and were consistently applied.

   b. The completeness and adequacy of the disclosures related to fair values are in conformity with accounting principles generally accepted in the United States of America.

   c. No events have occurred subsequent to June 30, 2007 that requires adjustment to the fair value measurements and disclosures included in the financial statements.

18. The Company, using its best estimates based on reasonable and supportable assumptions and projections, reviews for impairment of long-lived assets in accordance with FASB Statement No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, and goodwill and certain intangible assets in accordance with FASB Statement No. 142, *Goodwill and Other Intangible Assets*. The financial statements referred to above reflect all adjustments required by FASB Statements 144 and 142 as of June 30, 2007.

19. The cost method is used to account for the Company's investment in a captive insurance company because the Company does not have the ability to exercise significant influence over the investee's operating and financial policies. All related worker's compensation liabilities have been properly recorded. All relevant commitments and contingencies under the captive insurance arrangement have been disclosed.

20. The Company adopted FASB Interpretation ("FIN") 46(R) , *Consolidation of Variable Interest Entities*, as of November 1, 2005. We have evaluated all financial interests and contractual arrangements with related parties, de facto agents and other entities under FIN 46(R). We have considered both implicit and explicit variable interests in (a) determining whether potential variable interest entities (VIE) should be considered VIEs, (b) considering expected losses and residual returns, and (c) determining which party, if

MA00000044

Moss Adams LLP
Page 7

any, is the primary beneficiary.

We determined that Colusa County Canning and SK Aviation are variable interest entities and the Company is the primary beneficiary, and these entities have been properly consolidated in the financial statements as of June 30, 2007.  We determined that the Company holds variable interests in SS Farms, LLC, SSC Farming, LLC, SS Farms Australia Pty. Ltd., Blackstone Ranch, and Central Valley Shippers and that the Company's partners or related trusts are the primary beneficiaries of these entities. All information regarding these VIEs and transactions with these VIE's have been properly recorded and disclosed in the financial statements.  We determined the Company has no variable interest in Salyer American Fresh Foods.

We have made available all relevant information about financial interests and contractual arrangements with related parties, de facto agents and other entities, including but not limited to, their governing documents, equity and debt instruments, contracts, leases, guarantee arrangements, and other financial contracts and arrangements. The information we provided about financial interests and contractual arrangements includes information about all transactions, unwritten understandings, agreement modifications, and written and oral side agreements, if any.

Regarding entities in which the Company has variable interests (implicit and explicit), we have considered and provided all information about events and changes in circumstances that could potentially cause reconsideration about whether the entities are VIEs or whether the Company is the primary beneficiary or has a significant variable interest in the entity.

We have distributed our investments in foreign subsidiaries (Cedenco entities) to the partners and sold the net related intercompany receivables to a revocable trust with common ownership with the Company effective November 1, 2006. We determined that the Company dos not have a variable interest in the Cedenco entities.

The related party receivable from the sale of the Cedenco intercompany receivables is an asset of future benefit to the Company. The revocable trust and its grantor have sufficient assets to support the receivable.

21. Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, line of credit, or similar arrangements have been properly disclosed in the financial statements.

22. Financial instruments with significant individual or group concentration of credit risk have been appropriately identified, properly recorded, and disclosed in the financial statements.

23. The Company believes that it has properly identified all derivative instruments and any embedded derivative instruments that require bifurcation.  The only derivatives consist of the Partnership's interest rate swap. This derivative instrument is not afforded hedge accounting treatment as outlined in SFAS No. 133 and, as a result, the changes in the fair

MA00000045

Moss Adams LLP
Page 8

value of the contract is recorded directly to earnings and is included in other income/expenses. The fair value of the derivative instrument as reflected in the accompanying consolidated balance sheets as of June 30, 2007, is $119,000 for the swap, which is included in prepaid and other current assets. The fair values of this instrument has been determined based on prevailing market prices or by using financial models that we believe are the most appropriate models for valuing such instruments and that incorporate market data and other assumptions that we have determined to be reasonable and appropriate at June 30, 2007.

24. Receivables recorded in the financial statements represent valid claims against debtors for sales or other charges arising on or before the balance-sheet date and have been appropriately reduced to their estimated net realizable value.

25. Provision has been made to reduce excess or obsolete inventories to their estimated net realizable value. The unapplied overhead of $30,637,000 included in inventory is recoverable from the sale of the 2007 crop. All inventories are the property of the Company and do not include any items consigned to it, any items billed to customers, or any items for which the liability has not been recorded.

26. We believe that all expenditures that have been deferred to future periods are recoverable.

27. We do not have (a) asserted and unsettled income tax contingencies, or (b) unasserted income tax contingencies caused by uncertain tax positions taken in our income tax returns filed with the Internal Revenue Service and state, local, and foreign tax authorities that are probable of assertion by such tax authorities under the provisions of FASB Statement No. 5, *Accounting for Contingencies*. Furthermore, we have not received either written or oral tax opinions that are contrary to our assessment.

28. We have no intention of terminating our 401(k) plan or taking any other action that could result in an effective termination or reportable event for the plan. We are not aware of any occurrences that could result in the termination of our 401(k) plan to which we contribute.

29. No provision is necessary for any loss to be sustained in the fulfillment of, or from inability to fulfill, any sales commitments at June 30, 2007. We also estimate no loss accrual is necessary for certain customers who are not expected to enforce the contractual quantity or who will allow fulfillment from future crop production. We believe the costs of the future crop production will not exceed the market value for these contracts.

30. No provision is necessary for any loss to be sustained as a result of purchase commitments for inventory quantities in excess of normal requirements or at prices in excess of the prevailing market prices.

31. Provision has been made for losses to be sustained in the fulfillment of, or from inability to fulfill, any commitments to purchase or sell securities under forward-placement, financial futures contracts, and standby commitments - none.

MA00000046

Moss Adams LLP
Page 9

32. We have fully disclosed to you all sales terms, including all rights of return or price adjustments and all warranty provisions.

33. All documentation related to sales transactions is contained in customer files. We also confirm that:

    a.  We are not aware of any "side agreements" with any companies that are inconsistent with the applicable sales agreement, the customer's purchase order, sales invoice, or any other documentation contained in the customer's file. For the purposes of this letter, a "side agreement" is any agreement, understanding, promise, or commitment [whether written (e.g., in the form of a letter or formal agreement or in the form of any exchange of physical or electronic communications) or oral] by or on behalf of the Company (or any subsidiary, director, employee, or agent of the Company) with a customer from whom revenue has been recognized that is not contained in the written purchase order from the customer or sales order confirmation and sales invoice of the Company delivered to or generated by the Company's Accounting and Finance Department. The definition of a side agreement is not limited by any particular subject matter. For purposes of example only, any agreement not contained in the written purchase order from the customer or sales order and sales invoice of the Company that relates to return rights, acceptance rights, future pricing, payment terms, free consulting, free maintenance, or exchange rights would be a side agreement.

    b.  We are not aware of any commitments or concessions to a customer regarding pricing or payment terms outside of the terms documented in the customer's file.

34. The Company has identified all intercompany inventories and such inventories have been properly eliminated for financial consolidation purposes.

35. The Company has identified all intercompany transactions and any profit or loss as a result of intercompany transactions has been eliminated for financial statement consolidation purposes.

36. The Company has contracts with certain customers which require delivery of a specified amount of product. Customers determine delivery schedules based on their needs. These sales are recognized when title and risk of loss transfer to the customer, even though delivery may not have occurred.

37. In September 2007, SK Aviation purchased a new plane for approximately $15,000,000. SK Aviation financed $12,500,000 of the purchase price with a note maturing in 2019. In May 2007, SK Aviation sold a plane for approximately $11,500,000, at a gain of approximately $2,700,000. The sale proceeds were used to payoff the plane's related debt and as a deposit on the new aircraft. The related guarantee by the Partnership was cancelled.

38. We have changed our fiscal year end to June 30 effective November 1, 2006.

MA00000047

Moss Adams LLP
Page 10

Other than those described above, as disclosed in Notes to the financial statements, to the best of our knowledge and belief, no events have occurred subsequent to the balance-sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned financial statements.

_____
Scott Salyer, Chief Executive Officer and President


_____
Mark McCormick, Executive Vice President


_____
Shondale Seymour, Interim Chief Financial Officer

MA00000048

# EXHIBIT 11

BMO 001998

# In The Matter Of:

## *CEDENCO JV AUSTRALIA PTY LTD*

---

## *SCOTT DYE - Vol. I*
### *August 16, 2011*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


In re:                            )
                                  ) NO. 10-35002
CEDENCO JV AUSTRALIA PTY LTD, et  )
al, (In Liquidation),             ) Chapter 15
                                  )
    Debtors in Foreign Proceedings. )
_____ )


                    ---oOo---


 Fresno, California                    August 16, 2011


        The deposition of SCOTT DYE was taken in the

above-entitled matter pursuant to all of the provisions

of law pertaining to the taking and use of depositions

before Amanda Scott, CSR, with offices at Fresno,

California, commencing at the hour of 2:22 p.m. at the

law offices of McCormick, Barstow, Sheppard, Wayte &

Carruth, 5 River Park Place East, Fresno, California.

SCOTT DYE - 8-16-2011

Page 2

1                    INDEX
2
3    EXAMINATION                          PAGE
4    By Mr. Christmas                      5
5    By Ms. Woodruff                      49
6    By Mr. Nuti                          60
7    By Mr. Dreher                        65
8    Further Examination By Mr. Christmas  70
9    By Mr. Nicholson                     74
10
11   EXHIBITS
12   NO.     DESCRIPTION                  PAGE
13   1       Deposition Notice             5
14   2-37    (Skipped)
15   38      Work Paper                   27
16   39      Trial Balance of SK Foods LP  31
17   40      (Skipped)
18   41      Analysis of Intercompany Receivables  35
19   42      Financial Statements         38
20   43-48   (Skipped)
21   49      March 22, 2009 Letter From
             J. Scott Bristol             40
22
             50-67   (Skipped)
23
     68      April 23, 2009 Letter From
24           J. Scott Bristol             44
25   69      SK Foods Reconciliation      56

Page 3

1                INDEX CONTINUED
2
3    EXHIBITS
4    NO.     DESCRIPTION                  PAGE
5    70      December 18, 2007 Letter From Gary Perry  61
6    71      January 14, 2008 Letter From Gary Perry   62
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1    APPEARANCES OF COUNSEL:
2    FOR THE SALYER ENTITIES:
3        FARELLA, BRAUN & MARTEL
         Attorneys at Law
4        235 Montgomery Street
         San Francisco, California 94104
5        (415) 954-4400
         kwoodruff@fbm.com
6        BY:  KELLY A. WOODRUFF
7    FOR THE LIQUIDATORS:
8        NIXON PEABODY LLP
         Attorneys at Law
9        437 Madison Avenue
         New York, New York 10022
10       (212) 940-3000
         rchristmas@nixonpeabody .com
11       BY:  ROBERT N.H. CHRISTMAS
12   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
13       DOWNEY BRAND
         Attorneys at Law
14       621 Capitol Mall, 18th Floor
         Sacramento, California 95814
15       (916) 520-5478
         jdreher@downeybrand.com
16       BY:  JAMIE P. DREHER
17   FOR BRAD SHARP:
18       SCHNADER, HARRISON, SEGAL & LEWIS
         Attorneys at Law
19       One Montgomery Street, Suite 2200
         San Francisco, California 94104
20       (415) 364-6717
         gnuti@schnader.com
21       BY:  GREGORY C. NUTI
22   FOR THE BANK OF MONTREAL:
23       CHAPMAN & CUTLER
         Attorneys at Law
24       111 West Monroe Street
         Chicago, Illinois 60603
25       (312) 845-3010

Page 5

1            BY:  SCOTT LEWIS
2    FOR THE WITNESS:
3        McCormick, Barstow, Sheppard, Wayte & Carruth
         Attorneys at Law
4        5 River Park Place East
         Fresno, California 93720
5        (559) 433-1300
         benjamin.nicholson@mccormickbarstow.com
6        BY:  BENJAMIN T. NICHOLSON
7    Also Present:  John Sheahan
8            ---oOo---
9            SCOTT DYE,
10   called as a witness herein, having
11       been heretofore duly sworn,
12         testified as follows:
13           ---oOo---
14   (Exhibit 1 was marked for identification.)
15       EXAMINATION BY MR. CHRISTMAS
16       Q.  Good morning, Mr. Dye.  My name is
14:22  17   Robert Christmas, I'm with Nixon Peabody.  I'm counsel to
14:22  18   Mr. Sheahan, who's sitting to my right, as well as
14:22  19   Ian Lock, who's the other liquidator in these chapter 15
14:22  20   bankruptcy proceedings.
14:22  21       Just as a preliminary, have you ever been
14:22  22   deposed before?
14:22  23       A.  Yes, I have.
14:22  24       Q.  So you understand the procedure, that we can't
14:22  25   talk at the same time, court reporter can't take it down,

2 (Pages 2 to 5)

Merrill Corporation - San Francisco
800-869-9132                    www.merrillcorp.com/law
BMO 002001
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

**Page 6**

| | | |
|---|---|---|
| 14:22 | 1 | two people talking at once. So if you would, for |
| 14:22 | 2 | example, wait until the end of my question, you may |
| 14:22 | 3 | anticipate what my question is, but it may not turn out |
| 14:23 | 4 | to be that way, so in order to keep the record clear if |
| 14:23 | 5 | you would let me finish my questions before you answer, |
| 14:23 | 6 | that will help. |
| 14:23 | 7 | Also, the court reporter can't take down nods, |
| 14:23 | 8 | so you have to answer "yes" or "no," answer verbally |
| 14:23 | 9 | rather than by gestures. |
| 14:23 | 10 | Also, are you taking any medication today that |
| 14:23 | 11 | would interfere with your ability to remember events? |
| 14:23 | 12 | A. No, I am not. |
| 14:23 | 13 | Q. Or tell events? |
| 14:23 | 14 | A. No. |
| 14:23 | 15 | Q. And do you suffer from any physical condition |
| 14:23 | 16 | that affects your memory? |
| 14:23 | 17 | A. No. |
| 14:23 | 18 | Q. Now, in front of you should be Exhibit 1. |
| 14:23 | 19 | MR. NICHOLSON: I'm sorry. Mr. Christmas, were |
| 14:23 | 20 | you handing this to me for us to share? |
| 14:23 | 21 | MR. CHRISTMAS: No, no. He has the original in |
| 14:23 | 22 | front of him. |
| 14:23 | 23 | BY MR. CHRISTMAS: |
| 14:23 | 24 | Q. At the top is the notice of deposition, which |
| 14:23 | 25 | you probably haven't seen before, with the second part of |

**Page 7**

| | | |
|---|---|---|
| 14:23 | 1 | the exhibit as the subpoena. |
| 14:23 | 2 | Have you seen that document before? |
| 14:24 | 3 | A. Actually, I have seen the notice of deposition. |
| 14:24 | 4 | I don't recall seeing the subpoena specifically, no. I |
| 14:24 | 5 | think Mr. Nicholson has conveyed to me the requirements |
| 14:24 | 6 | of the subpoena. |
| 14:24 | 7 | Q. So you're aware that documents were required to |
| 14:24 | 8 | be produced pursuant to the subpoena? |
| 14:24 | 9 | A. I believe so, yes. |
| 14:24 | 10 | Q. And were you involved in the search for those |
| 14:24 | 11 | documents? |
| 14:24 | 12 | A. Yes, I was. |
| 14:24 | 13 | Q. And who else was involved? |
| 14:24 | 14 | A. Tracy Garone, our audit partner. |
| 14:24 | 15 | Q. And what types of locations of documents did |
| 14:24 | 16 | you search for responsive documents? |
| 14:24 | 17 | A. Ms. Garone searched through all the documents |
| 14:24 | 18 | she had in relationship to the audit that had been done |
| 14:24 | 19 | for SK Foods. She also searched through her entire |
| 14:24 | 20 | string of e-mails that she received through SK. In |
| 14:24 | 21 | addition, I have gone through e-mails and -- work-related |
| 14:25 | 22 | to agreed upon procedures. |
| 14:25 | 23 | Q. And the nature of the repository of the audit |
| 14:25 | 24 | file, how do you maintain that? |
| 14:25 | 25 | A. Most of that I think is still in hard copy. |

**Page 8**

| | | |
|---|---|---|
| 14:25 | 1 | Q. Were any of the documents that you produced, |
| 14:25 | 2 | other than e-mail, I'll get to e-mail in a second, were |
| 14:25 | 3 | retained in a non-hard-copy form? |
| 14:25 | 4 | A. Yes, they were. |
| 14:25 | 5 | Q. And how do they achieve that status? Do you |
| 14:25 | 6 | scan them? |
| 14:25 | 7 | A. I believe they were just produced within the |
| 14:25 | 8 | computer or transferred electronically in some fashion on |
| 14:25 | 9 | the drive that we provided you today. There are, I |
| 14:25 | 10 | believe, some Excel files. |
| 14:25 | 11 | Q. And so the people, the custodians of e-mails |
| 14:26 | 12 | who were searched were Ms. Garone and your e-mail inbox? |
| 14:26 | 13 | A. Correct. |
| 14:26 | 14 | Q. Anyone else's e-mail inbox? |
| 14:26 | 15 | A. She may have required Mr. Bristol, his e-mails, |
| 14:26 | 16 | to obtain additional e-mails from when she was first |
| 14:26 | 17 | asked to search the records. |
| 14:26 | 18 | Q. For the record, some documents were just |
| 14:26 | 19 | produced to us prior to the commencement of the |
| 14:26 | 20 | deposition. Can you tell me how those documents came to |
| 14:26 | 21 | light? |
| 14:26 | 22 | A. I was reviewing additional e-mails regarding |
| 14:26 | 23 | another matter and noticed one referencing a document, |
| 14:26 | 24 | and I went to the files and found that document. |
| 14:26 | 25 | Q. Which files are those? |

**Page 9**

| | | |
|---|---|---|
| 14:26 | 1 | A. Those are the electronic files. |
| 14:26 | 2 | Q. The electronic files, okay. So there's a hard |
| 14:26 | 3 | copy file and there's also a virtual file, if you will? |
| 14:26 | 4 | A. I believe most of the audit work papers are in |
| 14:26 | 5 | a hard copy file, and then there was other files for |
| 14:27 | 6 | other procedures that were to be worked on. |
| 14:27 | 7 | Q. Okay. And the other files are the ones that |
| 14:27 | 8 | are stored electronically? |
| 14:27 | 9 | A. Correct. |
| 14:27 | 10 | Q. Okay. If I could just ask you now a few |
| 14:27 | 11 | questions about your background. What post high school |
| 14:27 | 12 | degrees do you have? |
| 14:27 | 13 | A. I have a degree in business, emphasis on |
| 14:27 | 14 | accounting. |
| 14:27 | 15 | Q. And from what institution? |
| 14:27 | 16 | A. California State University of Chico. |
| 14:27 | 17 | Q. And what year were you awarded that degree? |
| 14:27 | 18 | A. I believe it was 1972. |
| 14:27 | 19 | Q. Do you have any professional licenses? |
| 14:27 | 20 | A. Yes, I'm a CPA. I'm also an ABV. |
| 14:27 | 21 | Q. Can you tell me what that is? |
| 14:27 | 22 | A. It's Accredited in Business Valuation. |
| 14:28 | 23 | And I'm a CFF. |
| 14:28 | 24 | Q. And what is that? |
| 14:28 | 25 | A. Certified Financial Forensic. |

3 (Pages 6 to 9)

SCOTT DYE - 8-16-2011

Page 10

14:28 1    Q. And does part of your practice include
14:28 2 valuation testimony as an expert witness?
14:28 3    A. Correct.
14:28 4    Q. And part of your practice involves forensic
14:28 5 investigation?
14:28 6    A. That's correct.
14:28 7    Q. How long have you been an expert witness in
14:28 8 valuation?
14:28 9    A. Since I didn't bring my resumé, it's about ten
14:28 10 years.
14:28 11    Q. And how long have you done forensic accounting?
14:28 12    A. I've worked in the forensic area for over
14:28 13 20 years.
14:28 14    Q. Okay. I'm sure you have a long and
14:28 15 distinguished career, so I don't want to go back over the
14:28 16 entire thing, but it would just be helpful to know, have
14:29 17 you been in practice as an accountant since graduation
14:29 18 from university?
14:29 19    A. As an accountant, correct.
14:29 20    Q. And how long have you been with Moss Adams --
14:29 21 Stoughton Davidson?
14:29 22    A. 27 years.
14:29 23    Q. As part of your practice are you doing
14:29 24 exclusively valuation and forensic work, or are you still
14:29 25 doing any kind of audit services?

Page 11

14:29 1    A. I have audit clients as well as tax clients
14:29 2 also.
14:29 3    Q. Oh, you do.
14:29 4       When did you first learn of SK Foods LP and the
14:29 5 related entities associated with the Salyer family?
14:30 6    A. I can't tell you exactly when the knowledge and
14:30 7 if I have a full knowledge of all the related entities
14:30 8 with the Salyer, because we didn't do all the work for
14:30 9 all the Salyer entities.
14:30 10       We first learned of them probably in about 2005
14:30 11 or '6, and we did an audit of their pension plan.
14:30 12    Q. Was that an annual engagement, you did a
14:30 13 pension plan every year?
14:30 14    A. Yes, it became one.
14:30 15    Q. And I take it at some point the engagement
14:30 16 expanded to reviewing the performing financial statement
14:30 17 services related to financial statements?
14:30 18    A. That would be correct.
14:30 19    Q. Okay. And what year was the engagement
14:30 20 expanded to include that?
14:30 21    A. That would have been for the year ending
14:31 22 June 30th, 2008.
14:31 23    Q. And do you recall who at Stoughton Davidson was
14:31 24 approached to ask if you could perform those services?
14:31 25    A. It was a step process, and I was initially

Page 12

14:31 1 contacted by a fellow named Marshal Scott out at SK
14:31 2 Foods, who I think was acting as a consultant at the
14:31 3 time. Their audit was coming up. They were unsure as to
14:31 4 what Moss Adams was going to do and they needed somebody
14:31 5 to at least observe the inventory as of June 30.
14:31 6    Q. What does it mean to observe the inventory?
14:31 7    A. You go out and you effectively observe the
14:31 8 process that the company goes through in counting their
14:31 9 inventory to ensure that it is properly counted as to how
14:31 10 much inventory is on hand.
14:32 11    Q. So if I understand you correctly, you said it
14:32 12 was a step process, so the first part of the engagement
14:32 13 was observing the inventory?
14:32 14    A. That was the first inquiry.
14:32 15    Q. Okay. Your firm was asked to do that?
14:32 16    A. Correct.
14:32 17    Q. And then at some point in time did it then
14:32 18 expand to something else?
14:32 19    A. I subsequent to that went on vacation, and one
14:32 20 of my partners was contacted about doing the full audit
14:32 21 of the financial statements.
14:32 22    Q. Which partner was that?
14:32 23    A. I'm not sure if it was Tom McFerson or
14:32 24 Scott Bristol. It was either one of those two.
14:32 25    Q. And did your firm accept that engagement?

Page 13

14:32 1    A. Ultimately, yes.
14:32 2    Q. And do you have any understanding as to why
14:32 3 your firm was asked to do that instead of Moss Adams?
14:33 4    MR. NICHOLSON: Objection. Calls for
14:33 5 speculation.
14:33 6    MR. CHRISTMAS: Just asking for your
14:33 7 understanding.
14:33 8    THE WITNESS: Well, I can tell you why we were
14:33 9 called, because we had previously had employees that had
14:33 10 worked with us that were currently working at SK Foods.
14:33 11 Why they chose us over Moss Adams for that period, I
14:33 12 would be speculating on.
14:33 13 BY MR. CHRISTMAS:
14:33 14    Q. And one of those individuals was
14:33 15 Mark McCormick. Is that correct?
14:33 16    A. That would be correct.
14:33 17    Q. And he previously worked with you?
14:33 18    A. That's correct.
14:33 19    Q. I believe in various places there's a statement
14:33 20 or something is emblazoned in some of the documents that
14:33 21 I've seen that refers to something called the "Moss Adams
14:33 22 connection," or I don't know what it is, "consortium."
14:34 23 Can you tell me what that is?
14:34 24    A. It was an association --
14:34 25    MR. NICHOLSON: Objection. Vague and

4 (Pages 10 to 13)

Merrill Corporation - San Francisco
800-869-9132          www.merrillcorp.com/law
BMO 002003
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

Page 14

14:34 1 ambiguous.
14:34 2 BY MR. CHRISTMAS:
14:34 3 Q. If you understand the question, you can answer.
14:34 4 A. It was an association of CPA firms that met
14:34 5 with Moss Adams on an annual basis where there was
14:34 6 additional continuing education, discussion about
14:34 7 services that could be either shared or provided by one
14:34 8 firm or the other, and it included firms in California,
14:34 9 Washington, Oregon, Idaho, and several other states, I
14:34 10 believe.
14:34 11 Q. So this doesn't involve interlocking governance
14:34 12 between firms in any way?
14:34 13 A. No.
14:34 14 Q. And doesn't involve interlocking ownership?
14:34 15 A. No.
14:34 16 Q. When your firm accepted the engagement, did you
14:35 17 then have any face-to-face meetings with members of
14:35 18 management of SK Foods?
14:35 19 A. Well, there are a number of meetings with
14:35 20 members of management.
14:35 21 MR. NICHOLSON: I'm not sure if you're
14:35 22 referring, when you say "you," if you're referring to
14:35 23 Scott or you're referring to the company.
14:35 24 BY MR. CHRISTMAS:
14:35 25 Q. Well, after your firm accepted the engagement,

Page 15

14:35 1 did you personally meet with members of SK Foods
14:35 2 management?
14:35 3 A. Do we have some sort of time frame here?
14:35 4 Q. Well, you accepted the engagement in when,
14:35 5 approximately?
14:35 6 A. Well, when I was on vacation. So right after
14:35 7 acceptance, no, I did not meet immediately with them.
14:35 8 Q. Do you know if any of your colleagues did?
14:35 9 A. Oh, I'm certain they did, yes.
14:35 10 Q. Why are you certain that they did?
14:35 11 A. Because they had to to arrange the engagement,
14:35 12 to plan the engagement and to finalize the engagement
14:36 13 letter.
14:36 14 Q. Okay. And did they tell you what was said at
14:36 15 those meetings in any fashion?
14:36 16 A. No, nothing other than the general discussions
14:36 17 that we're going to do an audit investigation.
14:36 18 Q. Did they identify any particular issues? Did
14:36 19 your colleagues inform you of any particular issues that
14:36 20 were important or sensitive?
14:36 21 MR. NICHOLSON: Objection. Vague and
14:36 22 ambiguous.
14:36 23 THE WITNESS: At what time?
14:36 24 BY MR. CHRISTMAS:
14:36 25 Q. Well, let's go to the -- did you at any point

Page 16

14:36 1 after you returned from vacation attend any in-person
14:36 2 meetings at SK Foods, or with SK Foods management?
14:36 3 A. Again, could we talk about the time frame here?
14:36 4 Q. Well, when did your vacation end?
14:36 5 A. Probably early July, 2008.
14:37 6 Q. Okay. After you returned to the office were
14:37 7 there any meetings right after you returned to the
14:37 8 office?
14:37 9 A. None that I recall that I was involved with.
14:37 10 Q. Did you have any meetings with Moss Adams at or
14:37 11 about that time?
14:37 12 A. I did not.
14:37 13 Q. Did any of your colleagues have any meetings
14:37 14 with Moss Adams at or about that time?
14:37 15 A. Yes.
14:37 16 Q. And who had those meetings?
14:37 17 A. Ms. Garone.
14:37 18 Q. Do you know if she took any notes of those
14:37 19 meetings?
14:37 20 A. I believe some of them are even included in
14:37 21 here, but yes, she would have taken notes because she was
14:37 22 reviewing the prior work papers of Moss Adams, which is a
14:37 23 standard procedure when performing an audit.
14:37 24 Q. Do you know if her notes identify any
14:37 25 particular controversial issues in the prior engagement?

Page 17

14:38 1 MR. NICHOLSON: Objection. Vague and
14:38 2 ambiguous.
14:38 3 MS. WOODRUFF: Objection. Vague and ambiguous
14:38 4 THE WITNESS: And off the top of my head, I
14:38 5 don't know.
14:38 6 BY MR. CHRISTMAS:
14:38 7 Q. So who were the lead people on this engagement
14:38 8 at this point? Did you step in to lead the engagement,
14:38 9 or were other of your colleagues leading the engagement?
14:38 10 A. No, the engagement was handled by Ms. Garone,
14:38 11 the audit partner.
14:38 12 Q. So after you returned from vacation, what was
14:38 13 your next involvement, your personal involvement in the
14:38 14 engagement?
14:38 15 A. I did not get involved with SK Foods until
14:38 16 subsequent to the audit.
14:38 17 Q. What was your involvement, what was your first
14:39 18 then involvement after the audit?
14:39 19 A. There was some agreed-upon procedures relating
14:39 20 to inventory.
14:39 21 Q. We'll get back to that.
14:39 22 Were you involved in reviewing any of the
14:39 23 documents relating to the audit?
14:39 24 A. Prior to issuance of the report?
14:39 25 Q. Yes.

5 (Pages 14 to 17)

SCOTT DYE - 8-16-2011

Page 18

14:39 1    A. No.
14:39 2    Q. And can you tell me what your involvement was
14:39 3  with the agreed-upon procedures?
14:39 4    A. Subsequent to the audit there became some
14:39 5  issues revolving around an account called Unapplied
14:39 6  Overhead. It was questioned and I believe November to
14:40 7  December of that year by some other consultants in there
14:40 8  that the account seemed to be extremely large, and at
14:40 9  that time we got involved to do further investigation
14:40 10 into that account.
14:40 11   Q. And that was part of the scope of the
14:40 12 agreed-upon procedures?
14:40 13   A. That's correct.
14:40 14   Q. Okay. And who led the engagement for the
14:40 15 agreed-upon procedures?
14:40 16   A. Mr. Bristol and myself.
14:40 17   Q. And is there a reason that you were the lead of
14:40 18 that engagement but didn't lead the audit?
14:40 19   A. Well, the agreed-upon procedures was not a
14:40 20 specific audit-type, nor was it a forensic-type, so it
14:40 21 was a special project, and I was available to assist with
14:40 22 that special project.
14:41 23     MR. NICHOLSON: I'm sorry. Can we stop for a
14:41 24 second.
14:41 25     MR. CHRISTMAS: Yes.

Page 19

14:41 1      MR. NICHOLSON: I apologize. I didn't have the
14:41 2  last number, so I just had them Bates-stamp them SD and
14:41 3  started at number 1 again. Documents have already been
14:41 4  provided, but hopefully it will make sense.
14:41 5      MR. CHRISTMAS: You can give me the extra sets.
14:41 6  I'll hold one for Scott here.
14:41 7  BY MR. CHRISTMAS:
14:42 8    Q. Can you give me a time frame of the agreed-upon
14:42 9  procedures, how long that engagement took?
14:42 10   A. Well, that engagement, when you use the term
14:42 11 "took" indicates that it was completed, and it never was
14:42 12 completed.
14:42 13   Q. Thank you for the correction.
14:42 14     What was the reason it was not completed?
14:42 15   A. Within our engagement letter there's a clause
14:42 16 about continuing work when you're not being paid, and we
14:42 17 hadn't been paid so we withdrew from the engagement until
14:42 18 payment would be made. Subsequently they filed
14:42 19 bankruptcy and we never did any further work.
14:42 20   Q. So in terms of audit work, there was only one
14:42 21 audit?
14:42 22   A. Of SK, correct.
14:42 23   Q. Are you familiar with the affiliates of SK
14:43 24 Foods that exist in Australia and New Zealand?
14:43 25   A. I know of them.

Page 20

14:43 1    Q. And how did you come to know of them?
14:43 2    A. Only in passing and getting ready for this
14:43 3  deposition.
14:43 4    Q. Are you aware of any transfers of ownership
14:43 5  interest of those entities that occurred prior to your
14:43 6  firm's engagement for the audit?
14:43 7    A. Yes, I am.
14:43 8    Q. Okay. And what did you learn of and when?
14:43 9    A. In reviewing the footnotes in the Moss Adams
14:43 10 financial statements for, I believe, June 30, 2007, they
14:43 11 disclose the transfer to the partners. And further
14:43 12 review in these documents indicates the underlying
14:43 13 journal entries indicating that transfer.
14:44 14   Q. Okay. And when you say "that transfer," you
14:44 15 mean the ownership transfer?
14:44 16   A. That's correct, the investment that SK had was
14:44 17 transferred out to the partners.
14:44 18   Q. Okay. Are you aware of an accompanying issue
14:44 19 with respect to transfer of debt? I won't say "issue," I
14:44 20 want to say a transfer or change in the identity of the
14:44 21 payer of debt?
14:44 22     MS. WOODRUFF: Objection. Vague and ambiguous
14:44 23     THE WITNESS: Well, I think I need some
14:44 24 clarification in terms of payor and payee. If you'd like
14:44 25 to be clear about who we're asking about, I'd gladly

Page 21

14:44 1  answer the question.
14:44 2  BY MR. CHRISTMAS:
14:44 3    Q. Are you aware that a trust was substituted for
14:44 4  the offshore entities on some intercompany debt as the
14:44 5  payor?
14:44 6      MS. WOODRUFF: Objection. Assumes facts not in
14:44 7  evidence.
14:44 8  BY MR. CHRISTMAS:
14:44 9    Q. You can answer.
14:44 10   A. Let me tell you what I'm aware of in that
14:44 11 situation to clarify so we're not dealing with words,
14:45 12 because when I hear offshore entities I think of tax
14:45 13 havens and stuff, as opposed to New Zealand and
14:45 14 Australia --
14:45 15   Q. That's what I meant, that's what I was
14:45 16 referring to, it was.
14:45 17   A. -- who I assume you're referring to.
14:45 18     I'm aware that on the books of SK Foods LP
14:45 19 there were a number of accounts receivable and payables
14:45 20 to certain affiliates in either Australia or in New
14:45 21 Zealand. Those accounts were, in fact, combined, and the
14:45 22 footnote indicates sold to the revocable trust.
14:45 23   Q. And what revocable trust, to your knowledge,
14:45 24 are you referring to?
14:45 25   A. The one that's the partner in SK Foods LP.

6 (Pages 18 to 21)

Merrill Corporation - San Francisco
800-869-9132                    www.merrillcorp.com/law
BMO 002005
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 22

14:45 1    Q. And do you know the name of that trust?
14:45 2    A. I've seen it referred several places. It was
14:45 3  Scott Salyer's revocable trust of some sort.
14:46 4    Q. Did you have occasion to review any of the
14:46 5  underlying transaction documents that affected the change
14:46 6  of the owner, of the alleged change in owner of the
14:46 7  Australian and New Zealand companies?
14:46 8    A. Are you referring to the legal documents that
14:46 9  would have been drawn back in 2006 or '7 when this
14:46 10  occurred?
14:46 11    Q. That's correct.
14:46 12    A. No, I have not.
14:46 13    Q. And similarly, the transaction that involved
14:46 14  the intercompany debt with respects to the irrevocable
14:46 15  trust that you're talking about, did you see any of the
14:46 16  legal documents?
14:46 17    A. Not that I recall.
14:46 18    Q. Do you know if anyone else at Stoughton
14:46 19  Davidson saw the legal documents for the equity or the
14:46 20  debt transaction?
14:46 21    A. I don't know the answer to that question.
14:46 22    Q. In preparing for this deposition did you come
14:47 23  across any legal documents relating to either the debt or
14:47 24  the equity that were in the file at the time of the audit
14:47 25  engagement?

Page 23

14:47 1    MR. NICHOLSON: Objection. Vague and
14:47 2  ambiguous.
14:47 3    THE WITNESS: The only documents, to clarify,
14:47 4  that I've come across are those which were produced in
14:47 5  the original packet, and these are here. So if there's
14:47 6  something in there that you're referring to as a legal
14:47 7  document, then yes, I've seen it.
14:47 8    MR. NICHOLSON: Just to be clear, he's
14:47 9  referring to the original production, and the
14:47 10  supplemental production, and now the supplemental
14:47 11  supplemental production.
14:47 12  BY MR. CHRISTMAS:
14:47 13    Q. Did you have any reason to question that the
14:47 14  transfer of ownership that was mentioned in the footnote
14:47 15  you just discussed was not made?
14:48 16    A. It was disclosed on the financial statements
14:48 17  that were audited by Moss Adams, so the answer would be
14:48 18  no.
14:48 19    Q. So you believe they were made?
14:48 20    A. As far as I was aware, yes.
14:48 21    Q. And the interposition of the irrevocable trust
14:48 22  and the intercompany debt structure, did you have any
14:48 23  reason to doubt that that had been effected?
14:48 24    A. No.
14:48 25    Q. Okay. Are you familiar with another trust

Page 24

14:48 1  called the SSC&L 2007 trust, as opposed to the
14:48 2  Scott Salyer irrevocable trust?
14:48 3    A. I've seen the SSCL letters, but I'm not
14:48 4  familiar with that trust at all.
14:48 5    Q. So it's your understanding that the
14:48 6  Scott Salyer revocable trust is involved in the
14:48 7  intercompany debt?
14:49 8    MS. WOODRUFF: Objection. Misstates the
14:49 9  evidence.
14:49 10    MR. CHRISTMAS: I'm asking for his
14:49 11  understanding, not what the evidence is.
14:49 12    MS. WOODRUFF: Well. Objection, then,
14:49 13  misstates the witness's prior testimony.
14:49 14    THE WITNESS: It's my understanding that
14:49 15  whichever trust was the partner in SK Foods LP was the
14:49 16  one that was involved in this transaction.
14:49 17  BY MR. CHRISTMAS:
14:49 18    Q. To your knowledge, did anyone at Stoughton
14:49 19  Davidson ever have occasion to communicate with any
14:49 20  members of management of the Australian or New Zealand
14:49 21  companies?
14:49 22    A. I don't know.
14:49 23    Q. Have you ever had any occasion to communicate
14:49 24  with management of the Australian or New Zealand
14:49 25  companies?

Page 25

14:49 1    A. I'm trying to recall. I may have been in a
14:50 2  room where there was a conference call, and I don't know
14:50 3  if the individual was even in management, but it had to
14:50 4  do with the projections and their format.
14:50 5    Q. I'll ask you the same question with respect to
14:50 6  the -- rephrase that.
14:50 7    Are you aware as to whether the Australian and
14:50 8  New Zealand companies have their own outside auditors?
14:50 9    A. I have no idea who audited those companies.
14:50 10    Q. So if you don't know who audited them, I would
14:50 11  assume, then, you have never had any communications with
14:50 12  them whose names you don't know?
14:50 13    A. That would be correct.
14:50 14    Q. Can you describe for me the extent to which
14:50 15  your firm received documents from Moss Adams in order to
14:51 16  perform the audit?
14:51 17    A. In performing the audit Ms. Garone went to the
14:51 18  Moss Adams office, reviewed their work papers and would
14:51 19  have requested any documents or work papers that she
14:51 20  would feel necessary to complete the audit.
14:51 21    Q. Okay. And if she took copies of those, they
14:51 22  would be in your document production?
14:51 23    A. Not necessarily.
14:51 24    Q. Do you know, if she took copies, where ones
14:51 25  that aren't in there would have gone?

Merrill Corporation - San Francisco

800-869-9132                                        www.merrillcorp.com/law

BMO 002006

e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 26

14:51  1       A. It would be in her audit file.
14:51  2       Q. So does the production not encompass the
14:51  3  entirety of the audit file, or just a selection of
14:51  4  documents?
14:51  5       A. That's correct. The production includes those
14:51  6  documents related to anything that she had identified
14:51  7  that had something to do that she had either copied,
14:51  8  received in an e-mail, relating to the foreign operations
14:52  9  and these affiliates or subsidiaries as they were at one
14:52  10  time.
14:52  11      Q. With respect to what we referred to as the
14:52  12  equity transfer, have you ever had any conversations with
14:52  13  anybody about that transfer?
14:52  14      MR. NICHOLSON: Objection. Vague and
14:52  15  ambiguous.
14:52  16      THE WITNESS: Only in general and getting ready
14:52  17  for this with, like, Ms. Garone and reviewing these
14:52  18  documents.
14:52  19  BY MR. CHRISTMAS:
14:52  20      Q. And I'm specifically referring to the transfer
14:52  21  of ownership of the Australian, New Zealand companies,
14:52  22  for the record.
14:52  23      Do you know if Ms. Garone ever had any
14:52  24  conversations with anyone with regard to the sale of the
14:52  25  transfer of --

Page 27

14:52  1       A. I do not --
14:52  2       Q. Let me finish.
14:52  3       -- the transfer of ownership of the Australian
14:52  4  and New Zealand companies?
14:52  5       A. No, I don't.
14:52  6       Q. Are you aware of anyone ever questioning
14:53  7  whether or not the transfer of the debt and transfer of
14:53  8  equity had actually been effected?
14:53  9       A. No.
14:53  10      MR. NICHOLSON: Objection. Vague and
14:53  11  ambiguous.
14:53  12      MS. WOODRUFF: Vague as to time.
14:53  13  BY MR. CHRISTMAS:
14:53  14      Q. I'm sorry, everyone was talking at once. Did
14:53  15  you have an answer?
14:53  16      A. I gave an answer. It was "no."
14:53  17      MR. CHRISTMAS: I apologize, I couldn't hear.
14:54  18      We're doing somewhat unconventional numbering,
14:54  19  so this is Exhibit 38. I'll pass -- how do you do this.
14:54  20      MS. WOODRUFF: Why don't you pass two to
14:54  21  Mr. Nicholson and two to you.
14:54  22      MR. NUTI: 38, you said?
14:54  23      MR. CHRISTMAS: Yes.
14:54  24      (Exhibit 38 was marked for identification.)
14:54  25  ///

Page 28

14:54  1  BY MR. CHRISTMAS:
14:54  2       Q. Mr. Dye, I've handed you a document that has
14:54  3  been numbered for identification as Exhibit 38 to your
14:54  4  deposition. Do you recognize this document?
14:54  5       A. I can tell you what it is, however I have never
14:55  6  seen it before.
14:55  7       Q. Tell me what it is.
14:55  8       A. It's a work paper from the audit file.
14:55  9       Q. So this is a work paper from the Stoughton
14:55  10  Davidson audit file, not the Moss Adams audit file?
14:55  11      A. That would be correct.
14:55  12      Q. Is this a printout of an Excel spreadsheet, or
14:55  13  what created the formatting of the document?
14:55  14      A. It's a software program that is Excel-based
14:55  15  that is used for the audits.
14:55  16      Q. Could you take a look at this document and tell
14:55  17  me what it memorializes.
14:55  18      A. I can tell you what I believe it memorializes
14:55  19  on here.
14:55  20      Q. Okay.
14:55  21      A. I believe this memorializes the balance that
14:56  22  remains as of 6/30/07 for the investment in SK Foods
14:56  23  Australia representing the balance of the notes that were
14:56  24  due, and this number has been moved to a different
14:56  25  account in June 30, 2008, although it hasn't changed in

Page 29

14:56  1  balance.
14:56  2       MR. CHRISTMAS: Can we just take a break for a
14:56  3  minute.
15:03  4       (Discussion off the record.)
15:03  5       MR. CHRISTMAS: We're back on the record.
15:03  6  Mr. Nuti is going to clarify something that I was unaware
15:03  7  of in the document production.
15:03  8       MR. NUTI: We have noticed that we have two
15:03  9  sets of documents Bates-stamped SD and then a six-digit
15:03  10  number. The trustee, sometime in March, produced its
15:03  11  audit files related to the Stoughton Davidson audit.
15:03  12  Those documents are Bates-stamped SD with a space, and
15:03  13  then a six-digit number.
15:04  14      Subsequent to that production, Stoughton
15:04  15  Davidson produced to the liquidator its files associated
15:04  16  with its audit, the same audit of SK Foods. Those are
15:04  17  designated SD, six-digit number, no space.
15:04  18      THE WITNESS: If I may speak, that's incorrect.
15:04  19      MR. NICHOLSON: Can we go off the record again
15:04  20  Do you want to talk to me?
15:04  21      (Discussion off the record.)
15:04  22      MR. NUTI: For clarification, the documents
15:04  23  produced by Stoughton Davidson are responsive to the
15:04  24  subpoena.
15:04  25      Is that correct?

8 (Pages 26 to 29)

Merrill Corporation - San Francisco
800-869-9132                                    www.merrillcorp.com/law
BMO 002007
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 30

15:04  1        THE WITNESS: That would be correct.
15:04  2    BY MR. CHRISTMAS:
15:04  3        Q. Could you turn back to the subpoena, to page 6.
15:05  4        Now, Mr. Dye, you understand that you are here
15:05  5    as a designated witness under rule 30(b)(6), or is that
15:05  6    your understanding?
15:05  7        A. That's correct.
15:05  8        Q. Before you came here today, did you have
15:05  9    occasion to review the matters for examination that are
15:05 10    listed there?
15:05 11        A. I have not seen this before.
15:05 12        Q. So you've never seen the listing of matters for
15:05 13    examination in the subpoena?
15:05 14        A. I don't believe so.
15:05 15        Q. Did you discuss your appearance today with
15:05 16    anybody?
15:05 17        A. Mr. Nicholson.
15:05 18        Q. Anybody else?
15:05 19        A. People in our office.
15:05 20        Q. In that discussion, or in any other way, did
15:06 21    you gain any understanding of what a rule 30(b)(6)
15:06 22    witness is supposed to do?
15:06 23        A. There was no discussion about that, no.
15:06 24        Q. Do you know what rule 30(b)(6) is?
15:06 25        A. No.

Page 31

15:06  1        Q. So I would take it from your answer that you do
15:06  2    not know what a rule 30(b)(6) witness is?
15:06  3        A. That would be correct.
15:06  4        MR. NICHOLSON: You might ask him about being a
15:06  5    person most knowledgeable. I'm not sure if he would
15:06  6    understand.
15:06  7        MR. CHRISTMAS: Let's go off the record.
15:07  8        (Discussion off the record.)
15:07  9        (Exhibit 39 was marked for identification.)
15:07 10    BY MR. CHRISTMAS:
15:08 11        Q. Mr. Dye, the court reporter has handed you a
15:08 12    document marked for identification as Stoughton Davidson
15:08 13    39 -- well, off the record.
15:08 14        (Discussion off the record.)
15:08 15    BY MR. CHRISTMAS:
15:08 16        Q. This is, we'll call it Stoughton Davidson 39.
15:08 17    Do you know what this document is, Mr. Dye?
15:09 18        A. Appears to be the trial balance, grouped, of SK
15:09 19    Foods LP for June 30th, 2008.
15:09 20        Q. And is this a document generated by SK Foods?
15:09 21        A. No, this appears to be a document that would
15:09 22    have been generated by a program known as Engagement,
15:09 23    used during the audit.
15:09 24        Q. And should I assume when you say "the audit,"
15:09 25    that would be the audit performed by Stoughton Davidson?

Page 32

15:09  1        A. That would be correct.
15:09  2        Q. Unless you specify Moss Adams or something
15:09  3    else?
15:09  4        A. Correct.
15:09  5        Q. That would help.
15:09  6        What's the purpose of this document?
15:09  7        A. It's used to summarize accounts and group them
15:10  8    to take them forward to the balance sheet and income
15:10  9    statements for the audit.
15:10 10        Q. And do you recognize the handwriting on this
15:10 11    document?
15:10 12        A. It appears to be Ms. Garone's, but I could be
15:10 13    incorrect.
15:10 14        Q. And do you know what -- there are a number of
15:10 15    instances of handwriting here that are followed by a
15:10 16    check mark, and there appears to be a legend at the
15:10 17    bottom that says "Agrees to audited consolidating
15:10 18    financial statements," and I can't read the rest of it,
15:10 19    and I don't understand the rest of it. "W/o/e."
15:10 20        MR. NICHOLSON: I'm sorry. Where is the legend
15:10 21    you're reading from?
15:10 22        MR. CHRISTMAS: At the bottom on the first
15:11 23    page.
15:11 24    BY MR. CHRISTMAS:
15:11 25        Q. Can you tell me what the check mark and the

Page 33

15:11  1    legend at the bottom means?
15:11  2        A. The "W/o/e" means "without exception." The
15:11  3    check marks indicate that they have gone to the financial
15:11  4    statements as drafted and agree that these totals were
15:11  5    the same as were on the financial statements.
15:11  6        Q. So the reference here would be to the prior
15:11  7    years' financial statements or to the ones that are being
15:11  8    generated in this process?
15:11  9        A. No, 6/30/2008.
15:11 10        Q. So this is generated as part of the ongoing
15:11 11    audit as opposed to looking to see whether or not these
15:11 12    numbers agree to the prior audit?
15:11 13        A. That's correct.
15:12 14        Q. I apologize if I asked you this before. Did
15:12 15    you say you had or had not seen this document before?
15:12 16        A. I don't recall seeing this document.
15:12 17        Q. I believe it was your testimony that you didn't
15:12 18    lead the audit for 2008. Did you have any participation
15:12 19    in the audit services rendered?
15:12 20        A. Only subsequent to the audit when it became a
15:12 21    question as to whether the one account was accurate or
15:13 22    not.
15:13 23        Q. And what one account was that?
15:13 24        A. The unapplied overhead.
15:13 25        Q. Okay. And is that separate from the

9 (Pages 30 to 33)

SCOTT DYE - 8-16-2011

Page 34

15:13 1   agreed-upon procedures, or --
15:13 2       A. The agreed-upon procedures were steps agreed
15:13 3   upon with SK Foods that we would perform to determine the
15:13 4   accuracy of that account as one of the steps.  There are
15:13 5   also a number of other steps to look at their inventory
15:13 6   procedures.
15:13 7       Q. And if I understand the chronology, the
15:13 8   agreed-upon procedures were after the audit was
15:13 9   concluded?
15:13 10      A. Correct.
15:13 11      Q. But your answer implies that -- well, I'm not
15:13 12  clear on your answer.  If the audit was concluded, how
15:13 13  was it that you were doing work on the audit?  Did there
15:13 14  need to be a correction?  I'm not following your answer.
15:13 15      A. The audit was withdrawn due to -- I had
15:14 16  explained earlier that some consultants that they had
15:14 17  hired thought that the unapplied overhead was extremely
15:14 18  high, in the latter part in October and November, and at
15:14 19  that point everybody got concerned that maybe the account
15:14 20  was incorrect, and so the procedure was to withdraw the
15:14 21  audit and to go back and attempt to determine the
15:14 22  validity of that account.
15:14 23      Q. But prior to that issue coming to light, did
15:14 24  you participate in the generation of the original audit
15:14 25  issued by your firm?

Page 35

15:14 1       A. No.
15:14 2       Q. And just to carry on with your second-to-last
15:14 3   answer, what's the mechanics of withdrawing the audit?
15:14 4   Did you send a letter to SK Foods?  How did that come
15:15 5   about?
15:15 6       A. There were discussions, there were e-mails, so
15:15 7   they could alert the potential users of those financial
15:15 8   statements that they should return those and not rely on
15:15 9   those.
15:15 10      Q. Okay.  And was there an amended set of
15:15 11  financial statements issued after doing the agreed-upon
15:15 12  procedures?
15:15 13      A. As stated earlier, the agreed-upon procedures
15:15 14  were never completed.  The answer to your question
15:15 15  regarding was there subsequent financial issued, is "no."
15:15 16      Q. So from Stoughton Davidson's perspective, the
15:15 17  financial statements were withdrawn and there was no
15:15 18  subsequent set of financial statements issued to anybody?
15:15 19      A. That's correct.
15:15 20      MR. CHRISTMAS:  Let's do 41.
15:16 21      (Exhibit 41 was marked for identification.)
15:16 22  BY MR. CHRISTMAS:
15:16 23      Q. Mr. Dye, I've had the court reporter hand you
15:16 24  Stoughton Davidson 41 for identification for your
15:16 25  deposition.

Page 36

15:16 1       Do you recognize this document?
15:16 2       A. It appears to be an analysis of the
15:16 3   intercompany receivables for SK Foods as of June 30th,
15:16 4   2008.
15:16 5       Q. And do you know, is this a Stoughton Davidson
15:17 6   generated document, or by someone else?
15:17 7       A. I don't know.  It appears to have been
15:17 8   generated by the client.  There is a notation up in the
15:17 9   upper-right corner that says PBC, that stands for
15:17 10  "prepared by client."
15:17 11      Q. The handwriting on here, do you recognize any
15:17 12  of that?
15:17 13      A. Well, based on the initials of the people
15:17 14  signing off, it appears to be more than one person.
15:17 15      Q. Do you recognize the persons who wrote on this
15:17 16  document, their handwriting?
15:17 17      A. I recognize initials as being Ms. Garone's and
15:17 18  Ms. Tozlian's.
15:18 19      Q. I'm sorry?
15:18 20      A. Tozlian.
15:18 21      Q. Who is that person?
15:18 22      A. She's an audit manager.
15:18 23      Q. What is her first name?
15:18 24      A. Jennifer.
15:18 25      Q. Do you know the purpose of this marked-up

Page 37

15:18 1   document?
15:18 2       A. It was used to analyze the intercompany
15:18 3   receivables for the audit.
15:18 4       Q. And do you know what the source of the numbers
15:18 5   on the document is?
15:18 6       A. They came from the client.  This document is
15:18 7   prepared by the client.
15:18 8       Q. And there are several legends at the bottom.
15:18 9   If I could ask you to walk through them with me, there's
15:18 10  a check mark legend on the far left, and can you tell me
15:18 11  what that legend indicates?
15:19 12      A. It indicates that those check marks next to
15:19 13  certain numbers in the columns up above were agreed
15:19 14  directly to notes receivable, related party receivables,
15:19 15  notes payable and other payables without exception.
15:19 16      Q. So what documents are being agreed to the
15:19 17  clients underlying general ledger, or can you just
15:19 18  explain that to me?
15:19 19      A. From reading it, it says it "Agrees directly to
15:19 20  notes receivable."  That would indicate to me that there
15:19 21  was some notes receivable that they were agreed to, or
15:19 22  related party receivables which may have come from a
15:19 23  general ledger on the related party side.  Or notes
15:19 24  payable and/or other payables.  So it appears that there
15:19 25  is a variety of sources that they are confirming those to

10 (Pages 34 to 37)

SCOTT DYE - 8-16-2011

Page 38

15:19  1    or verifying them with.

15:19  2        Q.  Okay.  The check with an X or a slash, hash

15:19  3    mark in it, and that's right below this naked check mark

15:20  4    legend.  What does that legend mean?  "Agreed w/o/m/e"?

15:20  5        A.  I don't know exactly what the w/o/m/e stands

15:20  6    for.  I would be making an assumption, but I think it has

15:20  7    to do with materiality.

15:20  8        Q.  How about the X that's just to the right of

15:20  9    that?  Looks like "non-operating assets" to something

15:20  10   "equity," I can't read it.

15:20  11       A.  Well, I agree with you, it does say

15:20  12   "non-operating assets to."  I can't read it either.

15:21  13           MR. CHRISTMAS:  Can we take a break for a

15:21  14   minute.

15:31  15       (Recess taken.)

15:31  16           MR. CHRISTMAS:  This is 42.

15:31  17       (Exhibit 42 was marked for identification.)

15:31  18   BY MR. CHRISTMAS:

15:31  19       Q.  Mr. Dye, the court reporter has handed you

15:31  20   Exhibit 42 to the Stoughton Davidson deposition.  If you

15:31  21   go to the page marked SD 00046, it starts there.  Do you

15:32  22   recognize this document?

15:32  23       A.  It appears to be the title page to the SK Foods

15:32  24   LP audit.

15:32  25       Q.  Have you ever seen this document before?

Page 39

15:32  1        A.  I can't recall.  I may have.

15:32  2        Q.  Did you look at it before coming here today?

15:32  3        A.  Not within the last -- not in preparing for

15:32  4    this, no.

15:32  5        Q.  Do you have any understanding of the procedures

15:32  6    that were followed to -- and I don't mean in the

15:32  7    hypothetical, the actual procedures that were followed to

15:32  8    create these financial statements?

15:32  9        A.  All standard audit procedures deemed necessary

15:32  10   for an audit.

15:32  11       Q.  I didn't mean in the hypothetical, I mean what

15:32  12   actual procedures were followed?

15:33  13       A.  Well, I suspect if I wanted to tell you, we

15:33  14   could take all day.

15:33  15       Q.  I don't mean what.  I mean, are you familiar

15:33  16   with what your colleagues did to create these financial

15:33  17   statements?

15:33  18       A.  I'm familiar with what they probably did, yes.

15:33  19   I did not review their work, as I stated earlier.

15:33  20       Q.  And did they consult with you while they did

15:33  21   their work?

15:33  22       A.  No.

15:33  23       Q.  Can you tell me what you did review before

15:33  24   coming here today?

15:33  25       A.  The documents that were in response to the

Page 40

15:33  1    initial subpoena, and I believe the amended ones that

15:33  2    were additionally attached, which would be Stoughton

15:33  3    Davidson, I believe 1 through 41, as well as SD 42

15:34  4    through 51, and the additional documents that I provided

15:34  5    you today.

15:34  6        Q.  Was Mr. Bristol involved in preparation of the

15:34  7    audit?

15:34  8        A.  He was the engagement partner.

15:34  9        Q.  So Ms. Garone reported to him?

15:34  10       A.  That would be correct.

15:34  11       Q.  And did you speak to Mr. Bristol before you

15:34  12   came here today?

15:34  13       A.  No, I did not.

15:34  14       Q.  Did you speak with Ms. Garone before you came

15:34  15   here today?

15:34  16       A.  Yes, I did.

15:34  17       Q.  And what did you discuss with her?

15:34  18       A.  I clarified my understanding of what was

15:34  19   represented within some of these e-mails and the

15:35  20   documents that were initially provided.

15:35  21       Q.  And when you say "documents provided," you mean

15:35  22   produced by Stoughton Davidson?

15:35  23       A.  Correct.

15:35  24           MR. CHRISTMAS:  Let's go to 49.

15:35  25       (Exhibit 49 was marked for identification.)

Page 41

15:35  1    BY MR. CHRISTMAS:

15:35  2        Q.  Mr. Dye, the court reporter has handed you

15:36  3    Exhibit 49 to the Stoughton Davidson deposition.  It's

15:36  4    actually, I'll call it a group exhibit.  There appear to

15:36  5    me to be two different letters here, pages SD -- and

15:36  6    there's no space -- 000042 through 46, appear to be one

15:36  7    document, although they all have sequential faxed page

15:36  8    numbers at the top apparently, and then the second

15:36  9    document starts at SD000047.

15:36  10           There may be other differences between the

15:36  11   documents, but if you could turn to -- well, first, have

15:36  12   you ever seen these documents before?

15:36  13       A.  Yes, I have.

15:37  14       Q.  Can you tell me what they are?

15:37  15       A.  They are the engagement letters for the

15:37  16   agreed-upon procedures.

15:37  17       Q.  Do you know why there are two different

15:37  18   letters?

15:37  19       A.  The first letter is addressing mostly only

15:37  20   inventory issues.  The second letter includes step ten,

15:37  21   or a tenth procedure which was to perform an analysis of

15:37  22   the current value of the companies.  It says "Investment

15:37  23   in Grantor Trust, SSCL, which holds the Cedenco notes

15:37  24   receivable and payable."

15:37  25       Q.  Does one of these letters supercede the other?

11 (Pages 38 to 41)

SCOTT DYE - 8-16-2011

Page 42

15:37 1    A. I would say yes. The one that has the tenth
15:37 2  procedure added to it would supercede, however, I don't
15:37 3  believe there's any change to the first nine procedures.
15:37 4    Q. So paragraph ten was an addition, rather than a
15:38 5  subtraction?
15:38 6    A. That's correct.
15:38 7    Q. Can you explain what procedure number ten is?
15:38 8    A. It was Mr. Salyer's request, because he
15:38 9  believed that the value of those notes had been impaired
15:38 10  and he wanted to determine what impairment there may or
15:38 11  may not have been at a period of about December 31st,
15:38 12  2008. He indicated it might have some tax impact to him.
15:38 13    Q. And when you say he had those thoughts, what's
15:38 14  the basis of your understanding of that?
15:38 15    A. An e-mail from Mr. Salyer.
15:38 16    Q. Okay. Do you know if that e-mail was part of
15:38 17  the document production?
15:38 18    A. It was part of today's production.
15:38 19    Q. Was that procedure, number ten, carried out?
15:39 20    A. No.
15:39 21    Q. Why was it not carried out?
15:39 22    A. We never got that far.
15:39 23    Q. So no part of procedure number ten was carried
15:39 24  out at all?
15:39 25    A. According to an e-mail from Mr. Bristol,

Page 43

15:39 1  actually it's a summary which was in the items produced
15:39 2  today, a memo dated through April 24th of '09 indicates
15:39 3  that there had been some review of companies e-mail
15:39 4  strands and other information provided by e-mail, as well
15:39 5  as review documents provided at the time of the June 30,
15:39 6  '08 audit, however Stoughton Davidson was still to
15:39 7  discuss valuation methods with management, as well as
15:39 8  management was to provide an analysis which had not been
15:39 9  performed.
15:39 10    Q. Are you reading from a document?
15:40 11    A. Yes, I am.
15:40 12    MR. NICHOLSON: Can I stop --
15:40 13    MR. CHRISTMAS: Mark that?
15:40 14    MR. NICHOLSON: He is reading from a document.
15:40 15  He has the originals that he brought. They got the Bates
15:40 16  stamp after he got here.
15:40 17    THE WITNESS: I was reading on SD Supp 009.
15:40 18    MR. CHRISTMAS: I guess we should mark that.
15:41 19    MR. NICHOLSON: Why don't we mark what was
15:41 20  produced today. We'll mark it as a group exhibit. Let's do it as 68.
15:41 21    MR. NUTI: The entire package?
15:42 22    MR. CHRISTMAS: Yeah.
15:42 23    MR. NICHOLSON: So that's SD Supp 1 through SD
15:42 24  Supp 9.
15:42 25    MR. CHRISTMAS: Yeah.

Page 44

15:42 1    MR. NICHOLSON: What was the number on that?
15:42 2    MR. CHRISTMAS: 68.
15:42 3    (Exhibit 68 was marked for identification.)
15:42 4  BY MR. CHRISTMAS:
15:42 5    Q. Mr. Dye, could you turn to SD Supp 004. This
15:43 6  appears to be a series of e-mails. It starts
15:43 7  chronologically on that page and goes back to the prior
15:43 8  page. There's an e-mail from Mr. Salyer, May 12, 2009,
15:43 9  at 8:24 a.m., and a series of e-mails ending with an
15:43 10  e-mail from Mr. Bristol.
15:43 11    They do span a fair period of time here, over a
15:43 12  year. Let's start with the one from Mr. Salyer to you.
15:43 13  Now, this e-mail is dated May 12, 2009. Have you seen
15:43 14  this e-mail before your preparation for today?
15:43 15    A. Yes.
15:43 16    Q. So you received it on May 1, 2009?
15:43 17    A. Appears that way.
15:43 18    Q. And what's Mr. Salyer writing to you about?
15:44 19    A. Again, this would be the issue on the
15:44 20  agreed-upon procedure ten.
15:44 21    Q. Okay. He says there "Reported 18 million at
15:44 22  6/30/08, we believe the value is much less."
15:44 23    Did he explain to you why he believed the value
15:44 24  was much less?
15:44 25    A. I believe somewhere there was some indication

Page 45

15:44 1  of foreign currency transactions that decreased the
15:44 2  value.
15:44 3    Q. And when he says "the Cedenco note" here, can
15:44 4  you explain your understanding of what that note was?
15:44 5    A. My understanding from the SK perspective is
15:44 6  that is a netting of all the payables and receivables
15:44 7  from the foreign subsidiaries which had been transferred
15:44 8  to the trust, which is sitting on the books of SK in the
15:44 9  amount of 18,200,000 some odd thousand dollars, I
15:45 10  believe, from the trust.
15:45 11    Q. Do you know the terms of payment of the note?
15:45 12    A. No, I don't, but on the financial statements
15:45 13  it's classified as long-term, and I believe if you looked
15:45 14  at the audit work paper that we reviewed earlier, there
15:45 15  is indications that the bank would not allow any
15:45 16  transfers or reduction in that, so it is considered not
15:45 17  to be paid within the next 12 months, but at some time
15:45 18  thereafter, and from that indication there would be no
15:45 19  fixed terms within the bank controlling.
15:45 20    Q. There would not be any fixed terms? You
15:45 21  mean --
15:45 22    A. Until there was paid off within the bank, and
15:45 23  that's -- I'd have to find the work paper that you
15:45 24  provided me earlier. It says --
15:45 25    Q. Can you refer, for the record, by exhibit

12 (Pages 42 to 45)

Merrill Corporation - San Francisco
800-869-9132                          www.merrillcorp.com/law
BMO 002011
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 46

15:46 1  number.

15:46 2      A. Exhibit 38. It is referred to as Investment in

15:46 3  SK Foods Australia in '07. In '08, Investment in Foreign

15:46 4  Affiliates is the title of the account. However, it's

15:46 5  highlighted and described down below that "These payables

15:46 6  and receivables are subordinated debt on both the side of

15:46 7  SK and the foreign related parties. Per the bank

15:46 8  covenants, there are to be no related party payments. As

15:46 9  such, this amount is not going to change until all loans

15:46 10 have been paid off. Appears reasonable and per review of

15:46 11 the SK bank agreement with BMO, Section 5, B-1," I

15:46 12 believe it says "the payables to the foreign related

15:46 13 parties are subordinated debt."

15:46 14     Q. Do you know if any reserve was established for

15:46 15 suspension of payment?

15:46 16     A. Based on the Exhibit 42, note eight, which is

15:47 17 transactions with related parties, which you'll find on

15:47 18 SD 63 back there, you'll see that the revocable trust

15:47 19 receivable is in full at the $18,262,000, does not appear

15:47 20 to have any reserve applied, because if you go again in

15:47 21 that exhibit to page 49, you will see that the 22,406 is

15:47 22 carried forward to the balance sheet as related party

15:47 23 receivables of 22,406.

15:47 24     Q. So do you know what analysis was done in order

15:47 25 to support the statement of the receivable at apparently

Page 47

15:48 1  face value?

15:48 2      MR. NICHOLSON: Objection. Vague and

15:48 3  ambiguous.

15:48 4      THE WITNESS: No, I do not.

15:48 5  BY MR. CHRISTMAS:

15:48 6      Q. Do you know if any analysis of that note was

15:48 7  done to determine its collectability?

15:48 8      MR. NICHOLSON: Objection. Vague and

15:48 9  ambiguous.

15:48 10     THE WITNESS: I do not.

15:48 11 BY MR. CHRISTMAS:

15:48 12     Q. Turning back to group Exhibit 68 and SD Supp

15:48 13 004, Mr. Salyer writes "Additionally, the note could

15:48 14 affect my personal tax situation." Do you have an

15:48 15 understanding as to what he meant by that?

15:48 16     A. No, I think you would have had --

15:48 17     MS. WOODRUFF: Sorry, objection. Lacks

15:49 18 foundation, calls for speculation.

15:49 19     MR. CHRISTMAS: You can answer.

15:49 20     THE WITNESS: The answer is "no."

15:49 21 BY MR. CHRISTMAS:

15:49 22     Q. Did you ever have any conversations by

15:49 23 telephone with Mr. Salyer about procedure number ten?

15:49 24     A. I can't recall specifically. There was a group

15:49 25 discussion with Mr. Salyer and I believe other

Page 48

15:49 1  consultants at the time when, in fact, ten was added to

15:49 2  the engagement letter, and I think we have provided in

15:49 3  our production the copy that was originally sent to him,

15:49 4  and he returned with some notes on it which is in the

15:49 5  original production titled SD 0004.

15:49 6      Q. Is that the SD no spaces 0004?

15:50 7      A. Correct.

15:50 8      MR. CHRISTMAS: Those are all the questions I

15:50 9  have at this time, subject obviously to recalling a

15:50 10 representative of Stoughton Davidson who's properly

15:51 11 prepared.

15:51 12     MR. NICHOLSON: I'm just going to object to

15:51 13 that last comment. I don't know that there was anything

15:51 14 you asked in the subpoena that Mr. Dye wasn't prepared to

15:51 15 talk about today.

15:51 16     MS. WOODRUFF: I second that objection, and I

15:51 17 would also object to any further depositions being taken

15:51 18 of Stoughton Davidson.

15:51 19     MR. NUTI: I tend to agree with the liquidator.

15:51 20 As I understand it, the witness did not participate in

15:51 21 the actual audit that produced document SD 42.

15:51 22     MR. NICHOLSON: And that may be -- excuse me.

15:51 23     MR. NUTI: He can't testify as to whether or

15:51 24 not anybody of Stoughton Davidson looked at the legal

15:51 25 documents underlying the transactions reflected in there.

Page 49

15:51 1      MR. NICHOLSON: That may be. I think if you

15:51 2  look back at the subpoena, there was nothing having to do

15:51 3  with the audit in the subpoena itself.

15:52 4      MR. NUTI: I don't see --

15:52 5      MR. NICHOLSON: Excuse me. To the extent you

15:52 6  supplement the subpoena, if there are additional

15:52 7  categories you're looking for, we'd be happy to take

15:52 8  another look at it. I object and resent the notion that

15:52 9  Mr. Dye has come here unprepared today. I think he was

15:52 10 very prepared to talk about the subjects you actually

15:52 11 categorized and gave him.

15:52 12     MR. NUTI: You want to go off the record for a

15:52 13 minute?

15:52 14     MR. CHRISTMAS: Okay.

15:57 15     (Discussion off the record.)

15:57 16     MR. CHRISTMAS: Ms. Woodruff I guess has the

15:57 17 floor.

15:57 18     You have more questions?

15:57 19     MS. WOODRUFF: Yeah.

15:57 20     EXAMINATION BY MS. WOODRUFF

15:57 21     Q. Hi, Mr. Dye. I want to follow-up and ask you a

15:57 22 few questions. Before I do, I want to put on the record

15:57 23 that the Australian liquidator and his counsel, as well

15:57 24 as counsel for the trustee and the counsel for the

15:57 25 Unsecured Creditors Committee stepped out into the hall

13 (Pages 46 to 49)

SCOTT DYE - 8-16-2011

Page 50

15:57 1  to confer amongst themselves during the time that we were
15:57 2  off the record.
15:58 3      Mr. Dye, you are here testifying on behalf of
15:58 4  Stoughton Davidson, correct?
15:58 5    A. That is correct.
15:58 6    Q. And as you sit here today, are you prepared to
15:58 7  testify to the extent that Stoughton Davidson has any
15:58 8  knowledge about the assignment, transfer, distribution or
15:58 9  sale of any ownership interest in SK Foods Australia?
15:58 10    A. The only knowledge we have was that this is a
15:58 11  transaction that occurred November 1st, 2006, prior to
15:58 12  our audit and, in fact, almost a full year prior to
15:58 13  audit, was included in the audit prior to us, and we
15:58 14  would not go back and look at documents and transactions
15:58 15  that occurred in prior periods, particularly when they've
15:58 16  been audited by a firm such as Moss Adams.
15:58 17    Q. Okay. Thank you.
15:58 18      And are you, as you sit here today, prepared to
15:58 19  testify on behalf of Stoughton Davidson about the
15:59 20  transfer of shares or other ownership interests in SK
15:59 21  Foods Australia, by SK Foods Limited Partnership, which
15:59 22  is the California limited partnership that's in
15:59 23  bankruptcy here, to the Scott Salyer revocable trust and
15:59 24  SKPM corporation effective November 1, 2006?
15:59 25      MR. CHRISTMAS: Alleged transfer.

Page 51

15:59 1      THE WITNESS: Again, our only knowledge of that
15:59 2  is from the prior year audit conducted by Moss Adams
15:59 3  indicating that that transfer took place on November 1st,
15:59 4  2006. We relied on Moss Adams' audit.
15:59 5  BY MS. WOODRUFF:
15:59 6    Q. And as you sit here today are you prepared to
15:59 7  testify on behalf of Stoughton Davidson concerning any
15:59 8  assignment, transfer, distribution or sale of any debt of
15:59 9  SK Foods Australia owing to SK Foods Limited Partnership?
15:59 10    A. Again, any knowledge we have of that relates to
15:59 11  the prior audit that we relied on.
15:59 12    Q. As you sit here today are you prepared to
15:59 13  testify about any conveyance to the SSC&L 2007 trust
16:00 14  effective November 1, 2006, whether by assignment,
16:00 15  transfer, distribution, sale or otherwise of debt of SK
16:00 16  Foods Australia owing to SK Foods Limited Partnership?
16:00 17    A. The SSCL trust, I need clarification because
16:00 18  I've seen this thing referred to as the SSCL trust, I've
16:00 19  seen it referred to as the Scott Salyer revocable trust.
16:00 20  I'm not sure they're interchangeable, if they are. We
16:00 21  only know of the transfer that went to in the work papers
16:00 22  indicating that Scott Salyer revocable trust in November.
16:00 23  If it's one and the same, then yes.
16:00 24    Q. And when you're referring to the transfer that
16:00 25  occurred to the trust, are you referring to the transfer

Page 52

16:00 1  of the ownership interests of the Australian subsidiary,
16:00 2  or of the debt?
16:00 3    A. There was both, transfers of ownership interest
16:00 4  and debt.
16:00 5    Q. Okay. And to the best of your knowledge, the
16:01 6  debt as well as the ownership interests were transferred
16:01 7  to a trust entitled Scott Salyer revocable trust?
16:01 8    A. That's our understanding from the audit
16:01 9  conducted by Moss Adams and our review of that.
16:01 10    Q. As you sit here today are you prepared to
16:01 11  testify about any transfer of SKPM corporation to
16:01 12  Monterey Peninsula Farming of any ownership interest in
16:01 13  SK Foods Australia?
16:01 14    A. No, I have no knowledge of that transfer.
16:01 15    Q. Is there anybody at Stoughton Davidson --
16:01 16    A. Excuse me, let me clarify. SKPM Corp?
16:01 17    Q. Correct.
16:01 18    A. Did we say Monterey Peninsula? Because in the
16:01 19  work papers the transfer of ownership interest indicates
16:01 20  that it was the other partner, which was SKPM Corp, and
16:01 21  therefore the interest would have been transferred.
16:01 22    Q. To SKPM Corp?
16:01 23    A. Right.
16:01 24    Q. And that transfer that you're referring to is
16:02 25  the transfer that occurred on November 1st, 2006?

Page 53

16:02 1    A. Correct.
16:02 2    Q. According to the Moss Adams audited financial
16:02 3  statements?
16:02 4    A. That is correct.
16:02 5    Q. And do you know whether there's anybody at
16:02 6  Stoughton Davidson who has any knowledge about any
16:02 7  subsequent transfer from SKPM Corporation to Monterey
16:02 8  Peninsula Farming?
16:02 9    A. To the best of my knowledge, no.
16:02 10    Q. Okay. As you sit here today, are you prepared
16:02 11  to testify about any transfer --
16:02 12      (Interruption of phone ringing.)
16:02 13      MR. NICHOLSON: Can we go off the record for a
16:02 14  second.
16:02 15      MR. CHRISTMAS: Sure.
16:02 16      (Discussion off the record.)
16:02 17  BY MS. WOODRUFF:
16:02 18    Q. -- any transfer by SKPM -- well, that seems to
16:03 19  be the same. Strike that.
16:03 20      As you sit here today, Mr. Dye, are you
16:03 21  prepared to testify on behalf of Stoughton Davidson
16:03 22  concerning any transfer by the Scott Salyer revocable
16:03 23  trust to Monterey Peninsula Farming of any ownership
16:03 24  interest in SK Foods Australia?
16:03 25    A. I have no knowledge of any transfer from the

14 (Pages 50 to 53)

e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 54

16:03  1   trust to Monterey Peninsula.
16:03  2        Q. To your knowledge is there anybody at Stoughton
16:03  3   Davidson who has knowledge of transfer from the Scott
16:03  4   Salyer revocable trust to Monterey Peninsula Farming?
16:03  5        A. To the best of my knowledge, no, there's no
16:03  6   one.
16:03  7        Q. As you sit here today, Mr. Dye, are you
16:03  8   prepared to testify on behalf of Stoughton Davidson
16:03  9   concerning any transfer by Monterey Peninsula Farming of
16:03  10  any ownership interest in SK Foods Australia to any
16:03  11  party?
16:03  12       A. I have no knowledge of Monterey Peninsula
16:04  13  Farming transferring any assets.
16:04  14       Q. To the best of your knowledge is there anybody
16:04  15  at Stoughton Davidson who has knowledge of a transfer
16:04  16  by Monterey Peninsula Farming of any ownership interest
16:04  17  in SK Foods Australia?
16:04  18       A. As far as I know, there is no one.
16:04  19       Q. All right. As you sit here today are you
16:04  20  prepared to testify concerning the stockholders, members
16:04  21  or any other types of holders of ownership interests in
16:04  22  Cedenco JV Australia or SK Foods Australia?
16:04  23       A. I'd have to double-check the transfers. The
16:04  24  only transfers we're aware of were the transfers that
16:04  25  took place November 1, 2006.

Page 55

16:05  1        Q. And as you sit here today are you prepared to
16:05  2   testify about the identity and owner of any debt that was
16:05  3   originally between SK Foods Limited Partnership on the
16:05  4   one hand and any SK Foods related entity from New Zealand
16:05  5   or Australia on the other hand?
16:05  6        A. I'm not sure I quite understand that question.
16:05  7        Q. Okay. I'm trying to broaden the topics. As
16:05  8   you sit here today are you prepared to testify on behalf
16:05  9   of Stoughton Davidson concerning who holds the notes
16:05  10  payable or notes receivable as between SK Foods limited
16:05  11  partnership on the one hand and notes that were
16:05  12  originally issued by or to any SK Foods related entity in
16:05  13  Australia or New Zealand?
16:05  14       A. As of what time?
16:05  15       Q. As of any time.
16:06  16       A. As of November 1st, 2006, I can testify as to
16:06  17  what notes were transferred to the revocable trust. From
16:06  18  that point forward, we have no knowledge as to what the
16:06  19  revocable trust may or may not have done with those
16:06  20  underlying assets.
16:06  21       Q. Okay. So what can you tell us about the
16:06  22  transfer of the notes on November 1st, 2006?
16:06  23       A. SK Foods consolidated a number of accounts at
16:06  24  that point in time, both receivables and payables to
16:06  25  foreign -- I'll use the term "affiliates,"

Page 56

16:06  1   "subsidiaries." They ended up combining to a balance of
16:06  2   18,262,149, which was transferred to the Scott Salyer
16:06  3   trust as indicated in the work papers provided to us.
16:07  4        MR. CHRISTMAS: Are you reading off a document,
16:07  5   sir?
16:07  6        THE WITNESS: I'm looking at SD 27, which was,
16:07  7   I believe, a Moss Adams document which shows which
16:07  8   accounts were consolidated.
16:07  9   BY MS. WOODRUFF:
16:07  10       Q. I'm sorry, you said SD 000027?
16:07  11       A. 27 in our production.
16:08  12       MS. WOODRUFF: Can we go off the record for a
16:08  13  moment.
16:08  14       (Discussion off the record.)
16:08  15       (Exhibit 69 was marked for identification.)
16:08  16  BY MS. WOODRUFF:
16:17  17       Q. I've asked the court reporter to mark a
16:17  18  document you produced, SD 27, and it's been marked by the
16:17  19  court reporter has Exhibit 69. Do you see that?
16:17  20       A. I do.
16:17  21       Q. Can you tell me what this is?
16:17  22       A. I believe it is a schedule relating to the
16:18  23  balance as of June 30th, 2007, for the accumulation and
16:18  24  consolidation of the receivables and payables that were
16:18  25  either transferred or sold to the revocable trust.

Page 57

16:18  1        Q. Is this a Stoughton Davidson work paper?
16:18  2        A. No, it is not.
16:18  3        Q. Is this a Moss Adams work paper?
16:18  4        A. I cannot testify to whose work paper it is,
16:18  5   other than it is not a Stoughton Davidson, but to the
16:18  6   best of my knowledge, it is a Moss Adams.
16:18  7        Q. Okay. Thank you.
16:18  8        The little notations on the side, there a
16:18  9   couple of 1s in circles and then summation and another 1
16:18  10  in a circle. Are those Stoughton Davidson markings?
16:18  11       A. I don't believe so. Again, I believe this is
16:18  12  part of the Moss Adams work papers, and those 1s
16:18  13  accumulate to the four million eight.
16:18  14       Q. Okay. Is this a document that you reviewed in
16:18  15  preparation for your deposition today?
16:19  16       A. I did review it, yes.
16:19  17       Q. And so, to the best of your knowledge, this is
16:19  18  a document that Moss Adams used in coming up with the
16:19  19  amount of the net receivable, 18.2 million roughly, that
16:19  20  appeared in the audited financial statements for 2007?
16:19  21       A. That would be correct.
16:19  22       Q. Let me just see if I have --
16:19  23       You testified at the beginning of your
16:19  24  deposition that you have both audit and tax experience.
16:19  25  Is that right?

15 (Pages 54 to 57)

e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 58

16:19  1      A. That would be correct.

16:19  2      Q. All right. In your experience in your career

16:19  3  having conducted audits, would you have -- let me back

16:19  4  up.

16:19  5          You've testified today that the information

16:19  6  that you are aware of, that Stoughton Davidson is aware

16:19  7  of, concerning the transfer of the Australian

16:19  8  subsidiaries to the SKPM corp and the Scott Salyer trust,

16:20  9  as well as the transfer of the debt, that your knowledge

16:20  10  of those were based on the audited financial statements

16:20  11  and work papers from Moss Adams. Is that accurate?

16:20  12     A. That is correct.

16:20  13     Q. In your experience as an auditor, in relying on

16:20  14  previously audited financial statements, would it be a

16:20  15  common practice to look to the underlying documents

16:20  16  supporting various line items in previously audited

16:20  17  financial statements?

16:20  18          MR. NICHOLSON: I'm going to object because I

16:20  19  think you're asking him an expert opinion there. I would

16:20  20  instruct him to go ahead and answer it, but I don't want

16:20  21  to go too far down the road here. He's not being paid as

16:20  22  an expert witness.

16:20  23          MR. LEWIS: Bank of Montreal, also objects,

16:20  24  improper lay testimony.

16:20  25          MR. NICHOLSON: You can go ahead and answer,

Page 59

16:20  1  Mr. Dye.

16:21  2          THE WITNESS: Could you repeat the question.

16:21  3  BY MS. WOODRUFF:

16:21  4      Q. Would it be a normal practice of you as an

16:21  5  auditor, in your experience as an auditor, to ask to see

16:21  6  the underlying documents supporting a specific line item

16:21  7  and previously audited financial statements?

16:21  8      A. If you're referring to the underlying legal

16:21  9  documents that would be supportive of these or the

16:21  10  transaction that included the transfers, not normally.

16:21  11     Q. Okay. Under what circumstances would you ask

16:21  12  to see, for example, the loan agreements between the

16:21  13  various Cedenco entities and SK Foods if you were

16:21  14  conducting the audit?

16:21  15          MR. LEWIS: Objection. Improper lay testimony.

16:21  16          THE WITNESS: Can you repeat.

16:21  17  BY MS. WOODRUFF:

16:21  18     Q. Under what circumstances? You said

16:21  19  "previously," not "normally," so under what circumstances

16:22  20  would you ask to see the underlying documents to support

16:22  21  a transaction?

16:22  22     A. I believe that the only time you might consider

16:22  23  that would be is if something had come to your attention

16:22  24  prior to your review of the prior auditor's work papers.

16:22  25          MS. WOODRUFF: Okay. I have no further

Page 60

16:22  1  questions.

16:22  2          MR. NUTI: I think I can -- have a couple

16:22  3  questions of this witness, and then I think I might be

16:22  4  done.

16:22  5          EXAMINATION BY MR. NUTI

16:22  6      Q. It's my understanding that the Moss Adams audit

16:22  7  reflects a transfer of a loan or an amount receivable to

16:22  8  the SSC&L trust. Is that correct?

16:22  9      A. The audit and footnotes to that audit do not

16:22  10  indicate who it was transferred to, but indicates it was

16:22  11  transferred to a partner. Whether it was the SSCL trust

16:23  12  or a Scott Salyer revocable trust, because the work

16:23  13  papers only refer to capital S Salyer revocable trust. I

16:23  14  don't know if that's the same trust that everybody refers

16:23  15  to as the SSCL trust.

16:23  16     Q. Well, you understand that there was two

16:23  17  separate transactions reflected in that footnote, and one

16:23  18  was a distribution of equity to the two partners?

16:23  19     A. Correct.

16:23  20     Q. One being SKPM corp, the other being the

16:23  21  Scott Salyer Revocable trust?

16:23  22     A. Okay.

16:23  23     Q. Another aspect of the divestiture of the

16:23  24  investments in the foreign entities was a divestiture of

16:23  25  notes receivable from Australia and New Zealand, correct?

Page 61

16:23  1      A. Correct.

16:23  2          MS. WOODRUFF: Objection. Misstates prior

16:23  3  testimony, even this witness's prior testimony that it

16:23  4  wasn't just notes receivable that were transferred to the

16:23  5  trust.

16:24  6  BY MR. NUTI:

16:24  7      Q. And obligations that were transferred by SK

16:24  8  Foods to a trust?

16:24  9      A. To a revocable trust, right.

16:24  10     Q. What is your understanding of the date of those

16:24  11  transactions?

16:24  12     A. According to the footnote, those transactions

16:24  13  occurred November 1st, 2006.

16:24  14          MR. NUTI: Will you mark that 70.

16:24  15          (Exhibit 70 was marked for identification.)

16:24  16  BY MR. NUTI:

16:24  17     Q. Mr. Dye, can you take a look at what's been

16:24  18  marked as Exhibit 70. The exhibit is a letter dated

16:24  19  December 18, 2007, correct?

16:25  20     A. That's correct.

16:25  21     Q. And from the letter, it appears it is from

16:25  22  Gary Perry, a lawyer for SK Foods, he also had other

16:25  23  clients at the time, sending to Mr. Salyer what is

16:25  24  referred to as two execution originals of each of the

16:25  25  following documents. One is SSC&L 2007 trust with a

16 (Pages 58 to 61)

## SCOTT DYE – 8-16-2011

### Page 62

16:25  1    request "Please sign as settlor and trustee where
16:25  2    indicated on page 42."
16:26  3        I'll represent to you that there is a copy of
16:26  4    that trust document signed by Mr. Salyer sometime between
16:26  5    December 18th and the end of the year, suggesting that
16:26  6    the SSC&L trust was formed in 2007.
16:26  7        MR. NICHOLSON:  Is there a question in there
16:26  8    somewhere?
16:26  9        MR. NUTI:  Give me a second.
16:26 10        Mark this as 71.
16:26 11        (Exhibit 71 was marked for identification.)
16:26 12        MR. CHRISTMAS:  Do you have a copy for us?
16:27 13        MR. NUTI:  Sorry.
16:27 14    BY MR. NUTI:
16:27 15      Q.  Have you had a chance to look at Document
16:27 16    Number 71, Mr. Dye?
16:27 17      A.  Well, briefly.
16:27 18      Q.  Take your time.
16:27 19        Can you tell me what this document appears to
16:27 20    be?
16:27 21        MR. NICHOLSON:  Objection.  The document speaks
16:27 22    for itself, also compound.
16:27 23        THE WITNESS:  And I assume you're asking for a
16:27 24    lay opinion?
16:27 25        MR. NUTI:  Of course.

### Page 63

16:27  1        THE WITNESS:  It appears to be a debt
16:27  2    assignment agreement.
16:27  3    BY MR. NUTI:
16:27  4      Q.  You notice it's dated January 14, 2008?
16:28  5        MS. WOODRUFF:  Objection --
16:28  6        MR. NICHOLSON:  Objection.  Vague and
16:28  7    ambiguous.
16:28  8        MS. WOODRUFF:  Objection.  Misstates the
16:28  9    evidence.  Objection.  The document speaks for itself.
16:28 10        THE WITNESS:  The document itself does not have
16:28 11    any date in 2008 on it.
16:28 12    BY MR. NUTI:
16:28 13      Q.  The letter itself.
16:28 14      A.  The letter is dated January 14, 2008.
16:28 15      Q.  And the debt assignment purports to be first
16:28 16    day of November, 2006 between the SSC&L 2007 trust, SK
16:28 17    Foods, and Cedenco Foods Limited New Zealand company
16:28 18        If, in fact, the SSC&L trust was not formed
16:28 19    until December, 2007, how is it that they could enter
16:28 20    into an agreement dated the first of November, 2006?
16:29 21        MS. WOODRUFF:  Objection --
16:29 22        THE WITNESS:  I'm not here to give legal
16:29 23    opinions and I have no answer to that question.
16:29 24        MR. NICHOLSON:  I'll join the objection, that's
16:29 25    an incomplete hypothetical.

### Page 64

16:29  1    BY MR. NUTI:
16:29  2      Q.  Based on these documents, does that raise a
16:29  3    question in your mind of the validity of the Moss Adams
16:29  4    audit?
16:29  5        MR. NICHOLSON:  Objection.  Calls for improper
16:29  6    lay opinion.
16:29  7        MS. WOODRUFF:  And objection, calls for a legal
16:29  8    conclusion.
16:29  9        THE WITNESS:  Again, I don't know if there are
16:29 10    other documents relating to this or not.  It does
16:29 11    indicate a difference in dates.  That's all that I can
16:29 12    gather for fact out of this.
16:29 13    BY MR. NUTI:
16:29 14      Q.  Does it raise a question in your mind as you
16:29 15    sit here today, and I assume seeing these for the first
16:29 16    time, of the validity, and the accuracy of Moss Adams
16:29 17    audit?
16:29 18        MR. NICHOLSON:  Objection.  Lacks foundation.
16:29 19        THE WITNESS:  Again, I'm not here to give an
16:29 20    opinion as to validity and quality of the Moss Adams
16:30 21    audit.  I've never seen these documents before, I don't
16:30 22    know whether documents might be involved to substantiate
16:30 23    whatever they did.
16:30 24    BY MR. NUTI:
16:30 25      Q.  In a vacuum, would this tend to make you

### Page 65

16:30  1    investigate further?
16:30  2        MR. NICHOLSON:  Objection.  Improper lay
16:30  3    opinion.
16:30  4        THE WITNESS:  In a vacuum, yes, I might
16:30  5    investigate further.
16:30  6        MR. NUTI:  Thank you.  I don't have any
16:30  7    questions.
16:30  8        EXAMINATION BY MR. DREHER
16:30  9      Q.  Just a quick follow-up question.
16:30 10        Mr. Dye, I believe you testified that your
16:30 11    firm's understanding of the purported November 1st, 2006
16:30 12    transfer of the ownership of the Australian subsidiary
16:30 13    out of SK Foods LP is based on the Moss Adams 2007 audit.
16:30 14    Is that correct?
16:30 15        MR. NICHOLSON:  Objection.  Vague and
16:30 16    ambiguous, compound, misstated the evidence also.
16:30 17    BY MR. DREHER:
16:30 18      Q.  Do you understand my question?
16:30 19      A.  I believe so.  Our understanding of that
16:30 20    transaction is based on Moss Adams' audit and work papers
16:31 21    provided that are included in these documents produced.
16:31 22      Q.  Thank you, and that's my clarification
16:31 23    question, because I've heard you use the term "work
16:31 24    papers" a few times over the past hour.  What do you mean
16:31 25    when you say "work papers"?  What are you referring to?

17 (Pages 62 to 65)

Merrill Corporation - San Francisco
800-869-9132                                          www.merrillcorp.com/law
BMO 002016
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 66

16:31 1    A. In performing an audit, to validate any account
16:31 2 you create work papers that support them. Some of these
16:31 3 documents here, for example, Exhibit 69 is presumably a
16:31 4 work paper. Something like that would validate the
16:31 5 18,262,000.
16:31 6    MR. NICHOLSON: On a lighter note, I also add
16:31 7 he's been answering questions for more than an hour.
16:31 8 BY MR. DREHER:
16:31 9    Q. Just to put the final point of clarification on
16:31 10 it, then, have you or your firm ever seen any work papers
16:31 11 supporting the purported November 1st, 2006 transfer of
16:31 12 the equity of the Australian subsidiary out of SK Foods
16:32 13 LP?
16:32 14    A. I believe so.
16:32 15    Q. Do you know if you've produced those documents?
16:32 16    A. I believe so.
16:32 17    Q. Can you show them to me?
16:32 18    A. If you go to our production, under SD000030
16:32 19 there is an adjusting journal entry there, number 35.
16:32 20    MR. CHRISTMAS: For clarification, which
16:32 21 production are you looking at? Does it have the space
16:32 22 between the numbers or not?
16:33 23    THE WITNESS: Our production, does not have a
16:33 24 space.
16:33 25    MR. NUTI: I'm sorry. It was number 30?

Page 67

16:33 1    THE WITNESS: Correct.
16:33 2 BY MR. DREHER:
16:33 3    Q. Okay. Specifically referring -- well, let me
16:33 4 ask you this before I ask you any further questions about
16:33 5 SD000030.
16:33 6    Is there any other work paper that you can
16:33 7 identify that also reflects or supports that transfer?
16:33 8    A. SD000027.
16:33 9    MS. WOODRUFF: Which, for the record, was
16:33 10 previously marked as...
16:33 11    THE WITNESS: Exhibit 69.
16:33 12    MS. WOODRUFF: Correct.
16:33 13 BY MR. DREHER:
16:33 14    Q. Are there any other documents that are work
16:33 15 papers that in your mind support or evidence that
16:34 16 transfer?
16:34 17    A. Well, there may be but these two adequately
16:34 18 support it in my mind.
16:34 19    Q. Looking at what's been marked as Exhibit 27,
16:34 20 which is --
16:34 21    MR. NICHOLSON: I think it's actually marked
16:34 22 Exhibit 69. It's Document 27.
16:34 23    MR. DREHER: You're correct.
16:34 24 BY MR. DREHER:
16:34 25    Q. Exhibit 69, do you have that in front of you,

Page 68

16:34 1 Mr. Dye?
16:34 2    A. I do.
16:34 3    Q. Just explain to me where on this work paper in
16:34 4 your mind that transfer is demonstrated or described?
16:34 5    MS. WOODRUFF: Objection. Vague and ambiguous
16:34 6 as to "that transfer."
16:34 7    THE WITNESS: At the bottom of the extended
16:34 8 column you will see in all capital letters "Investment in
16:34 9 SK Foods LLC, Investment in SK Foods Australia." To the
16:34 10 right of those is an amount for SK Foods LLC, $2,840,124.
16:34 11    To the right of Investment in SK Foods
16:35 12 Australia is the amount of 2,040,882.
16:35 13    You'll note that there are circled number 1s
16:35 14 next to those. Those are used to accumulate, and down
16:35 15 below you will see an amount of $4,881,006, and to the
16:35 16 left of that it says "Less investment distributed to the
16:35 17 partners." Okay?
16:35 18    If you'll then go to SD000030, you will see on
16:35 19 adjusting journal entry number 35 in the credit column a
16:35 20 4,881,006 amount taking off the investment in SK Foods
16:35 21 Australia as one line item for that amount, and debiting
16:35 22 the two capital accounts, one for S. Salyer revocable
16:35 23 trust, and the other capital account of SKPM Corp with a
16:36 24 description to distribute partnership interests.
16:36 25    Q. Okay. Do you know who prepared, I believe you

Page 69

16:36 1 were already asked this question on SD 69, but going back
16:36 2 and asking you about SD000030, do you know who prepared
16:36 3 that work paper?
16:36 4    A. I cannot tell you who prepared it.
16:36 5    Q. Okay. Sorry to jump around. Jumping back to
16:36 6 SD 69 on the top left, at least on my copy, there's what
16:36 7 appears to be the stamped letters PBC. Do you see that?
16:36 8    A. I do.
16:36 9    Q. What do you think that means?
16:36 10    A. Are you asking me to speculate?
16:36 11    MR. NICHOLSON: Objection. Calls for
16:36 12 speculation.
16:36 13    THE WITNESS: I would assume and guess that it
16:36 14 means Prepared By Client.
16:36 15 BY MR. DREHER:
16:36 16    Q. Why would you make that assumption?
16:36 17    A. Because that's the same initials we put on when
16:36 18 a document is prepared by a client during our audits.
16:36 19    Q. Do you believe that Exhibit 69 is something
16:36 20 that was prepared by SK Foods?
16:37 21    A. I have no idea who prepared it.
16:37 22    Q. Does your firm, or I guess if you know, Moss
16:37 23 Adams, but is it typical when an accounting firm is
16:37 24 auditing the financial statements of a company or a
16:37 25 business organization, is it typical for the accounting

e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 70

16:37  1  firm or for the client to prepare adjusting journal
16:37  2  entries?
16:37  3      MR. NICHOLSON: Objection. Improper lay
16:37  4  opinion.
16:37  5      THE WITNESS: It's not typical either way.
16:37  6  BY MR. DREHER:
16:37  7      Q. Okay. Could be either?
16:37  8      A. Could be either.
16:37  9      Q. In your experience?
16:37  10     A. Correct.
16:37  11     MR. DREHER: I don't have any other questions.
16:37  12     MR. CHRISTMAS: Just a couple of questions.
16:37  13     FURTHER EXAMINATION BY MR. CHRISTMAS
16:37  14     Q. In the Stoughton Davidson audit file do you
16:37  15  know if there are work papers supporting the intercompany
16:38  16  loan balance that's shown in the financial statements
16:38  17  prepared by Stoughton Davidson?
16:38  18     MR. NICHOLSON: Objection. Vague and
16:38  19  ambiguous.
16:38  20     MS. WOODRUFF: Which exhibit are you referring
16:38  21  to?
16:38  22     MR. CHRISTMAS: I'm just asking him about the
16:38  23  financial statements, without directing him to them.
16:38  24     THE WITNESS: I believe your Exhibit 38 is
16:38  25  responsive to that question.

Page 71

16:38  1  BY MR. CHRISTMAS:
16:38  2      Q. And does Exhibit 38 indicate what underlying
16:38  3  documents were reviewed by Stoughton Davidson to verify
16:38  4  the intercompany loan balance?
16:38  5      MR. NICHOLSON: Objection. Document speaks for
16:38  6  itself.
16:38  7      THE WITNESS: Which I would agree with
16:38  8  Mr. Nicholson's comment.
16:38  9  BY MR. CHRISTMAS:
16:39  10     Q. I'm just asking what you know.
16:39  11     A. It's in the legend as to what was done to
16:39  12  satisfy him that that was a valid number, the tick mark
16:39  13  legend.
16:39  14     Q. Do you know if any procedures were followed by
16:39  15  Stoughton Davidson in creating the financial statements
16:39  16  for June 30, 2008, to give effect to the alleged
16:39  17  distribution of equity to the partners of the Australian
16:39  18  and New Zealand entities?
16:39  19     MR. NICHOLSON: Objection. Vague and
16:39  20  ambiguous.
16:39  21     THE WITNESS: The answer is I would understand
16:39  22  it was that transaction took place before this year, and
16:39  23  therefore would not have any impact to these audit
16:39  24  financial statements.
16:39  25  ///

Page 72

16:39  1  BY MR. CHRISTMAS:
16:39  2      Q. Are you aware whether or not there were any
16:39  3  adjusting journal entries necessary in the year-end
16:39  4  June 30, 2008 to give effect of that transaction that
16:40  5  were not posted in the prior year?
16:40  6      MR. NICHOLSON: Objection. Improper lay
16:40  7  opinion.
16:40  8  BY MR. CHRISTMAS:
16:40  9      Q. I'm asking for the fact of that. Do you know
16:40  10  if there were?
16:40  11     A. I don't believe there were any journal entries
16:40  12  posted for that note or the investments which had already
16:40  13  been distributed.
16:40  14     Q. And you're basing that understanding on what?
16:40  15     A. The fact that the note balance, 18,262,000
16:40  16  stayed the same. There was no change in that number.
16:40  17  And the other investments had already been cleared off
16:40  18  the books.
16:40  19     Q. Do you know if the client had to address any
16:40  20  adjusting journal entries in its books to give effect to
16:40  21  that distribution of the equity?
16:40  22     MS. WOODRUFF: Objection. Calls for
16:40  23  speculation, lacks foundation.
16:40  24     THE WITNESS: Not during the 6/30/2008 audit,
16:40  25  no. I don't believe were anything -- I believe that was

Page 73

16:40  1  all done prior.
16:40  2  BY MR. CHRISTMAS:
16:40  3      Q. But your question implies that you know from
16:41  4  having worked on the audit, and I thought you had no
16:41  5  involvement in the audit?
16:41  6      MR. NICHOLSON: Objection. Misstates his
16:41  7  testimony.
16:41  8      THE WITNESS: My testimony relates to my review
16:41  9  of these documents, such as this one you provided me
16:41  10  today, showing no entries made to that account.
16:41  11  BY MR. CHRISTMAS:
16:41  12     Q. But your knowledge of that is only based on the
16:41  13  document production. Is that correct?
16:41  14     A. That's correct. I did not work on the audit.
16:41  15     Q. Right, and you did not look at the audit file
16:41  16  to prepare for this examination?
16:41  17     A. I did not.
16:41  18     MS. WOODRUFF: Sorry, I'm going to object on
16:41  19  that that it misstates the testimony, because the witness
16:41  20  testified that he prepared for this deposition by
16:41  21  reviewing documents and talking to Ms. Garone.
16:41  22     MR. CHRISTMAS: Well, the testimony speaks for
16:41  23  itself. I think that mischaracterizes it as well.
16:42  24     Nothing.
16:42  25     MR. NICHOLSON: I just have a couple questions.

19 (Pages 70 to 73)

Merrill Corporation - San Francisco
800-869-9132          www.merrillcorp.com/law
BMO 002018
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

SCOTT DYE - 8-16-2011

Page 74

16:42  1           EXAMINATION BY MR. NICHOLSON
16:42  2      Q.  Mr. Dye, if I can refer you all the way back to
16:42  3   Exhibit 1, which it starts with a Notice of Deposition
16:42  4   heading, and I apologize there are no Bates-stamped pages
16:42  5   on this exhibit, but if you flip back to what is page --
16:42  6   starts at page 6 and overlaps onto page 7 of the combined
16:42  7   designation of matters for testimony pursuant to Federal
16:42  8   Rules Procedure 30(b)(6).
16:42  9      Did you have occasion to read these categories
16:42  10  during one of the breaks today?
16:42  11     A.  Yes, I did.
16:42  12     Q.  Do you believe that you are the person most
16:42  13  knowledgeable at Stoughton Davidson to testify about the
16:42  14  categories listed here?
16:42  15     A.  I believe there is no one in the firm that has
16:42  16  any more knowledge than I have transferred to the parties
16:43  17  asking questions today than I do.
16:43  18     Q.  And just to be clear, I'm referring to all
16:43  19  matters for examination between paragraphs -- starts with
16:43  20  number 1 and goes all the way down to 13 on page 7.
16:43  21     If I understood your testimony, you believe you
16:43  22  are the person most knowledgeable at Stoughton Davidson
16:43  23  regarding these matters?
16:43  24     A.  Yes.
16:43  25     MR. NICHOLSON:  No further questions.

Page 75

1      (The deposition of SCOTT DYE was concluded at
2   4:43 p.m.)
3
4
5           ---oOo---
6      I declare under penalty of perjury under the
    laws of the State of California that the foregoing is
7   true and correct.
8   Executed at          , California on          ,
    2011.
9
10
            SCOTT DYE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 76

1   STATE OF CALIFORNIA   )
                          )
2   COUNTY OF FRESNO    )
3
4      I, AMANDA SCOTT, Certified Shorthand Reporter
5   licensed in the State of California, License No. 13226,
6   do hereby certify that the foregoing proceedings was
7   reported by me and was thereafter transcribed under my
8   direction into typewriting; that the foregoing is a full,
9   complete and true record of said proceeding.
10     I further certify that I am not of counsel or
11  attorney for either or any of the parties in the
12  foregoing proceeding and caption named, or in any way
13  interested in the outcome of the cause named in said
14  caption.
15     In witness whereof, I have hereunto set my hand
16  and affixed my seal this day.
17     Date:  August 25, 2011
18
19
20
21
22     AMANDA SCOTT, CSR #13226
23
24
25

20  (Pages 74 to 76)

Merrill Corporation - San Francisco
800-869-9132          BMO 002019          www.merrillcorp.com/law
e2da5d00-8659-40ab-a8bf-50ac67e1cbe3

# EXHIBIT 12

BMO 002020



UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

In re:
SK FOODS, L.P., a California    )
limited partnership, et al.,    )
                                )
            Debtors,            )  No. 09-29162-D-11
_____ )
In re:                          )
                                )  No. 09-29161-D-11
RHM INDUSTRIAL/SPECIALTY        )
FOODS, INC., a California       )
Corporation, d/b/a Colusa       )
County Canning Co.,             )
                                )
            Debtor.             )
_____ )


Deposition of
WAYNE W. BOOS, CPA
Monday, June 22, 2009

THE SOUZA GROUP
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California  94566


Reported by:
KAREN SCOTT, CRP, CSR
LICENSE NO. 4027

1  No. 5    Document entitled "Declaration      90
2      of Cary S. Collins in Support
3      of Opposition of SSC Farming,
4      LLC, SSC Farms I, LLC, and SSC
5      Farms II, LLC to Chapter 11
6      Trustee's Motion for Order
7      Determining that Wastewater
8      Discharge Agreements with
9      Related Parties Constitute
10     'Executory Contracts' for
11     Purposes of 11 USC Section
12     365."
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 3

1              I N D E X
2
3  DEPOSITION OF WAYNE W. BOOS, CPA
4  Monday, June 22, 2009
5
6  EXAMINATION BY:                 Page
7      MR. BROSNAHAN              8
8      MR. HART                   92
9
10            E X H I B I T S
11  Exhibit        Description       Page
12  No. 1    Document entitled "Attachment    13
13      A"
14  No. 2    Salyer Enterprises         56
15      organizational chart
16  No. 3    Document entitled          60
17      "Consolidated Farming
18      Operations SS Farms, LLC/SSC
19      Farming/SSC 1 Farming/SSC 2
20      Farming Financial Statements
21      For The Six Months Ending June
22      30, 2008."
23  No. 4    E-mail chain, top one dated    64
24      Wed, May 23, 2007 at 1:56 PM
25
                                              Page 2

1          QUESTIONS INSTRUCTED NOT TO ANSWER
2  QUESTION                        PAGE/LINE
3      Q   Did you review any documents to    10/4
4      refresh your recollection regarding
5      any matters pertinent to the
6      deposition?
7      Q   Did you review any documents that    10/11
8      refreshed your recollection
9      concerning the Salyer companies?
10     Q   Is that a fairly common structure    37/7
11     in the agricultural business?
12     Q   Are you aware of any accounting     50/13
13     rules that prohibit the practice
14     that we just described where there
15     is a loan from one company to
16     another and no underlying loan
17     document?
18
19
20
21
22
23
24
25
                                              Page 4

                                    1 (Pages 1 to 4)

1    BE IT REMEMBERED THAT, pursuant to the laws
2  pertaining to the taking and use of depositions, and
3  on Monday, June 22, 2009, commencing at the hour of
4  1:55 p.m. thereof, at the Law Offices of Kasowitz,
5  Benson, Torres & Friedman LLP, A New York Limited
6  Liability Partnership, 101 California Street,
7  Suite 2050, San Francisco, California, before me,
8  Karen Scott, a Certified Shorthand Reporter of the
9  State of California, there personally appeared
10         WAYNE W. BOOS, CPA,
11  called as a witness by SS Farms, SSC Farming,
12  SSC Farming I and SSC Farming II, who, being by me
13  first duly sworn/affirmed, was thereupon examined and
14  testified as is hereinafter set forth.
15         - - -
16         LAW OFFICES OF KASOWITZ, BENSON, TORRES &
17  FRIEDMAN LLP, A New York Limited Liability
18  Partnership, 101 California Street, Suite 2050,
19  San Francisco, California 94111, represented by
20  BRIAN P. BROSNAHAN, ESQ., appeared as counsel on
21  behalf of SS Farms, SSC Farming, SSC Farming I and SSC
22  Farming II.
23
24
25
*Page 5*

1         P R O C E E D I N G S
2              -oOo-
3         THE VIDEOGRAPHER:  Good afternoon.  We are
4  on the video record at 1:55 p.m.  I am Alan Dias from
5  The Souza Group, San Francisco, California.  The phone
6  number is (415) 433-1234.
7         This is a matter pending before the
8  United States Bankruptcy Court, Eastern District of
9  California, Sacramento Division, case
10  number 09-29162-D11 and case number 09-29161-D11.
11         Today's date is June 22nd, 2009.  We are
12  located at 101 California Street in the City of
13  San Francisco, California.
14         Counsel, would you please identify
15  yourselves, starting with the questioning attorney.
16         MR. BROSNAHAN:  I am Brian Brosnahan of
17  Kasowitz, Benson, Torres & Friedman, representing SSC
18  Farming, LLC, SSC Farms I, LLC, and SSC Farms II, LLC.
19         MR. O'GARA:  Vince O'Gara representing
20  Mr. Boos, the witness.
21         MR. HART:  Christopher Hart of Schnader
22  Harrison Segal & Lewis, on behalf of Brad Sharp,
23  Chapter 11 Trustee.
24         MR. FOSTER:  Jacob Foster of Kasowitz,
25  Benson, Torres & Friedman, on behalf of the SSC Farms
*Page 7*

1         LAW OFFICES OF SCHNADER HARRISON SEGAL &
2  LEWIS LLP, One Montgomery Street, Suite 2200,
3  San Francisco, California 94104, represented by
4  CHRISTOPHER H. HART, ESQ., appeared as counsel on
5  behalf of Bradley D. Sharp, Chapter 11 Trustee.
6
7         LAW OFFICES OF SEGAL & KIRBY, 770 L Street,
8  Suite 1440, Sacramento, California 95814, represented
9  by MALCOLM SEGAL, ESQ., appeared via telephone as
10  counsel on behalf of Scott Salyer.
11
12         MURPHY PEARSON BRADLEY & FEENEY, A
13  Professional Corporation, 88 Kearny Street,
14  10th Floor, San Francisco, California 94108,
15  represented by VINCENT O'GARA, ESQ., appeared as
16  counsel on behalf of the witness, Wayne W. Boos, CPA.
17
18         Also present:  Jacob N. Foster, Esq.;
19  Alan Dias, Videographer, The Souza Group.
20
21
22
23
24
25
*Page 6*

1  entities.
2         MR. BROSNAHAN:  And Malcolm?
3         MR. SEGAL:  Malcolm Segal on behalf of Scott
4  Salyer.
5         THE VIDEOGRAPHER:  Will the court reporter
6  please swear in the witness.
7              WAYNE W. BOOS, CPA,
8  having been duly sworn/affirmed, testified as follows:
9              -oOo-
10              EXAMINATION
11  BY MR. BROSNAHAN:
12    Q   Would you please state your full name and
13  address for the record?
14    **A   Wayne William Boos.  5260 North Palm Avenue,**
15  **Suite 120, Fresno, California 93704.**
16    Q   Thank you, Mr. Boos.  Have you ever had your
17  deposition taken before?
18    **A   Yes.**
19    Q   About how many times?
20    **A   Once.**
21    Q   Was that a long time ago?
22    **A   It was in December.**
23    Q   Not so long.
24    **A   Not too long ago.**
25    Q   I will give you a few of the ground rules
*Page 8*

2 (Pages 5 to 8)

1 even though your counsel has probably reviewed that
2 with you.
3     Most importantly, although we are in an
4 informal setting here in this conference room, your
5 testimony here today has the same force and effect as
6 if you were testifying in a court of law, and for that
7 reason it's very important that you understand the
8 questions that I ask you before you answer that.
9     So if I ask a question that you do not
10 understand, would you please ask me to reframe it or
11 restate it?
12     A   Yes.
13     Q   At the conclusion of the deposition, you
14 will be given a transcript to review and make any
15 corrections that you might feel are necessary, but any
16 party to the case could comment on any changes that
17 you make, and for that reason it's important that you
18 do your best to state your testimony completely and
19 accurately here this afternoon.
20     Do you understand?
21     A   Yes.
22     Q   Any questions about the process?
23     A   No.
24     Q   Okay.  You are represented by counsel here
25 today?

1     A   I received notice on Friday afternoon, so
2 not long.
3     Q   Can you tell me about how many hours?
4     A   I met with counsel, you know, an hour
5 earlier.  Briefly went over the -- preparing on Friday
6 when I got out of my meeting, you know, at 5:00.  A
7 little bit on Saturday.  So about three hours maybe.
8     Q   Thank you.  Have you had any conversations
9 with either the Chapter 11 trustee or his counsel
10 concerning the bankruptcy proceedings?
11     A   Regarding the bankruptcy proceedings?
12     Q   Yes.
13     A   Not the trustee himself.  I spoke with Kyle.
14     Q   Who is Kyle?
15     A   Kyle is with DSI.  Is that the right name?
16     Q   DSI?
17     A   DSI.
18     Q   And what do you understand Kyle's role to
19 be?
20     A   He works with the trustee.
21     Q   And what did you speak to him about?
22     A   The appointment of our firm for tax work in
23 bankruptcy for SK Foods.
24     Q   Has your firm been appointed for tax work
25 for SK Foods in the bankruptcy?

1     A   Yes.
2     Q   And that would be Mr. O'Gara?
3     A   Yes.
4     Q   Did you review any documents to refresh your
5 recollection regarding any matters pertinent to the
6 deposition?
7     MR. O'GARA:  I'm going to object to the
8 extent it calls for documents reviewed exclusively in
9 the presence of his counsel.
10 BY MR. BROSNAHAN:
11     Q   Did you review any documents that refreshed
12 your recollection concerning the Salyer companies?
13     MR. O'GARA:  Same objection.
14     MR. BROSNAHAN:  I think, Counsel, if the
15 documents reviewed his -- refreshed his recollection,
16 then he is permitted to testify about the documents,
17 notwithstanding any privilege.
18     MR. O'GARA:  Yes, he can testify about the
19 documents, but he is not going to give you a list of
20 documents reviewed with counsel.  If you'd like to ask
21 him specific questions about documents, please do.
22     MR. BROSNAHAN:  Perhaps we'll return to the
23 subject.
24     Q   About how long did you spend preparing for
25 your deposition?

1     A   It has not yet.
2     Q   Did you speak with anyone else who
3 represented the trustee regarding the bankruptcy?
4     A   No.  I believe that Kevin did call but did
5 not speak with me.
6     Q   Kevin Coleman?
7     A   Yes.
8     Q   You haven't spoken with anyone from
9 Mr. Coleman's law firm?
10     A   Correct.
11     Q   Did you do any search for documents in
12 preparation for your deposition?
13     A   Yes.
14     Q   And what did you do to search for documents?
15     A   I went through -- my understanding, this was
16 limited to the wastewater for the various entities,
17 the SSC, SSCI and II entities.
18     So in connection with that, I instructed
19 someone in our office to assist on going through the
20 work papers that we had and then, with regards to
21 e-mails, searched with the term wastewater.
22     Q   Did you find any documents?
23     A   Yes.
24     Q   Did you bring any documents with you today?
25     A   No.

1    Q   Why not?
2         I know you had a brief discussion with
3    Mr. Putterman off the record.
4         Did you reach any agreement with him or are
5    you taking the position that no documents need to be
6    produced or -- I am trying to short circuit the
7    inquiry.
8         MR. O'GARA:  I got some documents by e-mail
9    about 35 minutes ago, and I haven't had a chance to
10   review them nor have I been able to print them out on
11   my computer.  They were sent to me by e-mail.  So
12   until I have had a chance to review them, we can't
13   produce anything.
14        MR. BROSNAHAN:  Okay.  I understand.  We
15   would hope to be able to work out production of the
16   documents.  We understand it's been a very short time
17   schedule that's been a problem for all of us.
18        I will have the court reporter mark as
19   Exhibit 1 a document entitled "Attachment A," and then
20   it says "Definitions and General Instructions."
21        (Document referred to herein marked for
22        identification Exhibit No. 1)
23   BY MR. BROSNAHAN:
24   Q   Mr. Boos, have you seen the document that's
25   marked as Exhibit 1 before?

Page 13

1    it to just those relating to wastewater issues.
2    Q   Thank you.  Could you briefly give us your
3    educational background, beginning with your graduation
4    from high school?
5    A   I graduated from high school in 1981,
6    received my bachelor's degree in business
7    administration with an option in accounting from
8    California State University, Fresno, in May of 1985,
9    and received my master's in accounting from Cal State
10   Fresno in May of 1986.
11   Q   Are you a CPA?
12   A   Yes, I am.
13   Q   When did you become certified as a CPA?
14   A   I became certified in 1988.
15   Q   Could you briefly give us your employment
16   history?
17   A   After graduating from college, I went to go
18   work with Ernst & Whinney, subsequently becoming Ernst
19   & Young, in 1986, and continued with them until 1994,
20   when the Fresno office of Ernst & Young was merged
21   into the Fresno office of Deloitte & Touche.
22        I was with Deloitte & Touche until February
23   of 2004, at which time I was a tax director with the
24   firm.  At that time I left Deloitte and started my own
25   practice, Boos & Associates.  I have been operating

Page 15

1    A   Yes.  I received it on Friday.
2    Q   When you did the document search that you
3    described, were you looking for the documents listed
4    in Exhibit 1?
5    A   Yes.
6    Q   Were there any categories of documents in
7    Exhibit 1 that you were not looking for?
8    A   That I was not looking for?
9    Q   Yes.
10   A   What do you mean?
11   Q   In other words, did you exclude any of the
12   categories of documents from your search?
13   A   No.
14   Q   And did you provide your counsel with all of
15   the documents that you found that fell into any of the
16   categories listed on Exhibit 1?
17   A   Yes.  And as a clarification, when -- when
18   Mr. Goss in our office spoke, I believe, with
19   Mr. Putterman on Friday, it was agreed that it was
20   limited to issues relating to the wastewater
21   discharge.  As an example, it says all documents that
22   refer to farm entities.
23        We have a vast number of tax return
24   documents that state their name in there, you know,
25   tens of thousands of pages, but we limit the scope on

Page 14

1    that ever since.
2    Q   Is that a sole proprietorship?
3    A   Yes.
4    Q   What year did you start Boos & Associates?
5    A   2004.
6    Q   You have done work for companies associated
7    with Scott Salyer before, correct?
8    A   Correct.
9    Q   When did you first start working for
10   Mr. Salyer or a company associated with him?
11   A   In 1997.
12   Q   So that was while you were at --
13   A   Deloitte.
14   Q   -- Deloitte?
15        Can you tell us how that work came about?
16   A   It was a referral from an associate that I
17   had that was doing some consulting work for SK Foods
18   at the time.
19   Q   Who is that?
20   A   Tom Jackson.
21   Q   What was the nature of the work that you
22   started doing for either Mr. Salyer or companies
23   associated with him beginning in '97?
24   A   We -- we were working on the audit and tax
25   return work, and my role was in the tax department, so

Page 16

4 (Pages 13 to 16)

1  it was limited to that aspect.
2      Q   What kind of audit are you referring to?
3      **A   The financial statement audit. Deloitte did**
4  **that for SK Foods.**
5      Q   Have you -- well -- so that was SK Foods
6  that you were doing the tax work for?
7      **A   I was doing the tax work for SK Foods, Scott**
8  **Salyer, SS Farms, and maybe a few other ones back**
9  **then, but those were the primary ones.**
10     Q   So that would be SK Foods, SS Farms,
11 Mr. Salyer personally?
12     **A   Uh-huh. And Blackstone Ranch.**
13     Q   Uh-huh. Have you continued to do work for
14 Mr. Salyer or companies associated with him
15 continuously since 1997?
16     **A   Yes.**
17     Q   And has the number of companies that you've
18 done work on expanded over that time?
19     **A   Yes.**
20     Q   And can you tell me what other companies
21 associated with Mr. Salyer you have done work for?
22     **A   SSC Farming, SSC Farming I, SSC Farming II,**
23 **SSC Farming III, SARS, LLC, CSSS, L.P.**
24     Q   Can you --
25     **A   CSS --**
                                            Page 17

1      Q   Can we go back to the one before that?
2      **A   SARS. It's S-A-R-S.**
3      Q   As in the disease?
4      **A   Yeah. I don't know if that's how you spell**
5  **it, but that's the initials.**
6          **I have done work with regards to the foreign**
7  **operations in both New Zealand and Australia, and**
8  **there is multiple entities there, as well as**
9  **Mr. Salyer and his daughter's trust and their personal**
10 **returns. Altogether about 30 some entities and tax**
11 **paying.**
12     Q   When did you first start doing work on the
13 SSC books?
14     **A   The tax return?**
15     Q   Yes.
16     **A   I believe that was organized as an LLC -- I**
17 **believe it was organized around 1999 or 2000,**
18 **someplace around then.**
19     Q   And did you begin working on SSC matters as
20 soon as it became organized?
21     **A   Yes.**
22     Q   Is that also true of SSC Farms I, II and
23 III?
24     **A   Yes.**
25     Q   Are there any companies associated with
                                            Page 18

1  Mr. Salyer that you are aware of that you do not do
2  the tax work for?
3      **A   I don't believe so.**
4      Q   Is there a particular name that you use to
5  describe the group of companies that consists of
6  SS Farms, SSC Farming and then the SSC Farms I, II and
7  III entities?
8      **A   Farming entities?**
9      Q   Or farming companies.
10     **A   Farming companies.**
11     Q   So if we use either of those terms in the
12 deposition, that's what we will be speaking of; okay?
13     **A   Yes. And the other -- I do work also for**
14 **Salyer American Fresh Foods and that group of**
15 **entities, but I would separate that from the SSC**
16 **Farming entities. It's sort of managed differently.**
17     Q   When did you start doing work for Salyer
18 American Fresh Foods?
19     **A   In 2007, when Scott acquired the shares from**
20 **his father and sister.**
21     Q   Do you know Shondale Seymour?
22     **A   Yes.**
23     Q   How did you come to know her?
24     **A   I worked with Shondale initially at Ernst &**
25 **Whinney.**
                                            Page 19

1      Q   Have you worked with her since she came on
2  board with the various Salyer companies?
3      **A   Yes.**
4      Q   Could you describe how you have interfaced
5  with her since she's been working at the Salyer
6  companies?
7      **A   She is the CFO.**
8          **(Interruption.)**
9          MR. BROSNAHAN: We can try, but I don't know
10 that it will work.
11         We have moved the phone as close as we can,
12 so hopefully you can hear better now.
13         MR. SEGAL: Thank you.
14 BY MR. BROSNAHAN:
15     Q   Let's see. We were talking about
16 Ms. Seymour. What's the working relationship like in
17 terms of your interfacing with her?
18     **A   Well, she is the CFO for SK Foods and then**
19 **had -- and also Salyer American Fresh Foods, including**
20 **all the entities. So she was a key contact for us**
21 **from doing tax work.**
22     Q   Have you -- well, has she ever worked for
23 Boos & Associates?
24     **A   Yes.**
25     Q   When did she work for Boos & Associates?
                                            Page 20

5 (Pages 17 to 20)

1   A   April of 2007 through December of 2007.
2   Q   Was she full time at that point?
3   A   Yes.
4   Q   Has --
5   A   She worked extensively on SK Foods, though,
6   at that time.
7   Q   Has she done any work for Boos & Associates
8   since December of 2007?
9   A   No.  Actually in January of 2008.  No, she
10   hasn't.
11   Q   Has she received any compensation from Boos
12   & Associates since January 2008?
13   A   The only thing I think she received
14   subsequent was a PTO payout of her PTO accrual, but
15   not anything for additional work.
16   Q   Could you please describe the services that
17   you perform for the farming companies?  And maybe I
18   should back up a second.
19       You have talked about doing tax work.  Are
20   there people in Boos & Associates who do work other
21   than tax work?
22   A   Yes.
23   Q   Why don't you describe all the types of work
24   that Boos & Associates does for the farming entities.
25   A   For the farming entities?

Page 21

1   Q   Yes.  We can expand to cover all the other
2   entities.
3   A   We have done, obviously, the tax work, and
4   we have done accounting assistance work in the past
5   for those entities.
6   Q   What do you mean by "accounting assistance"?
7   A   Assisting the company in preparing their
8   general ledger and recording accounting transactions
9   as an outsource accounting assistance.
10   Q   During what period of time did Boos &
11   Associates provide accounting assistance to the
12   farming entities?
13   A   Well, during -- when Shondale was with the
14   firm, which was, you know, the April of '07 through
15   January of '08 period, and during that time we had
16   another individual by the name of Gary Shimmin, who is
17   in our accounting and audit department, work with her
18   for about two months to try to get the records up to
19   date.
20   Q   Since Ms. Seymour left Boos & Associates,
21   have you done any accounting assistance work for the
22   farming entities?
23   A   We had a staff person that has helped her
24   since she left, although I'm not -- I don't think she
25   worked on the farming entities.  She was mainly

Page 22

1   working on the SK Foods and Salyer American.
2   Q   Who was that person?
3   A   Deborah Blayney.
4   Q   Do you have an employee named Gene Kezirian?
5   A   No, I don't.  I saw that.  He's not an
6   employee.
7   Q   Okay.  Was he a consultant or did he do any
8   work for Boos & Associates?
9   A   No.  He -- he is an independent outside
10   consultant that works for SK, and then I think he is
11   now an employee of SK.
12   Q   But he never had anything to do with your
13   firm?
14   A   No.
15   Q   And --
16   A   He was hired by Mark McCormick in that role,
17   unrelated.  We worked with him to get information and
18   worked on projects, but he was not an employee of
19   ours.  Never has been.
20   Q   Okay.
21   A   And the same thing with Marshall Scott as
22   well.
23   Q   Turning to other Salyer companies besides
24   the farming entities, you've already testified that
25   you do tax work for those entities, right?

Page 23

1   A   Uh-huh.
2   Q   Do you also do accounting assistance for any
3   of those firms?
4   A   Deborah -- like I said, Deborah Blayney
5   worked on SK Foods and Salyer American Fresh Foods.
6   Q   During what period of time?
7   A   During April of 2007 until they filed
8   bankruptcy in May of '09.
9   Q   And was she located physically on site at
10   SK Foods?
11   A   Yes.
12   Q   But she was a full-time employee of Boos &
13   Associates?
14   A   Yes.
15   Q   Do you know whether she did any work that
16   involved accounting in the general ledger system of
17   the farming entities?
18   A   In the general ledger farming entities?  I
19   don't know.
20   Q   Are you familiar with the general ledger
21   system used by the Salyer companies?
22   A   Yes, somewhat.  The old system or the new
23   system?
24   Q   Well, how about the old system?
25   A   Uh-huh.

Page 24

6 (Pages 21 to 24)

1   Q   When did they stop using the old system?
2   A   They transferred over to -- sometime in
3   early '08 to the DAX system.
4   Q   You are familiar with both of those systems?
5   A   Uh-huh. I have seen reports from it. I
6   don't know how to use it, but I have seen them, yeah.
7   Q   Are you familiar with the structure of the
8   accounts in the general ledger system used by the
9   Salyer companies?
10   A   Yeah.
11   Q   Does each of the companies have its own
12   general ledger accounts?
13   A   There is a separate general ledger for each
14   company and they believe -- I believe they use
15   consistent account GL codings. So the cash is always
16   the same GL account in each of the entities, I
17   believe. I am not sure.
18   Q   So your understanding is that each of the
19   companies has its own general ledger?
20   A   That is true.
21   Q   Are there other kinds of accounting records
22   besides the general ledger system for which each of
23   the Salyer companies has its own set of books?
24   A   Well, they each have their own bank
25   accounts. They each have their own, you know,

Page 25

1   receivables, you know, subsidiary ledgers.
2   Q   That's the general kind of thing I am
3   looking for.
4   A   Yeah.
5   Q   Are there other kinds of accounting records
6   that you can think of that are maintained separately
7   by each of the Salyer companies?
8   A   There are separate payroll. There are
9   separate records for each entity.
10   Q   Has that been true since you started working
11   for the Salyer companies?
12   A   Yes.
13   Q   Have you been involved in preparing
14   financial statements for any of the Salyer entities?
15   A   No.
16   Q   Have you ever reviewed any financial
17   statements for any of the Salyer entities?
18   MR. O'GARA: I'm going to object to the use
19   of the word review because that has a very technical
20   meaning in the accounting business. Do you mean in
21   the technical or the more general sense?
22   BY MR. BROSNAHAN:
23   Q   Why don't we use the more general sense.
24   A   We have not performed any reviews. It's a
25   lesser form of an audit, but I have glanced at them.

Page 26

1   The ones that have been audited -- the SK foods is the
2   only one that's been audited.
3   Q   Let's talk about audits. You were just
4   referring to an audit of SK Foods. Was that a tax
5   audit?
6   A   No. Financial statement audit. Their
7   auditors were Deloitte, Moss Adams, and Stoughton
8   Davidson.
9   Q   When was that audit?
10   A   They were continuous since '97. Every year
11   there was an audit. Previous to that they were
12   audited by KPMG.
13   Q   What's your understanding -- were you
14   involved in that audit process at all, you or your
15   firm?
16   A   The only thing that we did was tax provision
17   work for the audit, to book the tax accounts for --
18   and it relates to the foreign entities.
19   Q   What is tax provision work?
20   A   It's recording in the GL the current and
21   deferred tax liability as well as the current tax
22   expense.
23   Q   What's your understanding of the purpose of
24   the financial statement audits that you have been
25   referring to?

Page 27

1   A   The financial statements are for Mr. Salyer
2   as well. For SK Foods, they were obviously provided
3   to the banks.
4   Q   Other than the series of audits that you
5   described for SK Foods, are you aware of any other
6   audits that have been done on any of the Salyer
7   entities?
8   A   Financial statement audits?
9   Q   Any kind of audits.
10   A   Well, there is IRS audit. Does that fall
11   under your question?
12   Q   Yes, it does.
13   A   SSC Farm -- SSC Farming was under audit.
14   Blackstone Farm -- Blackstone Ranch was under audit,
15   that I worked on, and Mr. Salyer's returns were under
16   audit. SK Foods was under audit. These are all IRS
17   exam audits or Franchise Tax Board exam audits.
18   Q   And the audits that -- the tax audits that
19   you just referred to, were they on a onetime basis or
20   were they recurring for some period?
21   A   They were on a onetime and they may have
22   recurred over time, but they were for a set period.
23   Normally it's a one- or two-year period that gets
24   audited by the IRS or Franchise Tax Board.
25   Q   Do you recall what the period of the audit

Page 28

7 (Pages 25 to 28)

1  was for the SSC Farming audit?
2      A   It was 2004 and 2005.
3      Q   How about Blackstone Ranch?
4      A   Blackstone Ranch was when I was at Deloitte.
5  It could have been in the late '90s or early 2000s.
6      Q   How about SK Foods?
7      A   SK Foods was when I was at Deloitte.  So it
8  was in the '90s -- actually, SK Foods was probably
9  audited a couple times.  '90s and 2000s.  And then
10  actually in the recent last year, year and a half,
11  SK Foods was brought into audit because of another
12  related entity, SKPM, which was under audit about a
13  year ago.
14      Q   When you say you forgot to mention, you mean
15  SKPM is another Salyer-connected company that you have
16  done work for?
17      A   Yes.  And also under IRS audit.
18      Q   So SK Foods and SKPM are under IRS audit
19  now?
20      A   No.
21      Q   No?
22      A   The audit has been closed.  The only ones
23  that are outstanding is SSC Farming.  It's in appeals.
24      Q   And that appeal relates to the '04-05 time
25  period?
                                                    Page 29

1      A   Correct.
2      Q   Did you personally participate in the audits
3  that you just described, the tax audits?
4      A   Yes.
5      Q   Are you aware of any audits that have been
6  done of any of the Salyer entities by accountants
7  brought in by any lenders?
8      A   I know that they have gone through a review
9  process.  I am not that familiar, though, with what
10  they have done or what entities it relates to.
11      Q   Have you had any dealings with Alvarez &
12  Marsal?
13      A   No.
14      Q   How about FTI?
15      A   No.
16      Q   Have you had any dealings with any other
17  accounting firms that you understood to have been
18  appointed by any lenders?
19      A   No.  Oh, I take that back.  By -- in 2007
20  the -- what's the name of the firm?  There was another
21  consulting firm brought in that worked with Glen
22  McClaran.  Glen McClaran was there as a CFO.  I did
23  meet with them.
24      Q   Do you -- you understood that they were
25  brought in by one of the lenders?
                                                    Page 30

1      A   Uh-huh.
2      Q   Do you know what company they were
3  reviewing?
4      A   SK Foods.  And they could have been
5  reviewing other entities too.  It was a brief meeting
6  just to kind of explain an overview of the company
7  structure.
8      Q   Have you ever prepared any organization
9  charts of the Salyer companies structure?
10      A   I haven't, but our office has.
11      Q   Have you ever reviewed one?
12      A   Yes.
13      Q   Do you know who in your office prepared
14  that?
15      A   Ana Silva.
16      Q   Do you know when it was prepared?
17      A   It was prepared probably a couple years ago
18  and then updated for changes since then.
19      Q   Do you have any particular process that you
20  go through to update the organization chart?
21      A   Usually when there is a new entity, we set
22  up a client for each entity.  We usually -- one of our
23  managers would probably provide that information to
24  Ana so that the organization chart could be updated,
25  or if an entity liquidated, it could be deleted.
                                                    Page 31

1      Q   How about if there is a change in the
2  ownership of an entity?  Does that get --
3      A   That would also be updated as well.
4      Q   Do you know that -- you still maintain that
5  chart?
6      A   Well, it's been maintained through the
7  beginning of this year.  I don't know if it's current
8  as of right now, but --
9      Q   When you say "the beginning of this year,"
10  could --
11      A   2009.
12      Q   But what's your best estimate of when in
13  2009 it was maintained through?
14      A   Probably January or February 2009.
15      Q   Is there any particular reason why it was
16  not maintained after that point?
17      A   At -- I don't know if there was any changes
18  since then, and then once the company went into
19  bankruptcy, we basically -- I --
20      Q   I'm sorry.
21      A   I'm not sure we have any additional
22  information that's been changed since then.
23      Q   Did you have any procedure to make sure that
24  the chart was accurate during the period before
25  January or February of 2009?
                                                    Page 32

                                          8 (Pages 29 to 32)

1    A   It was reviewed by a senior manager in our
2  firm who oversees the SK Foods report.
3    Q   It was --
4    A   Reviewed --
5    Q   Right.
6    A   -- for correctness.
7    Q   You said something about oversees SK Foods
8  work?
9    A   Yes.  The tax work.
10   Q   Uh-huh.
11   A   We have various people that work on the
12  Salyer/SK Foods tax return work.
13   Q   Do you know whether the organization chart
14  was regularly reviewed by anyone at any of the Salyer
15  companies?
16   A   Yes.  It was used by them and reviewed by
17  them.  By Shondale, by Mark.
18   Q   We'll try to bring the chart in in a few
19  minutes.  I don't have it with me right now.
20       A few minutes ago you referred to
21  outsourcing of certain accounting functions.  Were you
22  saying that during some period of time various Salyer
23  entities outsourced accounting functions and had your
24  firm perform services or functions that had previously
25  been performed in-house?

Page 33

1    A   Correct.
2    Q   Why was that work outsourced?
3    A   There was a turnover in accounting personnel
4  at SK and other entities, that they were behind, and
5  so we went in to assist them in getting their books
6  caught up.
7    Q   Now, had Ms. Seymour worked for any of the
8  Salyer entities before she came on board with you?
9    A   Yes.
10   Q   Was there any particular reason why she then
11  went to work for you during this outsourcing period?
12   A   She wanted to do work for other entities
13  other than just SK Foods.  She wanted to get back into
14  public accounting.
15   Q   So she wasn't working full time on Salyer
16  companies during that period?
17   A   She was working full time on Salyer
18  companies prior to -- right immediately prior to
19  coming to work for us, she was, yes.
20   Q   While she was working for you, was she
21  working full time on Salyer companies?
22   A   Yes.
23   Q   So the reason that she went to work for you
24  was because she wanted to work for Salyer companies
25  other than SK Foods?  Is that what you are saying?

Page 34

1    A   No.  Other clients of ours other than Salyer
2  or SK Foods entities.
3    Q   Okay.  Are you saying that didn't really
4  happen?
5    A   That didn't really happen.  She was needed
6  at SK Foods, so she had no opportunity.
7    Q   What accounting functions was your office
8  handling during this outsourcing period?
9    A   We were doing, you know, the accounting for
10  SK Foods, Salyer American Fresh Foods, and some of the
11  farming entities were -- that was more of a limited
12  time period.
13   Q   Right.  For the farming entities, it was
14  April of '07 through about January of '08?
15   A   No.  That was Shondale's tenure with us, and
16  that was for SK Foods and Salyer American Fresh Foods.
17  The farming entities was done by Gary Shimmin in our
18  firm, and that was basically the summer of '07 for a
19  couple months.  And then they had another -- a new
20  CFO, Chad Pinter or something like that, who took it
21  back in-house.
22   Q   During those couple of months in the summer
23  of '07, what accounting functions were outsourced by
24  the farming entities to your firm?
25   A   What accounting functions?  He basically

Page 35

1  assisted with the company in preparing the --
2  recording the transactions and so that they could, you
3  know, produce their -- their books for the month,
4  close their books for the month.
5    Q   When you say "their books," you are
6  referring to general ledger?
7    A   Yes.
8    Q   So Mr. Shimmin was essentially involved in
9  booking all of the transactions during that period?
10   A   I don't know -- I don't think all.  There
11  were some people at the company themselves, and I
12  wasn't directly involved with that process, so I can
13  tell you what I believe happened, but, you know, he
14  did receive documents from the company and then
15  recorded the transactions with the company's
16  assistance.
17   Q   Either during the period when the accounting
18  work was outsourced to your office or at any other
19  time, has your office provided input to any of the
20  Salyer companies in either setting up or improving
21  their accounting system?
22   A   Setting up their accounting systems?
23   Q   Yes, or improving those systems.
24   A   No, not really.
25   Q   Have you worked with any closely held

Page 36

9 (Pages 33 to 36)

1  companies before, putting aside the Salyer entities?
2     A   Yes.
3     Q   Have you worked with closely held companies
4  that had a corporate structure that involved multiple
5  related companies?
6     A   Yes.
7     Q   Is that a fairly common structure in the
8  agricultural business?
9        MR. O'GARA:  I'm going to object to that
10 question because it asks for him to give an expert
11 opinion.  He's here as a percipient witness, not an
12 expert.
13       MR. BROSNAHAN:  Are you instructing him not
14 to answer the question?
15       MR. O'GARA:  Yes, I am.
16 BY MR. BROSNAHAN:
17    Q   Could you tell me approximately how much of
18 your work since you opened your own office has been
19 with closely held companies?
20    A   About 70 percent.
21    Q   And how much of that work involves companies
22 that have a corporate structure that entails multiple
23 related companies?
24    A   Obviously a big part of that 70 percent is
25 the SK and Salyer group.  Other entities, other

Page 37

1     A   How many?  I don't know off the top of my
2  head.
3     Q   Is it more than just the Salyer companies?
4     A   Yes.
5     Q   Is it most of the 12 that you've described
6  as closely held companies that you have done work for?
7        MR. O'GARA:  That's been asked and answered.
8  He told you what his best recollection, which is he
9  doesn't know.
10 BY MR. BROSNAHAN:
11    Q   Can you give me an estimate?
12    A   There are more than one or two.  I mean, I
13 don't want to say it's 50 percent, but it's not
14 uncommon, I guess I could say.
15    Q   Of that dozen companies, how many of them
16 are involved in agriculture or processing agricultural
17 products?
18    A   Probably 50 percent.
19    Q   Now, in doing work for clients that involve
20 multiple related companies as part of their corporate
21 structure, have you been involved in accounting for
22 transactions between related companies?
23    A   No.  Again, I'm a tax person, so that's
24 primarily what my involvement is.
25    Q   How many people are in your firm?

Page 39

1  clients would be less than that amount, but it is
2  something that is seen.
3     Q   Of that 70 percent, about how much of that
4  is work for any of the Salyer companies?
5     A   About 50 percent.
6     Q   50 percent of the 70 percent?
7     A   Uh-huh.
8     Q   So about 35 percent of all your work is for
9  the Salyer companies?
10    A   No.  About 50 percent.
11    Q   Okay.  50 percent of all your work is --
12    A   Uh-huh.
13    Q   Okay.  About how many closely held companies
14 have you done accounting work for?
15    A   Groups.  A dozen.
16    Q   When you say "groups," you would count the
17 Salyer companies as one group?
18    A   Uh-huh.
19    Q   And have all of the companies that are
20 included in that dozen been companies that had
21 multiple related corporate entities?
22    A   No, not all.
23    Q   How many clients have you worked with that
24 were closely held companies that had a corporate
25 structure using multiple related companies?

Page 38

1     A   Twenty.
2     Q   And are you the top man in the company?
3     A   I am the managing director.
4     Q   Does that mean that you are the boss?
5     A   I would hope so.
6     Q   Now, during the period of time when you had
7  employees doing the outsourced accounting for the
8  Salyer companies, who were those employees reporting
9  to?
10    A   Shondale was a director in our firm, so she
11 was -- she would use the staff or Mr. Shimmin, who was
12 a manager in our firm at that time.
13    Q   Did Shondale report to you?
14    A   She worked principally under SK Foods, but I
15 was aware of -- so she -- she -- I wasn't involved
16 directly in what she was working on out there because
17 she was a director.  That was part -- it was her area
18 of expertise and so she was handling that area.
19    Q   Did she ever tell you what kinds of work she
20 was doing?
21    A   We spoke every once in a while.  She pretty
22 much was independent.
23    Q   But ultimately she reported to you?
24    A   Yes.
25    Q   Could you describe the process that you go

Page 40

10 (Pages 37 to 40)

1  through in doing a tax audit for the Salyer companies?
2      A   A tax audit?
3      Q   Yes.
4          MR. O'GARA:  I object to the question on the
5  grounds it misstates the record.
6  BY MR. BROSNAHAN:
7      Q   I suppose you are not the one who is doing
8  the tax audit, but you have been involved in tax
9  audits for the Salyer companies, correct?
10     A   Yes.
11     Q   Let's back up.
12         Have you prepared the federal and state
13 taxes for the SSC Farming entities since those
14 entities were created?
15     A   Our firm has, yes.  Or Deloitte has, yes.
16     Q   While you were at Deloitte, were you
17 involved in working on the farming companies' taxes?
18     A   Yes.
19     Q   Can you describe the process that you go
20 through to prepare those tax returns?
21     A   The process is that we normally would send
22 out a client-prepared schedule request, and then the
23 client would gather information and, you know, return
24 it to us in order for us to prepare the work papers,
25 and therefore the forms, and the tax return needs to
                                              Page 41

1  be filed with the government agencies.
2      Q   Do the materials that the client provides to
3  you in connection with that tax work include any
4  information about related company payments?
5      A   It can if it's relevant for the return.
6  When I say relevant for the return, primarily the only
7  real issue is if there is accrual, accruals from an
8  accrual-basis entity to a cash-basis entity, there is
9  a deferral of that deduction under the tax code.
10     Q   Are some of the Salyer companies on an
11 accrual basis and others on a cash basis?
12     A   Yes.
13     Q   Can you tell me which ones -- which are
14 the -- what basis are the farming companies on?
15     A   SS Farms is on the accrual.  The other ones
16 are on a cash.  The farming entities, SSC Farming, SSC
17 Farming I and II and Blackstone.
18     Q   On what basis is SK Foods?
19     A   Accrual.
20     Q   So if there are transactions between, let's
21 say, SSC Farming and SK Foods, they would be on a --
22 those two companies have a different basis for their
23 taxes and you might have to make adjustments
24 addressing those transactions?
25     A   If SK Foods had accrued expenses that were
                                              Page 42

1  not paid to SSC Farming, it was on the cash basis and
2  there could be a limitation on SK Foods' --
3      Q   Ability?
4      A   -- ability to deduct a current expense, yes.
5          There is no -- there is no opposite, though,
6  with an expense accrued by SSC to SK Foods.  Because
7  it's on a cash basis, it gets reversed anyway.
8      Q   What do you mean by that it gets reversed?
9      A   Reversed under the accrual to cash
10 adjustment where we convert the accrual books for an
11 entity to cash basis for the tax return.
12     Q   Because the tax returns are filed on a cash
13 basis?
14     A   Cash basis, yes.
15     Q   Other than the need to make sure that any
16 accrued expenses that had not yet been paid for with
17 cash were not taken as deductions, were there other
18 kinds of situations where you would need to look at
19 intercompany payments for purposes of preparing the
20 taxes?
21     A   Not generally.  I mean, you want to make
22 sure that the intercompany accounts balance between
23 all the entities.
24     Q   What do you mean by that?
25     A   That what is showing up on the client's
                                              Page 43

1  books, the accrual basis books, what's showing up as a
2  receivable on one, as a payable to somebody else on
3  the other companies' books, it should show the
4  corresponding same amount as of that period of time,
5  because if not, then something's not consistently
6  reported.
7      Q   Did you ever run across that situation?
8      A   For doing the returns?
9      Q   Yes.
10     A   No, I haven't.  I mean, again, I'm not the
11 detail person doing it, but I think for the most part
12 they were in balance, because at the time we do the
13 return, which, you know, could be six months after the
14 end of the year, you know, it's gone through a
15 companies' review and that's something that they
16 normally would do.
17     Q   Are you aware of any accounting rules or
18 conventions that were used by any of the Salyer
19 entities to account for intercompany payments?
20     A   Inter -- what do you mean?
21     Q   Well, was there a practice, for example, of
22 recording a transfer of money from one company to
23 another on the books of both of those companies?
24     A   Well, at the end of the year there were
25 prepayments made.  Is that what you are referring to?
                                              Page 44

                                   11 (Pages 41 to 44)

1    Q   Well, that would be an example.
2    A   And that prepayment is a prepaid for the
3  following year's service, and, you know, it's recorded
4  as a prepaid expense by the entity making the
5  statement and deferred income by the entity receiving
6  the payment.
7    Q   When you say "deferred income," does that
8  mean that it could only be -- it would only be
9  recognized as income as the services were actually
10 provided in the next year?
11   A   Correct.
12   Q   So taxes wouldn't be due on that income
13 until the next year?
14   A   As long as it was paid to an accrual-basis
15 entity.  If it was paid to a cash-basis entity, that
16 deferred income would be part of the accrual cash
17 adjustment and reverse out.
18   Q   Can you tell me the reason -- well, which
19 companies would typically prepay accounts?
20   A   SK Foods, SSC Farming and Salyer American.
21   Q   To which entities would they typically
22 prepay?
23   A   SS Farms.
24   Q   What was the reason --
25   A   And SKF Aviation.

Page 45

1    Q   What was the reason for doing it that way?
2    A   For tax purposes -- well, there is a couple
3  reasons.
4        One reason is that there was a benefit to
5  pay it prior to the end of the year in that it assured
6  the services for the following year, and then in some
7  situations there was a discount provided for that
8  prepayment, and then for tax purposes there was a
9  deduction for the entity making the payment if it was
10 done prior to the end of the year.
11   Q   When you say there was a discount provided,
12 in some instances was that a 2 percent discount for
13 prepayment?
14   A   I think it varied, but that sounds like it
15 would be a reasonable discount to provide.
16   Q   Are you aware of any practice used by any of
17 the Salyer companies of transferring cash from one
18 entity to another when one of the companies needed
19 cash and another company had cash?
20   A   There was intercompany transactions where
21 money was lent between entities.
22   Q   When one company would loan money to another
23 company, was interest charged?
24   A   Yes.
25   Q   Do you know the rate of interest?

Page 46

1    A   There was at least the AFR rate, which is
2  the IRS statutory rate, and I believe -- so I would
3  estimate that normally was between 5 to 8 percent,
4  depending what period of time you are looking at.  It
5  fluctuates monthly, the AFR rate.
6    Q   What does AFR stand for?
7    A   Applicable federal rate.
8    Q   Do you know why the Salyer companies
9  assessed interest on intercompany loans at the AFR
10 rate, or at least the AFR rate as you put it?
11   A   If you don't -- if you don't charge
12 interest, then the IRS deems interest on the loan.  So
13 even though there is no -- there is no interest, you
14 have to compute it as if there is interest and it
15 causes complexities.
16   Q   So it fouls up your tax returns --
17   A   Correct.
18   Q   -- if you don't actually charge the interest
19 on your own books?
20   A   It makes it more complicated, but also --
21 also to the extent these are loans, you need to charge
22 interest on loans.  So, first off, as an intercompany
23 loan, it would be charged.  Short-term advances, there
24 is no interest.
25   Q   What's the difference between a short-term

Page 47

1  advance and a loan?
2    A   A short-term advance, you know, would be
3  like AP.  For example, SSC Farming would sell tomatoes
4  to SK Foods.  That's in the normal course of business.
5        So as long as, you know, SK Foods paid SSC
6  similar to how it paid its other growers -- similar to
7  other growers, and the other growers didn't get
8  charged interest, then that's a normal course of
9  business, you know, payment.  It's kind of like AP
10 versus an intercompany note.
11   Q   Okay.  So are you saying that when -- let's
12 say the farming entities would sell product to
13 SK Foods.  As long as SK Foods paid the invoice for
14 that within about the same amount of time that they
15 would pay another provider of produce, then no
16 interest would be charged?
17   A   Correct.
18   Q   But if it was not an accounts payable-type
19 situation and it was essentially a transfer of money
20 that was not directly for the provision of some good
21 or service, then interest would be charged?
22   A   Correct.
23   Q   Do you know whether -- well, in that latter
24 situation, do you refer to that as an intercompany
25 loan?

Page 48

12 (Pages 45 to 48)

1     A   Yes.
2     Q   Do you know whether those loans were
3   typically documented with a note or some other loan
4   document?
5     A   Typically not.
6     Q   But interest was charged even if there was
7   no document?
8     A   Correct.
9     Q   Now, was that practice of loaning money from
10  one company to another and paying interest, even
11  though there was no note or other document underlying
12  it, a fairly common practice with the Salyer entities?
13    A   Yes.
14    Q   And is that a practice that you have
15  experienced with -- in dealing with your other
16  clients?
17        MR. O'GARA:  I'm going to object to that
18  question.  Once again, it calls for an opinion.
19        MR. BROSNAHAN:  No, I'm just asking if he's
20  ever -- if he has experience with that.
21        MR. O'GARA:  Why don't you rephrase the
22  question.
23        MR. BROSNAHAN:  Okay.
24    Q   Other than in your work with the Salyer
25  companies, do you have experience with the practice of
                                        Page 49

1   one company making a loan to a related company and
2   getting interest on that loan but there not being any
3   note or other loan document?
4     A   Yes.
5     Q   Have you dealt with that situation on many
6   occasions for other clients?
7     A   I don't know about many.  I have seen it.
8     Q   Is it -- in your experience, is that the
9   usual way that intercompany loans are handled?
10    A   I mean, there is no one way.  I mean, every
11  company is different in how they manage their cash
12  flow.
13    Q   Are you aware of any accounting rules that
14  prohibit the practice that we just described where
15  there is a loan from one company to another and no
16  underlying loan document?
17        MR. O'GARA:  I am going to object to that
18  question on the same grounds.  Requesting expert
19  opinions here.
20        MR. BROSNAHAN:  Are you instructing him not
21  to answer?
22        MR. O'GARA:  Yes, I am.
23  BY MR. BROSNAHAN:
24    Q   Have you ever been concerned about whether
25  there was anything improper in the practice that you
                                        Page 50

1   have been testifying about where an intercompany loan
2   with interest running on it is not supported by an
3   underlying note or loan document?
4     A   You can have an oral agreement.  Again,
5   it's -- I have not really been involved with the
6   company on setting up their notes on intercompany
7   transactions, so --
8     Q   So you say you can have oral agreement?
9     A   Uh-huh.
10    Q   That's yes?
11    A   Yes.  I mean, it's not documented, but there
12  could be, so --
13    Q   Right.  Is it fair to say that in your work
14  you have not been concerned that there was anything
15  improper about having a loan from one related company
16  to another that carries interest but is not documented
17  with a note or other loan document?  Is that fair?
18    A   From the tax standpoint, as long as they're
19  treated consistently with interest, that's what I
20  would be concerned about.
21    Q   In your experience, did the Salyer entities
22  treat those transactions consistently?
23    A   I believe so.
24    Q   Consistently charging interest from the
25  borrowing company going to the lending company?
                                        Page 51

1     A   Yes.
2     Q   And as -- were those transactions, these
3   loan transactions, reflected on the books of both of
4   the entities?
5     A   Yes, as far as I know.
6     Q   You don't know of any instance where that
7   was not done?
8     A   No, or it was corrected, so --
9     Q   Okay.  Was that important to you for
10  purposes of preparing the taxes, that it be --
11    A   Yes.  It is -- like I said, doing the
12  returns, doing it for all the entities, you want to
13  make sure that they're recording transactions
14  consistently between the parties.
15    Q   So that was important to you?
16    A   Yes.
17    Q   That -- okay.  Do you recall whether there
18  was any convention or custom by the Salyer entities to
19  try to square up the accounts at any particular point
20  of the year or at some regular interval?  When I say
21  square up the accounts, I mean eliminate any
22  intercompany loans that might exist.
23    A   It's varied over time, but they have become
24  more diligent in reducing the amount of intercompany
25  loans recently due to concerns by the bank and
                                        Page 52

13 (Pages 49 to 52)

1   restrictions on those intercompany loans.
2       Q    What restrictions are you referring to?
3       A    I believe within the last few years the
4   banks have -- have wanted the intercompany
5   transactions, loans, you know, reduced.
6       Q    How did you obtain that understanding?
7       A    Through discussions with Mark McCormick and
8   Shondale most likely.
9       Q    Were the intercompany loans reduced?
10      A    Yes.
11      Q    Do you know whether there were any
12  particular guidelines employed for when an
13  intercompany loan was appropriate and when it wasn't?
14      A    No, I don't.
15      Q    Now, putting aside the question of how often
16  an intercompany loan would be used, do you recall
17  whether there was any custom among the Salyer entities
18  of squaring up the accounts and paying off the various
19  loans?
20      A    No, not really.
21      Q    When you were doing the tax accounting, did
22  you sometimes observe that, say, one of the companies
23  would have a large balance owed to another of the
24  Salyer companies?
25      MR. HART:  Objection.  Improper

Page 53

1   hypothetical.
2   BY MR. BROSNAHAN:
3       Q    You can answer.  Do you want the question
4   again?
5       A    Yeah.
6       Q    Okay.
7       A    I don't know what to do.
8       MR. O'GARA:  Objection.  Incomprehensible.
9   BY MR. BROSNAHAN:
10      Q    When you were doing the tax work, did you
11  ever run across a situation where one of the companies
12  had a large loan balance owing to another of the
13  companies?
14      A    Yeah.  There were large intercompany loans.
15      Q    Was that a fairly common occurrence that one
16  company or another would owe a large intercompany loan
17  to another company?
18      A    Yes.  There was, like I say, a lot of
19  carryover from some -- especially from some of the
20  previous years' transactions.
21      Q    Was any of that a problem for you for
22  purposes of the tax accounting?
23      A    Not as long as they were treated
24  consistently for tax -- again, it doesn't really --
25  it's not a concern generally.

Page 54

1       Q    Do you recall which companies typically were
2   borrowing money from which other companies, if there
3   was a pattern to it at all?
4       A    The farming entities borrowed cash because
5   there is -- obviously for them it was a period at
6   which there is no, you know, cash coming in.  They're
7   a seasonal business, so they would borrow money.
8           There is intercompany loans that were set up
9   between SK Foods and foreign entities for the
10  acquisition of the shares of those companies.  SS
11  Farms, I believe, made loans to farm entities and
12  aviation.
13      Q    Was it fairly typical that the farming
14  entities would receive loans from SK Foods early in
15  the season and pay those loans back after the harvest?
16      A    I am not sure.  Again, I am looking at more
17  of a point of time, not during the year as much, so --
18  for tax that's what I am most concerned about.
19      Q    Was there any effort made to get the loans
20  paid back before the end of the tax year?
21      A    I would imagine, if they could.  I mean,
22  that's something that was probably done internally by
23  the company.
24      Q    For what, the tax year, calendar year?
25      A    Calendar year.

Page 55

1       MR. BROSNAHAN:  Why don't we take a short
2   break right now.  Is that okay?
3       MR. O'GARA:  Good.
4       THE VIDEOGRAPHER:  We are off the record at
5   3:09 p.m.
6       (Recess taken, 3:09 to 3:12 p.m.)
7       (Document referred to herein marked for
8       identification Exhibit No. 2)
9       THE VIDEOGRAPHER:  We are back on the record
10  at 3:12 p.m.  You may proceed.
11  BY MR. BROSNAHAN:
12      Q    Mr. Boos, I have given you Exhibit 2 as
13  marked by the reporter, which is an organization
14  chart.
15          Do you recognize that organization chart?
16      A    Yes.  It looks like something prepared by
17  our office.
18      Q    And this is the chart you referred to
19  earlier that is periodically updated by someone in
20  your office?
21      A    Yes.
22      Q    You see that this particular version says
23  updated 9/15/2008.  Do you see that?
24      A    Yes.
25      Q    Do you know whether you have ever seen a

Page 56

14 (Pages 53 to 56)

1  version of this chart that was updated after
2  September 15, 2008?
3      A   It should have been updated since then.
4  There has been new entities since this time period.
5      Q   But have you ever seen one that's more
6  recent than this?
7      A   I can't tell you if I have or not. I mean,
8  I thought I did, but --
9      Q   Do you recall ever participating in any
10 discussions about changing practices at the
11 Salyer-affiliated companies to have more of the
12 intercompany transactions documented by underlying
13 contracts?
14     A   With regards to the agreements between the
15 parties, yes, like the farming -- farming agreements,
16 the harvesting agreements specifically relating, I
17 remember, to Salyer American, and obviously that is a
18 goal to document, you know, as much as you can. The
19 more the better, so --
20     Q   Do you know whether there was an effort made
21 at some point in time to document more of the
22 transactions than had been documented in the past?
23     A   Probably so. I mean, I know there is an
24 effort to clean things up in the last few years. Part
25 of that, I am sure there was a documentation.

1      Q   What do you mean by "clean things up"?
2      A   Well, to reduce the amount of intercompany
3  transactions that were, you know, required to be done,
4  so that if somebody -- you know, really not just to
5  haphazardly loan money between entities. I mean,
6  there was an effort made to kind of reduce the number
7  of circumstances that happened.
8      Q   When one of the Salyer entities would loan
9  money to one of the other entities, what accounting
10 entries would be made in the general ledger system?
11     A   I wasn't involved with that.
12     Q   Are you familiar with the use of journal
13 entries by the Salyer companies?
14     A   I know that they prepare a journal. What do
15 you mean by -- what specifically on the journal
16 entries?
17     Q   Maybe we can look at some later, but I am
18 wondering whether you know if there was a practice,
19 when an intercompany loan was made, of making an entry
20 in the journal, the general ledger journal.
21     A   I would assume that they did because it did
22 get in there by the trial balance I looked at. I just
23 wasn't involved personally myself in recording those
24 transactions --
25     Q   And --

1      A   -- or reviewing those journal entries.
2      Q   When you say in the trial balance, what do
3  you mean?
4      A   The trial balance is just a printout of the
5  GL at a period of time. Normally I would see it at
6  the end of the year or monthly, on a monthly -- on a
7  periodic monthly basis.
8      Q   And if there were outstanding intercompany
9  loans, they would be reflected in that trial balance
10 that you looked at?
11     A   Yes.
12     Q   And for purposes of your tax work, did you
13 look only at the bottom line balance, or were you able
14 to look at the individual transactions that made up
15 that balance?
16     A   We normally didn't look at individual
17 transactions. It's not really needed for tax work.
18     Q   For tax work, all you needed to see was the
19 outstanding loan balance owed from one of the
20 companies to another of the companies?
21     A   Uh-huh.
22         MR. BROSNAHAN: I'll ask the court reporter
23 to mark a document entitled "Consolidated Farming
24 Operations SS Farms, LLC/SSC Farming/SSC 1 Farming/SSC
25 2 Farming Financial Statements For The Six Months

1  Ending June 30, 2008."
2         (Document referred to herein marked for
3         identification Exhibit No. 3)
4         MR. O'GARA: Is this three?
5         MR. BROSNAHAN: Three.
6      Q   Mr. Boos, please take a look at Exhibit 3,
7  and then tell me if you recognize it.
8         (Witness reviews document.)
9      A   I don't think I personally have seen this
10 before.
11     Q   Have you seen financial statements of this
12 type for the consolidated farming entities, regardless
13 of whether you have ever seen this particular
14 financial statement?
15     A   I don't think I have ever seen a
16 consolidated farming operations financial. I have
17 seen separate company ones.
18     Q   For the farming entities, you have seen
19 separate company ones?
20     A   Yeah. This isn't like their workbook they
21 would typically do, but it would be on an entity
22 basis. This may have happened. We may have this in
23 our files. I don't know. If it is, I haven't seen
24 it.
25     Q   How many people in your office work on

**The Souza Group**
**(800) 230-3376**

BMO 002035

1  Salyer matters?
2      A   Probably about ten.
3      Q   How many of them work on the tax matters?
4      A   Tax return?
5      Q   Yes.
6      A   Probably about six or seven.
7      Q   What do the other people do for the Salyer
8  entities?
9      A   The ones I mentioned that did the
10  accounting, the three that I mentioned, and then we
11  have some that do tax credit work for SK Foods.
12      Q   Now, you mentioned that you have seen
13  financial statements for the individual farming
14  entities.
15         Can you tell me the circumstances under
16  which you were looking at those documents?  In other
17  words, why were you looking at those documents?
18      A   We would look at it to do the tax return,
19  and then, you know, for the end-of-the-year tax
20  projections, we know we would again get the monthly
21  trial balance and information like this, usually as of
22  October.  And then for quarterly estimates, we would
23  get them on a -- we may get them on a quarterly basis.
24  Not always, though.
25      Q   Now, looking at Exhibit 3, and particularly
                                              Page 61

1  the second page of Exhibit 3, do you see the line that
2  says "Related party receivable"?
3      A   Uh-huh.
4      Q   What does that reflect?
5      A   What does the nature of that amount?
6      Q   Yes.
7      A   I don't know.  What caused it?  I don't know
8  what --
9      Q   No.  I mean, related-party receivable, is
10  that how the SSC Farming entities would reflect any
11  loans made to other Salyer companies?
12      A   Yes.  This is a receivable that SS Farms has
13  of $4 million.  I don't think on the schedule here it
14  reflects who it's from, but that's a net number.
15      Q   Okay.  And down, further down on this sheet
16  where it says "Related party debt, excluding current
17  installations," do you see that line?
18      A   Uh-huh.
19      Q   And does that reflect loans owed to related
20  parties?
21      A   Yeah.  The $11 million there is a debt that
22  is owed by SSC to some related entity or combination
23  of related entities.
24      Q   For your -- the tax work that you have done,
25  is it important that the related-party debts be
                                              Page 62

1  accurately reflected?
2      A   Yeah.  It's important that the trial balance
3  be accurately reflected, so it's part of the trial
4  balance.
5      Q   How about the assets?  So, for example,
6  where it says "Property, plant, and equipment," is it
7  important that that be accurately reflected for
8  purposes of the trial balance?
9      A   Yes, it is.  But we don't -- as tax
10  preparer, you don't go through and audit the
11  information, so it's company provided.
12      Q   In preparing the tax returns, is it
13  important that the assets shown as being on the books
14  of any particular entity actually belong to that
15  entity?
16         MR. O'GARA:  Once again, objection on the
17  grounds it asks for an opinion.
18  BY MR. BROSNAHAN:
19      Q   Was that important to you in preparing the
20  tax returns?
21      A   Well, I think it falls under my statement
22  about it's important the trial balance is correct, but
23  yet again we don't go through and audit the
24  information.  So --
25         MR. BROSNAHAN:  I would like the court
                                              Page 63

1  reporter to mark as Exhibit 4 a document that consists
2  of a series of e-mails.  On the first page it says
3  "redacted" and then forwarded message from Scott
4  Salyer, date Wednesday, May 23, 2007.  It's to Wayne
5  Boos.
6         (Document referred to herein marked for
7          identification Exhibit No. 4)
8         (Witness reviews document.)
9  BY MR. BROSNAHAN:
10      Q   Have you had a chance to take a look through
11  the exhibit?
12      A   Yes.
13      Q   On the first page, Mr. Salyer sends an
14  e-mail to you and says, "Wayne SSC 1 & 2 have property
15  in escrow (2600 acres) with Westlands Water District.
16  This property will be farmed on a limited basis
17  (1,000 acres +/-) but mainly used for waste water
18  discharge from Lemoore plant.  Westlands property will
19  be purchased for approximately $1 million, $850,000 by
20  late June."
21         Do you see that?
22      A   Yes.
23      Q   Do you recall any discussions with
24  Mr. Salyer about that subject?
25      A   Yes.
                                              Page 64

                                    16 (Pages 61 to 64)

1    Q   What was your involvement in the acquisition
2  of the Westlands Water District property?
3    A   I think on this particular one there was
4  some discussion, because of the water -- federal water
5  availability, using these SSCI and SSCII as new
6  entities so that the companies could get reduced water
7  costs from the federal government.
8         And there had to be a difference in
9  ownership in order to do that.  I remember Stephanie
10  had to have a certain percentage of ownership in order
11  to accomplish that.
12         So I know we had discussions with the -- an
13  attorney that was involved in water law, as well as
14  Rick Emmett and probably Scott, you know, at another
15  time.  And the wastewater, I'm sure, came up as part
16  of that too.
17    Q   Why were you involved in that discussion?
18    A   Its entities and, you know, for tax
19  purposes, you know, what entity to put things in, how
20  it would affect the companies -- or, you know, all the
21  companies -- all the companies themselves, the
22  operations, make sure it got kind of put in -- there
23  was no tax issues associated with what they were
24  planning to do, the company was planning to do.
25    Q   Are you saying that for tax purposes it was

Page 65

1  important that the -- that the water -- wastewater
2  discharge property be held by the entities SSC Farms I
3  and SSC Farms II?
4    A   Not for tax purposes.  I believe it was for
5  federal water.  Under Bureau of Reclamations there
6  are some rules on acreage, that you can only have so many
7  acreage under farming, and you can use related
8  entities -- related individuals to accomplish that,
9  and that's what they have attorneys that work on to
10  maximize that benefit.
11    Q   And that's why it was important that the
12  land be held by SSC Farms I and SSC Farms II?
13    A   Yes.
14    Q   Did it make any difference whether the money
15  to pay for that property came from some other entity,
16  or did it only matter who actually held title to the
17  land?
18    A   For the water law?  I don't even want to
19  guess.  I'm not an expert in that area, the legal
20  issue.
21    Q   For purposes of how the assets were
22  reflected on the books of the farming entity, in terms
23  of whose assets they were, was it booked according to
24  who held title to the land?
25    A   Yes.

Page 66

1    Q   In all your work with the Salyer entities,
2  have you ever seen a situation where the ownership of
3  land did not track title to the land?
4    A   I don't -- I don't recall any.
5    Q   In your work with any of the other clients
6  that you have where the client has related companies,
7  have you ever seen a situation where an asset was
8  reflected on the books of a company that was not the
9  company that held title to the asset?
10    A   Not personally, no.
11    Q   Have you -- did you ever hear anybody
12  connected with the Salyer entities say that the asset
13  should be reflected on the books of whatever company
14  may have provided money to purchase the asset?
15    A   No.
16    Q   How about in your work with any other
17  clients?  Have you ever heard that assertion?
18    A   No.
19    Q   Was it ever your opinion that an asset
20  should be reflected on the books of the Salyer company
21  who provided money to pay for that asset?
22         MR. HART:  Objection.  Asked and answered.
23  BY MR. BROSNAHAN:
24    Q   You can answer.
25    A   Can you do the question again?

Page 67

1    Q   Sure.  Did you ever have the opinion that
2  the assets shown on the books of the various Salyer
3  entities should be reflected on the books of whatever
4  company may have provided money to buy the asset,
5  regardless of in which company's name title was held?
6    A   No.
7    Q   In -- do you recall the Westlands water
8  deal?
9    A   Somewhat.
10    Q   Do you know where the money came from to buy
11  that property?
12    A   No.
13    Q   It didn't matter to you, for purposes of
14  your work, where that money came from, correct?
15    A   No.
16    Q   Could you --
17    A   Correct.
18    Q   All that mattered was that whoever actually
19  held title to the property had the property shown on
20  their book as an asset, correct?
21    A   Uh-huh.  As long as there was a note, they
22  borrowed money, a note corresponding with that
23  purchase for the funding.
24    Q   For the funding.  And would it be sufficient
25  if the loan transaction was reflected simply in

Page 68

17 (Pages 65 to 68)

1  general ledger entries with an associated interest
2  payment?
3      A   Yeah.  And subsidiary detail that broke it
4  out and tracked it, yeah, which they have done for
5  their intercompany.
6      Q   Which they have done for the intercompany,
7  you are saying?
8      A   Yes.
9      Q   It wasn't necessary that there actually be a
10  signed promissory note; is that correct?
11      A   From my standpoint, no.
12      Q   Are you familiar with a piece of property
13  called the Rogers property?
14      A   Is that -- can you expand on it?  Is that
15  the Colusa property?
16      Q   I believe it's one of the Colusa properties,
17  I believe.
18      A   Uh-huh.
19      Q   Have you ever heard of the Tihart property?
20      A   No.
21      Q   Have you heard that there is property in
22  Colusa County that was purchased by one of the farming
23  entities for use in wastewater discharge from the
24  processing operations of RHM?
25      A   Correct.  Yes.

Page 69

1      Q   And why are -- why did you become aware of
2  that?
3      A   Well, the Rogers property I have heard, and
4  going back and pulling together documents, speaking
5  with somebody in our office, there was a letter to
6  Rogers, I guess, that came up as one of the documents
7  that we came across.
8      Q   That came up in your office?
9      A   Yeah.
10      Q   Why was your office dealing with that?
11      A   I don't know.  I don't think I was involved
12  in that particular Rogers letter.  I don't remember,
13  but --
14      Q   Do you --
15      A   I am not sure.
16      Q   Do you know whether the Salyer companies
17  would sometimes transfer money from one company to
18  another simply because the company to which the money
19  was transferred was short of cash and needed cash to
20  make some purchase?
21      A   Yes.
22      Q   Do you know whether that was ever done in
23  connection with property used for wastewater?
24      A   I don't recall to be specific on that one.
25      Q   Is it fair to say that if that happened,

Page 70

1  that would not affect your view of how the assets
2  should be reflected on the books?
3      A   On the tax return, correct.
4      Q   So just to restate that fully, in a
5  situation where one of the Salyer entities loaned
6  money to another Salyer entity, so that the second
7  Salyer entity could purchase an asset such as a piece
8  of real property, for purposes of your work on the
9  books that should be shown as an asset of the company
10  that actually made the purchase and holds title to the
11  property, correct?
12      A   For purposes of the tax return, yes.
13      Q   Are you aware of any purpose for which it
14  should not be reflected that way?
15      A   Well, I am not a lawyer.  I am not going to
16  say the legal aspects of --
17      Q   Sure.
18      A   -- of ownership, but generally it's recorded
19  on who has title to the property.
20      Q   Are you aware of any situation that you have
21  encountered in the accounting world where the
22  ownership of the asset should be reflected according
23  to who provided money for it?
24      MR. O'GARA:  Objection.  Asks for opinion.
25

Page 71

1  BY MR. BROSNAHAN:
2      Q   Are you aware of any situation that you have
3  encountered where you think it should be reflected on
4  the books of the company who provided the money?
5      A   I have not seen that.
6      Q   If you look back at Exhibit 4, you will see
7  a reference on the bottom of the first page to the
8  Corcoran Ranch.  It says contracts have been signed --
9      MR. HART:  Brian, I'm sorry.  He apparently
10  got cut off.
11      UNIDENTIFIED VOICE:  I have him on the line.
12  Do you want me to go ahead and put him on?
13      MR. BROSNAHAN:  If you can, yeah.
14      MR. HART:  I swear I didn't touch it.
15      MR. BROSNAHAN:  I believe you.
16      MR. HART:  And I said it on the record.
17      MR. BROSNAHAN:  We have ghosts in our
18  phones.  Hello.  Hello.  Yes, is Malcolm there?
19      UNIDENTIFIED VOICE:  Yeah.  Let me transfer
20  you.
21      MR. SEGAL:  Hello.
22      MR. BROSNAHAN:  Hi, Malcolm.  Sorry you got
23  cut off.
24      MR. SEGAL:  That's okay.  I will put you
25  back on.

Page 72

18 (Pages 69 to 72)

1      MR. BROSNAHAN:  We won't repeat the
2  testimony for you.
3      MR. SEGAL:  That's okay.
4  BY MR. BROSNAHAN:
5      Q   Mr. Boos, would you please take a look at
6  the bottom of the first page of Exhibit 4, and you
7  will see a reference there that says contracts have
8  been signed to sell Corcoran Ranch for
9  $12.45 million --
10     A   Uh-huh.
11     Q   -- parens, Blackstone Ranch.
12     A   Uh-huh.
13     Q   Do you remember any sale of the Corcoran
14  Ranch property?
15     A   Yes.
16     Q   Why were you involved with that?
17     A   Because it was going to trigger a large tax
18  gain.
19     Q   And do you know what the proceeds from the
20  Corcoran Ranch sale were used for?
21     A   Part of them.  Part of them was used to pay
22  off a house that was in Blackstone, which Scott lives
23  in in Monterey.  The loan on that house.  And then I
24  believe part of it may have been loaned to other
25  entities.  I don't know the specifics of that, though.
Page 73

1      Q   Do you know whether any of the proceeds of
2  the Corcoran Ranch sale were used to buy property from
3  the Westlands Water District?
4      A   I don't recall exactly, so I am sure we can
5  figure it out if we get the detail.
6      Q   If you look further on that page, you will
7  see a reference to selling property in Visalia for
8  1.45 million.  Do you see that?
9      A   Uh-huh.
10     Q   Do you know what the proceeds of the sale of
11  the Visalia property were used for?
12     A   No.  No.
13     Q   If you look at the fifth page of Exhibit 5
14  [sic], at the bottom you will see that as part of this
15  e-mail string is an e-mail from Mr. Salyer to
16  Mr. Emmett saying, "Rick" -- this is re Westlands
17  Water District land purchase.  It says, "Rick We'll
18  plan to use funds from Visalia to fund transaction."
19     Does that refresh your recollection that
20  funds from the Visalia sale were used to buy the
21  property from the Westlands Water District?
22     A   Well, they could have been.  I don't recall
23  specifically.
24     Q   Do you know what entity owned the Visalia
25  property?
Page 74

1      A   I believe it was Blackstone.
2      Q   Do you know what entity owned Corcoran
3  Ranch?
4      A   That was Blackstone.
5      Q   Going back to Exhibit 3, which is the
6  financial statement, do you recall whether the entries
7  for property, plant and equipment shown as assets for
8  the various farming entities were reflected at book
9  value or at some other measure?
10     A   I would believe they would be reported at
11  cost.  Well, this is -- let's see.  Well, no, this is
12  probably a net accumulated depreciation, so that would
13  be book value.
14     Q   Do you recall participating in any
15  discussions about -- well, strike that.
16     Do you see the line that says "Investments"?
17     A   Yes.
18     Q   Do you know the basis on which investments
19  were valued in the books of the farming companies?
20     A   Do you know what the investment relates to?
21     Q   I don't personally, no.  Were there
22  different conventions?
23     A   My -- my guess on that is that's an
24  investment in SS Farms Australia, although it seems
25  kind of high, but if it is -- if that's what it is, it
Page 75

1  was a hundred percent-owned entity.  The original
2  capital contributed would show up in that account as
3  well as any accumulated earnings.  I don't know why
4  else they would have an investment recorded on the
5  books.  I guess it could be stock, but I don't think
6  they have that.
7      Q   Other than the tax work that you have
8  described and the other accounting work done during
9  the outsourcing period and as part of that function,
10  have you done any other accounting work for any of the
11  Salyer entities?
12     A   The only other -- I don't know if it's
13  accounting or consulting.  The only other work we
14  would have done would have been the due diligence on
15  the acquisition of Salyer American Fresh Foods.
16     Q   What due diligence was that?
17     A   On Scott's acquisition of shares from his
18  father and sister.
19     Q   Has any of the work that you have done been
20  tied into estate planning?
21     A   Yes.  Estate planning, yes.  That's -- I
22  would say it's tax work, yes.
23     Q   And how does your tax work relate to
24  Mr. Salyer's estate planning?
25     A   Well, obviously it's a -- estate tax is what
Page 76

19 (Pages 73 to 76)

1 we're concerned about, and, you know, as a tax adviser
2 you want to minimize the client's estate tax for their
3 family. So obviously that's something that we looked
4 at.
5     Q   For purposes of minimizing estate taxes, was
6 it important to make sure that the ownership of assets
7 was accurately reflected as among the various Salyer
8 entities?
9     A   Yeah. You want to make sure that -- I mean
10 as far as, you know, ownership, I mean, you do look at
11 who owns it for estate tax purposes. So --
12    Q   For those purposes, did you use the same
13 approach that you described earlier where the
14 ownership of the asset would be recorded according to
15 who held title to it, regardless of whether somebody
16 else might have provided funds to assist in purchasing
17 that asset?
18    A   Yes.
19    Q   Is it your understanding that SK Foods
20 currently owes money to banks that lent money to
21 SK Foods?
22    A   Yes.
23    Q   Do you know what banks those are?
24    A   Bank of Montreal, Wells Fargo, Bank of
25 America, and I believe -- I don't know if Bank of the
Page 77

1 consulting or anything on that. It was just more
2 informational comment. Although I think part of it,
3 though -- one thing I do recall is that for tax
4 payments that may have come up in that aspect, because
5 if there was tax payments due and -- you know, for
6 example, for Scott, there may be a limitation on his
7 ability to get cash to make those tax payments, or the
8 trust.
9     Q   Did any such restrictions imposed by the
10 banks cause problems for purposes of either the tax
11 accounting or the estate planning?
12    A   I believe the bank -- banks did not allow
13 certain estate tax -- estate planning to go through.
14    Q   When you say allow estate planning to go
15 through, what do you mean by that?
16    A   There -- Mr. Salyer wanted to transfer some
17 of the ownership in SK Foods to his daughter's trust.
18    Q   Was that an estate planning consideration
19 that was behind that?
20    A   It was an estate and asset protection
21 planning.
22    Q   It's your understanding that the banks would
23 not permit that?
24    A   Correct.
25    Q   Who -- where did you get the information
Page 79

1 West is here or not, but --
2     Q   Do you recall ever participating in any
3 discussions regarding whether any of those banks would
4 allow SK Foods to make intercompany payments?
5     A   I wasn't involved in any of those
6 discussions with the banks.
7     Q   Have you ever heard that at some point in
8 the spring of 2009 the lenders to SK Foods were not
9 permitting SK Foods to make payments to related
10 companies?
11    A   I believe they were scrutinized. Whether or
12 not they -- I don't recall if they -- it was a
13 flat-out against all, but they were definitely
14 scrutinized more so when FTI was in there, and other
15 consultants.
16    Q   How did you obtain that information?
17    A   I believe that Shondale told me that. Maybe
18 Mark. I'm not sure.
19    Q   Do you recall the circumstances of that
20 discussion as -- in other words, why she was telling
21 you that?
22    A   I think it's just the -- the type of stuff
23 that -- you know, scrutiny that the company was
24 beginning to come under during that time period.
25 There was nothing -- we weren't providing any
Page 78

1 that the banks would not permit that?
2     A   I am sure that was from Mark McCormick, who
3 is the --
4     Q   Are you aware of any other transactions that
5 the banks would not permit, specific transactions?
6     A   The -- the merger of RHM and SK Foods.
7     Q   What's your understanding of why the banks
8 would not permit that?
9     A   Because there was different creditors that
10 the collapse of them into one entity may have affected
11 one versus the other.
12    Q   Other than the transactions you've
13 described, do you know of any other transactions the
14 banks would not permit?
15    A   There was an overall reduction on payments
16 in general that began around December.
17    Q   A reduction in intercompany payments?
18    A   All payments, vendor payments. Vendor,
19 V-E-N-D-O-R.
20    Q   And was that reduction particularly steep
21 for intercompany payments?
22    A   I am sure it was. I mean, all payments in
23 general were significantly affected.
24    Q   Do you recall any other discussions about
25 wastewater properties besides what you have already
Page 80

20 (Pages 77 to 80)

1 testified to?
2    A   No, I don't believe so.
3    Q   Was your involvement limited to --
4    A   Well, no, I take that back.
5        There was some discussion that came up when
6 Marshall was doing the intercompany reconciliations,
7 Marshall Scott, that the wastewater discharge payments
8 were not made.
9    Q   Okay.  When did that discussion come up?
10   A   I believe it was in the summer.
11   Q   Summer of?
12   A   '08.
13   Q   And what was Mr. Scott's position at that
14 time?
15   A   Well, I think they found out they just were
16 not paid, so then they accrued them out from -- I
17 don't know if it was previous years or how many years
18 were paid, but there was some discussion about that.
19   Q   Why were you involved in that discussion?
20   A   I think it came up as -- as an overall -- an
21 analysis of the cash flow needs of Scott and the
22 related entities on some planning work that we were
23 doing for the, you know, estate planning, that, you
24 know, cash flow, and that was one -- one of the items
25 that provided cash flow, was the wastewater payments.
                                                    Page 81

1    Q   How was the cash flow needed for estate
2 planning?
3    A   There was a -- as part of the estate
4 planning there was going to be a sale of the property
5 on a note basis, and Scott's daughter's trust needed
6 the cash in order to fund the payment terms of that
7 note.
8    Q   What do you mean, a sale of property on a
9 note basis?
10   A   Scott was going to sell his ownership in
11 SK -- part of his ownership in SK Foods to his
12 daughter's trust on an installment basis.  So in order
13 for her to pay back that note, there needed to be
14 adequate cash that she would be or the trust would be
15 receiving to make those payments.
16   Q   But that sale of the property on a note
17 basis never went through; is that correct?
18   A   Correct.
19   Q   But had it gone through, the daughter's
20 trust would have been receiving payments on the
21 wastewater contracts that could --
22   A   Correct.
23   Q   -- that could be used to pay -- pay interest
24 and principal on the note that would have been
25 associated with the sale of Scott's interest in
                                                    Page 82

1 SK Foods?
2    A   Correct.
3    Q   Have you ever seen any contracts providing
4 for wastewater discharge?
5    A   I saw the ones that are, you know, filed
6 with the bankruptcy court.
7    Q   When did you see those?
8    A   I have seen them within the last month and
9 may have seen them before.  I don't recall.  I did see
10 a draft of one that was done in '07 that wasn't
11 finalized.
12   Q   Why did you have occasion to see a draft of
13 one in 2007?
14   A   Because it came up when I was searching for
15 my documents to provide for this deposition.
16   Q   I guess my question was:  In 2007 what were
17 the circumstances under which you saw a draft of an
18 agreement?
19   A   Scott sent it to both myself and the
20 attorney for comments.
21   Q   Which attorney?
22   A   Gary Perry.
23   Q   Do you recall if you had any comments?
24   A   I didn't -- I don't think I had any
25 comments.  I didn't see any.
                                                    Page 83

1    Q   What was your role in the transaction such
2 that he would be seeking your comments?
3    A   Just from the tax point, if there were any
4 tax issues with the payments.
5    Q   Do you mean how the payments would be
6 accounted for from a tax standpoint?
7    A   Yes, or if there was any planning that, you
8 know, when the timing of them could be made or not
9 made, and in this particular case I don't think there
10 was any tax issues associated with that.
11   Q   Do you know whether there was a written
12 contract that pertained to the wastewater discharge
13 prior to May of 2008?
14   A   Well, the draft that he sent was in '07.  I
15 don't think it was executed.  The terms, I think, are
16 different.  I don't know if there was anything else.
17   Q   So you have recently seen a copy of the 2007
18 draft?
19   A   Correct, yes.
20   Q   Do you recall what property it pertained to?
21   A   No, not off the top of my head.
22   Q   Do you know if it was property in Colusa?
23   A   I don't know.  It's either Colusa or
24 Lemoore.
25   Q   It was just one contract that you --
                                                    Page 84

                                            21 (Pages 81 to 84)

1    A   It was one contract, yes.
2    Q   And you recall that the terms of it were
3  different from the terms that were in the agreement
4  that was ultimately signed?
5    A   Yes.
6    Q   How were they different?
7    A   It used the term lessor and lessee in one
8  versus -- I don't know if I have it here.  What did --
9  they're called something different in this executed
10 contract.
11   Q   Do you recall why that was?
12   A   I don't recall.  I don't think I was
13 involved with providing the comments back.  It must
14 have been a legal something that the attorneys
15 changed.
16   Q   Do you recall whether the economic terms
17 were different?
18   A   I don't know.
19   Q   Now, going back to the discussion with
20 Marshall Scott, he was a consultant at that time?
21   A   Yes.
22   Q   And he had a discussion with you personally?
23   A   I think we had an accountants meeting where
24 him and John Iacopi and Darrell Carlis and Carol
25 Vartanian from our office attended with Shondale and
                                              Page 85

1    A   I don't recall that.
2    Q   Do you recall whether the contracts called
3  for payment on an annual basis?
4    A   I wasn't involved with that.
5    Q   Other than the resistance of the banks to
6  paying the wastewater amounts in 2008, are you aware
7  of resistance by the banks to permitting wastewater
8  payments at a later point in time?
9    A   No, other than what I have read on the
10 declarations that have been filed.
11   Q   So whose declarations are you referring to?
12   A   The trustee's and Shondale's and Scott's, or
13 Scott's attorneys.
14   Q   Do you recall Shondale ever telling you that
15 it was difficult to get the wastewater payments made
16 because the banks didn't want payments to related
17 companies?
18   A   Specifically on the wastewater, no, I don't
19 think I had those discussions.
20   Q   Did she say that generally with respect to
21 related-company payments?
22   A   Yes.
23   Q   And approximately when was that?
24   A   Well, it was February.  January, February,
25 March, April.
                                              Page 87

1  Gene Kezirian, and that was held in September of '08.
2  Subsequently another one was held in December of '08,
3  and I think that's where some of those items were, you
4  know, discussed.
5    Q   So as part of that discussion, was it
6  discussed that the payments had not been made for the
7  '07 period?
8    A   I believe so.  I'm not a hundred percent
9  sure.
10   Q   Do you recall if there was a decision made
11 to make the payment?
12   A   I think that they wanted the payments to be
13 made.  I think they were trying to.  I almost wanted
14 to say that the banks didn't allow it at first.
15   Q   Why not?
16   A   Because it was a related-party transaction.
17   Q   In the discussion that you participated in
18 in December of '07, what was said about the wastewater
19 payments?
20   A   I don't know -- I don't know how much was
21 said at that point in December.  I don't --
22   Q   Do you recall any part of that discussion?
23   A   No.
24   Q   Do you recall whether the wastewater
25 payments were set up to be paid on a monthly basis?
                                              Page 86

1        MR. BROSNAHAN:  The videographer is telling
2  me that we're about to run out of the disk, so we're
3  going to take a break and then we'll come back and
4  wrap it up.
5        THE WITNESS:  Okay.
6        THE VIDEOGRAPHER:  This is the end of disk
7  number 1, volume 1.  We're off the record at 4:02 p.m.
8        (Recess taken, 4:02 to 4:15 p.m.)
9        THE VIDEOGRAPHER:  This is the beginning of
10 disk number 2, volume 1.  We are back on the record at
11 4:15 p.m.  You may proceed.
12 BY MR. BROSNAHAN:
13   Q   Mr. Boos, does each of the Salyer companies
14 maintain a separate taxpayer identification number?
15   A   Yes.
16   Q   Does each of those companies file its own
17 separate tax return?
18   A   Where appropriate.  Some are single-member
19 LLCs that get combined into the parent company return.
20   Q   What about the farming entities?  SSC
21 Farming, LLC, for example, does it file its own --
22   A   All the farming entities file a separate tax
23 return.
24   Q   Each one of those?
25   A   Each one of them, yes.
                                              Page 88

22 (Pages 85 to 88)

1    Q   Does each of the Salyer entities have its
2  own bank account?
3    **A   I don't believe so.**
4    Q   Does each of the farming entities have its
5  own bank account?
6    **A   I think so.**
7    Q   Does SK Foods have its own bank account?
8    **A   Yes.**
9    Q   Does each of the Salyer entities maintain
10  its own set of books reflecting its income?
11    **A   Yes.**
12    Q   Expenses?
13    **A   Yes.**
14    Q   Assets?
15    **A   Yes.**
16    Q   Liabilities?
17    **A   Yes.**
18        MR. BROSNAHAN:  What's the next exhibit?
19  Five.  I am going to mark as Exhibit 5 a document
20  entitled "Declaration of Cary S. Collins in Support of
21  Opposition of SSC Farming, LLC, SSC Farms I, LLC, and
22  SSC Farms II, LLC to Chapter 11 Trustee's Motion for
23  Order Determining that Wastewater Discharge Agreements
24  with Related Parties Constitute 'Executory Contracts'
25  for Purposes of 11 USC Section 365."
                                                    Page 89

1  entities were sufficient to permit you to file
2  separate and independent tax returns?
3    **A   Yes.**
4    Q   For purposes of preparing the tax returns,
5  in reflecting transactions in the books and records,
6  is it important that the transactions be done at arm's
7  length?
8    **A   Yes.**
9    Q   What does that term mean to you?
10    **A   It means on the same terms that they would**
11  **be provided to an unrelated party.**
12    Q   In your dealings with the Salyer entities,
13  did they attempt to conduct intercompany transactions
14  on an arm's length basis as you've just defined it?
15    **A   As far as I know.  I mean, again, I wasn't**
16  **privy to how the transactions generally were set up,**
17  **but they, I think, tried to attempt that.**
18    Q   For purposes of the work you were doing on
19  the taxes, would there have been a problem if the
20  transactions were not reflected on an arm's length
21  basis?
22    **A   Well, the IRS has the ability, if things are**
23  **not done on an arm's length basis, to recast the**
24  **transaction.**
25    Q   So for that reason, as you were preparing
                                                    Page 91

1        (Document referred to herein marked for
2          identification Exhibit No. 5)
3  BY MR. BROSNAHAN:
4    Q   Mr. Boos, is this declaration from
5  Mr. Collins one of the declarations that you testified
6  earlier you had reviewed?
7    **A   I saw this this morning in counsel's office.**
8  **That's the first time I had seen it.**
9    Q   If you look at paragraph 4 on page 3,
10  beginning on line 11, there is a statement by
11  Mr. Collins that he has reviewed the federal and state
12  income tax returns for each of the Salyer family
13  entities for the calendar years December 31, 2006 and
14  December 31, 2007, and can attest that these entities
15  were maintained on an operationally separate and
16  distinct basis.
17        Do you see that?
18    **A   Uh-huh.**
19    Q   Do you agree that each of the Salyer family
20  entities was maintained on an operationally separate
21  and distinct basis?
22    **A   Yes.**
23    Q   And while you have been preparing tax
24  returns for the Salyer entities, has it been your
25  belief that the records that were maintained by those
                                                    Page 90

1  the tax returns, it was important that the
2  transactions actually be conducted on an arm's length
3  basis, right?
4    **A   Yes.**
5    Q   So far as you know, the transactions of the
6  Salyer entities that you have worked with over these
7  past 12 years have been conducted on an arm's length
8  basis, correct?
9    **A   As far as I know.**
10        MR. BROSNAHAN:  Mr. Boos, subject to any
11  right that we may have to reopen the deposition, I
12  have no further questions for you at this time.  Thank
13  you very much.
14            EXAMINATION
15  BY MR. HART:
16    Q   I have just a couple of questions, Mr. Boos.
17  Once again, my name is Christopher Hart and I
18  represent the Chapter 11 Trustee, Brad Sharp.
19        A moment ago you were testifying about your
20  knowledge of the transactions and the fact that to the
21  best of your knowledge they were conducted on an arm's
22  length basis.
23        Do you recall that?
24    **A   Yes.**
25    Q   Have you ever reviewed any of the wastewater
                                                    Page 92

23 (Pages 89 to 92)

1 discharge agreements and specifically the invoices
2 that were generated relating to the wastewater
3 discharge agreements?
4    **A   I have seen the wastewater agreements and**
5 **the declarations, and I have not reviewed the**
6 **invoices.**
7    Q   Do you happen to know if those agreements
8 were -- strike that.
9        Earlier this afternoon you referenced a
10 conversation that you had with Mr. Putterman on
11 Friday.  Do you recall that?
12    **A   I didn't have a conversation with him.**
13 **Somebody in our office did.**
14    Q   I see.
15    **A   David Goss.**
16    Q   And I am sorry.  What was the last --
17    **A   David Goss, G-O-S-S.**
18    Q   Have you ever had a conversation with
19 Mr. Putterman or anybody else with his firm outside
20 of, of course, today's deposition?
21    **A   No.  No.**
22    Q   And that call on Friday, was that initiated
23 by Mr. Putterman's -- or Mr. Putterman's office to
24 your call -- your office?
25    **A   I am not sure.  I wasn't in the office when**

Page 93

1 **that -- on Friday when this all transpired.**
2        MR. HART:  Those are all the questions I
3 have.
4        MR. BROSNAHAN:  None for me.
5        MR. O'GARA:  Anything else?
6        MR. BROSNAHAN:  No.
7        THE VIDEOGRAPHER:  This concludes today's
8 deposition.  We are off the record at 4:23 p.m.  The
9 master tapes will be held by The Souza Group.
10        (Deposition concluded at 4:23 p.m.)

Page 94

1    I, the undersigned, declare under penalty
2 of perjury that I have read the foregoing
3 transcript, and I have made any
4 corrections, additions, or deletions that
5 I was desirous of making; that the
6 foregoing is a true and correct
7 transcript of my testimony contained
8 therein.
9
10    Dated:_____ at
11 _____, California.
12
13
14    _____
15    WAYNE W. BOOS, CPA

Page 95

1        CERTIFICATE OF REPORTER
2
3    I, KAREN SCOTT, a Certified Shorthand
4 Reporter of the State of California, hereby certify
5 that the witness in the foregoing deposition was by me
6 duly sworn to tell the truth, the whole truth, and
7 nothing but the truth in the within-entitled cause;
8
9    That said deposition was taken in shorthand
10 by me, a disinterested person, at the time and place
11 therein stated, and that the testimony of the said
12 witness was thereafter reduced to typewriting, by
13 computer, under my direction and supervision;
14
15    I further certify that I am not of counsel
16 or attorney for either or any of the parties to the
17 said deposition, nor in any way interested in the
18 event of this cause, and that I am not related to any
19 of the parties thereto.
20
21    DATED:
22
23    KAREN SCOTT, CRP, CSR No. 4027
24
25

Page 96

24 (Pages 93 to 96)



```
 1          The Souza Group
              4615 First Street, Suite 200
 2            Pleasanton, California 94566
                  (925) 846-8831
 3

 4    June 23, 2009
 5    Mr. Wayne W. Boos
         c/o Vincent O'Gara, Esq.
 6    Murphy, Pearson, Bradley & Feeney
      88 Kearny Street, 10th Floor
 7    San Francisco, CA 94108
 8         Re:  In re SK Foods
              Deposition of:  WAYNE W. BOOS, CPA
 9            Taken on Monday, June 22, 2009
              Reported by Karen Scott, CSR No. 4027
10
      Dear Mr. Boos:
11
           The transcript of your testimony in the
12    above matter is now available.  Pursuant to CCP
      Section 2025(q)(l), the original transcript of your
13    deposition in this case will be held at our office for
      your inspection and signing.  If you do not read and
14    sign it within 30 days from the date you receive this
      letter, it can be used as if you had done so.
15
           If it is more convenient for you, you may
16    read your attorney's copy of the deposition.  Your
      attorney can advise us and opposing counsel of any
17    changes you may make in your testimony.  (Please do
      not change the questions.)  Upon receipt of any
18    changes, we will include them in the original
      transcript before it is filed with the court unless
19    trial begins before the signature deadline.
20         Please ask your attorney how to proceed.  If
      it is preferred that you read and sign the original
21    transcript, please telephone us at (925) 846-8831 to
      arrange a mutually convenient appointment.
22
           Sincerely,
23
24    Monica Lendway
      Production Manager
25    The Souza Group
```

                                                       Page 97

**The Souza Group**
**(800) 230-3376**

BMO 002045

## A

**ability** 43:3,4 79:7
  91:22
**able** 13:10,15
  59:13
**accomplish** 65:11
  66:8
**account** 25:15,16
  44:19 76:2 89:2
  89:5,7
**accountants** 30:6
  85:23
**accounted** 84:6
**accounting** 4:12
  15:7,9 22:4,6,8
  22:9,11,17,21
  24:2,16 25:21
  26:5,20 30:17
  33:21,23 34:3
  34:14 35:7,9,23
  35:25 36:17,21
  36:22 38:14
  39:21 40:7
  44:17 50:13
  53:21 54:22
  58:9 61:10
  71:21 76:8,10
  76:13 79:11
**accounts** 25:8,12
  25:25 27:17
  43:22 45:19
  48:18 52:19,21
  53:18
**accrual** 21:14
  42:7,11,15,19
  43:9,10 44:1
  45:16
**accruals** 42:7
**accrual-basis**
  42:8 45:14
**accrued** 42:25
  43:6,16 81:16
**accumulated**
  75:12 76:3
**accurate** 32:24
**accurately** 9:19
  63:1,3,7 77:7
**acquired** 19:19
**acquisition** 55:10
  65:1 76:15,17
**acreage** 66:6,7
**acres** 64:15,17
**Adams** 27:7
**additional** 21:15
  32:21
**additions** 95:4
**address** 8:13

**addressing** 42:24
**adequate** 82:14
**adjustment** 43:10
  45:17
**adjustments**
  42:23
**administration**
  15:7
**advance** 48:1,2
**advances** 47:23
**advise** 97:1
**adviser** 77:1
**affect** 65:20 71:1
**AFR** 47:1,5,6,9,10
**afternoon** 7:3
  9:19 11:1 93:9
**agencies** 42:1
**ago** 8:21,24 13:9
  29:13 31:17
  33:20 92:19
**agree** 90:19
**agreed** 14:19
**agreement** 13:4
  51:4,8 83:18
  85:3
**agreements** 3:8
  57:14,15,16
  89:23 93:1,3,4,7
**agricultural** 4:11
  37:8 39:16
**agriculture** 39:16
**ahead** 72:12
**al** 1:5
**Alan** 6:19 7:4
**allow** 78:4 79:12
  79:14 86:14
**Altogether** 18:10
**Alvarez** 30:11
**America** 77:25
**American** 19:14
  19:18 20:19
  23:1 24:5 35:10
  35:16 45:20
  57:17 76:15
**amount** 38:1 44:4
  48:14 52:24
  58:2 62:5
**amounts** 87:6
**Ana** 31:15,24
**analysis** 81:21
**annual** 87:3
**answer** 4:1 9:8
  37:14 50:21
  54:3 67:24
**answered** 39:7
  67:22
**anybody** 67:11
  93:19

**anyway** 43:7
**AP** 48:3,9
**apparently** 72:9
**appeal** 29:24
**appeals** 29:23
**appeared** 5:9,20
  6:4,9,15
**Applicable** 47:7
**appointed** 11:24
  30:18
**appointment**
  11:22 97:21
**approach** 77:13
**appropriate** 53:13
  88:18
**approximately**
  37:17 64:19
  87:23
**April** 21:1 22:14
  24:7 35:14
  87:25
**area** 40:17,18
  66:19
**arm's** 91:6,14,20
  91:23 92:2,7,21
**arrange** 97:21
**aside** 37:1 53:15
**asked** 39:7 67:22
**asking** 49:19
**asks** 37:10 63:17
  71:24
**aspect** 17:1 79:4
**aspects** 71:16
**assertion** 67:17
**assessed** 47:9
**asset** 67:7,9,12,14
  67:19,21 68:4
  68:20 71:7,9,22
  77:14,17 79:20
**assets** 63:5,13
  66:21,23 68:2
  71:1 75:7 77:6
  89:14
**assist** 12:19 34:5
  77:16
**assistance** 22:4,6
  22:9,11,21 24:2
  36:16
**assisted** 36:1
**Assisting** 22:7
**associate** 16:16
**associated** 16:6
  16:10,23 17:14
  17:21 18:25
  65:23 69:1
  82:25 84:10
**Associates** 15:25
  16:4 20:23,25

**anyway** 21:7,12,20,24
  22:11,20 23:8
  24:13
**assume** 58:21
**assured** 46:5
**Attachment** 2:12
  13:19
**attempt** 91:13,17
**attended** 85:25
**attest** 90:14
**attorney** 7:15
  65:13 83:20,21
  96:16 97:16,20
**attorneys** 66:9
  85:14 87:13
**attorney's** 97:16
**audit** 16:24 17:2,3
  22:17 26:25
  27:4,5,6,9,11,14
  27:17 28:10,13
  28:14,16,16,25
  29:1,11,12,17
  29:18,22 41:1,2
  41:8 63:10,23
**audited** 27:1,2,12
  28:24 29:9
**auditors** 27:7
**audits** 27:3,24
  28:4,6,8,9,17,17
  28:18,18 30:2,3
  30:5 41:9
**Australia** 18:7
  75:24
**availability** 65:5
**available** 97:12
**Avenue** 8:14
**aviation** 45:25
  55:12
**aware** 4:12 19:1
  28:5 30:5 40:15
  44:17 46:16
  50:13 70:1
  71:13,20 72:2
  80:4 87:6

## B

**B** 2:10
**bachelor's** 15:6
**back** 17:8 18:1
  21:18 30:19
  34:13 35:21
  41:11 55:15,20
  56:9 70:4 72:6
  72:25 75:5 81:4
  82:13 85:13,19
  88:3,10
**background** 15:3
**balance** 43:22

**bank** 25:24 52:25
  77:24,24,25
  79:12 89:2,5,7
**bankruptcy** 1:1
  7:8 11:10,11,23
  11:25 12:3 24:8
  32:19 83:6
**banks** 28:3 53:4
  77:20,23 78:3,6
  79:10,12,22
  80:1,5,7,14
  86:14 87:5,7,16
**basically** 32:19
  35:18,25
**basis** 28:19 42:11
  42:11,14,18,22
  43:1,7,11,13,14
  44:1 59:7 60:22
  61:23 64:16
  75:18 82:5,9,12
  82:17 86:25
  87:3 90:16,21
  91:14,21,23
  92:3,8,22
**becoming** 15:18
**began** 80:16
**beginning** 15:3
  16:23 32:7,9
  78:24 88:9
  90:10
**begins** 97:19
**behalf** 5:21 6:5,10
  6:16 7:22,25 8:3
**belief** 90:25
**believe** 12:4 14:18
  18:16,17 19:3
  25:14,14,17
  36:13 47:2
  51:23 53:3
  55:11 66:4
  69:16,17 72:15
  73:24 75:1,10
  77:25 78:11,17
  79:12 81:2,10
  86:8 89:3
**belong** 63:14
**benefit** 46:4 66:10
**Benson** 5:5,16
  7:17,25
**best** 9:18 32:12
  39:8 92:21
**better** 20:12 57:19
**big** 37:24

**bit** 11:7
**Blackstone** 17:12
  28:14,14 29:3,4
  42:17 73:11,22
  75:1,4
**Blayney** 23:3 24:4
**board** 20:2 28:17
  28:24 34:8
**book** 27:17 68:20
  75:8,13
**booked** 66:23
**booking** 36:9
**books** 18:13
  25:23 34:5 36:3
  36:4,5 43:10
  44:1,1,3,23
  47:19 52:3
  63:13 66:22
  67:8,13,20 68:2
  68:3 71:2,9 72:4
  75:19 76:5
  89:10 91:5
**Boos** 1:16 2:3
  5:10 6:16 7:20
  8:7,14,16 13:24
  15:25 16:4
  20:23,25 21:7
  21:11,20,24
  22:10,20 23:8
  24:12 56:12
  60:6 64:5 73:5
  88:13 90:4
  92:10,16 95:15
  97:5,8,10
**borrow** 55:7
**borrowed** 55:4
  68:22
**borrowing** 51:25
  55:2
**boss** 40:4
**bottom** 59:13 72:7
  73:6 74:14
**Brad** 7:22 92:18
**Bradley** 6:5,12
  97:6
**break** 56:2 88:3
**Brian** 5:20 7:16
  72:9
**brief** 13:2 31:5
**briefly** 11:5 15:2
  15:15
**bring** 12:24 33:18
**broke** 69:3
**Brosnahan** 2:7
  5:20 7:16,16 8:2
  8:11 10:10,14
  10:22 13:14,23
  20:9,14 26:22

37:13,16 39:10
  41:6 49:19,23
  50:20,23 54:2,9
  56:1,11 59:22
  60:5 63:18,25
  64:9 67:23 72:1
  72:13,15,17,22
  73:1,4 88:1,12
  89:18 90:3
  92:10 94:4,6
**brought** 29:11
  30:7,21,25
**Bureau** 66:5
**business** 4:11
  15:6 26:20 37:8
  48:4,9 55:7
**buy** 68:4,10 74:2
  74:20

**C**

**C** 7:1
**CA** 97:7
**Cal** 15:9
**calendar** 55:24,25
  90:13
**California** 1:2,5,9
  1:20 5:6,7,9,18
  5:19 6:3,8,14
  7:5,9,12,13 8:15
  15:8 95:11 96:4
  97:2
**call** 12:4 93:22,24
**called** 5:11 69:13
  85:9 87:2
**calls** 10:8 49:18
**Canning** 1:10
**capital** 76:2
**Carlis** 85:24
**Carol** 85:24
**carries** 51:16
**carryover** 54:19
**Cary** 3:2 89:20
**case** 7:9,10 9:16
  84:9 97:13
**cash** 25:15 42:11
  42:16 43:1,7,9
  43:11,12,14,17
  45:16 46:17,19
  46:19 50:11
  55:4,6 70:19,19
  79:7 81:21,24
  81:25 82:1,6,14
**cash-basis** 42:8
  45:15
**categories** 14:6
  14:12,16
**caught** 34:6
**cause** 79:10 96:7

96:18
**caused** 62:7
**causes** 47:15
**CCP** 97:12
**certain** 33:21
  65:10 79:13
**CERTIFICATE**
  96:1
**certified** 1:19 5:8
  15:13,14 96:3
**certify** 96:4,15
**CFO** 20:7,18
  30:22 35:20
**Chad** 35:20
**chain** 2:23
**chance** 13:9,12
  64:10
**change** 32:1
  97:17
**changed** 32:22
  85:15
**changes** 9:16
  31:18 32:17
  97:17,18
**changing** 57:10
**Chapter** 3:5 6:5
  7:23 11:9 89:22
  92:18
**charge** 47:11,18
  47:21
**charged** 46:23
  47:23 48:8,16
  48:21 49:6
**charging** 51:24
**chart** 2:15 31:20
  31:24 32:5,24
  33:13,18 56:14
  56:15,18 57:1
**charts** 31:9
**Christopher** 6:4
  7:21 92:17
**circuit** 13:6
**circumstances**
  58:7 61:15
  78:19 83:17
**City** 7:12
**clarification** 14:17
**clean** 57:24 58:1
**client** 31:22 41:23
  42:2 67:6
**clients** 35:1 38:1
  38:23 39:19
  49:16 50:6 67:5
  67:17
**client's** 43:25 77:2
**client-prepared**
  41:22
**close** 20:11 36:4

**closed** 29:22
**closely** 36:25 37:3
  37:19 38:13,24
  39:6
**code** 42:9
**codings** 25:15
**Coleman** 12:6
**Coleman's** 12:9
**collapse** 80:10
**college** 15:17
**Collins** 3:2 89:20
  90:5,11
**Colusa** 1:9 69:15
  69:16,22 84:22
  84:23
**combination**
  62:22
**combined** 88:19
**come** 19:23 78:24
  79:4 81:9 88:3
**coming** 34:19
  55:6
**commencing** 5:3
**comment** 9:16
  79:2
**comments** 83:20
  83:23,25 84:2
  85:13
**common** 4:10
  37:7 49:12
  54:15
**companies** 4:9
  10:12 16:6,22
  17:14,17,20
  18:25 19:5,9,10
  20:2,6 21:17
  21:23 24:21
  25:9,11,19,23
  26:7,11 31:9
  33:15 34:16,18
  34:21,24 36:20
  37:1,3,5,19,21
  37:23 38:4,9,13
  38:17,19,20,24
  38:25 39:3,6,15
  39:20,22 40:8
  41:1,9,17 42:10
  42:14,22 44:3
  44:15,23 45:19
  46:17,18 47:8
  49:25 53:22,24
  54:11,13 55:1,2
  55:10 57:11
  58:13 59:20,20
  62:11 65:6,20
  65:21,21 67:6
  70:16 75:19
  78:10 87:17

88:13,16
**company** 4:15
  16:10 22:7
  25:14 29:15
  31:2,6 32:18
  36:1,11,14 40:2
  42:4 44:22
  46:19,22,23
  49:10 50:1,1,11
  50:15 51:6,15
  51:25,25 54:16
  54:17 55:23
  60:17,19 63:11
  65:24 67:8,9,13
  67:20 68:4
  70:17,18 71:9
  72:4 78:23
  88:19
**company's** 36:15
  68:5
**compensation**
  21:11
**completely** 9:18
**complexities**
  47:15
**complicated**
  47:20
**compute** 47:14
**computer** 13:11
  96:13
**concern** 54:25
**concerned** 50:24
  51:14,20 55:18
  77:1
**concerning** 4:9
  10:12 11:10
**concerns** 52:25
**concluded** 94:10
**concludes** 94:7
**conclusion** 9:13
**conduct** 91:13
**conducted** 92:2,7
  92:21
**conference** 9:4
**connected** 67:12
**connection** 12:18
  42:3 70:23
**consideration**
  79:18
**consistent** 25:15
**consistently** 44:5
  51:19,22,24
  52:14 54:24
**consists** 19:5
  64:1
**consolidated** 2:17
  59:23 60:12,16
**Constitute** 3:9

89:24
**consultant** 23:7
23:10 85:20
**consultants** 78:15
**consulting** 16:17
30:21 76:13
79:1
**contact** 20:20
**contained** 95:7
**continued** 15:19
17:13
**continuous** 27:10
**continuously**
17:15
**contract** 84:12,25
85:1,10
**contracts** 3:10
57:13 72:8 73:7
82:21 83:3 87:2
89:24
**contributed** 76:2
**convenient** 97:15
97:21
**convention** 52:18
**conventions**
44:18 75:22
**conversation**
93:10,12,18
**conversations**
11:8
**convert** 43:10
**copy** 84:17 97:16
**Corcoran** 72:8
73:8,13,20 74:2
75:2
**corporate** 37:4,22
38:21,24 39:20
**Corporation** 1:9
6:13
**correct** 12:10 16:7
16:8 30:1 34:1
41:9 45:11
47:17 48:17,22
49:8 63:22
68:14,17,20
69:10,25 71:3
71:11 79:24
82:17,18,22
83:2 84:19 92:8
95:6
**corrected** 52:8
**corrections** 9:15
95:4
**correctness** 33:6
**corresponding**
44:4 68:22
**cost** 75:11
**costs** 65:7

**counsel** 5:20 6:4
6:10,16 7:14 9:1
9:24 10:9,14,20
11:4,9 14:14
96:15 97:16
**counsel's** 90:7
**count** 38:16
**County** 1:10 69:22
**couple** 29:9 31:17
35:19,22 46:2
92:16
**course** 48:4,8
93:20
**court** 1:1 7:8 8:5
9:6 13:18 59:22
63:25 83:6
97:18
**cover** 22:1
**CPA** 1:16 2:3 5:10
6:16 8:7 15:11
15:13 95:15
97:8
**created** 41:14
**credit** 61:11
**creditors** 80:9
**CRP** 1:23 96:23
**CSR** 1:23 96:23
97:9
**CSS** 17:25
**CSSS** 17:23
**current** 27:20,21
32:7 43:4 62:16
**currently** 77:20
**custom** 52:18
53:17
**cut** 72:10,23
**c/o** 97:5

**D**

**D** 2:1 6:5 7:1
**Darrell** 85:24
**date** 7:11 22:19
64:4 97:14
**dated** 2:23 95:10
96:21
**daughter's** 18:9
79:17 82:5,12
82:19
**David** 93:15,17
**Davidson** 27:8
**DAX** 25:3
**days** 97:14
**deadline** 97:19
**deal** 68:8
**dealing** 49:15
70:10
**dealings** 30:11,16
91:12

**dealt** 50:5
**Dear** 97:10
**Deborah** 23:3
24:4,4
**debt** 62:16,21
**Debtor** 1:11
**Debtors** 1:6
**debts** 62:25
**December** 8:22
21:1,8 80:16
86:2,18,21
90:13,14
**decision** 86:10
**declaration** 3:1
89:20 90:4
**declarations**
87:10,11 90:5
93:5
**declare** 95:1
**deduct** 43:4
**deduction** 42:9
46:9
**deductions** 43:17
**deems** 47:12
**deferral** 42:9
**deferred** 27:21
45:5,7,16
**defined** 91:14
**definitely** 78:13
**Definitions** 13:20
**degree** 15:6
**deleted** 31:25
**deletions** 95:4
**Deloitte** 15:21,22
15:24 16:13,14
17:3 27:7 29:4,7
41:15,16
**department** 16:25
22:17
**depending** 47:4
**deposition** 1:15
2:3 4:6 8:17
9:13 10:6,25
12:12 19:12
83:15 92:11
93:20 94:8,10
96:5,9,17 97:8
97:13,16
**depositions** 5:2
**depreciation**
75:12
**describe** 19:5
20:4 21:16,23
40:25 41:19
**described** 4:14
14:3 28:5 30:3
39:5 50:14 76:8
77:13 80:13

**Description** 2:11
**desirous** 95:5
**detail** 44:11 69:3
74:5
**Determining** 3:7
89:23
**Dias** 6:19 7:4
**difference** 47:25
65:8 66:14
**different** 42:22
50:11 75:22
80:9 84:16 85:3
85:6,9,17
**differently** 19:16
**difficult** 87:15
**diligence** 76:14
76:16
**diligent** 52:24
**direction** 96:13
**directly** 36:12
40:16 48:20
**director** 15:23
40:3,10,17
**discharge** 3:8
14:21 64:18
66:2 69:23 81:7
83:4 84:12
89:23 93:1,3
**discount** 46:7,11
46:12,15
**discussed** 86:4,6
**discussion** 13:2
65:4,17 78:20
81:5,9,18,19
85:19,22 86:5
86:17,22
**discussions** 53:7
57:10 64:23
65:12 75:15
78:3,6 80:24
87:19
**disease** 18:3
**disinterested**
96:10
**disk** 88:2,6,10
**distinct** 90:16,21
**District** 1:2 7:8
64:15 65:2 74:3
74:17,21
**Division** 1:3 7:9
**document** 2:12,16
3:1 4:17 13:19
13:21,24 14:2
49:4,7,11 50:3
50:16 51:3,17
56:7 57:18,21
59:23 60:2,8
64:1,6,8 89:19

90:1
**documentation**
57:25
**documented** 49:3
51:11,16 57:12
57:22
**documents** 4:3,7
10:4,8,11,15,16
10:19,20,21
12:11,14,22,24
13:5,8,16 14:3,6
14:12,15,21,24
36:14 61:16,17
70:4,6 83:15
**doing** 16:17,22
17:6,7 18:12
19:17 20:21
21:19 35:9
39:19 40:7,20
41:1,7 44:8,11
46:1 52:11,12
53:21 54:10
81:6,23 91:18
**dozen** 38:15,20
39:15
**draft** 83:10,12,17
84:14,18
**DSI** 11:15,16,17
**due** 45:12 52:25
76:14,16 79:5
**duly** 5:13 8:8 96:6
**d/b/a** 1:9

**E**

**E** 2:1,10 7:1,1
**earlier** 11:5 56:19
77:13 90:6 93:9
**early** 25:3 29:5
55:14
**earnings** 76:3
**Eastern** 1:2 7:8
**economic** 85:16
**educational** 15:3
**effect** 9:5
**effort** 55:19 57:20
57:24 58:6
**either** 11:9 16:22
19:11 36:17,20
79:10 84:23
96:16
**eliminate** 52:21
**Emmett** 65:14
74:16
**employed** 53:12
**employee** 23:4,6
23:11,18 24:12
**employees** 40:7,8
**employment**

15:15
**encountered** 71:21 72:3
**end-of-the-year** 61:19
**entails** 37:22
**Enterprises** 2:14
**entities** 8:1 12:16 12:17 14:22 18:8,10 19:7,8 19:15,16 20:20 21:24,25 22:2,5 22:12,22,25 23:24,25 24:17 24:18 25:16 26:14,17 27:18 28:7 30:6,10 31:5 33:23 34:4 34:8,12 35:2,11 35:13,17,24 37:1,25 38:21 41:13,14 42:16 43:23 44:19 45:21 46:21 48:12 49:12 51:21 52:4,12 52:18 53:17 55:4,9,11,14 57:4 58:5,8,9 60:12,18 61:8 61:14 62:10,23 65:6,18 66:2,8 67:1,12 68:3 69:23 71:5 73:25 75:8 76:11 77:8 81:22 88:20,22 89:1,4,9 90:13 90:14,20,24 91:1,12 92:6
**entitled** 2:12,16 3:1 13:19 59:23 89:20
**entity** 26:9 29:12 31:21,22,25 32:2 42:8,8 43:11 45:4,5,15 45:15 46:9,18 60:21 62:22 63:14,15 65:19 66:15,22 71:6,7 74:24 75:2 76:1 80:10
**entries** 58:10,13 58:16 59:1 69:1 75:6
**entry** 58:19
**equipment** 63:6

75:7
**Ernst** 15:18,18,20 19:24
**escrow** 64:15
**especially** 54:19
**Esq** 5:20 6:4,9,15 6:18 97:5
**essentially** 36:8 48:19
**estate** 76:20,21,24 76:25 77:2,5,11 79:11,13,13,14 79:18,20 81:23 82:1,3
**estimate** 32:12 39:11 47:3
**estimates** 61:22
**et** 1:5
**event** 96:18
**exactly** 74:4
**exam** 28:17,17
**EXAMINATION** 2:6 8:10 92:14
**examined** 5:13
**example** 14:21 44:21 45:1 48:3 63:5 79:6 88:21
**exclude** 14:11
**excluding** 62:16
**exclusively** 10:8
**executed** 84:15 85:9
**Executory** 3:10 89:24
**exhibit** 2:11 13:19 13:22,25 14:4,7 14:16 56:8,12 60:3,6 61:25 62:1 64:1,7,11 72:6 73:6 74:13 75:5 89:18,19 90:2
**exist** 52:22
**expand** 22:1 69:14
**expanded** 17:18
**expense** 27:22 43:4,6 45:4
**expenses** 42:25 43:16 89:12
**experience** 49:20 49:25 50:8 51:21
**experienced** 49:15
**expert** 37:10,12 50:18 66:19
**expertise** 40:18

**explain** 31:6
**extensively** 21:5
**extent** 10:8 47:21
**e-mail** 2:23 13:8 13:11 64:14 74:15,15
**e-mails** 12:21 64:2

_____

**F**

**fact** 92:20
**fair** 51:13,17 70:25
**fairly** 4:10 37:7 49:12 54:15 55:13
**fall** 28:10
**falls** 63:21
**familiar** 24:20 25:4,7 30:9 58:12 69:12
**family** 77:3 90:12 90:19
**far** 52:5 77:10 91:15 92:5,9
**Fargo** 77:24
**farm** 14:22 28:13 28:14 55:11
**farmed** 64:16
**farming** 2:17,20 3:3 5:11,12,12 5:21,21,22 7:18 17:22,22,22,23 19:6,8,9,10,16 21:17,24,25 22:12,22,25 23:24 24:17,18 28:13 29:1,23 35:11,13,17,24 41:13,17 42:14 42:16,16,17,21 43:1 45:20 48:3 48:12 55:4,13 57:15,15 59:23 59:25 60:12,16 60:18 61:13 62:10 66:7,22 69:22 75:8,19 88:20,21,22 89:4,21
**Farming/SSC** 2:19,19 59:24 59:24
**Farms** 2:18 3:4,5 5:11,21 7:18,18 7:25 17:8,10 18:22 19:6,6 42:15 45:23 55:11 59:24

62:12 66:2,3,12 66:12 75:24 89:21,22
**father** 19:20 76:18
**February** 15:22 32:14,25 87:24 87:24
**federal** 41:17 47:7 65:4,7 66:5 90:11
**feel** 9:15
**Feeney** 6:12 97:6
**fell** 14:15
**fifth** 74:13
**figure** 74:5
**file** 88:16,21,22 91:1
**filed** 24:7 42:1 43:12 83:5 87:10 97:18
**files** 60:23
**finalized** 83:11
**financial** 2:20 17:3 26:14,16 27:6,24 28:1,8 59:25 60:11,14 60:16 61:13 75:6
**find** 12:22
**firm** 11:22,24 12:9 15:24 22:14 23:13 27:15 30:20,21 33:2 33:24 35:18,24 39:25 40:10,12 41:15 93:19
**firms** 24:3 30:17
**first** 1:20 5:13 16:9 18:12 47:22 64:2,13 72:7 73:6 86:14 90:8 97:1
**Five** 89:19
**flat-out** 78:13
**Floor** 6:14 97:6
**flow** 50:12 81:21 81:24,25 82:1
**fluctuates** 47:5
**following** 45:3 46:6
**follows** 8:8
**foods** 1:5,9 11:23 11:25 16:17 17:4,5,7,10 19:14,18 20:18 20:19 21:5 23:1 24:5,5,10 27:1,4 28:2,5,16 29:6,7

29:8,11,18 31:4 33:2,7,12 34:13 34:25 35:2,6,10 35:10,16,16 40:14 42:18,21 42:25 43:2,6 45:20 48:4,5,13 48:13 55:9,14 61:11 76:15 77:19,21 78:4,8 78:9 79:17 80:6 82:11 83:1 89:7 97:8
**force** 9:5
**foregoing** 95:2,6 96:5
**foreign** 18:6 27:18 55:9
**forgot** 29:14
**form** 26:25
**forms** 41:25
**forth** 5:14
**forwarded** 64:3
**Foster** 6:18 7:24 7:24
**fouls** 47:16
**found** 14:15 81:15
**Franchise** 28:17 28:24
**Francisco** 5:7,19 6:3,14 7:5,13 97:7
**Fresh** 19:14,18 20:19 24:5 35:10,16 76:15
**Fresno** 8:15 15:8 15:10,20,21
**Friday** 11:1,5 14:1 14:19 93:11,22 94:1
**Friedman** 5:5,17 7:17,25
**FTI** 30:14 78:14
**full** 8:12 21:2 34:15,17,21
**fully** 71:4
**full-time** 24:12
**function** 76:9
**functions** 33:21 33:23,24 35:7 35:23,25
**fund** 74:18 82:6
**funding** 68:23,24
**funds** 74:18,20 77:16
**further** 62:15 74:6 92:12 96:15

**G** 7:1
**gain** 73:18
**Gary** 22:16 35:17
  83:22
**gather** 41:23
**Gene** 23:4 86:1
**general** 13:20
  22:8 24:16,18
  24:20 25:8,12
  25:13,19,22
  26:2,21,23 36:6
  58:10,20 69:1
  80:16,23
**generally** 43:21
  54:25 71:18
  87:20 91:16
**generated** 93:2
**getting** 34:5 50:2
**ghosts** 72:17
**give** 8:25 10:19
  15:2,15 37:10
  39:11
**given** 9:14 56:12
**GL** 25:15,16 27:20
  59:5
**glanced** 26:25
**Glen** 30:21,22
**go** 15:17 18:1
  31:20 40:25
  41:19 63:10,23
  72:12 79:13,14
**goal** 57:18
**going** 10:7,19
  12:19 26:18
  37:9 49:17
  50:17 51:25
  70:4 71:15
  73:17 75:5 82:4
  82:10 85:19
  88:3 89:19
**good** 7:3 48:20
  56:3
**Goss** 14:18 93:15
  93:17
**government** 42:1
  65:7
**graduated** 15:5
**graduating** 15:17
**graduation** 15:3
**ground** 8:25
**grounds** 41:5
  50:18 63:17
**group** 1:19 6:19
  7:5 19:5,14
  37:25 38:17
  94:9 97:1,25
**groups** 38:15,16
**growers** 48:6,7,7

**guess** 39:14 66:19
  70:6 75:23 76:5
  83:16
**guidelines** 53:12
**G-O-S-S** 93:17

**H**

**H** 2:10 6:4
**half** 29:10
**handled** 50:9
**handling** 35:8
  40:18
**haphazardly** 58:5
**happen** 35:4,5
  93:7
**happened** 36:13
  58:7 60:22
  70:25
**Harrison** 6:1 7:22
**Hart** 2:8 6:4 7:21
  7:21 53:25
  67:22 72:9,14
  72:16 92:15,17
  94:2
**harvest** 55:15
**harvesting** 57:16
**head** 39:2 84:21
**hear** 20:12 67:11
**heard** 67:17 69:19
  69:21 70:3 78:7
**held** 36:25 37:3,19
  38:13,24 39:6
  66:2,12,16,24
  67:3,9 68:5,19
  77:15 86:1,2
  94:9 97:13
**Hello** 72:18,18,21
**helped** 22:23
**hereinafter** 5:14
**Hi** 72:22
**high** 15:4,5 75:25
**hired** 23:16
**history** 15:16
**holds** 71:10
**hope** 13:15 40:5
**hopefully** 20:12
**hour** 5:3 11:4
**hours** 11:3,7
**house** 73:22,23
**hundred** 76:1 86:8
**hypothetical** 54:1

**I**

**Iacopi** 85:24
**identification**
  13:22 56:8 60:3
  64:7 88:14 90:2

**identify** 7:14
**II** 3:5 5:12,22 7:18
  12:17 17:22
  18:22 19:6
  42:17 66:3,12
  89:22
**III** 17:23 18:23
  19:7
**imagine** 55:21
**immediately**
  34:18
**important** 9:7,17
  52:9,15 62:25
  63:2,7,13,19,22
  66:1,11 77:6
  91:6 92:1
**importantly** 9:3
**imposed** 79:9
**improper** 50:25
  51:15 53:25
**improving** 36:20
  36:23
**include** 42:3
  97:18
**included** 38:20
**including** 20:19
**income** 45:5,7,9
  45:12,16 89:10
  90:12
**Incomprehensi...**
  54:8
**independent** 23:9
  40:22 91:2
**individual** 22:16
  59:14,16 61:13
**individuals** 66:8
**INDUSTRIAL/S...**
  1:8
**informal** 9:4
**information** 23:17
  31:23 32:22
  41:23 42:4
  61:21 63:11,24
  78:16 79:25
**informational**
  79:2
**initially** 19:24
**initials** 18:5
**initiated** 93:22
**input** 36:19
**inquiry** 13:7
**inspection** 97:13
**installations**
  62:17
**installment** 82:12
**instance** 52:6
**instances** 46:12
**instructed** 4:1

  12:18
**instructing** 37:13
  50:20
**Instructions**
  13:20
**Inter** 44:20
**intercompany**
  43:19,22 44:19
  46:20 47:9,22
  48:10,24 50:9
  51:1,6 52:22,24
  53:1,4,9,13,16
  54:14,16 55:8
  57:12 58:2,19
  59:8 69:5,6 78:4
  80:17,21 81:6
  91:13
**interest** 46:23,25
  47:9,12,12,13
  47:14,18,22,24
  48:8,16,21 49:6
  49:10 50:2 51:2
  51:16,19,24
  69:1 82:23,25
**interested** 96:17
**interfaced** 20:4
**interfacing** 20:17
**internally** 55:22
**Interruption** 20:8
**interval** 52:20
**investment** 75:20
  75:24 76:4
**investments**
  75:16,18
**invoice** 48:13
**invoices** 93:1,6
**involve** 39:19
**involved** 24:16
  26:13 27:14
  36:8,12 37:4
  39:16,21 40:15
  41:8,17 51:5
  58:11,23 65:13
  65:17 70:11
  73:16 78:5
  81:19 85:13
  87:4
**involvement**
  39:24 65:1 81:3
**involves** 37:21
**in-house** 33:25
  35:21
**IRS** 28:10,16,24
  29:17,18 47:2
  47:12 91:22
**issue** 42:7 66:20
**issues** 14:20 15:1
  65:23 84:4,10

**items** 81:24 86:3

**J**

**Jackson** 16:20
**Jacob** 6:18 7:24
**January** 21:9,12
  22:15 32:14,25
  35:14 87:24
**John** 85:24
**journal** 58:12,14
  58:15,20,20
  59:1
**June** 1:17 2:4,21
  5:3 7:11 60:1
  64:20 97:4,9

**K**

**Karen** 1:23 5:8
  96:3,23 97:9
**Kasowitz** 5:4,16
  7:17,24
**Kearny** 6:13 97:6
**Kevin** 12:4,6
**key** 20:20
**Kezirian** 23:4 86:1
**kind** 17:2 26:2
  28:9 31:6 48:9
  58:6 65:22
  75:25
**kinds** 25:21 26:5
  40:19 43:18
**KIRBY** 6:7
**know** 11:4,6 13:2
  14:24 18:4
  19:21,23 20:9
  22:14 24:15,19
  25:6,25 26:1
  30:8 31:2,13,16
  32:4,7,17 33:13
  35:9 36:3,10,13
  39:1,9 41:23
  44:13,14 45:3
  46:25 47:8 48:2
  48:5,9,23 49:2
  50:7 52:5,6 53:5
  53:11 54:7 55:6
  56:25 57:18,20
  57:23 58:3,4,14
  58:18 60:23
  61:19,20 62:7,7
  65:12,14,18,19
  65:20 68:10
  70:11,16,22
  73:19,25 74:1
  74:10,24 75:2
  75:18,20 76:3
  76:12 77:1,10
  77:23,25 78:23

**The Souza Group**
**(800) 230-3376**

BMO 002050

79:5 80:13
81:17,23,24
83:5 84:8,11,16
84:22,23 85:8
85:18 86:4,20
86:20 91:15
92:5,9 93:7
**knowledge** 92:20
92:21
**KPMG** 27:12
**Kyle** 11:13,14,15
**Kyle's** 11:18

**L**

**L** 6:7
**land** 66:12,17,24
67:3,3 74:17
**large** 53:23 54:12
54:14,16 73:17
**late** 29:5 64:20
**law** 5:4,16 6:1,7
9:6 12:9 65:13
66:18
**laws** 5:1
**lawyer** 71:15
**ledger** 22:8 24:16
24:18,20 25:8
25:12,13,19,22
36:6 58:10,20
69:1
**ledgers** 26:1
**left** 15:24 22:20,24
**legal** 66:19 71:16
85:14
**Lemoore** 64:18
84:24
**lenders** 30:7,18
30:25 78:8
**lending** 51:25
**Lendway** 97:24
**length** 91:7,14,20
91:23 92:2,7,22
**lent** 46:21 77:20
**lessee** 85:7
**lesser** 26:25
**lessor** 85:7
**letter** 70:5,12
97:14
**let's** 20:15 27:3
41:11 42:20
48:11 75:11
**Lewis** 6:2 7:22
**Liabilities** 89:16
**liability** 5:6,17
27:21
**LICENSE** 1:24
**limit** 14:25
**limitation** 43:2

79:6
**limited** 1:5 5:5,17
12:16 14:20
17:1 35:11
64:16 81:3
**line** 59:13 62:1,17
72:11 75:16
90:10
**liquidated** 31:25
**list** 10:19
**listed** 14:3,16
**little** 11:7
**lives** 73:22
**LLC** 3:4,4,5 7:18
7:18,18 17:23
18:16 88:21
89:21,21,22
**LLCs** 88:19
**LLC/SSC** 2:18
59:24
**LLP** 5:5,17 6:2
**loan** 4:15,16 46:22
47:12,23 48:1
48:25 49:3 50:1
50:2,3,15,16
51:1,3,15,17
52:3 53:13,16
54:12,16 58:5,8
58:19 59:19
68:25 73:23
**loaned** 71:5 73:24
**loaning** 49:9
**loans** 47:9,21,22
49:2 50:9 52:22
52:25 53:1,5,9
53:19 54:14
55:8,11,14,15
55:19 59:9
62:11,19
**located** 7:12 24:9
**long** 8:21,23,24
10:24 11:2
45:14 48:5,13
51:18 54:23
68:21
**look** 43:18 58:17
59:13,14,16
60:6 61:18
64:10 72:6 73:5
74:6,13 77:10
90:9
**looked** 58:22
59:10 77:3
**looking** 14:3,7,8
26:3 47:4 55:16
61:16,17,25
**looks** 56:16
**lot** 54:18

**L.P** 1:5 17:23

**M**

**maintain** 32:4
88:14 89:9
**maintained** 26:6
32:6,13,16
90:15,20,25
**making** 45:4 46:9
50:1 58:19 95:5
**Malcolm** 6:9 8:2,3
72:18,22
**man** 40:2
**manage** 50:11
**managed** 19:16
**manager** 33:1
40:12 97:24
**managers** 31:23
**managing** 40:3
**March** 87:25
**mark** 13:18 23:16
33:17 53:7
59:23 64:1
78:18 80:2
89:19
**marked** 13:21,25
56:7,13 60:2
64:6 90:1
**Marsal** 30:12
**Marshall** 23:21
81:6,7 85:20
**master** 94:9
**master's** 15:9
**materials** 42:2
**matter** 7:7 66:16
68:13 97:12
**mattered** 68:18
**matters** 4:5 10:5
18:19 61:1,3
**maximize** 66:10
**McClaran** 30:22
30:22
**McCormick** 23:16
53:7 80:2
**mean** 14:10 22:6
26:20 29:14
39:12 40:4 43:8
43:21,24 44:10
44:20 45:8
50:10,10 51:11
52:21 55:21
57:7,23 58:1,5
58:15 59:3 62:9
77:9,10 79:15
80:22 82:8 84:5
91:9,15
**meaning** 26:20
**means** 91:10

**measure** 75:9
**meet** 30:23
**meeting** 11:6 31:5
85:23
**mention** 29:14
**mentioned** 61:9
61:10,12
**merged** 15:20
**merger** 80:6
**message** 64:3
**met** 11:4
**million** 62:13,21
64:19 73:9 74:8
**minimize** 77:2
**minimizing** 77:5
**minutes** 13:9
33:19,20
**misstates** 41:5
**moment** 92:19
**Monday** 1:17 2:4
5:3 97:9
**money** 44:22
46:21,22 48:19
49:9 55:2,7 58:5
58:9 66:14
67:14,21 68:4
68:10,14,22
70:17,18 71:6
71:23 72:4
77:20,20
**Monica** 97:24
**Monterey** 73:23
**Montgomery** 6:2
**month** 36:3,4 83:8
**monthly** 47:5 59:6
59:6,7 61:20
86:25
**months** 2:21
22:18 35:19,22
44:13 59:25
**Montreal** 77:24
**morning** 90:7
**Moss** 27:7
**Motion** 3:6 89:22
**moved** 20:11
**multiple** 18:8 37:4
37:22 38:21,25
39:20
**Murphy** 6:12 97:6
**mutually** 97:21

**N**

**N** 2:1 6:18 7:1
**name** 8:12 11:15
14:24 19:4
22:16 30:20
68:5 92:17
**named** 23:4

**nature** 16:21 62:5
**necessary** 9:15
69:9
**need** 13:5 43:15
43:18 47:21
**needed** 35:5
46:18 59:17,18
70:19 82:1,5,13
**needs** 41:25 81:21
**net** 62:14 75:12
**never** 23:12,19
82:17
**new** 5:7,11 18:7
24:22 31:21
35:19 57:4 65:5
**normal** 48:4,8
**normally** 28:23
41:21 44:16
47:3 59:5,16
**North** 8:14
**note** 48:10 49:3
49:11 50:3 51:3
51:17 68:21,22
69:10 82:5,7,9
82:13,16,24
**notes** 51:6
**notice** 11:1
**notwithstanding**
10:17
**number** 7:6,10,10
14:23 17:17
58:6 62:14 88:7
88:10,14

**O**

**O** 7:1
**object** 10:7 26:18
37:9 41:4 49:17
50:17
**objection** 10:13
53:25 54:8
63:16 67:22
71:24
**observe** 53:22
**obtain** 53:6 78:16
**obviously** 22:3
28:2 37:24 55:5
57:17 76:25
77:3
**occasion** 83:12
**occasions** 50:6
**occurrence** 54:15
**October** 61:22
**office** 12:19 14:18
15:20,21 31:10
31:13 35:7
36:18,19 37:18
56:17,20 60:25

70:5,8,10 85:25
90:7 93:13,23
93:24,25 97:13
**Offices** 5:4,16 6:1
6:7
**Oh** 30:19
**okay** 9:24 13:14
19:12 23:7,20
35:3 38:11,13
48:11 49:23
52:9,17 54:6
56:2 62:15
72:24 73:3 81:9
88:5
**old** 24:22,24 25:1
**once** 8:2,30 32:18
40:21 49:18
63:16 92:17
**ones** 17:8,9 27:1
29:22 42:13,15
60:17,19 61:9
83:5
**onetime** 28:19,21
**oOo** 7:2 8:9
**opened** 37:18
**operating** 15:25
**operationally**
90:15,20
**operations** 2:18
18:7 59:24
60:16 65:22
69:24
**opinion** 37:11
49:18 63:17
67:19 68:1
71:24
**opinions** 50:19
**opportunity** 35:6
**opposing** 97:16
**opposite** 43:5
**Opposition** 3:3
89:21
**option** 15:7
**oral** 51:4,8
**order** 3:6 41:24
65:9,10 82:6,12
89:23
**organization** 31:8
31:20,24 33:13
56:13,15
**organizational**
2:15
**organized** 18:16
18:17,20
**original** 76:1
97:12,18,20
**outside** 23:9
93:19

**outsource** 22:9
**outsourced** 33:23
34:2 35:23
36:18 40:7
**outsourcing**
33:21 34:11
35:8 76:9
**outstanding**
29:23 59:8,19
**overall** 80:15
81:20
**oversees** 33:2,7
**overview** 31:6
**owe** 54:16
**owed** 53:23 59:19
62:19,22
**owes** 77:20
**owing** 54:12
**owned** 74:24 75:2
**ownership** 32:2
65:9,10 67:2
71:18,22 77:6
77:10,14 79:17
82:10,11
**owns** 77:11
**O'Gara** 6:15 7:19
7:19 10:2,7,13
10:18 13:8
26:18 37:9,15
39:7 41:4 49:17
49:21 50:17,22
54:8 56:3 60:4
63:16 71:24
94:5 97:5

―――――――――
**P**
―――――――――
**P** 5:20 7:1
**page** 2:6,11 62:1
64:2,13 72:7
73:6 74:6,13
90:9
**pages** 14:25
**PAGE/LINE** 4:2
**paid** 43:1,16 45:14
45:15 48:5,6,13
55:20 81:16,18
86:25
**Palm** 8:14
**papers** 12:20
41:24
**paragraph** 90:9
**parens** 73:11
**parent** 88:19
**part** 37:24 39:20
40:17 44:11
45:16 57:24
63:3 65:15
73:21,21,24

**74:14 76:9 79:2
82:3,11 86:5,22
**participate** 30:2
**participated** 86:17
**participating** 57:9
75:14 78:2
**particular** 19:4
31:19 32:15
34:10 52:19
53:12 56:22
60:13 63:14
65:3 70:12 84:9
**particularly** 61:25
80:20
**parties** 3:9 52:14
57:15 62:20
89:24 96:16,19
**partnership** 1:5
5:6,18
**party** 9:16 62:2,16
91:11
**pattern** 55:3
**pay** 46:5 48:15
55:15 66:15
67:21 73:21
82:13,23,23
**payable** 44:2
**payable-type**
48:18
**paying** 18:11
49:10 53:18
87:6
**payment** 45:6
46:9 48:9 69:2
82:6 86:11 87:3
**payments** 42:4
43:19 44:19
78:4,9 79:4,5,7
80:15,17,18,18
80:21,22 81:7
81:25 82:15,20
84:4,5 86:6,12
86:19,25 87:8
87:15,16,21
**payout** 21:14
**payroll** 26:8
**Pearson** 6:12 97:6
**penalty** 95:1
**pending** 7:7
**people** 21:20
33:11 36:11
39:25 60:25
61:7
**percent** 37:20,24
38:3,5,6,6,8,10
38:11 39:13,18
46:12 47:3 86:8
**percentage** 65:10

**percent-owned**
76:1
**percipient** 37:11
**perform** 21:17
33:24
**performed** 26:24
33:25
**period** 22:10,15
24:6 28:20,22
28:23,25 29:25
32:24 33:22
34:11,16 35:8
35:12 36:9,17
40:6 44:4 47:4
55:5 57:4 59:5
76:9 78:24 86:7
**periodic** 59:7
**periodically** 56:19
**perjury** 95:2
**permit** 79:23 80:1
80:5,8,14 91:1
**permitted** 10:16
**permitting** 78:9
87:7
**Perry** 83:22
**person** 22:23 23:2
39:23 44:11
96:10
**personal** 18:9
**personally** 5:9
17:11 30:2
58:23 60:9
67:10 75:21
85:22
**personnel** 34:3
**pertained** 84:12
84:20
**pertaining** 5:2
**pertinent** 4:5 10:5
**phone** 7:5 20:11
**phones** 72:18
**physically** 24:9
**piece** 69:12 71:7
**Pinter** 35:20
**place** 96:10
**plan** 74:18
**planning** 65:24,24
76:20,21,24
79:11,13,14,18
79:21 81:22,23
82:2,4 84:7
**plant** 63:6 64:18
75:7
**Pleasanton** 1:20
97:2
**please** 7:14 8:6,12
9:10 10:21
21:16 60:6 73:5

97:17,20,21
**PM** 2:24
**point** 21:2 32:16
52:19 55:17
57:21 78:7 84:3
86:21 87:8
**position** 13:5
81:13
**practice** 4:13
15:25 44:21
46:16 49:9,12
49:14,25 50:14
50:25 58:18
**practices** 57:10
**preferred** 97:20
**prepaid** 45:2,4
**preparation** 12:12
58:14
**prepared** 31:8,13
31:16,17 41:12
56:16
**preparer** 63:10
**preparing** 10:24
11:5 22:7 26:13
36:1 43:19
52:10 63:12,19
90:23 91:4,25
**prepay** 45:19,22
**prepayment** 45:2
46:8,13
**prepayments**
44:25
**presence** 10:9
**present** 6:18
**pretty** 40:21
**previous** 27:11
54:20 81:17
**previously** 33:24
**primarily** 39:24
42:6
**primary** 17:9
**principal** 82:24
**principally** 40:14
**print** 13:10
**printout** 59:4
**prior** 34:18,18
46:5,10 84:13
**privilege** 10:17
**privy** 91:16
**probably** 9:1 29:8
31:17,23 32:14
39:18 55:22
57:23 61:2,6
65:14 75:12
**problem** 13:17
54:21 91:19
**problems** 79:10

procedure 32:23
proceed 56:10
   88:11 97:20
proceedings
   11:10,11
proceeds 73:19
   74:1,10
process 9:22
   27:14 30:9
   31:19 36:12
   40:25 41:19,21
processing 39:16
   69:24
produce 13:13
   36:3 48:15
produced 13:6
product 48:12
production 13:15
   97:24
products 39:17
Professional 6:13
prohibit 4:13
   50:14
projections 61:20
projects 23:18
promissory 69:10
properties 69:16
   80:25
property 63:6
   64:14,16,18
   65:2 66:2,15
   68:11,19,19
   69:12,13,15,19
   69:21 70:3,23
   71:8,11,19
   73:14 74:2,7,11
   74:21,25 75:7
   82:4,8,16 84:20
   84:22
proprietorship
   16:2
protection 79:20
provide 14:14
   22:11 31:23
   46:15 83:15
provided 28:2
   36:19 45:10
   46:7,11 63:11
   67:14,21 68:4
   71:23 72:4
   77:16 81:25
   91:11
provider 48:15
provides 42:2
providing 78:25
   83:3 85:13
provision 27:16
   27:19 48:20

PTO 21:14,14
public 34:14
pulling 70:4
purchase 67:14
   68:23 70:20
   71:7,10 74:17
purchased 64:19
   69:22
purchasing 77:16
purpose 27:23
   71:13
purposes 3:11
   43:19 46:2,8
   52:10 54:22
   59:12 63:8
   65:19,25 66:4
   66:21 68:13
   71:8,12 77:5,11
   77:12 79:10
   89:25 91:4,18
pursuant 5:1
   97:12
put 47:10 65:19
   65:22 72:12,24
Putterman 13:3
   14:19 93:10,19
Putterman's
   93:23,23
putting 37:1 53:15
p.m 5:4 7:4 56:5,6
   56:10 88:7,8,11
   94:8,10

──────── Q ────────

quarterly 61:22,23
question 4:2 9:9
   28:11 37:10,14
   41:4 49:18,22
   50:18 53:15
   54:3 67:25
   83:16
questioning 7:15
questions 4:1 9:8
   9:22 10:21
   92:12,16 94:2
   97:17

──────── R ────────

R 7:1
Ranch 17:12
   28:14 29:3,4
   72:8 73:8,11,14
   73:20 74:2 75:3
rate 46:25 47:1,2
   47:5,7,10,10
reach 13:4
read 87:9 95:2
   97:13,16,20

real 42:7 71:8
really 35:3,5 36:24
   51:5 53:20
   54:24 58:4
   59:17
reason 9:7,17
   32:15 34:10,23
   45:18,24 46:1,4
   91:25
reasonable 46:15
reasons 46:3
recall 28:25 52:17
   53:16 55:1 57:9
   64:23 67:4 68:7
   70:24 74:4,22
   75:6,14 78:2,12
   78:19 79:3
   80:24 83:9,23
   84:20 85:2,11
   85:12,16 86:10
   86:22,24 87:1,2
   87:14 92:23
   93:11
recast 91:23
receipt 97:17
receivable 44:2
   62:2,9,12
receivables 26:1
receive 36:14
   55:14 97:14
received 11:1
   14:1 15:6,9
   21:11,13
receiving 45:5
   82:15,20
Recess 56:6 88:8
Reclamations
   66:5
recognize 56:15
   60:7
recognized 45:9
recollection 4:4,8
   10:5,12,15 39:8
   74:19
reconciliations
   81:6
record 7:4 8:13
   13:3 41:5 56:4,9
   72:16 88:7,10
   94:8
recorded 36:15
   45:3 71:18 76:4
   77:14
recording 22:8
   27:20 36:2
   44:22 52:13
   58:23
records 22:18

25:21 26:5,9
   90:25 91:5
recurred 28:22
recurring 28:20
redacted 64:3
reduce 58:2,6
reduced 53:5,9
   65:6 96:12
reducing 52:24
reduction 80:15
   80:17,20
refer 14:22 48:24
reference 72:7
   73:7 74:7
referenced 93:9
referral 16:16
referred 13:21
   28:19 33:20
   56:7,18 60:2
   64:6 90:1
referring 17:2
   27:4,25 36:6
   44:25 53:2
   87:11
reflect 62:4,10,19
reflected 52:3
   59:9 63:1,3,7
   66:22 67:8,13
   67:20 68:3,25
   71:2,14,22 72:3
   75:8 77:7 91:20
reflecting 89:10
   91:5
reflects 62:14
reframe 9:10
refresh 4:4 10:4
   74:19
refreshed 4:8
   10:11,15
regarding 4:4
   10:5 11:11 12:3
   78:3
regardless 60:12
   68:5 77:15
regards 12:20
   18:6 57:14
regular 52:20
regularly 33:14
relate 76:23
related 3:9 29:12
   37:5,23 38:21
   38:25 39:20,22
   42:4 50:1 51:15
   62:2,16,19,22
   62:23 66:7,8
   67:6 78:9 81:22
   87:16 89:24
   96:18

related-company
   87:21
related-party 62:9
   62:25 86:16
relates 27:18
   29:24 30:10
   75:20
relating 12:20
   15:1 57:16 93:2
relationship 20:16
relevant 42:5,6
remember 57:17
   65:9 70:12
   73:13
REMEMBERED
   5:1
reopen 92:11
repeat 73:1
rephrase 49:21
report 33:2 40:13
reported 1:23
   40:23 44:6
   75:10 97:9
reporter 5:8 8:5
   13:18 56:13
   59:22 64:1 96:1
   96:4
Reporters 1:19
reporting 40:8
reports 25:5
represent 92:18
represented 5:19
   6:3,8,15 9:24
   12:3
representing 7:17
   7:19
request 41:22
Requesting 50:18
required 58:3
resistance 87:5,7
respect 87:20
restate 9:11 71:4
restrictions 53:1
   53:2 79:9
return 10:22 14:23
   16:25 18:14
   33:12 41:23,25
   42:5,6 43:11
   44:13 61:4,18
   71:3,12 88:17
   88:19,23
returns 18:10
   28:15 41:20
   43:12 44:8
   47:16 52:12
   63:12,20 90:12
   90:24 91:2,4
   92:1

**reverse** 45:17
**reversed** 43:7,8,9
**review** 4:3,7 9:14
  10:4,11 13:10
  13:12 26:19
  30:8 44:15
**reviewed** 9:1 10:8
  10:15,20 26:16
  31:11 33:1,4,14
  33:16 90:6,11
  92:25 93:5
**reviewing** 31:3,5
  59:1
**reviews** 26:24
  60:8 64:8
**RHM** 1:8 69:24
  80:6
**Rick** 65:14 74:16
  74:17
**right** 11:15 23:25
  32:8 33:5,19
  34:18 35:13
  51:13 56:2 92:3
  92:11
**Rogers** 69:13 70:3
  70:6,12
**role** 11:18 16:25
  23:16 84:1
**room** 9:4
**rules** 4:13 8:25
  44:17 50:13
  66:6
**run** 44:7 54:11
  88:2
**running** 51:2

---

**S**

**S** 2:10 3:2 7:1
  89:20
**Sacramento** 1:3
  6:8 7:9
**sale** 73:13,20 74:2
  74:10,20 82:4,8
  82:16,25
**Salyer** 2:14 4:9
  6:10 8:4 10:12
  16:7,10,22 17:8
  17:11,14,21
  18:9 19:1,14,17
  20:2,5,19 23:1
  23:23 24:5,21
  25:9,23 26:7,11
  26:14,17 28:1,6
  30:6 31:9 33:14
  33:22 34:8,15
  34:17,21,24
  35:1,10,16
  36:20 37:1,25

38:4,9,17 39:3
  40:8 41:1,9
  42:10 44:18
  45:20 46:17
  47:8 49:12,24
  51:21 52:18
  53:17,24 57:17
  58:8,13 61:1,7
  62:11 64:4,13
  64:24 67:1,12
  67:20 68:2
  70:16 71:5,6,7
  74:15 76:11,15
  77:7 79:16
  88:13 89:1,9
  90:12,19,24
  91:12 92:6
**Salyer's** 28:15
  76:24
**Salyer-affiliated**
  57:11
**Salyer-connected**
  29:15
**Salyer/SK** 33:12
**San** 5:7,19 6:3,14
  7:5,13 97:7
**SARS** 17:23 18:2
**Saturday** 11:7
**saw** 23:5 83:5,17
  90:7
**saying** 33:22
  34:25 35:3
  48:11 65:25
  69:7 74:16
**says** 13:20 14:21
  56:22 62:2,16
  63:6 64:2,14
  72:8 73:7 74:17
  75:16
**schedule** 13:17
  41:22 62:13
**Schnader** 6:1 7:21
**school** 15:4,5
**scope** 14:25
**Scott** 1:23 5:8
  6:10 8:3 16:7
  17:7 19:19
  23:21 64:3
  65:14 73:22
  79:6 81:7,21
  82:10 83:19
  85:20 96:3,23
  97:9
**Scott's** 76:17
  81:13 82:5,25
  87:12,13
**scrutinized** 78:11
  78:14

**scrutiny** 78:23
**search** 12:11,14
  14:2,12
**searched** 12:21
**searching** 83:14
**season** 55:15
**seasonal** 55:7
**second** 21:18
  62:1 71:6
**Section** 3:11
  89:25 97:12
**see** 20:15 56:22
  56:23 59:5,18
  62:1,17 64:21
  72:6 73:7 74:7,8
  74:14 75:11,16
  83:7,9,12,25
  90:17 93:14
**seeking** 84:2
**seen** 13:24 25:5,6
  38:2 50:7 56:25
  57:5 60:9,11,13
  60:15,17,18,23
  61:12 67:2,7
  72:5 83:3,8,9
  84:17 90:8 93:4
**Segal** 6:1,7,9 7:22
  8:3,3 20:13
  72:21,24 73:3
**sell** 48:3,12 73:8
  82:10
**selling** 74:7
**send** 41:21
**sends** 64:13
**senior** 33:1
**sense** 26:21,23
**sent** 13:11 83:19
  84:14
**separate** 19:15
  25:13 26:8,9
  60:17,19 88:14
  88:17,22 90:15
  90:20 91:2
**separately** 26:6
**September** 57:2
  86:1
**series** 28:4 64:2
**service** 45:3 48:21
**services** 21:16
  33:24 45:9 46:6
**set** 5:14 25:23
  28:22 31:21
  55:8 86:25
  89:10 91:16
**setting** 9:4 36:20
  36:22 51:6
**seven** 61:6
**Seymour** 19:21

20:16 22:20
  34:7
**shares** 19:19
  55:10 76:17
**Sharp** 6:5 7:22
  92:18
**sheet** 62:15
**Shimmin** 22:16
  35:17 36:8
  40:11
**Shondale** 19:21
  19:24 22:13
  33:17 40:10,13
  53:8 78:17
  85:25 87:14
**Shondale's** 35:15
  87:12
**short** 13:6,16 56:1
  70:19
**shorthand** 1:19
  5:8 96:3,9
**short-term** 47:23
  47:25 48:2
**show** 44:3 76:2
**showing** 43:25
  44:1
**shown** 63:13 68:2
  68:19 71:9 75:7
**sic** 74:14
**sign** 97:14,20
**signature** 97:19
**signed** 69:10 72:8
  73:8 85:4
**significantly**
  80:23
**signing** 97:13
**Silva** 31:15
**similar** 48:6,6
**simply** 68:25
  70:18
**Sincerely** 97:22
**single-member**
  88:18
**sister** 19:20 76:18
**site** 24:9
**situation** 44:7
  48:19,24 50:5
  54:11 67:2,7
  71:5,20 72:2
**situations** 43:18
  46:7
**six** 2:21 44:13
  59:25 61:6
**SK** 1:5 11:23,25
  16:17 17:4,5,7
  17:10 20:18
  21:5 23:1,10,11
  24:5,10 27:1,4

28:2,5,16 29:6,7
  29:8,11,18 31:4
  33:2,7 34:4,13
  34:25 35:2,6,10
  35:16 37:25
  40:14 42:18,21
  42:25 43:2,6
  45:20 48:4,5,13
  48:13 55:9,14
  61:11 77:19,21
  78:4,8,9 79:17
  80:6 82:11,11
  83:1 89:7 97:8
**SKF** 45:25
**SKPM** 29:12,15
  29:18
**sole** 16:2
**somebody** 44:2
  58:4 70:5 77:15
  93:13
**someplace** 18:18
**something's** 44:5
**somewhat** 24:22
  68:9
**soon** 18:20
**sorry** 32:20 72:9
  72:22 93:16
**sort** 19:16
**sounds** 46:14
**Souza** 1:19 6:19
  7:5 94:9 97:1,25
**speak** 11:21 12:2
  12:5
**speaking** 19:12
  70:4
**specific** 10:21
  70:24 80:5
**specifically** 57:16
  58:15 74:23
  87:18 93:1
**specifics** 73:25
**spell** 10:21
**spend** 10:24
**spoke** 11:13 14:18
  40:21
**spoken** 12:8
**spring** 78:8
**square** 52:19,21
**squaring** 53:18
**SS** 2:18 5:11,21
  17:8,10 19:6
  42:15 45:23
  55:10 59:24
  62:12 75:24
**SSC** 3:3,4,4 5:11
  5:12,12,21,21
  5:21 7:17,18,18
  7:25 12:17

17:22,22,22,23
18:13,19,22
19:6,6,15 28:13
28:13 29:1,23
41:13 42:16,16
42:21 43:1,6
45:20 48:3,5
62:10,22 64:14
66:2,3,12,12
88:20 89:21,21
89:22
**SSCI** 12:17 65:5
**SSCII** 65:5
**staff** 22:23 40:11
**stand** 47:6
**standpoint** 51:18
69:11 84:6
**start** 16:4,9 18:12
19:17
**started** 15:24
16:22 26:10
**starting** 7:15
**state** 5:9 8:12 9:18
14:24 15:8,9
41:12 90:11
96:4
**stated** 96:11
**statement** 17:3
27:6,24 28:8
45:5 60:14
63:21 75:6
90:10
**statements** 2:20
26:14,17 28:1
59:25 60:11
61:13
**States** 1:1 7:8
**statutory** 47:2
**steep** 80:20
**Stephanie** 65:9
**stock** 76:5
**stop** 25:1
**Stoughton** 27:7
**Street** 1:20 5:6,18
6:2,7,13 7:12
97:1,6
**strike** 75:15 93:8
**string** 74:15
**structure** 4:10
25:7 31:7,9 37:4
37:7,22 38:25
39:21
**stuff** 78:22
**subject** 10:23
64:24 92:10
**subsequent** 21:14
**subsequently**
15:18 86:2

**subsidiary** 26:1
69:3
**sufficient** 68:24
91:1
**Suite** 1:20 5:7,18
6:2,8 8:15 97:1
**summer** 35:18,22
81:10,11
**supervision** 96:13
**Support** 3:2 89:20
**supported** 51:2
**suppose** 41:7
**sure** 25:17 32:21
32:23 43:15,22
52:13 55:16
57:25 65:15,22
68:1 70:15
71:17 74:4 77:6
77:9 78:18 80:2
80:22 86:9
93:25
**swear** 8:6 72:14
**sworn** 96:6
**sworn/affirmed**
5:13 8:8
**system** 24:16,21
24:22,23,24
25:1,3,8,22
36:21 58:10
**systems** 25:4
36:22,23
**S-A-R-S** 18:2

_____

**T**

**T** 2:10
**take** 30:19 56:1
60:6 64:10 73:5
81:4 88:3
**taken** 8:17 43:17
56:6 88:8 96:9
97:9
**talk** 27:3
**talked** 21:19
**talking** 20:15
**tapes** 94:9
**tax** 11:22,24 14:23
15:23 16:24,25
17:6,7 18:10,14
19:2 20:21
21:19,21 22:3
23:25 27:4,16
27:17,19,21,21
28:17,18,24
30:3 33:9,12
39:23 41:1,2,8,8
41:20,25 42:3,9
43:11,12 46:2,8
47:16 51:18

53:21 54:10,22
54:24 55:18,20
55:24 59:12,17
59:18 61:3,4,11
61:18,19 62:24
63:9,12,20
65:18,23,25
66:4 71:3,12
73:17 76:7,22
76:23,25 77:1,2
77:11 79:3,5,7
79:10,13 84:3,4
84:6,10 88:17
88:22 90:12,23
91:2,4 92:1
**taxes** 41:13,17
42:23 43:20
45:12 52:10
77:5 91:19
**taxpayer** 88:14
**technical** 26:19
26:21
**telephone** 6:9
97:21
**tell** 11:3 16:15
17:20 36:13
37:17 40:19
42:13 45:18
57:7 60:7 61:15
96:6
**telling** 78:20
87:14 88:1
**ten** 61:2
**tens** 14:25
**tenure** 35:15
**term** 12:21 85:7
91:9
**terms** 19:11 20:17
66:22 82:6
84:15 85:2,3,16
91:10
**testified** 5:14 8:8
23:24 81:1 90:5
**testify** 10:16,18
**testifying** 9:6 51:1
92:19
**testimony** 9:5,18
73:2 95:7 96:11
97:11,17
**Thank** 8:16 11:8
15:2 20:13
92:12
**thereof** 5:4
**thereto** 96:19
**thing** 21:13 23:21
26:2 27:16 79:3
**things** 57:24 58:1
65:19 91:22

**think** 10:14 21:13
22:24 23:10
26:6 36:10
44:11 46:14
60:9,15 62:13
63:21 65:3
70:11 72:3 76:5
78:22 79:2
81:15,20 83:24
84:9,15,15
85:12,23 86:3
86:12,13 87:19
89:6 91:17
**thought** 57:8
**thousands** 14:25
**three** 11:7 60:4,5
61:10
**tied** 76:20
**Tihart** 69:19
**time** 8:21 13:16
15:23,24 16:18
17:18 21:2,6
22:10,15 24:6
28:22 29:24
33:22 34:15,17
34:21 35:12
36:19 40:6,12
44:4,12 47:4
48:14 52:23
55:17 57:4,21
59:5 65:15
78:24 81:14
85:20 87:8 90:8
92:12 96:10
**times** 8:19 29:9
**timing** 84:8
**title** 66:16,24 67:3
67:9 68:5,19
71:10,19 77:15
**today** 9:5,25
12:24
**today's** 7:11 93:20
94:7
**told** 39:8 78:17
**Tom** 16:20
**tomatoes** 48:3
**top** 2:23 39:1 40:2
84:21
**Torres** 5:5,16 7:17
7:25
**touch** 72:14
**Touche** 15:21,22
**track** 67:3
**tracked** 69:4
**transaction** 68:25
74:18 84:1
86:16 91:24
**transactions** 22:8

36:2,9,15 39:22
42:20,24 46:20
51:7,22 52:2,3
52:13 53:5
54:20 57:12,22
58:3,24 59:14
59:17 80:4,5,12
80:13 91:5,6,13
91:16,20 92:2,5
92:20
**transcript** 9:14
95:3,7 97:11,12
97:18,21
**transfer** 44:22
48:19 70:17
72:19 79:16
**transferred** 25:2
70:19
**transferring** 46:17
**transpired** 94:1
**treat** 51:22
**treated** 51:19
54:23
**trial** 58:22 59:2,4
59:9 61:21 63:2
63:3,8,22 97:19
**tried** 91:17
**trigger** 73:17
**true** 18:22 25:20
26:10 95:6
**trust** 18:9 79:8,17
82:5,12,14,20
**trustee** 6:5 7:23
11:9,13,20 12:3
92:18
**trustee's** 3:6
87:12 89:22
**truth** 96:6,6,7
**try** 20:9 22:18
33:18 52:19
**trying** 13:6 86:13
**Turning** 23:23
**turnover** 34:3
**Twenty** 40:1
**two** 22:18 39:12
42:22
**two-year** 28:23
**type** 60:12 78:22
**types** 21:23
**typewriting** 96:12
**typical** 55:13
**typically** 45:19,21
49:3,5 55:1
60:21

_____

**U**

**Uh-huh** 17:12,13
24:1,25 25:5

31:1 33:10 38:7
38:12,18 51:9
59:21 62:3,18
68:21 69:18
73:10,12 74:9
90:18
**ultimately** 40:23
85:4
**uncommon** 39:14
**underlying** 4:16
49:11 50:16
51:3 57:12
**undersigned** 9:7
**understand** 9:7
9:10,20 11:18
13:14,16
**understanding**
12:15 25:18
27:13,23 53:6
77:19 79:22
80:7
**understood** 30:17
30:24
**UNIDENTIFIED**
72:11,19
**United** 1:1 7:8
**University** 15:8
**unrelated** 23:17
91:11
**update** 31:20
**updated** 31:18,24
32:3 56:19,23
57:1,3
**USC** 3:11 89:25
**use** 5:2 19:4,11
25:6,14 26:18
26:23 40:11
58:12 66:7
69:23 74:18
77:12
**usual** 50:9
**usually** 31:21,22
61:21

— **V** —

**value** 75:9,13
**valued** 75:19
**varied** 46:14
52:23
**various** 12:16
20:2 33:11,22
53:18 68:2 75:8
77:7
**Vartanian** 85:25
**vast** 14:23
**vendor** 80:18,18
**version** 56:22
57:1

**versus** 48:10
80:11 85:8
**video** 7:4
**videographer**
6:19 7:3 8:5
56:4,9 88:1,6,9
94:7
**view** 71:1
**Vince** 7:19
**Vincent** 6:15 97:5
**Visalia** 74:7,11,18
74:20,24
**VOICE** 72:11,19
**volume** 88:7,10
**V-E-N-D-O-R**
80:19

— **W** —

**W** 1:16 2:3 5:10
6:16 8:7 95:15
97:5,8
**want** 39:13 43:21
52:12 54:3
66:18 72:12
77:2,9 87:16
**wanted** 34:12,13
34:24 53:4
79:16 86:12,13
**wasn't** 34:15
36:12 40:15
53:13 58:11,23
69:9 78:5 83:10
87:4 91:15
93:25
**waste** 64:17
**wastewater** 3:7
12:16,21 14:20
15:1 65:15 66:1
69:23 70:23
80:25 81:7,25
82:21 83:4
84:12 86:18,24
87:6,7,15,18
89:23 92:25
93:2,4
**water** 64:15,17
65:2,4,4,6,13
66:1,5,18 68:7
74:3,17,21
**way** 46:1 50:9,10
71:14 96:17
**Wayne** 1:16 2:3
5:10 6:16 8:7,14
64:4,14 95:15
97:5,8
**Wed** 2:24
**Wednesday** 64:4
**Wells** 77:24

**went** 11:5 12:15
15:17 32:18
34:5,11,23
82:17
**weren't** 78:25
**West** 78:1
**Westlands** 64:15
64:18 65:2 68:7
74:3,16,21
**we'll** 10:22 33:18
74:17 88:3
**we're** 77:1 88:2,2
88:7
**Whinney** 15:18
19:25
**William** 8:14
**within-entitled**
96:7
**witness** 5:11 6:16
7:20 8:6 37:11
60:8 64:8 88:5
96:5,12
**wondering** 58:18
**word** 26:19
**words** 14:11
61:17 78:20
**work** 11:22,24
12:20 13:15
15:18 16:6,15
16:17,21,25
17:6,7,13,18,21
18:6,12 19:2,13
19:17 20:10,21
20:25 21:7,15
21:19,20,21,23
22:3,4,17,21
23:8,25 24:15
27:17,19 29:16
33:8,9,11,12
34:2,11,12,19
34:23,24 36:18
37:18,21 38:4,8
38:11,14 39:6
39:19 40:19
41:24 42:3
49:24 51:13
54:10 59:12,17
59:18 60:25
61:3,11 62:24
66:9 67:1,5,16
68:14 71:8 76:7
76:8,10,13,19
76:22,23 81:22
91:18
**workbook** 60:20
**worked** 19:24
20:1,22 21:5
22:25 23:17,18

24:5 28:15
30:21 34:7
36:25 37:3
38:23 40:14
92:6
**working** 16:9,24
18:19 20:5,16
23:1 26:10
34:15,17,20,21
40:16 41:17
**works** 11:20
23:10
**world** 71:21
**wouldn't** 45:12
**wrap** 88:4
**written** 84:11

— **X** —

**X** 2:1,10

— **Y** —

**yeah** 18:4 25:6,10
26:4 54:5,14
60:20 62:21
63:2 69:3,4 70:9
72:13,19 77:9
**year** 16:4 27:10
29:10,10,13
32:7,9 44:14,24
45:10,13 46:5,6
46:10 52:20
55:17,20,24,24
55:25 59:6
**years** 31:17 53:3
54:20 57:24
81:17,17 90:13
92:7
**year's** 45:3
**York** 5:5,17
**Young** 15:19,20

— **Z** —

**Zealand** 18:7

— **$** —

**$1** 64:19
**$11** 62:21
**$12.45** 73:9
**$4** 62:13
**$850,000** 64:19

— **0** —

**04-05** 29:24
**07** 22:14 35:14,18
35:23 83:10
84:14 86:7
**08** 22:15 25:3

35:14 81:12
86:1,2,18
**09** 24:8
**09-29161-D-11** 1:8
**09-29161-D11**
7:10
**09-29162-D-11** 1:6
**09-29162-D11**
7:10

— **1** —

**1** 2:12,19 13:19,22
13:25 14:4,7,16
59:24 64:14
88:7,7,10
**1,000** 64:17
**1.45** 74:8
**1:55** 5:4 7:4
**1:56** 2:24
**10th** 6:14 97:6
**10/11** 4:7
**10/4** 4:3
**101** 5:6,18 7:12
**11** 3:5,11 6:5 7:23
11:9 89:22,25
90:10 92:18
**12** 39:5 92:7
**120** 8:15
**13** 2:12
**1440** 6:8
**15** 57:2
**1981** 15:5
**1985** 15:8
**1986** 15:10,19
**1988** 15:14
**1994** 15:19
**1997** 16:11 17:15
**1999** 18:17

— **2** —

**2** 2:14,19 46:12
56:8,12 59:25
64:14 88:10
**200** 1:20 97:1
**2000** 18:17
**2000s** 29:5,9
**2004** 15:23 16:5
29:2
**2005** 29:2
**2006** 90:13
**2007** 2:24 19:19
21:1,1,8 24:7
30:19 64:4
83:13,16 84:17
90:14
**2008** 2:22 21:9,12
57:2 60:1 84:13
87:6

**2009** 1:17 2:4 5:3
    7:11 32:11,13
    32:14,25 78:8
    97:4,9
**2025(q)(I)** 97:12
**2050** 5:7,18
**22** 1:17 2:4 5:3
    97:9
**22nd** 7:11
**2200** 6:2
**23** 2:24 64:4 97:4
**2600** 64:15

_____ **3** _____

**3** 2:16 60:3,6
    61:25 62:1 75:5
    90:9
**3:09** 56:5,6
**3:12** 56:6,10
**30** 2:22 18:10 60:1
    97:14
**31** 90:13,14
**35** 13:9 38:8
**365** 3:12 89:25
**37/7** 4:10

_____ **4** _____

**4** 2:23 64:1,7 72:6
    73:6 90:9
**4:02** 88:7,8
**4:15** 88:8,11
**4:23** 94:8,10
**4027** 1:24 96:23
    97:9
**415** 7:6
**433-1234** 7:6
**4615** 1:20 97:1

_____ **5** _____

**5** 3:1 47:3 74:13
    89:19 90:2
**5:00** 11:6
**50** 38:5,6,10,11
    39:13,18
**50/13** 4:12
**5260** 8:14
**56** 2:14

_____ **6** _____

**60** 2:16
**64** 2:23

_____ **7** _____

**70** 37:20,24 38:3,6
**770** 6:7

_____ **8** _____

**8** 2:7 47:3
**846-8831** 97:2,21
**88** 6:13 97:6

_____ **9** _____

**9/15/2008** 56:23
**90** 3:1
**90s** 29:5,8,9
**92** 2:8
**925** 97:2,21
**93704** 8:15
**94104** 6:3
**94108** 6:14 97:7
**94111** 5:19
**94566** 1:20 97:2
**95814** 6:8
**97** 16:23 27:10

PH's - Deft's Ex   104
Depo of  Wayne Boos
Date 8/15/11
AMANDA SCOTT, CSR

**From:**      Wayne Boos <wboos@BOOSCPA.com>
**Sent:**      Monday, April 6, 2009 6:38 PM
**To:**        Mark McCormick <markmc@skfoods.com>
**Subject:**   RE: NZ/Aust Loan roll forwards

Mark, did you get anything from Moss Adams. We are looking at this as well.

**Wayne W. Boos CPA**

**Boos & Associates**
Fig Garden Financial Center
5260 North Palm Avenue, Suite 120 | Fresno, California 93704
Phone (Main): 1.559.449.7688 | Phone (Direct): 1.559.408-7281
Fax (Main): 1.559.449.1934 | Fax (Direct): 1.559.408-7381
Cell: 1.559.288-2366
E-mail: wboos@booscpa.com

 Please consider the environment before printing this e-mail

**From:** Mark McCormick [mailto:markmc@skfoods.com]
**Sent:** Sunday, April 05, 2009 8:30 PM
**To:** Nick Frankish; Shondale Seymour
**Cc:** Richard Lawrence; Wayne Boos
**Subject:** RE: NZ/Aust Loan roll forwards

All,

I will call Dan Nutley at Moss Adams and Gary Perry tomorrow morning. Dan and Gary originated these transactions at the time that notes were transferred to the SSC&L Trust. Their workpapers and their original legal documents should be in the files.

-MMM

**From:** Nick Frankish [mailto:NICK@cedenco.co.nz]
**Sent:** Sunday, April 05, 2009 8:17 PM
**To:** Shondale Seymour
**Cc:** Mark McCormick; Richard Lawrence; Wayne Boos
**Subject:** RE: NZ/Aust Loan roll forwards

**Shondale - my comments added to yours below**

**QUESTIONS:**

1/ do you know why loan to trust was 18.2m not 26.9m ?  It is a net number as it is shown in the adjustments. NF- The 26.9m was already a NET number per my first bullet point. There were 2 differences between 26.9m and 18.2m - 1/ FX adj rev and 2/ minority int adj.

**SHARP_CH15 001333**

2/ do you know why FX reversed 7.788m ? Do you know how this comes off the loans / interest balances? (it only relates to SKF Int and SKFA loans/interest) didn't intend to reverse anything except the current year activity on the FCX, only reclass it into the net payable/receivable. NF- I expect the 7.788m was the cumulative FCX, it could not be just the current yr. The reversal was dr equity cr loan, so was not a reclassification of receivable ?

3/ do you know what the minority interest adj 1.0m is ? this is something that came from the audit – I never had it in the workpapers – it was booked top level only and not to the gL

4/ is there a loan agreement between SKFLP and SSCL trust for 18.262m ? Assume there is no interest on loan as balance unchanged yr on yr - no loans – SKF assigned the debt to the SSCL trust (as far as I can tell – don't have signed docs) – the auditors said this was an investment vs a receivable as I had thought NF- My understanding is that the investments in NZ/Aust were 100% debt funded - which is the way it has been recorded here, and this has been an issue for the balance sheets (raised with MMM before). Down here none of the funds "invested" were recorded as equity, all as interest bearing debt

5/ are there any FS for SSC&L Trust which records loans / interest to NZ/Aust entities? Only FS are done by Wayne as I haven't had the staff to do it – trust acctg only. The trust should have recorded the interest to/from. I'll include Wayne on this as he can reply. NF- I will begin dialogue with Wayne

6/ as the loan between SKFLP and SSC&L appears fixed at 18.262m, the net increase / decrease in amount owing in USD after FX adjs and interest, therefore must occur in SSC&L books ? Yes – everything occurs on the trust's books – not on SKF – we have no ownership in Cedenco anymore and only the investment in the trust. NF- Is it possible for SKFLP to have an investment in the Trust, or is it a loan to the Trust ?

# Regards

# Nick

---

**From:** Shondale Seymour [mailto:ShondaleS@skfoods.com]
**Sent:** Monday, 6 April 2009 12:49 p.m.
**To:** Nick Frankish; Wayne Boos
**Cc:** Mark McCormick; Tracy A. Garone; Hinkelman, Andrew
**Subject:** RE: NZ/Aust Loan roll forwards

Nick,

SHARP_CH15 001334

Swamped on other items for our bank forbearance that is due this evening – I'll have to work on this tomorrow.

I can quickly tell you a few things – see below.  The auditors have been asked to review this also and have the same workpapers that I sent to you.  I've included Tracy on this e-mail so she stays in the loop.

Shondale

**From:** Nick Frankish [mailto:NICK@cedenco.co.nz]
**Sent:** Sunday, April 05, 2009 4:23 PM
**To:** Shondale Seymour
**Cc:** Mark McCormick
**Subject:** FW: NZ/Aust Loan roll forwards


Shondale

Need a reply asap - Thanks

Nick


**From:** Nick Frankish
**Sent:** Friday, 3 April 2009 2:35 p.m.
**To:** 'Shondale Seymour'
**Cc:** Richard Lawrence
**Subject:** NZ/Aust Loan roll forwards


Shondale

Thanks for the info you have sent me. As you know I am trying to confirm NZ/ Aust loan balances and balances transferred from SKFLP to the Trust.

I have established from your info:

- Per Berts workpaper #11A loan balances at 31/10/06 were:


USD Loan balances at 31/10/06

| | Loan | Interest | Total | |
|---|---|---|---|---|
| SKF Int | - 20,474,510 | - 5,351,915 | - 25,826,425 | |
| SKF Aust | - 8,673,575 | - 2,633,070 | - 11,306,645 | |
| CAP | 5,499,980 | 935,223 | 6,435,203 | |
| CED | 3,199,978 | 536,510 | 3,736,488 | |

**SHARP_CH15 001335**

- 20,448,127    -   6,513,252    -   26,961,379

I **agree** with these numbers and they appear to be correctly FX adjusted. The SKF Int and SKFA loans are in NZD and AUD respectively and the other 2 loans from CAP and CED are in USD.

- FX as at 31/10/06

There is a Bert workpaper at 31/10/06 which has a FX gain to Equity of USD 7,788,137.
This implies the loan balance above before adjustment for FX was USD 19,173,242  (26,961,379 - 7,788,137)

- On 1/11/06 some part of the loans totalling 18,262,149 were apparently transferred to Grantor (SSC&L Trust)

- At next balance day 30/6/07 SKFLP reported related party loans to Grantor (SSC&L Trust) relating to NZ/Aust of USD 18,292,149 (proof in TB pg4, and in 2007 FS). A summary of Workpaper supplied is

USD Loan balances at 30/06/07

| | Loan | Interest | Total |
|---|---|---|---|
| SKF Int | -20,474,510 | -5,351,915 | -  25,826,425 |
| SKF Aust | -  8,673,575 | -2,731,469 | -  11,405,044 |
| CAP | 5,499,980 | 935,223 | 6,435,203 |
| CED | 3,199,978 | 536,509 | 3,736,487 |
| | -20,448,127 | -6,611,652 | -  27,059,779 |
| less FX ?? | | 7,788,137 | |
| less Min interest ?? | | 1,009,493 | |
| | | -  18,262,149 | |

So the differences between 26,961,379 and 18,262,149 of  8,699,230 are

1/ Interest on SKFA loan - + 98,399
2/ FX reversed - 7,788,137
3/ Minority interest jnl - 1,009,493

- At next balance day 30/6/08 SKFLP reported same RP receivable - called Revocable Trust of USD 18,262,149 (proof note 8 2008 FS)

**QUESTIONS:**

1/ do you know why loan to trust was 18.2m not 26.9m ?  It is a **net** number as it is shown in the adjustments.
2/ do you know why FX reversed 7.788m ? Do you know how this comes off the loans / interest balances? (it only relates to SKF Int and SKFA loans/interest)  didn't intend to reverse anything except the current year activity on the FCX, only reclass it into the net payable/receivable.

**SHARP_CH15 001336**

3/ do you know what the minority interest adj 1.0m is ?  this is something that came from the audit – I never had it in the workpapers – it was booked top level only and not to the gL
4/ is there a loan agreement between SKFLP and SSCL trust for 18.262m ? Assume there is no interest on loan as balance unchanged yr on yr - no loans – SKF assigned the debt to the SSCL trust (as far as I can tell – don't have signed docs) – the auditors said this was an investment vs a receivable as I had thought

5/ are there any FS for SSC&L Trust which records loans / interest to NZ/Aust entities?   Only FS are done by Wayne as I haven't had the staff to do it – trust acctg only.  The trust should have recorded the interest to/from.  I'll include Wayne on this as he can reply.
6/ as the loan between SKFLP and SSC&L appears fixed at 18.262m, the net increase / decrease in amount owing in USD after FX adjs and interest, therefore must occur in SSC&L books ? Yes – everything occurs on the trust's books – not on SKF – we have no owenership in Cedenco anymore and only the investment in the trust.


Nick

**Nick Frankish | Group CFO | Cedenco Foods |** Level 2, 12 Heather Street, Parnell, Auckland 1052.  PO Box 137-337, Parnell, Auckland, 1151 | DDI: (+64 9) 362 0803 | PH: (+64 9) 362 0800 | Fax: (+64 9) 362 0806 | www.cedenco.com

*****Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency*****

This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**SHARP_CH15 001337**

# EXHIBIT 13

BMO 002063

# In The Matter Of:

## *In re: CEDENCO JV AUSTRALIA PTY LTD, et al,*

_____

## *LISA CRIST - Vol. 1*
### *August 17, 2011*

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

LISA  CRIST  - 8-17-2011

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---


In re:                              )
                                    ) NO. 10-35002
CEDENCO JV AUSTRALIA PTY LTD, et    )
al, (In Liquidation),               ) Chapter 15
                                    )
   Debtors in Foreign Proceedings.  )
_____ )



---oOo---



 Fresno, California                 August 17, 2011



        The deposition of LISA CRIST was taken in the

above-entitled matter pursuant to all of the provisions

of law pertaining to the taking and use of depositions

before Amanda Scott, CSR, with offices at Fresno,

California, commencing at the hour of 9:14 a.m. at the

law offices of McCormick, Barstow, Sheppard, Wayte &

Carruth, 5 River Park Place East, Fresno, California.

LISA  CRIST  - 8-17-2011

Page 2

1                    INDEX
2
3    EXAMINATION                               PAGE
4    By Mr. Christmas                    5
5    By Mr. Nuti                         58
6    EXHIBITS
7    NO.    DESCRIPTION                        PAGE
8    1      Deposition Notice            5
9    2-6    (Skipped)
10   7      Resolutions                  14
11   8      General Assignment and Transfer of Shares  14
12   9      General Assignment and Transfer of Shares  14
13   10     Declaration of Trust         14
14   11     Notice of Beneficial Ownership    14
15   12     Share Certificate            14
16   13     Share Certificate            14
17   14     Standard Transfer Form       14
18   15     Standard Transfer Form       14
19   16     Share/Option Transfer Journal    15
20   17-25  (Skipped)
21   26     March 13, 2008 Letter From Scott Salyer  26
22   27     March 17, 2008 E-Mail From Lisa Crist    28
23   28-38  (Skipped)
24   39     March 28, 2008 E-Mail From Julie Patton  31
25   40     March 28,2008 E-Mail From Julie Patton   34

Page 3

1                 INDEX CONTINUED
2    EXHIBITS
3    NO.    DESCRIPTION                        PAGE
4    41     (Skipped)
5    42     April 2, 2008 E-Mail         38
6    43     (Skipped)
7    44     Power Of Attorney            41
8    45-51  (Skipped)
9    52     EIN Individual Request       17
10   53     Bill of Sale                 44
11   54     Bill of Sale                 44
12   55     Secretary of State Form      17
13   56     LLC Articles Of Organization     17
14   57-65  (Skipped)
15   66     Salyer Enterprises Flow Chart    23
16   67     Accounts Receivable Set Off Agreement    44
17   68     Bill Of Sale                 53
18   69     Register Of Members          53
19   70     Register Of Notices of Beneficial
            Ownership                    53
20
21   71     Minutes of Meeting           53
22   72     List of Documents Produced       16
23   73     General Assignment and Transfer Of Shares  20
24   74     Assignees and Transferees        21
25   75     Salyer Entities Chart        21

Page 4

1    APPEARANCES OF COUNSEL:
2    FOR THE SALYER ENTITIES:
3        FARELLA, BRAUN & MARTEL
         Attorneys at Law
4        235 Montgomery Street
         San Francisco, California 94104
5        (415) 954-4400
         kwoodruff@fbm.com
6        BY: KELLY A. WOODRUFF
7    FOR THE LIQUIDATORS:
8        NIXON PEABODY LLP
         Attorneys at Law
9        437 Madison Avenue
         New York, New York 10022
10       (212) 940-3000
         rchristmas@nixonpeabody .com
11       BY: ROBERT N.H. CHRISTMAS
12   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
13       DOWNEY BRAND
         Attorneys at Law
14       621 Capitol Mall, 18th Floor
         Sacramento, California 95814
15       (916) 520-5542
         schristensen@downeybrand.com
16       BY: SPENCER W. CHRISTENSEN
17   FOR BRAD SHARP:
18       SCHNADER, HARRISON, SEGAL & LEWIS
         Attorneys at Law
19       One Montgomery Street, Suite 2200
         San Francisco, California 94104
20       (415) 364-6717
         gnuti@schnader.com
21       BY: GREGORY C. NUTI
22   FOR THE BANK OF MONTREAL:
23       CHAPMAN & CUTLER
         Attorneys at Law
24       111 West Monroe Street
         Chicago, Illinois 60603
25       (312) 845-3010
         heiser@chapman.com

Page 5

1        BY:  JAMES HEISER
2    Also Present:  John Sheahan
3              ---oOo---
4            LISA CRIST,
5        called as a witness herein, having
6        been heretofore duly sworn,
7        testified as follows:
8              ---oOo---
9        (Exhibit 1 was marked for identification.)
08:54  10      EXAMINATION BY MR. CHRISTMAS
08:54  11      Q.  Good morning, Ms. Crist.  As you know, I'm
09:14  12  Robert Christmas.  I'm representing the joint
09:14  13  liquidators, Mr. Sheahan sitting to my right, and also in
09:14  14  the room is counsel for the committee, counsel for the SK
09:14  15  Foods Chapter 11 trustee, and counsel for the Salyer
09:14  16  interests, just to refresh who you just met.  And on the
09:14  17  phone is counsel for the Bank of Montreal.
09:14  18      Okay.  I just want to set the table for the
09:14  19  process.  Have you ever been deposed before?
09:15  20      A.  I have.
09:15  21      Q.  So you understand the process, that we can't
09:15  22  talk at the same time, the court reporter can't take down
09:15  23  two people talking at once.  You'll probably anticipate
09:15  24  what my question may be, but it may end up in a different
09:15  25  place than you think, so if you could wait for me to

                                2 (Pages 2 to 5)

Merrill Corporation - San Francisco
800-869-9132                          www.merrillcorp.com/law
BMO 002066
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA CRIST - 8-17-2011

Page 6

09:15 1    finish my questions, then the record will be clearer.
09:15 2    Also, the court reporter cannot take down non- -- visual
09:15 3    communications, so nods don't work.
09:15 4        Are you taking any medication today that would
09:15 5    interfere with your ability to remember or retell events?
09:15 6        A. No.
09:15 7        Q. Do you have any physical condition that impairs
09:15 8    your memory?
09:15 9        A. No.
09:15 10       Q. Just like to ask you a few questions about your
09:15 11   professional background. Can you tell me the post high
09:15 12   school degrees that you have, if any?
09:15 13       A. Currently I have a degree in environment health
09:15 14   and safety, and that's my current degree.
09:16 15       Q. And from what institution?
09:16 16       A. From Merced College.
09:16 17       Q. What year was that granted?
09:16 18       A. In 1998.
09:16 19       Q. After you got that degree, is that the area in
09:16 20   which you have worked until now?
09:16 21       A. Yes, but I have shared responsibilities in
09:16 22   human resources as well as environmental health.
09:16 23       Q. Is that with your current employer?
09:16 24       A. Yes.
09:16 25       Q. And who is that?

Page 7

09:16 1        A. Morningstar Foods, LLC.
09:16 2        Q. What is their business?
09:16 3        A. Dairy food manufacturing.
09:16 4        Q. And when did you join Morningstar?
09:16 5        A. December 21st of 2009.
09:16 6        Q. And where did you work before that?
09:16 7        A. For SK Foods LP.
09:16 8        Q. And when did you join SK Foods LP?
09:16 9        A. November 5th, 2004.
09:16 10       Q. Where did you work before that?
09:17 11       A. Kagome, Inc., K-A-G-O-M-E, Inc.
09:17 12       Q. And what are the times that you worked --
09:17 13       A. June 20th, 1994 -- I'm sorry, 1996 to,
09:17 14   actually, November 4th, 2004.
09:17 15       Q. And where did you work for Kagome?
09:17 16       A. In Los Banos, where I currently live.
09:17 17       Q. And what were your responsibilities?
09:17 18       A. Environmental health and safety and human
09:17 19   resources.
09:17 20       Q. And when you say "environmental health and
09:17 21   safety," would I be correct in assuming that that has to
09:17 22   do with helping your employer comply with state and
09:17 23   federal regulations?
09:17 24       A. Yes.
09:17 25       Q. How did you become acquainted with SK Foods?

Page 8

09:18 1        A. I was head-hunted, I was recruited.
09:18 2        Q. And who recruited you?
09:18 3        A. It was from Produce Careers.
09:18 4        Q. An outside agency?
09:18 5        A. Right, third-party.
09:18 6        Q. And what were you hired to do there?
09:18 7        A. I was hired on as the director of environmental
09:18 8    health and safety initially.
09:18 9        Q. And you just said "initially," so I presume
09:18 10   that changed over time?
09:18 11       A. It did.
09:18 12       Q. Can you tell me how that changed?
09:18 13       A. Sure. Initially in November of 2004 when I
09:18 14   joined the organization, again, I was director of
09:18 15   environmental health and safety, and probably eight
09:18 16   months into that role I was promoted to director of HR
09:18 17   and EHS, which is environmental health and safety. HR
09:19 18   being human resources. And I believe in 2006 I was
09:19 19   promoted to vice president of HR and environmental health
09:19 20   and safety.
09:19 21       Q. And did you hold that position until you left?
09:19 22       A. Yes, I did.
09:19 23       Q. Okay. And to whom did you report?
09:19 24       A. I initially reported to Steve King, the VP of
09:19 25   operations, and then I reported to Mark Grewal, who at

Page 9

09:19 1    the time was the chief operating officer in 2005, and
09:19 2    after 2006 I reported to Scott Salyer, the CEO and
09:19 3    president.
09:19 4        Q. Just to do some housekeeping now, the court
09:19 5    reporter has marked as Exhibit 1 to your deposition the
09:20 6    notice of deposition, which I sent to your counsel, and
09:20 7    then following that is the subpoena that we issued.
09:20 8        Have you seen that document before?
09:20 9        A. Yes.
09:20 10       Q. Okay. And did you understand that it required
09:20 11   the search for and production of responsive documents?
09:20 12       A. Yes.
09:20 13       Q. Okay. And you did produce documents to me?
09:20 14       A. Yes, I did.
09:20 15       Q. Can you tell me where you looked in terms of
09:20 16   search for responsive documents?
09:20 17       A. An external drive.
09:20 18       Q. Like a thumb drive?
09:20 19       A. Yes.
09:20 20       Q. And was this a drive that you kept at home
09:20 21   while you worked at SK Foods?
09:20 22       A. Yes, it was in my possession because I also
09:20 23   provided support to the bankruptcy estate for SK Foods
09:20 24   and related entities.
09:20 25       Q. Okay. Was that on a consulting basis?

3 (Pages 6 to 9)

Merrill Corporation - San Francisco
800-869-9132          www.merrillcorp.com/law
BMO 002067
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

Page 10

09:21  1   A. Yes.
09:21  2   Q. And were you paid for that?
09:21  3   A. Yes, I was.
09:21  4   Q. And how long were you a consultant?
09:21  5   A. For approximately one year.
09:21  6   Q. So that was from the bankruptcy petition date
09:21  7   forward for one year?
09:21  8   A. Yes.
09:21  9   Q. And to whom did you report in that capacity?
09:21  10   A. I don't know if I reported to any single
09:21  11   person, but I provided services to Brad Sharp and his
09:21  12   team.
09:21  13   Q. And what were the nature of the services?
09:21  14   A. I helped reconcile benefits so the company was
09:21  15   health insured for health benefits, and I provided
09:21  16   services reconciling those for months after the filing of
09:21  17   bankruptcy, helping to support workers' compensation as
09:21  18   it related to claims management. I provided services as
09:21  19   it related to 401k plans and -- how do I say it, the
09:22  20   unraveling of 401k plans. The 401k plan was closed, so
09:22  21   there was a significant process that was involved in
09:22  22   that. So basically all employee- and benefit-related
09:22  23   services primarily.
09:22  24   Q. Have you been named as a defendant in any
09:22  25   litigation relating to SK Foods?

Page 11

09:22  1   A. Yes, I have.
09:22  2   Q. Can you tell me what the nature of that
09:22  3   litigation was?
09:22  4   A. Initially I was named as a defendant in a PACA
09:22  5   claim, which was with the USDA PACA, meaning the
09:22  6   Perishable Agricultural Commodities Act. I was named in
09:22  7   litigation, Allied World and related entities versus SK
09:23  8   Foods, it's an insurance claim.
09:23  9   Q. Any others?
09:23  10   A. No.
09:23  11   Q. And with respect to the PACA litigation, is
09:23  12   that still ongoing, or is that resolved?
09:23  13   A. No, it's resolved.
09:23  14   Q. And the Allied World litigation?
09:23  15   A. That's still ongoing.
09:23  16   Q. Can you tell me who Julie Patton is?
09:23  17   A. No.
09:23  18   Q. Did you ever have any contact with Gary Perry's
09:23  19   office?
09:23  20   A. Yes, I have.
09:23  21   Q. Who's Mr. Perry?
09:23  22   A. He is an estate attorney, estate planning --
09:23  23   he's an attorney who I believe specializes in estate
09:23  24   planning.
09:23  25   Q. Okay. And what was the reason you had contact

Page 12

09:24  1   with his office?
09:24  2   A. I was the corporate secretary, and so from time
09:24  3   to time as the Salyer entities -- Scott Salyer's estate
09:24  4   planning, so there were various entities that were
09:24  5   involved in that, so from time to time as corporate
09:24  6   records evolved, meaning entities were formed or
09:24  7   ownership changes occurred, I would maintain some of
09:24  8   those records from a record-keeping, storage standpoint.
09:24  9   Q. And when did you first become corporate
09:24  10   secretary?
09:24  11   A. In 2007, December of 2007.
09:24  12   Q. And who held that position before you?
09:24  13   A. I don't know.
09:24  14   Q. And were you corporate secretary through the
09:24  15   end of your employment with SK Foods?
09:24  16   A. Yes, I was.
09:25  17   Q. Were you familiar with the existence of
09:25  18   Australia and New Zealand subsidiaries of SK Foods?
09:25  19   A. Yes, I am.
09:25  20   Q. When did you first learn that they existed?
09:25  21   A. I knew upon my employment, just learning about
09:25  22   the organization.
09:25  23   Q. Did you have any responsibilities with respect
09:25  24   to those subsidiaries?
09:25  25   A. None.

Page 13

09:25  1   Q. Did you ever have contact with anyone who
09:25  2   worked for those subsidiaries?
09:25  3   A. Yes, I did.
09:25  4   Q. Who did you have contact with?
09:25  5   A. I had contact with Richard Lawrence, who was
09:25  6   the managing director, and had met some employees of
09:25  7   Cedenco throughout my career with SK Foods on an
09:26  8   acquaintance, colleague basis.
09:26  9   MR. CHRISTMAS: I'm going to mark some
09:26  10   documents now.
09:26  11   MS. WOODRUFF: Robert, while you're doing that,
09:26  12   may I ask, the documents Ms. Crist provided, were they
09:26  13   provided to all parties?
09:26  14   MR. NUTI: No. I just asked John the same
09:26  15   question.
09:26  16   MR. CHRISTMAS: Oh, okay. I thought that they
09:26  17   were.
09:26  18   MS. WOODRUFF: When can we expect them to be
09:26  19   provided to us?
09:26  20   MR. CHRISTMAS: I expect I can do that today.
09:26  21   MS. WOODRUFF: That would be great.
09:27  22   MR. NUTI: I was going to ask, how many were
09:27  23   there?
09:27  24   THE WITNESS: Like four. I have nothing really
09:27  25   for Cedenco.

4  (Pages 10 to 13)

LISA   CRIST   - 8-17-2011

Page 14

| | | |
|---|---|---|
| 09:27 | 1 | MR. CHRISTMAS: We could mark this as 7. |
| 09:27 | 2 | Why don't we just mark several. This is 8, |
| 09:28 | 3 | this is 9, this is 10. |
| 09:29 | 4 | (Exhibits 7, 8, 9 and 10 were marked for |
| 09:29 | 5 | identification.) |
| 09:29 | 6 | MR. CHRISTMAS: Sharp 963 is 9. |
| 09:29 | 7 | MR. NUTI: I don't have that. |
| 09:29 | 8 | MR. CHRISTMAS: Here you go. |
| 09:29 | 9 | MS. WOODRUFF: I've got all four. |
| 09:29 | 10 | BY MR. CHRISTMAS: |
| 09:29 | 11 | Q. I'm just going to ask you, we've marked a |
| 09:29 | 12 | series of documents for identification to your |
| 09:29 | 13 | deposition. |
| 09:29 | 14 | Have you ever seen Exhibit 7 before? |
| 09:29 | 15 | A. Not that I'm aware of, no. |
| 09:29 | 16 | Q. How about Exhibit 8? |
| 09:30 | 17 | A. No. |
| 09:30 | 18 | Q. Exhibit 9? |
| 09:30 | 19 | A. No. |
| 09:30 | 20 | Q. Exhibit 10? |
| 09:30 | 21 | A. No. |
| 09:30 | 22 | MR. CHRISTMAS: Okay. Let's mark some more. |
| 09:30 | 23 | Let's mark these. This is 11, here is 12, 13, 14, 15. |
| 09:32 | 24 | (Exhibits 11, 12, 13, 14 and 15 were marked for |
| 09:32 | 25 | identification.) |

Page 15

| | | |
|---|---|---|
| 09:32 | 1 | BY MR. CHRISTMAS: |
| 09:32 | 2 | Q. Okay. Ms. Crist, the court reporter has handed |
| 09:32 | 3 | you a series of documents numbered sequentially. We'll |
| 09:32 | 4 | go through them. |
| 09:32 | 5 | Have you ever seen Exhibit 11 before? |
| 09:32 | 6 | A. No. |
| 09:33 | 7 | Q. How about Exhibit 12? |
| 09:33 | 8 | A. No. |
| 09:33 | 9 | Q. Exhibit 13? |
| 09:33 | 10 | A. No. |
| 09:33 | 11 | Q. Exhibit 14? |
| 09:33 | 12 | A. No. |
| 09:33 | 13 | Q. Exhibit 15? |
| 09:33 | 14 | A. No. |
| 09:33 | 15 | Q. Exhibit 16? |
| 09:33 | 16 | A. 16? |
| 09:33 | 17 | MR. NUTI: I haven't seen that one either. |
| 09:33 | 18 | MR. CHRISTMAS: Oh, sorry. |
| 09:33 | 19 | Did it get marked? |
| 09:33 | 20 | COURT REPORTER: No. |
| 09:33 | 21 | (Exhibit 16 was marked for identification.) |
| 09:33 | 22 | THE WITNESS: No. |
| 09:34 | 23 | MR. CHRISTMAS: If we could mark -- I'm going |
| 09:34 | 24 | to go out of order so the witness can identify just a |
| 09:34 | 25 | handful of documents that were produced from the thumb |

Page 16

| | | |
|---|---|---|
| 09:34 | 1 | drive. |
| 09:35 | 2 | COURT REPORTER: What number is this? |
| 09:35 | 3 | MR. CHRISTMAS: 72. |
| 09:35 | 4 | (Exhibit 72 was marked for identification.) |
| 09:35 | 5 | BY MR. CHRISTMAS: |
| 09:35 | 6 | Q. Ms. Crist, the court reporter has handed you |
| 09:35 | 7 | Exhibit 72 to your deposition. Do you recognize this |
| 09:35 | 8 | document? |
| 09:35 | 9 | A. Yes. |
| 09:35 | 10 | Q. What is it? |
| 09:35 | 11 | A. I provided you in response to the subpoena the |
| 09:35 | 12 | list of the following -- the five items that are listed, |
| 09:35 | 13 | and then additional document locations where additional |
| 09:35 | 14 | documents may be held in accordance with the subpoena |
| 09:35 | 15 | requirements. |
| 09:35 | 16 | Q. Okay. So you typed this up? |
| 09:35 | 17 | A. Yes, I did. |
| 09:35 | 18 | Q. And this lists the contents of the thumb drive? |
| 09:35 | 19 | A. Yes. |
| 09:35 | 20 | Q. So the first document, what does that document |
| 09:35 | 21 | refer to there? |
| 09:35 | 22 | A. Do you have it? |
| 09:35 | 23 | Q. Number one? Do you know what it was, or do I |
| 09:35 | 24 | have to show you? |
| 09:35 | 25 | A. Articles of organization and EIN number with |

Page 17

| | | |
|---|---|---|
| 09:36 | 1 | the state for the formation of Monterey Peninsula |
| 09:36 | 2 | Farming. |
| 09:36 | 3 | Q. And what's the next one? |
| 09:36 | 4 | A. I don't remember the document exactly. Do you |
| 09:36 | 5 | have it? |
| 09:36 | 6 | Q. Yeah, I'm going to pull them out. I just |
| 09:36 | 7 | wondered if you could remember, to describe what they |
| 09:36 | 8 | were. |
| 09:36 | 9 | I'll continue to pull those out, but if you |
| 09:36 | 10 | could just go through and tell me what they were. |
| 09:36 | 11 | A. I basically looked through my records to see if |
| 09:36 | 12 | I had anything related to the subpoena and the document |
| 09:36 | 13 | requests, or document production requests, so I'd have to |
| 09:36 | 14 | look at number two and number three for clarification. |
| 09:36 | 15 | Number four is a flow chart that shows the |
| 09:36 | 16 | Salyer enterprises, meaning all of the entities under the |
| 09:37 | 17 | Salyer organization, and it shows ownership interests or |
| 09:37 | 18 | percentages to and from each entity, and ownership |
| 09:37 | 19 | interests back to the trust. |
| 09:37 | 20 | And number five, I believe, is a spreadsheet in |
| 09:37 | 21 | Excel that, again, shows some of the ownership interests |
| 09:37 | 22 | and listing of the Salyer entities. |
| 09:37 | 23 | MR. CHRISTMAS: This is 55 and 56, and 52. |
| 09:37 | 24 | (Exhibits 52, 55 and 56 were marked for |
| 09:38 | 25 | identification.) |

5 (Pages 14 to 17)

Merrill Corporation - San Francisco
800-869-9132                    www.merrillcorp.com/law
BMO 002069
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   – 8-17-2011

Page 18

09:38   1        THE WITNESS: These actually go together.
09:38   2    BY MR. CHRISTMAS:
09:38   3        Q. Ms. Crist, the court reporter has just handed
09:38   4    you Exhibits 55, 51 and 52, I believe?
09:38   5        MS. WOODRUFF: No. 55, 52 and 56.
09:39   6        MR. CHRISTMAS: Okay. What did I do with 56?
09:39   7    Can I see?
09:39   8        THE WITNESS: Mm-hmm.
09:39   9    BY MR. CHRISTMAS:
09:39   10       Q. Let's look at 55 first. Does that relate to
09:39   11   the first numbered item on your --
09:39   12       A. All three of them relate to the first item.
09:39   13       Q. And that's the first item on Exhibit 72?
09:39   14       A. Yes.
09:39   15       Q. In that space --
09:39   16       A. It's part of the articles of organization, so
09:39   17   actually 55 and 56 go together.
09:39   18       Q. That's what I thought.
09:39   19       A. And 52 is the EIN that was assigned to Monterey
09:39   20   Peninsula Farming.
09:39   21       MR. CHRISTMAS: We may have called out the
09:40   22   wrong number when I passed those around. Do you want to
09:40   23   show --
09:40   24       THE WITNESS: 52?
09:40   25       MR. CHRISTMAS: Is the IRS document.

Page 19

09:40   1        And what else do you have in your hand?
09:40   2        THE WITNESS: 55 and 56 are the articles of
09:40   3    organization for the state of California for the LLC, for
09:40   4    Monterey Peninsula Farming.
09:40   5        MR. CHRISTMAS: Does everyone have those?
09:40   6        MS. WOODRUFF: Yes.
09:40   7        MR. NUTI: Yes.
09:40   8    BY MR. CHRISTMAS:
09:40   9        Q. Is that --
09:40   10       A. That's item number one.
09:40   11       Q. What's the last?
09:40   12       A. Item number two --
09:40   13       Q. No, I just mean let me see the last of those.
09:40   14       Why did you have item number 1 on your list?
09:40   15       A. For corporate secretary I maintained a file for
09:40   16   each of the California entities, or California, I should
09:41   17   say "domestic," meaning U.S. entities, and so I was given
09:41   18   that as just for record-keeping.
09:41   19       Q. And where did you maintain the corporate
09:41   20   secretarial file?
09:41   21       A. Initially they were in Lemoore, California at
09:41   22   the SK Foods plant, physical plant location, and then
09:41   23   transferred to the 200 -- what was that address? In
09:41   24   Monterey. I can't remember the name of the address.
09:41   25       Q. So did you move your office to Monterey?

Page 20

09:41   1        A. Yes, my office moved. My physical office moved
09:41   2    from Lemoore to Monterey. Ragsdale Drive.
09:41   3        Q. And in what form was the file maintained? Was
09:41   4    it in hard copy form, or electronic form, or both?
09:41   5        A. Both.
09:41   6        Q. Was it maintained on an individual PC, or on
09:41   7    the network?
09:41   8        A. It was maintained on an individual PC.
09:41   9        Q. Okay. Was that your PC?
09:41   10       A. Yes, it was.
09:41   11       MR. CHRISTMAS: This is 73.
09:42   12       (Exhibit 73 was marked for identification.)
09:42   13   BY MR. CHRISTMAS:
09:42   14       Q. Is this the second document on your list?
09:42   15       A. Yes.
09:42   16       Q. Can you tell me what this is.
09:42   17       A. Do you want me to read it? General Assignment
09:42   18   Transfer of Shares of SK Foods Australia Ltd.
09:42   19       Q. Do you know what the purpose of this document
09:42   20   was?
09:42   21       A. I really don't, it was just included in some of
09:42   22   the corporate records that I had.
09:42   23       Q. Were you involved in its preparation?
09:42   24       A. No, I was not.
09:42   25       Q. Do you recall having any discussions about this

Page 21

09:42   1    document?
09:42   2        A. No. Huh-uh.
09:43   3        Q. And that is item number two, then. Is that
09:43   4    correct?
09:43   5        A. Yes, it is.
09:43   6        MR. CHRISTMAS: I think this probably should
09:43   7    have been read in conjunction with that. This is the
09:43   8    second page. 74.
09:43   9        (Exhibit 74 was marked for identification.)
09:43   10       THE WITNESS: Can I just add that this looks
09:44   11   like it's the same item as item number 9, but item number
09:44   12   9 is executed, where the one that I provided was not.
09:44   13   They look the same to me.
09:44   14   BY MR. CHRISTMAS:
09:44   15       Q. But I believe you said you'd never seen item --
09:44   16   rather, we'll call it "exhibit." Exhibit 9.
09:44   17       A. I don't remember it, because it would have been
09:44   18   before I was assigned -- I don't remember it being
09:44   19   executed. It may have just been in a file that I had
09:44   20   with regard to another entity. Because I didn't maintain
09:44   21   corporate records for any of the international entities.
09:44   22       Q. You do recall --
09:44   23       A. No, I did not.
09:44   24       (Exhibit 75 was marked for identification.)
09:44   25   ///

Merrill Corporation - San Francisco
800-869-9132                                          www.merrillcorp.com/law
BMO 002070

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

Page 22

09:44 1 BY MR. CHRISTMAS:
09:44 2     Q. Let me move to 75. I haven't located -- what
09:45 3 item is that on your -- I have to show it to you first.
09:45 4     A. So again, this attachment goes with this one,
09:45 5 right? As the same as item 9, Exhibit 9, I'm sorry.
09:45 6     Q. For clarity of the record, you've been -- I
09:45 7 handed you Exhibit 73, and then I handed you Exhibit 74.
09:45 8     A. Right.
09:45 9     Q. It was my belief that these since they were
09:45 10 sequentially numbered and it is an exhibit, that they
09:45 11 went together.
09:45 12     A. Yep. Well, that's what it looks like when you
09:45 13 provided 9, that they're together.
09:45 14     Q. But you don't have any independent
09:45 15 understanding of the order of these documents?
09:45 16     A. I don't. And like I say, they may have been in
09:45 17 another entity record, such as SKPM corp because of the
09:46 18 reference there, but I don't have any working knowledge
09:46 19 of its preparation, or the execution of Scott's
09:46 20 signature, or anything like that.
09:46 21         MR. CHRISTMAS: Okay. Do you have 75? Have we
09:46 22 handed out 75?
09:46 23         MR. SHEAHAN: I have.
09:46 24 BY MR. CHRISTMAS:
09:46 25     Q. I believe this is from your production. Can

Page 23

09:46 1 you identify this document?
09:46 2     A. Yes, this is an Excel spreadsheet that I
09:46 3 prepared showing -- actually, I think I remember it being
09:46 4 e-mailed back and forth between Gary Perry and myself,
09:46 5 just trying to support the SK Foods LP and related entity
09:46 6 bankruptcy in 2009, just to help clarify the entities,
09:46 7 and dates of incorporation, and EIN numbers, et cetera.
09:46 8 BY MR. CHRISTMAS:
09:46 9     Q. Did Mr. Perry give input to this document?
09:47 10     A. Yes.
09:47 11     Q. And then I take it you also gave input to this
09:47 12 document?
09:47 13     A. Yes.
09:47 14     Q. And does this document correspond to one of the
09:47 15 items on your list?
09:47 16     A. It is item number five.
09:47 17         MR. CHRISTMAS: Let's do this 66.
09:47 18         (Exhibit 66 was marked for identification.)
09:47 19 BY MR. CHRISTMAS:
09:47 20     Q. The court reporter has handed you Exhibit 66 to
09:47 21 your deposition. Do you recognize this document?
09:47 22     A. Yes.
09:47 23     Q. Can you tell me what it is?
09:47 24     A. It is the Salyer Enterprises Flow Chart.
09:47 25     Q. And were you involved in preparing this

Page 24

09:47 1 document?
09:47 2     A. No.
09:47 3     Q. Do you know who prepared it?
09:47 4     A. Wayne Boos.
09:47 5     Q. And do you know why you ended up with a copy of
09:47 6 it on your thumb drive?
09:47 7     A. Again, as it related to supporting the
09:48 8 bankruptcy estate, and then also I managed lines of
09:48 9 insurance -- let me back up. So I've had a copy of this
09:48 10 probably since '08. There was another version, I
09:48 11 believe, before this one. There are probably multiple
09:48 12 versions before this one. And I supported all lines of
09:48 13 insurance, and so just to make sure that we had the
09:48 14 appropriate entities insured under the GL policies, et
09:48 15 cetera, as named entities, I maintained a copy of this as
09:48 16 well.
09:48 17     Q. Did you ever give any input as to changes to be
09:48 18 made to that document?
09:48 19     A. No, none.
09:48 20     Q. And does this correspond to an item on your
09:48 21 list?
09:48 22     A. Item number four.
09:48 23     Q. All right. We'll get to item number three at
09:48 24 some point here, but I just wanted to get those out.
09:49 25         Who was Mr. Pinter? Chad Pinter? Do you

Page 25

09:49 1 recall?
09:49 2     A. He was hired as CFO for a short period of time.
09:49 3     Q. Did you report to him?
09:49 4     A. No, I did not.
09:49 5     Q. As corporate secretary, were you ever involved
09:50 6 in the drafting of any of the documents over which you
09:50 7 were the custodian?
09:50 8     A. Possibly.
09:50 9     Q. Do you have any individual recollection of
09:50 10 assisting in drafting?
09:50 11     A. What type of documents? Can you be more
09:50 12 specific?
09:50 13     Q. Well, like any documents that would convey
09:50 14 ownership interest of any of the entities to any other
09:50 15 entity?
09:50 16     A. I do remember typing drafts of resolutions,
09:50 17 adopting resolutions after, say, a board of directors
09:50 18 meeting. Minutes, agendas, things like that as it
09:50 19 related to board of directors meetings for SKPM corp
09:50 20 only.
09:50 21     Q. Okay. So you attended the board meetings?
09:51 22     A. Yes, I did. Two.
09:51 23     Q. For two entities?
09:51 24     A. No, two board of directors meetings.
09:51 25     Q. And what boards of directors were those?

7 (Pages 22 to 25)

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA  CRIST  - 8-17-2011

Page 26

09:51  1      A. Dates, or?
09:51  2      Q. Let me back up.  You only ever attended two
09:51  3   meetings?  Is that what you mean?
09:51  4      A. Yes.
09:51  5      Q. And you took down the minutes for those
09:51  6   meetings?
09:51  7      A. Yes, I did.
09:51  8      Q. And then you typed them up?
09:51  9      A. Mm-hmm.
09:51  10      Q. Now, I was referring more to, I guess what we
09:51  11   could call legal documents, or transaction documents that
09:51  12   might change the corporate ownership of the entities
09:51  13   themselves.
09:51  14      A. I don't recall changing ownership.  I remember
09:51  15   typing up, like I said, resolutions, but I would need to
09:51  16   look at them to remember.
09:51  17      Q. Did you ever assist Mr. Perry in drafting any
09:51  18   legal transaction documents?
09:51  19      A. Not that I can recall.
09:51  20      Q. Did you ever give any comments to Mr. Perry on
09:51  21   any legal transaction documents that he had prepared?
09:52  22      A. Not that I can recall.
09:52  23      MR. CHRISTMAS:  This is 26.
09:52  24      (Exhibit 26 was marked for identification.)
09:52  25   ///

Page 27

09:52  1   BY MR. CHRISTMAS:
09:52  2      Q. Ms. Crist, the court reporter has handed you
09:52  3   Exhibit 26 to your deposition.  Do you recognize this
09:52  4   document?
09:52  5      A. I don't remember it.  Is it a part of a loan,
09:52  6   like a loan transaction?
09:52  7      Q. If you look at the lower right, it has a number
09:52  8   on it.
09:52  9      A. Okay.
09:52  10      Q. And I believe, is this number three on your
09:53  11   list?
09:53  12      A. Could be.  Yes.  This is what I provided you in
09:53  13   that, right?
09:53  14      Q. I'm asking you.
09:53  15      A. Like I said, I just did a general search, so
09:53  16   anything that would have had anything related to the
09:53  17   subpoena, I provided.
09:53  18      Q. I believe that this is it.
09:53  19      A. Okay.  Yes, SSC&L trust.
09:53  20      Q. And it appears to be the only page that we
09:53  21   haven't hit in your production.
09:53  22      A. Yes, mm-hmm.
09:53  23      MR. SHEAHAN:  So that means everyone's got each
09:53  24   page of the production?
09:53  25      MR. CHRISTMAS:  Yes.

Page 28

09:53  1      MR. SHEAHAN:  So you've all got it.
09:54  2      MR. CHRISTMAS:  27.
09:54  3      (Exhibit 27 was marked for identification.)
09:54  4   BY MR. CHRISTMAS:
09:54  5      Q. Just one housekeeping question, when you left
09:54  6   SK Foods, did you retain your computer, or did you leave
09:54  7   it at SK Foods?
09:54  8      A. I retained my laptop for a period of time while
09:54  9   I supported the bankruptcy estate, and then returned it
09:54  10   to the bankruptcy estate through Shondale Seymour, and
09:54  11   then she actually turned it over to Olam Tomato Company,
09:54  12   I don't know their legal name, who actually purchased all
09:54  13   of the assets from the estate.
09:54  14      Q. The court reporter has handed you Exhibit 27 to
09:55  15   your deposition.  Do you recognize this series of
09:55  16   e-mails?
09:55  17      A. I'm looking through it right now.  Lisac@first
09:55  18   organization.com, I don't recognize that e-mail address
09:55  19   at all.  I've never held an e-mail address that's
09:55  20   lisac@first organization.com.
09:55  21      Q. Do you know if --
09:55  22      A. And I don't remember this e-mail.
09:55  23      Q. Do you know if any outbound e-mails from SK
09:55  24   Foods might have had a different address?
09:55  25      A. Not that I'm aware of.  It would have been --

Page 29

09:55  1      Q. What was your address?
09:55  2      A. It was lisac@skfoods.com.  I don't think it was
09:55  3   lcrist, I believe it was lisac@skfoods.com.
09:55  4      Q. Well, turning to the substance of this series
09:55  5   of e-mails, the one on the bottom is from Nick Frankish.
09:56  6   Do you know who he was?
09:56  7      A. Yes.
09:56  8      Q. What was his role?
09:56  9      A. He was the CFO for Cedenco.
09:56  10      Q. And have you had a chance to read this e-mail?
09:56  11      A. I'm reading it right now.
09:56  12      I don't remember the e-mail.
09:56  13      Q. Apart from not remembering the e-mail, how
09:57  14   about the substance of the e-mail, the topics that are
09:57  15   addressed there?  Well, let's start with do you recall
09:57  16   whether there were any changes in ownership of the
09:57  17   Australian and New Zealand companies while you worked for
09:57  18   SK Foods?
09:57  19      A. I was not involved in their -- I was not
09:57  20   involved in the Cedenco operations at all.  I don't
09:57  21   recall any conversations as it related to any ownership
09:57  22   changes or anything like that for Cedenco.
09:57  23      Q. Do you know if you received for storage in the
09:57  24   corporate secretarial file any documents that purported
09:57  25   to effect changes in the ownership of the Australia and

8 (Pages 26 to 29)

LISA  CRIST  - 8-17-2011

Page 30

09:58  1  New Zealand companies?
09:58  2      A.  The only things that I had were what I
09:58  3  provided.
09:58  4      Q.  No, I mean in the corporate secretarial file at
09:58  5  SK Foods.
09:58  6      A.  Would I have had what?
09:58  7      Q.  Would you have been the person to whom legal
09:58  8  documents that effected changes in ownership of the
09:58  9  Australia and New Zealand companies would have been sent?
09:58  10      A.  I don't believe so, but I didn't -- you know, I
09:58  11  maintained -- basically each entity had a formal binder
09:58  12  that had all the AOs and, you know, Articles of
09:58  13  Incorporation, Articles of Organization, EIN numbers,
09:58  14  various resolutions, et cetera, et cetera.  And then with
09:58  15  the government investigation, all of those records were
09:58  16  taken, and so there were some records that Gary Perry was
09:58  17  able to reproduce so that we could continue to run the
09:58  18  business.
09:59  19          So it's very difficult for me to pinpoint one
09:59  20  record versus another, because after all of the formal
09:59  21  corporate records were taken as a part of the
09:59  22  investigation, they were never returned.  So they're
09:59  23  still in the government's possession, Department of
09:59  24  Justice.
09:59  25          So basically, Gary Perry provided manila

Page 31

09:59  1  folders with some basic corporate records just to, you
09:59  2  know, support the business basically.
09:59  3          So if you're asking me if I have specific
09:59  4  ownership-related documents in my possession, I don't
09:59  5  believe that I do, or that I remember having in those
09:59  6  folders.  Because I received those corporate records in
09:59  7  December of 2007 after the first board of directors
09:59  8  meeting that I attended and was appointed as corporate
09:59  9  secretary.  Those records came into my possession then,
10:00  10  and in '08 the government raid happened in April, so I
10:00  11  only had the formal records for a period of maybe five
10:00  12  months.
10:00  13          Does that make sense?
10:00  14      Q.  I understand your answer.
10:00  15      A.  So I had nothing for a period of time after the
10:00  16  government raid, and then requested of Gary Perry, "Hey,
10:00  17  do you have anything so we can support banking
10:00  18  transactions or anything," as it related to needing --
10:00  19  trying to support the business basically.
10:00  20          MR. CHRISTMAS:  Okay.  This is 39.
10:00  21          (Exhibit 39 was marked for identification.)
10:00  22  BY MR. CHRISTMAS:
10:01  23      Q.  Ms. Crist, the court reporter has handed you
10:01  24  Exhibit 39 to your deposition.
10:01  25      A.  Okay.

Page 32

10:01  1      Q.  I asked you at the beginning of the deposition
10:02  2  if you remembered the name Julie Patton.
10:02  3      A.  Mm-hmm.
10:02  4      Q.  Do you see that name there at the top of
10:02  5  Exhibit 39, the e-mail?
10:02  6      A.  I do.
10:02  7      Q.  By looking at that e-mail address, does that
10:02  8  refresh your recollection as to who she was?
10:02  9      A.  It appears that she worked for Gary Perry.
10:02  10      Q.  Do you have any independent recollection of
10:02  11  dealings with her?
10:02  12      A.  I didn't correspond with her very often.  It
10:02  13  would have been few and far between as far as my
10:02  14  communications with her.
10:02  15      Q.  Now, if I could draw your attention to the
10:02  16  attachment to this e-mail, do you recall -- well, first
10:02  17  do you recall receiving this e-mail and the attachments?
10:02  18      A.  It appears that it was e-mailed to me.
10:02  19      Q.  Do you have any independent recollection of
10:02  20  that?
10:02  21      A.  I guess so.  If you're asking about the initial
10:03  22  transaction in its entirety, I don't.  I mean, there
10:03  23  were -- my days were long, so.
10:03  24      Q.  I just mean, do you remember receiving this
10:03  25  e-mail?  Does this refresh your recollection that you

Page 33

10:03  1  received this e-mail?
10:03  2      A.  Yes, yes.
10:03  3      Q.  Now, do you know why you are receiving this
10:03  4  e-mail and attachment?
10:03  5          MS. WOODRUFF:  Objection.  Calls for
10:03  6  speculation, lacks foundation.
10:03  7  BY MR. CHRISTMAS:
10:03  8      Q.  Did you have an understanding?
10:03  9          MS. WOODRUFF:  Same objection.
10:03  10          THE WITNESS:  Yeah...
10:03  11  BY MR. CHRISTMAS:
10:03  12      Q.  You can answer.  That's just part of the
10:03  13  process.
10:03  14      A.  It must have -- somebody must have asked me or
10:03  15  requested of me to try and get records, and I probably
10:03  16  went to Gary Perry and said "Hey, do you have this," in
10:03  17  connection with providing or supporting a request from
10:04  18  another person.
10:04  19      Q.  But these appear to be unsigned?
10:04  20      A.  Mm-hmm.
10:04  21      Q.  So apart from this document, did you ever have
10:04  22  occasion to be asked to seek signatures for documents?
10:04  23      A.  I did seek, or I should say "obtain" signatures
10:04  24  for various records as it related to, like, loans, so if
10:04  25  the company were going through a loan, or a new loan, or

9 (Pages 30 to 33)

Merrill Corporation - San Francisco
800-869-9132        www.merrillcorp.com/law
BMO 002073
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA CRIST - 8-17-2011

Page 34

10:04 1 a current loan, restructuring maybe, I would have helped
10:04 2 support that through producing records and getting
10:04 3 signatures and having things FedExed back and forth
10:04 4 between the banks and the company, just basically as an
10:04 5 admin, purely in an admin role, just being that liaison
10:05 6 between, you know, the CFO, Scott, the banks, et cetera.
10:05 7 Q. It says -- Ms. Patton writes "Lisa attached the
10:05 8 two forms we discussed on Wednesday." Do you recall the
10:05 9 telephone conversation that you had?
10:05 10 A. No, I do not, honestly.
10:05 11 Q. Do you know what you did after you received
10:05 12 this e-mail?
10:05 13 A. No, I don't.
10:05 14 Q. Do you recall if you sent these documents to
10:05 15 anyone for signature?
10:05 16 A. I don't even remember the transaction, to be
10:05 17 honest with you.
10:05 18 Q. When you say "the transaction," is that --
10:05 19 A. Meaning the request for the records, who I sent
10:05 20 them to. I don't remember what the business name was, if
10:05 21 it was in support of somebody needing records for
10:06 22 whatever business purpose, I don't even remember what the
10:06 23 business purpose was.
10:06 24 MR. CHRISTMAS: Let's mark 40.
10:06 25 (Exhibit 40 was marked for identification.)

Page 35

10:06 1 BY MR. CHRISTMAS:
10:06 2 Q. Ms. Crist, the court reporter has handed you
10:06 3 Exhibit 40 to your deposition, which is -- we looked at
10:06 4 Exhibit 39, which was an e-mail with attachments of
10:06 5 March 28, 2008 at 11:49 a.m., and here again, this is the
10:06 6 same day, March 28, and this is now 2:35 p.m.
10:07 7 Do you have any recollection as to -- if you
10:07 8 could look at the documents, I believe they are the same
10:07 9 documents, why she would have sent it to you twice?
10:07 10 MS. WOODRUFF: Objection. Calls for
10:07 11 speculation, lacks foundation.
10:07 12 THE WITNESS: They appear to be the same. I
10:07 13 don't know why they would have been e-mailed twice.
10:07 14 BY MR. CHRISTMAS:
10:07 15 Q. And would it be fair to say that just as with
10:07 16 the e-mail and attachments that were sent in the morning
10:08 17 that you don't have a recollection as to what you did, if
10:08 18 anything, with these documents after receipt?
10:08 19 A. I do not --
10:08 20 MS. WOODRUFF: Sorry. Objection. Assumes
10:08 21 facts not in evidence that it was received.
10:08 22 BY MR. CHRISTMAS:
10:08 23 Q. Did you receive these e-mails, Exhibit 40?
10:08 24 A. That is my e-mail address, lisac@skfoods.com.
10:08 25 Q. Apart from looking at the document, do you have

Page 36

10:08 1 an independent recollection of receiving this e-mail?
10:08 2 A. I don't remember the business transaction. I
10:08 3 don't.
10:08 4 Q. Did you ever travel to New Zealand or Australia
10:08 5 in connection with your position?
10:08 6 A. I did twice.
10:08 7 Q. And when did you do that?
10:08 8 A. I can give you the years. I don't remember
10:09 9 time frame.
10:09 10 Q. Whatever you remember.
10:09 11 A. Okay. The first trip I believe was in 2007,
10:09 12 and the second was in 2008.
10:09 13 Q. Turning to the 2007 trip, what was the reason
10:09 14 that you made the trip?
10:09 15 A. I was invited to go, just from -- each year
10:09 16 Scott Salyer traveled to the Cedenco entities probably
10:09 17 two or three times a year, and each time he would take a
10:09 18 different member of senior management on most occasions,
10:09 19 and I was new, new in my role as VP of HR and EHS, and so
10:10 20 I went purely to visit what we called our "sister
10:10 21 companies," and so it was just basically an opportunity
10:10 22 for me to get to know the business and to meet others in
10:10 23 our organization with the international companies.
10:10 24 Q. But you didn't have specific responsibilities
10:10 25 to carry out in Australia?

Page 37

10:10 1 A. No.
10:10 2 Q. Or in New Zealand?
10:10 3 A. No.
10:10 4 Q. With whom did you meet, if anyone, on this
10:10 5 trip?
10:10 6 A. I met a lot of people. I toured the
10:10 7 facilities, I toured each facility, I met a lot of
10:10 8 people. We had a dinner where we invited the plant
10:10 9 employees.
10:10 10 Q. And in 2008 you traveled again?
10:10 11 A. I traveled with Scott Salyer's daughter,
10:11 12 Stephanie Salyer, and we traveled commercial, not
10:11 13 privately on the company's, you know, the company
10:11 14 airplane, jet.
10:11 15 So I traveled with Stephanie Salyer, and it was
10:11 16 an opportunity for her to get to see the other entities,
10:11 17 and I accompanied her and made those introductions, and
10:11 18 she and I did plant tours and things like that, and it
10:11 19 was an opportunity for her. She had taken another role
10:11 20 in the organization, so again, it was just a
10:11 21 meet-and-greet and to introduce her to the business as
10:11 22 well.
10:11 23 Q. Was Mr. Salyer --
10:11 24 A. He was there during that time, but we didn't
10:11 25 travel with him.

10 (Pages 34 to 37)

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

Page 38

10:11  1      Q. And in the 2007 trip did you go to New Zealand
10:12  2  and Australia?
10:12  3      A. Yes.
10:12  4      Q. And in 2008, New Zealand and Australia?
10:12  5      A. Yes.
10:12  6      Q. Other than plant tours and dinners, et cetera,
10:12  7  were there any business meetings as part of the 2008
10:12  8  trip?
10:12  9      A. I did attend a -- they always -- that's
10:12  10  speculation. Richard Lawrence and Nick Frankish and the
10:12  11  plant manager or plant operations director, I don't know
10:12  12  his exact title, presented a capital investment with list
10:12  13  per se, like, you know, what they would hope to do as far
10:12  14  as expansion of the operations, or capital improvements
10:12  15  for the various plants. They had acquired a new squash
10:12  16  company in Ohakune, I believe. Had Mountain Carrots in
10:12  17  another location, and so I attended those meetings.
10:13  18      MR. CHRISTMAS: Mark this as 42.
10:13  19      (Exhibit 42 was marked for identification.)
10:13  20  BY MR. CHRISTMAS:
10:13  21      Q. Ms. Crist, the court reporter has handed you
10:13  22  Exhibit 42 to your deposition, which is a series of
10:13  23  e-mails. The earliest e-mail appears to be an e-mail
10:13  24  dated April 1, 2008 at 7:25 p.m.
10:13  25      A. Mm-hmm.

Page 39

10:13  1      Q. Military time there.
10:13  2      And the second e-mail appears to be one from
10:13  3  Gary Perry dated April 2, 2008 at 6:37 a.m.
10:13  4      Do you recognize these series of e-mails?
10:13  5      A. I do remember a conversation with Nick. I
10:13  6  remember, and I can't be specific specific, but I do
10:13  7  remember Nick, they were talking about -- I was in a
10:14  8  meeting and a sidebar conversation was occurring where
10:14  9  Nick was talking about they were going through their
10:14  10  audit, their annual audit, and he needed to have Scott
10:14  11  sign some documents and asked me if I were going to see
10:14  12  Scott, if I could have him sign some documents related to
10:14  13  their audit.
10:14  14      Q. Okay. Do you know the nature of the documents?
10:14  15      A. I can't recall specifically unless you have
10:14  16  something that you want me to review.
10:14  17      Q. Do you have a recollection about any
10:14  18  resolutions relating to the transfer of ownership of the
10:14  19  Australian or New Zealand companies?
10:14  20      A. I don't remember what the resolutions were, I
10:14  21  just remember Nick needing Scott to have something signed
10:14  22  in response to his audit, the needs for his audit, and
10:14  23  wanted to -- there was one document in particular that he
10:14  24  asked me if I had authority to sign, and I told him I
10:15  25  wasn't sure, as corporate secretary, and I told him that

Page 40

10:15  1  I wasn't sure because I wasn't an officer of the
10:15  2  Cedenco-related entities. And so I did sign one
10:15  3  document, I don't remember what it was, but it turned out
10:15  4  that I didn't have the authority to sign it anyway, and
10:15  5  Scott had to sign them.
10:15  6      Q. Do you recall what the nature of the resolution
10:15  7  was?
10:15  8      A. I don't, unless you have it.
10:15  9      Q. Were you involved in the preparation of any of
10:15  10  the resolutions relating to --
10:15  11      A. For Cedenco?
10:15  12      Q. You have to wait for me to finish so the court
10:15  13  reporter can take us down.
10:15  14      A. I'm sorry.
10:15  15      Q. -- the resolutions that are mentioned in this
10:15  16  e-mail, or referred to?
10:16  17      A. The resolution stated in the e-mail isn't
10:16  18  specified, so I wouldn't know without looking at it.
10:16  19      Q. Do you recall the significance of the two dates
10:16  20  that are in this e-mail, November 1, 2007 versus
10:16  21  November 1, 2006?
10:16  22      MS. WOODRUFF: Objection. Calls for
10:16  23  speculation, lacks foundation and also assumes facts not
10:16  24  in evidence as to their significance.
10:16  25  ///

Page 41

10:16  1  BY MR. CHRISTMAS:
10:16  2      Q. You can answer. I'm just asking if you know
10:16  3  their significance, what they connect to.
10:16  4      A. I don't.
10:16  5      Q. Did you ultimately obtain signatures of any
10:17  6  documents that were in furtherance of this e-mail?
10:17  7      A. During this trip I don't believe that I was
10:17  8  able to get Scott's signature. I think that he signed
10:17  9  them when he was back in the U.S., whatever they were. I
10:17  10  may have carried an envelope with the documents that Nick
10:17  11  needed signed, but I don't remember Scott actually
10:17  12  signing them during that trip. I think it was handled
10:17  13  when he got back to the states.
10:17  14      Q. So do you know when he got back to the states?
10:17  15      A. No, I don't even remember the exact time of the
10:17  16  trip.
10:17  17      Q. Did his dates of travel overlap exactly with
10:18  18  yours, or were they different?
10:18  19      A. During this trip they would have been different
10:18  20  because Stephanie and I traveled separately.
10:18  21      Q. But on the first trip you were on the corporate
10:18  22  plane?
10:18  23      A. Yes, I was.
10:18  24      MR. CHRISTMAS: This is 44.
10:18  25      (Exhibit 44 was marked for identification.)

11 (Pages 38 to 41)

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

Page 42

10:18  1    BY MR. CHRISTMAS:
10:18  2        Q. Ms. Crist, the court reporter has handed you
10:18  3    Exhibit 44 to your deposition. Do you recognize this
10:19  4    document?
10:19  5        A. Yes, I do.
10:19  6        Q. Can you tell me what it is.
10:19  7        A. Hang on one second. Let me read it.
10:19  8          It is basically the power of attorney.
10:19  9        Q. Okay. What's your understanding of the reason
10:19 10    that you were granted power of attorney?
10:19 11          MS. WOODRUFF: Objection. Calls for
10:19 12    speculation, lacks foundation.
10:19 13          THE WITNESS: Scott was traveling to a country,
10:19 14    and I don't remember the -- I believe it was Turkey and a
10:19 15    couple other countries. It was like an annual tomato
10:19 16    conference, and then he was doing some other traveling
10:19 17    outside of that, and there was one country that was,
10:19 18    like, at war, and we were kind of talking about "What if
10:20 19    you died" type thing, and were kidnapped as part of, you
10:20 20    know, kidnapping a rich American and holding him -- I
10:20 21    don't know.
10:20 22          He was traveling abroad to some various
10:20 23    countries that weren't -- Columbia I think was one of
10:20 24    them too, that were not entirely safe. So Gerard Rose
10:20 25    and Scott and I talked. Basically they contacted me and

Page 43

10:20  1    Gerard said "Hey, Scott's going to be doing this
10:20  2    traveling for the next three weeks." And it was a very
10:20  3    short period of time, I can tell you that, and he
10:20  4    appointed me power of attorney, just to make very
10:20  5    low-level business decisions during that time, and
10:20  6    basically to support his estate if he were to die, to be
10:21  7    pretty blunt, as it related to his daughters. Because I
10:21  8    formed a close relationship with Stephanie. Not so much
10:21  9    Caroline, I didn't get to know her that well, but with
10:21 10    Stephanie I did, so that's how that came about.
10:21 11    BY MR. CHRISTMAS:
10:21 12        Q. Do you know if this power of attorney was ever
10:21 13    revoked?
10:21 14        A. God, I hope so. It was only during the time
10:21 15    that he was traveling to those various countries, and it
10:21 16    was like a two- or three-week...
10:21 17        Q. Do you know why he chose you?
10:21 18          MS. WOODRUFF: Objection. Calls for
10:21 19    speculation, lacks foundation.
10:21 20    BY MR. CHRISTMAS:
10:21 21        Q. If you have an understanding.
10:21 22        A. I believe that he trusted me, but honestly, I
10:22 23    don't -- it would be speculation, because I don't know
10:22 24    from Scott. And I've heard, and my communications with
10:22 25    regard to this were actually from Gary Perry -- I mean,

Page 44

10:22  1    I'm sorry. Strike that. Gerard Rose.
10:22  2          And I was gracious that he felt very high -- he
10:22  3    felt highly of me I guess, but I was no way equipped to
10:22  4    manage the company if he were to die. It was kind of --
10:22  5    I hate to say it was a joke. I understand this is a
10:22  6    legal document, but it really never came into play.
10:22  7        Q. Were you ever granted a power of attorney by
10:22  8    anyone else while you worked at SK Foods?
10:22  9        A. No.
10:23 10          MR. CHRISTMAS: This is 53, this is 54.
10:23 11          (Exhibits 53 and 54 were marked for
10:23 12    identification.)
10:23 13          THE WITNESS: Is there a reason why it's so
10:23 14    cold in this office? Is that on purpose?
10:24 15          MR. CHRISTMAS: And dark.
10:24 16          THE WITNESS: I'm freezing to death.
10:24 17    BY MR. CHRISTMAS:
10:24 18        Q. Ms. Crist, the court reporter has handed you
10:24 19    Exhibit 53 and 54 to your deposition. Have you ever seen
10:24 20    Exhibit 53?
10:24 21        A. I'm not aware of these documents.
10:24 22        Q. And so that includes also 54?
10:25 23        A. Yes.
10:25 24          MR. CHRISTMAS: 67.
10:25 25          (Exhibit 67 was marked for identification.)

Page 45

10:25  1    BY MR. CHRISTMAS:
10:25  2        Q. Ms. Crist, the court reporter has handed you
10:25  3    Exhibit 67 to your deposition. Have you ever seen this
10:25  4    document?
10:25  5        A. I did as part of a loan transaction, and that
10:25  6    was only to organize the documents and get them FedExed
10:25  7    to the bank group, I believe.
10:25  8        Q. Do you know the purpose of this document?
10:25  9        A. No.
10:25 10        Q. Were you involved in the preparation of this
10:25 11    document?
10:26 12        A. Not that I remember.
10:26 13        Q. Who was the lender in the loan transaction?
10:26 14        A. There were several banks involved in the bank
10:26 15    group, even outside of the farming entities that had a
10:26 16    separate bank group, so I wouldn't remember each of the
10:26 17    banks involved.
10:26 18        Q. Do you remember any of the names of the banks?
10:26 19        A. BMO.
10:26 20        Q. That's Bank of Montreal?
10:26 21        A. Yes, Bank of Montreal. Chase was a small
10:26 22    lender as part of the bank group. Bank of the West was a
10:27 23    lender in the bank group for a period of time. That's
10:27 24    all I can remember right now.
10:27 25        Q. Did you organize documents and send them to the

12 (Pages 42 to 45)

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA  CRIST  - 8-17-2011

Page 46

10:27 1    banks?
10:27 2        A. I have.
10:27 3        Q. Was this a document that you did so?
10:27 4        A. I believe this was one of the loans, one of the
10:27 5    documents in the loan, because I would have collected
10:27 6    them and had signatures, especially as it related to
10:27 7    Mark McCormick. I had to organize the documents and
10:27 8    relayed it to the loan doc requirements of the bank in
10:27 9    how they needed to be presented, and organized, and then
10:27 10   get the signatures, the notaries, reorganize them and
10:27 11   send them back.
10:27 12       Q. Did you ever have any communications with any
10:27 13   representatives of any of the banks in connection with
10:27 14   this document?
10:27 15       A. I possibly could have. I have had bank
10:27 16   communications in the past as part of the bank group.
10:28 17       Q. And can you tell me, was that part of your
10:28 18   responsibilities?
10:28 19       A. Just -- I hate to be so candid, but as a
10:28 20   scribe, I was really a scribe, purely administrative, or
10:28 21   as corporate secretary, so if I needed to retain those
10:28 22   records as a part of the corporate records, I would do
10:28 23   that. I would also sign some of the documents as
10:28 24   corporate secretary as needed, and then, again,
10:28 25   collection, organization, and making sure they were

Page 47

10:28 1    handed over to the CFO and organized so that she could --
10:28 2    Shondale Seymour at the time, or, you know,
10:28 3    Mark McCormick, working in conjunction with the two of
10:28 4    them. They would create binders and then they would keep
10:28 5    those binders in their office.
10:28 6        Q. Did you ever attend any meetings with
10:28 7    representatives of any of the banks?
10:29 8        A. I have.
10:29 9        Q. And do you recall who attended on behalf of the
10:29 10   banks?
10:29 11       A. There was one meeting in San Francisco where
10:29 12   all of the banks were represented collectively, and that
10:29 13   was in an effort to obtain, I believe, either an
10:29 14   extension of a current loan or a separate loan
10:29 15   altogether.
10:29 16       Q. Do you recall the approximate date of that
10:29 17   meeting?
10:29 18       A. I don't. It would be probably 2008.
10:29 19       Q. What was the purpose of your attending the
10:29 20   meeting?
10:29 21       A. As an officer.
10:29 22       Q. Were you taking any minutes of the meeting?
10:29 23       A. I did not take minutes. I did take notes, if I
10:29 24   remember, and I did give a short presentation as it
10:29 25   related to -- I presented the org chart for the executive

Page 48

10:30 1    management team, and talked about opportunities. We were
10:30 2    restructuring some of our teams, especially as it related
10:30 3    to finance. We had some significant turnover, and that
10:30 4    was a concern. Turnover in finance, in the accounting
10:30 5    team, so that was a concern of the banks' at the time,
10:30 6    and I remember speaking to that and talking about our
10:30 7    recruiting efforts, and what we were trying to do there.
10:30 8        Q. Who changed positions?
10:30 9        A. Many. Whether it were cost accountants,
10:30 10   whether it were CFOs, whether it were senior accountants,
10:30 11   we had some turnover there.
10:30 12       Q. And do you know what happened to your notes of
10:30 13   the meeting?
10:30 14       A. I don't. I wasn't at the company the day of
10:30 15   the raid, the day of the Department of Justice
10:31 16   investigation, the day of the raid, April 16th. I was
10:31 17   still at home getting ready to leave for work, so my
10:31 18   office in Lemoore was -- I was transitioning between two
10:31 19   offices, the Lemoore and the Monterey facilities, so my
10:31 20   offices were gone through.
10:31 21       Q. Now, these packages that you discussed sending
10:31 22   to the banks, was there a log kept of outgoing packages
10:31 23   from SK Foods?
10:31 24       A. I don't know if there's a log. I know there is
10:31 25   a binder of records that were maintained for each of the

Page 49

10:31 1    loans, and the binder of records were maintained in the
10:31 2    CFO office in Lemoore, to my knowledge. That's where I
10:31 3    recall them being.
10:31 4        Q. Were you ever asked to backdate any documents
10:32 5    during your employment at SK Foods?
10:32 6        MS. WOODRUFF: Objection. Vague and ambiguous
10:32 7    argumentative.
10:32 8    BY MR. CHRISTMAS:
10:32 9        Q. Do you know what backdate means?
10:32 10       A. So if a date were today, to backdate it three
10:32 11   days ago?
10:32 12       Q. Or any period of time, yes.
10:32 13       A. I don't recall specific backdating incidents,
10:32 14   but I do remember leaving a date blank so that the day of
10:32 15   the close all of those dates could be reported and
10:32 16   accounted for, except where a notary was involved, and of
10:32 17   course those dates were recorded on that day.
10:33 18       Q. Could I ask you to go back to Exhibit 42.
10:33 19       A. Okay.
10:33 20       Q. As you saw, the dates of these two e-mails are
10:33 21   April 1, 2008 and April 2, 2008, and the discussion in
10:33 22   the e-mail is dates being November 1, 2007 or November 1,
10:33 23   2006.
10:33 24       Do you recall any instances where, using your
10:33 25   definition of "backdating," whether either period of

Merrill Corporation - San Francisco
800-869-9132                                    www.merrillcorp.com/law

BMO 002077

c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA  CRIST  - 8-17-2011

Page 50

10:33 1  time, either back from April, 2008 to November 1, 2007,
10:34 2  or the longer period to 2006, whether that was ever done?
10:34 3       MS. WOODRUFF: Objection. Vague and ambiguous,
10:34 4  unintelligible, argumentative.
10:34 5       THE WITNESS: I don't even remember what
10:34 6  resolutions these were.
10:34 7  BY MR. CHRISTMAS:
10:34 8       Q. But one period of time is approximately five to
10:34 9  six months. Do you have a recollection of any documents
10:34 10  being backdated --
10:34 11      A. I don't --
10:34 12      MS. WOODRUFF: Objection. Vague and ambiguous,
10:34 13  argumentative. As to backdating, it implies something
10:34 14  illegal.
10:34 15      MR. CHRISTMAS: Can I finish the question.
10:34 16  Can you read back the question, please.
10:34 17      (The question was read.)
10:34 18      MS. WOODRUFF: To --
10:34 19      MR. CHRISTMAS: Can I finish, please?
10:34 20      MS. WOODRUFF: That sounded like you finished
10:34 21  the question.
10:34 22      MR. CHRISTMAS: No, I didn't.
10:34 23  BY MR. CHRISTMAS:
10:34 24      Q. -- to that period, extent of time.
10:34 25      MS. WOODRUFF: Objection. Vague and ambiguous,

Page 51

10:34 1  argumentative, assumes facts not in evidence.
10:34 2       THE WITNESS: I agree. I don't know what you
10:35 3  mean by five or six months. It says November 1st of
10:35 4  2006, versus November 1st of 2007, which would have been
10:35 5  a year difference.
10:35 6  BY MR. CHRISTMAS:
10:35 7       Q. Okay. Let's break them down. If the document
10:35 8  was executed in April of 2008, but dated as of
10:35 9  November 1, 2007, that is approximately six months.
10:35 10      Were you ever involved in -- rephrase that.
10:35 11  Did you ever see any documents that were executed six
10:35 12  months after their date?
10:35 13      A. I don't recall anything like that that I can
10:35 14  remember, and I don't recall specifically even what these
10:35 15  resolutions were.
10:35 16      Q. Okay. I'm just asking about a practice, if
10:35 17  any, of backdating documents, and I'd ask you the same
10:35 18  question. Did you ever see any documents that were,
10:35 19  using your definition, backdated approximately 18 months?
10:35 20      MS. WOODRUFF: Objection. Vague and ambiguous,
10:35 21  argumentative, assumes facts not in evidence as to
10:36 22  backdating. Documents can be effected at a time they're
10:36 23  not dated.
10:36 24  BY MR. CHRISTMAS:
10:36 25      Q. You can answer.

Page 52

10:36 1       A. I don't know. Do you have anything specific?
10:36 2  I don't know.
10:36 3       Q. Using your definition of backdating, if a
10:36 4  document were executed in April of 2008 with a date of
10:36 5  November 1, 2006, would that meet your definition of
10:36 6  backdating?
10:36 7       A. I don't even know how to answer that. I don't
10:36 8  know what you're referring to.
10:36 9       Q. I'm just saying if a document were executed in
10:36 10  April of 2008 with a date of November 1, 2006, would you
10:37 11  consider that backdating?
10:37 12      MS. WOODRUFF: Objection. Calls for a legal
10:37 13  conclusion, vague and ambiguous, incomplete hypothetical.
10:37 14      THE WITNESS: Yeah, I think I would need a
10:37 15  break to call my attorney, Steve Sutro. I'm not even
10:37 16  sure. I don't even know how I should answer that.
10:37 17      MR. CHRISTMAS: We can reserve that question.
10:37 18  There may be other things you want to talk to him about.
10:37 19  If you're not comfortable without your counsel, answering
10:37 20  a question, I think that that's appropriate.
10:37 21      THE WITNESS: Yeah.
10:37 22      MR. NUTI: Is it a good time for a break?
10:37 23      MR. CHRISTMAS: Yeah.
10:37 24      (Recess taken.)
10:48 25      MR. CHRISTMAS: This is 68.

Page 53

10:48 1       (Exhibit 68 was marked for identification.)
10:48 2  BY MR. CHRISTMAS:
10:51 3       Q. Ms. Crist, the court reporter has handed you
10:51 4  Exhibit 68 to your deposition. Have you ever seen this
10:51 5  document?
10:51 6       A. No, I have not.
10:52 7       MR. CHRISTMAS: This is 69.
10:52 8       (Exhibit 69 was marked for identification.)
10:52 9  BY MR. CHRISTMAS:
10:52 10      Q. Ms. Crist, the court reporter has handed you
10:52 11  Exhibit 70 to your deposition. Have you ever seen this
10:52 12  document?
10:52 13      MR. SHEAHAN: 69.
10:52 14      MR. CHRISTMAS: I'm sorry, 69.
10:52 15      THE WITNESS: No, I have not.
10:52 16      MR. CHRISTMAS: This is 70.
10:52 17      (Exhibit 70 was marked for identification.)
10:52 18  BY MR. CHRISTMAS:
10:52 19      Q. Ms. Crist, the court reporter has handed you
10:52 20  Exhibit 70 to your deposition. Have you ever seen this
10:52 21  document?
10:52 22      A. No, I have not.
10:53 23      MR. CHRISTMAS: This is 71.
10:53 24      (Exhibit 71 was marked for identification.)
10:53 25  ///

14 (Pages 50 to 53)

Merrill Corporation - San Francisco
800-869-9132                    www.merrillcorp.com/law
BMO 002078
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

---

Page 54

10:53  1   BY MR. CHRISTMAS:
10:53  2      Q. And likewise, Ms. Crist, the court reporter has
10:53  3   handed you Exhibit 71. Have you ever seen this document?
10:53  4      A. No, I have not.
10:53  5      Q. Moving off the documents, are you aware of any
10:53  6   changes in ownership of the Australian and New Zealand
10:53  7   companies that were effected during your employment with
10:53  8   SK Foods?
10:53  9      A. Not that I'm aware of or that I can remember.
10:54  10     Q. Do you recall having any discussions with
10:54  11  anyone about the subject of an accounting rule called Fin
10:54  12  46?
10:54  13     A. The only discussions I had were with Nick that
10:54  14  one time that I can remember being in New Zealand. As I
10:54  15  said, they were having a meeting, talking about the
10:54  16  business, and capital, and I remember them giving Scott a
10:54  17  presentation and Stephanie and I being a part of that,
10:54  18  and then Nick, you know, going through this audit and
10:54  19  having some questions.
10:54  20     Q. Is that the only instance you recall of Fin
10:54  21  46 --
10:54  22     A. That I can remember.
10:54  23     Q. -- being discussed?
10:54  24        Do you know what Fin 46 is?
10:54  25     A. No, I do not.

Page 55

10:54  1      Q. You mentioned earlier you had some occasion to
10:55  2   be in communication with representatives of the banks.
10:55  3   Do you remember any individuals' names with whom you were
10:55  4   in communication?
10:55  5      A. Oh, my goodness. There were a few.
10:55  6      Q. But you don't recall their names?
10:55  7      A. I remember one bank representative from BMO,
10:55  8   her name is Betsy. And there was another bank, like,
10:55  9   customer service rep that we communicated with from time
10:55  10  to time as it related to bank services, and I can't
10:55  11  remember his name.
10:55  12        There were a few. I don't recall.
10:55  13     Q. Were your duties and responsibilities
10:56  14  encompassing of needing to communicate with
10:56  15  representatives of the bank group?
10:56  16     A. I did from time to time.
10:56  17     Q. And I know you had several roles.
10:56  18     A. I did.
10:56  19     Q. What role or roles was this in furtherance of?
10:56  20     A. I was a check signer, so from time to time I
10:56  21  would sign checks. There was a third-party brought in
10:56  22  from the bank group to oversee the financial operations,
10:56  23  so they were very much -- they were on site the entire --
10:56  24  and I don't remember their name right now. It was a
10:56  25  third party that was brought in and we would review

Page 56

10:56  1   payables, we would review receivables, would talk about
10:57  2   immediate business needs for things that needed to be
10:57  3   today immediately, like payroll. That was my role. I
10:57  4   wanted to make sure payroll got funded each week,
10:57  5   especially during the processing season, because our
10:57  6   payroll dollars went ten times over versus what the
10:57  7   other, non-seasonal time of the year. And that was
10:57  8   toward the end when, you know, our finances became
10:57  9   severely strained.
10:57  10     Q. That was in late 2008, or was it in --
10:57  11     A. Late 2008, and then all the way until the end.
10:57  12  So I was a part of that group. Not part of that group,
10:57  13  but on that team, so I would present "This is what our
10:57  14  payroll dollars look like this pay period, this is what
10:57  15  benefits look like this pay period."
10:57  16        Again, we needed two check signers, so I would
10:57  17  sign checks if I were available. We would also sign the
10:57  18  weekly -- what was it called? If Shondale Seymour
10:58  19  weren't available, or Mark McCormick, I had the authority
10:58  20  to sign -- I can't remember what it's called. We had a
10:58  21  weekly something that we needed to sign.
10:58  22     Q. Did you ever have any communications with the
10:58  23  accounting firm Moss Adams?
10:58  24     A. I did.
10:58  25     Q. And in what connection did you have those

Page 57

10:58  1   communications?
10:58  2      A. Supporting audits.
10:58  3      Q. How did you support audits?
10:58  4      A. I supported audits based on if they needed
10:58  5   records to support the audit. Could be various business
10:58  6   records. I was interviewed from time to time, just
10:58  7   employment practices as it related to benefits, lines of
10:58  8   insurance, coverage, various things.
10:58  9      Q. With whom did you have communications at Moss
10:59  10  Adams?
10:59  11     A. The auditor that came out.
10:59  12     Q. Recall a name?
10:59  13     A. No, I don't.
10:59  14     Q. Was it a Mr. Nutley?
10:59  15     A. Possibly. I don't know.
10:59  16     Q. And same questions with regard to the
10:59  17  accounting firm of Stoughton Davidson?
10:59  18     A. It would have been along the same lines.
10:59  19     Q. You supported the audit?
10:59  20     A. I did.
10:59  21     Q. Do you recall who at Stoughton Davidson you
10:59  22  were in communication with?
10:59  23     A. I don't.
10:59  24     Q. Was it a man or a woman?
10:59  25     A. I don't even remember.

15 (Pages 54 to 57)

Merrill Corporation - San Francisco
800-869-9132                          www.merrillcorp.com/law
BMO 002079
c89a9fe9-8b08-48f8-a257-0038087ac26c

LISA   CRIST   - 8-17-2011

Page 58

| | | |
|---|---|---|
| 10:59 | 1 | MR. CHRISTMAS: Okay. I have no further direct |
| 10:59 | 2 | questions of this witness. |
| 10:59 | 3 | EXAMINATION BY MR. NUTI |
| 10:59 | 4 | Q. I'm Greg Nuti, I represent Brad Sharp. |
| 10:59 | 5 | A. Hi. |
| 10:59 | 6 | Q. Have you talked to Scott Salyer? |
| 10:59 | 7 | A. I have not. |
| 10:59 | 8 | Q. When was the last time? |
| 10:59 | 9 | A. Not since the filing of bankruptcy and going |
| 11:00 | 10 | through. I saw him at a couple court hearings for the |
| 11:00 | 11 | bankruptcy estate, and that's been it. |
| 11:00 | 12 | Q. Have you spoken to any of his lawyers? |
| 11:00 | 13 | A. I have. |
| 11:00 | 14 | Q. When? |
| 11:00 | 15 | A. I just recently spoke to John Keker last week. |
| 11:00 | 16 | Q. And that's in connection with? |
| 11:00 | 17 | A. The criminal investigation. |
| 11:00 | 18 | MS. WOODRUFF: And I'm going to object to this |
| 11:00 | 19 | line of questioning. This has nothing to do with the |
| 11:00 | 20 | 2004 exam, and you're not to go -- that's way -- |
| 11:00 | 21 | MR. NUTI: I just asked what it was about. |
| 11:00 | 22 | THE WITNESS: And I can't -- my attorney told |
| 11:00 | 23 | me anything related to the criminal case, absolutely |
| 11:00 | 24 | hands off. |
| 11:00 | 25 | /// |

Page 59

| | | |
|---|---|---|
| 11:00 | 1 | BY MR. NUTI: |
| 11:00 | 2 | Q. Anybody else besides John Keker? |
| 11:00 | 3 | A. No. |
| 11:00 | 4 | Q. Are you aware that Scott traveled to Australia, |
| 11:00 | 5 | New Zealand I guess right after the bankruptcy was filed |
| 11:00 | 6 | in May, 2009? |
| 11:00 | 7 | A. Possibly. He was out of touch for quite a |
| 11:00 | 8 | period of time during the bankruptcy, filing of the |
| 11:01 | 9 | bankruptcy, after the bankruptcy. I don't know the |
| 11:01 | 10 | extent of his travels. |
| 11:01 | 11 | Q. Well, he did travel to New Zealand and |
| 11:01 | 12 | Australia right around May 13th, 2009. Do you know |
| 11:01 | 13 | anything about that trip or why he went down there? |
| 11:01 | 14 | A. I do not. |
| 11:01 | 15 | MR. NUTI: I don't have any other questions. |
| 11:01 | 16 | MR. CHRISTENSEN: No questions. |
| 11:01 | 17 | MS. WOODRUFF: I have no questions. |
| 11:01 | 18 | THE WITNESS: Great. Am I free to go? |
| 11:02 | 19 | (Discussion off the record.) |
| 11:02 | 20 | MR. CHRISTMAS: Ms. Crist, since your counsel |
| 11:02 | 21 | is not here to advise you, but he probably will advise |
| 11:02 | 22 | you, you have the right to review, request and sign your |
| 11:02 | 23 | deposition transcript and provide us with any corrections |
| 11:02 | 24 | if anything was taken down incorrectly. So you don't |
| 11:02 | 25 | have to make that decision now, but I will be in contact |

Page 60

| | | |
|---|---|---|
| 11:02 | 1 | with your counsel. |
| 11:02 | 2 | THE WITNESS: Okay. |
| 11:02 | 3 | MR. CHRISTMAS: I assume, like most people -- |
| 11:02 | 4 | THE WITNESS: I want that right, yes. |
| | 5 | (The deposition of LISA CRIST was concluded at |
| | 6 | 11:02 a.m.) |
| | 7 | |
| | 8 | |
| | 9 | ---oOo--- |
| | 10 | I declare under penalty of perjury under the |
| | | laws of the State of California that the foregoing is |
| | 11 | true and correct. |
| | 12 | Executed at            , California on            , |
| | | 2011. |
| | 13 | |
| | 14 | |
| | 15 | LISA CRIST |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 61

| | |
|---|---|
| 1 | STATE OF CALIFORNIA   ) |
| | ) |
| 2 | COUNTY OF FRESNO      ) |
| 3 | |
| 4 | I, AMANDA SCOTT, Certified Shorthand Reporter |
| 5 | licensed in the State of California, License No. 13226, |
| 6 | do hereby certify that the foregoing proceedings was |
| 7 | reported by me and was thereafter transcribed under my |
| 8 | direction into typewriting; that the foregoing is a full, |
| 9 | complete and true record of said proceeding. |
| 10 | I further certify that I am not of counsel or |
| 11 | attorney for either or any of the parties in the |
| 12 | foregoing proceeding and caption named, or in any way |
| 13 | interested in the outcome of the cause named in said |
| 14 | caption. |
| 15 | In witness whereof, I have hereunto set my hand |
| 16 | and affixed my seal this day. |
| 17 | Date:  August 25, 2011 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | AMANDA SCOTT, CSR #13226 |
| 23 | |
| 24 | |
| 25 | |

16  (Pages 58 to 61)

c89a9fe9-8b08-48f8-a257-0038087ac26c

Plf's - Deft's Ex _____ 42
Depo of Lisa Crist
Date 8/17/11
AMANDA SCOTT, CSR

| | |
|---|---|
| **From:** | Gary Perry Law <gary@garyperrylaw.com> |
| **Sent:** | Wednesday, April 2, 2008 6:37 AM |
| **To:** | Lisa Crist <lisac@skfoods.com> |
| **Subject:** | Re: SKF Australia |

Let me confirm with Wayne. Gary
Gary Perry
gary@garyperrylaw.com
-----Original Message-----
From: "Lisa Crist" <lisac@skfoods.com>
Date: Tue, 1 Apr 2008 19:25:03
To:<gary@garyperrylaw.com>
Subject: SKF Australia
Hello Gary,

I'm here in NZ with Nick Frankish and we are questioning the dates of the resolutions, should they be November 1, 2007 vs. November 1, 2006? Nick mentioned talking about it in 2007 to get in front of the FIN 46 requirements.

I just wanted to double check before Scott signs them. If indeed the dates should reflect 11/1/07, I can make the changes.

Thank you for your clarification,

Lisa

Lisa Crist
EVP of Administration
SK Foods Group
1175 19th Ave
Lemoore, CA 93245-0160
(559) 924-6544 - Office
(559) 924-0178 - Fax
www.skfoods.com: <http://www.skfoods.com>

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, any disclosure, copying, distribution, or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail, and delete the original transmission and its attachments without reading or saving in any manner. We reserve the right to monitor all email communications. Although we believe this email and any attachments are virus-free, we do not guarantee that it is virus-free, and we accept no liability for any loss or damage arising from its use. Thank you.

**SHARP_CH15 000727**