# EXHIBIT 115

# In The Matter Of:

*CEDENCO JV AUSTRALIA PTY LTD, et al.*

## MARK MCCORMICK - Vol. I
### August 16, 2011

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oUo---

In re:                              )
                                    ) NO. 10-35002
                                    )
CEDENCO JV AUSTRALIA PTY LTD, et    )
al, (In Liquidation),               ) Chapter 15
                                    )
    Debtors in Foreign Proceedings. )
_____    )


---o0o---


Fresno, California                     August 16, 2011


        The deposition of MARK McCORMICK was taken in
the above-entitled matter pursuant to all of the
provisions of law pertaining to the taking and use of
depositions before Amanda Scott, CSR, with offices at
Fresno, California, commencing at the hour of 9:03 a.m.
at the law offices of McCormick, Barstow, Sheppard, Wayte
& Carruth, 5 River Park Place East, Fresno, California.

BMO 002083

Page 2

INDEX

EXAMINATION                                    PAGE
By Mr. Christmas                          6
By Mr. Nuti                          99
Further Examination By Mr. Christmas        112
By Ms. Woodruff                      115

EXHIBITS
NO.      DESCRIPTION                   PAGE
1    Deposition Notice                  6
2    Declaration of Mark M. McCormick        38
3    (Skipped)
4    General Assignment And Transfer of Shares
     Of SK Foods Australia, Pty Ltd.    43

5    General Assignment And Transfer of
     Member Interests Of SK Foods LLC   43
6    Declaration of Trust               44
7    November 1, 2006 Letter From Scott Salyer  44
8    Share Certificate                  44
9    Share Certificate                  44
10   Standard Transfer Form             44
11   Standard Transfer Form             44
12   Share/Option Transfer Journal      44
13   Collection of Worksheets           45
14   A-07 Engagement Review Memo        46

Page 3

INDEX CONTINUED

EXHIBITS
NO.    DESCRIPTION                   PAGE
15-19   (Skipped)
20    E-Mail Chain                   52
21-22   (Skipped)
23    E-Mail Chain                   58
24    E-Mail Chain                   60
25    September 13, 2007 E-Mail From Dan Nutley  61
26-27   (Skipped)
28    E-Mail Chain                   68
29    E-Mail Chain                   63
30-31   (Skipped)
32    Debt Subordination Agreement       64
33    Debt Subordination Agreement       64
34-52   (Skipped)
53    December 21, 2007 Letter From Scott Salyer  70
54    Financial Statements           75
55-56   (Skipped)
57    First Amendment to Amended and Restated
      Credit Agreement               85

58    E-Mail Chain                   73

59    February 18, 2008 E-Mail From Wayne Boos  88

60-61   (Skipped)

Page 4

INDEX CONTINUED

EXHIBITS
NO.    DESCRIPTION                   PAGE
62    E-Mail Chain                   89
63-69   (Skipped)
70    August 1, 2008 E-Mail From John Iacopi    80
71-97   (Skipped)
98    Special Purpose Financial Report      93
99    (Skipped)
100   Accounts Receivable Set Off Agreement    81
101   March 26, 2009 E-Mail From Jeanne Johnston 81
102   (Skipped)
103   E-Mail Chain                   81
104-110  (Skipped)
111   Lending Agreement              99
112   December 18, 2007 Letter From Gary Perry  107
113   January 14, 2008 Letter From Gary Perry   108

Page 5

APPEARANCES OF COUNSEL:
FOR THE SALYER ENTITIES:
    FARELLA, BRAUN & MARTEL
    Attorneys at Law
    235 Montgomery Street
    San Francisco, California 94104
    (415) 954-4400
    kwoodruff@fbm.com
    BY:  KELLY A. WOODRUFF
FOR THE LIQUIDATORS:
    NIXON PEABODY LLP
    Attorneys at Law
    437 Madison Avenue
    New York, New York 10022
    (212) 940-3000
    rchristnas@nixonpeabody .com
    BY:  ROBERT N.H. CHRISTMAS
FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
    DOWNEY BRAND
    Attorneys at Law
    621 Capitol Mall, 18th Floor
    Sacramento, California 95814
    (916) 520-5478
    jdreher@downeybrand.com
    BY:  JAMIE P. DREHER
FOR BRAD SHARP:
    SCHNADER, HARRISON, SEGAL & LEWIS
    Attorneys at Law
    One Montgomery Street, Suite 2200
    San Francisco, California 94104
    (415) 364-6717
    gnuti@schnader.com
    BY:  GREGORY C. NUTI
FOR THE BANK OF MONTREAL:
    CHAPMAN & CUTLER
    Attorneys at Law
    111 West Monroe Street
    Chicago, Illinois 60603
    (312) 845-3010

2  (Pages 2 to 5)

MARK MCCORMICK – 8/16/2011

Page 6

```
 1        BY: JAMES HEISER
 2    Also Present:  John Sheahan
 3             ---oOo---
 4          MARK McCORMICK
```

```
 6        been heretofore duly sworn,
 7          testified as follows:
 8             ---oOo---
 9      (Exhibits 1 and 2 were marked for
10    identification.)
11        EXAMINATION BY MR. CHRISTMAS
12    Q.  Good morning, Mr. McCormick.  As you know, I'm
13    Robert Christmas, I'm counsel to the liquidators in these
14    chapter 15 cases.  I'm going to be asking you a series of
15    questions.
16        Let me ask you, you've been deposed before?
17    A.  I have.
18    Q.  So you know the essential drill.  We can only
19    speak one at a time, otherwise the court reporter can't
20    take both of us down at once.
21        You'll probably anticipate what my question
22    might be, but let me finish my question because it may be
23    something different, so that will also help us from
24    talking across each other.  And you have to say "yes" or
25    "no."  The court reporter can't take down nods.
```

Page 7

```
 1        Just another thing is are you taking any
 2    medication today that interferes with your ability to
 3    remember or retell events?
 4    A.  No.
 5    Q.  Do you have any physical condition that
 6    interferes with your memory?
 7    A.  No.
 8    Q.  Can you tell me what post high school degrees
 9    you have.
10    A.  I have a bachelor of science degree in finance.
11    Q.  And what institution was that from?
12    A.  Cal State University Fresno.
13    Q.  Okay.  And what year were you awarded that
14    degree?
15    A.  1994.
16    Q.  And any other post high school degrees?
17    A.  No.
18    Q.  Any professional licenses?
19    A.  I have a license from State of California as a
20    certified public accountant.
21    Q.  And what year did you first obtain that
22    license?
23    A.  It was '89 or '90.
24    Q.  And have you ever practiced accountancy?
25    A.  I did.
```

Page 8

```
 1    Q.  Where did you do that?
 2    A.  In Fresno.
 3    Q.  Okay.  And for a firm, or on your own?
 4    A.  For a firm.
```

```
 6    A.  Stoughton Davidson.
 7    Q.  And what years were you at Stoughton Davidson?
 8    A.  '86 to '90.
 9    Q.  And were you in -- pardon me if I don't get
10    this precisely, but were you in the tax side of the
11    practice, or were you more in the audit side of the
12    practice?
13    A.  I was computer systems and litigation support.
14    Q.  And was that a group at Stoughton Davidson?  A
15    practice group?
16    A.  Sure, yes.
17    Q.  How long did you do that kind of work at
18    Stoughton Davidson?
19    A.  The entire time I was there.
20    Q.  Okay.  And I'm sorry, what year did you leave?
21    A.  Approximately 1990.
22    Q.  '90, okay.
23        And where did you work after that?
24    A.  I was consulting for my own practice with a
25    variety of small accounts here locally.
```

Page 9

```
 1    Q.  And also doing litigation support?
 2    A.  No, it was computer systems development for a
 3    generic pharmaceutical manufacturer, construction
 4    companies and agricultural farming practices.
 5    Q.  So is this like design of computer systems, or
 6    can you tell me what it was?
 7    A.  No, back at that time PCs and -- farming
 8    accounting systems were relatively new, so it was a
 9    conversion off of typically mid-range computer systems,
10    IBM 34s and 36s to a variety of different network
11    applications, using typically famous software for
12    agricultural companies, as well as different vertical
13    market software for construction companies and other
14    manufacturing businesses.
15    Q.  And so how long were you on your own after
16    1990?
17    A.  About three years.
18    Q.  And where did you go after that?
19    A.  I went to work for the Bruce Church Company in
20    Salinas.
21    Q.  And what's the Bruce Church Company?
22    A.  They became Fresh Express, they're a grower,
23    packer and shipper of commodity vegetables, which today
24    is prepackaged salad mix.
25    Q.  Like the salad bags?
```

3  (Pages 6 to 9)

MARK MCCORMICK - 8/16/2011

Page 10

1    A. Yeah.
2    Q. What was your first position there?
3    A. Corporate Controller.
4    Q. And can you sum up in a sentence or so what
5  your duties were as corporate controller?
6    A. Preparing financial statements, managing the
7  relationships with the growers and other suppliers,
8  interacting with various different operations or entities
9  including sales and marketing.
10   Q. And how long did you do that?
11   A. Three years.
12   Q. That takes us to about '96. Where did you work
13  after that?
14   A. Tanimura & Antle.
15   Q. And what did that firm...
16   A. They're the largest vegetable --
17  privately-owned vegetable shipper in the world.
18   Q. And how long were you there?
19   A. Until '99.
20   Q. And what was your job there?
21   A. Operations Controller.
22   Q. And were your duties similar to that at Bruce
23  Church?
24   A. Similar, but in addition I had responsibilities
25  for assisting their grower base with refinancing

Page 11

1  transactions.
2    Q. Refinancing as in bank financing?
3    A. Or lease financing, or whatever the case may
4  be, mortgage financing.
5    Q. And how long were you there?
6    A. '99.
7    Q. Oh, until '99.
8      Did you have the same position the whole time?
9    A. I did.
10   Q. Where did you go next?
11   A. I did a variety of consulting work for my own
12  account and for a small firm up in San Mateo.
13   Q. And how long did you do that?
14   A. Until 2006 or '7.
15   Q. And where did you go after that?
16   A. I entered into a business with Stewart Title.
17   Q. The land title company?
18   A. Mm-hmm.
19   Q. And what was that business?
20   A. We had a national insurance brokerage business
21  we established.
22   Q. Like commercial insurance?
23   A. Commercial, residential, bonds, insurance
24  products for real estate transactions nationally.
25   Q. And what was your title there, your position?

Page 12

1    A. President.
2    Q. And how long were you there?
3    A. We sold the business in late 2007, the onset of
4  the recession.
5    Q. And what was your next position?
6    A. I joined SK Foods.
7    Q. And what year was that?
8    A. September, '07.
9    Q. Were you employed by SK Foods or any of the
10  other entities?
11   A. SK Foods.
12   Q. So that would be SK Foods LP?
13   A. It would.
14   Q. And where was your office?
15   A. Monterey.
16   Q. And what was your position?
17   A. Executive Vice President and Treasurer.
18   Q. And what were your duties?
19   A. Essentially I assumed the responsibilities that
20  were being carried out by consultant David Hay. The
21  principal responsibilities were initially to manage the
22  refinancing transaction, and then subsequently became
23  interacting with the banks and legal representatives as
24  the business affairs of the company changed.
25   Q. And what changed at the business that caused

Page 13

1  the change in your duties?
2    A. There was a federal investigation that became
3  public in April, 2008.
4    Q. Okay. When did you first meet Scott Salyer,
5  Mr. Salyer?
6    A. Late July of '07.
7    Q. And how did you meet him?
8    A. I was referred to him, they called me.
9  Jeanne Johnston called the house and asked to meet with
10  me.
11   Q. And this was in connection with potential
12  employment?
13   A. Right.
14   Q. To whom did you report in your position?
15   A. Scott Salyer, until approximately August of
16  2008.
17   Q. And then did you report to someone else?
18   A. Richard Lawrence.
19   Q. Who is Mr. Lawrence?
20   A. He was nominated by Scott to take over the
21  day-to-day operations of the company, "company" meaning
22  globally.
23   Q. And how did Mr. Salyer's role change at that
24  point?
25   A. He had no day-to-day involvement with the

4 (Pages 10 to 13)

BMO 002086

MARK MCCORMICK – 8/16/2011

Page 14

1 business for approximately August, '08 forward. At least
2 not -- I didn't really communicate with him much.
3 Richard Lawrence may have, but I didn't.
4     **Q. And when did you leave SK Foods?**

6 Effective first week of April.
7     **Q. And why did you leave?**
8     A. I left because of a wire transfer that was
9 initiated without my notice, or approval, or consent.
10     **Q. And who was the wire transfer made out to?**
11     A. I have no idea.
12     **Q. But it was SK Foods' money being transferred?**
13     A. No, no.
14     **Q. Whose money was being transferred?**
15     A. SS Farms.
16     **Q. Was it the U.S. SS Farms, or?**
17     A. It was.
18     **Q. And who initiated the wire transfer?**
19     A. I left. I could only tell you by rumor, but I
20 don't want to speculate because I walked out the door.
21     **Q. I'm not asking you to speculate.**
22     **What was the amount?**
23     A. I couldn't tell you. It was a significant sum
24 of money.
25     **Q. And I assume from your answer that it was your**

Page 15

1 **function to decide those things, and someone overrode**
2 **that?**
3     A. It was.
4     **Q. Do you know who overrode it?**
5     A. No. I found out about the wire, I came into
6 this office, hired counsel. I went to the bank,
7 disclosed the transaction, and resigned.
8     **Q. Now, when you first joined SK Foods, did SK**
9 **Foods have a lender?**
10     A. They did.
11     **Q. Okay. And what did they finance in the**
12 **business?**
13     A. The long-term debt apportion was probably plan
14 equipment, working capital for inventory and receivables.
15     **Q. And what was the name of the lender, or was it**
16 **an agent? A syndicated facility?**
17     A. It was a syndicated facility when I joined at
18 the time. It was led by Bank of Montreal.
19     **Q. Was there a previous one with Harris Bank?**
20     A. I wouldn't know.
21     **Q. So Bank of Montreal was the agent bank at the**
22 **time?**
23     A. Right.
24     **Q. Do you know the members of the syndicate?**
25     A. The time I joined, it was Rabobank and LaSalle.

Page 16

1     **Q. And that changed at some point, didn't it?**
2     A. It did.
3     **Q. Do you know who the additional members were**
4 **added?**

6 closed soon after I arrived. Bank of Montreal remained
7 the agent. Wells Fargo, U.S. Bank, LaSalle and Bank of
8 the West were the participants.
9     **Q. And am I correct in understanding that Bank of**
10 **the West also provided separate financing to some other**
11 **member of the -- I'll call it the Salyer companies?**
12     A. They did.
13     **Q. And to what companies did they lend on their**
14 **own?**
15     A. Salyer American Fresh Foods and SS Farms.
16     **Q. Now, if we could just focus on your role with**
17 **respect to the banking, just start with the refinancing,**
18 **when did that refinancing occur?**
19     A. I don't know the specific date off the top of
20 my head, but I believe it was sometime in mid to latter
21 part of October when that transaction closed, of 2007.
22 You would have the records, so you know better than I.
23     **Q. Okay. And what was the purpose of the**
24 **refinancing?**
25     A. The original transaction closed the prior year

Page 17

1 and Rabobank gave notice, as I understand, I wasn't
2 there, just repeating what I was told. Rabobank gave
3 notice to bank of Montreal that they wanted to exit the
4 lending relationship, and in order to do so Bank of
5 Montreal's agent went and found successor banks.
6     **Q. So it wasn't -- the purpose of the refinancing**
7 **was not due to changed needs of SK Foods, it was due to**
8 **the...**
9     A. I don't know what the previous financing was, I
10 never focused on that transaction. As I understand it,
11 the major component piece of Rabobank wanted to exit the
12 relationship was their change in the nature of the
13 financing. It was certain that there was. There were
14 different amounts that were leant, there was different
15 interest rates, there was a different tenure, all of
16 those things, but I couldn't compare and contrast those
17 to the original lending agreement. I wasn't a part of
18 it, couldn't even speak to it, don't know.
19     **Q. And what month did you join in '07, did you**
20 **join SK Foods?**
21     A. September, '07.
22     **Q. So if I have it right, it closed the following**
23 **month?**
24     A. The first meeting that I went to with Bank of
25 Montreal, they came with a full commitment offering, so

5 (Pages 14 to 17)

MARK MCCORMICK - 8/16/2011

Page 18

1  it was negotiated prior to my even arriving.
2      Q. Now, when did you first have contact with Bank
3  of Montreal?
4      A. Within the first two weeks of September, '07.
5      Q. Okay. And how did you have that contact? Was
6  it in --
7      A. There was a meeting in Monterey at the Monterey
8  Jet Center.
9      Q. At the Monterey?
10     A. The Monterey Jet Center.
11     Q. What is that?
12     A. It's an office in Monterey.
13     Q. Okay. Who were the representatives of Bank of
14  Montreal at that meeting?
15     A. Probably six to eight people. Bill Bishop.
16     Q. If you can remember them, that would be
17  helpful.
18     A. Bill Bishop, Erica Kuhlmann, Betsy Erdelyi.
19     Q. Can you just slow down a little.
20         Bill Bishop, Erica Kuhlmann.
21     A. Betsy Erdelyi.
22     Q. E-R-D-E-L-Y-I, I think.
23     A. Carl Knudsen. Scott, whose last name I don't
24  remember. The lady in charge of the syndications group.
25     Q. Who is that?

Page 19

1      A. I don't recall her name. If you showed me a
2  list, I'd be able to tell you.
3         The president of the bank.
4      Q. Of the U.S. side, or from Canada?
5      A. I couldn't tell you. I would remember his name
6  if you showed me a list.
7         And one or two others.
8      Q. Do you know if anyone kept any notes or minutes
9  of that meeting?
10     A. They gave a presentation, so there's a Power
11  Point presentation that they provided.
12     Q. What was the purpose of this meeting?
13     A. Offer a fully underwritten commitment to SK
14  Foods for the financing of the -- refinancing of the
15  credit facilities.
16     Q. Was this as part of -- I'll use the phrase
17  "beauty contest" between different banks to compete for
18  lending possibility?
19     A. No.
20     Q. Was there a reason there was that many people
21  in attendance from BMO?
22     A. You'd have to ask them. I have no idea. I had
23  never met them before.
24     Q. So this was a several-hour presentation on the
25  commitment, or what happened at the meeting? I'm just

Page 20

1  asking.
2      A. They offered Scott Salyer $200 million senior
3  lending commitment.
4      Q. And was that accepted?
5      A. It was.
6      Q. Was there any significant negotiation of it
7  after, or was there...
8      A. There may have -- not with me. I'm sure there
9  were conversations with others.
10     Q. After this facility was closed, at some point
11  did you assume day-to-day responsibility for
12  communications with the bank?
13     A. Not initially.
14     Q. Who did that initially?
15     A. Chad Pinter.
16     Q. And who is he?
17     A. He was hired as the Chief Financial Officer.
18     Q. Okay. And did he leave the company, or did you
19  just assume more responsibilities?
20     A. He left the company.
21     Q. And when did he leave? Do you recall?
22     A. Shortly -- probably October or November of '07.
23     Q. Okay. And at that point, was that when you
24  assumed responsibility for communicating with the bank?
25     A. Not really. It wasn't until probably April or

Page 21

1  so of '08.
2      Q. And what happened in April, '08 to cause the
3  change?
4      A. Scott had hired Mike Hoverson as the Chief
5  Financial Officer. Mike left soon after the federal
6  investigation became public. David Hay was in New
7  Zealand, and I began working with the bank on an
8  hour-to-hour, day-to-day, week-to-week basis.
9      Q. Was your contact that frequent?
10     A. Yes.
11     Q. And why was it that frequent?
12     A. There was a variety of reasons. You know,
13  certainly what was the nature of the federal
14  investigation, what was the company doing about it.
15  These are all questions being asked by the bank. What
16  was the nature of the relationship with the customers,
17  has there been any fallout from the customers. And a
18  myriad of questions in and around employees, growers,
19  continuity of supply chain.
20         Further to that, they wanted regular and
21  frequent updates on just the general business affairs of
22  the company.
23     Q. So this was the nature of the communication at
24  the time that you took over responsibility. You didn't
25  have, let's say, a quieter period before that?

6 (Pages 18 to 21)

MARK MCCORMICK – 8/16/2011

Page 22

1    A. No, I wasn't working on that. I was working on
2    another transaction with Salyer American Fresh Foods for
3    a very short period of time. I wasn't the
4    moment-to-moment, day-to-day operations person. It was

6        Q. So would I correctly understand it that you
7    became the primary contact for Bank of Montreal at that
8    point?
9        A. In the spring of '08.
10       Q. And how did you communicate with the bank of
11   Montreal?
12       A. Phone and e-mail, meetings when they were in
13   California or when we were in Chicago.
14       Q. And who were the people with whom you
15   communicated?
16       A. Erica Kuhlmann, Betsy Erdelyi.
17       Q. I'll get to asking about these people.
18       Okay. Erica Kuhlmann, C-O-L-E-M-A-N?
19       A. K-U-H-L-M-A-N-N.
20       Q. Okay. Betsy Erdelyi?
21       A. "Erdelyi."
22       Q. Those are the two main people?
23       A. Yeah. From time to time there was conversation
24   with Bill Bishop, although not frequently. And other
25   members of Bank of Montreal from time to time.

Page 23

1        Q. What was Erica's title?
2        A. She was a sector head for North America Food
3    and Beverage, or Food and Ag, I'm not sure of the title
4    of the group.
5        Q. And Betsy?
6        A. Managing director for the same group.
7        Q. So who was the superior?
8        A. Erica.
9        Q. At that point in time what e-mail system or
10   software did SK Foods use? Outlook?
11       A. Sure, Outlook.
12       Q. Okay. And was there a server on which that
13   operated?
14       A. I'm assuming so. You'd have to ask the IT guy.
15       Q. Who was the IT guy?
16       A. I would tell you that there was an IT group,
17   Dan Cline was involved at one point in time, and a guy
18   named Jose whose last name I can't remember. And he had
19   a variety of people working for him.
20       Q. Do you know anything about whether e-mails were
21   backed up?
22       A. I have no idea.
23       Q. Okay. How about word processing and financial
24   documents, Excel? Do you know if that was done on a
25   networked basis or whether they worked out of individual

Page 24

1    PCs?
2        A. I don't know the specifics. I mean, I'm
3    assuming that, you know, the majority of the work was on
4    the network, but you would also have to assume that other

6    because I don't know.
7        Q. Did you have a work-issued laptop?
8        A. I did.
9        Q. Do you know what happened to that laptop?
10       A. I returned it.
11       Q. Did you save things individually on that laptop
12   apart from the network?
13       A. I couldn't tell you.
14       Q. You don't recall?
15       A. I don't recall.
16       Q. Okay. Was there a way to do -- well, say a
17   dial-up if you were working at home? Was there a way --
18       A. Not that I ever knew or was involved in.
19       Q. Were your communications with Bank of Montreal
20   via e-mail, did you ever print them out, put them in a
21   file cabinet?
22       A. No.
23       Q. As part of the -- let me just set aside the
24   questions about the investigation that the bank had. Can
25   you describe the regular review process, if there was

Page 25

1    one, if you could separate those things out, if possible,
2    of financial statements, performance of the company. Did
3    you have a process for that, can you describe that?
4        A. You would have to ask the Chief Financial
5    Officer, because that wasn't my role or responsibility,
6    so that would go back to Shondale or to others.
7        Q. Okay. So for example, the provision of
8    financial statements was not part of what you were doing?
9        A. No.
10       Q. Was there any sort of overlap at some point
11   between you and Shondale on what the bank needed to
12   extend or do anything in terms of the lending
13   relationship, the actual numbers of the relationship?
14       A. You have to ask the question differently. I
15   don't understand what you're asking me.
16       Q. So they were asking questions about the
17   investigation, the operations of the business, and did
18   that continue on a regular basis?
19       A. Until effectively the day I left.
20       Q. Okay. So how did you divide between you and
21   Shondale what you were responding to? Did you say "Well,
22   you'll have to ask Shondale about that, I'm not working
23   on that," or give me an example?
24       A. Sure, and there were some conference calls we
25   held together, but I was not involved in the day-to-day

7 (Pages 22 to 25)

MARK MCCORMICK - 8/16/2011

Page 26

1  of SK Foods. I spent the majority of the time working on
2  budgets, forecasts, grower contracts, customer contracts.
3  I went on a nationwide tour with Richard Lawrence and
4  Jim Kendry, visited the majority of the largest
5  customers. I wasn't in the office and I wasn't dealing
6  with the moment-to-moment, day-to-day aspects of the
7  accounting or the general ledger. I was with the lawyers
8  damn near daily, or at least it felt that way, sometimes
9  moment to moment.
10     **Q. And these were civil lawyers and criminal**
11  **lawyers?**
12     A. Oh, yeah.
13     **Q. Did you ever attend -- well, let me withdraw**
14  **that and rephrase it.**
15     **Did BMO have periodic review meetings in terms**
16  **of renewing or extending credit?**
17     A. I'm not sure I understand your question, but
18  let me interpret your question and answer. It wasn't
19  about renewing or extending credit. There was a meeting
20  in September of '08, the company had additional working
21  capital based upon an increase in the price of tomatoes
22  that needed to be contracted from the growers.
23     **Q. So you attended that meeting?**
24     A. I did attend that meeting.
25     **Q. And who was in attendance at that meeting?**

Page 27

1     A. Sir, there was probably 50 people in that
2  meeting.
3     **Q. Not all from BMO?**
4     A. No. Most of the people -- there were
5  representatives from almost every bank group in that
6  meeting, as well as other presenters, as well as lawyers.
7  There was many, many people.
8     **Q. Apart from that meeting did you have any**
9  **contact with the other members of the bank group?**
10     A. I did.
11     **Q. You did. So BMO didn't act as sole emissary?**
12     A. In what regard?
13     **Q. What was the reason you had contact with the**
14  **individual members as opposed to just the agent?**
15     A. We had banking relationships outside of SK
16  Foods with Bank of the West, so I met with them regularly
17  with regard to Salyer American Fresh Foods. There was
18  leasing agreements with Bank of the West and SS Farms on
19  tomato harvest equipment.
20     Wells Fargo Bank had regular commercial deposit
21  relationships. We met with them as well. There were a
22  variety of reasons to meet with the other members of the
23  bank group.
24     **Q. And was there an ultimate result of the**
25  **September, '08 meeting?**

Page 28

1     A. They extended additional credit, meaning the
2  bank group as a whole.
3     **Q. Were there any other periodic meetings**
4  **regarding the facility that you attended with BMO?**
5     A. They invited me to a golf tournament in Kohler,
6  Wisconsin. We attended a luncheon in Chicago. So when
7  you ask about meetings, I'm not quite sure I understand
8  what the point of your question is.
9     **Q. Well, I'm just trying to ascertain the ordinary**
10  **course, if there was an ordinary course, of this lending**
11  **relationship at that point, whether you attended the**
12  **meetings -- did Shondale have such meetings, periodic**
13  **meetings with the bank?**
14     A. Telephonic meetings or phone calls, you know,
15  regularly.
16     **Q. She did?**
17     A. Yeah. She and others, prior to my joining SK
18  Foods. There were multiple weekly calls. Once there, I
19  didn't know the people, didn't participate in the calls,
20  but I was aware that they took place.
21     **Q. But after you assumed this greater**
22  **responsibility, you didn't attend every phone call that**
23  **Shondale had with the bank?**
24     A. No.
25     **Q. But you were aware that she had such contact?**

Page 29

1     A. I was.
2     Let me footnote that comment. There were
3  others that had calls to the bank as well, which would be
4  Richard Lawrence, David Hay.
5     **Q. And Mr. Pinter, when he was CFO?**
6     A. Sure. And immediately prior to my departure
7  there was a consultant firm hired, FTI, which took over
8  all the communications with the bank. So there were many
9  others besides myself, including lawyers and other
10  consultants that had communication with the bank.
11     **Q. So from the time you assumed responsibility for**
12  **this part of communicating with the bank until you left**
13  **the company, did that change? Did your responsibilities**
14  **with respect to responding to the bank change, like**
15  **become greater or lesser in any way?**
16     A. I'm not sure I understand your question.
17     **Q. Well, it seems that you had to answer an**
18  **onslaught of telephone calls and e-mails and questions**
19  **about operational matters. Am I summarizing your**
20  **testimony fairly?**
21     A. No, you're not summarizing it correctly.
22     **Q. Okay. Well, it was primarily, then, I guess it**
23  **was focused on the investigation as well really, was it**
24  **not?**
25     A. Much of my responsibility was focused on the

8 (Pages 26 to 29)

MARK MCCORMICK — 8/16/2011

Page 30

1   investigation and responding to inquiries from a variety
2   of different sources.
3      Q. I guess what I'm trying to ask is did that
4   change between the time you started doing that and the
6      A. Sir, I don't understand your question. I just,
7   I'm asking you to rephrase it.
8      Q. I mean, did what you were supposed to do,
9   interfacing between BMO and the company, did that change?
10  Did you step back from it at any point, did you take on
11  anything from Shondale that she was doing on a regular
12  basis?
13     A. No, I did not take on the stuff from Shondale.
14  Shondale continued in that moment-to-moment, day-to-day
15  stuff. Was I aware of what Shondale was doing?
16  Certainly aware in the general sense. Was I involved in
17  the detail, no.
18        I spent a considerable amount of time dealing
19  with some of the farming company issues, whether it was
20  Salyer American Fresh Foods or SS Farms, for example.
21  Those businesses had different challenge as well, but
22  emanating from the same issue, what's going on with the
23  investigation.
24     Q. Just to finish your CV, where did you go to
25  work after you left SK Foods?

Page 31

1      A. I went to work for Triangle T Ranch.
2      Q. And is that where you're working today?
3      A. No.
4      Q. How long were you at Triangle T?
5      A. Until May, 2010.
6      Q. Where did you go after that?
7      A. I am employed by Stewart Title Company, and I
8   also do some consulting work.
9      Q. Did you ever tell Ms. Seymour that she was not
10  allowed to communicate with Bank of Montreal?
11     A. I don't know that I did or didn't. I don't
12  recall.
13        MR. CHRISTMAS: The court reporter, I believe,
14  has marked Exhibits 1 and 2 to your deposition. If you
15  could hand that to the witness.
16  BY MR. CHRISTMAS:
17     Q. Mr. McCormick, just turning to Exhibit 2, do
18  you recall receiving this subpoena?
19     A. I believe I received this electronically.
20     Q. Okay. And did you undertake a search for
21  documents responsive to this?
22     A. I -- no. I have no documents.
23     Q. So everything that you had with respect to SK
24  Foods was left at SK Foods?
25     A. I walked out the door. I have no idea where

Page 32

1   the documents are.
2      Q. So you didn't take any documents with you?
3      A. Nothing.
4      MR. NUTLI: Which is 1 and which is 2?
6   BY MR. CHRISTMAS:
7      Q. Do you recall the issue -- let me ask you this
8   first: Are you familiar with an accounting regulation
9   called Fin 46?
10     A. I am.
11     Q. When did you first hear about that?
12     A. Summer of '07.
13     Q. And in what connection did you hear about it?
14     A. With respect to SK Foods.
15     Q. And did you read about it, or did someone
16  communicate about it to you?
17     A. Both.
18     Q. Who was that?
19     A. The auditors, Dan Nutley, Abigail Pike of Moss
20  Adams.
21     Q. And do you recall what they told you?
22     A. No.
23     Q. Was this something that needed to be addressed
24  by the company, by SK Foods?
25     A. I don't understand. Can you ask the question

Page 33

1   differently.
2      Q. Was Fin 46 something that required action by SK
3   Foods?
4      A. I'm not sure I understand your question. I
5   mean, Fin 46 is an accounting principle which discusses
6   variable interest entities, right?
7      Q. Understood.
8      A. The issue with respect to SK Foods was the --
9   and the point of this deposition, was the bank group did
10  not want the Cedenco and other related foreign entities
11  consolidated into the financial statements of SK Foods.
12  There's an issue with respect to Fin 46 about whether or
13  not Fin 46 is even applicable.
14     Q. To SK Foods?
15     A. Right.
16     Q. And what's the issue about it not being
17  applicable? Is there a fact that doesn't apply, or can
18  you explain that?
19     A. No, you would have to go to the auditors.
20  There was an ongoing series of conversations that
21  happened well before I got there about whether it applied
22  or didn't apply.
23     Q. And did the auditors take the position that it
24  did apply?
25     A. You'd have to ask them.

9  (Pages 30 to 33)

MARK MCCORMICK - 8/16/2011

Page 34

1   Q. You don't know who took what position?
2   A. No.
3   Q. Okay. But ultimately did the management of SK
4   Foods decide that actions were going to have to be taken
5   to address Fin 46?
6   A. I think the actions were taken prior to me
7   getting there. It was the decisions and choices and
8   options were all fully vetted long before I got there
9   with respect to Fin 46. Some of those issues had to do
10  with tax reporting, both domestically and
11  internationally. Some of them had to deal with financial
12  reporting domestically and internationally. All of those
13  conversations occurred many, many months, if not longer,
14  before I arrived.
15      The issue was, you know, how to fold those
16  decisions into SK Foods such that the desired tax results
17  and financial reporting and presentation met the
18  objectives of all the parties.
19      Q. So when you first started working at SK Foods,
20  the actual implementation of those decisions had not
21  taken place. Is that fair to say?
22      A. I think the decisions had been made, but I
23  don't know that the implementation, if you will, I don't
24  know what that word means in the context of your
25  question. I don't really know how to respond to that,

Page 35

1   but I would say no, they had not.
2      Q. Among the things that had to take place, did
3   that include changing the ownership relationship between
4   the U.S. company and the Australian companies?
5      A. You know, honestly, I can't answer that because
6   I wasn't really involved in the ownership, and don't know
7   the answer to that question. The focus I had was on the
8   notes going back and forth, the promissory notes between
9   the two companies, or however many companies were
10  involved.
11     Q. And why was that your focus?
12     A. It was the bank's focus, and the credit
13  agreement that was negotiated, those notes were frozen
14  and subordinated, both domestically and internationally.
15     Q. And do you have an understanding as to whether
16  or not the intercompany debt was impacted by Fin 46 for
17  SK Foods?
18     A. I have no clue.
19     Q. Do you know why the notes were subordinated and
20  frozen?
21     A. That was decided long before I even met these
22  people.
23     Q. So what did you have to do with respect to
24  those notes? If it was decided previously, what was your
25  role with respect to the notes when you came on board?

Page 36

1      A. If they're subordinated and frozen, why would
2   you account for any or accrue for any additional interest
3   on both sides of the transaction? Why would you account
4   for foreign exchange fluctuations between the U.S.
5   entities and the Australian entities? It seemed to me to
6   be an enormous waste of time to record paper entries that
7   were going nowhere, so to speak.
8      Q. So that was what was happening, and I take it
9   you voiced disagreement with what was happening?
10     A. Sure.
11     Q. And who did you communicate that to?
12     A. The auditors, Dan Nutley, Abigail Pike maybe
13  maybe not, I don't recall. Certainly discussion was had
14  with the other constituents to the conversation,
15  Nick Frankish in New Zealand, David Hay. I would think I
16  would have talked to the bank about it as well, not sure
17  who, but would have had those conversations.
18     Q. Was your disagreement with the accrual and
19  related aspects of booking the notes, or was it that in
20  some fashion these were being treated as performing
21  notes?
22     A. I don't understand your question. My
23  disagreement was it makes no sense to me to report
24  accruals on a monthly basis for either foreign exchange
25  gain or loss, or accrued interest. If the notes were

Page 37

1   frozen, all payments were frozen. It was simply an
2   accounting for nothing. Typically, that accounting would
3   be done at year-end for audit purposes, but on a
4   month-in, month-out basis, I don't understand the point.
5      Q. Who was insisting that that be done?
6      A. Nobody was insisting that it was done, it was
7   just a prior practice of the company over years since the
8   inception of the note or the notes. There wasn't any
9   insistence by anybody. I felt it was busywork and
10  completely irrelevant and a complete waste of time.
11     Q. Did it cease?
12     A. I believe so. I don't know. I have no idea
13  what happened in Australia, New Zealand, had no
14  involvement with those companies. You'd have to review
15  the records with Shondale to see if she discontinued the
16  accruals.
17     Q. I think I neglected to do this. Exactly which
18  notes are you referring to? Which notes were subject to
19  this accrual?
20     A. I think from recollection, and only from
21  recollection, right, I believe there were two notes to
22  Australia and New Zealand. I'm not sure which company.
23  There were two notes coming back from Australia and
24  New Zealand to SK Foods, and I don't know which companies
25  they were coming from.

10 (Pages 34 to 37)

MARK MCCORMICK - 8/16/2011

Page 38

1    Q. Do you recall amounts?
2    A. No, I physically had the original notes in my
3    hand at one point in time, okay, and those were seized by
4    the federal government. So I've only had those notes in
6    original copies of them, and I've seen them. But I can't
7    tell you today what the amounts were, nor can I tell you
8    who the parties were on the notes. If I saw them, I
9    could tell you if those were the ones I saw. I don't
10   know today.
11       MR. CHRISTMAS: Fair enough.
12       Let's mark this next in order.
13       Off the record.
14       (Discussion off the record.)
15       (Exhibit 2 was withdrawn.)
16       (Exhibit 2 was marked for identification.)
17   BY MR. CHRISTMAS:
18       Q. Mr. McCormick, the court reporter has handed
19   you a document that has been marked as Exhibit 2 to your
20   deposition for identification.
21       Do you recognize this document?
22   A. I do.
23       Q. Can you tell me who prepared it?
24   A. These are my words. I mean, who typed it?
25       Q. Yeah.

Page 39

1    A. I don't know who physically typed it.
2    Q. Did you draft it?
3    A. I did not draft it.
4    Q. Who drafted it?
5    A. I believe it was Andy Miller.
6    Q. Is he an attorney?
7    A. She is.
8    Q. And what firm is she with?
9    A. Nageley, Meredith & Miller.
10   Q. And who was that firm representing at that
11   point in time this was executed?
12   A. You'd have to ask them.
13   Q. Do you know the reason why it was prepared?
14   A. I don't recall.
15   Q. If we could just draw your attention to the
16   paragraph four, the sentence that begins about four lines
17   up, it says there "BMO specifically requested that the
18   Cedenco entities be separate from U.S. operations, as
19   they were not part of the borrowing group in the U.S.A."
20       What is the basis for that statement? What's
21   your understanding of the basis --
22   A. I talked to the lady in charge of the
23   syndications group.
24   Q. And who is that?
25   A. If you showed me the list of people I would

Page 40

1    know her name. I don't recall, but I can see her in my
2    mind's eye.
3    Q. You spoke to her?
4    A. Right.
6    A. On the phone, although I met her face-to-face
7    several times.
8    Q. And do you recall when this conversation
9    occurred?
10   A. September. Late September of '07.
11   Q. And do you recall what she said to you?
12   A. That they were going to syndicate this loan and
13   that the Cedenco companies, they needed the financial
14   statements, the completed and audited financial
15   statements of SK Foods, which had not been issued yet,
16   and that the Cedenco companies were not part of the
17   borrowing group and had nothing to do with the business,
18   and there was no collateral supportive of the lending
19   facility offered by Bank of Montreal, and that having
20   Cedenco consolidated in the financial statements of SK
21   Foods made no sense. And the bank clearly did not want
22   Cedenco consolidating the financial statements.
23   Q. So let me just try to break this down. She
24   wanted them separated -- the bank wanted them separated
25   from the financial statement?

Page 41

1    A. The bank did not want Cedenco financial
2    statements, had no interest in Cedenco whatsoever.
3    Q. And among the reasons -- did she give you
4    reasons for that?
5    A. That it made the financial statements confusing
6    for the purposes of syndicating the credit facility.
7    Q. And you said she addressed the issue of
8    collateral. She stated that they were not part of the bank
9    group's collateral, BMO?
10   A. Right.
11   Q. And I mean the U.S. bank group.
12   A. Right, that's correct.
13   Q. So did you have any other conversations with
14   her about this issue at any other point in time?
15   A. No.
16   Q. How about anybody else at BMO?
17   A. Erica Kuhlmann, Betsy Erdelyi would be the
18   primary people.
19   Q. So this issue came up more than one time?
20   A. Well before arrived at the company. Perhaps as
21   long as a year before I got there. Maybe even longer.
22   Q. And how do you know that it was discussed
23   previous to your --
24   A. I had conversations with David Hay,
25   Shondale Seymour, Scott Salyer.

11 (Pages 38 to 41)

MARK MCCORMICK - 8/16/2011

Page 42

1    Q. And your conversations with them, was it in the
2  nature of confirming what you had been told, or did they
3  raise the issue with you after you joined the company?
4    A. No, they brought me up to date on what the
5  conversations had been over the prior year. I made
6  inquiries as to the obvious inquiries as to why we're
7  going through a refinancing transaction after the
8  original credit facility had been in place for such a
9  short period of time. What's the nature of the
10  relationship between the company, what's the nature of
11  the relationship between the bank group. A whole series
12  of questions about -- that summarizes to where the hell
13  are we, and in the context of those conversations with
14  numerous people, these conversations brought up many
15  points, one of which is Cedenco stands on its own. It
16  has its own banking facilities, it has its own
17  management, it has its own customers, it has its own
18  auditors. It shares nothing in any form of commonality
19  with SK Foods.
20    Q. And did that ultimately happen, were the
21  financial statements prepared with -- excluding the
22  Cedenco group?
23    A. I believe that's true.
24    Q. And that happened while you were there?
25    A. Yes.

Page 43

1    MR. CHRISTMAS: We're going to mark some
2  documents now. We're going to skip some numbers again.
3  This is 5 -- wait, no. Is that right?
4    Sorry about this.
5    Well, actually, let me pull out the index and
6  that will help me.
7    Yeah, this is 5.
8    (Exhibit 5 was marked for identification.)
9  BY MR. CHRISTMAS:
10    Q. Mr. McCormick, the court reporter has handed
11  you Exhibit 5 for identification to your deposition. Do
12  you recognize this document?
13    A. No.
14    Q. Have you ever seen an unsigned version of this
15  document?
16    A. No.
17    MR. CHRISTMAS: Let's call this 5A, they're two
18  different ones.
19    Yeah, it was 4. We'll remark this as 4, this
20  is 5. SK Foods Australia is 4, and this one, SK Foods
21  LLC is 5. We've got to go by that.
22    (Exhibit 5 was withdrawn.)
23    (Exhibits 4 and 5 were marked for
24  identification.)
25  ///

Page 44

1  BY MR. CHRISTMAS:
2    Q. The court reporter has handed you Exhibit 5 to
3  your deposition. Have you ever seen this document
4  before?
5    A. No.
6    Q. Have you ever seen it in blank?
7    A. No.
8    MS. WOODRUFF: Robert, I don't have Exhibit 5.
9    MR. CHRISTMAS: Oh, I'm sorry.
10    MS. WOODRUFF: Thank you.
11    MR. CHRISTMAS: This is 6.
12    (Exhibit 6 was marked for identification.)
13  BY MR. CHRISTMAS:
14    Q. Mr. McCormick, the court reporter has handed
15  you Exhibit 6 for identification to your deposition.
16  Have you ever seen this document?
17    A. I've never seen this document.
18    MR. CHRISTMAS: That's fine.
19    We'll speed this up, mark some more. Let's
20  just mark some for a few minutes. This is 7, this is 8,
21  this is 9, this is 10. 11 is the share transfer by SKPM.
22  And lastly, this is 12.
23    (Exhibits 7, 8, 9, 10, 11 and 12 were marked
24  for identification.)
25  ///

Page 45

1  BY MR. CHRISTMAS:
2    Q. Mr. McCormick, I'm now going to go through a
3  series of documents that have been marked, and I'll read
4  them off and ask you if you could draw your attention to
5  each of them, and I'll ask you if you've seen each of
6  them.
7    The first is Exhibit 7, I believe is in front
8  of you, it's a two-page document. Have you ever seen
9  that before?
10    A. I've never seen this document.
11    Q. How about Exhibit 8, the share certificate?
12    A. I've never seen Exhibit 8.
13    Q. How about Exhibit 9?
14    A. I've never seen Exhibit 9.
15    Q. Exhibit 10?
16    A. I've never seen Exhibit 10.
17    Q. 11?
18    A. I've never seen Exhibit 11.
19    MR. CHRISTMAS: This is 13.
20    (Exhibit 13 was marked for identification.)
21  BY MR. CHRISTMAS:
22    Q. Mr. McCormick, the court reporter has handed
23  you Exhibit 13 to your deposition. Do you recognize
24  this, the format of this document?
25    A. No.

12 (Pages 42 to 45)

MARK MCCORMICK - 8/16/2011

Page 46

1     Q. Have you ever seen a document that looks like
2  this at SK Foods?
3     A. I've never seen this document. Am I familiar
4  with accounting journal entries, I am. But have I seen

6     Q. Have you seen a document similar to this at SK
7  Foods, do you have a recollection?
8     A. No.
9        Let me be more specific. I wasn't employed by
10 the company, I have never seen these documents.
11    Q. You weren't employed by the company when?
12    A. As of the date of these documents. I don't
13 know what they are. I mean, they're obviously accounting
14 work papers, but I've never seen these before.
15       MR. CHRISTMAS: Okay. This is 14.
16       (Exhibit 14 was marked for identification.)
17 BY MR. CHRISTMAS:
18    Q. Mr. McCormick, the court reporter has handed
19 you Exhibit 14 for identification to your deposition.
20 Have you seen this document?
21    A. I need a moment to read this.
22       I have -- to be responsive to your question,
23 no, I've never seen this before, although I'd like to
24 take a moment to read it.
25    Q. Sure.

Page 47

1     A. Okay. I've never seen that before.
2     Q. If I could just draw your attention, though,
3  before you put it away, to the second page. One, two,
4  three, four paragraphs down, it says "Effective
5  November 1, 2006, the company distributed their
6  investments in the New Zealand and Australia subsidiaries
7  to the partners at the carrying value of the
8  investments."
9        As of the date that's on the front of this
10 document, June 30, 2007, now I know you joined the
11 company a few months after that, but do you know whether
12 documentation, legal documentation that would have the
13 effect of conveying the ownership interest had been
14 prepared at that point?
15       MS. WOODRUFF: Objection. Vague and ambiguous
16 as to "that point." Also misstates the evidence as the
17 document is not dated June 30, 2007, it's dated
18 January 10th, 2008 or January 14, 2008, is the date that
19 it was signed.
20       MR. CHRISTMAS: We can break that down.
21 BY MR. CHRISTMAS:
22    Q. As of the point that you joined SK Foods, do
23 you know if the documentation to effect the distribution
24 of the investments as stated in that paragraph had been
25 completed?

Page 48

1     A. I don't know the answer to that question.
2  That's a legal question for the lawyers that were
3  involved in that transaction. So I would defer to those
4  that were party to the actual transaction.

6  point in time.
7     A. No, I don't know.
8     Q. How about the later, the signature date of the
9  document, in January of '08?
10    A. I don't know the answer to that question. I
11 would tell you that it had to have been done prior to the
12 issuance of the financial statements. Okay?
13    Q. And why is that?
14    A. Well, because the bank made the loan that
15 closed in October, and they wouldn't have made the loan
16 without the financial statements. And the auditors
17 wouldn't have issued the financial statements until the
18 transactions were completed. So it had to have happened
19 in October of '07, at the absolute latest. All right?
20 So did it happen in early '08, I have no idea, but it's
21 highly, highly unlikely.
22    Q. Do you --
23    A. I know the decisions were made to do this well
24 before I ever got there. Do I know when the documents
25 were actually signed, no. But I would tell you it

Page 49

1  happened prior to the issuance of the financial
2  statements.
3     Q. Did you have any conversations with anybody
4  about the documents being completed to effect the
5  transfer?
6     A. I know that they were being done. That
7  conversation happened between Dan Nutley and Gary Perry.
8     Q. And what's your understanding of Mr. Perry's
9  role?
10    A. He was attorney to the company, counsel to the
11 company.
12    Q. Did you ever have any direct conversations with
13 Mr. Perry about the preparation of the transfer
14 documents?
15    A. I know that they were being prepared.
16 Dan Nutley and Gary Perry knew each other professionally
17 for many, many years before, and Dan Nutley contacted
18 Gary Perry.
19    Q. And this is because Mr. Nutley told you that,
20 or how do you know that?
21    A. He told me that.
22    Q. Dan Nutley told you that?
23    A. Dan Nutley told me that. Dan Nutley provided a
24 "solution" to the Fin 46 issue.
25    Q. What was your role with respect to

13 (Pages 46 to 49)

MARK MCCORMICK - 8/16/2011

Page 50

1  communications between the company and the outside
2  auditors at Moss Adams?
3      A. It was limited with respect to Moss Adams until
4  the last, oh, I'd say two or three weeks before the
5  financial statements were issued and the loan closed.
6  The pressure from the bank group to close the loan was
7  significant. They'd already issued the full commitment
8  offer, as I described, when I first joined the company,
9  and they needed the financial statements in order to
10 complete their underwriting, I would assume.
11     Q. And to complete the financial statements, the
12 structure of the transfer of the offshore, Australian,
13 New Zealand entities had to be determined. Is that
14 right?
15     A. No, there were many other issues to complete
16 the financial statements. Shondale had work that she was
17 wrapping up. There were a variety of day-to-day
18 functions that needed to be done as well. But to your
19 point, yes, there were probably -- I'm guessing, and I
20 know I shouldn't guess, but there were --
21     Q. Only if you know.
22     A. All I know is there were three or four
23 different options with respect to dealing with foreign
24 tax issues, dealing with how would the transaction, or
25 when would the transaction be approved by whatever nature

Page 51

1  that transaction was, be approved by the foreign bank
2  group. There were a variety of mechanical issues that
3  the accountants, both tax accountants and auditors, as
4  well as lawyers, needed to resolve.
5      And so that prompted Dan Nutley to speak with
6  Gary Perry once a solution was identified in order to
7  effectuate the transaction.
8      Q. Were you part of the back-and-forth between
9  Mr. Salyer and Moss Adams about how to structure the
10 transfer and address Fin 46?
11     MS. WOODRUFF: Objection. Assumes facts not in
12 evidence. I think the back-and-forth was between
13 Mr. Salyer and Moss Adams.
14     THE WITNESS: I attended probably two meetings
15 with Dan Nutley and Scott Salyer. Those meetings were
16 not necessarily about the details of Fin 46, although Fin
17 46 came up in the context of it's not applicable to
18 privately-held companies, we have nothing to do with
19 respect to SK Foods or SKPM with the operations of
20 Cedenco, and he expressed his frustration over the delays
21 in getting the financial statements issued such that the
22 bank financing could be completed.
23 BY MR. CHRISTMAS:
24     Q. Mr. Salyer was frustrated?
25     A. Everyone was, including Mr. Nutley.

Page 52

1      Q. But the financial statements were ultimately
2  issued, correct?
3      A. They were. So to answer your question
4  specifically, yes, I was involved in one or two meetings
5  with Scott Salyer and Dan Nutley, but they were not of a
6  specific nature to a transaction. They were about we
7  need to get these issued resolved so the financial
8  statements can be issued to satisfy the reporting
9  requirements to the bank.
10     MR. CHRISTMAS: This is 20.
11     (Exhibit 20 was marked for identification.)
12 BY MR. CHRISTMAS:
13     Q. Mr. McCormick, the court reporter has handed
14 you Exhibit 20 to your deposition. It's a series of
15 e-mails starting with an e-mail from Abigail Pike at Moss
16 Adams, and it appears that you're not copied until the
17 end, in the last e-mail which is at the top, an
18 August 24, 2007 e-mail at 10:06 a.m.
19     Is this e-mail from -- it appears to be to you
20 from Mr. Salyer. Is that correct?
21     A. That's correct.
22     Q. I notice that you don't seem to be copied on
23 the prior e-mails. Why is he communicating this e-mail
24 chain to you?
25     A. Because I had just accepted employment with

Page 53

1  them to begin September 1st, a week later.
2      Q. And he writes to you "These MA are not working
3  for us." Would I correctly assume that's Moss Adams?
4      A. I would assume the same thing.
5      Q. And did you have a conversation with him around
6  the time of this e-mail about Moss Adams?
7      A. I don't recall, but it would have been soon
8  after I joined the company. Was it prior to this, or
9  after this, within a day or so, I couldn't answer that
10 question.
11     Q. Did he at any point in there explain what he
12 expected you to do in response to his statement, "These
13 MA are not working for us"?
14     A. No.
15     Q. He didn't explain that? I mean, I couldn't
16 tell from this e-mail whether he's asking you to do
17 something like find another firm, or to get involved, or
18 why it is he's copying you.
19     A. I can't tell you from the context of this
20 e-mail, right. I don't really recall this e-mail,
21 although I was copied on it. But I can tell you the
22 question was when are the financial statements going to
23 get out, the bank wants the financial statements, we need
24 to get this thing refinanced. The company was in
25 forbearance, as I'm sure you know, and the issue clearly

14 (Pages 50 to 53)

BMO 002096

MARK MCCORMICK - 8/16/2011

Page 54

1   was the bank did not want Cedenco to be consolidated in
2   the financial statements, and that was the issue of Fin
3   46.
4        So soon after I joined the company, as I've
6   degree, what the prior conversations had been over the
7   prior year about how to report SK Foods on a stand-alone
8   basis.
9        Q. In the process that occurred to structure the
10  response to Fin 46, did you give any input as far as
11  strategy, addressing any tax or any other issue?
12       A. No, at the end of, I would say -- I'm guessing,
13  the end of September, Dan Nutley came forward to me and
14  suggested different options on Fin 46, specifically the
15  transfer of the debt instruments to a non-business
16  entity.
17       Q. And why did he come to you about that?
18       A. I happened to be standing in the room at the
19  time while I was at the office.
20       Q. Because I'm just trying to ascertain whether
21  you had responsibility, or what responsibility, if any,
22  you had in ultimately choosing what advice to take on
23  that issue.
24       A. It wasn't my company to choose, so that was
25  above my pay grade, so to speak. So at the end of the

Page 55

1   conversation, I can tell you because I remember very
2   vividly, we were standing at the top of the staircase at
3   the Lemoore factory, significant pressure by all parties,
4   the bank, myself, Shondale, David Hay, Scott Salyer, and
5   the list can go on. We need the financial statements
6   issued. And the conversation was had with Dan Nutley at
7   the top of the staircase when he suggested "I have an
8   idea. Let me work on it."
9        Q. And what was the idea?
10       A. To transfer the notes to the SSC&L trust as a
11  non-business entity.
12       Q. So that's the debt part of the transfer. And
13  how about the equity part of the transfer?
14       A. I don't recall equity. I have no idea.
15       Q. So you didn't have any responsibility for
16  analyzing the effects of alternatives that Mr. Nutley may
17  have proposed?
18       A. No, I wouldn't know what they were prior to
19  that time. In terms of effects, you know, the focus was
20  clearly addressing the need of the bank, that they wanted
21  stand-alone financial statements. That was the focus,
22  clearly.
23       My focus, I have no understanding whatsoever of
24  Scott's tax consequences domestically or internationally,
25  wasn't involved in it, no clue. Not my area of

Page 56

1   understanding anyway.
2        Q. Fair enough.
3        At some point in time were the outside auditors
4   changed? Did SK Foods change its outside auditors?
6        Q. And do you know why?
7        A. I do.
8        Q. Were you part of the decision process?
9        A. I was.
10       Q. Can you tell me why?
11       A. Dan Nutley didn't have enough staff or time in
12  order to complete the audit.
13       Q. And for what tax year or audit year was this?
14       A. It would have been June 30th, 2008.
15       Q. So when was Moss Adams fired?
16       A. They weren't fired.
17       Q. What happened? Like I said, I don't want to
18  put words in your mouth. Can you tell me what happened?
19       A. In May, 2008 they declined the engagement.
20  They did not have the resources in order to complete the
21  audit in terms of scheduling, human capital and
22  scheduling.
23       Q. So they resigned. Did they do it in writing or
24  by telephone?
25       A. I was informed of it by phone from Dan Nutley,

Page 57

1   and also I heard from Erica Kuhlmann at the Bank of
2   Montreal. I don't know if there was a writing or not.
3   There may have been, I don't recall.
4        Q. Do you know if Mr. Salyer had expressed any
5   unhappiness with the invoices issued by --
6        A. We all did.
7        Q. -- by Moss Adams?
8        A. Yes.
9        Q. Okay. And how long had that unhappiness been
10  in existence?
11       A. I knew about it, you know, within the first
12  week or two that I joined the company.
13       Q. And was there displeasure also by Mr. Salyer
14  about Moss Adams' process of addressing Fin 46?
15       A. I don't know if that's the frustration,
16  although that became a frustration. I think the
17  frustration, having talked to Scott about it and been in
18  the meeting with Moss Adams, was about the delay of the
19  financial statements more than anything.
20       Q. And what firm replaced Moss Adams?
21       A. Stoughton Davidson.
22       Q. Do you know why they were chosen?
23       A. Because Grant Thornton declined it. The audit
24  needed to be done, inventory needed to be observed, and
25  Stoughton Davidson is a Moss Adams affiliated firm.

15 (Pages 54 to 57)

BMO 002097

MARK MCCORMICK - 8/16/2011

Page 58

1    Q. Can you explain that affiliation, how that
2  works?
3    A. I can't.
4    Q. Of the two firms, which is larger in terms of
5  number of professionals?
6        MS. WOODRUFF:  Objection.  Calls for
7  speculation, lacks foundation.
8  BY MR. CHRISTMAS:
9    Q. If you know.
10   A. I don't know.
11       MR. SHEAHAN:  Would anyone like some water?
12 Anyone?
13       COURT REPORTER:  No, thank you.
14       MR. SHEAHAN:  Would you?
15       MR. CHRISTMAS:  Actually, I would.
16       MR. NUTI:  Take a quick break?
17       MR. CHRISTMAS:  Yeah, why don't we do that.
18       (Recess taken.)
19       (Exhibit 23 was marked for identification.)
20 BY MR. CHRISTMAS:
21   Q. Mr. McCormick, the court reporter has handed
22 you Exhibit 23 to your deposition, which is a series of
23 e-mails starting with one from Mr. Boos of August 19,
24 2007 at 6:03 p.m., and the last one is from Mr. Salyer on
25 August 29, 10:41 a.m.

Page 59

1        If I could draw your attention to the middle of
2  the first page.  And you're not copied on that e-mail,
3  but the e-mail between Mr. Boos and Mr. Salyer of
4  9:33 a.m. says -- Mr. Boos writes you had indicated Mark
5  was following up with someone in Washington.  Do you know
6  if that "Mark" refers to you?
7    A. I think it does.
8    Q. Can you explain what you were following up with
9  with someone in Washington, if that's true?
10   A. I don't think it's true.  I think what happened
11 was that I was calling the AICPA technical hotline in New
12 York City.
13   Q. And that was with regard to Fin 46?
14   A. Yes.
15   Q. And did you end up speaking to someone at the
16 AICPA?
17   A. Just the person that answered the hotline
18 number.
19   Q. And what were you hoping to get out of that
20 contact?
21   A. The applicability of Fin 46 to privately-held
22 companies, what the nature of the application of the
23 accounting principle is, general questions.
24   Q. Did you get an answer to your questions?
25   A. Not really.

Page 60

1    Q. Did you make any other similar attempts to
2  reach professional organizations of that nature?
3    A. I don't recall.
4    Q. Further up in the document Mr. Salyer writes
5  regarding Cedenco and Fin 46 "Mark is working on this as
6  MA refuses to cooperate."
7        Do you know what he meant by "MA refuses to
8  cooperate"?  I assume that's Moss Adams.
9        MS. WOODRUFF:  Let me just interpose an
10 objection that it calls for speculation.
11       MR. CHRISTMAS:  If he knows.
12       If you know.
13       THE WITNESS:  No, I don't know.
14       MR. CHRISTMAS:  Let's mark 24.
15       (Exhibit 24 was marked for identification.)
16 BY MR. CHRISTMAS:
17   Q. Mr. McCormick, the court reporter has handed
18 you a document marked as Exhibit 24 for identification to
19 your deposition, a series of e-mails starting with one
20 from you dated August 29, 2007.
21       If I could draw your attention to the e-mail
22 second from the top from you to Ms. Seymour copied to
23 Mr. Salyer, August 29, 2007 at 6:00 p.m., do you recall
24 this e-mail?
25   A. Vaguely.  I mean, this is the first time I've

Page 61

1  seen this document in almost four years.
2    Q. You write there that the attorney letters are
3  still an open item.  What are you referring to there?
4    A. It is part of an audit, the auditors needed to
5  confirm whether or not there is pending litigation with
6  the company's attorneys, so as part of the audit process
7  the attorneys need to respond to the auditors with a
8  letter either affirming that there is no open litigation,
9  or providing some estimate as to the exposure of any
10 litigation for the purposes of completing footnotes in
11 the audited financial statements.
12       And in the context of this e-mail, we're trying
13 to get the financial statements done and had met with
14 Dan Nutley.  From this e-mail Dan Nutley said that he was
15 still waiting for attorney letters to be sent back to the
16 auditors.
17       MR. CHRISTMAS:  Okay.  This is 25.
18       (Exhibit 25 was marked for identification.)
19 BY MR. CHRISTMAS:
20   Q. Mr. McCormick, the court reporter has handed
21 you Exhibit 25 for identification to your deposition.  Do
22 you recognize this document?
23   A. No.
24   Q. Do you recall receiving it?
25   A. I don't recall receiving it.

16 (Pages 58 to 61)

BMO 002098

MARK MCCORMICK - 8/16/2011

Page 62

1  **Q. Do you recall, is it fair to say that at this**
2  **point in time Mr. Nutley is still working on the**
3  **structure to address Fin 46 with respect to responses or**
4  ~~action to be taken?~~

6  question.
7  **Q. Sure.**
8  A. Okay. Could you ask your question again?
9  **Q. Yeah, would it be fair to say that to your**
10 **understanding at this point in time it's still being**
11 **determined what the actual structure of the debt and**
12 **equity transfers that are going to be needed to address**
13 **Fin 46, they're still being discussed at this point. Is**
14 **that right?**
15 A. Yes. I think the mechanics of how to get it
16 done -- I think the frame work for the solution had been
17 identified. I think the mechanics of getting it done
18 were still being discussed.
19 **Q. And three paragraphs down Mr. Nutley writes**
20 **"Consider SKFLP distributing the Cedenco stock to the**
21 **partners."**
22 **In fact, that was the ultimate structure that**
23 **was decided. Is that correct?**
24 A. I really wasn't focused on the stock piece. I
25 was more focused on the debt piece, so I'm assuming it

Page 63

1  was "distributed," but I couldn't tell you what the
2  details of that were.
3  MR. CHRISTMAS: This is 29.
4  (Exhibit 29 was marked for identification.)
5  BY MR. CHRISTMAS:
6  **Q. Mr. McCormick, the court reporter has handed**
7  **you Exhibit 29 for identification to your deposition.**
8  **The bottom one is an e-mail from you to Mr. Nutley. Do**
9  **you recall preparing that?**
10 A. No.
11 **Q. Do you recall receiving the e-mail up above**
12 **that?**
13 A. I do not. It's as if I'm reading this for the
14 first time, so you'll have to give me a moment.
15 **Q. Sure. Go ahead.**
16 A. Okay. And your question is?
17 **Q. Do you have an understanding of what Mr. Nutley**
18 **is proposing there? And perhaps I can break it down. In**
19 **the second paragraph he refers to a third-party lender.**
20 **Can you tell me if you have an understanding as to what**
21 **he's proposing there.**
22 A. I think you would have to ask him, but let me
23 speculate for a moment, because there was a conversation
24 about whether or not a third-party, an unrelated
25 third-party, could hold the notes between SK Foods and

Page 64

1  Cedenco entities and the Cedenco entities and SK Foods,
2  and the simplest way to describe what that thought
3  process was was holding those notes in escrow as a
4  ~~third party custodian, and having a third party custodian~~

6  solve or potentially solve the Fin 46 problem.
7  **Q. And just elaborating on that, would the**
8  **third-party be involved in any payments back and forth?**
9  A. No, there were no payments back and forth as
10 the notes and all payments of all types were frozen and
11 subordinated.
12 MR. CHRISTMAS: This is 32, and this is 33.
13 (Exhibits 32 and 33 were marked for
14 identification.)
15 BY MR. CHRISTMAS:
16 **Q. Mr. McCormick, the court reporter has handed**
17 **you Exhibits 32 and 33 to your deposition.**
18 **Let's start with 32. Do you recognize this**
19 **document?**
20 A. No.
21 **Q. And how about 33?**
22 A. No.
23 **Q. Do you recall if there was a debt subordination**
24 **agreement regarding any of the intercompany debt?**
25 A. I do know that the intercompany debt was

Page 65

1  subordinated and frozen, but I don't recall the
2  agreement, I've never seen these documents before.
3  **Q. Do you recall when the intercompany debt was**
4  **first subordinated?**
5  A. I don't. I was told that it was frozen and
6  subordinated sometime in either late '06 or early '07,
7  either as part of the forbearance agreement or some other
8  agreement. I wouldn't be able to tell you. I would
9  assume, and clearly I'm speculating, that it was part of
10 the forbearance agreement.
11 **Q. Okay. And what was the forbearance agreement?**
12 **Can you elaborate on that, your understanding?**
13 A. Bank of Montreal with the prior bank group,
14 which included Rabo and LaSalle, entered into a
15 forbearance agreement. I don't know the date. I believe
16 it was sometime in late '06 or early '07 with respect to
17 the original credit facility. As part of that, as that
18 relationship changed there was significant monitoring of
19 the company by many groups, the bank directly as well as
20 an agreed-to company, Capstone.
21 And during that time prior to my arrival, I was
22 told this by David Hay, Scott Salyer, Shondale Seymour
23 and many others, there was an agreement that all of the
24 company transactions, including those of Cedenco and the
25 foreign subsidiaries, were frozen and subordinated.

17 (Pages 62 to 65)

BMO 002099

MARK MCCORMICK - 8/16/2011

Page 66

1    So I believe that the answer to your question
2  could be found in the forbearance agreement. I've never
3  seen it, don't know what it says, just letting you know
4  what I've been told.
5    Q. Do you know the reason why SK Foods needed
6  forbearance from the banks?
7    A. I don't know the specific reasons. I was told
8  that there were transfers to repay intercompany
9  transactions that occurred soon after the original loan
10  was closed, and that soon after that Rabo noticed Bank of
11  Montreal's agent that they did not want to continue with
12  the bank group.
13    Q. And in terms of the forbearance, did the
14  refinancing, to your understanding, supercede that
15  forbearance agreement, in whole or in part?
16    A. I think if I understand your question correctly
17  that the refinancing transaction, which paid Rabo, did
18  that cancel the forbearance, and the answer to that
19  question is "yes."
20    Q. Did you ever have any direct conversations with
21  anyone at BMO about the transfer of debt or equity of the
22  foreign subsidiaries?
23    A. Yes.
24    Q. Who did you have discussions with about that?
25    A. Clearly Betsy and Erica. I do not recall and

Page 67

1  cannot recall the name of the lady in the syndications
2  group. I can picture her. As I've stated before, if I
3  had a list of the names of people, I could tell you who
4  it was.
5    Q. And how did that topic come up in these
6  conversations? Was it initiated by you or initiated by
7  them?
8    A. I can't answer that question. I can tell you
9  that it came up as a result of we need to have the
10  audited financial statements done in order to get this
11  underwritten commitment letter fulfilled. We need to get
12  this transaction financed, how do we get the financial
13  statements from the auditors.
14    Q. And so I take it they told you they didn't want
15  the off-shore or the foreign subsidiaries in those
16  financial statements that they were expecting. Is that
17  fair to say?
18    A. Well, it was told to many others prior to my
19  tenure at SK Foods.
20    Q. Correct, I recall your testimony on that.
21    A. When I got there, yes, that was part of the
22  conversation as well.
23    Q. They said it to you directly?
24    A. Yes, yes.
25    MR. CHRISTMAS: I'm just going to go back one.

Page 68

1  This is 28.
2    (Exhibit 28 was marked for identification.)
3  BY MR. CHRISTMAS:
4    Q. Mr. McCormick, the court reporter has handed
5  you Exhibit 28 to your deposition. It's a series of
6  e-mails, and if you need to, feel free to read them, but
7  I want to ask you, if you know, I'm going to ask you what
8  Mr. Salyer means in the September 15, 2007 e-mail at
9  6:31 p.m. where he says "Try again. Can't drop equity by
10  37 million."
11    MS. WOODRUFF: Objection. Calls for
12  speculation, lacks foundation.
13    THE WITNESS: Can you ask your question again?
14  BY MR. CHRISTMAS:
15    Q. Yes. If you know, what did Mr. Salyer mean
16  when he says "Try again, can't drop equity by 37
17  million"?
18    MS. WOODRUFF: Same objections.
19    THE WITNESS: I don't know.
20  BY MR. CHRISTMAS:
21    Q. Have you ever seen the amended and restated
22  credit agreement?
23    A. I have.
24    Q. And in what connection did you review it?
25    A. In connection to the funding of the credit

Page 69

1  facility in October of 2007.
2    Q. Did you have to read it?
3    A. I read the majority of it, yes.
4    Q. And why did you read it?
5    A. Because I was asked to.
6    Q. Who asked you to read it?
7    A. There were a number of people in the room who
8  were all reviewing various different areas, including
9  Shondale and myself, David Hay, Scott Salyer, and I
10  happened to be there and they asked if I would read the
11  credit agreement.
12    Q. And was this prior to execution, or after
13  execution?
14    A. Both.
15    Q. Are you familiar with who the parties were to
16  that agreement in terms of guarantors?
17    A. Off the top of my head, I don't believe there
18  were guarantors.
19    Q. Do you know if any of the debt was guaranteed
20  by the Australian or New Zealand companies?
21    A. I don't -- I would have to read the credit
22  agreement to answer that question, but the answer is no,
23  I don't believe it is.
24    Q. Do you know if the stock of the Australian or
25  New Zealand companies was part of the collateral under

18 (Pages 66 to 69)

MARK MCCORMICK - 8/16/2011

---

Page 70

1  that agreement?
2     A.  I don't know off the top of my head.  I would
3  have to read the agreement to refresh my memory.
4     Q.  In terms of maintaining the general ledger of
6  adjusted journal entries or any other of the accounting
7  functions like that?
8     A.  Rarely.
9     Q.  And that was Shondale's responsibility.  Is
10  that correct?
11     A.  Largely.
12     MR. CHRISTMAS:  This is 53.
13     (Exhibit 53 was marked for identification.)
14  BY MR. CHRISTMAS:
15     Q.  Mr. McCormick, I've handed you a document
16  marked as 53 to your deposition.  Are you familiar with
17  this document?
18     A.  I am.
19     Q.  Can you tell me what it is.
20     A.  I think this is the management representation
21  letter to the auditors.
22     Q.  And were you involved in reviewing any of the
23  management representation letters?
24     A.  The auditors prepare the manager's
25  representation letters.  I've read this letter.

---

Page 71

1     Q.  And in what connection did you review it?
2     A.  Shondale was asked to sign the management rep
3  letter, Scott Salyer was asked to sign the management rep
4  letter, and for the audit of June 30th, 2007, I do not
5  believe -- I don't know.  I may have been asked to sign
6  it.  I am not sure, because I wasn't there with the
7  company at the time.
8     Q.  So is it correct that -- and this one I believe
9  shows that only Mr. Salyer had signed this one, correct?
10  If you turn to the last page.
11     A.  Right.  That's his signature.
12     Q.  Why was it that you and Ms. Seymour were added
13  as signators?
14     MS. WOODRUFF:  Objection. Misstates the
15  evidence.
16     MR. CHRISTMAS:  The witness just testified that
17  he had to review it because he was going to be a
18  signatory to one of them.
19     THE WITNESS:  No, let me clarify my testimony.
20  I don't know that I was signatory to this letter, which
21  specifies the June 30, 2007 financial statements since I
22  wasn't there at the time and had nothing to do with the
23  company.  Nor would I have been able to represent any of
24  this information to the auditors because I wasn't
25  employed.

---

Page 72

1  BY MR. CHRISTMAS:
2     Q.  And I'm sorry, I misspoke, but you meant the
3  next cycle of audit?
4     A.  I think that's probably true, but I'd have to
6     Q.  Do you know why you were asked to sign the
7  subsequent letter?
8     A.  Generally accepted auditing standards ask
9  auditors to have management sign the management rep
10  letter in whatever form management happens to be, whether
11  it's an owner, member of the board, or whether it's the
12  primary accounting or operations people, so that they
13  confirm the representation to the auditors to the items
14  specified in the letter.
15     Q.  Understood, I just wondered why specifically
16  Mr. Salyer's signature wasn't sufficient for the next
17  audit cycle apparently.
18     A.  Because generally accepted --
19     MS. WOODRUFF:  Objection. Misstates the
20  evidence.  Also, I want to interpose an objection to the
21  last question, the witness testified that he may have
22  been asked to sign the 2008 audit.  He didn't know,
23  unless he saw the document.  So that also misstates, here
24  there's been no testimony that Mr. Salyer was not
25  sufficient for the 2008 audit.

---

Page 73

1  With all those objections, you may answer.
2     THE WITNESS:  Can you ask the question again.
3     MR. CHRISTMAS:  Can you read it back.
4     (The question was read.)
5     THE WITNESS:  Generally accepted auditing
6  standards require more than just one signature by the
7  chief executive officer, so I would refer you to the
8  generally accepted auditing standard and refer you to the
9  auditors standard in the AICPA, for the definition of who
10  is included in signing the management rep letters.
11  BY MR. CHRISTMAS:
12     Q.  Was there ever a conversation that you recall
13  about who the signatory should be for the next audit
14  cycle?
15     A.  No.
16     (Exhibit 58 was marked for identification.)
17  BY MR. CHRISTMAS:
18     Q.  Mr. McCormick, the court reporter has marked
19  number 58 for identification to your deposition.  This is
20  a series of e-mails starting with one from James Liu and
21  ending with one from you.  Do you recall any of these
22  series of e-mails?
23     A.  No.  Let me make two comments.  I don't recall
24  this string of e-mails, and I don't know where this
25  e-mail address is which is attributed to me, which is

---

19  (Pages 70 to 73)

MARK MCCORMICK - 8/16/2011

Page 74

1 markmc@first organization.com, as I have no idea what
2 that e-mail address is, I have never seen it before.
3    Q. So you don't think you prepared that e-mail?
4    A. I didn't say that. I said I've never seen this
5 e-mail address before, and I don't recall this e-mail.
6    Q. Do you recall that there were some discussions
7 in February, 2008 regarding the form of the transactions
8 to address Fin 46 regarding the debt and equity?
9       MS. WOODRUFF: Objection. Vague and ambiguous.
10 BY MR. CHRISTMAS:
11    Q. And how they had been accomplished?
12       MS. WOODRUFF: Again, objection. Vague and
13 ambiguous.
14       THE WITNESS: I don't know how to answer that
15 question. Can you try again.
16 BY MR. CHRISTMAS:
17    Q. Well, Ms. Seymour is writing to Ms. Vartanian,
18 and in response to apparently some of her requests for
19 information to do certain accounting entries, and she
20 says there "Mark is reviewing" — let me start over
21 again.
22       This is in the February 6, 2008, 4:28 p.m.
23 e-mail. "All of these transactions rolled into the new
24 trust, but I haven't booked any entries yet as I don't
25 have the final documents. Mark was reviewing them during

Page 75

1 the audit, but I'm not sure where things ended."
2       And then you respond "The notes were assigned
3 to the new trust named 2007 SSC&L Trust. We did not make
4 any distributions."
5       Do you recall what you were referring to there?
6       MS. WOODRUFF: Let me interpose an objection.
7 Misstates the testimony, Mr. McCormick responded with
8 that sentence that you just read. He testified he did
9 not recognize the e-mail address or the e-mail.
10 BY MR. CHRISTMAS:
11    Q. Does reading it refresh your recollection at
12 all?
13    A. No, but I can tell you that the notes were
14 assigned to the SSC&L trust prior to the finalization of
15 the financial statements, the audited financial
16 statements as required before the credit agreement could
17 be finalized.
18    Q. What about the shares of the equity?
19    A. I don't know the answer to the question. I
20 wasn't involved in that.
21       MR. CHRISTMAS: This is 54.
22       (Exhibit 54 was marked for identification.)
23 BY MR. CHRISTMAS:
24    Q. Mr. McCormick, the court reporter has handed
25 you Exhibit 54 to your deposition. Do you recognize this

Page 76

1 document?
2    A. Yeah, I do.
3    Q. Okay. And in what connection did you have
4 occasion to see this document?
5    A. This was the June 30th, '07 audit and financial
6 statements that were completed by Moss Adams.
7    Q. For SK Foods LP?
8    A. For SK Foods LP.
9    Q. And did you receive a copy of this?
10    A. You know, there were many bound copies. I
11 don't know that I had one that was mine. I'm sure I had
12 access to it.
13    Q. Did you ever have reason to review these?
14    A. I read them.
15    Q. After they were issued?
16    A. After they were issued.
17    Q. Okay. If I could draw your attention to
18 page 8, and on page 8, in the third paragraph down
19 there's a sentence that begins about five lines up, and
20 it says "The partnership distributed the investments in
21 foreign subsidiaries to the partners effective
22 November 1, 2006, and so the partnerships" --
23    A. I'm sorry. Can you stop for a second. I can't
24 find where you're reading.
25    Q. I'm sorry. Page 8, third paragraph down. One,

Page 77

1 two, three, four, five lines up from the bottom.
2    A. Okay.
3    Q. So it says "The partnership distributed the
4 investments in foreign subsidiaries to the partners
5 effective November 1, 2006, and sold the partnerships
6 intercompany receivables to irrevocable trust with common
7 ownership with the partnership."
8       To your knowledge, does that statement
9 accurately reflect the facts? That would be at the time
10 of issuance of these statements, January 15, 2008.
11    A. Let me parse the sentence. I don't have the
12 recollection about distributing the investment in the
13 foreign subsidiaries. As I've stated before, I really
14 don't have a recollection of what the investment means.
15 With respect to the partnership intercompany receivable,
16 with that I think the more accurate thing would be there
17 was an assignment and transfer of interest bearing notes,
18 so I would use different words if I were to have written
19 this footnote to describe that, but I know what they're
20 referring to.
21    Q. Do you know if these financial statements were
22 sent to any members of the bank group?
23    A. I'm assuming that Shondale sent them to Bank of
24 Montreal as the agent.
25    Q. That wasn't your role?

20 (Pages 74 to 77)

Page 78

1     A. No.
2     Q. Did you ever discuss the financial statements
3  once they were issued with anyone at the bank group?
4     A. I'm sure I did.

6  discussing it with them?
7     A. No.
8     Q. And why would you have had such a conversation?
9     A. I was working with David Hay and Shondale on
10  the new credit agreement, which would have removed
11  Rabobank from the bank group and added the others.
12     Q. Did any member of the bank group, to your
13  knowledge, question the transactions that are summarized
14  in that sentence?
15     A. No.
16     Q. Did they ever raise any other issue, to your
17  knowledge, with respect to these financial statements?
18     A. You know, not that I'm aware of. I mean, this
19  is four years ago, so I don't recall.
20     Q. At the beginning of the deposition I showed you
21  an exhibit that purports to reflect a transfer of shares.
22  Did you ever see any documents that purported to transfer
23  the shares of the foreign subsidiaries?
24     A. The answer to the question is "no," but let me
25  footnote that answer. I'm sure you're aware in April,

Page 79

1  '08 there was a federal investigation and the majority of
2  the accounting records were seized by the FBI, and at
3  that time they were being stored in a secured warehouse
4  in Sacramento. We had no documents. There was nothing.
5        So there was an attempt to acquire documents by
6  others and rebuild our files. So I can't tell you if I
7  saw them or didn't see them. The way that the offices
8  were left were clearly in shambles, so many of my
9  responses to your questions about documents, including
10  the share transfer documents, are going to be no, I've
11  never seen these before. While they may have been at the
12  company at the time, or in storage, or at another office
13  or another location, many of these things I haven't seen
14  and many of the documents were seized. They may exist,
15  but I wouldn't have had the opportunity to have seen
16  them.
17     Q. Understood.
18        Was there an index or any other kind of receipt
19  that the government provided after seizing the documents?
20     A. I signed one, yes. I don't know who signed the
21  others, and I've never seen them.
22     Q. Did it list by item the types of documents?
23     A. No, no. They were handwritten descriptions in
24  a very general format.
25     MR. CHRISTMAS: This is 70.

Page 80

1        (Exhibit 70 was marked for identification.)
2  BY MR. CHRISTMAS:
3     Q. Mr. McCormick, the court reporter has handed
4  you Exhibit 70 to your deposition, that's 7-0.
6  John Iacopi is?
7     A. I do.
8     Q. Can you tell me who he is?
9     A. He is a CPA.
10     Q. And at this point in time, and that is
11  August 1st, 2008, he's writing to you with copy to
12  Mr. Salyer and others. Who is he working for at this
13  point?
14     MS. WOODRUFF: Objection. Calls for
15  speculation, lacks foundation.
16  BY MR. CHRISTMAS:
17     Q. If you know.
18     A. I've never seen his engagement letter, so I
19  couldn't tell you.
20     Q. Do you recall why he was writing to you?
21     A. I believe he was trying to respond to questions
22  for Scott Salyer.
23     Q. And about three lines down he uses a term with
24  initial capitalization, "the Intentionally Defective
25  Grantor Trust." Do you know what that references?

Page 81

1     A. I'd have to read this document for a moment to
2  understand the context of what this e-mail is about. I
3  don't recall the e-mail.
4     Q. Certainly.
5     A. Can you repeat your question.
6     Q. Yes. Do you have an understanding of what the
7  Intentionally Defective Grantor Trust was?
8     A. No.
9     MR. CHRISTMAS: That's all I have on that
10  document.
11        100.
12        Might as well mark this while we're at it, 101.
13  And this is 103.
14        (Exhibits 100, 101 and 103 were marked for
15  identification.)
16     MS. WOODRUFF: Is there no 102?
17     MR. CHRISTMAS: We're skipping 102 in the
18  record.
19  BY MR. CHRISTMAS:
20     Q. Mr. McCormick, the court reporter has handed
21  you Number 100 for identification to your deposition.
22  Have you ever seen this document?
23     A. I don't recall ever seeing this document.
24     Q. If I could ask you to read the document and
25  tell me if it refreshes your recollection as to the

21 (Pages 78 to 81)

MARK MCCORMICK - 8/16/2011

Page 82

1  subject of the document.
2       A. I have read the document, and I don't recall
3  ever seeing this document.
4       Q. In March, 2009 were you a Vice President of
5  SKPM Corporation?
6       A. I was.
7       Q. Had you ever signed any documents as Vice
8  President of SKPM Corporation?
9       A. I don't recall the specific documents, but I
10 probably did.
11      Q. Do you recall any discussion in March, 2009 of
12 the matters that are addressed in this document?
13      A. No.
14      Q. If I could draw your attention to Exhibit 101,
15 which is an e-mail from Ms. Johnston to you dated
16 March 26, 2009, 10:32 a.m. to which is attached another
17 document entitled -- there's a blank page and then
18 Accounts Receivable Set Off Agreement. Do you recall
19 receiving this e-mail?
20      A. No.
21      Q. Do you recall ever seeing the document that's
22 attached to the second page behind the e-mail?
23      A. I'd like to take an opportunity to read it.
24      Q. Sure.
25      A. I have no recollection of this document.

Page 83

1       Q. Do you have a recollection of whether or not
2  there existed a debt assignment agreement as referred to
3  in paragraph number two?
4       A. I believe that the debt assignment agreement is
5  the agreement we've discussed earlier today, the
6  November 1st, 2006, assignment agreements to the SSC&L
7  trust.
8       Q. And do you recall any discussion of the desire
9  by anyone to change that assignment?
10      A. None whatsoever.
11      Q. If I could draw your attention to Exhibit 103
12 that the court reporter has placed in front of you, it's
13 a series of e-mails starting with an e-mail from
14 March 26, 2009, 10:22 p.m. from Mr. Frankish, and ending
15 with another e-mail at the top from Mr. Frankish of
16 March 29, 2009, at 1:22 p.m.
17      First of all, do you know who Mr. Frankish is?
18      A. I do.
19      Q. And can you tell me --
20      A. His title on this e-mail says Group CFO,
21 Cedenco Foods.
22      Q. Did you ever have any communications from
23 Mr. Frankish?
24      A. From time to time. I met him in person once or
25 twice.

Page 84

1       Q. And in what connection did you have
2  communications with him?
3       A. You'd have to refresh my memory with e-mail,
4  but it was via e-mail in -- whether it would be copied on
5  certain e-mail threads, but I really didn't speak with
6  him on the phone very often. He happened to be in the
7  United States once or twice and I attended a dinner or
8  two where he was present.
9       Q. But did you have any occasion to respond to
10 inquiries or requests for documents from him?
11      A. Rarely.
12      Q. Have you ever seen this set of e-mails?
13      A. No.
14      Q. Do you know --
15      A. Could we pause for a moment? I'd like to read
16 this. I've never seen this before.
17      Q. Sure.
18      A. Okay.
19      MR. CHRISTMAS: If we could have five minutes
20 outside. We're just going to take a short break.
21      THE WITNESS: Sure.
22      (Recess taken.)
23 BY MR. CHRISTMAS:
24      Q. Mr. McCormick, are you familiar with the SSC&L
25 trust?

Page 85

1       A. I know the name.
2       Q. You know the name?
3       A. Yeah.
4       Q. Do you know what that entity was?
5       A. I believe it was a grantor trust.
6       Q. Do you know why it was created?
7       A. To hold the notes both to and from the Cedenco
8  entities and SK Foods.
9       Q. Do you know if it had any other purpose?
10      A. I don't.
11      Q. Do you know if it had any bank accounts in its
12 own name?
13      A. I wasn't the trustee or the beneficiary. I
14 wouldn't know.
15      (Exhibit 57 was marked for identification.)
16 BY MR. CHRISTMAS:
17      Q. Mr. McCormick, the court reporter has handed
18 you Exhibit 57 for identification to your deposition.
19 Have you ever seen this document?
20      A. I'm sure I have, I just need to take a moment
21 to read it.
22      Q. Sure.
23      A. Okay. I...
24      Q. Have you seen this document before?
25      A. I've seen it.

22 (Pages 82 to 85)

MARK MCCORMICK - 8/16/2011

Page 86

1     Q. Do you know what precipitated the necessity for
2  this document?
3     A. I do.
4     Q. Can you tell me?

6  Federal Reserve, Ben Bernanke, announced that the Federal
7  Reserve was reducing interest rates by three quarters of
8  a point, which had the immediate effect of reducing the
9  fair market value of certain interest rate swap
10  agreements that were held by SK Foods and were issued by
11  various different banks, including JPMorgan Chase, and I
12  believe LaSalle. I'm not -- off the top of my head I
13  don't remember all the various swap agreements, but the
14  valuation of those derivatives based upon
15  Chairman Bernanke's reduction of the interest rate was
16  significant in the magnitude of millions and millions of
17  dollars.
18        There are generally accepted accounting
19  principals, I don't know them off the top of my head,
20  which define the accounting treatment of interest rate
21  derivative of positions, and that those valuations needed
22  to be recorded to the financial statements of the
23  company. It's up to the company and its auditors to
24  determine when those valuations would be made.
25        We amended the credit agreement so that the

Page 87

1  valuations of the swap agreements on page 2, section 1.2
2  would not be taken into account with respect to any
3  covenants in the bank agreement.
4        We did so because those were non-cash
5  transactions and had nothing to do with the operations of
6  the company and had solely to do with the actions of the
7  Federal Reserve.
8     Q. So was there a connection, then, between the
9  terms of this agreement and what's reflected in the
10  financial statements that were issued at or about this
11  time?
12     A. I have no idea if there was a connection. All
13  I know is that what I told you was that the accounting
14  for the interest rate derivatives and the valuation of
15  those derivatives, based upon Chairman Bernanke's
16  reduction of the interest rates, had an effect on all
17  companies that held those financial instruments, not just
18  SK Foods.
19        But that one -- obviously it's unprecedented in
20  American financial history, right, so in order to address
21  that, and with the consents of the bank, the agreement
22  was because those are non-cash transactions and have
23  nothing to do with the operations of the company, to
24  amend as referenced on page 2, section 1.2, how to deal
25  with the interest rate derivatives also referred to as

Page 88

1  swap agreements or swaps.
2        MR. CHRISTMAS: Understood. Thank you.
3        This is 59.
4        (Exhibit 59 was marked for identification.)

6     Q. Mr. McCormick, the court reporter has handed
7  you Exhibit 59 for identification to your deposition.
8  It's an e-mail from Mr. Boos to you dated February 18,
9  2008, 1:56 p.m. Do you recall this e-mail?
10     A. I don't recall the e-mail.
11     Q. Could you read through it and then I'm going to
12  ask you if you recall the subject matter of the e-mail.
13     A. Okay. And your question is?
14     Q. Do you recall having a communication with
15  Mr. Boos about any of the issues in this e-mail?
16     A. I don't recall this e-mail, and I don't recall
17  the communication.
18     Q. Are you aware of what the tax items that cannot
19  be resolved, as he refers to in this e-mail?
20     A. No, I never received copies of the tax returns,
21  so I'm not familiar with the tax returns or what the tax
22  issues were.
23     Q. And there he asks for -- he says "a copy of the
24  signed transaction documents." Do you know if he ever
25  got a copy of the signed transaction documents?

Page 89

1     A. You'd have to ask him.
2     Q. Mr. McCormick, were you ever involved in
3  discussions of the potential for withholding tax
4  liability in connection with the intercompany debt?
5     A. No.
6     Q. Do you have any familiarity with any
7  requirement of Australian law to withhold on the payment
8  of debt?
9     A. No.
10     Q. How about the payment of interest?
11     A. No.
12        (Exhibit 62 was marked for identification.)
13  BY MR. CHRISTMAS:
14     Q. Mr. McCormick, the court reporter has handed
15  you Exhibit 62 for identification to your deposition.
16  Have you ever seen this set of e-mails?
17     A. I don't recall this e-mail, but give me a
18  moment and I'll read this.
19        Okay. And your question is?
20     Q. Have you ever seen this set of e-mails?
21     A. I recall this.
22     Q. Turning to your e-mail to Mr. Salyer at the
23  bottom, what did you mean by Nick Frankish is in a bind
24  with his auditors?
25     A. I am not specific on what I'm going to tell

23  (Pages 86 to 89)

Page 90

1  you, just from recollection. I believe there was an
2  e-mail that Nick sent saying that they need a "letter of
3  support." I think his auditors are Deloitte, although
4  I'm not sure. I don't know that.
5       I'm not familiar with what a letter of support
6  is or what it purports to be in Australia, New Zealand or
7  what those accounting principals are in foreign
8  countries. So I was reluctant to provide any auditors
9  with any documents or letters or any representations that
10 said "letter of support."
11      So my e-mail to Scott was "I don't know what
12 this is, this is a problem. I think there's issues that
13 we need to investigate."
14      **Q. And he writes back "Send them our audit." Do**
15 **you have an understanding as to what he meant by that?**
16      MS. WOODRUFF: Objection. Calls for
17 speculation.
18      THE WITNESS: I don't know, but I will
19 speculate and say it says "Send them our audit report."
20 BY MR. CHRISTMAS:
21      **Q. So that would have been the Moss Adams?**
22      MS. WOODRUFF: Objection. Calls for
23 speculation.
24      THE WITNESS: I don't know.
25 ///

Page 91

1  BY MR. CHRISTMAS:
2       **Q. Did you send Mr. Frankish a copy of it --**
3       A. I don't know.
4       **Q. -- of the financial statements?**
5       **Let me finish my question.**
6       **Do you know why Mr. Salyer would say "BMO won't**
7  **know and neither will our auditors, so don't tell**
8  **Shondale"?**
9       MS. WOODRUFF: Objection. Calls for
10 speculation, lacks foundation.
11      THE WITNESS: I don't know.
12 BY MR. CHRISTMAS:
13      **Q. Did he ever instruct you not to tell**
14 **Ms. Seymour certain matters?**
15      A. He did.
16      **Q. Can you tell me what occasion or occasions he**
17 **did that, and what the connection was?**
18      A. I can't. I can refer generally to
19 conversations.
20      **Q. Tell me what you recall.**
21      A. He didn't know if Shondale would stay with the
22 company or not, so his concerns were about
23 confidentiality with respect to Shondale, and with
24 respect to others as well. So there were comments that
25 he would make relative to various different employees

Page 92

1  and/or vendors and/or customers about confidentiality.
2       So with respect to Shondale, she was just
3  another one of those individuals where he felt it was
4  important to maintain confidentiality.
5       **Q. The last sentence of your e-mail, or**
6  **second-to-last refers to a going concern opinion**
7  **apparently for the foreign subsidiaries.**
8       **Turning to SK Foods LP, was there at any point**
9  **during your employment at SK Foods was the possibility of**
10 **a going concern opinion ever raised by anyone?**
11      A. No.
12      **Q. Possibility of insolvency ever raised by**
13 **anyone?**
14      A. No.
15      **Q. Did you have any personal view about whether SK**
16 **Foods had any going concern issues?**
17      A. No.
18      **Q. And how about insolvency issues?**
19      A. No.
20      **Q. Did you have any contact with ANZ Bank in**
21 **Australia or New Zealand?**
22      A. I met with them on one or two occasions.
23      **Q. And where did you meet with them?**
24      A. In Australia.
25      **Q. And do you recall the time frame?**

Page 93

1       A. It was probably June of 2008.
2       **Q. And why did you have occasion to meet with**
3  **them?**
4       A. See if they had an interest in participating in
5  the SK Foods credit facility in the United States.
6       **Q. So the approach was initiated by SK Foods to**
7  **ANZ Bank to make that request?**
8       A. By David Hay.
9       **Q. And what was their response?**
10      A. They weren't interested.
11      **Q. And who did you meet with at ANZ Bank?**
12      A. We met with two, two individuals. I can
13 picture them. If I had a list of names, I'd tell you who
14 they were.
15      **Q. What city was it in?**
16      A. In Sydney.
17      **Q. David Byrd?**
18      A. That name's not familiar to me.
19      **Q. How about Kate Dekker?**
20      A. No.
21      **Q. Are you aware whether ANZ Bank was monitoring**
22 **the FBI investigation in the United States?**
23      A. I have no idea.
24      MR. CHRISTMAS: This is 98.
25      (Exhibit 98 was marked for identification.)

24  (Pages 90 to 93)

MARK MCCORMICK - 8/16/2011

Page 94

1  BY MR. CHRISTMAS:
2      Q. Mr. McCormick, the court reporter has handed
3  you Exhibit 98 for identification to your deposition.
4  Have you ever seen this document?

6      Q. If I could just draw your attention to page 2
7  of this document, and this document is for the fiscal
8  year, financial year ended 31 October, 2008.
9          At that point in time is it your understanding
10 that the foreign subsidiaries are no longer — to your
11 understanding, were they no longer owned by SK Foods LP?
12     A. That would be my understanding.
13     Q. Okay. Could you turn to page 2. Do you see
14 there the holding company is listed as SK Foods LP?
15     A. I do.
16     Q. In your view is that incorrect?
17     A. In my view that's inaccurate.
18     Q. Are you aware of any communications between the
19 New Zealand and Australian auditors on the one hand and
20 the U.S. auditors on the other hand to confirm the
21 intercompany loan amounts?
22     A. No.
23     Q. Did you ever see the SK Foods Australia '07
24 financial statements?
25     A. No.

Page 95

1      Q. How about the '08 financial statements?
2      A. I've never seen any financial statements of any
3  company in Australia, New Zealand until you handed me
4  Exhibit 98.
5      Q. Okay. Were you aware that there was a
6  disparity between the U.S. financial statements and the
7  Australian financial statements regarding the
8  intercompany debt?
9          MS. WOODRUFF: Objection. Assumes facts not in
10 evidence.
11         THE WITNESS: I didn't hear your question
12 clearly. If you could repeat it again.
13         MR. CHRISTMAS: Could you read it back.
14         (The question was read.)
15         THE WITNESS: No.
16         MS. WOODRUFF: And again, I object that it
17 assumes facts not in evidence. It's also vague and
18 ambiguous as to time.
19 BY MR. CHRISTMAS:
20     Q. The effect of the actions taken to address Fin
21 46, am I correct that your understanding is that the
22 SSC&L 2007 Trust became the entity that was SK Food LP's
23 debtor? Is that correct?
24         In other words, it owed money to SK Foods LP
25 instead of any of the foreign subsidiaries?

Page 96

1      MS. WOODRUFF: Objection. Vague and ambiguous.
2      THE WITNESS: Yeah, I can't answer that
3  question. I'm not sure I understand the question. My
4  understanding is that the SSC&L trust, the '07 trust

6  did. So I don't know, and nor have I ever seen a debt
7  agreement between SSC&L 2007 Trust and SK Foods LP. So I
8  think the answer to your question is "no," because I've
9  never seen the promissory note.
10 BY MR. CHRISTMAS:
11     Q. So you're not aware whether there is or is not
12 a note issued by that trust --
13     A. I have no idea.
14     Q. Are you aware of any disputes, if any, between
15 members of the bank group?
16     A. Which bank group?
17     Q. The second bank group, the group under the loan
18 that was closed while you were employed.
19     A. I'm not aware of any disputes amongst them in
20 and of themselves.
21     Q. I'm not sure I understand your answer.
22     A. I don't know if they had disagreements between
23 each other or what they would have disagreed to, so I
24 have no idea.
25     Q. Do you know if the bank group was concerned

Page 97

1  about its collective exposure to SK Foods LP?
2      MS. WOODRUFF: Objection. Calls for
3  speculation, lacks foundation.
4      THE WITNESS: I have no idea.
5  BY MR. CHRISTMAS:
6      Q. Do you know if any interim financial statements
7  were prepared and sent to the bank group while you worked
8  for SK Foods LP?
9      A. They were.
10     Q. And who prepared those?
11     A. Typically Shondale Seymour.
12     Q. And do you know with what regularity she sent
13 those reports?
14     A. Probably monthly.
15     Q. Are you aware of any response by the banks to
16 those interim statements?
17     A. I don't understand your question.
18     Q. Did they communicate anything back to you based
19 on what they saw in those statements?
20     A. They did.
21     Q. Okay. Was it a lot, or a little, or can you
22 describe it?
23     A. There were regular bank calls, particularly
24 bank calls after the investigation by the Federal Bureau
25 of Investigation became public, so regular conversations

25 (Pages 94 to 97)

Page 98

1  about sales, costs, forecasts, projections, customers,
2  inventory, receivables, a myriad of questions in and
3  around the business operation.
4      Q. And did you attend all those calls, or --
5      A. I couldn't tell you if I attended them all or
6  not because I don't know the total population of calls.
7      Q. That's right. Okay.
8         Was it weekly?
9      A. Sometimes it was hourly.
10     Q. To your knowledge did the bank group ever
11  express any concern over the transfer of the ownership of
12  the foreign subsidiaries?
13     A. No.
14     Q. Do you know if they ever requested that the
15  transfer be unwound?
16     A. No.
17     Q. Are you aware of whether Ms. Seymour was ever
18  requested to take any action to unwind either the debt
19  transfer or the equity transfer as an accounting basis?
20     A. No.
21     Q. Do you know if she was asked to do that in any
22  way?
23     MS. WOODRUFF: Objection. Asked and answered.
24     THE WITNESS: I have no idea.
25     MR. CHRISTMAS: We are done.

Page 99

1      MR. NUTI: Should I jump right in or do you
2  guys want to take a break first?
3      MR. CHRISTMAS: Doesn't matter to me.
4      MS. WOODRUFF: I'm fine.
5      COURT REPORTER: I'm fine.
6      MR. CHRISTMAS: Might as well plow ahead.
7      MR. NUTI: Mr. McCormick, I'm Greg Nuti, I
8  represent Brad Sharp, Chapter 11 trustee of SK Foods.
9         How do you want to do some additional exhibits?
10     MR. CHRISTMAS: Let's go off the record.
11     (Discussion off the record.)
12     (Exhibit 111 was marked for identification.)
13        EXAMINATION BY MR. NUTI
14     Q. So Mr. McCormick, the reporter has handed you
15  what has been marked as Exhibit 111, and to speed things
16  up, this is a copy of the lending agreement from SK Foods
17  and the bank group dated September 28, 2007. Do you
18  recognize this document?
19     A. I do.
20     Q. And was this the lending transaction that
21  closed shortly after your employment at SK Foods?
22     A. It is.
23     Q. I'd like to draw your attention to page 41 at
24  the bottom of the agreement, in the section 6.2
25  subsidiaries, you see that?

Page 100

1      A. I do.
2      MS. WOODRUFF: I'm sorry, 41 --
3      MR. NUTI: Page 41 of the agreement, 48 of the
4  document.
5      MS. WOODRUFF: Thank you.
6  BY MR. NUTI:
7      Q. About halfway down that paragraph, almost at
8  the end of the line it says schedule 6.2 hereto
9  identifies each subsidiary.
10     A. I see that.
11     Q. "The jurisdiction of its organization, the
12  percentage of issued and outstanding shares of each class
13  of its capital stock or other equity," et cetera, et
14  cetera.
15     A. I see that.
16     Q. And if you look back to schedule 6.2, page 130
17  of the entire document, do you see where it says SK Foods
18  Australia PTY Limited?
19     A. I do.
20     Q. And it indicates it's 99.01 percent owned by SK
21  Foods LP?
22     A. That's...
23     Q. Was that accurate at the time of this document?
24     A. I wasn't involved in the equity transaction, so
25  I can't answer your question. It would seem inconsistent

Page 101

1  with what my understanding was.
2      Q. If you turn to page -- actually, it's a little
3  farther back in the document, which is a copy of the
4  first amendment to amended and restated credit agreement.
5  I think it starts page numbering again.
6      MS. WOODRUFF: Can you just read the Bates.
7      MR. NUTI: It's Exhibit 1(A)(G) 2 of 84.
8      MS. WOODRUFF: Thank you.
9  BY MR. NUTI:
10     Q. And I believe we looked at a copy of this
11  document before. Do you recognize this document?
12     A. I do.
13     Q. And your signature is at the end of this
14  document?
15     A. That's correct.
16     Q. And as I recall, the explanation of this
17  document had to do with addressing a credit default swap?
18     A. That's correct.
19     Q. Did it change the agreement in any other
20  significant way?
21     A. I don't recall.
22     Q. If you look at page 2, under Representation,
23  section 3, it states "In order to induce the lenders who
24  execute and deliver this agreement, the buyers hereby
25  represent to the lenders that as of the date hereof,"

26 (Pages 98 to 101)

MARK MCCORMICK - 8/16/2011

Page 102

1 which is February 1st, 2008, "the reps and warranties set
2 forth in section 6 of the credit agreement," which we
3 just looked at, "and that any other representations and
4 warranties which relate to a specific date are true and

6     A. I see it.
7     Q. Do you see that?
8     A. I do.
9     Q. Did you understand that to reaffirm the reps
10 and warranties in section 6.2 and the schedule were true
11 and correct?
12     A. That's what this refers to, although I wouldn't
13 have reviewed that at the time when this was signed.
14     Q. If we go farther into the document, it would be
15 page 33 of 84, is this the second amendment to amended
16 and restated credit agreement dated September 15, 2008?
17     A. I have that.
18     Q. Do you recognize this document?
19     A. I'm aware of the document. I don't recall it
20 sitting here looking at it right now.
21     Q. If you look at page 47 of 84, are those your
22 signatures on the signature blocks for SK PM Corp and RHM
23 Industrial/Specialty Foods?
24     A. They are my signatures.
25     Q. If you look back at page 13 of the document

Page 103

1 itself, or page 45 of the larger document, under
2 section 5, Representations, there's again a confirmation
3 of the rep warranties. Section 6 of the original
4 document, which reaffirmed that subsidiaries are owned as
5 indicated in the original document. Do you see that?
6     A. I do.
7     Q. Was that true and correct as of the day you
8 signed this document?
9     A. With respect to the foreign companies, I don't
10 believe this is true and correct.
11     Q. Did you believe at the time you signed the
12 document?
13     A. I wouldn't have reviewed this in detail. I
14 don't know that I would have even had a copy of the
15 original lending agreement, as those documents were
16 seized by the government. So I'm not sure that I would
17 have reached for it to reaffirm every single line item in
18 this second amendment.
19     Q. Do I understand that what you're telling me is
20 that the government seized all the documents in April,
21 2008, correct?
22     A. That's correct.
23     Q. And you did not have a copy of the original
24 credit agreement available?
25     A. I wouldn't have had the original credit

Page 104

1 agreement.
2     Q. A copy of the credit agreement?
3     A. I don't know that I did or I didn't. I may
4 have had it in pdf. I don't think so. These were bound

6 were gone. So I couldn't tell you at that time if I had
7 the credit agreement at hand. I would tell you it was
8 unlikely that I did, and I would also tell you that I
9 would not have focused on this section and gone back to
10 reaffirm it because I don't think I really had the
11 document.
12     Q. You said you had an understanding that the
13 equity in the foreign entities had been transferred?
14     A. That's true.
15     Q. What do you base that upon?
16     A. Conversations with Wayne Boos and Dan Nutley.
17     Q. Anything besides conversations with those two
18 individuals?
19     A. Not that I know of.
20     Q. Did you ever see any transactional documents
21 that would effectuate that transaction?
22     A. I don't believe so, and I certainly could be
23 mistaken, but I would reiterate my point that I didn't
24 see any of the foreign documentation. I wouldn't have, I
25 wasn't there. Any U.S. documentation would have been

Page 105

1 seized, and I can tell you we made a great effort to
2 compile as many source documents as possible, but there
3 would be no way of knowing if we had the total population
4 documents or some minor subset.
5     So the answer to your question would be "no," I
6 wouldn't have had a recollection of receiving any
7 documents.
8     Q. What's your understanding of when that
9 transaction took place with respect to the equity?
10     A. The effective date would have been
11 November 1st, 2006. The decision to implement that
12 transaction would have been sometime in 2006. I wasn't
13 there, can't answer the question any more specifically.
14     Q. Well, what's your understanding of the
15 effective date?
16     A. November 1st, 2006.
17     Q. When you say "effective," what do you mean by
18 that?
19     A. It couldn't have been done any earlier because
20 the financial statements year-end was October 31st, 2006,
21 and nobody would go back to the prior auditors and have
22 them open up the books again to record the transaction in
23 a prior fiscal year. So the first day of the new fiscal
24 year, November 1st, 2006, was the effective date of the
25 transaction.

27 (Pages 102 to 105)

Page 106

1    Q. But you don't know when that was documented?
2    A. Not without reviewing documents. I don't know.
3  I know that Dan Nutley and Gary Perry were involved in
4  the documentation of the transaction, and I would refer
5  you to Dan Nutley and Gary Perry to answer that question.
6    Q. I'll refer you back to Exhibit Number 2, which
7  is your declaration. Paragraph three in the first
8  sentence, "SK did not own Cedenco Australia," et cetera,
9  et cetera. That statement is not completely accurate, is
10 it? Because SK did own Cedenco Australia.
11   A. I've never seen the documents that showed that
12 they did. I've never seen stock certificates, I've never
13 seen registers, I've never seen corporate minute books,
14 so I personally have never seen any documentation that
15 shows that they did.
16   Q. Do you know that they did not?
17   A. I know that they -- I do not know that they did
18 not.
19   Q. So you really had no basis for that statement
20 in your declaration, then?
21   MS. WOODRUFF: Objection. Argumentative,
22 badgering this witness. He's answered the question.
23   THE WITNESS: I wrote the declaration and I
24 signed it based upon the knowledge at the time that the
25 declaration was prepared and the time I signed it.

Page 107

1    MR. NUTI: Mark this as 112.
2    (Exhibit 112 was marked for identification.)
3  BY MR. NUTI:
4    Q. Do you recall receiving this letter from
5  Mr. Perry?
6    A. I don't.
7    Q. Do you see it says "I got an e-mail from Mark
8  and have corrected the date of each document. Enclosed
9  please find two execution original of the revised
10 documents. One, the SSC&L 2007 Trust, certified abstract
11 of the trust, and a debt assignment agreement."
12     You see that?
13   A. I do.
14   Q. Does that refresh your recollection of what
15 this transaction was about?
16   A. I know what the transaction was about, but I
17 don't recall this letter.
18   Q. Can you explain to me your recollection of the
19 transaction.
20   A. There was an assignment in the transfer of the
21 debt instruments to the SSC&L 2007 Trust.
22   Q. Which debt instruments?
23   A. As I testified earlier, it would be, as I
24 recall, two notes from SK Foods to the foreign companies
25 and two notes coming back.

Page 108

1    Q. So by the date of this letter, is it safe to
2  assume that the SSC&L trust was created on or about
3  December 18, 2007?
4    A. You would have to ask Gary Perry. I don't know
5  when it was created.
6    Q. Do you recall seeing a signed trust document
7  before December 18, 2007?
8    A. I never saw the trust document.
9    MR. NUTI: 113.
10   (Exhibit 113 was marked for identification.)
11 BY MR. NUTI:
12   Q. I'd like you to take a look at what's been
13 marked as 113, Mr. McCormick. Have you seen this letter
14 before?
15   A. I have not seen the letter.
16   Q. It states "I am enclosing a copy of the
17 executed original of the debt assignment agreement for
18 your records." Do you see that?
19   A. I do.
20   Q. Indicating a singular document. You see that?
21   A. I do.
22   Q. And then attached to this is a document
23 entitled Debt Assignment Agreement?
24   A. Yes.
25   Q. Have you seen this document before?

Page 109

1    A. I'm sure I have. I don't recall it until you
2  handed it to me.
3    Q. If you would look at the first paragraph, do
4  you see that this agreement is between SK Foods LP, SSC&L
5  trust and Cedenco Foods Limited, a New Zealand company?
6    A. I do.
7    Q. "On this first day of November, 2006." Do you
8  see that?
9    A. I do.
10   Q. Do you have any idea how this document can be
11 dated the first of November, 2006 when it appears that
12 the SSC&L trust was created in December of 2007?
13   MS. WOODRUFF: Objection. Calls for
14 speculation, calls for a legal conclusion, lacks
15 foundation.
16   THE WITNESS: I don't know how I'm supposed to
17 respond to your question. Can you ask it differently? I
18 mean, I've testified earlier that the decisions were made
19 about how to manage the different issues that were
20 presented with the company by the bank group, and there
21 was a conclusion that was reached. It was effective as
22 of November 1st, 2006.
23 BY MR. NUTI:
24   Q. I understand, but this agreement says "On this
25 first day of November, 2006," suggesting it occurred on

28 (Pages 106 to 109)

MARK MCCORMICK - 8/16/2011

Page 110

1  that day.
2      A. Sir, I -- go ahead.
3      Q. Let me ask a question.
4      ~~Do you have any idea how that could be~~

6          MS. WOODRUFF: Objection. Calls for
7  speculation, calls for a legal conclusion and
8  argumentative.
9          THE WITNESS: I didn't sign the agreement. You
10 would have to ask Mr. Salyer's counsel and Mr. Salyer
11 directly.
12 BY MR. NUTI:
13     Q. So you don't know?
14         MS. WOODRUFF: Same objections.
15         THE WITNESS: My answer stands.
16 BY MR. NUTI:
17     Q. Did you ever see a similar agreement that had
18 the Australian entity as a party?
19     A. I have not.
20     Q. In the discussions with Mr. Nutley and others
21 regarding the Fin 46 issue and the distribution of the
22 equity, was there a solvency analysis conducted by
23 anybody in connection with the transaction?
24     A. Solvency of who?
25     Q. Of SK Foods.

Page 111

1      A. No.
2      Q. Are you aware of a legal opinion reviewing the
3  documents effectuating a transaction?
4      A. No.
5      Q. Now, you have testified that BMO requested
6  audited financials of SK Foods that did not include the
7  foreign subsidiaries. Is that correct?
8      A. That's correct.
9      Q. Did they specifically ask for a divestiture of
10 those assets, or were they looking for financial
11 statements that simply did not include them in the
12 information, if you understand the distinction?
13     A. I do. They asked for financial statements that
14 did not include them.
15     Q. They did not specifically ask or demand a
16 divestiture of those assets?
17     A. Not to me. I would have no knowledge
18 whatsoever if they asked anybody else. The prior persons
19 principally involved would be David Hay, so I would
20 direct you to others to ask that question. I've never
21 had that conversation.
22     Q. Have you talked to Scott Salyer or his lawyers
23 recently?
24     A. No.
25     Q. When was the last time you talked to any of his

Page 112

1  lawyers?
2      A. I probably talked to Andy Miller, it's been
3  some time, before she got sick.
4      ~~Q. In connection with the declaration she drafted?~~

6  deposition in other matters.
7      Q. What about Scott Salyer?
8      A. I haven't spoken to him since I left the
9  company.
10     Q. Could we look at Exhibit 2, please, one more
11 time. Look at paragraph four. I believe the fourth
12 sentence, "The Cedenco debt and Cedenco receivables were
13 transferred on November 1st, 2006, to the SSC&L 2007
14 Trust."
15     A. Mm-hmm.
16     Q. What did you base that statement upon?
17     A. The effective date of the assignment agreements
18 that we've been discussing today.
19         MR. NUTI: Okay. Thank you. I don't have any
20 further questions.
21         MR. DREHER: I don't have any questions.
22         MR. CHRISTMAS: I just have a few questions.
23         FURTHER EXAMINATION BY MR. CHRISTMAS
24     Q. Mr. McCormick, do you know if the foreign
25 subsidiaries were guarantors under the amended and

Page 113

1  restated credit agreement that is part of Exhibit 111?
2      A. I have no knowledge. I significantly -- pardon
3  me. I would doubt. I've never seen any documents that
4  would say that they're guarantors.
5      Q. Can I draw your attention to page 21 of the
6  document, page 28 of 131 in the lower right.
7          At the top there, if you look at section 4.1,
8  it says "The payment and performance of the obligations,
9  hedging liability, and funds transfer and deposit account
10 liability shall at all times be guaranteed by each direct
11 and indirect domestic subsidiary of each borrower
12 (individually a guarantor and collectively the
13 guarantors)."
14         I think it goes on. It appears to me that only
15 the domestic subsidiaries are the guarantors. Is that
16 consistent or inconsistent with your understanding?
17     A. That would be consistent with my understanding.
18 Let me comment that this credit agreement was in place
19 before I joined the company, right, so I don't know what
20 the original credit agreement was.
21     Q. Understood.
22     A. And I've never seen it, but with respect to
23 this agreement that was dated September 28, 2007, it
24 would just be the domestic subsidiaries.
25     Q. And to your understanding, did that ever

29 (Pages 110 to 113)

MARK MCCORMICK - 8/16/2011

Page 114

1 change? Did the foreign subsidiaries ever become
2 guarantors of the U.S. debt?
3     A. No, not to my knowledge.
4     Q. And then one last question, in connection --
5 well, withdraw and I'll rephrase it.
6         Are you acquainted with the law firm called
7 Nageley, Meredith & Miller?
8     A. Yes.
9     Q. And did you contact them in connection with the
10 subpoena that brought you here today?
11    A. No. They're aware of it.
12    Q. Do you know how they became aware of it?
13        MS. WOODRUFF: Objection. Calls for
14 speculation.
15        MR. CHRISTMAS: I don't need to mark this, but
16 looking at an invoice that they issued February 28, 2011,
17 and it says "On February 18, 2011, reviewed subpoena
18 documents forwarded by M. McCormick." Did you forward
19 the subpoena?
20    A. I'm sure I did.
21    Q. Who did you forward it to?
22    A. Probably Andy Miller, or whoever -- I don't
23 know if she was sick or not at that time, but...
24    Q. And were they at some point acting as your
25 counsel?

Page 115

1     A. No.
2     Q. Then why did you forward it to them?
3     A. To understand what was going on here. I've
4 really zero knowledge of the Cedenco entities, so they're
5 the only counsel that ever contacted me in the last four
6 years about these matters, so she was the only person
7 that I knew.
8        MR. CHRISTMAS: Understood.
9        I don't have anything more.
10       MS. WOODRUFF: Well, I have some questions.
11       EXAMINATION BY MS. WOODRUFF
12    Q. Mr. McCormick, as you know I'm Kelly Woodruff,
13 and I'm representing the Salyer entities in connection
14 with this Cedenco chapter 15 bankruptcy.
15       Mr. Nuti gave you a copy of the amended and
16 restated debt agreement with BMO as Exhibit 111 that's
17 attached to this. I'd like you to turn to page 21 of the
18 agreement, which is page 28 of 131 in the bottom-right
19 corner.
20       Do you know whether or not the collateral
21 securing the credit facility between SK Foods and the
22 bank group included any equity or assets of any of the
23 foreign subsidiaries?
24    A. It did not.
25    Q. And now I'd like you to turn to page 45 of 131,

Page 116

1 which is page 38 of the exhibit. If you look to the
2 definition of "subsidiary," the definition of
3 "subsidiary" expressly excludes for purposes of the
4 credit agreement the foreign subsidiaries. Do you see
5 that?
6     A. I do.
7     Q. Do you know whether or not that was a change to
8 the credit facility, the credit document from the prior
9 agreement?
10    A. I don't, and I never saw the original credit
11 agreement.
12    Q. Okay. And then referring back to schedule 6.2,
13 which is page 130 of 131 in the bottom-right corner, you
14 testified earlier in response to Mr. Nuti's questions
15 that this was not accurate, and your understanding was
16 that this was not accurate at the time of this credit
17 facility. Is that correct?
18    A. I believe that's correct.
19    Q. Do you know whether or not this schedule 6.2
20 changed from the prior, the original credit agreement
21 that was executed?
22    A. I do not.
23    Q. Do you know whether Mountain Carrots, the New
24 Zealand company that's identified in the last line was,
25 in fact, 56 percent owned by SK Foods International?

Page 117

1     A. I do not.
2     Q. Do you know anything about the Mountain
3 Carrots?
4     A. I don't.
5     Q. Do you know whether or not drafts of the
6 audited 2007 financial statements were provided to Bank
7 of Montreal prior to being finalized and issued?
8     A. I don't. I don't recall specifically if that
9 occurred.
10    Q. Did you have any conversations with anyone at
11 BMO, or do you know whether anyone had any conversations
12 with anyone at BMO from the SK Foods side concerning the
13 footnotes to the audited financial statements?
14    A. It would have been Shondale.
15    Q. Do you know that Shondale had those
16 conversations?
17    A. I know that she did.
18    Q. Okay. Do you know whether or not Shondale
19 reviewed drafts of the footnotes with Bank of Montreal
20 prior to them being finalized?
21    A. I don't.
22    Q. Do you know whether or not anybody from SK
23 Foods reviewed the management representation letter with
24 Bank of Montreal prior to it being signed and finalized?
25    A. I don't.

30 (Pages 114 to 117)

MARK MCCORMICK - 8/16/2011

Page 118

1    Q.  Did you have any conversations with anyone at
2 Bank of Montreal concerning the transfer of the debt, the
3 debt between the Australian and New Zealand entities on

6    A.  If I understand your question correctly, I
7 believe I did.  As I said, I had the conversation with
8 numerous people, but in particular with the lady
9 responsible for the syndications department at Bank of
10 Montreal.
11    Q.  Do you recall whether or not in those
12 conversations you discussed that the company had decided
13 to structure the transaction that way so that it could
14 deconsolidate the financial statements?
15    A.  I don't recall the substance of the
16 conversation.  The conversation was Bank of Montreal on
17 one hand and the company on the other realized that the
18 financial statements, the audited financial statements,
19 should not include the foreign subsidiaries, and they
20 clearly did not want those balances reflected in the
21 financial statements.
22    Q.  Okay.  Is it your understanding that Bank of
23 Montreal never objected to the decision to transfer the
24 notes?
25    A.  There was -- I wasn't a party to any

1  STATE OF CALIFORNIA  )
                       )
2  COUNTY OF FRESNO    )

5 licensed in the State of California, License No. 13226,
6 do hereby certify that the foregoing proceedings was
7 reported by me and was thereafter transcribed under my
8 direction into typewriting; that the foregoing is a full,
9 complete and true record of said proceeding.
10    I further certify that I am not of counsel or
11 attorney for either or any of the parties in the
12 foregoing proceeding and caption named, or in any way
13 interested in the outcome of the cause named in said
14 caption.
15    In witness whereof, I have hereunto set my hand
16 and affixed my seal this day.
17    Date:  August 24, 2011
18
19
20
21
22    AMANDA SCOTT, CSR #13226
23
24
25

Page 119

1 conversation about the objection or never heard an
2 objection at all.
3    Q.  Did you ever hear of Bank of Montreal asserting
4 any kind of objection to the transfer of the equity of
5 the subsidiaries?
6    A.  No.
7    MS. WOODRUFF:  Okay.  I have no further
8 questions.
9    MR. CHRISTMAS:  Nothing further.
10    (Discussion off the record.)
11    MR. CHRISTMAS:  The witness has requested the
12 opportunity to review the deposition and execute, so it
13 will be sent to Mr....
14    THE WITNESS:  Tim Thompson.
15    MR. CHRISTMAS:  Tim Thompson at this firm.
16    (The deposition of MARK McCORMICK was concluded
17 at 1:06 p.m.)
18
19    ---oOo---
20    I declare under penalty of perjury under the
laws of the State of California that the foregoing is
21 true and correct.
22 Executed at        , California on        ,
2011.
23
24
    MARK McCORMICK
25

Merrill Corporation - San Francisco

800-869-9132                                www.merrillcorp.com/law

BMO 002113