# EXHIBIT 116

# In The Matter Of:

## *In re: CEDENCO JV AUSTRALIA PTY LTD, et al,*

---

## *WAYNE BOOS - Vol. 1*
### *August 15, 2011*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

BMO 002114

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---o0o---

In re:                              )
                                    ) NO. 10-35002
CEDENCO JV AUSTRALIA PTY LTD, et    )
al, (In Liquidation),               ) Chapter 15
                                    )
    Debtors in Foreign Proceedings. )
_____ )

---o0o---

Fresno, California                        August 15, 2011

        The deposition of WAYNE BOOS was taken in the

above-entitled matter pursuant to all of the provisions

of law pertaining to the taking and use of depositions

before Amanda Scott, CSR, with offices at Fresno,

California, commencing at the hour of 11:10 a.m. at the

law offices of McCormick, Barstow, Sheppard, Wayte &

Carruth, 5 River Park Place East, Fresno, California.

Page 2

INDEX

EXAMINATION                                      PAGE
By Mr. Christmas                                    7
By Mr. Nuti                                        119
By Mr. Dreher                                      121
By Ms. Woodruff                                    123

EXHIBITS
NO.     DESCRIPTION                              PAGE
1       Deposition Notice                            7
2       General Assignment And Transfer of Shares  13
3       Minutes of a Meeting of the Directors       13
4       Adjusting Journal Entries Report            13
5       February 25, 2002 Promissory Note           20
6       SK Foods Australia Pty Ltd Members
        Register                                    21

7       Corporate Consent Document                  21

8       January 21, 2005 Letter From
        Richard Washburn                            22
9       AM 214 Basic Client Information             27
10      Scott Salyer Share Certificate              28
11      SK PM Corporation Share Certificate         28
12      Standard Transfer Form                      29
13      Standard Transfer Form                      29
14      Share/Option Transfer Journal               29

Page 4

INDEX CONTINUED
EXHIBITS
NO.     DESCRIPTION                    PAGE
41-43   (Skipped)
44      E-Mail Chain                    86
45-48   (Skipped)
49      E-Mail Chain                    88
50      (Skipped)
51      E-Mail Chain and Financial Statements    90
52      E-Mail Chain                    93
53      February 18, 2008 E-Mail From Wayne Boos  99
54-68   (Skipped)
69      July 14, 2008 Journal Entry      16
70-73   (Skipped)
74      August 24 , 2008 E-Mail From
        Mark McCormick                 100

75      August 24, 2008 E-Mail From John    102

76      (Skipped)

77      E-Mail Chain                   103

78      (Skipped)

79      Financial Statements           106

80-89   (Skipped)

90      Bill of Sale                   108

91      Bill of Sale                   108

92-95   (Skipped)

Page 3

INDEX CONTINUED
EXHIBITS
NO.     DESCRIPTION                    PAGE
15      November 7, 2006 E-Mail From Wayne Boos  31
16-17   (Skipped)
18      E-Mail Chain                    33
19      Australian and New Zealand Entities FIN46
        Evaluation                      35

20      E-Mail Chain                    35

21      August 16, 2007 E-Mailed Correspondence  37

22      E-Mail Chain                    41

23      August 21, 2007 E-Mailed Correspondence  48

24      (Skipped)

25      August 29, 2007 E-Mail From Wayne Boos   58

26      E-Mail Chain                    58

27      E-Mail Chain                    61

28      (Skipped)

29      September 27, 2007 E-Mail From
        Shondale Seymour                63
30      E-Mail Chain                    67
31      Debt Subordination Agreement    70
32      Debt Subordination Agreement    70
33      E-Mail Chain                    71
34      E-Mail Chain                    71
35-39   (Skipped)
40      December 17, 2007 Fax           75

Page 5

INDEX CONTINUED

EXHIBITS
NO.     DESCRIPTION                    PAGE
96      Financial Report               108
97      (Skipped)
98      Accounts Receivable Set Off Agreement   109
99-103  (Skipped)
104     E-Mail Chain                   110
105     E-Mail Chain                   110
106     April 6, 2009 E-Mail From Darrell Carlis  111
107-109 (Skipped)
110     Bill of Sale                   113
111     Bill of Sale                   113
112     Chance to Company Details      114
113     Register of Members            114

Merrill Corporation - San Francisco

800-869-9132                        www.merrillcorp.com/law

BMO 002116

Page 6

1  APPEARANCES OF COUNSEL:
2  FOR THE WITNESS:
3     MURPHY, PEARSON, BRADLEY & FEENEY
         Attorneys at Law
4        88 Kearney Street, 10th Floor
         San Francisco, California 94108
5        (415) 788-1900.
         vgara@mpbf.com
6     BY: VINCENT O'GARA
7  FOR THE SALYER ENTITIES:
8     FARELLA, BRAUN & MARTEL
         Attorneys at Law
9        235 Montgomery Street
         San Francisco, California 94104
10       (415) 954-4400
         kwoodruff@fbm.com
11    BY: KELLY A. WOODRUFF
12  FOR THE LIQUIDATORS:
13    NIXON PEABODY LLP
         Attorneys at Law
14       437 Madison Avenue
         New York, New York 10022
15       (212) 940-3000
         rchristmas@nixonpeabody .com
16    BY: ROBERT N.H. CHRISTMAS
17  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
18    DOWNEY BRAND
         Attorneys at Law
19       621 Capitol Mall, 18th Floor
         Sacramento, California 95814
20       (916) 520-5478
         jdreher@downeybrand.com
21    BY: JAMIE P. DREHER
22  FOR BRAD SHARP:
23    SCHNADER, HARRISON, SEGAL & LEWIS
         Attorneys at Law
24       One Montgomery Street, Suite 2200
         San Francisco, California 94104
25       (415) 364-6717
         gnuti@schnader.com

Page 7

1     BY: GREGORY C. NUTI
2  FOR THE BANK OF MONTREAL:
3     CHAPMAN & CUTLER
         Attorneys at Law
4        111 West Monroe Street
         Chicago, Illinois 60603
5        (312) 845-3010
         slewis@chapman.com
6     BY: SCOTT LEWIS
7  Also Present: John Sheahan
8           ---oOo---
9           WAYNE BOOS,
10      called as a witness herein, having
11        been heretofore duly sworn,
12            testified as follows:
13           ---oOo---
14   (Exhibit 1 was marked for identification.)
15       EXAMINATION BY MR. CHRISTMAS
16    Q. Good morning, Mr. Boos. As you know, I'm
17  Robert Christmas. I am with Nixon Peabody, I'm counsel
18  for the liquidators in these Chapter 15 proceedings.
19    Just for some housekeeping purposes, have you
20  been deposed before?
21    A. Yes.
22    Q. So you know the process, that we can't talk
23  over each other. Also, if I could just suggest, you
24  might anticipate where my question is going, but my
25  question may end up with a different word or words than

Page 8

1  you expect, so if you could just wait for me to finish my
2  question before answering, then the court reporter won't
3  strangle us.
4    A. Okay.
5    Q. Some other preliminary questions; are you
6  taking any medication today that would interfere with
7  your ability to recall or retell events?
8    A. No.
9    Q. Do you suffer from any physical condition that
10 interferes with your memory?
11   A. No.
12   Q. Okay. Just want to go briefly through
13 background and then we'll get to some other things and
14 some documents.
15     What post high school degrees do you have?
16   A. I have my AA in accounting, I have my
17 bachelor's in business with an emphasis in accounting and
18 I have my master's of accounting as well.
19   Q. Could you give me the institutions and the
20 years for those?
21   A. My AA was at Reedley College in 1983, and my
22 bachelor's was at Fresno State, California State
23 University Fresno in '85, and my master's was from
24 California State University Fresno in 1986.
25   Q. Okay. And just briefly, you don't have to go

Page 9

1  through all the details, but I assume you've been
2  practicing in the field of accounting for basically since
3  graduation?
4    A. Correct, since '86.
5    Q. Since '86, okay.
6      And can you tell me what firms you worked for
7  before founding Wayne Boos & Associates?
8    A. I started out of school at Ernst & Whinney,
9  which became Ernst & Young. In '94 the Fresno office of
10 Ernst & Young merged into Deloitte & Touche, and I was
11 with Deloitte from '94 until 2004. I was a tax director
12 with Deloitte, and I started Boos & Associates in 2004.
13   Q. Okay. And when did you first do professional
14 work for any entities associated with the Salyer family?
15   A. In 1997 while I was at Deloitte is when I
16 started working with the Salyer group.
17   Q. Okay. And when you founded Boos & Associates
18 were you doing or did you immediately thereafter do work
19 for any Salyer entities?
20   A. Immediately thereafter.
21   Q. And let's start with I guess 2006. What
22 services, and if it's really elaborate, we'll narrow it,
23 but what services was, I'll say Boos & Associates,
24 providing to Salyer associated entities?
25   A. We were the tax adviser, that was our main role

3  (Pages 6 to 9)

WAYNE  BOOS - 8/15/2011

Page 10

1  obviously with my background for all the entities,
2  including Scott Salyer, and we did some accounting
3  services for SK Foods.
4      Q. And when you say SK Foods, that's SK Foods LP?
5      A. Yeah, SK Foods LP.
6      Q. Did you do accounting services for Mr. Salyer
7  personally in any way?
8      A. We did accounting services for a limited basis
9  for an entity called SS Farms, some of the farming
10  entities, but that was handled by somebody else out of
11  our office. I didn't really work on that.
12      Q. So you didn't work on any personal trusts or
13  any --
14      A. Well, from the tax side I did, but we didn't
15  have any accounting...
16      Q. So you did tax advisory for Mr. Salyer's
17  personal entities?
18      A. As well as the companies, yes.
19      Q. And was there a role -- again, I guess let's
20  just start with 2006. Was there a role for outside
21  auditors for the Salyer company? Was there --
22      A. Yeah, there was --
23      Q. Let me withdraw and I'll rephrase it.
24          Was there one or more outside auditor?
25      A. Yes, there was, and there was different

Page 11

1  companies so there was different auditors. We didn't
2  provide any auditing service for any of the Salyer
3  entities.
4      Q. You did not, okay.
5          Was that a choice by your firm to just focus on
6  tax?
7      A. Yeah, I don't have an audit background, so.
8      Q. Okay. Can you name the audit firms that you
9  recall that were acting in 2006?
10      A. In 2006, Moss Adams was the auditors for SK
11  Foods, I believe, and it was previously with Deloitte,
12  but I think that relationship ceased in '05. Salyer
13  American Fresh Foods, the auditor was Hayashi, I believe,
14  out of Salinas. In New Zealand and Australia, the
15  auditors for those entities was Deloitte.
16      Q. And at that point in time, let's say in 2006,
17  did you have interactions with any of these outside
18  auditors as part of your services?
19      A. Yes.
20      Q. Okay. And did you have interactions with each
21  of Moss Adams, Hayashi and Deloitte in Australia and New
22  Zealand?
23      A. Hayashi, very limited interaction; and
24  Deloitte, a lessened amount. Moss Adams, I had some
25  interaction. We did the tax provision for SK Foods, and

Page 12

1  provided that to the company, on behalf of the company,
2  and that was provided to the auditors.
3      Q. Can you explain the tax provisions and the
4  financial statements?
5      A. Tax provision is basically a deferred tax
6  account, either an asset or a liability, and, you know,
7  recording what those liabilities would be on their
8  financial statement. Most of that, because SK Foods is a
9  pass-through entity, all they would really have is $800.
10          And I may get confused in my periods, but there
11  was a point where we had to do that on behalf of the
12  foreign entities that pass through SK Foods, because they
13  had obviously New Zealand and Australia taxes that were
14  paid, in addition to the taxes that were paid at Scott's
15  level.
16      MR. CHRISTMAS: Let's turn to some documents
17  now.
18          Just as a preface to some of these documents,
19  I'm generally going to be doing them in chronological
20  order, but for the record, simply because of the order in
21  which they are presented does not mean that anyone has
22  made any conclusion about their dates on behalf of the
23  liquidators, but this is the order at least that we've
24  selected for the witness.
25          Some of these, I'll go fairly quickly through,

Page 13

1  I'll just ask you if you've ever seen before, others
2  we're going to go into more detail, if that's helpful.
3          The court reporter has marked for
4  identification Exhibit Boos 2.
5          (Exhibit 2 was marked for identification.)
6  BY MR. CHRISTMAS:
7      Q. Have you ever seen that document, Mr. Boos?
8          I'm sorry. Let me go off for a second.
9          (Discussion off the record.)
10      THE WITNESS: I don't remember if I've seen
11  this -- I don't recall this particular document. I don't
12  think I have.
13  BY MR. CHRISTMAS:
14      Q. Have you seen it possibly in unsigned form?
15      A. I don't recall it. I'm not saying I haven't,
16  but -- I've seen a lot of documents, but this one doesn't
17  stand out as one that I remember.
18      MR. CHRISTMAS: Okay. Let's mark this as...
19          (Exhibit 3 was marked for identification.)
20  BY MR. CHRISTMAS:
21      Q. Mr. Boos, the court reporter has handed you a
22  document marked for identification as Boos 3. Have you
23  ever seen this document?
24      A. I've never seen this document.
25          (Exhibit 4 was marked for identification.)

4  (Pages 10 to 13)

WAYNE  BOOS - 8/15/2011

Page 14

1  BY MR. CHRISTMAS:
2      Q. Mr. Boos, the court reporter has handed you a
3  document marked for identification as Boos 4. Do you
4  recognize this form of document?
5      A. Yes.
6      Q. Can you tell me what this document is?
7      A. I believe this is part of our tax work papers,
8  and the first page is a copy of SK Foods' journal entries
9  from their system, which reflect an adjustment for the
10  distribution of SK Foods Australia to Scott Salyer trust
11  and SKPM Corp, and the subsequent work papers are
12  reflecting a revision to a previous tax return, the
13  12/31/06 return to reflect that distribution.
14      Q. So the first page is, would it be fair to say
15  it's a printout from some computer system --
16      A. Yeah, from SK Foods.
17      Q. And if you would just let me finish.
18      A. Okay. I'm sorry.
19      Q. To spare the court reporter.
20      So you said this is from their computer system
21  and they -- withdraw that.
22      How about the boxed portion down below? There
23  appears to be, if I draw your attention to the bottom of
24  the page, there's text in a different font that appears
25  to be typed inside a text box. Was that generated by

Page 15

1  your firm?
2      A. This was probably done by the staff at our firm
3  as a work paper notation.
4      Q. And you testified just a few moments ago about
5  a distribution. Is that journal entry 35, or was that
6  the entire page?
7      A. No, it was journal entry 35.
8      Q. And we have a better copy we'll get to later on
9  in the documents, but would you happen to recognize the
10  handwriting that's close to the bottom of the page, whose
11  handwriting it might be?
12      MR. O'GARA: Mr. Christmas, do you have another
13  copy? It's a little bit illegible.
14      MR. CHRISTMAS: I don't have another copy. I
15  have another document that has that, which we will get
16  to. I don't have it right in front of me.
17  BY MR. CHRISTMAS:
18      Q. Do you --
19      MR. NUTI: I have a copy of the letter.
20      MR. CHRISTMAS: Just a second.
21      MR. O'GARA: Looks like it's a great, great,
22  great, great grandchild of the original.
23      THE WITNESS: I don't...
24  BY MR. CHRISTMAS:
25      Q. You can answer if you --

Page 16

1      A. I don't believe it was done by someone at our
2  office. It doesn't look familiar, but also, we normally
3  would have typed it on a work paper, not written. So I
4  believe it probably came from SK Foods.
5      MR. CHRISTMAS: I'll have the court reporter
6  mark another exhibit now and then we'll set it aside
7  perhaps before we get to it.
8      If you could mark this as 69.
9      (Exhibit 69 was marked for identification.)
10  BY MR. CHRISTMAS:
11      Q. Mr. Boos, the court reporter has marked as
12  Exhibit 69 a two-page document, and I think we'll address
13  this a little bit later, just chronologically in the
14  deposition, but if I could draw your attention to the
15  second page of that document, it at least appears to me
16  that these are the second page of 69 and first page of
17  Boos 4 are the same printout from SK Foods with
18  handwriting that is now in this 69, legible, and I'll
19  just read it into the record. It says "Entry missed,
20  never booked."
21      Is this handwriting recognizable to you now, or
22  is it someone outside your organization?
23      MS. WOODRUFF: Objection. Calls for
24  speculation whether it's somebody else.
25      MR. CHRISTMAS: I'm asking you if it is, if he

Page 17

1  knows.
2      THE WITNESS: I don't believe it's on our tax
3  preparer's side anybody in our office. It also looks
4  like it was an SK Foods journal entry. It possibly, I've
5  seen Deborah Blayney there, she was doing work at SK
6  Foods. It could be her writing.
7  BY MR. CHRISTMAS:
8      Q. And who is Ms. Blayney?
9      A. She was a staff accountant, worked for us, that
10  was assisting SK Foods in accounting, along with
11  Shondale.
12      Q. And you're referring to Shondale Seymour?
13      A. Yes.
14      Q. So if we could turn back to Exhibit 4, the note
15  that is typewritten at the bottom refers to adjusting
16  journal entry 35. Can you explain in perhaps layman's
17  terms what the text in the box means?
18      A. Basically the 2006 return for SK Foods was
19  prepared not reflecting that distribution and the
20  adjustment. The effect of that adjustment was shown on
21  the subsequent pages as what the return would have looked
22  like, and I believe the beginning of the year column is
23  December 31st of '06, and the end of the year column is
24  '07. Yeah, because this is a 2007 return.
25      So because that adjustment did not get

5  (Pages 14 to 17)

WAYNE   BOOS - 8/15/2011

Page 18

1  reflected in '06, we wanted to see the impact obviously
2  from a tax return standpoint, and because basically it's
3  just a distribution, doesn't really have any tax impact,
4  and this is more just for the presentation purpose to
5  substantiate that, and I believe that in order to match
6  the return that was filed at the IRS, the adjustment was
7  just, what it states here was basically treated as a
8  distribution in the current year, '07.
9      Q. And when you say "current year," did SK Foods
10  have a fiscal year?
11     A. Had a calendar year for tax purposes.
12     Q. Okay. And the calendar year for tax purposes
13  was December 31?
14     A. December 31st, yeah.
15     Q. But for accounting purposes, it had --
16     A. For accounting purposes, it switched. It was
17  historically on a October 31st fiscal year, and the last
18  one ended October 31st of '06, and then they changed to a
19  June 30th fiscal year, and that period would have been
20  for June 30th, '07.
21     Q. So '07 was the first year that they had
22  adjusted their fiscal year?
23     A. Yes, the fiscal year ended in '07, yes.
24     Q. Was this a tax-free distribution? I think your
25  testimony indicated that it was.

Page 19

1      A. Yes.
2      Q. And can you elaborate on that?
3      A. Basically because SK Foods is a partnership,
4  doesn't pay tax, and the fact that a partnership is
5  allowed to distribute cash or property tax-free generally
6  and that doesn't cause a tax event to happen within the
7  partnership, and then obviously there's an issue they
8  have to look at the partner level as to whether or not
9  they're taxable at that level, but at least at the
10  partnership level there was no tax event that was
11  created.
12     Q. Okay. And the values that are shown on the
13  first page of Exhibit 4, the 2 million and 2 million, is
14  that a book value, or a basis amount, or can you explain?
15     A. That's a tax basis, an amount. Tax basis
16  amount.
17     Q. Did your firm also provide the tax services for
18  the general limited partners of SK Foods?
19     A. Yes.
20     Q. And that would include the return filing, et
21  cetera?
22     A. Yes.
23     Q. Okay. Do you know if the transaction relating
24  to adjusting journal entry 35 in Boos 4 created a tax
25  payable by the partners on account of the distribution?

Page 20

1      A. I don't believe it did. It should have had
2  enough basis at that time.
3      Q. You think they had enough tax basis?
4      A. Mm-hmm.
5          (Exhibit 5 was marked for identification.)
6  BY MR. CHRISTMAS:
7      Q. Mr. Boos, the court reporter has handed you a
8  document marked as Exhibit 5 for identification. Have
9  you ever seen this document?
10     A. I believe so.
11     Q. Okay. Can you tell me what you understand it
12  to be?
13     A. It's a note payable from SK Foods Australia to
14  SK Foods from 2002 in the amount of $12 million plus.
15     Q. Do you know what gave rise to this promissory
16  note, the underlying transaction?
17     A. In 2002 SK Foods acquired the Australian and
18  the New Zealand entities, and part of that transaction
19  was reflected as capital, and part of it was reflected as
20  a note for the funds that were transferred to those
21  entities. SK Foods Australia was the holding company
22  that acquired the Cedenco Australia interests from -- I
23  think there were two parties for that partnership.
24     Q. Do you know if interest was ever paid on this
25  note?

Page 21

1      A. I'm not sure. I don't recall.
2      Q. Do you know if it was collateralized in any
3  way?
4      A. I'm not sure.
5          MR. CHRISTMAS: Could you mark this as 6, and
6  this as 7.
7          (Exhibits 6 and 7 were marked for
8  identification.)
9  BY MR. CHRISTMAS:
10     Q. Mr. Boos, the court reporter has handed you
11  Boos Exhibits 6 and 7 for identification, and I'm just
12  going to ask you if you've ever seen either of these
13  documents.
14     A. I don't recall seeing Exhibit 6. 7, I can --
15     Q. I apologize for the quality of Exhibit 7.
16     A. Let's see if there's a different page here.
17     Q. My understanding, it is an Australian corporate
18  consent document relating to the acquisition that you
19  referenced earlier.
20     A. I don't remember or recall this document.
21     Q. Okay. How did you learn of the acquisition,
22  the initial acquisition by SK Foods of the companies,
23  directly or indirectly? I want to be precise, the
24  companies in Australia and New Zealand?
25     A. In 2002?

6  (Pages 18 to 21)

BMO 002120

WAYNE   BOOS - 8/15/2011

Page 22

1     Q. Yes.
2     A. I was involved with that acquisition while I
3  was at Deloitte, in structuring how that acquisition was
4  going to be handled, and there were some tax benefits to
5  structuring it as debt versus all equity infusion, which
6  I base upon the advice of Deloitte International Tax
7  Group. It was handled that way.
8     MR. CHRISTMAS: Okay. This is 8.
9     (Exhibit 8 was marked for identification.)
10 BY MR. CHRISTMAS:
11    Q. Mr. Boos, the court reporter has handed you
12 Boos Exhibit 8 for identification. Have you ever seen
13 this document before?
14    A. No, I have not. I don't recall seeing this
15 document.
16    Q. Do you recall that there was any need for
17 confirmation of the payment terms of the notes to the
18 accountants acting for Cedenco in Australia and New
19 Zealand?
20    MS. WOODRUFF: Objection. Lacks foundation and
21 doesn't refer to any -- that this was seen.
22 BY MR. CHRISTMAS:
23    Q. I'm just asking in general. Are you aware of
24 any need to confirm the terms of notes between the
25 companies in north America and South America -- I mean

Page 23

1  Australia and New Zealand?
2     A. Well, Cedenco and SK Foods Australia had
3  audits, so there would have been obviously a need for
4  auditors to substantiate those notes, and what they need
5  to do is to classify it as either current or long-term on
6  the balance sheets.
7     Q. Okay. That's all I was looking for.
8     Can you tell me what Fin 46 is?
9     A. The short version?
10    MR. O'GARA: Mr. Christmas, I'm going to make
11 my standard objection to that in accountant depos.
12    Mr. Boos is here as a percipient witness, not
13 an expert, and I don't want you asking what he did or why
14 he did it in terms of accounting, and I do object and
15 I'll have a continuing objection in this deposition to
16 using Mr. Boos as a substitute expert while he's not been
17 identified as an expert in this litigation.
18    MR. CHRISTMAS: I understand. He hasn't been
19 so identified, so I understand. Your objection is noted.
20    MR. O'GARA: It's my standard speech.
21    MR. CHRISTMAS: Understood.
22 BY MR. CHRISTMAS:
23    Q. I guess I don't want to say I want to hear the
24 cocktail party version of Fin 46, but if you could give
25 us an abbreviated version of Fin 46 for purposes of dumb

Page 24

1  lawyers.
2     A. My understanding of Fin 46 in general, and
3  remember I'm a tax person, but from a financial statement
4  standpoint, under GAAP there was a new codification that
5  occurred around this 2005 time, maybe a little before
6  that, which basically looked more at the economic
7  substance of an arrangement, and it was principally, I
8  believe, driven from the Enron issues that were there on
9  these entities that had liabilities that weren't
10 consolidated in Enron's financial statement.
11    But what it basically does is it requires in
12 order to have GAAP financial statements and to include
13 certain entities in that consolidated financial statement
14 other than just a pure ownership standpoint. And
15 basically looking to -- if the entity that you're
16 reporting on bears the ultimate risk of loss for the
17 other entity that would get consolidated.
18    Q. Now, did Fin 46 become an issue for any of the
19 Salyer entities after its promulgation in or around 2005?
20    MS. WOODRUFF: Objection. Goes beyond this
21 witness's personal knowledge.
22    MR. CHRISTMAS: We haven't found out what that
23 was.
24    You can answer.
25    THE WITNESS: Fin 46 definitely is an issue for

Page 25

1  SK Foods, because of all their related entities that were
2  in existence.
3  BY MR. CHRISTMAS:
4     Q. And if you know, who first identified that it
5  was an issue?
6     A. Well, I believe while I was at Deloitte, so
7  that was prior to '04 when it was promulgated. The
8  auditors would have definitely raised that there's a
9  change in the standards that needed to be addressed. I
10 believe there was a couple years of a transition period
11 before it became effective, and so that's obviously when
12 it first occurred, and then Moss Adams was, as a
13 subsequent auditor to Deloitte, was I believe the
14 auditing firm that basically addressed it in the first
15 audit that it applied to.
16    Q. Without identifying names of clients, have you
17 had occasion to deal with this issue for other clients in
18 your practice?
19    A. It's something that's addressed, but not to the
20 extent that it was an issue with SK Foods.
21    Q. Okay. So I take it, then, the transition
22 period expired and it became something that had to be
23 addressed?
24    A. Yes.
25    Q. By SK Foods.

7  (Pages 22 to 25)

Page 26

1       Okay.  Were the outside auditors in charge of
2   coming up with a way to address that, or were you, or was
3   it a combination?
4       A.  Well, the company was the one that ultimately
5   is responsible for that, and at that time Mark McCormick
6   was the CFO, and so he was the one that I would say had
7   the ultimate responsibility for that.
8       The auditors obviously dealt with it, because
9   they're the ones that are opining on the financial
10  statements, so it's an audit step they have to go
11  through, an analysis they have to go through.
12      In SK Foods' situation obviously there was
13  discussion between myself and our firm and Moss Adams,
14  Mark McCormick and Scott Salyer on this particular issue.
15  Because there was, what I was told, a desire by the
16  company as well as the banks not to include the foreign
17  entities in their financial statement for SK Foods.
18      Q.  And where did you learn that that was a desire
19  of the banks?
20      A.  From Scott, Mark, Shondale and Moss Adams who
21  had indicated that.
22      Q.  So they wanted these entities not shown on the
23  financial statements?
24      A.  Correct.  They wanted to view it as the U.S.
25  operations only.  In addition, adding them in, there was

Page 27

1   logistical problems with the timing.  It caused
2   significantly more time to consolidate them in because
3   it's complicated because you have international companies
4   that you're dealing with and foreign currencies, et
5   cetera, but it delayed the issuance of the audit report
6   because it was a complicated audit.
7       Q.  And do you know the identity of any of the
8   banks involved?
9       A.  Harris Bank, Bank of Montreal.
10      Q.  And did you ever have any conversations with
11  anyone at Harris Bank or Bank of Montreal about this
12  issue?
13      A.  No.
14      MR. CHRISTMAS:  This is 9.
15      (Exhibit 9 was marked for identification.)
16  BY MR. CHRISTMAS:
17      Q.  Mr. Boos, the court reporter has handed you
18  Exhibit 9 to your deposition.  Do you recognize this
19  document?
20      A.  No, I don't believe I've seen this.
21      Q.  You've never seen this document?
22      A.  I don't believe so.  It wouldn't be something
23  that we would have prepared.
24      Q.  It would not have been?
25      A.  No, I don't believe so.

Page 28

1       Q.  Just looking at the format of this document,
2   are you familiar with the format that's used here?
3       MR. O'GARA:  Same objection.
4       THE WITNESS:  I've never --
5       MR. CHRISTMAS:  It's got a blank final page.
6       THE WITNESS:  I don't know this.  It almost
7   looks like an audit work paper of some sort because it
8   talks about AICPA guides and audits of small businesses.
9   BY MR. CHRISTMAS:
10      Q.  Okay.  But other than your supposition, you
11  don't --
12      A.  No, since I'm not an auditor, I don't know
13  about this.
14      MR. CHRISTMAS:  All right.  This is 10.  This
15  is 11.
16      (Exhibits 10 and 11 were marked for
17  identification.)
18      MR. O'GARA:  I'm missing 10.
19      MS. WOODRUFF:  I thought the share certificate
20  was 10.
21      MR. CHRISTMAS:  There is more than one.
22      MR. O'GARA:  Thank you.
23      MR. CHRISTMAS:  The SKPM share certificate is
24  11, and the Scott Salyer ATF Scott Salyer trust is 10.
25      MS. WOODRUFF:  So I don't have 11.

Page 29

1       MR. CHRISTMAS:  I thought it was coming around
2   to you.
3       This is 12.
4       (Exhibit 12 was marked for identification.)
5       MR. CHRISTMAS:  Vince, did I get you 12?
6       MR. O'GARA:  I have it now.
7       MR. CHRISTMAS:  No, that's 13.
8       Did I hand you 13?
9       COURT REPORTER:  No, I don't have it yet.
10      MR. CHRISTMAS:  Here's 13, and here is 14.
11      (Exhibits 13 and 14 were marked for
12  identification.)
13      MR. CHRISTMAS:  Should we do a roll call?
14      MR. NUTI:  Yeah, please.
15      MR. CHRISTMAS:  10 is the Scott Salyer ATF
16  Scott Salyer revocable trust share certificate.  11 is
17  the SK PM corporation share certificate.  12 is the
18  standard transfer form for SK Foods Australia
19  proprietary.
20      MS. WOODRUFF:  12 is for the trust and 13 is
21  for SKPM, the shared transfer form?
22      MR. CHRISTMAS:  Yes, that's right, at the
23  bottom.
24      And did I do 14 yet?
25      THE WITNESS:  I have 14.  14 is a journal

8  (Pages 26 to 29)

WAYNE   BOOS  -  8/15/2011

Page 30

1  entry.
2  BY MR. CHRISTMAS:
3      Q. We'll just run through these quickly, Mr. Boos.
4      The court reporter has placed in front of you
5  for identification Exhibits 10, 11, 12, 13 and 14. If
6  you could look at each of those in order and tell me if
7  you have ever seen any of these before.
8      A. I don't recall seeing any of these.
9      Q. Okay. If you could turn to Exhibit 12 and
10 Exhibit 13, each of these forms has a line that says
11 "consideration," and there's a number there in each one.
12     Were you involved in the calculation of those
13 amounts in any way?
14     A. No.
15     Q. Have you ever seen those amounts or similar
16 amounts before, in your work?
17     A. Well, my understanding this was a
18 distribution from SK Foods LP, so I'm not sure why it
19 would be saying consideration and amount paid. I don't
20 recall seeing that before.
21     Q. Is that because it's your understanding that
22 there was no consideration paid?
23     A. Correct. As a distribution, there is no
24 consideration.
25     Q. You mean a distribution to partners?

Page 31

1      A. Correct.
2      MR. CHRISTMAS: Okay. This is 15.
3      (Exhibit 15 was marked for identification.)
4  BY MR. CHRISTMAS:
5      Q. Mr. Boos, the court reporter has handed you
6  Exhibit 15 for identification. This appears to be an
7  e-mail from you to Mr. Salyer dated November 6, 2006,
8  with Bates number Sharp Chapter 15 page 96, November 7,
9  2006. Are you familiar with this e-mail?
10     A. I recall it now.
11     Q. And who is Stacey? Do you recall?
12     A. Stacey Alexander was the controller and then
13 became the CFO of SK Foods.
14     Q. And Rick E.?
15     A. Rick Emmett is the director of farming for the
16 SS Farms-related entities, all the farming side of the
17 Salyer group.
18     Q. And SSC farming, is that --
19     A. Rick Emmett. SSC farming is one of the farming
20 companies.
21     Q. And it refers there to starting significant
22 farming operations in Australia. Did that ever come to
23 pass?
24     A. I believe so, yes.
25     Q. And what was the entity that did the farming

Page 32

1  operations?
2      A. SS Farms Australia PTY Limited.
3      Q. Do you know who owned SS Farms Australia
4  Proprietary?
5      A. SS Farms.
6      Q. And so the formal name of that, do you recall,
7  was it --
8      A. SS Farms LLC.
9      Q. And what or who owned SS Farms LLC?
10     A. During this time it was owned a third by
11 Scott's trust and a third each by his two daughters'
12 trust. I think the SAS trust and the CGS trust.
13     Q. And at some point in time did that change?
14     A. The ownership of SS Farms?
15     Q. Yes.
16     A. Not while I was working on it.
17     Q. The line next to the bottom of this e-mail
18 refers to a Nick and a Harry. Can you identify those
19 individuals?
20     A. Nick Frankish is the CFO of Cedenco New
21 Zealand, and Harry was the controller of the -- he was
22 primarily responsible for the Australian entities,
23 Harry Heath.
24     Q. Harry Heath, okay.
25     Have you met either of those individuals in

Page 33

1  person?
2      A. I met both of them, yes.
3      Q. And you met them here in the United States?
4      A. I met them here in the United States, and I met
5  Nick, I was in New Zealand before as well one time.
6      Q. Okay. When did you go to New Zealand?
7      A. In 2002 or '3, when I was at Deloitte.
8      Q. And was that to work on the acquisition?
9      A. Yes, it was after it had been completed.
10     MR. CHRISTMAS: We're going to skip an exhibit
11 number and go now to 18.
12     (Exhibit 18 was marked for identification.)
13 BY MR. CHRISTMAS:
14     Q. Mr. Boos, the court reporter has handed you
15 Exhibit 18 for identification, which is a series of
16 e-mails from May, 2007. May 10. If you could read it
17 over and then I'll ask you a couple questions.
18     A. Okay.
19     Q. Now, it appears from the e-mail, the first
20 e-mail is from Mr. Frankish, whom you just identified in
21 your last answer or so.
22     What is he referring to there?
23     MS. WOODRUFF: Objection. Calls for
24 speculation as to what the author is referring to.
25     MR. CHRISTMAS: Well, we'll find out if the

9 (Pages 30 to 33)

Page 34

1  witness spoke to him, or knows.
2       THE WITNESS:  An issue they had was that for
3  U.S. tax purposes we had to reflect the accounting on a
4  calendar year, and that also, because those entities in
5  Australia and New Zealand were effectively treated as
6  pass-through entities and pass-through SK Foods, pass
7  through to Scott, they had to provide us information on a
8  calendar year basis for tax purposes.
9       For accounting purposes and financial statement
10  purposes, the SK Foods was on a, at this time, October
11  31st year-end, last year ending October 31st, '06, so I
12  know it always caused frustration for Nick just on the
13  fact there was duplicate work because of these different
14  year-ends.  So I believe he was just trying to align it.
15  BY MR. CHRISTMAS:
16       Q.  And your response, would it be fair to say is
17  that you were fine with making the change?
18       A.  Yeah.  I think that they -- I think what it was
19  also is that at this time they were on a December 31st
20  for their reporting to the New Zealand tax authorities
21  which does include some type of a financial statement
22  goes along with it, and Australia, so they were wanting
23  to change their tax reporting to that.  That does have no
24  bearing on our -- because the New Zealand and the
25  Australian taxes were handled by Nick and Harry at the

Page 35

1  company and Deloitte in New Zealand and Deloitte in
2  Australia, I'm not a New Zealand or Australian tax
3  expert, so I left that to them, but I think he was just
4  saying how that would impact us here in the U.S., and I
5  said it doesn't really impact us, but we would just have
6  to continue for tax purposes be on a December 31st
7  year-end.
8       COURT REPORTER:  What is this now?
9       MR. CHRISTMAS:  This is 19.
10       (Exhibit 19 was marked for identification.)
11  BY MR. CHRISTMAS:
12       Q.  Mr. Boos, the court reporter has handed you
13  Exhibit 19 for identification.  Do you recognize this
14  document?
15       A.  I've never seen this before.
16       MR. CHRISTMAS:  This is 20.
17       (Exhibit 20 was marked for identification.)
18  BY MR. CHRISTMAS:
19       Q.  Mr. Boos, the court reporter has handed you
20  Exhibit 20 for identification, which is a series of
21  e-mails, dated in July, 2007.  And in the e-mail, the
22  first e-mail from Mr. Frankish to Ms. Seymour with copies
23  to Mr. Lawrence, Mr. Hay and Mr. Heath, he says the
24  following:  "We have heard from Scott/David that SKF is
25  looking to change its balance dates to June 30, and to

Page 36

1  separate the ownership of NZ/Aust subsidiaries from SKF
2  to a Scott Salyer trust."
3       So this is July, 2007.  Had you heard that
4  there was going to be any kind of separation of ownership
5  prior to this point in time?
6       A.  I believe this was about the time period which
7  I was informed of it.
8       Q.  Okay.  And then Shondale up above writes to you
9  and says in her last paragraph, she says "The intent is
10  to spin off all foreign entities into a different company
11  such that there is not the tie to SKF and therefore no
12  consolidation.  These will spin off as of the end of May,
13  2007."
14       Why is she writing to you about that?
15       MS. WOODRUFF:  Objection.  Calls for
16  speculation as to her intent.
17       MR. CHRISTMAS:  You can answer if you know.
18       THE WITNESS:  I think she mentions in here
19  what -- very specific to tax issues, so if there was a
20  tax issue, they would forward it to me for consideration.
21  BY MR. CHRISTMAS:
22       Q.  And who is Mr. Carlis?
23       A.  Darrell Carlis was a director in our office who
24  was primarily responsible for SK Foods' engagement.
25       Q.  As of 2007, approximately how many years of tax

Page 37

1  experience did he have, if you know?
2       A.  He has about probably 30, 3-0.
3       Q.  And is he still in your employ?
4       A.  No, he's not.
5       Q.  Is he retired or deceased?
6       A.  No, he went to another accounting firm.
7       MR. CHRISTMAS:  This is 21.
8       (Exhibit 21 was marked for identification.)
9  BY MR. CHRISTMAS:
10       Q.  Mr. Boos, the court reporter has marked as
11  Exhibit 21 to your deposition for identification an
12  e-mail with a memo attached to it.  Do you recognize this
13  set of documents?
14       A.  Yes.
15       Q.  Now, did you ask Mr. Carlis to put together the
16  memo that's attached to the e-mail dated August 16, 2007?
17       A.  I don't think I particularly asked him to do
18  it.  I mean, he was sort of documenting the process that
19  we were going through at that time.
20       Q.  Okay.  What was the purpose of the preparation
21  of that memo?
22       A.  There was a lot of discussions during that time
23  period of potential restructuring, particularly around
24  the Fin 46 issue, and this may be just a summary of those
25  preliminary discussions and potential tax issues that

10 (Pages 34 to 37)

WAYNE  BOOS - 8/15/2011

Page 38

1  needed to be considered, as well as his brief, you know,
2  considerations of Fin 46.
3       This is an internal memo, so it would have
4  really only been for our purposes, to help, you know,
5  probably myself get up to speed on particular issues.
6       Q. Did you ever have any interaction directly with
7  any of the lenders to SK Foods?
8       A. During this time period, or at all?
9       Q. Well, from 2006 forward.
10      A. From 2006, no.
11      Q. But you had at some point?
12      A. The only time I was kind of involved was when
13  Glenn McClaren was at SK Foods and they had some
14  consultants come in I guess on behalf of the lenders, and
15  my limited role there was just to kind of discuss the
16  operations. It was a very brief meeting. I don't know
17  if there was any particular representatives from the
18  banks other than the consultants.
19      Q. How about Mr. Carlis? Do you know, if you
20  know, if he ever had any direct contact with any of the
21  banks?
22      A. I wouldn't think so --
23      MR. LEWIS: Objection. Speculation.
24      MR. CHRISTMAS: I'm just asking if he knows.
25  You can answer.

Page 39

1       THE WITNESS: I don't think so. Our role is
2  for taxes, so it's not...
3  BY MR. CHRISTMAS:
4       Q. Was Boos & Associates ever involved in putting
5  together any materials requested by any members of the
6  bank?
7       A. No.
8       Q. Do you have any knowledge as to what materials,
9  if any, were provided by SK Foods to the banks?
10      A. Not my -- no, I don't.
11      Q. In the memo from Mr. Carlis, the second to last
12  sentence of the first paragraph, first page, it says "The
13  bank requires financial statements for SKLP, but doesn't
14  need the operations of the foreign entities included.
15  There would be a cost savings to SKLP and the foreign
16  entities if they were not included in SKLP's financial
17  statements."
18      Do you have any understanding of what he's
19  talking about there?
20      MR. LEWIS: Objection. Speculation.
21      MR. CHRISTMAS: I'm asking for his
22  understanding.
23      You can answer.
24      THE WITNESS: Well, my understanding at this
25  time was that, from what we were told by Mark McCormick

Page 40

1  and Scott and Shondale was that -- and Nick Frankish from
2  the foreign entity side, is that everybody wanted to do
3  the separate stand-alone financial statements, including
4  the bank.
5       So the same reason I stated before, make the
6  audit easier and focus only on the U.S. operations. So
7  that's what we were told, so I have no knowledge what the
8  bank's desire was there.
9  BY MR. CHRISTMAS:
10      Q. You used the word "everybody," and I wanted to
11  make sure I understood. Who did you mean by "everybody"
12  wanted this separation?
13      A. Scott, the company, SK Foods, New Zealand, the
14  banks for both the U.S. and the foreign lenders. I think
15  that pretty much covered it. It didn't matter to us,
16  from my standpoint, as a tax person. Like I say, it's
17  irrelevant because it all flows to Scott anyway. So what
18  we just have to make sure is if it's structured a
19  particular way, it doesn't create some tax impact.
20      Q. To your knowledge, did the U.S. banks have any
21  collateral from the Australian or New Zealand companies
22  as part of their lending structure?
23      MR. LEWIS: Objection. Foundation.
24      MR. CHRISTMAS: I'm asking if he knows.
25      THE WITNESS: The only thing I recall is I

Page 41

1  believe with SK Foods LLC, which is another entity, there
2  was some security with that, and I believe there was --
3  you know, I don't know. I saw some subordination
4  agreements at some point on these notes, but I don't know
5  if they were signed ones, I don't know if they were ever
6  executed. Several times, it's not uncommon I would have
7  got non-executed documents, so I don't know if that's...
8       MR. CHRISTMAS: This is 22.
9       (Exhibit 22 was marked for identification.)
10  BY MR. CHRISTMAS:
11      Q. Mr. Boos, the court reporter has handed to you
12  Exhibit 22 to your deposition, which is a series of
13  e-mails from August 20 and 21 of 2007. If we could start
14  with your e-mail, which is the first one in the series.
15      A. Scott's is the first one.
16      Q. Oh, Scott's is the first one. Sorry.
17      I see it now.
18      What are you conveying in your e-mail to him?
19      MR. O'GARA: Can we identify the e-mail?
20      MR. CHRISTMAS: Yeah, the e-mail is Monday,
21  August 20, 2007, 8:09 p.m.
22  BY MR. CHRISTMAS:
23      Q. And can you give us the context of this, what's
24  going on?
25      A. It appears that on August the 20th there was a

11  (Pages 38 to 41)

WAYNE  BOOS - 8/15/2011

Page 42

1  meeting with myself, Shondale, Nick Frankish, who was in
2  the United States at that time on a visit, as well as I
3  believe just a phone call with Moss Adams.
4       Both the partner and, I can't remember his
5  name, and Abby, who was like the senior manager on this
6  potential Fin 46 issue on consolidating, the requirements
7  to continue to consolidate the foreign entities.
8       Q. You said here "We spent most of the afternoon
9  discussing your favorite topic, Fin 46 consolidation,
10  with Moss Adams." I assume that's facetious?
11      A. Yes, at this point, you know, Scott thought
12  this was easier and obviously didn't read the whole Fin
13  46 manual before making the conclusion here, thought it
14  was an easy thing and just basically wanted to leave it
15  off of the consolidation, and at this point Moss Adams
16  was not going to allow or not directly going to allow
17  that because of some considerations that would have
18  brought it back in, so.
19      Q. In point three you say two sentences there,
20  "MA," that's Moss Adams?
21      A. Mm-hmm.
22      Q. "Thinks may get out of FIN 46 issue but they
23  need to think about and run up flag pole, thus basis for
24  our call tomorrow.  However, they also stated would need
25  to audit collectability of receivable from Scott, which

Page 43

1  may entail looking at other entities, personal, et
2  cetera."
3       Did Moss Adams explain why they would need to
4  audit the collectability of receivable, if that is the
5  way the transaction was structured?
6       A. Because I believe there would be a receivable
7  on SK's books from Scott Salyer, so they would have to,
8  in connection with the audit you have to look at
9  collectability, so due to the significant amount, they
10  would, I believe, you know, would have to have some basis
11  for that conclusion, so they would have to get into his
12  personal assets in order to do that, which they were not
13  involved with at that point.
14      Q. Do you know if point three contemplated that
15  the receivable would be from Scott personally or from
16  some other entity, created entity?
17      A. From Scott personally.  So Scott assumed.
18      Q. I believe that ultimately there was a trust
19  instead of Scott personally issuing a note.  Is that
20  correct?
21      A. That's correct.
22      Q. Did Moss Adams have the same need to determine
23  the collectability of the note from the trust?
24      MS. WOODRUFF: Objection.  Calls for
25  speculation as to Moss Adams' need.

Page 44

1       THE WITNESS: I'm not aware of that, what they
2  did with that.
3  BY MR. CHRISTMAS:
4       Q. Okay.  Can you think of any reason why an
5  individual versus a trust would require different
6  consideration of the note?
7       MR. O'GARA:  Once again, I'm going to make the
8  same objection.
9       MR. CHRISTMAS:  That's fine.
10      THE WITNESS:  The only thing I can think of is
11  this is an assumption of the note.  I don't know how the
12  other one was structured, the trust.  I don't recall.
13  BY MR. CHRISTMAS:
14      Q. Now, if you scroll forward in time, which is
15  closer to the front of the document, there is an e-mail
16  from you to Mr. Salyer where you say -- this is the
17  e-mail August 21, 9:39 a.m.
18      You say "One additional option they brought up
19  today is do an audit for SK with qualified opinion,
20  leaving out foreign entities."  Who is the "they" in that
21  sentence, if you know?
22      A. Moss Adams.
23      Q. Okay.  Now, at some point in time here, and we
24  may encounter further e-mails from Moss Adams, we'll get
25  to those, but at some point, and I don't know when it

Page 45

1  was, but my understanding is that the auditors were
2  changed from Moss Adams to Stoughton Davidson?
3       A. Mm-hmm.
4       Q. Is that your understanding?
5       A. Mm-hmm.
6       Q. You have to say "yes" or "no," rather than --
7       A. Oh, "yes."
8       Q. The court reporter, that was part of my -- I
9  omitted that from my prefatory speech at the beginning of
10  the deposition, that nods and et cetera don't work.
11      Do you know why the auditors were changed, and
12  who made the decision?
13      A. Well, Scott would make the decision.  My
14  understanding is it was changed because of the problems
15  that they were going through with this particular issue,
16  for one, that he felt was a more simple issue than what
17  they made it out to believe, and their fees, I believe,
18  were significantly higher than what they proposed.  The
19  subsequent auditor, Stoughton Davidson, was significantly
20  less.
21      Q. But they did ultimately complete the --
22      A. Yes, they did.
23      Q. Let me finish my sentence.
24      At this point in time, let's just set the table
25  there, they're working on financial statements for what

12 (Pages 42 to 45)

WAYNE  BOOS - 8/15/2011

Page 46

1  period ending?
2      A. June 30th, '07.
3      Q. Okay.  And they ultimately completed those
4  statements, did they not?
5      A. Yes.  I believe in December of '07.
6      Q. And "they" being Moss Adams?
7      A. Correct.
8      Q. I've seen in the documents a reference to the
9  Moss Adams network or consortium, something like that.
10  Do you know what that means?
11      A. There's independent accounting firms that can
12  be affiliated with a larger firm like Moss Adams or
13  Grant Thornton, or some of the non Big Four firms, and
14  there's basically an opportunity, I guess, to use their
15  resources to some extent.  I'm not familiar, because I've
16  never been involved in that, but I believe Stoughton
17  Davidson is a Moss Adams affiliate.
18      Q. Do you know why Stoughton Davidson was
19  selected?
20      A. No.
21      You mean selected for the audit, or --
22      Q. Yes, selected to succeed Moss Adams.
23      A. Well, one thing is their fees were
24  significantly lower, but also I believe Mark McCormick
25  had a relationship with Stoughton Davidson.  He used to

Page 47

1  work there.
2      Q. Okay.  And were you involved in the selection
3  process?
4      A. No.
5      Q. Do you still have --
6      A. 22?
7      Q. -- 22 in front of you?  Yes.
8      If I could draw your attention to the e-mail of
9  8:05 a.m. on August 21, you write there --
10      A. What is it?  8:05 a.m.?  8:09 a.m.?
11      Q. It's on the second page?
12      A. Oh, 8:05 a.m., okay.
13      Q. You write there "Scott, would it be an option
14  to convert some or all of the SKI/SKA" -- Oh, SK
15  International.  It's SKI/SKA "debt to equity prior to the
16  spin off.  I am not suggesting, just want to see if this
17  is even a possibility from SK's standpoint."
18      What are you referring to there?
19      A. If I recall, Moss Adams threw out several
20  alternatives the company could do to avoid this Fin 46
21  consolidation, and that likely was one of those
22  possibilities.
23      Q. Did you analyze this as a possibility from a
24  tax point of view?
25      A. No.  It didn't happen, so.  It wouldn't have a

Page 48

1  tax impact anyway, conversion from debt to equity is
2  usually not taxable.
3      Q. If I can go back to your lay person's
4  explanation of Fin 46, is it fair to say that Fin 46 does
5  not only look at ownership, but also looks at
6  intercompany debt?
7      MR. O'GARA:  Same objection.
8      MR. CHRISTMAS:  You can answer.
9      THE WITNESS:  Well, it looks at, like I said,
10  the economic substance of the structuring, so.
11  BY MR. CHRISTMAS:
12      Q. So debt would be --
13      A. Would look at that.
14      Q. And in this instance was there a Fin 46 concern
15  with respect to the intercompany debt?
16      A. It was something that was under consideration.
17  Whether it was an issue or not, I don't remember.
18      Q. But this was something Moss Adams was looking
19  at?
20      A. Yeah.
21      Q. Not just the equity issue?
22      A. Yeah.
23      (Exhibit 23 was marked for identification.)
24  BY MR. CHRISTMAS:
25      Q. Mr. Boos, I'm now showing you an e-mail and a

Page 49

1  memorandum, the e-mail is dated August 21, 2007 at
2  4:03 p.m., attached to which apparently was a memo from
3  Mr. Carlis to the SK Foods tax file.
4      Do you recall Mr. Carlis preparing this memo
5  and e-mail?
6      A. I recall receiving it, yes.
7      Q. And is this still the point in time when the
8  various parties are talking about -- when I say "various
9  parties," I mean Mr. Salyer, you and Moss Adams are
10  discussing how to structure the company's address of Fin
11  46?
12      MS. WOODRUFF:  Objection.  Vague and ambiguous
13  as to time.
14  BY MR. CHRISTMAS:
15      Q. As of August 21, was that still going on?
16      A. Yes -- well, I'm a little bit confused on this
17  date, July 18, because there's August 21st, August 21st,
18  and then the date on here is July 18 on this memo.
19      Q. That's how it was produced to us.
20      A. I don't know if that's the date or not, but I
21  thought the meeting, I believe we only had one meeting,
22  which I thought was in August, so I think this relates to
23  the other e-mail that we were previously looking at.  I
24  was informing Scott of our meeting, this is the same
25  meeting, I think.

13 (Pages 46 to 49)

BMO 002127

WAYNE   BOOS - 8/15/2011

Page 50

1    Q. So which document do you think has the wrong
2    date?  The memo --
3    A. I think this restructuring meeting is the wrong
4    day.
5    Q. July 18 should have been some date in August?
6    A. I think it's August 20th, yeah, August 21st.
7    Q. Okay.  I just have a few questions about this
8    memo.  The second-to-last sentence of the first page of
9    the memo says "SK Foods is on the hook for the majority
10   of the expected losses that might be incurred by the
11   entities."
12       Do you know what he means there, from your
13   understanding, as to what "on the hook for the majority
14   of the expected losses"?
15   A. Well, that's how Moss Adams explained it to us,
16   was that, again, you look at who has the ultimate risk of
17   loss.  And so if someone is lending funds through a
18   linear relationship, you may have to consolidate that
19   other entity into your financial statement just because
20   it's almost as if you're owning the company and therefore
21   would be required to consolidate it in.
22   Q. So this was based on a statement or statements
23   by Moss Adams?
24   A. Yeah, and I shouldn't say owning the company,
25   it's different than ownership because Fin 46 doesn't

Page 51

1    recharacterize it as ownership, it's just a
2    consolidation, financial statement consolidation.  It
3    doesn't change any legal ramifications, it's just a
4    consolidation rule.
5    Q. So did Moss Adams elaborate on the basis of
6    that view?  Was it based on intercompany guarantees, or
7    guarantee of bank debt, or anything more specific that
8    you can recall?
9    A. I mean, I think just the fact that if those
10   entities, Australia and New Zealand entities, were to,
11   you know, lose money, SK Foods was the one that primarily
12   provided the funding for that.  So therefore, they would
13   be the one with the "ultimate risk of loss," and one
14   company can only have the ultimate risk of loss, so it
15   was their opinion or discussion that they would fall
16   under that category the way it was currently structured.
17   Q. Are you aware of any guarantees issued by SK
18   Foods LP for the debt of any of the New Zealand or
19   Australian entities?
20   A. A guarantee of those debts?
21   Q. Yes.
22   A. To the foreign banks?
23   Q. Yes.
24   A. No.
25   Q. How about any other creditor?

Page 52

1    A. I don't know of any.  Again, the guarantees is
2    not an issue I would need to normally look at.
3    Q. If I could just draw your attention to the next
4    page, in that vein, in the middle of the page Mr. Carlis
5    writes there "Dan Nutley said that loan guarantees are
6    bad when looking at Fin 46 because they basically state
7    that the bank doesn't feel the entity can stand on its
8    own, so a third party must be on the hook for repayment
9    of the debt."
10      Do you know if Mr. Nutley ever identified to
11   you any guarantees?
12   A. I don't recall.
13   Q. If we could turn to the last page, below the
14   line on the last page, Mr. Carlis writes "In discussing
15   the potential offset of debt between the Australian
16   companies, Wayne pointed out to Nick that withholding may
17   be required on the deemed payment of interest to
18   Australia and the deemed payment to the US.  Nick thought
19   that if Australia was not able to utilize the withholding
20   against tax, it would be lost.  We need to consider this
21   point."
22       Is the "Wayne" there you?
23   A. Yes.
24   Q. Okay.  Can you explain what this issue is to
25   which he's referring?

Page 53

1    A. I believe -- and this is not really related to
2    Fin 46, but you may know that there's loans going both
3    ways.  There's loans that SK has from the foreign
4    entities, but there's also loans from the foreign
5    entities to SK.  It is not nearly as much as the SK Food
6    loans that were made down there, but Nick wanted to
7    basically net those together.
8        But upon that netting, what my comment or
9    Darrell's comment here is that we would have to consider
10   that because that netting would effectively be -- could
11   possibly be treated as a deemed payment of interest, and
12   when you pay interest across borders, there's potentially
13   withholding tax that could apply, so it would have to
14   consider it.  I don't believe that those notes were ever
15   netted, so.
16   Q. Okay.  Let me just break that down.
17       So to your understanding there would be
18   withholding on the Australian side for a deemed payment?
19   A. It could be Australian.  I don't think there
20   would be under the U.S., but I believe the Australian and
21   New Zealand side.
22   Q. So the Australian tax authorities would be
23   involved in some fashion?
24   A. Yeah, and New Zealand.
25   Q. But from the U.S. side, if there's a deemed

14  (Pages 50 to 53)

Page 54

1  payment to...
2      A. I don't think it would apply in this case,
3  because for U.S. tax purposes it all flows through into
4  the United States. It would be different if it was a
5  corporation in New Zealand or Australia.
6          Trying to test my recollection here, but I
7  think that's the case.
8      Q. Is there, apart from the pass-through nature of
9  the SK Foods LP entities, are there any rules on
10  withholding of payments to foreign entities, any U.S. tax
11  rules?
12      MR. O'GARA: Same objection.
13      MR. CHRISTMAS: For interest.
14      MR. O'GARA: Same objection.
15      THE WITNESS: Well, there are withholding rules
16  in the U.S., yes, for certain situations.
17  BY MR. CHRISTMAS:
18      Q. Do you know if any of the SK Foods LP tax
19  advisers ever looked at the issue or the potential issue
20  of the change in the obligor triggering a notion or
21  repayment? In other words, the change from the
22  intercompany relationship to putting a trust as the
23  obligor on the intercompany note owed of SK Foods LP?
24  Did anyone look at that from a tax point of view?
25      A. Not prior to the transaction happening.

Page 55

1      Q. Do you know if anyone looked at it afterwards,
2  whether the change in obligor was treated as a deemed
3  repayment or triggered some other tax payment issue?
4      A. From a New Zealand and Australian withholding
5  tax standpoint, or from the U.S.?
6      Q. From the U.S. standpoint.
7      A. Because they're all pass-through, I don't
8  believe that that mattered, because effectively from the
9  U.S. side, it gets eliminated. The debt gets eliminated.
10  It's to yourself, so.
11      Q. How about from the other perspective? From New
12  Zealand?
13      A. The other perspective is an issue. Withholding
14  tax is an issue as opposed to a change in obligor.
15  Whether that caused the same withholding tax, I don't
16  know. I mean, generally Deloitte handled all the, like I
17  say, the New Zealand and Australian matters independently
18  of myself.
19      Q. Do you know if Deloitte ever gave any advice on
20  that issue?
21      A. I'm not aware of any. I don't know.
22      Q. Before we move off that document I just wanted
23  to elaborate on a point that you had made earlier. And I
24  believe it's fair to say your testimony was that there
25  was a desire by many parties to deconsolidate the

Page 56

1  financial statements.
2          If you move to paragraph six of Exhibit 23, the
3  second sentence of that paragraph, that numbered
4  paragraph six says "This creates two problems (1) it
5  tends to confuse the banks" --
6      A. Where are you at?
7      Q. Last page of Exhibit 23, paragraph six.
8      A. Okay.
9      Q. Do you have any understanding as to what
10  Mr. Carlis is saying there when he says "tends to confuse
11  the banks"?
12      A. That was --
13      MR. LEWIS: Objection. Speculation, lack of
14  foundation.
15      MR. CHRISTMAS: You can answer.
16      THE WITNESS: Well, I know that we were told
17  by, again, the company, that the banks were only
18  interested in the U.S. operations and how profitable
19  those were, not necessarily the foreign -- and because
20  there's a lot of foreign currency exchange rate
21  adjustments that could impact their financial reporting,
22  which really had nothing to do with the business, it was
23  more of a currency adjustment, that was an issue that was
24  raised as a concern.
25  ///

Page 57

1  BY MR. CHRISTMAS:
2      Q. Did you ever receive any e-mail that confirmed
3  what you just said?
4      A. I don't know. If one of the e-mails that I
5  provided, somebody, Mark or Scott could have said it.
6      Q. Did you ever see an e-mail forwarded from any
7  of the banks?
8      A. No, I would not have seen any of the banks'
9  e-mails. And again, the context that I would have
10  received that is just why they were looking at, not
11  necessarily -- it was just more of an after -- more of an
12  elaboration on why they wanted to do this, because again,
13  I was looking primarily from a tax standpoint.
14      Q. Do you know who SK Foods, one or maybe more
15  than one person, the contacts were between the company
16  and the banks, the individuals, who the individuals were?
17      A. Mark McCormick and Scott --
18      MR. LEWIS: Objection. Foundation.
19  BY MR. CHRISTMAS:
20      Q. To your understanding --
21      A. Yeah, Mark indicated there was a person that he
22  dealt with, and again, I don't know the bank people so I
23  don't recall the name, but there would be obviously
24  transactions that they have to run by the bank, and they
25  were, you know, following the guidance that they

15 (Pages 54 to 57)

BMO 002129

WAYNE  BOOS - 8/15/2011

Page 58

1  basically were given, so.
2      Q. Who was the second person?  There were too many
3  people talking.
4      A. Scott.
5      MR. CHRISTMAS:  If we could go to -- let's see,
6  the next one is Exhibit...
7      Off the record.
8      (Discussion off the record.)
9      MR. CHRISTMAS:  This is 25.
10     MR. O'GARA:  Did we skip 24?
11     MR. CHRISTMAS:  Yes.  For the record, we're
12 skipping 24.
13     MR. DREHER:  You said this is 25?
14     MR. CHRISTMAS:  Yeah, we're skipping 24.  And
15 while we're at it, let's Mark 26 too.
16     (Exhibits 25 and 26 were marked for
17 identification.)
18 BY MR. CHRISTMAS:
19     Q. Mr. Boos, the court reporter has marked
20 Exhibits 25 and 26 to your deposition, which are a series
21 of e-mails.
22     25 is an e-mail from you to various recipients
23 dated August 29, 2007, 8:58 a.m., and then the next one
24 contains that e-mail and has a response by Mr. Salyer of
25 August 29, 2007, 9:22 a.m.

Page 59

1      We didn't receive the attachments, but do you
2  know what kind of structure was reflected in the
3  documents that were attached to this in which you say,
4  among other things, in the first sentence, in all caps
5  "THIS IS TAXABLE"?  Do you have any recollection as to
6  the structure that was contemplated in the attached
7  documents?
8      A. If I recall right, this was not a pro rata spin
9  off to each member, and if you don't do a pro rata spin
10 off, then it could create a tax issue, and with SK Foods
11 there was the type of assets that would have created a
12 taxable event.
13     Q. So is it solely the fact that it's not pro
14 rata?
15     A. Non pro rata was the sole factor there.
16     Q. And when you say "taxable," you mean U.S.
17 taxable?
18     A. Correct.
19     Q. And since it's a pass-through entity, who would
20 be the entities who would be responsible for the tax if
21 it were taxable?
22     A. Well, the tax was all paid out on Scott's tax
23 return, however I believe there was obviously within the
24 covenants there would be distributions from SK Foods
25 allowed to cover his taxes.

Page 60

1      Q. Whose decision was it that they need to be
2  destroyed, the documents?
3      A. These were not signed documents when I sent
4  that, so these documents were not ever -- they were sent
5  by Gary Perry before I had a chance to even look at them,
6  so I just, on a draft basis I was making that comment.
7  They were not signed, that I know of.
8      Q. You didn't want there to be a risk that they be
9  signed?
10     A. Correct.  Yeah.  I mean, there's many times
11 that I would get documents that they're draft form, and
12 obviously there's tax considerations that I would have to
13 look at, so, you know, documents would be revised
14 accordingly.  You're right, I don't want anything to
15 confuse the issue.
16     Q. Do you know if -- in Exhibit 26 Mr. Salyer
17 writes "This is unacceptable to have me sign them and
18 then at a later date say they should be destroyed."  Do
19 you know if he did sign them?  He seems to suggest that
20 he did.
21     A. That's what it sounds like he's saying.
22     Q. Did you ever see any signed versions of the
23 documents that were attached to this e-mail?
24     A. No.
25     MR. CHRISTMAS:  This is Exhibit 27.

Page 61

1      (Exhibit 27 was marked for identification.)
2      THE WITNESS:  I'll also point out, this is not
3  in connection with how I understood the transaction was
4  going to happen, so that was another concern that I
5  raised.  Not only from a tax standpoint, it wasn't at
6  that time how it was discussed it was going to be
7  structured, so it was going to be a pro rata --
8  BY MR. CHRISTMAS:
9      Q. So the structure of the documents didn't
10 reflect —
11     A. Correct, my understanding.
12     Q. Okay.  Here is 27.
13     MR. CHRISTMAS:  Did I hand you 27?
14     COURT REPORTER:  Yes.
15 BY MR. CHRISTMAS:
16     Q. The next document that the court reporter has
17 marked for identification is Exhibit 27, which is a
18 series of e-mails beginning with your e-mail to Mr. Perry
19 dated August 19, 2007 at 6:03 p.m.  If we could roll up
20 to the 9:33 a.m. e-mail on August 29, in the second line
21 you say there "Nick, Shondale and I met two days arguing
22 with MA FIN 46 issues related to this matter."
23     "MA" is Moss Adams?
24     A. Mm-hmm.
25     Q. You use the word "arguing" there.  Why has this

16 (Pages 58 to 61)

BMO 002130

WAYNE BOOS - 8/15/2011

Page 62

1 reached the level of arguing? Do you recall?
2     A. Well, if I recall, again, I'm not a Fin 46
3 expert, but I had a hard time understanding why
4 particularly these two entities would be the only two
5 entities in the whole Salyer group where this was a
6 consideration, because to me they're foundation of the
7 argument to include them but not the other entities. It
8 didn't seem like it was correct.
9     Q. You thought that there were --
10     A. Well, and there were other ones as well, and
11 you know, I think that we would obviously looking at the
12 various alternatives. I think "arguing" is probably a
13 little over -- I don't know.
14     Q. Let me just focus that. Did you discuss the
15 other entities and their Fin 46 issues with Moss Adams,
16 or their possible issues?
17     A. Yes.
18     Q. And were solutions in terms of ownership or
19 change in debt structure proposed by Moss Adams to deal
20 with those as well?
21     A. None of the other entities had to restructure.
22 I think SK Foods, SKF Aviation was included for a period
23 of time, because SK Foods guaranteed the debt on the
24 airplane. And I think that is when RHM was brought into
25 the consolidation. Prior to that it was a separate

Page 63

1 entity.
2     MR. CHRISTMAS: I think this is a good point to
3 take a break. Let's take five minutes.
4     (Recess taken.)
5 BY MR. CHRISTMAS:
6     Q. We're back on the record. We have skipped
7 Exhibit 28. Before I get to Exhibit 29, Mr. Boos, can
8 you tell me who Gary Perry is?
9     A. Gary Perry is the attorney for SK Foods and
10 Scott Salyer and related entities. Or an attorney for SK
11 Foods, I should say.
12     Q. I saw that on a number of exhibits, maybe we
13 haven't gotten to them yet, but he actually directly
14 copies you on draft documents. Do you know why he did
15 that?
16     A. Obviously I was -- I would normally look at the
17 draft documents to make sure that there was no tax
18 issues. Not all the time, but sometimes.
19     MR. CHRISTMAS: Understood.
20     (Exhibit 29 was marked for identification.)
21 BY MR. CHRISTMAS:
22     Q. If I could draw your attention to Exhibit 29,
23 which the court reporter has handed to you, and this is
24 an e-mail from Mr. Seymour to various people, including
25 copy to you, of September 27, 2007 at 9:51 a.m., and she

Page 64

1 mentioned here, she says "I was talking with Wayne last
2 p.m. and I mentioned the Cedenco spin off."
3     Do you recall her talking to you on or about
4 September 26?
5     A. In general. Nothing specific, but in general.
6     Q. Well, we'll get to the issue. "I told him I
7 thought some of the dates had changed and that we were
8 taking some of the transactions back from 5/31/07 to
9 11/1/06 to eliminate as much activity from Cedenco being
10 considered during the 6/30/07 audit."
11     Do you have a recollection as to what she's
12 referring to there?
13     A. I believe the issue is that there was a concern
14 or just additional work that would have to be done with a
15 5/31/07 effective date of that transaction, then they
16 would have to include the periods of November 1st, '06
17 through 5/31/07 for the foreign entities in the SK Foods
18 consolidated audit report, because it wasn't spun off
19 until that date.
20     So effectively, I guess they're saying this was
21 a work-around with regards to that, and they looked to do
22 it as effective as November 1st, '06.
23     Q. And to your knowledge, that was ultimately the
24 date --
25     A. That's correct, yes.

Page 65

1     Q. -- that was decided?
2     You have to let me finish.
3     A. Yes.
4     Q. Do you know whether that decision to change the
5 effective date was driven by -- what it was driven by?
6     A. It was, I believe, as she indicates here, it
7 just made the audit easier and therefore they didn't have
8 to include any of the foreign entities' activity in that
9 6/30/07 audit report.
10     Q. Let me just ask you a few questions, if you
11 know what some of these e-mail addresses are. First,
12 Shondale is writing from an e-mail which ends with the
13 address @first organization.com. Do you know what that
14 refers to?
15     A. I don't know what that is.
16     Q. Okay. Who is, there's a recipient here,
17 david@antipodes99.com. Do you know who that is?
18     A. That's David Hay out of New Zealand. He was a
19 consultant to SK Foods, and especially with regards at
20 this time especially regarding foreign entities and the
21 relationship with SK.
22     Q. And Chad Pinter?
23     A. Chad Pinter was the CFO for a very brief time,
24 like maybe a month.
25     Q. At SK Foods U.S.?

17 (Pages 62 to 65)

BMO 002131

WAYNE  BOOS - 8/15/2011

Page 66

1    A. Correct.
2    Q. All right. Do you know which SK Foods related
3 companies are -- let me rephrase that.
4       Do you know which Salyer family related
5 entities Gary Perry was represented?
6    A. Gary Perry would have done documents for every
7 entity, except for the foreign. I don't believe he did
8 anything with the foreign document, foreign lease.
9 Because that would have been under the laws of those
10 countries.
11   Q. And what period of time would you say that
12 that --
13   A. When I started working with the Salyer group in
14 '97, Gary was involved at that time, and through when I
15 ceased in 2009 he was still involved with it.
16   Q. What kind of services did he provide to the
17 various entities?
18      MS. WOODRUFF: Objection. Lacks foundation.
19      MR. CHRISTMAS: If you know.
20      THE WITNESS: Well, he was an attorney, so he
21 was the one primarily responsible for drafting of
22 documents and incorporating entities and things like
23 that.
24 BY MR. CHRISTMAS:
25   Q. Okay. I was going to give you examples of

Page 67

1 dispute litigation or formation.
2    A. I don't think he was involved with any
3 litigation, that I know of anyway. But it was more...
4    Q. Did he give any tax advice at any point?
5    A. No, not really.
6    Q. So was your firm the primary tax adviser from
7 2006 until the end of your engagement?
8    A. Correct.
9       MR. CHRISTMAS: This is 30.
10      (Exhibit 30 was marked for identification.)
11 BY MR. CHRISTMAS:
12   Q. Mr. Boos, the court reporter has handed you a
13 document marked for identification as Exhibit 30 to your
14 deposition, a series of e-mails starting with your e-mail
15 dated September 26, 2007 at 8:48 p.m.
16      The next e-mail above it is an e-mail from
17 Mr. Salyer which has it mentioned here in the second
18 sentence, it says "So the plan is to do a note exchange
19 with a 3rd party (Bank) and pull CED out. Paper work is
20 not complete."
21      To your understanding, to what is Mr. Salyer
22 referring to when he says a third party bank?
23   A. I wasn't part of that discussion that they had
24 with Moss Adams, but I would assume it's a transaction
25 which would exchange -- where a bank would come in and

Page 68

1 obtain the notes that SK Foods had in the foreign
2 entities for consideration and get SK Foods out of that
3 equation. That transaction did not occur.
4    Q. In the first line of Mr. Salyer's e-mail he
5 says "MA said they could not audit SK and meet time line
6 for stub period if CED was still in SK."
7       What is he referring to there, if you know,
8 when he says "stub period"?
9    A. The stub period is the financial statement
10 period of November 1st, '06 through June 30th, '07, and
11 so it's the financial statements regarding that period.
12   Q. And that was a stub because --
13   A. It's not a full 12 months.
14   Q. And that's because, I think as you testified,
15 they changed --
16   A. The year-end. The book year-end, yes.
17   Q. From your perspective, does a transaction have
18 to be completed in a certain period of time to be booked
19 in the financial statements for that period?
20      MR. O'GARA: Same objection.
21      THE WITNESS: I'm not an auditor. Not an
22 attorney.
23 BY MR. CHRISTMAS:
24   Q. Mr. Boos, I may have this wrong but isn't there
25 a concept in taxation called the All Events Test? Is

Page 69

1 that a familiar term to you?
2    A. For -- well, it relates to the accrual?
3    Q. Yeah.
4    A. Accrual of an expense, that all the events have
5 to occur in order to book the expense.
6    Q. Does that have a relationship to any other than
7 expenses, does it have a relationship to income as well?
8    A. Not generally, because I mean, the IRS is going
9 to want to recognize income as soon as possible. So it's
10 more of a deferral of the deduction.
11   Q. From your perspective, Mr. Boos, do you have a
12 view as to what the latest date it could be where the
13 underlying transaction documents were executed for the
14 equity spin off to be booked in the tax documents for the
15 period that included November 1, 2006?
16      MR. O'GARA: Same objection.
17 BY MR. CHRISTMAS:
18   Q. You understand my question? How far away from
19 November 1, 2006 could the documents be executed and in
20 your view still be properly treated and booked in at
21 November 1, 2006?
22   A. Again, I don't know. I'm not an auditor, not
23 an attorney.
24      MR. CHRISTMAS: This is 31, this is 32.
25      MR. O'GARA: Is this the same document?

18 (Pages 66 to 69)

BMO 002132

Page 70

1    MR. CHRISTMAS: No, they're fraternal twins.
2    (Exhibits 31 and 32 were marked for
3  identification.)
4  BY MR. CHRISTMAS:
5    Q. Mr. Boos, the court reporter has handed you
6  Exhibits 31 and 32 for identification to your deposition,
7  two documents each entitled Debt Subordination Agreement,
8  and as I read them at least they have different amounts
9  in the body that are handwritten in, 2.712 million and
10  2.787 million.
11    Have you --
12    MR. O'GARA: Could we identify which documents?
13    MR. CHRISTMAS: Oh, yes. 31 has 2.712, and 32
14  has 2.787, as I read it.
15  BY MR. CHRISTMAS:
16    Q. Have you ever seen these documents before,
17  either one of them?
18    A. I believe these documents were attached to an
19  e-mail that we received from Nick Frankish either in '08
20  or '09 that went to Mr. Carlis in our office. However, I
21  did not think that they were signed. I'm not saying they
22  weren't, but at least 31 wasn't signed, but I haven't...
23    Q. Do you know what the purpose of these documents
24  was?
25    A. No, I'm not familiar with these really. I

Page 71

1  mean, it says Debt Subordination Agreement, so I would
2  assume the purpose is a debt subordination.
3    Q. Did you ever see signed copies before --
4    A. I don't believe so. I didn't think the one I
5  had was signed.
6    Q. How about dated?
7    A. I don't believe -- I don't know about dated.
8  Could have been dated, but I don't know.
9    Q. So you don't --
10    A. I'm not that familiar with these documents.
11  Doesn't really affect the tax return.
12    Q. So you don't know the purpose of these
13  documents?
14    A. No.
15    MR. CHRISTMAS: Have I handed you Exhibit 34?
16    COURT REPORTER: Not 34, no.
17    (Exhibits 33 and 34 were marked for
18  identification.)
19  BY MR. CHRISTMAS:
20    Q. Mr. Boos, the court reporter has handed you
21  Exhibits 33 and 34 for identification to your deposition.
22  It's a series of e-mails, the first one is from
23  Shondale Seymour to Mr. Hay and you and others dated
24  September 27, 2007 at 9:51 a.m. to which you responded
25  "Mark, any further update on this? We need to determine

Page 72

1  carve out as of 11/1 for tax returns if applicable."
2    What does "carve out" mean?
3    A. Basically the 2006 tax returns were due on or
4  around October 15th of '07, the U.S. tax returns. If
5  this transaction was deemed to be effective prior to
6  December 31st, '06, we would need to adjust the reporting
7  in the U.S. tax returns and the various foreign
8  information returns that were attached to the SK Foods
9  return.
10    And as Shondale has alluded to here, if a
11  transaction happened effective as of November 1st of '06,
12  we would only be reporting ten months, not the last two
13  months of activity on the U.S. return.
14    Q. At this point in time, what was the fiscal year
15  for SK Foods LP?
16    A. The book fiscal year?
17    Q. Yeah.
18    A. Was that same 6/30/07. But the tax return
19  number's on a calendar year. So we're doing --
20    Q. Calendar-year basis, so this is not --
21    MR. O'GARA: Hold up.
22    MR. CHRISTMAS: We're both talking.
23    MR. O'GARA: You've got to give the court
24  reporter a chance.
25  ///

Page 73

1  BY MR. CHRISTMAS:
2    Q. This was the return that was due on extension
3  to October 15, 2007 for the '06 calendar year?
4    A. You got it.
5    Q. So that's for October 15, that's the final?
6    A. Final due date is originally due April 15th,
7  and extended to October 15.
8    Q. So then if you move to Exhibit 34, looks like
9  Shondale responds to you on the 15th, looks about eight
10  days later, and she says "No determination yet."
11    Do you know if there was any kind of
12  determination as to the effective date of the transaction
13  before you filed the return?
14    A. There was not, and so therefore the returns
15  were filed based upon the information we had at that
16  time.
17    Q. So the returns reflected that the transaction
18  had occurred, or --
19    A. Had not occurred.
20    Q. Okay. Were they subsequently amended to
21  reflect the transaction occurring as of November 1, 2006?
22    A. Because it didn't have a tax impact, they
23  weren't amended. They were revised on the subsequent
24  2007 return to reflect the transaction, and we were going
25  to go back and amend it and then we weren't engaged.

19  (Pages 70 to 73)

Page 74

1   When SK Foods filed bankruptcy we were not engaged to be
2   their tax adviser, so I relayed it to Mr. Sharp and took
3   it from there.
4       Q. And so the change was -- I'll just show you,
5   I'll hold it up to you, Exhibit 4, the change, would that
6   be on the balance sheet portion of the tax return?
7       A. It's on the balance sheet, correct.
8       Q. And I showed you page 2 of Exhibit 4.
9       So if you had been engaged to reflect that
10  transaction in the '06 calendar year tax return, it would
11  have been on that page?
12      MR. O'GARA: Same objection.
13      MR. CHRISTMAS: You can answer.
14      MR. O'GARA: It's a hypothetical,
15  Mr. Christmas. I think we've moved from a general
16  objection to a very specific objection.
17      MR. CHRISTMAS: Okay. I think I know the
18  answer, so I don't need the answer from him.
19      I think this is a good point to take a lunch
20  break, unless anyone disagrees.
21      MR. O'GARA: Do you want to take half an hour,
22  45 minutes?
23      MR. CHRISTMAS: Let's say 45 minutes.
24      Mr. Lewis, we'll reconvene again at 2:30.
25      MR. LEWIS: Okay. Thank you.

Page 75

1       (The lunch recess was taken at 1:45 p.m. and
2   the deposition was resumed at 2:44 p.m.)
3       (Exhibit 40 was marked for identification.)
4   BY MR. CHRISTMAS:
5       Q. Mr. Boos, the court reporter has handed you
6   Exhibit 40 for identification to your deposition. It's a
7   multi-page, it's a six-page fax dated September 17, 2007
8   from Mr. Perry. The fax is addressed to you. The
9   underlying letter with the attached Debt Assignment
10  Agreement is addressed to Mr. Salyer.
11      First, let me ask you, do you recall receiving
12  this document on or about December 17, 2007?
13      A. Yes.
14      Q. And do you know who drafted this Debt
15  Assignment Agreement that's attached to the letter to
16  Mr. Salyer?
17      A. No. Normally Mr. Perry would draft the
18  documents.
19      Q. And this one, if you could turn to the
20  agreement itself, which is the third page in, you see at
21  the top there, the entities who are the parties to it?
22      A. Uh-huh.
23      Q. It says "by and among SK Foods LP, SSC&L 2007
24  Trust and Cedenco Foods, Limited, a New Zealand company."
25      First let me ask you, do you have an

Page 76

1   understanding of what the purpose of this document is?
2       A. I believe this is the debt assignment agreement
3   to transfer the debt that SK had directly from the
4   foreign entities and via -- got changed via the SSC&L
5   trust.
6       Q. So the purpose of this -- would it be correct
7   to say that this is to respond to Fin 46?
8       MS. WOODRUFF: Objection. Lacks foundation,
9   calls for speculation.
10      MR. CHRISTMAS: Just asking if he knows.
11      THE WITNESS: I believe that this is what Moss
12  Adams bought off on.
13  BY MR. CHRISTMAS:
14      Q. So this is --
15      A. This transaction -- yeah.
16      Q. This was part of the -- let me withdraw that
17  and rephrase it.
18      This is part of the restructuring that Moss
19  Adams agreed would be appropriate to address Fin 46, to
20  your understanding?
21      A. Yeah.
22      MS. WOODRUFF: Objection. Lacks foundation,
23  calls for speculation.
24      MR. CHRISTMAS: You can answer.
25      THE WITNESS: I wasn't really involved with

Page 77

1   particularly this trust agreement, so I'm limited in what
2   I know here, but my understanding is at the end of the
3   day this is one of the -- this is the final agreement
4   itself, but this use of this SSC&L trust was what allowed
5   the Fin 46, under Fin 46 not to consolidate.
6   BY MR. CHRISTMAS:
7       Q. So that's your understanding of how it was
8   ultimately going to be structured?
9       A. Yeah.
10      Q. Was --
11      A. In December, yes.
12      Q. This, though, is just for one part of it,
13  correct? This is just New Zealand?
14      A. Correct.
15      Q. So to your understanding there was other
16  intercompany debt that had to be addressed. Is that fair
17  to say?
18      A. Yeah, I'm not sure this is the final agreement.
19  It's not signed. I'm not sure, but I thought they were
20  both together.
21      Q. Do you know what the purpose of clause three
22  was, if you have an understanding?
23      A. Clause three?
24      Q. Yeah.
25      A. No.

20 (Pages 74 to 77)

Page 78

1    Q. Would you know why the New Zealand company
2  would be indemnifying the trust? Do you have any reason
3  to know why that would be?
4    A. Well, I mean, if this is assignment, and I'm
5  not an attorney, but would it be common for the party
6  that assigns a debt like this to basically identify the
7  party coming in that's going to allow the transaction to
8  happen, that would be my only speculation.
9    Q. Do you know if Moss Adams required that to be
10 in there?
11   MR. O'GARA:  When you respond, make sure you
12 don't drop your voice at the end, because the court
13 reporter has difficulty hearing it.
14   THE WITNESS:  Do I know if Moss Adams
15 recommended that to go in?
16   MR. CHRISTMAS:  Yes.
17   THE WITNESS:  I don't know.  I never really
18 looked at that particular clause, focused much attention
19 to it.
20 BY MR. CHRISTMAS:
21   Q. Do you know if -- first, let me ask you, do you
22 know if this document was ever signed, either in its
23 current version or a later version?
24   A. I don't think this document is the final
25 version.

Page 79

1    Q. Do you know if there was a parallel version for
2  the intercompany debt --
3    A. There is a --
4    Q. Let me finish.
5    -- for the Australian companies?
6    A. There is a debt assignment agreement that was
7  signed for both the New Zealand and the Australian
8  companies, I believe.
9    Q. When did you see the final documents?
10   A. I believe in 2008.  I really wasn't involved at
11 this stage a lot with Moss Adams and this Fin 46 issue.
12   Q. So when I say "final," I mean executed as well.
13   A. Mm-hmm.  Yeah.
14   Q. And do you know how you ended up seeing those?
15 Was it through a fax or some other method?
16   A. I think either fax or e-mail.  We would have
17 needed it for preparing the 2007 return.
18   Q. And do you know who had the originals, who had
19 possession of the originals?
20   A. No.  I would imagine they were kept at SK
21 Foods.
22   Q. Do you know if Nick Frankish was aware of the
23 changes in ownership that were being proposed, the
24 changes in the debt structure?
25   A. In the debt structure?

Page 80

1    Q. Yes.  Either or both.
2    MS. WOODRUFF:  Objection.  Compound.
3  BY MR. CHRISTMAS:
4    Q. Let me make it easier.  Do you know if --
5    A. Nick Frankish was in a meeting that we had in
6  August, so he was somewhat aware of what was being
7  contemplated.
8    Q. He was physically present in the United States?
9    A. Yes.
10   Q. Okay.  Who was the primary contact with Moss
11 Adams in this process?  Was it you or was it Mark?
12   A. Mark McCormick.
13   Q. This Exhibit 40 has a reference in the
14 assignment agreement to the SSC&L 2007 trust.  Do you
15 know when this trust was created?
16   A. I wasn't involved with the creation of that
17 trust.
18   Q. Did you know at the time that it was being
19 created?
20   A. No.
21   Q. Do you know what it stands for, the initials?
22   A. Yeah, actually I do.  Scott, Stephanie,
23 Caroline and Louie.
24   Q. And that's Scott Salyer, his two daughters?
25   A. Two daughters, and his dog.

Page 81

1    Q. Do you know what the purpose of the creation of
2  the trust was, more than one purpose, or a single
3  purpose, or do you know?
4    A. My understanding was limited to this debt
5  assignment agreement.  There was no tax purpose at all
6  for it.  Nothing that I would have recommended.  It was
7  all disregarded from an income tax standpoint.  It was a
8  Revocable trust, I believe.
9    Q. So a Revocable trust --
10   A. Is not taxed as a separate entity.
11   Q. So the person who's is the --
12   A. Yeah.
13   Q. You need to let me finish, because the court
14 reporter is going to shoot us.
15   The person who's I guess the settler of the
16 trust, if that's the right word, is an individual.  That
17 person is the taxable person on the trust?
18   A. Mm-hmm, mm-hmm.
19   Q. Have you ever done any tax services for that
20 trust?
21   A. The trust is not required to file a separate
22 return, so there was an accrual of interest that was
23 calculated when we did the 2007 return, which at least
24 was addressed in Scott's return.
25   Q. And the accrual was of what?  Payable, or

21 (Pages 78 to 81)

Page 82

1  receivable?
2      A. Well, it's on the debt that was assigned, there
3  was a calculation pursuant to the terms of the debt, as
4  far as what the interest being accrued, what that amount
5  is, both from the income side and then also the expense
6  side. And remember, everything went down to Scott
7  anyway, so it really had no tax effect. That's why I
8  don't really recall exactly too much about this
9  particular trust, because it's not a lot of tax issues
10  with it.
11      Q. So who were you working for on that, with
12  respect to that work? Was it the trust or was it Scott,
13  or I mean, who was your client?
14      A. Well, it affected two sides, so it affected
15  both the New Zealand side and Australian side, as well as
16  affecting Scott's side, and also I believe it flowed to
17  some extent through SK Foods, because SK Foods still was
18  in the middle of this, and all four of those returns and
19  how they all flowed down, it was all over the place.
20      Q. Did the trust pay for your services, or do you
21  know who did?
22      A. Probably nobody paid for it, but.
23      Q. I do understand you have a receivable.
24      A. It would have been where we were preparing what
25  return it would have went into. The trust wasn't --

Page 83

1  again, there was no tax return. It wasn't very much time
2  to do that, an interest calculation.
3      Q. Do you know under what law or jurisdiction the
4  trust existed? California or some other jurisdiction?
5      A. No, I don't think I've ever seen the trust
6  agreement, or I don't recall anyway.
7      Q. Do you know who the trustee is? It's
8  Mr. Salyer, right? I think you said that.
9      A. Generally with the Revocable trust it would be
10  the settler, so yes. I'm not sure that's the case, but
11  that's how I estimate it happened.
12      Q. Do you know anything about the operations of
13  the trust, whether it has its own bank account or
14  anything like that?
15      MS. WOODRUFF: I'm going to object. This is
16  substantially beyond the scope of the rule 114 of the
17  Australian entities.
18      MR. CHRISTMAS: I think it's within the scope.
19      You can answer.
20      THE WITNESS: I think the thing that -- not
21  that I'm aware of, I think all it has is accruals, but
22  I'm not sure.
23  BY MR. CHRISTMAS:
24      Q. When did you cease providing services, just for
25  the record, to the Salyer entities and Mr. Salyer? And

Page 84

1  if they're different dates, just fill that in.
2      A. SK Foods, obviously on the bankruptcy we were
3  never engaged, because of Mr. Salyer's objections. So
4  that would be May 7th or whatever that date is 2009, and
5  then Scott terminated our services in July of '09.
6      Q. Now, ultimately the distribution of the
7  ownership, or the alleged distribution of the ownership
8  of the foreign subsidiaries was reflected in the Moss
9  Adams financial statement, correct?
10      A. That is correct, yes.
11      Q. Do you know what Moss Adams relied on as a
12  basis for putting that in the financial statements?
13      A. No.
14      Q. Did you ever have any discussions with Moss
15  Adams about the documents that they had received or
16  they'd received?
17      A. No, the only real discussion I had with Moss
18  Adams was the one meeting in August. I didn't really
19  deal with Moss Adams.
20      Q. Mark did that?
21      A. Yeah.
22      Q. At some point in time there were tax returns
23  prepared, I believe you said, to reflect the alleged
24  distribution of equity and the transfer of the debt,
25  correct?

Page 85

1      A. Mm-hmm.
2      Q. And that was for the calendar year 2008?
3      A. 2007. That was the last return we did. We
4  didn't do the 2008 return.
5      Q. Okay. So that would have been due October 15,
6  2008?
7      A. Uh-huh.
8      Q. Okay. Do you recall what documents your firm
9  received to document the two parts of that, the equity
10  distribution and the debt transfer in order to prepare
11  the tax returns?
12      A. A lot of it would have been by the clients, so
13  we would have had the clients who recorded it, that's on
14  their books, that's part of that journal entry 935 that
15  we saw earlier. And then obviously the Moss Adams split
16  note that talked about the distributions was I think
17  where I felt the most reliable with, because it was in
18  their financial statements. And I don't know if we had
19  other documents. I don't remember. I think we probably
20  do, but I'm not sure.
21      Q. Do you recall seeing any actual legal documents
22  that conveyed the transfer of the equity ownership?
23      MS. WOODRUFF: Objection. Vague and ambiguous
24  as to legal documents. A financial statement could
25  easily be a legal document, ledgers could be --

22 (Pages 82 to 85)

BMO 002136

WAYNE   BOOS - 8/15/2011

Page 86

1   BY MR. CHRISTMAS:
2       Q. I'll be more specific. We've looked at
3   documents prepared by Gary Perry. Well, let's go back to
4   Exhibit 2. Did you ever see a signed version of this
5   document before today?
6       A. This is one I said I don't recall seeing.
7       Q. So you don't believe you saw one?
8       A. I don't recall seeing it.
9       MR. NUTI:  Just to be clear, was that Boos
10  Number 1 you were looking at?
11      MR. CHRISTMAS:  No, Number 1 is the deposition
12  notice. I think it's Number 2.
13      MR. O'GARA:  Number 2.
14      MR. CHRISTMAS:  Yep.
15      (Exhibit 44 was marked for identification.)
16  BY MR. CHRISTMAS:
17      Q. Mr. Boos, I've asked the court reporter to hand
18  you Exhibit 44 to your deposition for identification.
19  It's a series of e-mails with an attached draft of
20  financial statements. Do you recall why you were sent a
21  copy of the draft financial statement?
22      MS. WOODRUFF:  Objection. Calls for
23  speculation to the author's intent.
24      THE WITNESS:  I don't know what page 3 is.
25  Page 3 of the draft.

Page 87

1   BY MR. CHRISTMAS:
2       Q. Are you looking at Ms. Shondale Seymour's --
3       A. Yeah, most likely it was the income tax section
4   wording from the bottom of two.
5       Q. Lower down there, below the e-mail that was
6   addressed to you, there's a reference to a phone call
7   with the bank, and Mr. McCormick says "I committed to
8   sending the bank a copy of the draft financial statements
9   as soon as we have signed the management rep letter."
10      Are you familiar with, apart from this e-mail,
11  the nature of the documents, if any, that the bank is
12  receiving from Mr. McCormick?
13      A. I wasn't part of that call.
14      Q. Do you have an understanding as to whether the
15  financial statements of the company were being sent to
16  the bank on any regular basis?
17      MR. LEWIS:  Objection. Foundation,
18  speculative.
19      THE WITNESS:  I don't know.
20      MR. CHRISTMAS:  Asking for your understanding.
21      THE WITNESS:  I don't know beyond what I worked
22  with.
23  BY MR. CHRISTMAS:
24      Q. You don't know whether they were receiving them
25  or not?

Page 88

1       A. I didn't really deal with the banks, so I can't
2   say what Mark was providing.
3       Q. Do you know if the bank ever raised any
4   objection to the transfer of the equity interests in the
5   Australian companies?
6       A. Not that I'm aware of.
7       Q. And the same question for the debt, are you
8   aware if the banks ever raised any objection to the
9   transfer of the debt to the trust?
10      A. Not that I'm aware of.
11      MR. CHRISTMAS:  This is 49.
12      MR. O'GARA:  You skipped five?
13      MR. CHRISTMAS:  Yeah, we're skipping forward to
14  49.
15      (Exhibit 49 was marked for identification.)
16  BY MR. CHRISTMAS:
17      Q. Mr. Boos, I've had the court reporter hand to
18  you Exhibit 49 to your deposition for identification.
19  It's a series of e-mails beginning with an e-mail from a
20  James Liu to a Carolyn Vartanian, it looks like, of your
21  firm.
22      Can you tell me who Mr. Lieu is?
23      A. James Liu was the tax senior who was primarily
24  responsible for preparing the tax returns for SK Foods.
25      Q. At your firm?

Page 89

1       A. At our firm, yes.
2       Q. Okay. And Ms. Vartanian?
3       A. Carolyn was a senior manager who was, again,
4   primarily responsible in SK Foods tax matters.
5       Q. And it appears from this e-mail that Carol is
6   writing to Darrell, your firm, asking for the journal
7   entries relating to the distribution of the partnership
8   interests. You see that there?
9       A. Mm-hmm.
10      Q. Do you recall hearing there was a request to
11  decline for that information?
12      A. No, but that doesn't mean -- again, I had
13  high-level people working on this from our firm, so I
14  wouldn't have been involved with every request that would
15  have went out for the return, so.
16      Q. But that was something that I believe you
17  testified you wanted as part of preparing the tax
18  returns?
19      A. That our firm would want, yes. Not necessarily
20  me.
21      Q. Right, your firm.
22      A. There was high-level on this.
23      Q. Do you know if these professionals at your firm
24  ever got the journal entries?
25      A. The journal entry was that journal entry 35,

23 (Pages 86 to 89)

WAYNE   BOOS - 8/15/2011

Page 90

1 and that was on our work paper.
2    Q. From the documents?
3    A. Document 69 or whatever that was.
4       MR. CHRISTMAS: Yes, okay. Understood.
5    This is 51. We're not going to go through the
6 whole thing.
7       (Exhibit 51 was marked for identification.)
8 BY MR. CHRISTMAS:
9    Q. Mr. Boos, the court reporter has handed you
10 Exhibit 51 to your deposition for identification. It's a
11 large document, has e-mails in the front, and then
12 attached is what appears to be a draft of the -- I don't
13 know if it's a draft or if it's the final. It's a final,
14 it appears, of the Moss Adams report dated January 15,
15 2008.
16    I'm looking at the e-mails on the first page,
17 and there appears here to be an exchange between
18 Mr. McCormick, Ms. Seymour, Ms. Vartanian, and then
19 ultimately at the top from Ms. Vartanian to you and to
20 Mr. Carlis, and it appears that there is some kind of
21 confusion about the way the notes were treated with
22 respect to the Fin 46 issue. Do you have a recollection
23 of this exchange?
24       MS. WOODRUFF: Objection. Mischaracterizes the
25 document. The document speaks for itself.

Page 91

1 BY MR. CHRISTMAS:
2    Q. Tell me what your recollection is of this issue
3 and describe it maybe in layman's terms.
4    A. Well, I think we never really got a good sense
5 of what the final documents were and how this ended up
6 happening, because we weren't involved with it, and we
7 needed to prepare the returns and the potential amended
8 return for '06, but I think an issue here is that Mark
9 states that they did not make any distributions, and I
10 think he may be providing further e-mails that we
11 questioned that, because it goes against what was in the
12 Moss Adams footnote, that there was a distribution. So
13 we were a little bit unclear exactly what happened in
14 this whole thing and we wanted to get the final
15 agreement.
16    Because it matters for the tax return, who owns
17 the company, as far as how it flows through the return.
18 It doesn't matter from an income tax standpoint, because
19 it all goes to Scott, but it's how we prepare those
20 returns, so we like to get the final.
21    Q. So the returns were based on an understanding
22 of who the actual owners were?
23    A. Yeah. For U.S. purposes, you have to file
24 foreign information returns, form 4371, 8868, and there's
25 another one, 85 something. Basically there's more

Page 92

1 disclosure statements, and obviously ownership is
2 included in there, so.
3    Q. And are those filed at the same time as the
4 returns?
5    A. They're filed as part of the return, and the
6 income would flow through the return on who was owning
7 the company, so it's important for us to know who that
8 is.
9       (Exhibit 52 was marked for identification.)
10 BY MR. CHRISTMAS:
11    Q. Mr. Boos, the court reporter has handed you
12 Exhibit 52 for identification to your deposition. It's
13 just a series of e-mails starting at the back with a
14 February 18, 2008 e-mail of 1:09 p.m.
15    Can you confirm for me, at the top there
16 appears to be an e-mail from Mr. Carlis to Shondale. Is
17 this e-mail addressing the point that you just raised in
18 your last answer or answers which was that the financial
19 statements said one thing that seemed to contradict what
20 Mr. McCormick had said?
21       MS. WOODRUFF: Objection. Lacks foundation,
22 the witness is not the recipient or center of this
23 e-mail.
24 BY MR. CHRISTMAS:
25    Q. Is this the issue -- you can answer the

Page 93

1 question.
2    A. Yeah, I've seen this e-mail. Yeah, it was part
3 of determining what the structure of that transaction was
4 solidifying.
5       MR. CHRISTMAS: Okay. This is 53.
6       (Exhibit 53 was marked for identification.)
7 BY MR. CHRISTMAS:
8    Q. Mr. Boos, the court reporter has handed you
9 Exhibit 53 for identification to your deposition. It
10 appears to me, looking at this e-mail, which is from you
11 to Mark McCormick with a copy to Ms. Seymour, Mr. Perry,
12 Mr. Carlis, dated February 18, 2008 at 1:56 p.m. that you
13 then raised the same issue that Mr. Carlis had raised to
14 you, you're raising it now with Mr. McCormick, is that
15 fair to say?
16    A. Correct, because he said that they were not
17 distributed, and that was, again, not what our
18 understanding was. And also, if it was not distributed,
19 it would cause our financial statements to be wrong,
20 because it gets beyond the Fin 46 as I allude to here,
21 and there's a direct ownership, so those foreign entities
22 have to be included in the consolidated financial
23 statements.
24    Q. About three lines from the bottom of the first
25 paragraph of your e-mail, you say "I would like your

24  (Pages 90 to 93)

WAYNE BOOS - 8/15/2011

Page 94

1  concurrence on this treatment and a copy of the signed
2  transaction documents."
3      Do you know whether your firm ever received a
4  copy of the signed transaction documents?
5      A. I don't think we had, but I can't say for
6  certain we hadn't. If we would have, I would have
7  provided it to you.
8      Q. Did you have any conversation or conversations
9  with Mr. McCormick after you sent him this e-mail, about
10 the signed transaction documents particularly?
11     A. I believe I probably did at some point.
12     Q. Do you recall what you said to him and he said
13 to you?
14     A. I believe he deferred it to he needs to check
15 with Moss Adams.
16     Q. Did you ever have any conversations with
17 Mr. Perry regarding the structuring of, I'll call it the
18 equity transfer and the debt transfer?
19     MS. WOODRUFF: Objection. Compound.
20     MR. CHRISTMAS: You can say either or both.
21     THE WITNESS: I don't believe that I did.
22 BY MR. CHRISTMAS:
23     Q. Did anyone else at your firm have
24 conversations, to your knowledge, with Mr. Perry?
25     A. Well, there was one e-mail that you previously

Page 95

1  had from Darrell that indicated that Gary Perry had not
2  known something, so Darrell would probably have been the
3  one that would have talked with Gary on this, to see if
4  he had the documents.
5      Q. Do you still have Document 69 in front of you?
6      Have you been able to locate it?
7      A. Yeah.
8      Q. We looked at this previously. We didn't look
9  at the first page, and if I could draw your attention to
10 the first page, can you --
11     MR. NUTI: What exhibit is that, Robert? I'm
12 sorry.
13     MR. CHRISTMAS: 69.
14     THE WITNESS: Journal entry.
15     MR. NUTI: Did I not get that?
16     MR. CHRISTMAS: I thought you did. Let me see
17 if I -- here, I can give you this one.
18     MR. NUTI: It's all right. I can look at his.
19 BY MR. CHRISTMAS:
20     Q. Drawing your attention to the first page of
21 this exhibit, can you tell me what the first page is?
22     A. It's a journal entry, SK Foods journal entry.
23     Q. And is this a computer-generated form or a hard
24 copy -- let me see if I can get that precise.
25     Is this generated by a computer or is it just a

Page 96

1  preprinted form that someone writes on?
2      A. I've never recorded journal entries in their
3  system. I don't know.
4      Q. Okay. But this is their method, to your
5  understanding, of booking journal entries?
6      A. That's what it sure looks like.
7      Q. You have to answer "yes" or "no."
8      A. Yes.
9      Q. Do you know why this journal entry is
10 apparently -- if I can draw your attention to the bottom
11 of the page, the date is 7/14/08, and this is, just for
12 clarification, this is for journal entry 35 that we had
13 discussed previously, correct?
14     A. Mm-hmm.
15     Q. Do you know why it's being booked in July of
16 2008?
17     MS. WOODRUFF: Objection. Calls for
18 speculation, also misstates the evidence, lacks
19 foundation.
20     MR. CHRISTMAS: You can answer.
21     THE WITNESS: On page 2 it says "Entry missed,
22 never booked."
23 BY MR. CHRISTMAS:
24     Q. Apart from reading that, do you have any
25 knowledge of --

Page 97

1      A. That they missed it?
2      Q. Yes.
3      A. No, I don't recall that.
4      Q. Is this something that you would have gotten
5  involved in preparing the tax return -- I mean, would
6  your firm have needed to see this entry to prepare the
7  tax returns?
8      A. By the time we would have got the return for
9  December 31, '07, this journal entry would already have
10 been most likely in the trial balance that we would have
11 had, I would think, because we don't sometimes get the
12 final -- we hadn't got a lot of the information generally
13 late in the summertime, so it would have been reflected
14 already in what we would have received. We're way
15 behind. We're like almost a year behind.
16     Q. Oh, I see. What you're saying is --
17     A. Because we had October 15th of '08 to do this
18 return.
19     Q. So you would have gotten -- assuming this was
20 done, this journal entry was entered, your documents you
21 would have received from the client would have reflected
22 this already?
23     A. If we would have got the trial balance after
24 this date, which could be a possibility. I don't know,
25 it could have been we got it before and this was raised

25  (Pages 94 to 97)

Page 98

1 as an issue. But I don't remember.
2    Q. Do you know how the matter of the discrepancy
3 we had discussed in the previous exhibit regarding what
4 was said in the financial statement versus what
5 Mr. McCormick was saying, do you know how that was ever
6 ultimately resolved, or if it was?
7    A. This journal entry here would show it being a
8 distribution to bring it back to the financial
9 statements, so as of November 1st, 2006.
10    Q. So looking at that journal entry, that agrees
11 to the statement in the Moss Adams financial statements?
12    A. Yeah. And I don't believe that any subsequent
13 audit that was done by Stoughton Davidson made any
14 revisions or prior adjustments for that to not reflect it
15 as a distribution, so.
16    Q. Do you know if -- did you ever -- let me focus
17 it on you. Did you ever discuss that particular issue
18 with Stoughton Davidson?
19    A. No, I didn't talk to Stoughton Davidson about
20 anything.
21    Q. You never talked to Stoughton Davidson?
22    A. Huh-uh.
23    Q. Did anyone in your firm talk to Stoughton
24 Davidson?
25    MS. WOODRUFF: Objection. Lacks foundation,

Page 99

1 calls for speculation.
2    MR. CHRISTMAS: If you know.
3    THE WITNESS: Darrell may have. I don't know.
4 BY MR. CHRISTMAS:
5    Q. Do you know --
6    A. I don't know if necessarily we would have
7 talked about this particular -- I just don't know. I
8 guess just leave it at that.
9    Q. Do you know if the debt and equity transfer
10 issues ever came up between Mr. Carlis and Stoughton
11 Davidson? Was it ever discussed, is what I mean.
12    MR. LEWIS: Objection. Calls for speculation.
13    THE WITNESS: I don't know.
14 BY MR. CHRISTMAS:
15    Q. Do you recall whether the performance of the
16 foreign loans ever came up as an issue? Do you recall if
17 you ever had discussions regarding that? In other words,
18 whether payment was suspended on those loans or deferred
19 in any way?
20    A. Which loans? The intercompany loans?
21    Q. Yes.
22    A. I don't think there was any set schedule
23 repayment amortization.
24    Q. Do you know why that was?
25    A. It wasn't structured as a loan that had that

Page 100

1 provision in it.
2    MR. CHRISTMAS: This is 74, if we just can
3 elaborate on that point.
4    (Exhibit 74 was marked for identification.)
5 BY MR. CHRISTMAS:
6    Q. Mr. Boos, I'm showing you a document that has
7 been marked as Boos 74 for identification to your
8 deposition, and this is a series of e-mails, one from
9 John Iacopi to Ms. Seymour and others, and then a
10 follow-on one from Mr. McCormick to Mr. Iacopi,
11 Ms. Seymour and others, on which you are copied, and the
12 one at the top is dated August 24, 2008 at 9:31 a.m.
13    Mr. McCormick writes there that "The receivable
14 to and from the foreign entities are 'suspended' per
15 written agreement with both the U.S. banks and the
16 foreign banks. As such, by bank agreement, they can NOT
17 be performing in the ordinary course of business."
18    When you talked about the loans not being
19 performing, do you agree with his characterization on why
20 they were that way?
21    MS. WOODRUFF: Objection. Misstates the
22 witness's testimony. He did not testify that notes were
23 not performing.
24    THE WITNESS: Yeah, I indicated they were
25 structured not to perform. It was more of like an

Page 101

1 on-demand type of -- not "demand," but no set structure.
2 This, I wasn't really involved with the suspension per
3 this agreement. I don't think I've ever -- may have seen
4 it, but I don't recall it, whatever agreement there may
5 have been.
6 BY MR. CHRISTMAS:
7    Q. Is that because it's not a tax issue, or is it
8 a tax issue?
9    A. It's not a tax issue.
10    Q. Okay. I'll ask you essentially the same
11 question about the note issued by the SSC&L trust, or I
12 want to get to that. Do you know if any of the auditors
13 formed an opinion as to whether or not that loan was
14 fully collectable?
15    MS. WOODRUFF: Objection. Vague and ambiguous
16 as to "that loan."
17    MR. CHRISTMAS: The loan -- to set the table,
18 you recall that the SSC&L trust became the obligor to SK
19 Foods as part of the Fin 46 debt transfer transaction
20 that was proposed by Moss Adams, correct?
21    A. Mm-hmm.
22    Q. Do you know if the auditors formed any opinion
23 of any kind about that loan, the loan or the note payable
24 by the trust?
25    A. I'm not aware --

26 (Pages 98 to 101)

WAYNE BOOS – 8/15/2011

Page 102

1     MR. LEWIS: Objection. Lack of foundation.
2     THE WITNESS: I'm not aware of any opinion --
3 it would be a part of their work papers that I'm not
4 privy to. The only thing I know is that it never came up
5 as a potential tax issue on a reserve that the auditors
6 were reserving that note, which I don't think they did,
7 so.
8     MR. CHRISTMAS: Getting very close to the end.
9 Okay. This is 75.
10     (Exhibit 75 was marked for identification.)
11     MR. NUTI: Robert, what was the number of that
12 last document?
13     MR. CHRISTMAS: 74.
14 BY MR. CHRISTMAS:
15     Q. Mr. Boos, the court reporter has handed you
16 Boos 75 for identification to your deposition. This is
17 an e-mail dated August 24, 2008 at 9:37 a.m. from
18 Mr. Iacopi to Mr. McCormick, Ms. Seymour and Mr. Scott
19 with copy to Mr. Perry and to you.
20     Do you recall receiving this document?
21     A. Yes.
22     Q. In what connection were you copied on this
23 document?
24     MS. WOODRUFF: Objection. Calls for
25 speculation as to the author's intent.

Page 103

1     THE WITNESS: Looks like I was cc'ed.
2 BY MR. CHRISTMAS:
3     Q. Now, to your understanding who is Mr. Iacopi?
4     A. Mr. Iacopi is a CPA who Mr. Salyer retained for
5 special projects.
6     Q. And do you know, was he working on something in
7 connection with Mr. Salyer's divorce at this point?
8     A. This was not related to the divorce.
9     Q. Do you know what this is related to?
10     A. I believe this is probably related to a
11 transaction that was being contemplated for estate
12 planning purposes to transfer shares of SK Foods and RHM
13 to his daughter's trust, which did not occur.
14     Q. It did not occur?
15     A. And Mr. Iacopi was doing evaluation for that
16 proposed transaction.
17     MR. CHRISTMAS: This is 77.
18     MS. WOODRUFF: This is 77?
19     MR. CHRISTMAS: Yes.
20     (Exhibit 77 was marked for identification.)
21 BY MR. CHRISTMAS:
22     Q. Mr. Boos, are you aware of any discussion of
23 forgiving any of the intercompany debt at any point in
24 time?
25     A. This says there was some discussion about our

Page 104

1 forgiveness.
2     Q. Do you recall that, apart from looking at the
3 document?
4     A. What Mr. Iacopi wanted to do was basically come
5 up with the value of the company, and if something was
6 not of any value, as far as valuing a company for gift
7 tax purposes, he wanted it cleaned up.
8     Q. And "the company" referring to SK Foods LP?
9     A. Yeah. This transaction never did happen, that
10 I know of, this forgiveness of debt.
11     Q. Are you familiar with the terms, the repayment
12 terms on which the trust was to repay the loan?
13     MS. WOODRUFF: Objection. Vague and ambiguous
14 as to "the loan."
15     MR. CHRISTMAS: Again, the loan owed by the
16 trust to SK Foods LP.
17     MS. WOODRUFF: Again, sorry, just let me -- I'm
18 sorry. I have to just for the record.
19     MR. CHRISTMAS: I know, but I think we all know
20 which loan we're talking about. I could go through a
21 paragraph of Fin 46 and say which loan it was.
22     MS. WOODRUFF: For the record, I object. Vague
23 and ambiguous as to "the loan." The witness has
24 testified that there were numerous loans between both
25 Australia and New Zealand and SK Foods, going both

Page 105

1 directions.
2 BY MR. CHRISTMAS:
3     Q. Okay. The SSC&L trust obligation to repay its
4 loan to the loan from SK Foods LP that was originally to
5 the Australian subsidiary, taken over in terms of
6 obligation by SSC&L trust.
7     So they were talking about those obligations by
8 the trust to repay that loan.
9     MR. NUTI: Now I need to object. It lacks
10 foundation, because the documents we saw was a document
11 between SSC&L, SK Foods and a New Zealand entity, and I
12 believe the testimony was that Mr. Boos never saw a
13 document, similar document, that was with the Australian
14 entity.
15     MR. CHRISTMAS: That's fine.
16 BY MR. CHRISTMAS:
17     Q. You had an understanding that there was a loan
18 that was being repaid by the trust to SK Foods LP. Is
19 that correct?
20     A. There was a debt assignment agreement, from my
21 understanding, yes. And I don't recall any particular
22 terms of that.
23     Q. That was my question. Did you recall the
24 terms.
25     Do you know if anyone performed any kind of

27 (Pages 102 to 105)

BMO 002141

WAYNE  BOOS - 8/15/2011

Page 106

1  review of those terms of any sort? I'm talking about
2  outside professionals, auditors of any type.
3      A. No, I'm not aware of.
4      Q. Do you know if the financial statements
5  referred to the terms of that loan?
6      A. I don't remember.
7      MR. CHRISTMAS: This is 79. I have maybe one
8  question on this, so don't be frightened.
9      MS. WOODRUFF: This is 79?
10     MR. CHRISTMAS: Yes, 79.
11     (Exhibit 79 was marked for identification.)
12 BY MR. CHRISTMAS:
13     Q. Mr. Boos, I've had the court reporter hand you
14 Exhibit 79 for identification to your deposition.
15     Do you recognize this document?
16     A. It looks like the SK Foods financial statement.
17 I'm not sure if I've ever seen it.
18     Q. Did your firm receive a copy?
19     A. I'm not sure. It's really irrelevant, because
20 we're not on this fiscal year-end. We're on a December
21 31st for tax purposes. The numbers...
22     Q. Could you turn to page 16 of the financial
23 statement. Do you see two-thirds down the page there's a
24 set of numbers underneath the sentence "Non-current
25 related party receivables at June 30, 2008 consistent

Page 108

1  father, which SK Foods purchased.
2      MR. CHRISTMAS: This is 90, this is 91.
3      MS. WOODRUFF: Second one is 91?
4      MR. CHRISTMAS: Yes.
5      (Exhibits 90 and 91 were marked for
6  identification.)
7  BY MR. CHRISTMAS:
8      Q. Mr. Boos, the court reporter has handed you
9  Exhibits 90 and 91 to your deposition for identification.
10 Have you ever seen these documents?
11     A. I have never seen these.
12     MR. NUTI: I'm sorry?
13     THE WITNESS: I have never seen these.
14     MR. CHRISTMAS: I just have one question on
15 this.
16     COURT REPORTER: What number is this?
17     MR. CHRISTMAS: This is 96.
18     (Exhibit 96 was marked for identification.)
19 BY MR. CHRISTMAS:
20     Q. Mr. Boos, I've had the court reporter hand you
21 Exhibit 96 for identification to your deposition. Have
22 you ever seen this document?
23     A. I don't believe I've ever seen this.
24     Q. Did your firm, to your knowledge, receive
25 financial statements from the auditors for the Australian

Page 107

1  with the following"?
2      A. Mm-hmm.
3      Q. The line item that says "revocable trust" and
4  then the amount corresponding to it is 18,262,000. Do
5  you have an understanding as to what that is?
6      MR. O'GARA: Same objection.
7      THE WITNESS: I wasn't involved with this
8  document. I would assume that's somewhere to the debt
9  assignment. I haven't reviewed this.
10 BY MR. CHRISTMAS:
11     Q. How about the irrevocable trust? Do you know
12 the existence of any irrevocable trust?
13     A. Of the existence of an irrevocable trust?
14     Q. Related to the --
15     A. 3.8 million?
16     Q. That owed a receivable to SK Foods LP.
17     A. The irrevocable trust would have been Scott's
18 daughters' trust, and I don't remember or recall they
19 owed $3.8 million. I just don't remember.
20     Oh, no. I'm sorry. Let me take that back, I'm
21 looking below it. The irrevocable trust I think is the
22 Fred Salyer irrevocable trust, which is the life
23 insurance.
24     Q. I'm sorry. You have to keep your voice up.
25     A. It's the life insurance trust for Scott's

Page 109

1  companies?
2      A. For that year-end October 31, '08, I'm not
3  sure. We didn't do the return for that year, so may not
4  have received it.
5      Q. Do you know whether or not the auditors for the
6  Australia companies were aware of the equity transfer of
7  the ownership of SK Foods Australia?
8      MS. WOODRUFF: Objection. Calls for
9  speculation, lacks foundation.
10     THE WITNESS: I don't know. I never dealt with
11 them.
12     (Exhibit 98 was marked for identification.)
13 BY MR. CHRISTMAS:
14     Q. Mr. Boos, the reporter has handed you
15 Exhibit 98 for identification to your deposition, a
16 document entitled Account Receivable Set Off Agreement.
17     Have you ever seen this document before,
18 whether signed or unsigned?
19     A. I don't believe so.
20     Q. If you could note, again, the parties in the
21 first paragraph, SK Foods LP, SSC&L 2007 Trust and
22 Cedenco Foods Limited New Zealand Company. Right now I'm
23 just asking you about whether or not you've seen this
24 document with the New Zealand company as a party, and
25 your answer is you don't think you've seen it?

28 (Pages 106 to 109)

WAYNE  BOOS - 8/15/2011

Page 110

1    A. No, not that I'm aware of, recall.
2    Q. How about a similar document for the
3  Australian --
4    A. No, I don't recall the wording "set off
5  agreement," so.
6    Q. Okay. Let me finish my question.
7       -- for any of the Australian companies?
8    A. Not the set off agreement, no.
9       MR. CHRISTMAS: Okay. This is 104, this is
10  105.
11      (Exhibits 104 and 105 were marked for
12  identification.)
13  BY MR. CHRISTMAS:
14   Q. Mr. Boos, the court reporter has handed to you
15  exhibits 104 and 105 for identification to your
16  deposition, and these e-mails appear to memorialize an
17  exchange between yourself and Mr. McCormick and
18  Ms. Seymour and Mr. Frankish regarding various
19  information that Mr. Frankish wants to receive. Do you
20  recall these exchanges?
21   A. Yes.
22   Q. What was the reason Mr. Frankish was looking
23  for information he was seeking, if you know?
24   A. I'm not sure.
25      MS. WOODRUFF: I'm sorry. For the record,

Page 111

1  objection, lacks foundation.
2       MR. CHRISTMAS: You can answer.
3       THE WITNESS: I'm not sure.
4  BY MR. CHRISTMAS:
5    Q. But it appears that you asked Mr. McCormick --
6  let's see. On Exhibit 104 you asked Mr. McCormick
7  whether he had received anything from Moss Adams. Do you
8  know what was being sought from Moss Adams?
9    A. I believe it's the signed documents for the
10  transfer, the debt assignment agreement, and likely the
11  distribution. I just don't think we ever received them.
12   Q. That was my next question, is whether or not
13  those materials were ever received from Moss Adams, to
14  your knowledge.
15   A. No, and I think this is like the last of
16  this -- unless you're going to pull some more out I'm not
17  aware of, I don't know where, but I think the last part
18  of this, because Mark left, resigned, SK Foods shortly
19  thereafter, and then SK filed for bankruptcy.
20   Q. Do you know why Mr. McCormick resigned?
21   A. No.
22      MR. CHRISTMAS: This is 106.
23      (Exhibit 106 was marked for identification.)
24  BY MR. CHRISTMAS:
25   Q. Mr. Boos, I've had the court reporter hand you

Page 112

1  a document marked as 106 for identification to your
2  deposition. If I can draw your attention to the -- let's
3  see, it's one, two, three, four, five, sixth paragraph
4  down, it starts with the "SSC&L trust."
5    A. Mm-hmm.
6    Q. Mr. Carlis says there "The SSC&L trust stepped
7  into the shoes of SK LP with regard to the payable and
8  receivable, is the way we understand it."
9       Do you know why he says there that the trust
10  stepped into the shoes of SK LP? Do you know what he
11  means by that?
12      MS. WOODRUFF: Objection. Calls for
13  speculation, lacks foundation.
14      THE WITNESS: I would think that that was our
15  understanding, how we understood the transaction. It was
16  a debt assignment, so usually a debt assignment, you're
17  stepping into the shoes of the transaction. There's no
18  real change to the terms.
19  BY MR. CHRISTMAS:
20   Q. And he goes on to say in the next sentence "We
21  have never seen the final documentation on the
22  transaction that was supplied to the Financial Statement
23  Auditors Moss Adams."
24      Do you have any reason to disagree with that
25  statement?

Page 113

1    A. No, I don't recall seeing it either.
2       (Exhibit 110 was marked for identification.)
3  BY MR. CHRISTMAS:
4    Q. Very quick question, if I could draw your
5  attention first to Exhibit 110 that the court reporter
6  has handed to you. Have you ever seen this document?
7    A. No, I've never seen that document.
8       (Exhibit 111 was marked for identification.)
9  BY MR. CHRISTMAS:
10   Q. And if I could turn your attention to
11  Exhibit 111, have you ever seen that document?
12   A. No, I haven't seen that document either.
13   Q. Have you ever heard of Monterey Peninsula
14  Farming LLC?
15   A. Yeah, I've heard of it.
16   Q. In what connection have you heard of it?
17   A. It was an entity that was set up originally to
18  consolidate -- my understanding was consolidate some of
19  the farming operations, but I don't believe that ever
20  occurred, so it was a shell company while I was involved
21  with the it, with the Salyers and SK Foods.
22   Q. To your knowledge, did Monterey Peninsula
23  Farming LLC, was it a party to the equity transfer of
24  ownership to SK Foods Australia LP?
25      MS. WOODRUFF: Objection. Lacks foundation,

29 (Pages 110 to 113)

WAYNE   BOOS - 8/15/2011

Page 114

1  calls for speculation.
2       THE WITNESS: I know nothing about that
3  transaction.
4  BY MR. CHRISTMAS:
5       Q. How about Fast Falcon?  Have you ever heard of
6  that entity?
7       A. Just what's been released in the news, or on
8  the filings.
9       Q. You mean bankruptcy filings or in the media
10 reports?
11      A. Yeah.  Before that I hadn't even heard of that
12 company.
13      (Exhibit 112 was marked for identification.)
14 BY MR. CHRISTMAS:
15      Q. If I could draw your attention to Exhibit 112
16 for identification to your examination.  Have you ever
17 seen this document?  I mean, well, it's a series.  It is
18 one document with a blank final page.
19      A. No, I've never seen this.
20      (Exhibit 113 was marked for identification.)
21 BY MR. CHRISTMAS:
22      Q. And if you could turn to Exhibit 113, have you
23 ever seen that document?
24      A. I've never seen that document.
25      MR. CHRISTMAS: Just one minute, if I may, with

Page 115

1  my client, and then I think we'll turn it over.
2       (Recess taken.)
3  BY MR. CHRISTMAS:
4       Q. I just have a couple more questions and then
5  I'll be finished.
6       Were you aware of communications between the
7  Australian and New Zealand auditors on one hand and the
8  U.S. auditors on the other hand to confirm the
9  intercompany balances between the U.S. companies and the
10 Australian and New Zealand companies?
11      A. No, the only thing would have maybe been when
12 Deloitte was doing both sides of the audit.  There may
13 have been at that point.
14      Q. When you worked for Deloitte?
15      A. Yeah.
16      Q. Did it ever come to your attention that the
17 financial statements for the Australian companies and the
18 U.S. companies showed different things with respect to
19 the ownership of the SK Foods Australia?
20      MS. WOODRUFF: Objection.  Assumes facts not in
21 evidence, lacks foundation.
22      THE WITNESS: No.
23 BY MR. CHRISTMAS:
24      Q. Specifically, it's my understanding that the
25 U.S. financial statements show that the transfer of the

Page 116

1  equity ownership of SK Foods Australia was made, and
2  financial statements for prepares in Australia don't
3  reflect that the transfer of the equity ownership was
4  made.
5       MS. WOODRUFF: Objection.  Assumes facts not in
6  evidence.
7       THE WITNESS: I'm not aware.
8  BY MR. CHRISTMAS:
9       Q. You have no awareness of that issue?
10      A. No, I don't know.
11      Q. And they show the same discrepancy with respect
12 to the obligors and the obligees on the debt, the
13 intercompany debt that the SSC&L trust assumed the
14 obligations for.
15      MS. WOODRUFF: Objection.  Assumes facts not in
16 evidence.
17      THE WITNESS: No, I'm not aware.
18 BY MR. CHRISTMAS:
19      Q. You're not aware of that discrepancy.
20      Just a housekeeping question, after you -- I
21 assume you received a copy of Exhibit 1, the second part
22 of Exhibit 1, which is the subpoena.  I think you
23 received it from your counsel -- or no, I think we served
24 it on you, actually.
25      A. Originally?

Page 117

1       Q. Yes.  I just wanted to ask you just a couple
2  questions about the conduct of the search for documents.
3       A. Okay.
4       Q. Did you search your e-mail system for
5  documents?
6       A. Yes, I did.
7       Q. Okay.  And is that just the live system, or did
8  you search e-mail archive?
9       A. I searched our -- we don't really have an
10 e-mail archive.  I searched my e-mails, and then also we
11 normally would print e-mails that are relevant to what we
12 call our "file cabinet," and so it's a document
13 management system where it's retained, so some of that
14 are pulled from there.
15      Q. Do you have a backup system for your e-mail?
16      A. Yes.
17      Q. And how far back do the dates go?
18      A. Maybe a year.
19      Q. So I take it from your second-to-last answer
20 that there's a physical paper file that you reviewed to
21 respond to the subpoena?
22      A. A physical paper file?
23      Q. Yes.
24      A. No, not paper file.  The file cabinet is
25 actually electronic file, electronic version of a file

30 (Pages 114 to 117)

BMO 002144

WAYNE BOOS - 8/15/2011

Page 118

1  cabinet where they get printed to. But most of my
2  e-mails are still on my e-mail.
3      Q. And is there a physical paper file that you
4  reviewed as well?
5      A. No, we don't really have that. We're
6  electronic.
7      Q. You've gone to electronic office?
8      A. As much as we can.
9      Q. So you scan -- what you do is you scan all the
10 documents? I mean, you just explained an electronic
11 print process.
12     A. We scan the documents, and also for e-mails you
13 can print the e-mail to the electronic file cabinet
14 program so it would store it by client. So it lists it
15 there, as well as that's where we store our permanent
16 documents and tax work papers. There's another program
17 that we have for that, but those are all our work papers,
18 are all electronic.
19     Q. What's done with the physical documents after
20 they're scanned, if it's a hard copy?
21     A. If they're the clients' documents we return
22 them to the client. If they're ours that are for a
23 current work paper, we will shred them. And we generally
24 keep a perm file, a hard copy perm file of those
25 documents too.

Page 119

1      Q. Was that searched in response to the subpoena?
2      A. Uh-huh, yeah.
3      MR. CHRISTMAS: That's all I have. I don't
4  know who wants to go next.
5      EXAMINATION BY MR. NUTI
6      Q. I just have some very quick follow-up
7  questions. I'm Greg Nuti, I represent the chapter 11
8  trustee, Brad Sharp.
9      I have a couple of follow-up questions.
10 Earlier, I think it was this morning, correct me if I'm
11 wrong, I recall your testimony that people at SK Foods,
12 Scott, Mark McCormick, Shondale, had told you that the
13 bank didn't want the foreign entities in the audit?
14     A. Mm-hmm.
15     Q. Do you recall a distinction of whether or not
16 they didn't want the audited financial statements to
17 reflect those investments, as opposed to the bank wanted
18 those investments to be divested from the company? Do
19 you understand the distinction?
20     A. Yeah. No, I don't believe that it was -- their
21 primary concern, my understanding, was the time it took
22 to consolidate, and so I believe that was more the
23 operational P&L-type activity, not so much the ownership.
24     Q. So the bank was concerned with seeing a pure
25 financial statement?

Page 120

1      A. Correct.
2      Q. That doesn't include the foreign entities in
3  it?
4      A. Correct.
5      Q. But as far as you understood, the bank wasn't
6  asking SK Foods to divest itself of those entities?
7      MS. WOODRUFF: Objection. Calls for
8  speculation, lacks foundation.
9      THE WITNESS: I have no knowledge about the
10 divestiture of the distribution. It was primarily just
11 not to consolidate the foreign entities, was the issue.
12 BY MR. NUTI:
13     Q. Okay. The documents that effectuated the
14 transfer we've been talking about, the equity transfer of
15 the documents on the debt transfer, are you aware of any
16 legal opinions at SK Foods obtained during this period
17 that opined as to whether or not the documents
18 effectuated a legal transfer of those assets?
19     A. No, I'm not, other than through Moss Adams,
20 opined on their financial statement.
21     Q. Are you aware of any solvency analysis done by
22 anybody on behalf of SK Foods to determine whether or not
23 SK Foods was solvent at the time the equity was being
24 distributed up to the partners?
25     A. I don't believe at that time there was any

Page 121

1  concern about an insolvency issue by anybody, so I
2  believe there was not -- I'm pretty sure there was no
3  insolvency analysis done as to what was on the radar.
4      MR. NUTI: I think that's all I have.
5      EXAMINATION BY MR. DREHER
6      Q. Mr. Boos, Jamie Dreher. I represent the
7  Official Committee of Unsecured Creditors in the SK Foods
8  LP bankruptcy case. I think I just have two questions.
9      One is did you ever prepare Mr. Scott Salyer's
10 personal tax return?
11     A. Yes.
12     Q. Did you prepare it in 2006?
13     A. Yes.
14     Q. And is there anywhere on that return that you
15 prepared that would show or reveal the existence of his
16 family trust ownership of SK Foods Australia's stock?
17 Would that have shown up on his tax return? That's my
18 question. Does that make sense?
19     A. No, it did not reflect it on that return
20 because I recall as of October 15th of '07 when that
21 return had to be filed, there was no solidification of
22 those documents.
23     Q. How about did you prepare Mr. Salyer's 2007 tax
24 return?
25     A. Correct, yes.

31 (Pages 118 to 121)

WAYNE   BOOS - 8/15/2011

---

Page 122

1   Q. Same question.
2   A. Yes, it was reflected if there was any
3   adjustment that was needed to state that. Now, there's
4   really no tax impact of it, so I'm not quite sure where
5   it would be other than how the pass-through to him is now
6   flowing from. So now it becomes in 2007 a direct
7   pass-through from -- not through SK Foods, it goes
8   from --
9   Q. I'm just trying to think, I'm not a tax expert
10  by any means, but can you think of where on that tax form
11  it would be reflected?
12  A. Well, schedule E is where that would typically
13  pass-through would be reflected at. In addition, those
14  other informational returns, the 450, 471s, 8868s and the
15  other one, 8858, I believe, I believe that for 2007 that
16  was filed with SKPM's return.
17  Q. I'm sorry. I don't understand what you just
18  said at the very end. I was with you, but --
19  A. Well, there's also disclosure of ownership, and
20  foreign entities activity that has to get reported to the
21  U.S., other than just flowing through Scott's return, and
22  those special forms, those get filed with one party, and
23  I believe those were filed in 2007 with SKPM Corp on
24  behalf of all the U.S. reporting -- individuals that had
25  a reporting requirement.

---

Page 123

1   Q. Did your firm prepare SKPM corporate's tax
2   return?
3   A. 2007, yes.
4   Q. How about 2006?
5   A. 2006, yes.
6   Q. How about 2008?
7   A. 2008, no. We did not.
8   Q. And it's your testimony, at least your
9   recollection, that in both of the 2007 tax returns for
10  SKPM Corp and Scott Salyer personally that the ownership
11  of shares in SK Foods Australia would be reflected?
12  A. Yes.
13      MR. DREHER: I don't have any other questions.
14  Thank you.
15      EXAMINATION BY MS. WOODRUFF
16  Q. Mr. Boos, I would like to ask a couple of
17  questions, and I may need to take a break to get some
18  documents copied.
19      I'm Kelly Woodruff, I represent Scott Salyer
20  and the Salyer family entities in connection with this.
21      You said that the tax returns had to be filed
22  for all of the Salyer entities, including SK Foods LP on
23  or around October 15th, 2007 for the 2006 calendar year,
24  correct?
25  A. Correct.

---

Page 124

1   Q. And at that point you did not have the
2   documentation for the transfer of the equity or the debt
3   in the Australian and New Zealand subsidiaries, right?
4   A. Correct.
5   Q. Did you file an amended return for SK Foods LP,
6   an amended 2006 return for SK Foods?
7   A. No, we did not. It was the adjustment was
8   reflected in the 2007, beginning number, and it was on
9   our list of projects to do, but we also never got any of
10  the documents to finalize that amended return.
11  Q. Okay. And is your recollection that you did
12  not even file an amended California income tax return for
13  SK Foods?
14  A. We didn't file any amended returns relating to
15  that transaction.
16  Q. Did you file an amended return for Mr. Salyer
17  personally for 2006?
18  A. Possibly. I'm trying to remember, but I
19  believe that he was under -- I think there was maybe an
20  IRS audit adjustment for that year, for SKPM, that the
21  adjustment needed to be reflected on.
22  Q. Okay. So as a separate issue, you believe that
23  SKPM was being audited for the 2006 calendar year?
24  A. SKPM was audited by the IRS for a particular
25  year. I don't remember exactly what year it was, but it

---

Page 125

1   could have been 2006, and I know there was some amended
2   returns done to reflect that IRS audit adjustment, how
3   that affected California.
4   Q. Okay. But is your recollection that you did
5   not file an amended return for SKPM or Mr. Salyer
6   personally to specifically reflect the acquisition of the
7   Australian and New Zealand subsidiaries?
8   A. I believe we did not, correct.
9       MS. WOODRUFF: I have no more questions.
10      MR. CHRISTMAS: No redirect?
11      MR. NUTI: No. Looks like you're done.
12      (The deposition of WAYNE BOOS was concluded at
13  4:30 p.m.)
14
15
16          ---oOo---
17      I declare under penalty of perjury under the
    laws of the State of California that the foregoing is
18  true and correct.
19  Executed at          , California on          ,
    2011.
20
21
            WAYNE BOOS
22
23
24
25

---

32 (Pages 122 to 125)

BMO 002146

Page 126

```
 1   STATE OF CALIFORNIA  )
                          )
 2   COUNTY OF FRESNO     )
 3
 4        I, AMANDA SCOTT, Certified Shorthand Reporter
 5   licensed in the State of California, License No. 13226,
 6   do hereby certify that the foregoing proceedings was
 7   reported by me and was thereafter transcribed under my
 8   direction into typewriting; that the foregoing is a full,
 9   complete and true record of said proceeding.
10        I further certify that I am not of counsel or
11   attorney for either or any of the parties in the
12   foregoing proceeding and caption named, or in any way
13   interested in the outcome of the cause named in said
14   caption.
15        In witness whereof, I have hereunto set my hand
16   and affixed my seal this day.
17        Date:  August 22, 2011
18
19
20
21
22        AMANDA SCOTT, CSR #13226
23
24
25
```

Merrill Corporation - San Francisco

800-869-9132                              www.merrillcorp.com/law

BMO 002147

# EXHIBIT 117

# In The Matter Of:

## *In re: CEDENCO JV AUSTRALIA PTY LTD, et al,*

---

## *LISA CRIST - Vol. 1*
### *August 17, 2011*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---o0o---

In re:                                          )

                                                ) NO. 10-35002

CEDENCO JV AUSTRALIA PTY LTD, et                )

al, (In Liquidation),                           ) Chapter 15

                                                )

   Debtors in Foreign Proceedings.              )

_____       )

---o0o---

Fresno, California                          August 17, 2011

        The deposition of LISA CRIST was taken in the

above-entitled matter pursuant to all of the provisions

of law pertaining to the taking and use of depositions

before Amanda Scott, CSR, with offices at Fresno,

California, commencing at the hour of 9:14 a.m. at the

law offices of McCormick, Barstow, Sheppard, Wayte &

Carruth, 5 River Park Place East, Fresno, California.

Page 2

1                   INDEX

2

3   EXAMINATION                                      PAGE

4   By Mr. Christmas                       5

5   By Mr. Nuti                            58

6   EXHIBITS

7   NO.    DESCRIPTION                               PAGE

8   1      Deposition Notice                 5

9   2-6    (Skipped)

10  7      Resolutions                            14

11  8      General Assignment and Transfer of Shares 14

12  9      General Assignment and Transfer of Shares 14

13  10     Declaration of Trust                   14

14  11     Notice of Beneficial Ownership           14

15  12     Share Certificate                      14

16  13     Share Certificate                      14

17  14     Standard Transfer Form                 14

18  15     Standard Transfer Form                 14

19  16     Share/Option Transfer Journal          15

20  17-25  (Skipped)

21  26     March 13, 2008 Letter From Scott Salyer   26

22  27     March 17, 2008 E-Mail From Lisa Crist     28

23  28-38  (Skipped)

24  39     March 28, 2008 E-Mail From Julie Patton   31

25  40     March 28,2008 E-Mail From Julie Patton    34

Page 3

1              INDEX CONTINUED

2   EXHIBITS

3   NO.    DESCRIPTION                      PAGE

4   41     (Skipped)

5   42     April 2, 2008 E-Mail             38

6   43     (Skipped)

7   44     Power Of Attorney                41

8   45-51  (Skipped)

9   52     EIN Individual Request           17

10  53     Bill Of Sale              44

11  54     Bill Of Sale              44

12  55     Secretary of State Form          17

13  56     LLC Articles Of Organization     17

14  57-65  (Skipped)

15  66     Salyer Enterprises Flow Chart    23

16  67     Accounts Receivable Set Off Agreement    44

17  68     Bill Of Sale                     53

18  69     Register Of Members              53

19  70     Register Of Notices of Beneficial
           Ownership                        53

20

21  71     Minutes of Meeting               53

22  72     List of Documents Produced       16

23  73     General Assignment and Transfer Of Shares  20

24  74     Assignees and Transferees        21

25  75     Salyer Entities Chart            21

Page 4

1   APPEARANCES OF COUNSEL:

2   FOR THE SALYER ENTITIES:

3       FARELLA, BRAUN & MARTEL
        Attorneys at Law

4       235 Montgomery Street
        San Francisco, California 94104

5       (415) 954-4400
        kwoodruff@fbm.com

6       BY:  KELLY A. WOODRUFF

7   FOR THE LIQUIDATORS:

8       NIXON PEABODY LLP
        Attorneys at Law

9       437 Madison Avenue
        New York, New York 10022

10      (212) 940-3000
        rchristmas@nixonpeabody .com

11      BY:  ROBERT N.H. CHRISTMAS

12  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

13      DOWNEY BRAND
        Attorneys at Law

14      621 Capitol Mall, 18th Floor
        Sacramento, California 95814

15      (916) 520-5542
        schristensen@downeybrand.com

16      BY:  SPENCER W. CHRISTENSEN

17  FOR BRAD SHARP:

18      SCHNADER, HARRISON, SEGAL & LEWIS
        Attorneys at Law

19      One Montgomery Street, Suite 2200
        San Francisco, California 94104

20      (415) 364-6717
        gnuti@schnader.com

21      BY:  GREGORY C. NUTI

22  FOR THE BANK OF MONTREAL:

23      CHAPMAN & CUTLER
        Attorneys at Law

24      111 West Monroe Street
        Chicago, Illinois 60603

25      (312) 845-3010
        heiser@chapman.com

Page 5

1       BY:  JAMES HEISER

2   Also Present:  John Sheahan

3                ---oOo---

4            LISA CRIST,

5       called as a witness herein, having

6       been heretofore duly sworn,

7       testified as follows:

8                ---oOo---

9       (Exhibit 1 was marked for identification.)

10      EXAMINATION BY MR. CHRISTMAS

11      Q.  Good morning, Ms. Crist.  As you know, I'm

12  Robert Christmas.  I'm representing the joint

13  liquidators, Mr. Sheahan sitting to my right, and also in

14  the room is counsel for the committee, counsel for the SK

15  Foods Chapter 11 trustee, and counsel for the Salyer

16  interests, just to refresh who you just met.  And on the

17  phone is counsel for the Bank of Montreal.

18      Okay.  I just want to set the table for the

19  process.  Have you ever been deposed before?

20      A.  I have.

21      Q.  So you understand the process, that we can't

22  talk at the same time, the court reporter can't take down

23  two people talking at once.  You'll probably anticipate

24  what my question may be, but it may end up in a different

25  place than you think, so if you could wait for me to

Merrill Corporation − San Francisco

800-869-9132                          www.merrillcorp.com/law

BMO 002150

LISA   CRIST  -  8/17/2011

**Page 6**

1 finish my questions, then the record will be clearer.
2 Also, the court reporter cannot take down non- -- visual
3 communications, so nods don't work.
4     Are you taking any medication today that would
5 interfere with your ability to remember or retell events?
6     A. No.
7     Q. Do you have any physical condition that impairs
8 your memory?
9     A. No.
10     Q. Just like to ask you a few questions about your
11 professional background. Can you tell me the post high
12 school degrees that you have, if any?
13     A. Currently I have a degree in environment health
14 and safety, and that's my current degree.
15     Q. And from what institution?
16     A. From Merced College.
17     Q. What year was that granted?
18     A. In 1998.
19     Q. After you got that degree, is that the area in
20 which you have worked until now?
21     A. Yes, but I have shared responsibilities in
22 human resources as well as environmental health.
23     Q. Is that with your current employer?
24     A. Yes.
25     Q. And who is that?

**Page 7**

1     A. Morningstar Foods, LLC.
2     Q. What is their business?
3     A. Dairy food manufacturing.
4     Q. And when did you join Morningstar?
5     A. December 21st of 2009.
6     Q. And where did you work before that?
7     A. For SK Foods LP.
8     Q. And when did you join SK Foods LP?
9     A. November 5th, 2004.
10     Q. Where did you work before that?
11     A. Kagome, Inc., K-A-G-O-M-E, Inc.
12     Q. And what are the times that you worked --
13     A. June 20th, 1994 -- I'm sorry, 1996 to,
14 actually, November 4th, 2004.
15     Q. And where did you work for Kagome?
16     A. In Los Banos, where I currently live.
17     Q. And what were your responsibilities?
18     A. Environmental health and safety and human
19 resources.
20     Q. And when you say "environmental health and
21 safety," would I be correct in assuming that that has to
22 do with helping your employer comply with state and
23 federal regulations?
24     A. Yes.
25     Q. How did you become acquainted with SK Foods?

**Page 8**

1     A. I was head-hunted, I was recruited.
2     Q. And who recruited you?
3     A. It was from Produce Careers.
4     Q. An outside agency?
5     A. Right, third-party.
6     Q. And what were you hired to do there?
7     A. I was hired on as the director of environmental
8 health and safety initially.
9     Q. And you just said "initially," so I presume
10 that changed over time?
11     A. It did.
12     Q. Can you tell me how that changed?
13     A. Sure.  Initially in November of 2004 when I
14 joined the organization, again, I was director of
15 environmental health and safety, and probably eight
16 months into that role I was promoted to director of HR
17 and EHS, which is environmental health and safety.  HR
18 being human resources.  And I believe in 2006 I was
19 promoted to vice president of HR and environmental health
20 and safety.
21     Q. And did you hold that position until you left?
22     A. Yes, I did.
23     Q. Okay.  And to whom did you report?
24     A. I initially reported to Steve King, the VP of
25 operations, and then I reported to Mark Grewal, who at

**Page 9**

1 the time was the chief operating officer in 2005, and
2 after 2006 I reported to Scott Salyer, the CEO and
3 president.
4     Q. Just to do some housekeeping now, the court
5 reporter has marked as Exhibit 1 to your deposition the
6 notice of deposition, which I sent to your counsel, and
7 then following that is the subpoena that we issued.
8     Have you seen that document before?
9     A. Yes.
10     Q. Okay.  And did you understand that it required
11 the search for and production of responsive documents?
12     A. Yes.
13     Q. Okay.  And you did produce documents to me?
14     A. Yes, I did.
15     Q. Can you tell me where you looked in terms of
16 search for responsive documents?
17     A. An external drive.
18     Q. Like a thumb drive?
19     A. Yes.
20     Q. And was this a drive that you kept at home
21 while you worked at SK Foods?
22     A. Yes, it was in my possession because I also
23 provided support to the bankruptcy estate for SK Foods
24 and related entities.
25     Q. Okay.  Was that on a consulting basis?

3  (Pages 6 to 9)

LISA   CRIST   -   8/17/2011

Page 10

1  A. Yes.
2  **Q. And were you paid for that?**
3  A. Yes, I was.
4  **Q. And how long were you a consultant?**
5  A. For approximately one year.
6  **Q. So that was from the bankruptcy petition date**
7  **forward for one year?**
8  A. Yes.
9  **Q. And to whom did you report in that capacity?**
10  A. I don't know if I reported to any single
11  person, but I provided services to Brad Sharp and his
12  team.
13  **Q. And what were the nature of the services?**
14  A. I helped reconcile benefits so the company was
15  health insured for health benefits, and I provided
16  services reconciling those for months after the filing of
17  bankruptcy, helping to support workers' compensation as
18  it related to claims management.  I provided services as
19  it related to 401k plans and -- how do I say it, the
20  unraveling of 401k plans.  The 401k plan was closed, so
21  there was a significant process that was involved in
22  that.  So basically all employee- and benefit-related
23  services primarily.
24  **Q. Have you been named as a defendant in any**
25  **litigation relating to SK Foods?**

Page 11

1  A. Yes, I have.
2  **Q. Can you tell me what the nature of that**
3  **litigation was?**
4  A. Initially I was named as a defendant in a PACA
5  claim, which was with the USDA PACA, meaning the
6  Perishable Agricultural Commodities Act.  I was named in
7  litigation, Allied World and related entities versus SK
8  Foods, it's an insurance claim.
9  **Q. Any others?**
10  A. No.
11  **Q. And with respect to the PACA litigation, is**
12  **that still ongoing, or is that resolved?**
13  A. No, it's resolved.
14  **Q. And the Allied World litigation?**
15  A. That's still ongoing.
16  **Q. Can you tell me who Julie Patton is?**
17  A. No.
18  **Q. Did you ever have any contact with Gary Perry's**
19  **office?**
20  A. Yes, I have.
21  **Q. Who's Mr. Perry?**
22  A. He is an estate attorney, estate planning --
23  he's an attorney who I believe specializes in estate
24  planning.
25  **Q. Okay.  And what was the reason you had contact**

Page 12

1  with his office?
2  A. I was the corporate secretary, and so from time
3  to time as the Salyer entities -- Scott Salyer's estate
4  planning, so there were various entities that were
5  involved in that, so from time to time as corporate
6  records evolved, meaning entities were formed or
7  ownership changes occurred, I would maintain some of
8  those records from a record-keeping, storage standpoint.
9  **Q. And when did you first become corporate**
10  **secretary?**
11  A. In 2007, December of 2007.
12  **Q. And who held that position before you?**
13  A. I don't know.
14  **Q. And were you corporate secretary through the**
15  **end of your employment with SK Foods?**
16  A. Yes, I was.
17  **Q. Were you familiar with the existence of**
18  **Australia and New Zealand subsidiaries of SK Foods?**
19  A. Yes, I am.
20  **Q. When did you first learn that they existed?**
21  A. I knew upon my employment, just learning about
22  the organization.
23  **Q. Did you have any responsibilities with respect**
24  **to those subsidiaries?**
25  A. None.

Page 13

1  **Q. Did you ever have contact with anyone who**
2  **worked for those subsidiaries?**
3  A. Yes, I did.
4  **Q. Who did you have contact with?**
5  A. I had contact with Richard Lawrence, who was
6  the managing director, and had met some employees of
7  Cedenco throughout my career with SK Foods on an
8  acquaintance, colleague basis.
9  MR. CHRISTMAS: I'm going to mark some
10  documents now.
11  MS. WOODRUFF: Robert, while you're doing that
12  may I ask, the documents Ms. Crist provided, were they
13  provided to all parties?
14  MR. NUTI: No.  I just asked John the same
15  question.
16  MR. CHRISTMAS: Oh, okay.  I thought that they
17  were.
18  MS. WOODRUFF: When can we expect them to be
19  provided to us?
20  MR. CHRISTMAS: I expect I can do that today.
21  MS. WOODRUFF: That would be great.
22  MR. NUTI: I was going to ask, how many were
23  there?
24  THE WITNESS: Like four.  I have nothing really
25  for Cedenco.

4  (Pages 10 to 13)

LISA   CRIST  -  8/17/2011

Page 14

1      MR. CHRISTMAS: We could mark this as 7.
2      Why don't we just mark several. This is 8,
3  this is 9, this is 10.
4      (Exhibits 7, 8, 9 and 10 were marked for
5  identification.)
6      MR. CHRISTMAS: Sharp 963 is 9.
7      MR. NUTI: I don't have that.
8      MR. CHRISTMAS: Here you go.
9      MS. WOODRUFF: I've got all four.
10  BY MR. CHRISTMAS:
11      Q. I'm just going to ask you, we've marked a
12  series of documents for identification to your
13  deposition.
14      Have you ever seen Exhibit 7 before?
15      A. Not that I'm aware of, no.
16      Q. How about Exhibit 8?
17      A. No.
18      Q. Exhibit 9?
19      A. No.
20      Q. Exhibit 10?
21      A. No.
22      MR. CHRISTMAS: Okay. Let's mark some more.
23  Let's mark these. This is 11, here is 12, 13, 14, 15.
24      (Exhibits 11, 12, 13, 14 and 15 were marked for
25  identification.)

Page 15

1  BY MR. CHRISTMAS:
2      Q. Okay. Ms. Crist, the court reporter has handed
3  you a series of documents numbered sequentially. We'll
4  go through them.
5      Have you ever seen Exhibit 11 before?
6      A. No.
7      Q. How about Exhibit 12?
8      A. No.
9      Q. Exhibit 13?
10      A. No.
11      Q. Exhibit 14?
12      A. No.
13      Q. Exhibit 15?
14      A. No.
15      Q. Exhibit 16?
16      A. 16?
17      MR. NUTI: I haven't seen that one either.
18      MR. CHRISTMAS: Oh, sorry.
19      Did it get marked?
20      COURT REPORTER: No.
21      (Exhibit 16 was marked for identification.)
22      THE WITNESS: No.
23      MR. CHRISTMAS: If we could mark -- I'm going
24  to go out of order so the witness can identify just a
25  handful of documents that were produced from the thumb

Page 16

1  drive.
2      COURT REPORTER: What number is this?
3      MR. CHRISTMAS: 72.
4      (Exhibit 72 was marked for identification.)
5  BY MR. CHRISTMAS:
6      Q. Ms. Crist, the court reporter has handed you
7  Exhibit 72 to your deposition. Do you recognize this
8  document?
9      A. Yes.
10      Q. What is it?
11      A. I provided you in response to the subpoena the
12  list of the following -- the five items that are listed,
13  and then additional document locations where additional
14  documents may be held in accordance with the subpoena
15  requirements.
16      Q. Okay. So you typed this up?
17      A. Yes, I did.
18      Q. And this lists the contents of the thumb drive?
19      A. Yes.
20      Q. So the first document, what does that document
21  refer to there?
22      A. Do you have it?
23      Q. Number one? Do you know what it was, or do I
24  have to show you?
25      A. Articles of organization and EIN number with

Page 17

1  the state for the formation of Monterey Peninsula
2  Farming.
3      Q. And what's the next one?
4      A. I don't remember the document exactly. Do you
5  have it?
6      Q. Yeah, I'm going to pull them out. I just
7  wondered if you could remember, to describe what they
8  were.
9      I'll continue to pull those out, but if you
10  could just go through and tell me what they were.
11      A. I basically looked through my records to see if
12  I had anything related to the subpoena and the document
13  requests, or document production requests, so I'd have to
14  look at number two and number three for clarification.
15      Number four is a flow chart that shows the
16  Salyer enterprises, meaning all of the entities under the
17  Salyer organization, and it shows ownership interests or
18  percentages to and from each entity, and ownership
19  interests back to the trust.
20      And number five, I believe, is a spreadsheet in
21  Excel that, again, shows some of the ownership interests
22  and listing of the Salyer entities.
23      MR. CHRISTMAS: This is 55 and 56, and 52.
24      (Exhibits 52, 55 and 56 were marked for
25  identification.)

5 (Pages 14 to 17)

Page 18

1    THE WITNESS: These actually go together.
2  BY MR. CHRISTMAS:
3    Q. Ms. Crist, the court reporter has just handed
4  you Exhibits 55, 51 and 52, I believe?
5    MS. WOODRUFF: No. 55, 52 and 56.
6    MR. CHRISTMAS: Okay. What did I do with 56?
7  Can I see?
8    THE WITNESS: Mm-hmm.
9  BY MR. CHRISTMAS:
10    Q. Let's look at 55 first. Does that relate to
11  the first numbered item on your --
12    A. All three of them relate to the first item.
13    Q. And that's the first item on Exhibit 72?
14    A. Yes.
15    Q. In that space --
16    A. It's part of the articles of organization, so
17  actually 55 and 56 go together.
18    Q. That's what I thought.
19    A. And 52 is the EIN that was assigned to Monterey
20  Peninsula Farming.
21    MR. CHRISTMAS: We may have called out the
22  wrong number when I passed those around. Do you want to
23  show --
24    THE WITNESS: 52?
25    MR. CHRISTMAS: Is the IRS document.

Page 19

1    And what else do you have in your hand?
2    THE WITNESS: 55 and 56 are the articles of
3  organization for the state of California for the LLC, for
4  Monterey Peninsula Farming.
5    MR. CHRISTMAS: Does everyone have those?
6    MS. WOODRUFF: Yes.
7    MR. NUTI: Yes.
8  BY MR. CHRISTMAS:
9    Q. Is that --
10    A. That's item number one.
11    Q. What's the last?
12    A. Item number two --
13    Q. No, I just mean let me see the last of those.
14    Why did you have item number 1 on your list?
15    A. For corporate secretary I maintained a file for
16  each of the California entities, or California, I should
17  say "domestic," meaning U.S. entities, and so I was given
18  that as just for record-keeping.
19    Q. And where did you maintain the corporate
20  secretarial file?
21    A. Initially they were in Lemoore, California at
22  the SK Foods plant, physical plant location, and then
23  transferred to the 200 -- what was that address? In
24  Monterey. I can't remember the name of the address.
25    Q. So did you move your office to Monterey?

Page 20

1    A. Yes, my office moved. My physical office moved
2  from Lemoore to Monterey. Ragsdale Drive.
3    Q. And in what form was the file maintained? Was
4  it in hard copy form, or electronic form, or both?
5    A. Both.
6    Q. Was it maintained on an individual PC, or on
7  the network?
8    A. It was maintained on an individual PC.
9    Q. Okay. Was that your PC?
10    A. Yes, it was.
11    MR. CHRISTMAS: This is 73.
12    (Exhibit 73 was marked for identification.)
13  BY MR. CHRISTMAS:
14    Q. Is this the second document on your list?
15    A. Yes.
16    Q. Can you tell me what this is.
17    A. Do you want me to read it? General Assignment
18  Transfer of Shares of SK Foods Australia Ltd.
19    Q. Do you know what the purpose of this document
20  was?
21    A. I really don't, it was just included in some of
22  the corporate records that I had.
23    Q. Were you involved in its preparation?
24    A. No, I was not.
25    Q. Do you recall having any discussions about this

Page 21

1  document?
2    A. No. Huh-uh.
3    Q. And that is item number two, then. Is that
4  correct?
5    A. Yes, it is.
6    MR. CHRISTMAS: I think this probably should
7  have been read in conjunction with that. This is the
8  second page. 74.
9    (Exhibit 74 was marked for identification.)
10    THE WITNESS: Can I just add that this looks
11  like it's the same item as item number 9, but item number
12  9 is executed, where the one that I provided was not.
13  They look the same to me.
14  BY MR. CHRISTMAS:
15    Q. But I believe you said you'd never seen item --
16  rather, we'll call it "exhibit." Exhibit 9.
17    A. I don't remember it, because it would have been
18  before I was assigned -- I don't remember it being
19  executed. It may have just been in a file that I had
20  with regard to another entity. Because I didn't maintain
21  corporate records for any of the international entities.
22    Q. You did not?
23    A. No, I did not.
24    (Exhibit 75 was marked for identification.)
25  ///

6 (Pages 18 to 21)

BMO 002154

LISA CRIST - 8/17/2011

Page 22

BY MR. CHRISTMAS:

1  BY MR. CHRISTMAS:
2      Q.  Let me move to 75.  I haven't located -- what
3  item is that on your -- I have to show it to you first.
4      A.  So again, this attachment goes with this one,
5  right?  As the same as item 9, Exhibit 9, I'm sorry.
6      Q.  For clarity of the record, you've been -- I
7  handed you Exhibit 73, and then I handed you Exhibit 74.
8      A.  Right.
9      Q.  It was my belief that these since they were
10  sequentially numbered and it is an exhibit, that they
11  went together.
12      A.  Yep.  Well, that's what it looks like when you
13  provided 9, that they're together.
14      Q.  But you don't have any independent
15  understanding of the order of these documents?
16      A.  I don't.  And like I say, they may have been in
17  another entity record, such as SKPM corp because of the
18  reference there, but I don't have any working knowledge
19  of its preparation, or the execution of Scott's
20  signature, or anything like that.
21      MR. CHRISTMAS:  Okay.  Do you have 75?  Have we
22  handed out 75?
23      MR. SHEAHAN:  I have.
24  BY MR. CHRISTMAS:
25      Q.  I believe this is from your production.  Can

Page 23

1  you identify this document?
2      A.  Yes, this is an Excel spreadsheet that I
3  prepared showing -- actually, I think I remember it being
4  e-mailed back and forth between Gary Perry and myself,
5  just trying to support the SK Foods LP and related entity
6  bankruptcy in 2009, just to help clarify the entities,
7  and dates of incorporation, and EIN numbers, et cetera.
8  BY MR. CHRISTMAS:
9      Q.  Did Mr. Perry give input to this document?
10      A.  Yes.
11      Q.  And then I take it you also gave input to this
12  document?
13      A.  Yes.
14      Q.  And does this document correspond to one of the
15  items on your list?
16      A.  It is item number five.
17      MR. CHRISTMAS:  Let's do this 66.
18      (Exhibit 66 was marked for identification.)
19  BY MR. CHRISTMAS:
20      Q.  The court reporter has handed you Exhibit 66 to
21  your deposition.  Do you recognize this document?
22      A.  Yes.
23      Q.  Can you tell me what it is?
24      A.  It is the Salyer Enterprises Flow Chart.
25      Q.  And were you involved in preparing this

Page 24

1  document?
2      A.  No.
3      Q.  Do you know who prepared it?
4      A.  Wayne Boos.
5      Q.  And do you know why you ended up with a copy of
6  it on your thumb drive?
7      A.  Again, as it related to supporting the
8  bankruptcy estate, and then also I managed lines of
9  insurance -- let me back up.  So I've had a copy of this
10  probably since '08.  There was another version, I
11  believe, before this one.  There are probably multiple
12  versions before this one.  And I supported all lines of
13  insurance, and so just to make sure that we had the
14  appropriate entities insured under the GL policies, et
15  cetera, as named entities, I maintained a copy of this as
16  well.
17      Q.  Did you ever give any input as to changes to be
18  made to that document?
19      A.  No, none.
20      Q.  And does this correspond to an item on your
21  list?
22      A.  Item number four.
23      Q.  All right.  We'll get to item number three at
24  some point here, but I just wanted to get those out.
25      Who was Mr. Pinter?  Chad Pinter?  Do you

Page 25

1  recall?
2      A.  He was hired as CFO for a short period of time.
3      Q.  Did you report to him?
4      A.  No, I did not.
5      Q.  As corporate secretary, were you ever involved
6  in the drafting of any of the documents over which you
7  were the custodian?
8      A.  Possibly.
9      Q.  Do you have any individual recollection of
10  assisting in drafting?
11      A.  What type of documents?  Can you be more
12  specific?
13      Q.  Well, like any documents that would convey
14  ownership interest of any of the entities to any other
15  entity?
16      A.  I do remember typing drafts of resolutions,
17  adopting resolutions after, say, a board of directors
18  meeting.  Minutes, agendas, things like that as it
19  related to board of directors meetings for SKPM corp
20  only.
21      Q.  Okay.  So you attended the board meetings?
22      A.  Yes, I did.  Two.
23      Q.  For two entities?
24      A.  No, two board of directors meetings.
25      Q.  And what boards of directors were those?

7 (Pages 22 to 25)

Page 26

1     A. Dates, or?
2     Q. Let me back up.  You only ever attended two
3  meetings?  Is that what you mean?
4     A. Yes.
5     Q. And you took down the minutes for those
6  meetings?
7     A. Yes, I did.
8     Q. And then you typed them up?
9     A. Mm-hmm.
10     Q. Now, I was referring more to, I guess what we
11  could call legal documents, or transaction documents that
12  might change the corporate ownership of the entities
13  themselves.
14     A. I don't recall changing ownership.  I remember
15  typing up, like I said, resolutions, but I would need to
16  look at them to remember.
17     Q. Did you ever assist Mr. Perry in drafting any
18  legal transaction documents?
19     A. Not that I can recall.
20     Q. Did you ever give any comments to Mr. Perry on
21  any legal transaction documents that he had prepared?
22     A. Not that I can recall.
23        MR. CHRISTMAS: This is 26.
24        (Exhibit 26 was marked for identification.)
25  ///

Page 27

1  BY MR. CHRISTMAS:
2     Q. Ms. Crist, the court reporter has handed you
3  Exhibit 26 to your deposition.  Do you recognize this
4  document?
5     A. I don't remember it.  Is it a part of a loan,
6  like a loan transaction?
7     Q. If you look at the lower right, it has a number
8  on it.
9     A. Okay.
10     Q. And I believe, is this number three on your
11  list?
12     A. Could be.  Yes.  This is what I provided you in
13  that, right?
14     Q. I'm asking you.
15     A. Like I said, I just did a general search, so
16  anything that would have had anything related to the
17  subpoena, I provided.
18     Q. I believe that this is it.
19     A. Okay.  Yes, SSC&L trust.
20     Q. And it appears to be the only page that we
21  haven't hit in your production.
22     A. Yes, mm-hmm.
23        MR. SHEAHAN: So that means everyone's got each
24  page of the production?
25        MR. CHRISTMAS: Yes.

Page 28

1        MR. SHEAHAN:  So you've all got it.
2        MR. CHRISTMAS: 27.
3        (Exhibit 27 was marked for identification.)
4  BY MR. CHRISTMAS:
5     Q. Just one housekeeping question, when you left
6  SK Foods, did you retain your computer, or did you leave
7  it at SK Foods?
8     A. I retained my laptop for a period of time while
9  I supported the bankruptcy estate, and then returned it
10  to the bankruptcy estate through Shondale Seymour, and
11  then she actually turned it over to Olam Tomato Company,
12  I don't know their legal name, who actually purchased all
13  of the assets from the estate.
14     Q. The court reporter has handed you Exhibit 27 to
15  your deposition.  Do you recognize this series of
16  e-mails?
17     A. I'm looking through it right now.  Lisac@first
18  organization.com, I don't recognize that e-mail address
19  at all.  I've never held an e-mail address that's
20  lisac@first organization.com.
21     Q. Do you know if --
22     A. And I don't remember this e-mail.
23     Q. Do you know if any outbound e-mails from SK
24  Foods might have had a different address?
25     A. Not that I'm aware of.  It would have been --

Page 29

1     Q. What was your address?
2     A. It was lisac@skfoods.com.  I don't think it was
3  lcrist, I believe it was lisac@skfoods.com.
4     Q. Well, turning to the substance of this series
5  of e-mails, the one on the bottom is from Nick Frankish.
6  Do you know who he was?
7     A. Yes.
8     Q. What was his role?
9     A. He was the CFO for Cedenco.
10     Q. And have you had a chance to read this e-mail?
11     A. I'm reading it right now.
12        I don't remember the e-mail.
13     Q. Apart from not remembering the e-mail, how
14  about the substance of the e-mail, the topics that are
15  addressed there?  Well, let's start with do you recall
16  whether there were any changes in ownership of the
17  Australian and New Zealand companies while you worked for
18  SK Foods?
19     A. I was not involved in their -- I was not
20  involved in the Cedenco operations at all.  I don't
21  recall any conversations as it related to any ownership
22  changes or anything like that for Cedenco.
23     Q. Do you know if you received for storage in the
24  corporate secretarial file any documents that purported
25  to effect changes in the ownership of the Australia and

8  (Pages 26 to 29)

BMO 002156

LISA   CRIST   -   8/17/2011

Page 30

1  New Zealand companies?
2      A. The only things that I had were what I
3  provided.
4      Q. No, I mean in the corporate secretarial file at
5  SK Foods.
6      A. Would I have had what?
7      Q. Would you have been the person to whom legal
8  documents that effected changes in ownership of the
9  Australia and New Zealand companies would have been sent?
10     A. I don't believe so, but I didn't -- you know, I
11 maintained -- basically each entity had a formal binder
12 that had all the AOs and, you know, Articles of
13 Incorporation, Articles of Organization, EIN numbers,
14 various resolutions, et cetera, et cetera.  And then with
15 the government investigation, all of those records were
16 taken, and so there were some records that Gary Perry was
17 able to reproduce so that we could continue to run the
18 business.
19         So it's very difficult for me to pinpoint one
20 record versus another, because after all of the formal
21 corporate records were taken as a part of the
22 investigation, they were never returned.  So they're
23 still in the government's possession, Department of
24 Justice.
25         So basically, Gary Perry provided manila

Page 31

1  folders with some basic corporate records just to, you
2  know, support the business basically.
3         So if you're asking me if I have specific
4  ownership-related documents in my possession, I don't
5  believe that I do, or that I remember having in those
6  folders.  Because I received those corporate records in
7  December of 2007 after the first board of directors
8  meeting that I attended and was appointed as corporate
9  secretary.  Those records came into my possession then,
10 and in '08 the government raid happened in April, so I
11 only had the formal records for a period of maybe five
12 months.
13         Does that make sense?
14     Q. I understand your answer.
15     A. So I had nothing for a period of time after the
16 government raid, and then requested of Gary Perry, "Hey,
17 do you have anything so we can support banking
18 transactions or anything," as it related to needing --
19 trying to support the business basically.
20     MR. CHRISTMAS: Okay.  This is 39.
21         (Exhibit 39 was marked for identification.)
22 BY MR. CHRISTMAS:
23     Q. Ms. Crist, the court reporter has handed you
24 Exhibit 39 to your deposition.
25     A. Okay.

Page 32

1      Q. I asked you at the beginning of the deposition
2  if you remembered the name Julie Patton.
3      A. Mm-hmm.
4      Q. Do you see that name there at the top of
5  Exhibit 39, the e-mail?
6      A. I do.
7      Q. By looking at that e-mail address, does that
8  refresh your recollection as to who she was?
9      A. It appears that she worked for Gary Perry.
10     Q. Do you have any independent recollection of
11 dealings with her?
12     A. I didn't correspond with her very often.  It
13 would have been few and far between as far as my
14 communications with her.
15     Q. Now, if I could draw your attention to the
16 attachment to this e-mail, do you recall -- well, first
17 do you recall receiving this e-mail and the attachments?
18     A. It appears that it was e-mailed to me.
19     Q. Do you have any independent recollection of
20 that?
21     A. I guess so.  If you're asking about the initial
22 transaction in its entirety, I don't.  I mean, there
23 were -- my days were long, so.
24     Q. I just mean, do you remember receiving this
25 e-mail?  Does this refresh your recollection that you

Page 33

1  received this e-mail?
2      A. Yes, yes.
3      Q. Now, do you know why you are receiving this
4  e-mail and attachment?
5      MS. WOODRUFF: Objection.  Calls for
6  speculation, lacks foundation.
7  BY MR. CHRISTMAS:
8      Q. Did you have an understanding?
9      MS. WOODRUFF:  Same objection.
10     THE WITNESS:  Yeah...
11 BY MR. CHRISTMAS:
12     Q. You can answer.  That's just part of the
13 process.
14     A. It must have -- somebody must have asked me or
15 requested of me to try and get records, and I probably
16 went to Gary Perry and said "Hey, do you have this," in
17 connection with providing or supporting a request from
18 another person.
19     Q. But these appear to be unsigned?
20     A. Mm-hmm.
21     Q. So apart from this document, did you ever have
22 occasion to be asked to seek signatures for documents?
23     A. I did seek, or I should say "obtain" signatures
24 for various records as it related to, like, loans, so if
25 the company were going through a loan, or a new loan, or

9 (Pages 30 to 33)

Page 34

1  a current loan, restructuring maybe, I would have helped
2  support that through producing records and getting
3  signatures and having things FedExed back and forth
4  between the banks and the company, just basically as an
5  admin, purely in an admin role, just being that liaison
6  between, you know, the CFO, Scott, the banks, et cetera.
7      Q. It says -- Ms. Patton writes "Lisa attached the
8  two forms we discussed on Wednesday." Do you recall the
9  telephone conversation that you had?
10     A. No, I do not, honestly.
11     Q. Do you know what you did after you received
12 this e-mail?
13     A. No, I don't.
14     Q. Do you recall if you sent these documents to
15 anyone for signature?
16     A. I don't even remember the transaction, to be
17 honest with you.
18     Q. When you say "the transaction," is that --
19     A. Meaning the request for the records, who I sent
20 them to. I don't remember what the business name was, if
21 it was in support of somebody needing records for
22 whatever business purpose, I don't even remember what the
23 business purpose was.
24     MR. CHRISTMAS: Let's mark 40.
25     (Exhibit 40 was marked for identification.)

Page 35

1  BY MR. CHRISTMAS:
2      Q. Ms. Crist, the court reporter has handed you
3  Exhibit 40 to your deposition, which is -- we looked at
4  Exhibit 39, which was an e-mail with attachments of
5  March 28, 2008 at 11:49 a.m., and here again, this is the
6  same day, March 28, and this is now 2:35 p.m.
7      Do you have any recollection as to -- if you
8  could look at the documents, I believe they are the same
9  documents, why she would have sent it to you twice?
10     MS. WOODRUFF: Objection. Calls for
11 speculation, lacks foundation.
12     THE WITNESS: They appear to be the same. I
13 don't know why they would have been e-mailed twice.
14 BY MR. CHRISTMAS:
15     Q. And would it be fair to say that just as with
16 the e-mail and attachments that were sent in the morning,
17 that you don't have a recollection as to what you did, if
18 anything, with these documents after receipt?
19     A. I do not --
20     MS. WOODRUFF: Sorry. Objection. Assumes
21 facts not in evidence that it was received.
22 BY MR. CHRISTMAS:
23     Q. Did you receive these e-mails, Exhibit 40?
24     A. That is my e-mail address, lisac@skfoods.com.
25     Q. Apart from looking at the document, do you have

Page 36

1  an independent recollection of receiving this e-mail?
2      A. I don't remember the business transaction. I
3  don't.
4      Q. Did you ever travel to New Zealand or Australia
5  in connection with your position?
6      A. I did twice.
7      Q. And when did you do that?
8      A. I can give you the years. I don't remember
9  time frame.
10     Q. Whatever you remember.
11     A. Okay. The first trip I believe was in 2007,
12 and the second was in 2008.
13     Q. Turning to the 2007 trip, what was the reason
14 that you made the trip?
15     A. I was invited to go, just from -- each year
16 Scott Salyer traveled to the Cedenco entities probably
17 two or three times a year, and each time he would take a
18 different member of senior management on most occasions,
19 and I was new, new in my role as VP of HR and EHS, and so
20 I went purely to visit what we called our "sister
21 companies," and so it was just basically an opportunity
22 for me to get to know the business and to meet others in
23 our organization with the international companies.
24     Q. But you didn't have specific responsibilities
25 to carry out in Australia?

Page 37

1      A. No.
2      Q. Or in New Zealand?
3      A. No.
4      Q. With whom did you meet, if anyone, on this
5  trip?
6      A. I met a lot of people. I toured the
7  facilities, I toured each facility, I met a lot of
8  people. We had a dinner where we invited the plant
9  employees.
10     Q. And in 2008 you traveled again?
11     A. I traveled with Scott Salyer's daughter,
12 Stephanie Salyer, and we traveled commercial, not
13 privately on the company's, you know, the company
14 airplane, jet.
15     So I traveled with Stephanie Salyer, and it was
16 an opportunity for her to get to see the other entities,
17 and I accompanied her and made those introductions, and
18 she and I did plant tours and things like that, and it
19 was an opportunity for her. She had taken another role
20 in the organization, so again, it was just a
21 meet-and-greet and to introduce her to the business as
22 well.
23     Q. Was Mr. Salyer --
24     A. He was there during that time, but we didn't
25 travel with him.

10  (Pages 34 to 37)

BMO 002158

LISA CRIST - 8/17/2011

Page 38

1    Q. And in the 2007 trip did you go to New Zealand
2  and Australia?
3    A. Yes.
4    Q. And in 2008, New Zealand and Australia?
5    A. Yes.
6    Q. Other than plant tours and dinners, et cetera,
7  were there any business meetings as part of the 2008
8  trip?
9    A. I did attend a -- they always -- that's
10  speculation. Richard Lawrence and Richard Frankish and the
11  plant manager or plant operations director, I don't know
12  his exact title, presented a capital investment wish list
13  per se, like, you know, what they would hope to do as far
14  as expansion of the operations, or capital improvements
15  for the various plants. They had acquired a new squash
16  company in Ohakune, I believe. Had Mountain Carrots in
17  another location, and so I attended those meetings.
18    MR. CHRISTMAS: Mark this as 42.
19    (Exhibit 42 was marked for identification.)
20  BY MR. CHRISTMAS:
21    Q. Ms. Crist, the court reporter has handed you
22  Exhibit 42 to your deposition, which is a series of
23  e-mails. The earliest e-mail appears to be an e-mail
24  dated April 1, 2008 at 7:25 p.m.
25    A. Mm-hmm.

Page 39

1    Q. Military time there.
2    And the second e-mail appears to be one from
3  Gary Perry dated April 2, 2008 at 6:37 a.m.
4    Do you recognize these series of e-mails?
5    A. I do remember a conversation with Nick. I
6  remember, and I can't be specific specific, but I do
7  remember Nick, they were talking about -- I was in a
8  meeting and a sidebar conversation was occurring where
9  Nick was talking about they were going through their
10  audit, their annual audit, and he needed to have Scott
11  sign some documents and asked me if I were going to see
12  Scott, if I could have him sign some documents related to
13  their audit.
14    Q. Okay. Do you know the nature of the documents?
15    A. I can't recall specifically unless you have
16  something that you want me to review.
17    Q. Do you have a recollection about any
18  resolutions relating to the transfer of ownership of the
19  Australian or New Zealand companies?
20    A. I don't remember what the resolutions were, I
21  just remember Nick needing Scott to have something signed
22  in response to his audit, the needs for his audit, and
23  wanted to -- there was one document in particular that he
24  asked me if I had authority to sign, and I told him I
25  wasn't sure, as corporate secretary, and I told him that

Page 40

1  I wasn't sure because I wasn't an officer of the
2  Cedenco-related entities. And so I did sign one
3  document, I don't remember what it was, but it turned out
4  that I didn't have the authority to sign it anyway, and
5  Scott had to sign them.
6    Q. Do you recall what the nature of the resolution
7  was?
8    A. I don't, unless you have it.
9    Q. Were you involved in the preparation of any of
10  the resolutions relating to --
11    A. For Cedenco?
12    Q. You have to wait for me to finish so the court
13  reporter can take us down.
14    A. I'm sorry.
15    Q. -- the resolutions that are mentioned in this
16  e-mail, or referred to?
17    A. The resolution stated in the e-mail isn't
18  specified, so I wouldn't know without looking at it.
19    Q. Do you recall the significance of the two dates
20  that are in this e-mail, November 1, 2007 versus
21  November 1, 2006?
22    MS. WOODRUFF: Objection. Calls for
23  speculation, lacks foundation and also assumes facts not
24  in evidence as to their significance.
25  ///

Page 41

1  BY MR. CHRISTMAS:
2    Q. You can answer. I'm just asking if you know
3  their significance, what they connect to.
4    A. I don't.
5    Q. Did you ultimately obtain signatures of any
6  documents that were in furtherance of this e-mail?
7    A. During this trip I don't believe that I was
8  able to get Scott's signature. I think that he signed
9  them when he was back in the U.S., whatever they were. I
10  may have carried an envelope with the documents that Nick
11  needed signed, but I don't remember Scott actually
12  signing them during that trip. I think it was handled
13  when he got back to the states.
14    Q. So do you know when he got back to the states?
15    A. No, I don't even remember the exact time of the
16  trip.
17    Q. Did his dates of travel overlap exactly with
18  yours, or were they different?
19    A. During this trip they would have been different
20  because Stephanie and I traveled separately.
21    Q. But on the first trip you were on the corporate
22  plane?
23    A. Yes, I was.
24    MR. CHRISTMAS: This is 44.
25    (Exhibit 44 was marked for identification.)

11 (Pages 38 to 41)

BMO 002159

LISA   CRIST   -   8/17/2011

Page 42

BY MR. CHRISTMAS:
1
2    Q. Ms. Crist, the court reporter has handed you
3 Exhibit 44 to your deposition. Do you recognize this
4 document?
5    A. Yes, I do.
6    Q. Can you tell me what it is.
7    A. Hang on one second. Let me read it.
8       It is basically the power of attorney.
9    Q. Okay. What's your understanding of the reason
10 that you were granted power of attorney?
11      MS. WOODRUFF: Objection. Calls for
12 speculation, lacks foundation.
13      THE WITNESS: Scott was traveling to a country,
14 and I don't remember the -- I believe it was Turkey and a
15 couple other countries. It was like an annual tomato
16 conference, and then he was doing some other traveling
17 outside of that, and there was one country that was,
18 like, at war, and we were kind of talking about "What if
19 you died" type thing, and were kidnapped as part of, you
20 know, kidnapping a rich American and holding him -- I
21 don't know.
22      He was traveling abroad to some various
23 countries that weren't -- Columbia I think was one of
24 them too, that were not entirely safe. So Gerard Rose
25 and Scott and I talked. Basically they contacted me and

Page 43

1 Gerard said "Hey, Scott's going to be doing this
2 traveling for the next three weeks." And it was a very
3 short period of time, I can tell you that, and he
4 appointed me power of attorney, just to make very
5 low-level business decisions during that time, and
6 basically to support his estate if he were to die, to be
7 pretty blunt, as it related to his daughters. Because I
8 formed a close relationship with Stephanie. Not so much
9 Caroline, I didn't get to know her that well, but with
10 Stephanie I did, so that's how that came about.
11 BY MR. CHRISTMAS:
12    Q. Do you know if this power of attorney was ever
13 revoked?
14    A. God, I hope so. It was only during the time
15 that he was traveling to those various countries, and it
16 was like a two- or three-week...
17    Q. Do you know why he chose you?
18      MS. WOODRUFF: Objection. Calls for
19 speculation, lacks foundation.
20 BY MR. CHRISTMAS:
21    Q. If you have an understanding.
22    A. I believe that he trusted me, but honestly, I
23 don't -- it would be speculation, because I don't know
24 from Scott. And I've heard, and my communications with
25 regard to this were actually from Gary Perry -- I mean,

Page 44

1 I'm sorry. Strike that. Gerard Rose.
2      And I was gracious that he felt very high -- he
3 felt highly of me I guess, but I was no way equipped to
4 manage the company if he were to die. It was kind of --
5 I hate to say it was a joke. I understand this is a
6 legal document, but it really never came into play.
7    Q. Were you ever granted a power of attorney by
8 anyone else while you worked at SK Foods?
9    A. No.
10      MR. CHRISTMAS: This is 53, this is 54.
11      (Exhibits 53 and 54 were marked for
12 identification.)
13      THE WITNESS: Is there a reason why it's so
14 cold in this office? Is that on purpose?
15      MR. CHRISTMAS: And dark.
16      THE WITNESS: I'm freezing to death.
17 BY MR. CHRISTMAS:
18    Q. Ms. Crist, the court reporter has handed you
19 Exhibit 53 and 54 to your deposition. Have you ever seen
20 Exhibit 53?
21    A. I'm not aware of these documents.
22    Q. And so that includes also 54?
23    A. Yes.
24      MR. CHRISTMAS: 67.
25      (Exhibit 67 was marked for identification.)

Page 45

1 BY MR. CHRISTMAS:
2    Q. Ms. Crist, the court reporter has handed you
3 Exhibit 67 to your deposition. Have you ever seen this
4 document?
5    A. I did as part of a loan transaction, and that
6 was only to organize the documents and get them FedExed
7 to the bank group, I believe.
8    Q. Do you know the purpose of this document?
9    A. No.
10    Q. Were you involved in the preparation of this
11 document?
12    A. Not that I remember.
13    Q. Who was the lender in the loan transaction?
14    A. There were several banks involved in the bank
15 group, even outside of the farming entities that had a
16 separate bank group, so I wouldn't remember each of the
17 banks involved.
18    Q. Do you remember any of the names of the banks?
19    A. BMO.
20    Q. That's Bank of Montreal?
21    A. Yes, Bank of Montreal. Chase was a small
22 lender as part of the bank group. Bank of the West was a
23 lender in the bank group for a period of time. That's
24 all I can remember right now.
25    Q. Did you organize documents and send them to the

12  (Pages 42 to 45)

LISA   CRIST   -   8/17/2011

Page 46

1  banks?
2     A. I have.
3     Q. Was this a document that you did so?
4     A. I believe this was one of the loans, one of the
5  documents in the loan, because I would have collected
6  them and had signatures, especially as it related to
7  Mark McCormick. I had to organize the documents and
8  relayed it to the loan doc requirements of the bank in
9  how they needed to be presented, and organized, and then
10  get the signatures, the notaries, reorganize them and
11  send them back.
12     Q. Did you ever have any communications with any
13  representatives of any of the banks in connection with
14  this document?
15     A. I possibly could have. I have had bank
16  communications in the past as part of the bank group.
17     Q. And can you tell me, was that part of your
18  responsibilities?
19     A. Just -- I hate to be so candid, but as a
20  scribe, I was really a scribe, purely administrative, or
21  as corporate secretary, so if I needed to retain those
22  records as a part of the corporate records, I would do
23  that. I would also sign some of the documents as
24  corporate secretary as needed, and then, again,
25  collection, organization, and making sure they were

Page 47

1  handed over to the CFO and organized so that she could --
2  Shondale Seymour at the time, or, you know,
3  Mark McCormick, working in conjunction with the two of
4  them. They would create binders and then they would keep
5  those binders in their office.
6     Q. Did you ever attend any meetings with
7  representatives of any of the banks?
8     A. I have.
9     Q. And do you recall who attended on behalf of the
10  banks?
11     A. There was one meeting in San Francisco where
12  all of the banks were represented collectively, and that
13  was in an effort to obtain, I believe, either an
14  extension of a current loan or a separate loan
15  altogether.
16     Q. Do you recall the approximate date of that
17  meeting?
18     A. I don't. It would be probably 2008.
19     Q. What was the purpose of your attending the
20  meeting?
21     A. As an officer.
22     Q. Were you taking any minutes of the meeting?
23     A. I did not take minutes. I did take notes, if I
24  remember, and I did give a short presentation as it
25  related to -- I presented the org chart for the executive

Page 48

1  management team, and talked about opportunities. We were
2  restructuring some of our teams, especially as it related
3  to finance. We had some significant turnover, and that
4  was a concern. Turnover in finance, in the accounting
5  team, so that was a concern of the banks' at the time,
6  and I remember speaking to that and talking about our
7  recruiting efforts, and what we were trying to do there.
8     Q. Who changed positions?
9     A. Many. Whether it were cost accountants,
10  whether it were CFOs, whether it were senior accountants,
11  we had some turnover there.
12     Q. And do you know what happened to your notes of
13  the meeting?
14     A. I don't. I wasn't at the company the day of
15  the raid, the day of the Department of Justice
16  investigation, the day of the raid, April 16th. I was
17  still at home getting ready to leave for work, so my
18  office in Lemoore was -- I was transitioning between two
19  offices, the Lemoore and the Monterey facilities, so my
20  offices were gone through.
21     Q. Now, these packages that you discussed sending
22  to the banks, was there a log kept of outgoing packages
23  from SK Foods?
24     A. I don't know if there's a log. I know there is
25  a binder of records that were maintained for each of the

Page 49

1  loans, and the binder of records were maintained in the
2  CFO office in Lemoore, to my knowledge. That's where I
3  recall them being.
4     Q. Were you ever asked to backdate any documents
5  during your employment at SK Foods?
6        MS. WOODRUFF: Objection. Vague and ambiguous,
7  argumentative.
8  BY MR. CHRISTMAS:
9     Q. Do you know what backdate means?
10     A. So if a date were today, to backdate it three
11  days ago?
12     Q. Or any period of time, yes.
13     A. I don't recall specific backdating incidents,
14  but I do remember leaving a date blank so that the day of
15  the close all of those dates could be reported and
16  accounted for, except where a notary was involved, and of
17  course those dates were recorded on that day.
18     Q. Could I ask you to go back to Exhibit 42.
19     A. Okay.
20     Q. As you saw, the dates of these two e-mails are
21  April 1, 2008 and April 2, 2008, and the discussion in
22  the e-mail is dates being November 1, 2007 or November 1,
23  2006.
24        Do you recall any instances where, using your
25  definition of "backdating," whether either period of

13  (Pages 46 to 49)

Page 50

1  time, either back from April, 2008 to November 1, 2007,
2  or the longer period to 2006, whether that was ever done?
3      MS. WOODRUFF: Objection. Vague and ambiguous,
4  unintelligible, argumentative.
5      THE WITNESS: I don't even remember what
6  resolutions these were.
7  BY MR. CHRISTMAS:
8      Q. But one period of time is approximately five to
9  six months. Do you have a recollection of any documents
10  being backdated —
11     A. I don't --
12     MS. WOODRUFF: Objection. Vague and ambiguous,
13  argumentative. As to backdating, it implies something
14  illegal.
15     MR. CHRISTMAS: Can I finish the question.
16  Can you read back the question, please.
17     (The question was read.)
18     MS. WOODRUFF: To --
19     MR. CHRISTMAS: Can I finish, please?
20     MS. WOODRUFF: That sounded like you finished
21  the question.
22     MR. CHRISTMAS: No, I didn't.
23  BY MR. CHRISTMAS:
24     Q. — to that period, extent of time.
25     MS. WOODRUFF: Objection. Vague and ambiguous,

Page 51

1  argumentative, assumes facts not in evidence.
2      THE WITNESS: I agree. I don't know what you
3  mean by five or six months. It says November 1st of
4  2006, versus November 1st of 2007, which would have been
5  a year difference.
6  BY MR. CHRISTMAS:
7      Q. Okay. Let's break them down. If the document
8  was executed in April of 2008, but dated as of
9  November 1, 2007, that is approximately six months.
10  Were you ever involved in — rephrase that.
11  Did you ever see any documents that were executed six
12  months after their date?
13     A. I don't recall anything like that that I can
14  remember, and I don't recall specifically even what these
15  resolutions were.
16     Q. Okay. I'm just asking about a practice, if
17  any, of backdating documents, and I'd ask you the same
18  question. Did you ever see any documents that were,
19  using your definition, backdated approximately 18 months?
20     MS. WOODRUFF: Objection. Vague and ambiguous,
21  argumentative, assumes facts not in evidence as to
22  backdating. Documents can be effected at a time they're
23  not dated.
24  BY MR. CHRISTMAS:
25     Q. You can answer.

Page 52

1      A. I don't know. Do you have anything specific?
2  I don't know.
3      Q. Using your definition of backdating, if a
4  document were executed in April of 2008 with a date of
5  November 1, 2006, would that meet your definition of
6  backdating?
7      A. I don't even know how to answer that. I don't
8  know what you're referring to.
9      Q. I'm just saying if a document were executed in
10  April of 2008 with a date of November 1, 2006, would you
11  consider that backdating?
12     MS. WOODRUFF: Objection. Calls for a legal
13  conclusion, vague and ambiguous, incomplete hypothetical.
14     THE WITNESS: Yeah, I think I would need a
15  break to call my attorney, Steve Sutro. I'm not even
16  sure. I don't even know how I should answer that.
17     MR. CHRISTMAS: We can reserve that question.
18  There may be other things you want to talk to him about.
19  If you're not comfortable without your counsel, answering
20  a question, I think that that's appropriate.
21     THE WITNESS: Yeah.
22     MR. NUTI: Is it a good time for a break?
23     MR. CHRISTMAS: Yeah.
24     (Recess taken.)
25     MR. CHRISTMAS: This is 68.

Page 53

1      (Exhibit 68 was marked for identification.)
2  BY MR. CHRISTMAS:
3      Q. Ms. Crist, the court reporter has handed you
4  Exhibit 68 to your deposition. Have you ever seen this
5  document?
6      A. No, I have not.
7      MR. CHRISTMAS: This is 69.
8      (Exhibit 69 was marked for identification.)
9  BY MR. CHRISTMAS:
10     Q. Ms. Crist, the court reporter has handed you
11  Exhibit 70 to your deposition. Have you ever seen this
12  document?
13     MR. SHEAHAN: 69.
14     MR. CHRISTMAS: I'm sorry, 69.
15     THE WITNESS: No, I have not.
16     MR. CHRISTMAS: This is 70.
17     (Exhibit 70 was marked for identification.)
18  BY MR. CHRISTMAS:
19     Q. Ms. Crist, the court reporter has handed you
20  Exhibit 70 to your deposition. Have you ever seen this
21  document?
22     A. No, I have not.
23     MR. CHRISTMAS: This is 71.
24     (Exhibit 71 was marked for identification.)
25  ///

14 (Pages 50 to 53)

BMO 002162

LISA   CRIST  -  8/17/2011

## Page 54

BY MR. CHRISTMAS:

1  BY MR. CHRISTMAS:
2      Q.  And likewise, Ms. Crist, the court reporter has
3  handed you Exhibit 71.  Have you ever seen this document?
4      A.  No, I have not.
5      Q.  Moving off the documents, are you aware of any
6  changes in ownership of the Australian and New Zealand
7  companies that were effected during your employment with
8  SK Foods?
9      A.  Not that I'm aware of or that I can remember.
10      Q.  Do you recall having any discussions with
11  anyone about the subject of an accounting rule called Fin
12  46?
13      A.  The only discussions I had were with Nick that
14  one time that I can remember being in New Zealand.  As I
15  said, they were having a meeting, talking about the
16  business, and capital, and I remember them giving Scott a
17  presentation and Stephanie and I being a part of that,
18  and then Nick, you know, going through this audit and
19  having some questions.
20      Q.  Is that the only instance you recall of Fin
21  46 --
22      A.  That I can remember.
23      Q.  -- being discussed?
24         Do you know what Fin 46 is?
25      A.  No, I do not.

## Page 55

1      Q.  You mentioned earlier you had some occasion to
2  be in communication with representatives of the banks.
3  Do you remember any individuals' names with whom you were
4  in communication?
5      A.  Oh, my goodness.  There were a few.
6      Q.  But you don't recall their names?
7      A.  I remember one bank representative from BMO,
8  her name is Betsy.  And there was another bank, like,
9  customer service rep that we communicated with from time
10  to time as it related to bank services, and I can't
11  remember his name.
12         There were a few.  I don't recall.
13      Q.  Were your duties and responsibilities
14  encompassing of needing to communicate with
15  representatives of the bank group?
16      A.  I did from time to time.
17      Q.  And I know you had several roles.
18      A.  I did.
19      Q.  What role or roles was this in furtherance of?
20      A.  I was a check signer, so from time to time I
21  would sign checks.  There was a third-party brought in
22  from the bank group to oversee the financial operations,
23  so they were very much -- they were on site the entire --
24  and I don't remember their name right now.  It was a
25  third party that was brought in and we would review

## Page 56

1  payables, we would review receivables, would talk about
2  immediate business needs for things that needed to be
3  today immediately, like payroll.  That was my role.  I
4  wanted to make sure payroll got funded each week,
5  especially during the processing season, because our
6  payroll dollars went ten times over versus what the
7  other, non-seasonal time of the year.  And that was
8  toward the end when, you know, our finances became
9  severely strained.
10      Q.  That was in late 2008, or was it in --
11      A.  Late 2008, and then all the way until the end.
12  So I was a part of that group.  Not part of that group,
13  but on that team, so I would present "This is what our
14  payroll dollars look like this pay period, this is what
15  benefits look like this pay period."
16         Again, we needed two check signers, so I would
17  sign checks if I were available.  We would also sign the
18  weekly -- what was it called?  If Shondale Seymour
19  weren't available, or Mark McCormick, I had the authority
20  to sign -- I can't remember what it's called.  We had a
21  weekly something that we needed to sign.
22      Q.  Did you ever have any communications with the
23  accounting firm Moss Adams?
24      A.  I did.
25      Q.  And in what connection did you have those

## Page 57

1  communications?
2      A.  Supporting audits.
3      Q.  How did you support audits?
4      A.  I supported audits based on if they needed
5  records to support the audit.  Could be various business
6  records.  I was interviewed from time to time, just
7  employment practices as it related to benefits, lines of
8  insurance, coverage, various things.
9      Q.  With whom did you have communications at Moss
10  Adams?
11      A.  The auditor that came out.
12      Q.  Recall a name?
13      A.  No, I don't.
14      Q.  Was it a Mr. Nutley?
15      A.  Possibly.  I don't know.
16      Q.  And same questions with regard to the
17  accounting firm of Stoughton Davidson?
18      A.  It would have been along the same lines.
19      Q.  You supported the audit?
20      A.  I did.
21      Q.  Do you recall who at Stoughton Davidson you
22  were in communication with?
23      A.  I don't.
24      Q.  Was it a man or a woman?
25      A.  I don't even remember.

15  (Pages 54 to 57)

BMO 002163

Page 58

1      MR. CHRISTMAS: Okay. I have no further direct
2  questions of this witness.
3         EXAMINATION BY MR. NUTI
4      Q. I'm Greg Nuti, I represent Brad Sharp.
5      A. Hi.
6      Q. Have you talked to Scott Salyer?
7      A. I have not.
8      Q. When was the last time?
9      A. Not since the filing of bankruptcy and going
10  through. I saw him at a couple court hearings for the
11  bankruptcy estate, and that's been it.
12     Q. Have you spoken to any of his lawyers?
13     A. I have.
14     Q. When?
15     A. I just recently spoke to John Keker last week.
16     Q. And that's in connection with?
17     A. The criminal investigation.
18        MS. WOODRUFF: And I'm going to object to this
19  line of questioning. This has nothing to do with the
20  2004 exam, and you're not to go -- that's way --
21        MR. NUTI: I just asked what it was about.
22        THE WITNESS: And I can't -- my attorney told
23  me anything related to the criminal case, absolutely
24  hands off.
25  ///

Page 59

1  BY MR. NUTI:
2      Q. Anybody else besides John Keker?
3      A. No.
4      Q. Are you aware that Scott traveled to Australia,
5  New Zealand I guess right after the bankruptcy was filed
6  in May, 2009?
7      A. Possibly. He was out of touch for quite a
8  period of time during the bankruptcy, filing of the
9  bankruptcy, after the bankruptcy. I don't know the
10  extent of his travels.
11     Q. Well, he did travel to New Zealand and
12  Australia right around May 13th, 2009. Do you know
13  anything about that trip or why he went down there?
14     A. I do not.
15        MR. NUTI: I don't have any other questions.
16        MR. CHRISTENSEN: No questions.
17        MS. WOODRUFF: I have no questions.
18        THE WITNESS: Great. Am I free to go?
19        (Discussion off the record.)
20        MR. CHRISTMAS: Ms. Crist, since your counsel
21  is not here to advise you, but he probably will advise
22  you, you have the right to review, request and sign your
23  deposition transcript and provide us with any corrections
24  if anything was taken down incorrectly. So you don't
25  have to make that decision now, but I will be in contact

Page 60

1  with your counsel.
2         THE WITNESS: Okay.
3         MR. CHRISTMAS: I assume, like most people --
4         THE WITNESS: I want that right, yes.
5         (The deposition of LISA CRIST was concluded at
6  11:02 a.m.)
7
8
9              ---oOo---
10        I declare under penalty of perjury under the
11  laws of the State of California that the foregoing is
12  true and correct.
13  Executed at            , California on          ,
    2011.
14
                    LISA CRIST
15
16
17
18
19
20
21
22
23
24
25

Page 61

1  STATE OF CALIFORNIA   )
                          )
2  COUNTY OF FRESNO      )
3
4      I, AMANDA SCOTT, Certified Shorthand Reporter
5  licensed in the State of California, License No. 13226,
6  do hereby certify that the foregoing proceedings was
7  reported by me and was thereafter transcribed under my
8  direction into typewriting; that the foregoing is a full,
9  complete and true record of said proceeding.
10     I further certify that I am not of counsel or
11  attorney for either or any of the parties in the
12  foregoing proceeding and caption named, or in any way
13  interested in the outcome of the cause named in said
14  caption.
15     In witness whereof, I have hereunto set my hand
16  and affixed my seal this day.
17     Date: August 25, 2011
18
19
20
21
22        AMANDA SCOTT, CSR #13226
23
24
25

16 (Pages 58 to 61)