# EXHIBIT 119

In The Matter Of:

*CEDENCO JV AUSTRALIA PTY LTD, et al.*

---

## SCOTT DYE - Vol. I
### *August 16, 2011*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

In re:                              )
                                    ) NO. 10-35002
                                    )
CEDENCO JV AUSTRALIA PTY LTD, et    )
al, (In Liquidation),               ) Chapter 15
                                    )
    Debtors in Foreign Proceedings. )
_____ )

---oOo---

Fresno, California                      August 16, 2011


        The deposition of SCOTT DYE was taken in the
above-entitled matter pursuant to all of the provisions
of law pertaining to the taking and use of depositions
before Amanda Scott, CSR, with offices at Fresno,
California, commencing at the hour of 2:22 p.m. at the
law offices of McCormick, Barstow, Sheppard, Wayte &
Carruth, 5 River Park Place East, Fresno, California.

SCOTT DYE - 8/16/2011

Page 2

1                    INDEX
2
3   EXAMINATION                        PAGE
4   By Mr. Christmas              5
5   By Ms. Woodruff              49
6   By Mr. Nuti                  60
7   By Mr. Dreher               65
8   Further Examination By Mr. Christmas    70
9   By Mr. Nicholson            74
10
11  EXHIBITS
12  NO.     DESCRIPTION              PAGE
13  1     Deposition Notice          5
14  2-37   (Skipped)
15  38     Work Paper               27
16  39     Trial Balance of SK Foods LP    31
17  40     (Skipped)
18  41     Analysis of Intercompany Receivables    35
19  42     Financial Statements     38
20  43-48  (Skipped)
21  49     March 22, 2009 Letter From
              J. Scott Bristol        40
22
        50-67  (Skipped)
23
        68     April 23, 2009 Letter From
24            J. Scott Bristol        44
25  69     SK Foods Reconciliation       56

Page 4

1   APPEARANCES OF COUNSEL:
2   FOR THE SALYER ENTITIES:
3       FARELLA, BRAUN & MARTEL
        Attorneys at Law
4       235 Montgomery Street
        San Francisco, California 94104
5       (415) 954-4400
        kwoodruff@fbm.com
6   BY:  KELLY A. WOODRUFF
7   FOR THE LIQUIDATORS:
8       NIXON PEABODY LLP
        Attorneys at Law
9       437 Madison Avenue
        New York, New York 10022
10      (212) 940-3000
        rchristmas@nixonpeabody.com
11  BY:  ROBERT N.H. CHRISTMAS
12  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
13      DOWNEY BRAND
        Attorneys at Law
14      621 Capitol Mall, 18th Floor
        Sacramento, California 95814
15      (916) 520-5478
        jdreher@downeybrand.com
16  BY:  JAMIE P. DREHER
17  FOR BRAD SHARP:
18      SCHNADER, HARRISON, SEGAL & LEWIS
        Attorneys at Law
19      One Montgomery Street, Suite 2200
        San Francisco, California 94104
20      (415) 364-6717
        gnuti@schnader.com
21  BY:  GREGORY C. NUTI
22  FOR THE BANK OF MONTREAL:
23      CHAPMAN & CUTLER
        Attorneys at Law
24      111 West Monroe Street
        Chicago, Illinois 60603
25      (312) 845-3010

Page 3

1           INDEX CONTINUED
2
3   EXHIBITS
4   NO.     DESCRIPTION                PAGE
5   70     December 18, 2007 Letter From Gary Perry   61
6   71     January 14, 2008 Letter From Gary Perry    62
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   BY:  SCOTT LEWIS
2   FOR THE WITNESS:
3       McCormick, Barstow, Sheppard, Wayte & Carruth
        Attorneys at Law
4       5 River Park Place East
        Fresno, California 93720
5       (559) 433-1300
        benjamin.nicholson@mccormickbarstow.com
6   BY:  BENJAMIN T. NICHOLSON
7   Also Present:  John Sheahan
8           ---oOo---
9               SCOTT DYE,
10      called as a witness herein, having
11          been heretofore duly sworn,
12              testified as follows:
13           ---oOo---
14      (Exhibit 1 was marked for identification.)
15      EXAMINATION BY MR. CHRISTMAS
16      Q.  Good morning, Mr. Dye.  My name is
17  Robert Christmas, I'm with Nixon Peabody.  I'm counsel to
18  Mr. Sheahan, who's sitting to my right, as well as
19  Ian Lock, who's the other liquidator in these chapter 15
20  bankruptcy proceedings.
21      Just as a preliminary, have you ever been
22  deposed before?
23      A.  Yes, I have.
24      Q.  So you understand the procedure, that we can't
25  talk at the same time, court reporter can't take it down,

2 (Pages 2 to 5)

SCOTT DYE - 8/16/2011

## Page 6

1 two people talking at once. So if you would, for
2 example, wait until the end of my question, you may

4 to be that way, so in order to keep the record clear if
5 you would let me finish my questions before you answer,
6 that will help.
7 Also, the court reporter can't take down nods,
8 so you have to answer "yes" or "no," answer verbally
9 rather than by gestures.
10 Also, are you taking any medication today that
11 would interfere with your ability to remember events?
12 A. No, I am not.
13 Q. Or tell events?
14 A. No.
15 Q. And do you suffer from any physical condition
16 that affects your memory?
17 A. No.
18 Q. Now, in front of you should be Exhibit 1.
19 MR. NICHOLSON: I'm sorry. Mr. Christmas, were
20 you handing this to me for us to share?
21 MR. CHRISTMAS: No, no. He has the original in
22 front of him.
23 BY MR. CHRISTMAS:
24 Q. At the top is the notice of deposition, which
25 you probably haven't seen before, with the second part of

## Page 7

1 the exhibit as the subpoena.
2 Have you seen that document before?
3 A. Actually, I have seen the notice of deposition.
4 I don't recall seeing the subpoena specifically, no. I
5 think Mr. Nicholson has conveyed to me the requirements
6 of the subpoena.
7 Q. So you're aware that documents were required to
8 be produced pursuant to the subpoena?
9 A. I believe so, yes.
10 Q. And were you involved in the search for those
11 documents?
12 A. Yes, I was.
13 Q. And who else was involved?
14 A. Tracy Garone, our audit partner.
15 Q. And what types of locations of documents did
16 you search for responsive documents?
17 A. Ms. Garone searched through all the documents
18 she had in relationship to the audit that had been done
19 for SK Foods. She also searched through her entire
20 string of e-mails that she received through SK. In
21 addition, I have gone through e-mails and -- work-related
22 to agreed upon procedures.
23 Q. And the nature of the repository of the audit
24 file, how do you maintain that?
25 A. Most of that I think is still in hard copy.

## Page 8

1 Q. Were any of the documents that you produced,
2 other than e-mail, I'll get to e-mail in a second, were

4 A. Yes, they were.
5 Q. And how do they achieve that status? Do you
6 scan them?
7 A. I believe they were just produced within the
8 computer or transferred electronically in some fashion on
9 the drive that we provided you today. There are, I
10 believe, some Excel files.
11 Q. And so the people, the custodians of e-mails
12 who were searched were Ms. Garone and your e-mail inbox?
13 A. Correct.
14 Q. Anyone else's e-mail inbox?
15 A. She may have required Mr. Bristol, his e-mails,
16 to obtain additional e-mails from when she was first
17 asked to search the records.
18 Q. For the record, some documents were just
19 produced to us prior to the commencement of the
20 deposition. Can you tell me how those documents came to
21 light?
22 A. I was reviewing additional e-mails regarding
23 another matter and noticed one referencing a document,
24 and I went to the files and found that document.
25 Q. Which files are those?

## Page 9

1 A. Those are the electronic files.
2 Q. The electronic files, okay. So there's a hard
3 copy file and there's also a virtual file, if you will?
4 A. I believe most of the audit work papers are in
5 a hard copy file, and then there was other files for
6 other procedures that were to be worked on.
7 Q. Okay. And the other files are the ones that
8 are stored electronically?
9 A. Correct.
10 Q. Okay. If I could just ask you now a few
11 questions about your background. What post high school
12 degrees do you have?
13 A. I have a degree in business, emphasis on
14 accounting.
15 Q. And from what institution?
16 A. California State University of Chico.
17 Q. And what year were you awarded that degree?
18 A. I believe it was 1972.
19 Q. Do you have any professional licenses?
20 A. Yes, I'm a CPA. I'm also an ABV.
21 Q. Can you tell me what that is?
22 A. It's Accredited in Business Valuation.
23 And I'm a CFF.
24 Q. And what is that?
25 A. Certified Financial Forensic.

3 (Pages 6 to 9)

SCOTT DYE - 8/16/2011

Page 10

1      Q. And does part of your practice include
2  valuation testimony as an expert witness?
3      A. Correct.
4      Q. And part of your practice involves forensic
5  investigation?
6      A. That's correct.
7      Q. How long have you been an expert witness in
8  valuation?
9      A. Since I didn't bring my resumé, it's about ten
10  years.
11      Q. And how long have you done forensic accounting?
12      A. I've worked in the forensic area for over
13  20 years.
14      Q. Okay. I'm sure you have a long and
15  distinguished career, so I don't want to go back over the
16  entire thing, but it would just be helpful to know, have
17  you been in practice as an accountant since graduation
18  from university?
19      A. As an accountant, correct.
20      Q. And how long have you been with Moss Adams --
21  Stoughton Davidson?
22      A. 27 years.
23      Q. As part of your practice are you doing
24  exclusively valuation and forensic work, or are you still
25  doing any kind of audit services?

Page 11

1      A. I have audit clients as well as tax clients
2  also.
3      Q. Oh, you do.
4      When did you first learn of SK Foods LP and the
5  related entities associated with the Salyer family?
6      A. I can't tell you exactly when the knowledge and
7  if I have a full knowledge of all the related entities
8  with the Salyer, because we didn't do all the work for
9  all the Salyer entities.
10      We first learned of them probably in about 2005
11  or '6, and we did an audit of their pension plan.
12      Q. Was that an annual engagement, you did a
13  pension plan every year?
14      A. Yes, it became one.
15      Q. And I take it at some point the engagement
16  expanded to reviewing the performing financial statement
17  services related to financial statements?
18      A. That would be correct.
19      Q. Okay. And what year was the engagement
20  expanded to include that?
21      A. That would have been for the year ending
22  June 30th, 2008.
23      Q. And do you recall who at Stoughton Davidson was
24  approached to ask if you could perform those services?
25      A. It was a step process, and I was initially

Page 12

1  contacted by a fellow named Marshal Scott out at SK
2  Foods, who I think was acting as a consultant at the
3  time. Their audit was coming up. They were unsure as to
4  what Moss Adams was going to do and they needed somebody
5  to at least observe the inventory as of June 30.
6      Q. What does it mean to observe the inventory?
7      A. You go out and you effectively observe the
8  process that the company goes through in counting their
9  inventory to ensure that it is properly counted as to how
10  much inventory is on hand.
11      Q. So if I understand you correctly, you said it
12  was a step process, so the first part of the engagement
13  was observing the inventory?
14      A. That was the first inquiry.
15      Q. Okay. Your firm was asked to do that?
16      A. Correct.
17      Q. And then at some point in time did it then
18  expand to something else?
19      A. I subsequent to that went on vacation, and one
20  of my partners was contacted about doing the full audit
21  of the financial statements.
22      Q. Which partner was that?
23      A. I'm not sure if it was Tom McFerson or
24  Scott Bristol. It was either one of those two.
25      Q. And did your firm accept that engagement?

Page 13

1      A. Ultimately, yes.
2      Q. And do you have any understanding as to why
3  your firm was asked to do that instead of Moss Adams?
4      MR. NICHOLSON: Objection. Calls for
5  speculation.
6      MR. CHRISTMAS: Just asking for your
7  understanding.
8      THE WITNESS: Well, I can tell you why we were
9  called, because we had previously had employees that had
10  worked with us that were currently working at SK Foods.
11  Why they chose us over Moss Adams for that period, I
12  would be speculating on.
13  BY MR. CHRISTMAS:
14      Q. And one of those individuals was
15  Mark McCormick. Is that correct?
16      A. That would be correct.
17      Q. And he previously worked with you?
18      A. That's correct.
19      Q. I believe in various places there's a statement
20  or something is emblazoned in some of the documents that
21  I've seen that refers to something called the "Moss Adams
22  connection," or I don't know what it is, "consortium."
23  Can you tell me what that is?
24      A. It was an association --
25      MR. NICHOLSON: Objection. Vague and

4 (Pages 10 to 13)

SCOTT DYE - 8/16/2011

Page 14

1  ambiguous.
2  BY MR. CHRISTMAS:
4      A.  It was an association of CPA firms that met
5  with Moss Adams on an annual basis where there was
6  additional continuing education, discussion about
7  services that could be either shared or provided by one
8  firm or the other, and it included firms in California,
9  Washington, Oregon, Idaho, and several other states, I
10  believe.
11      Q.  So this doesn't involve interlocking governance
12  between firms in any way?
13      A.  No.
14      Q.  And doesn't involve interlocking ownership?
15      A.  No.
16      Q.  When your firm accepted the engagement, did you
17  then have any face-to-face meetings with members of
18  management of SK Foods?
19      A.  Well, there are a number of meetings with
20  members of management.
21      MR. NICHOLSON:  I'm not sure if you're
22  referring, when you say "you," if you're referring to
23  Scott or you're referring to the company.
24  BY MR. CHRISTMAS:
25      Q.  Well, after your firm accepted the engagement,

Page 15

1  did you personally meet with members of SK Foods
2  management?
3      A.  Do we have some sort of time frame here?
4      Q.  Well, you accepted the engagement in when,
5  approximately?
6      A.  Well, when I was on vacation.  So right after
7  acceptance, no, I did not meet immediately with them.
8      Q.  Do you know if any of your colleagues did?
9      A.  Oh, I'm certain they did, yes.
10      Q.  Why are you certain that they did?
11      A.  Because they had to arrange the engagement,
12  to plan the engagement and to finalize the engagement
13  letter.
14      Q.  Okay.  And did they tell you what was said at
15  those meetings in any fashion?
16      A.  No, nothing other than the general discussions
17  that we're going to do an audit investigation.
18      Q.  Did they identify any particular issues?  Did
19  your colleagues inform you of any particular issues that
20  were important or sensitive?
21      MR. NICHOLSON:  Objection. Vague and
22  ambiguous.
23      THE WITNESS:  At what time?
24  BY MR. CHRISTMAS:
25      Q.  Well, let's go to the -- did you at any point

Page 16

1  after you returned from vacation attend any in-person
2  meetings at SK Foods, or with SK Foods management?
4      Q.  Well, when did your vacation end?
5      A.  Probably early July, 2008.
6      Q.  Okay.  After you returned to the office were
7  there any meetings right after you returned to the
8  office?
9      A.  None that I recall that I was involved with.
10      Q.  Did you have any meetings with Moss Adams at or
11  about that time?
12      A.  I did not.
13      Q.  Did any of your colleagues have any meetings
14  with Moss Adams at or about that time?
15      A.  Yes.
16      Q.  And who had those meetings?
17      A.  Ms. Garone.
18      Q.  Do you know if she took any notes of those
19  meetings?
20      A.  I believe some of them are even included in
21  here, but yes, she would have taken notes because she was
22  reviewing the prior work papers of Moss Adams, which is a
23  standard procedure when performing an audit.
24      Q.  Do you know if her notes identify any
25  particular controversial issues in the prior engagement?

Page 17

1      MR. NICHOLSON:  Objection.  Vague and
2  ambiguous.
3      MS. WOODRUFF:  Objection.  Vague and ambiguous.
4      THE WITNESS:  And off the top of my head, I
5  don't know.
6  BY MR. CHRISTMAS:
7      Q.  So who were the lead people on this engagement
8  at this point?  Did you step in to lead the engagement,
9  or were other of your colleagues leading the engagement?
10      A.  No, the engagement was handled by Ms. Garone,
11  the audit partner.
12      Q.  So after you returned from vacation, what was
13  your next involvement, your personal involvement in the
14  engagement?
15      A.  I did not get involved with SK Foods until
16  subsequent to the audit.
17      Q.  What was your involvement, what was your first
18  then involvement after the audit?
19      A.  There was some agreed-upon procedures relating
20  to inventory.
21      Q.  We'll get back to that.
22      Were you involved in reviewing any of the
23  documents relating to the audit?
24      A.  Prior to issuance of the report?
25      Q.  Yes.

5  (Pages 14 to 17)

COMPLETE

SCOTT DYE - 8/16/2011

Page 18

1    A. No.

2    **Q. And can you tell me what your involvement was**

3  **with the agreed-upon procedures?**

4    A. Subsequent to the audit there became some

5  issues revolving around an account called Unapplied

6  Overhead. It was questioned and I believe November to

7  December of that year by some other consultants in there

8  that the account seemed to be extremely large, and at

9  that time we got involved to do further investigation

10  into that account.

11    **Q. And that was part of the scope of the**

12  **agreed-upon procedures?**

13    A. That's correct.

14    **Q. Okay. And who led the engagement for the**

15  **agreed-upon procedures?**

16    A. Mr. Bristol and myself.

17    **Q. And is there a reason that you were the lead of**

18  **that engagement but didn't lead the audit?**

19    A. Well, the agreed-upon procedures was not a

20  specific audit-type, nor was it a forensic-type, so it

21  was a special project, and I was available to assist with

22  that special project.

23    MR. NICHOLSON: I'm sorry. Can we stop for a

24  second.

25    MR. CHRISTMAS: Yes.

Page 19

1    MR. NICHOLSON: I apologize. I didn't have the

2  last number, so I just had them Bates-stamp them SD and

3  started at number 1 again. Documents have already been

4  provided, but hopefully it will make sense.

5    MR. CHRISTMAS: You can give me the extra sets.

6  I'll hold one for Scott here.

7  BY MR. CHRISTMAS:

8    **Q. Can you give me a time frame of the agreed-upon**

9  **procedures, how long that engagement took?**

10    A. Well, that engagement, when you use the term

11  "took" indicates that it was completed, and it never was

12  completed.

13    **Q. Thank you for the correction.**

14    **What was the reason it was not completed?**

15    A. Within our engagement letter there's a clause

16  about continuing work when you're not being paid, and we

17  hadn't been paid so we withdrew from the engagement until

18  payment would be made. Subsequently they filed

19  bankruptcy and we never did any further work.

20    **Q. So in terms of audit work, there was only one**

21  **audit?**

22    A. Of SK, correct.

23    **Q. Are you familiar with the affiliates of SK**

24  **Foods that exist in Australia and New Zealand?**

25    A. I know of them.

Page 20

1    **Q. And how did you come to know of them?**

2    A. Only in passing and getting ready for this

3  deposition.

4    **Q. Are you aware of any transfers of ownership**

5  **interest of those entities that occurred prior to your**

6  **firm's engagement for the audit?**

7    A. Yes, I am.

8    **Q. Okay. And what did you learn of and when?**

9    A. In reviewing the footnotes in the Moss Adams

10  financial statements for, I believe, June 30, 2007, they

11  disclose the transfer to the partners. And further

12  review in these documents indicates the underlying

13  journal entries indicating that transfer.

14    **Q. Okay. And when you say "that transfer," you**

15  **mean the ownership transfer?**

16    A. That's correct, the investment that SK had was

17  transferred out to the partners.

18    **Q. Okay. Are you aware of an accompanying issue**

19  **with respect to transfer of debt? I won't say "issue," I**

20  **want to say a transfer or change in the identity of the**

21  **payer of debt?**

22    MS. WOODRUFF: Objection. Vague and ambiguous.

23    THE WITNESS: Well, I think I need some

24  clarification in terms of payor and payee. If you'd like

25  to be clear about who we're asking about, I'd gladly

Page 21

1  answer the question.

2  BY MR. CHRISTMAS:

3    **Q. Are you aware that a trust was substituted for**

4  **the offshore entities on some intercompany debt as the**

5  **payor?**

6    MS. WOODRUFF: Objection. Assumes facts not in

7  evidence.

8  BY MR. CHRISTMAS:

9    **Q. You can answer.**

10    A. Let me tell you what I'm aware of in that

11  situation to clarify so we're not dealing with words,

12  because when I hear offshore entities I think of tax

13  havens and stuff, as opposed to New Zealand and

14  Australia --

15    **Q. That's what I meant, that's what I was**

16  **referring to, it was.**

17    A. -- who I assume you're referring to.

18    I'm aware that on the books of SK Foods LP

19  there were a number of accounts receivable and payables

20  to certain affiliates in either Australia or in New

21  Zealand. Those accounts were, in fact, combined, and the

22  footnote indicates sold to the revocable trust.

23    **Q. And what revocable trust, to your knowledge,**

24  **are you referring to?**

25    A. The one that's the partner in SK Foods LP.

6 (Pages 18 to 21)

BMO 002199

Page 22

1     Q. And do you know the name of that trust?
2     A. I've seen it referred several places. It was

4     Q. Did you have occasion to review any of the
5  underlying transaction documents that affected the change
6  of the owner, of the alleged change in owner of the
7  Australian and New Zealand companies?
8     A. Are you referring to the legal documents that
9  would have been drawn back in 2006 or '7 when this
10  occurred?
11     Q. That's correct.
12     A. No, I have not.
13     Q. And similarly, the transaction that involved
14  the intercompany debt with respects to the irrevocable
15  trust that you're talking about, did you see any of the
16  legal documents?
17     A. Not that I recall.
18     Q. Do you know if anyone else at Stoughton
19  Davidson saw the legal documents for the equity or the
20  debt transaction?
21     A. I don't know the answer to that question.
22     Q. In preparing for this deposition did you come
23  across any legal documents relating to either the debt or
24  the equity that were in the file at the time of the audit
25  engagement?

Page 23

1     MR. NICHOLSON: Objection. Vague and
2  ambiguous.
3     THE WITNESS: The only documents, to clarify,
4  that I've come across are those which were produced in
5  the original packet, and these are here. So if there's
6  something in there that you're referring to as a legal
7  document, then yes, I've seen it.
8     MR. NICHOLSON: Just to be clear, he's
9  referring to the original production, and the
10  supplemental production, and now the supplemental
11  supplemental production.
12  BY MR. CHRISTMAS:
13     Q. Did you have any reason to question that the
14  transfer of ownership that was mentioned in the footnote
15  you just discussed was not made?
16     A. It was disclosed on the financial statements
17  that were audited by Moss Adams, so the answer would be
18  no.
19     Q. So you believe they were made?
20     A. As far as I was aware, yes.
21     Q. And the interposition of the irrevocable trust
22  and the intercompany debt structure, did you have any
23  reason to doubt that that had been effected?
24     A. No.
25     Q. Okay. Are you familiar with another trust

Page 24

1  called the SSC&L 2007 trust, as opposed to the
2  Scott Salyer irrevocable trust?

4  familiar with that trust at all.
5     Q. So it's your understanding that the
6  Scott Salyer revocable trust is involved in the
7  intercompany debt?
8     MS. WOODRUFF: Objection. Misstates the
9  evidence.
10     MR. CHRISTMAS: I'm asking for his
11  understanding, not what the evidence is.
12     MS. WOODRUFF: Well. Objection, then,
13  misstates the witness's prior testimony.
14     THE WITNESS: It's my understanding that
15  whichever trust was the partner in SK Foods LP was the
16  one that was involved in this transaction.
17  BY MR. CHRISTMAS:
18     Q. To your knowledge, did anyone at Stoughton
19  Davidson ever have occasion to communicate with any
20  members of management of the Australian or New Zealand
21  companies?
22     A. I don't know.
23     Q. Have you ever had any occasion to communicate
24  with management of the Australian or New Zealand
25  companies?

Page 25

1     A. I'm trying to recall. I may have been in a
2  room where there was a conference call, and I don't know
3  if the individual was even in management, but it had to
4  do with the projections and their format.
5     Q. I'll ask you the same question with respect to
6  the -- rephrase that.
7     Are you aware as to whether the Australian and
8  New Zealand companies have their own outside auditors?
9     A. I have no idea who audited those companies.
10     Q. So if you don't know who audited them, I would
11  assume, then, you have never had any communications with
12  them whose names you don't know?
13     A. That would be correct.
14     Q. Can you describe for me the extent to which
15  your firm received documents from Moss Adams in order to
16  perform the audit?
17     A. In performing the audit Ms. Garone went to the
18  Moss Adams office, reviewed their work papers and would
19  have requested any documents or work papers that she
20  would feel necessary to complete the audit.
21     Q. Okay. And if she took copies of those, they
22  would be in your document production?
23     A. Not necessarily.
24     Q. Do you know, if she took copies, where ones
25  that aren't in there would have gone?

7 (Pages 22 to 25)

SCOTT DYE - 8/16/2011

Page 26

1    A. It would be in her audit file.
2    Q. So does the production not encompass the
3  entirety of the audit file, or just a selection of
4  documents?
5    A. That's correct. The production includes those
6  documents related to anything that she had identified
7  that had something to do that she had either copied,
8  received in an e-mail, relating to the foreign operations
9  and these affiliates or subsidiaries as they were at one
10  time.
11    Q. With respect to what we referred to as the
12  equity transfer, have you ever had any conversations with
13  anybody about that transfer?
14    MR. NICHOLSON: Objection. Vague and
15  ambiguous.
16    THE WITNESS: Only in general and getting ready
17  for this with, like, Ms. Garone and reviewing these
18  documents.
19  BY MR. CHRISTMAS:
20    Q. And I'm specifically referring to the transfer
21  of ownership of the Australian, New Zealand companies,
22  for the record.
23    Do you know if Ms. Garone ever had any
24  conversations with anyone with regard to the sale of the
25  transfer of --

Page 27

1    A. I do not --
2    Q. Let me finish.
3    -- the transfer of ownership of the Australian
4  and New Zealand companies?
5    A. No, I don't.
6    Q. Are you aware of anyone ever questioning
7  whether or not the transfer of the debt and transfer of
8  equity had actually been effected?
9    A. No.
10    MR. NICHOLSON: Objection. Vague and
11  ambiguous.
12    MS. WOODRUFF: Vague as to time.
13  BY MR. CHRISTMAS:
14    Q. I'm sorry, everyone was talking at once. Did
15  you have an answer?
16    A. I gave an answer. It was "no."
17    MR. CHRISTMAS: I apologize, I couldn't hear.
18    We're doing somewhat unconventional numbering,
19  so this is Exhibit 38. I'll pass -- how do you do this.
20    MS. WOODRUFF: Why don't you pass two to
21  Mr. Nicholson and two to you.
22    MR. NUTI: 38, you said?
23    MR. CHRISTMAS: Yes.
24    (Exhibit 38 was marked for identification.)
25  ///

Page 28

1  BY MR. CHRISTMAS:
2    Q. Mr. Dye, I've handed you a document that has
3  been numbered for identification as Exhibit 38 to your
4  deposition. Do you recognize this document?
5    A. I can tell you what it is, however I have never
6  seen it before.
7    Q. Tell me what it is.
8    A. It's a work paper from the audit file.
9    Q. So this is a work paper from the Stoughton
10  Davidson audit file, not the Moss Adams audit file?
11    A. That would be correct.
12    Q. Is this a printout of an Excel spreadsheet, or
13  what created the formatting of the document?
14    A. It's a software program that is Excel-based
15  that is used for the audits.
16    Q. Could you take a look at this document and tell
17  me what it memorializes.
18    A. I can tell you what I believe it memorializes
19  on here.
20    Q. Okay.
21    A. I believe this memorializes the balance that
22  remains as of 6/30/07 for the investment in SK Foods
23  Australia representing the balance of the notes that were
24  due, and this number has been moved to a different
25  account in June 30, 2008, although it hasn't changed in

Page 29

1  balance.
2    MR. CHRISTMAS: Can we just take a break for a
3  minute.
4    (Discussion off the record.)
5    MR. CHRISTMAS: We're back on the record.
6  Mr. Nuti is going to clarify something that I was unaware
7  of in the document production.
8    MR. NUTI: We have noticed that we have two
9  sets of documents Bates-stamped SD and then a six-digit
10  number. The trustee, sometime in March, produced its
11  audit files related to the Stoughton Davidson audit.
12  Those documents are Bates-stamped SD with a space, and
13  then a six-digit number.
14    Subsequent to that production, Stoughton
15  Davidson produced to the liquidator its files associated
16  with its audit, the same audit of SK Foods. Those are
17  designated SD, six-digit number, no space.
18    THE WITNESS: If I may speak, that's incorrect.
19    MR. NICHOLSON: Can we go off the record again.
20  Do you want to talk to me?
21    (Discussion off the record.)
22    MR. NUTI: For clarification, the documents
23  produced by Stoughton Davidson are responsive to the
24  subpoena.
25    Is that correct?

8 (Pages 26 to 29)

SCOTT DYE - 8/16/2011

## Page 30

1    THE WITNESS: That would be correct.
2    BY MR. CHRISTMAS:

4    Now, Mr. Dye, you understand that you are here
5  as a designated witness under rule 30(b)(6), or is that
6  your understanding?
7    A. That's correct.
8    Q. Before you came here today, did you have
9  occasion to review the matters for examination that are
10  listed there?
11    A. I have not seen this before.
12    Q. So you've never seen the listing of matters for
13  examination in the subpoena?
14    A. I don't believe so.
15    Q. Did you discuss your appearance today with
16  anybody?
17    A. Mr. Nicholson.
18    Q. Anybody else?
19    A. People in our office.
20    Q. In that discussion, or in any other way, did
21  you gain any understanding of what a rule 30(b)(6)
22  witness is supposed to do?
23    A. There was no discussion about that, no.
24    Q. Do you know what rule 30(b)(6) is?
25    A. No.

## Page 31

1    Q. So I would take it from your answer that you do
2  not know what a rule 30(b)(6) witness is?
3    A. That would be correct.
4    MR. NICHOLSON: You might ask him about being a
5  person most knowledgeable. I'm not sure if he would
6  understand.
7    MR. CHRISTMAS: Let's go off the record.
8    (Discussion off the record.)
9    (Exhibit 39 was marked for identification.)
10  BY MR. CHRISTMAS:
11    Q. Mr. Dye, the court reporter has handed you a
12  document marked for identification as Stoughton Davidson
13  39 -- well, off the record.
14    (Discussion off the record.)
15  BY MR. CHRISTMAS:
16    Q. This is, we'll call it Stoughton Davidson 39.
17  Do you know what this document is, Mr. Dye?
18    A. Appears to be the trial balance, grouped, of SK
19  Foods LP for June 30th, 2008.
20    Q. And is this a document generated by SK Foods?
21    A. No, this appears to be a document that would
22  have been generated by a program known as Engagement,
23  used during the audit.
24    Q. And should I assume when you say "the audit,"
25  that would be the audit performed by Stoughton Davidson?

## Page 32

1    A. That would be correct.
2    Q. Unless you specify Moss Adams or something.
4    A. Correct.
5    Q. That would help.
6    What's the purpose of this document?
7    A. It's used to summarize accounts and group them
8  to take them forward to the balance sheet and income
9  statements for the audit.
10    Q. And do you recognize the handwriting on this
11  document?
12    A. It appears to be Ms. Garone's, but I could be
13  incorrect.
14    Q. And do you know what -- there are a number of
15  instances of handwriting here that are followed by a
16  check mark, and there appears to be a legend at the
17  bottom that says "Agrees to audited consolidating
18  financial statements," and I can't read the rest of it,
19  or I don't understand the rest of it. "W/o/e."
20    MR. NICHOLSON: I'm sorry. Where is the legend
21  you're reading from?
22    MR. CHRISTMAS: At the bottom on the first
23  page.
24  BY MR. CHRISTMAS:
25    Q. Can you tell me what the check mark and the

## Page 33

1  legend at the bottom means?
2    A. The "W/o/e" means "without exception." The
3  check marks indicate that they have gone to the financial
4  statements as drafted and agree that these totals were
5  the same as were on the financial statements.
6    Q. So the reference here would be to the prior
7  years' financial statements or to the ones that are being
8  generated in this process?
9    A. No, 6/30/2008.
10    Q. So this is generated as part of the ongoing
11  audit as opposed to looking to see whether or not these
12  numbers agree to the prior audit?
13    A. That's correct.
14    Q. I apologize if I asked you this before. Did
15  you say you had or had not seen this document before?
16    A. I don't recall seeing this document.
17    Q. I believe it was your testimony that you didn't
18  lead the audit for 2008. Did you have any participation
19  in the audit services rendered?
20    A. Only subsequent to the audit when it became a
21  question as to whether the one account was accurate or
22  not.
23    Q. And what one account was that?
24    A. The unapplied overhead.
25    Q. Okay. And is that separate from the

Merrill Corporation - San Francisco
800-869-9132                                  www.merrillcorp.com/law

BMO 002202

SCOTT DYE - 8/16/2011

Page 34

1 agreed-upon procedures, or --
2     A. The agreed-upon procedures were steps agreed
3 upon with SK Foods that we would perform to determine the
4 accuracy of that account as one of the steps. There are
5 also a number of other steps to look at their inventory
6 procedures.
7     Q. And if I understand the chronology, the
8 agreed-upon procedures were after the audit was
9 concluded?
10     A. Correct.
11     Q. But your answer implies that -- well, I'm not
12 clear on your answer. If the audit was concluded, how
13 was it that you were doing work on the audit? Did there
14 need to be a correction? I'm not following your answer.
15     A. The audit was withdrawn due to -- I had
16 explained earlier that some consultants that they had
17 hired thought that the unapplied overhead was extremely
18 high, in the latter part in October and November, and at
19 that point everybody got concerned that maybe the account
20 was incorrect, and so the procedure was to withdraw the
21 audit and to go back and attempt to determine the
22 validity of that account.
23     Q. But prior to that issue coming to light, did
24 you participate in the generation of the original audit
25 issued by your firm?

Page 35

1     A. No.
2     Q. And just to carry on with your second-to-last
3 answer, what's the mechanics of withdrawing the audit?
4 Did you send a letter to SK Foods? How did that come
5 about?
6     A. There were discussions, there were e-mails, so
7 they could alert the potential users of those financial
8 statements that they should return those and not rely on
9 those.
10     Q. Okay. And was there an amended set of
11 financial statements issued after doing the agreed-upon
12 procedures?
13     A. As stated earlier, the agreed-upon procedures
14 were never completed. The answer to your question
15 regarding was there subsequent financial issued, is "no."
16     Q. So from Stoughton Davidson's perspective, the
17 financial statements were withdrawn and there was no
18 subsequent set of financial statements issued to anybody?
19     A. That's correct.
20     MR. CHRISTMAS: Let's do 41.
21     (Exhibit 41 was marked for identification.)
22 BY MR. CHRISTMAS:
23     Q. Mr. Dye, I've had the court reporter hand you
24 Stoughton Davidson 41 for identification for your
25 deposition.

Page 36

1     Do you recognize this document?
2     A. It appears to be an analysis of the
3 intercompany receivables for SK Foods as of June 30th,
4 2008.
5     Q. And do you know, is this a Stoughton Davidson
6 generated document, or by someone else?
7     A. I don't know. It appears to have been
8 generated by the client. There is a notation up in the
9 upper-right corner that says PBC, that stands for
10 "prepared by client."
11     Q. The handwriting on here, do you recognize any
12 of that?
13     A. Well, based on the initials of the people
14 signing off, it appears to be more than one person.
15     Q. Do you recognize the persons who wrote on this
16 document, their handwriting?
17     A. I recognize initials as being Ms. Garone's and
18 Ms. Tozlian's.
19     Q. I'm sorry?
20     A. Tozlian.
21     Q. Who is that person?
22     A. She's an audit manager.
23     Q. What is her first name?
24     A. Jennifer.
25     Q. Do you know the purpose of this marked-up

Page 37

1 document?
2     A. It was used to analyze the intercompany
3 receivables for the audit.
4     Q. And do you know what the source of the numbers
5 on the document is?
6     A. They came from the client. This document is
7 prepared by the client.
8     Q. And there are several legends at the bottom.
9 If I could ask you to walk through them with me, there's
10 a check mark legend on the far left, and can you tell me
11 what that legend indicates?
12     A. It indicates that those check marks next to
13 certain numbers in the columns up above were agreed
14 directly to notes receivable, related party receivables,
15 notes payable and other payables without exception.
16     Q. So what documents are being agreed to the
17 clients underlying general ledger, or can you just
18 explain that to me?
19     A. From reading it, it says it "Agrees directly to
20 notes receivable." That would indicate to me that there
21 was some notes receivable that they were agreed to, or
22 related party receivables which may have come from a
23 general ledger on the related party side. Or notes
24 payable and/or other payables. So it appears that there
25 is a variety of sources that they are confirming those to

10 (Pages 34 to 37)

SCOTT DYE - 8/16/2011

Page 38

1    or verifying them with.
2    Q. Okay. The check with an X or a slash, back
4    legend. What does that legend mean? "Agreed w/o/m/e"?
5    A. I don't know exactly what the w/o/m/e stands
6    for. I would be making an assumption, but I think it has
7    to do with materiality.
8    Q. How about the X that's just to the right of
9    that? Looks like "non-operating assets" to something
10   "equity," I can't read it.
11   A. Well, I agree with you, it does say
12   "non-operating assets to." I can't read it either.
13   MR. CHRISTMAS: Can we take a break for a
14   minute.
15   (Recess taken.)
16   MR. CHRISTMAS: This is 42.
17   (Exhibit 42 was marked for identification.)
18   BY MR. CHRISTMAS:
19   Q. Mr. Dye, the court reporter has handed you
20   Exhibit 42 to the Stoughton Davidson deposition. If you
21   go to the page marked SD 00046, it starts there. Do you
22   recognize this document?
23   A. It appears to be the title page to the SK Foods
24   LP audit.
25   Q. Have you ever seen this document before?

Page 39

1    A. I can't recall. I may have.
2    Q. Did you look at it before coming here today?
3    A. Not within the last -- not in preparing for
4    this, no.
5    Q. Do you have any understanding of the procedures
6    that were followed to -- and I don't mean in the
7    hypothetical, the actual procedures that were followed to
8    create these financial statements?
9    A. All standard audit procedures deemed necessary
10   for an audit.
11   Q. I didn't mean in the hypothetical, I mean what
12   actual procedures were followed?
13   A. Well, I suspect if I wanted to tell you, we
14   could take all day.
15   Q. I don't mean what. I mean, are you familiar
16   with what your colleagues did to create these financial
17   statements?
18   A. I'm familiar with what they probably did, yes.
19   I did not review their work, as I stated earlier.
20   Q. And did they consult with you while they did
21   their work?
22   A. No.
23   Q. Can you tell me what you did review before
24   coming here today?
25   A. The documents that were in response to the

Page 40

1    initial subpoena, and I believe the amended ones that
2    were additionally attached, which would be Stoughton
3    through 51, and the additional documents that I provided
5    you today.
6    Q. Was Mr. Bristol involved in preparation of the
7    audit?
8    A. He was the engagement partner.
9    Q. So Ms. Garone reported to him?
10   A. That would be correct.
11   Q. And did you speak to Mr. Bristol before you
12   came here today?
13   A. No, I did not.
14   Q. Did you speak with Ms. Garone before you came
15   here today?
16   A. Yes, I did.
17   Q. And what did you discuss with her?
18   A. I clarified my understanding of what was
19   represented within some of these e-mails and the
20   documents that were initially provided.
21   Q. And when you say "documents provided," you mean
22   produced by Stoughton Davidson?
23   A. Correct.
24   MR. CHRISTMAS: Let's go to 49.
25   (Exhibit 49 was marked for identification.)

Page 41

1    BY MR. CHRISTMAS:
2    Q. Mr. Dye, the court reporter has handed you
3    Exhibit 49 to the Stoughton Davidson deposition. It's
4    actually, I'll call it a group exhibit. There appear to
5    me to be two different letters here, pages SD -- and
6    there's no space -- 000042 through 46, appear to be one
7    document, although they all have sequential faxed page
8    numbers at the top apparently, and then the second
9    document starts at SD000047.
10   There may be other differences between the
11   documents, but if you could turn to -- well, first, have
12   you ever seen these documents before?
13   A. Yes, I have.
14   Q. Can you tell me what they are?
15   A. They are the engagement letters for the
16   agreed-upon procedures.
17   Q. Do you know why there are two different
18   letters?
19   A. The first letter is addressing mostly only
20   inventory issues. The second letter includes step ten,
21   or a tenth procedure which was to perform an analysis of
22   the current value of the companies. It says "Investment
23   in Grantor Trust, SSCL, which holds the Cedenco notes
24   receivable and payable."
25   Q. Does one of these letters supercede the other?

11 (Pages 38 to 41)

SCOTT DYE - 8/16/2011

Page 42

1    A. I would say yes. The one that has the tenth
2 procedure added to it would supercede, however, I don't
3 believe there's any change to the first nine procedures.
4    Q. So paragraph ten was an addition, rather than a
5 subtraction?
6    A. That's correct.
7    Q. Can you explain what procedure number ten is?
8    A. It was Mr. Salyer's request, because he
9 believed that the value of those notes had been impaired
10 and he wanted to determine what impairment there may or
11 may not have been at a period of about December 31st,
12 2008. He indicated it might have some tax impact to him.
13    Q. And when you say he had those thoughts, what's
14 the basis of your understanding of that?
15    A. An e-mail from Mr. Salyer.
16    Q. Okay. Do you know if that e-mail was part of
17 the document production?
18    A. It was part of today's production.
19    Q. Was that procedure, number ten, carried out?
20    A. No.
21    Q. Why was it not carried out?
22    A. We never got that far.
23    Q. So no part of procedure number ten was carried
24 out at all?
25    A. According to an e-mail from Mr. Bristol,

Page 43

1 actually it's a summary which was in the items produced
2 today, a memo dated through April 24th of '09 indicates
3 that there had been some review of companies e-mail
4 strands and other information provided by e-mail, as well
5 as review documents provided at the time of the June 30,
6 '08 audit, however Stoughton Davidson was still to
7 discuss valuation methods with management, as well as
8 management was to provide an analysis which had not been
9 performed.
10    Q. Are you reading from a document?
11    A. Yes, I am.
12    MR. NICHOLSON: Can I stop --
13    MR. CHRISTMAS: Mark that?
14    MR. NICHOLSON: He is reading from a document.
15 He has the originals that he brought. They got the Bates
16 stamp after he got here.
17    THE WITNESS: I was reading on SD Supp 009.
18    MR. CHRISTMAS: I guess we should mark that.
19 Why don't we mark what was produced today. We'll mark it
20 as a group exhibit. Let's do it as 68.
21    MR. NUTI: The entire package?
22    MR. CHRISTMAS: Yeah.
23    MR. NICHOLSON: So that's SD Supp 1 through SD
24 Supp 9.
25    MR. CHRISTMAS: Yeah.

Page 44

1    MR. NICHOLSON: What was the number on that?
2    MR. CHRISTMAS: 68.
3    (Exhibit 68 was marked for identification.)
4 BY MR. CHRISTMAS:
5    Q. Mr. Dye, could you turn to SD Supp 004. This
6 appears to be a series of e-mails. It starts
7 chronologically on that page and goes back to the prior
8 page. There's an e-mail from Mr. Salyer, May 12, 2009,
9 at 8:24 a.m., and a series of e-mails ending with an
10 e-mail from Mr. Bristol.
11    They do span a fair period of time here, over a
12 year. Let's start with the one from Mr. Salyer to you.
13 Now, this e-mail is dated May 12, 2009. Have you seen
14 this e-mail before your preparation for today?
15    A. Yes.
16    Q. So you received it on May 1, 2009?
17    A. Appears that way.
18    Q. And what's Mr. Salyer writing to you about?
19    A. Again, this would be the issue on the
20 agreed-upon procedure ten.
21    Q. Okay. He says there "Reported 18 million at
22 6/30/08, we believe the value is much less."
23    Did he explain to you why he believed the value
24 was much less?
25    A. I believe somewhere there was some indication

Page 45

1 of foreign currency transactions that decreased the
2 value.
3    Q. And when he says "the Cedenco note" here, can
4 you explain your understanding of what that note was?
5    A. My understanding from the SK perspective is
6 that is a netting of all the payables and receivables
7 from the foreign subsidiaries which had been transferred
8 to the trust, which is sitting on the books of SK in the
9 amount of 18,200,000 some odd thousand dollars, I
10 believe, from the trust.
11    Q. Do you know the terms of payment of the note?
12    A. No, I don't, but on the financial statements
13 it's classified as long-term, and I believe if you looked
14 at the audit work paper that we reviewed earlier, there
15 is indications that the bank would not allow any
16 transfers or reduction in that, so it is considered not
17 to be paid within the next 12 months, but at some time
18 thereafter, and from that indication there would be no
19 fixed terms with the bank controlling.
20    Q. There would not be any fixed terms? You
21 mean --
22    A. Until there was paid off within the bank, and
23 that's -- I'd have to find the work paper that you
24 provided me earlier. It says --
25    Q. Can you refer, for the record, by exhibit

12 (Pages 42 to 45)

SCOTT DYE - 8/16/2011

Page 46

1  number.

4  Affiliates is the title of the account. However, it's
5  highlighted and described down below that "These payables
6  and receivables are subordinated debt on both the side of
7  SK and the foreign related parties. Per the bank
8  covenants, there are to be no related party payments. As
9  such, this amount is not going to change until all loans
10 have been paid off. Appears reasonable and per review of
11 the SK bank agreement with BMO, Section 5, B-1," I
12 believe it says "the payables to the foreign related
13 parties are subordinated debt."
14      Q. Do you know if any reserve was established for
15 suspension of payment?
16      A. Based on the Exhibit 42, note eight, which is
17 transactions with related parties, which you'll find on
18 SD 63 back there, you'll see that the revocable trust
19 receivable is in full at the $18,262,000, does not appear
20 to have any reserve applied, because if you go again in
21 that exhibit to page 49, you will see that the 22,406 is
22 carried forward to the balance sheet as related party
23 receivables of 22,406.
24      Q. So do you know what analysis was done in order
25 to support the statement of the receivable at apparently

Page 47

1  face value?
2      MR. NICHOLSON: Objection. Vague and
3  ambiguous.
4      THE WITNESS: No, I do not.
5  BY MR. CHRISTMAS:
6      Q. Do you know if any analysis of that note was
7  done to determine its collectability?
8      MR. NICHOLSON: Objection. Vague and
9  ambiguous.
10     THE WITNESS: I do not.
11 BY MR. CHRISTMAS:
12     Q. Turning back to group Exhibit 68 and SD Supp
13 004, Mr. Salyer writes "Additionally, the note could
14 affect my personal tax situation." Do you have an
15 understanding as to what he meant by that?
16     A. No, I think you would have had --
17     MS. WOODRUFF: Sorry, objection. Lacks
18 foundation, calls for speculation.
19     MR. CHRISTMAS: You can answer.
20     THE WITNESS: The answer is "no."
21 BY MR. CHRISTMAS:
22     Q. Did you ever have any conversations by
23 telephone with Mr. Salyer about procedure number ten?
24     A. I can't recall specifically. There was a group
25 discussion with Mr. Salyer and I believe other

Page 48

1  consultants at the time when, in fact, ten was added to

4  and he returned with some notes on it which is in the
5  original production titled SD 0004.
6      Q. Is that the SD no spaces 0004?
7      A. Correct.
8      MR. CHRISTMAS: Those are all the questions I
9  have at this time, subject obviously to recalling a
10 representative of Stoughton Davidson who's properly
11 prepared.
12     MR. NICHOLSON: I'm just going to object to
13 that last comment. I don't know that there was anything
14 you asked in the subpoena that Mr. Dye wasn't prepared to
15 talk about today.
16     MS. WOODRUFF: I second that objection, and I
17 would also object to any further depositions being taken
18 of Stoughton Davidson.
19     MR. NUTI: I tend to agree with the liquidator.
20 As I understand it, the witness did not participate in
21 the actual audit that produced document SD 42.
22     MR. NICHOLSON: And that may be -- excuse me.
23     MR. NUTI: He can't testify as to whether or
24 not anybody of Stoughton Davidson looked at the legal
25 documents underlying the transactions reflected in there.

Page 49

1      MR. NICHOLSON: That may be. I think if you
2  look back at the subpoena, there was nothing having to do
3  with the audit in the subpoena itself.
4      MR. NUTI: I don't see --
5      MR. NICHOLSON: Excuse me. To the extent you
6  supplement the subpoena, if there are additional
7  categories you're looking for, we'd be happy to take
8  another look at it. I object and resent the notion that
9  Mr. Dye has come here unprepared today. I think he was
10 very prepared to talk about the subjects you actually
11 categorized and gave him.
12     MR. NUTI: You want to go off the record for a
13 minute?
14     MR. CHRISTMAS: Okay.
15     (Discussion off the record.)
16     MR. CHRISTMAS: Ms. Woodruff I guess has the
17 floor.
18     You have more questions?
19     MS. WOODRUFF: Yeah.
20     EXAMINATION BY MS. WOODRUFF
21     Q. Hi, Mr. Dye. I want to follow-up and ask you a
22 few questions. Before I do, I want to put on the record
23 that the Australian liquidator and his counsel, as well
24 as counsel for the trustee and the counsel for the
25 Unsecured Creditors Committee stepped out into the hall

13 (Pages 46 to 49)

SCOTT DYE - 8/16/2011

Page 50

1 to confer amongst themselves during the time that we were
2 off the record.
3         Mr. Dye, you are here testifying on behalf of
4 Stoughton Davidson, correct?
5     A. That is correct.
6     Q. And as you sit here today, are you prepared to
7 testify to the extent that Stoughton Davidson has any
8 knowledge about the assignment, transfer, distribution or
9 sale of any ownership interest in SK Foods Australia?
10    A. The only knowledge we have was that this is a
11 transaction that occurred November 1st, 2006, prior to
12 our audit and, in fact, almost a full year prior to
13 audit, was included in the audit prior to us, and we
14 would not go back and look at documents and transactions
15 that occurred in prior periods, particularly when they've
16 been audited by a firm such as Moss Adams.
17    Q. Okay. Thank you.
18        And are you, as you sit here today, prepared to
19 testify on behalf of Stoughton Davidson about the
20 transfer of shares or other ownership interests in SK
21 Foods Australia, by SK Foods Limited Partnership, which
22 is the California limited partnership that's in
23 bankruptcy here, to the Scott Salyer revocable trust and
24 SKPM corporation effective November 1, 2006?
25        MR. CHRISTMAS: Alleged transfer.

Page 51

1     THE WITNESS: Again, our only knowledge of that
2 is from the prior year audit conducted by Moss Adams
3 indicating that that transfer took place on November 1st,
4 2006. We relied on Moss Adams' audit.
5 BY MS. WOODRUFF:
6     Q. And as you sit here today are you prepared to
7 testify on behalf of Stoughton Davidson concerning any
8 assignment, transfer, distribution or sale of any debt of
9 SK Foods Australia owing to SK Foods Limited Partnership?
10    A. Again, any knowledge we have of that relates to
11 the prior audit that we relied on.
12    Q. As you sit here today are you prepared to
13 testify about any conveyance to the SSC&L 2007 trust
14 effective November 1, 2006, whether by assignment,
15 transfer, distribution, sale or otherwise of debt of SK
16 Foods Australia owing to SK Foods Limited Partnership?
17    A. The SSCL trust, I need clarification because
18 I've seen this thing referred to as the SSCL trust, I've
19 seen it referred to as the Scott Salyer revocable trust.
20 I'm not sure they're interchangeable, if they are. We
21 only know of the transfer that went to in the work papers
22 indicating that Scott Salyer revocable trust in November.
23 If it's one and the same, then yes.
24    Q. And when you're referring to the transfer that
25 occurred to the trust, are you referring to the transfer

Page 52

1 of the ownership interests of the Australian subsidiary,
2 or of the debt?
3     A. There was both, transfers of ownership interest
4 and debt.
5     Q. Okay. And to the best of your knowledge, the
6 debt as well as the ownership interests were transferred
7 to a trust entitled Scott Salyer revocable trust?
8     A. That's our understanding from the audit
9 conducted by Moss Adams and our review of that.
10    Q. As you sit here today are you prepared to
11 testify about any transfer of SKPM corporation to
12 Monterey Peninsula Farming of any ownership interest in
13 SK Foods Australia?
14    A. No, I have no knowledge of that transfer.
15    Q. Is there anybody at Stoughton Davidson --
16    A. Excuse me, let me clarify. SKPM Corp?
17    Q. Correct.
18    A. Did we say Monterey Peninsula? Because in the
19 work papers the transfer of ownership interest indicates
20 that it was the other partner, which was SKPM Corp, and
21 therefore the interest would have been transferred.
22    Q. To SKPM Corp?
23    A. Right.
24    Q. And that transfer that you're referring to is
25 the transfer that occurred on November 1st, 2006?

Page 53

1     A. Correct.
2     Q. According to the Moss Adams audited financial
3 statements?
4     A. That is correct.
5     Q. And do you know whether there's anybody at
6 Stoughton Davidson who has any knowledge about any
7 subsequent transfer from SKPM Corporation to Monterey
8 Peninsula Farming?
9     A. To the best of my knowledge, no.
10    Q. Okay. As you sit here today, are you prepared
11 to testify about any transfer --
12        (Interruption of phone ringing.)
13        MR. NICHOLSON: Can we go off the record for a
14 second.
15        MR. CHRISTMAS: Sure.
16        (Discussion off the record.)
17 BY MS. WOODRUFF:
18    Q. -- any transfer by SKPM -- well, that seems to
19 be the same. Strike that.
20        As you sit here today, Mr. Dye, are you
21 prepared to testify on behalf of Stoughton Davidson
22 concerning any transfer by the Scott Salyer revocable
23 trust to Monterey Peninsula Farming of any ownership
24 interest in SK Foods Australia?
25    A. I have no knowledge of any transfer from the

14 (Pages 50 to 53)

BMO 002207

SCOTT DYE - 8/16/2011

Page 54

1 trust to Monterey Peninsula.
2 ~~Q. To your knowledge is there anybody at Stoughton~~
4 Salyer revocable trust to Monterey Peninsula Farming?
5 A. To the best of my knowledge, no, there's no
6 one.
7 Q. As you sit here today, Mr. Dye, are you
8 prepared to testify on behalf of Stoughton Davidson
9 concerning any transfer by Monterey Peninsula Farming of
10 any ownership interest in SK Foods Australia to any
11 party?
12 A. I have no knowledge of Monterey Peninsula
13 Farming transferring any assets.
14 Q. To the best of your knowledge is there anybody
15 at Stoughton Davidson who has any knowledge of a transfer
16 by Monterey Peninsula Farming of any ownership interest
17 in SK Foods Australia?
18 A. As far as I know, there is no one.
19 Q. All right. And as you sit here today are you
20 prepared to testify concerning the stockholders, members
21 or any other types of holders of ownership interests in
22 Cedenco JV Australia or SK Foods Australia?
23 A. I'd have to double-check the transfers. The
24 only transfers we're aware of were the transfers that
25 took place November 1, 2006.

Page 55

1 Q. And as you sit here today are you prepared to
2 testify about the identity and owner of any debt that was
3 originally between SK Foods Limited Partnership on the
4 one hand and any SK Foods related entity from New Zealand
5 or Australia on the other hand?
6 A. I'm not sure I quite understand that question.
7 Q. Okay. I'm trying to broaden the topics. As
8 you sit here today are you prepared to testify on behalf
9 of Stoughton Davidson concerning who holds the notes
10 payable or notes receivable as between SK Foods limited
11 partnership on the one hand and notes that were
12 originally issued by or to any SK Foods related entity in
13 Australia or New Zealand?
14 A. As of what time?
15 Q. As of any time.
16 A. As of November 1st, 2006, I can testify as to
17 what notes were transferred to the revocable trust. From
18 that point forward, we have no knowledge as to what the
19 revocable trust may or may not have done with those
20 underlying assets.
21 Q. Okay. So what can you tell us about the
22 transfer of the notes on November 1st, 2006?
23 A. SK Foods consolidated a number of accounts at
24 that point in time, both receivables and payables to
25 foreign -- I'll use the term "affiliates,"

Page 56

1 "subsidiaries." They ended up combining to a balance of
2 ~~18,262,149, which was transferred to the Scott Salyer~~
4 MR. CHRISTMAS: Are you reading off a document,
5 sir?
6 THE WITNESS: I'm looking at SD 27, which was,
7 I believe, a Moss Adams document which shows which
8 accounts were consolidated.
9 BY MS. WOODRUFF:
10 Q. I'm sorry, you said SD 000027?
11 A. 27 in our production.
12 MS. WOODRUFF: Can we go off the record for a
13 moment.
14 (Discussion off the record.)
15 (Exhibit 69 was marked for identification.)
16 BY MS. WOODRUFF:
17 Q. I've asked the court reporter to mark a
18 document you produced, SD 27, and it's been marked by the
19 court reporter has Exhibit 69. Do you see that?
20 A. I do.
21 Q. Can you tell me what this is?
22 A. I believe it is a schedule relating to the
23 balance as of June 30th, 2007, for the accumulation and
24 consolidation of the receivables and payables that were
25 either transferred or sold to the revocable trust.

Page 57

1 Q. Is this a Stoughton Davidson work paper?
2 A. No, it is not.
3 Q. Is this a Moss Adams work paper?
4 A. I cannot testify to whose work paper it is,
5 other than it is not a Stoughton Davidson, but to the
6 best of my knowledge, it is a Moss Adams.
7 Q. Okay. Thank you.
8 The little notations on the side, there a
9 couple of 1s in circles and then summation and another 1
10 in a circle. Are those Stoughton Davidson markings?
11 A. I don't believe so. Again, I believe this is
12 part of the Moss Adams work papers, and those 1s
13 accumulate to the four million eight.
14 Q. Okay. Is this a document that you reviewed in
15 preparation for your deposition today?
16 A. I did review it, yes.
17 Q. And so, to the best of your knowledge, this is
18 a document that Moss Adams used in coming up with the
19 amount of the net receivable, 18.2 million roughly, that
20 appeared in the audited financial statements for 2007?
21 A. That would be correct.
22 Q. Let me just see if I have --
23 You testified at the beginning of your
24 deposition that you have both audit and tax experience.
25 Is that right?

15 (Pages 54 to 57)

SCOTT DYE - 8/16/2011

Page 58

1    A. That would be correct.
2    Q. All right. In your experience in your career
3 having conducted audits, would you have -- let me back
4 up.
5       You've testified today that the information
6 that you are aware of, that Stoughton Davidson is aware
7 of, concerning the transfer of the Australian
8 subsidiaries to the SKPM corp and the Scott Salyer trust,
9 as well as the transfer of the debt, that your knowledge
10 of those were based on the audited financial statements
11 and work papers from Moss Adams. Is that accurate?
12    A. That is correct.
13    Q. In your experience as an auditor, in relying on
14 previously audited financial statements, would it be a
15 common practice to look to the underlying documents
16 supporting various line items in previously audited
17 financial statements?
18    MR. NICHOLSON: I'm going to object because I
19 think you're asking him an expert opinion there. I would
20 instruct him to go ahead and answer it, but I don't want
21 to go too far down the road here. He's not being paid as
22 an expert witness.
23    MR. LEWIS: Bank of Montreal, also objects,
24 improper lay testimony.
25    MR. NICHOLSON: You can go ahead and answer,

Page 59

1 Mr. Dye.
2    THE WITNESS: Could you repeat the question.
3 BY MS. WOODRUFF:
4    Q. Would it be a normal practice of you as an
5 auditor, in your experience as an auditor, to ask to see
6 the underlying documents supporting a specific line item
7 and previously audited financial statements?
8    A. If you're referring to the underlying legal
9 documents that would be supportive of these or the
10 transaction that included the transfers, not normally.
11    Q. Okay. Under what circumstances would you ask
12 to see, for example, the loan agreements between the
13 various Cedenco entities and SK Foods if you were
14 conducting the audit?
15    MR. LEWIS: Objection. Improper lay testimony.
16    THE WITNESS: Can you repeat.
17 BY MS. WOODRUFF:
18    Q. Under what circumstances? You said
19 "previously," not "normally," so under what circumstances
20 would you ask to see the underlying documents to support
21 a transaction?
22    A. I believe that the only time you might consider
23 that would be is if something had come to your attention
24 prior to your review of the prior auditor's work papers.
25    MS. WOODRUFF: Okay. I have no further

Page 60

1 questions.
2    MR. NUTI: I think I can -- have a couple
3 questions of this witness, and then I think I might be
4 done.
5       EXAMINATION BY MR. NUTI
6    Q. It's my understanding that the Moss Adams audit
7 reflects a transfer of a loan or an amount receivable to
8 the SSC&L trust. Is that correct?
9    A. The audit and footnotes to that audit do not
10 indicate who it was transferred to, but indicates it was
11 transferred to a partner. Whether it was the SSCL trust
12 or a Scott Salyer revocable trust, because the work
13 papers only refer to capital S Salyer revocable trust. I
14 don't know if that's the same trust that everybody refers
15 to as the SSCL trust.
16    Q. Well, you understand that there was two
17 separate transactions reflected in that footnote, and one
18 was a distribution of equity to the two partners?
19    A. Correct.
20    Q. One being SKPM corp, the other being the
21 Scott Salyer Revocable trust?
22    A. Okay.
23    Q. Another aspect of the divestiture of the
24 investments in the foreign entities was a divestiture of
25 notes receivable from Australia and New Zealand, correct?

Page 61

1    A. Correct.
2    MS. WOODRUFF: Objection. Misstates prior
3 testimony, even this witness's prior testimony that it
4 wasn't just notes receivable that were transferred to the
5 trust.
6 BY MR. NUTI:
7    Q. And obligations that were transferred by SK
8 Foods to a trust?
9    A. To a revocable trust, right.
10    Q. What is your understanding of the date of those
11 transactions?
12    A. According to the footnote, those transactions
13 occurred November 1st, 2006.
14    MR. NUTI: Will you mark that 70.
15    (Exhibit 70 was marked for identification.)
16 BY MR. NUTI:
17    Q. Mr. Dye, can you take a look at what's been
18 marked as Exhibit 70. The exhibit is a letter dated
19 December 18, 2007, correct?
20    A. That's correct.
21    Q. And from the letter, it appears it is from
22 Gary Perry, a lawyer for SK Foods, he also had other
23 clients at the time, sending to Mr. Salyer what is
24 referred to as two execution originals of each of the
25 following documents. One is SSC&L 2007 trust with a

16 (Pages 58 to 61)

BMO 002209

SCOTT DYE - 8/16/2011

---

Page 62

1  request "Please sign as settlor and trustee where

4  that trust document signed by Mr. Salyer sometime between
5  December 18th and the end of the year, suggesting that
6  the SSC&L trust was formed in 2007.
7      MR. NICHOLSON: Is there a question in there
8  somewhere?
9      MR. NUTI: Give me a second.
10     Mark this as 71.
11     (Exhibit 71 was marked for identification.)
12     MR. CHRISTMAS: Do you have a copy for us?
13     MR. NUTI: Sorry.
14 BY MR. NUTI:
15     Q. Have you had a chance to look at Document
16  Number 71, Mr. Dye?
17     A. Well, briefly.
18     Q. Take your time.
19     Can you tell me what this document appears to
20  be?
21     MR. NICHOLSON: Objection. The document speaks
22  for itself, also compound.
23     THE WITNESS: And I assume you're asking for a
24  lay opinion?
25     MR. NUTI: Of course.

---

Page 63

1      THE WITNESS: It appears to be a debt
2  assignment agreement.
3  BY MR. NUTI:
4      Q. You notice it's dated January 14, 2008?
5      MS. WOODRUFF: Objection --
6      MR. NICHOLSON: Objection. Vague and
7  ambiguous.
8      MS. WOODRUFF: Objection. Misstates the
9  evidence. Objection. The document speaks for itself.
10     THE WITNESS: The document itself does not have
11  any date in 2008 on it.
12  BY MR. NUTI:
13     Q. The letter itself.
14     A. The letter is dated January 14, 2008.
15     Q. And the debt assignment purports to be first
16  day of November, 2006 between the SSC&L 2007 trust, SK
17  Foods, and Cedenco Foods Limited New Zealand company.
18     If, in fact, the SSC&L trust was not formed
19  until December, 2007, how is it that they could enter
20  into an agreement dated the first of November, 2006?
21     MS. WOODRUFF: Objection --
22     THE WITNESS: I'm not here to give legal
23  opinions and I have no answer to that question.
24     MR. NICHOLSON: I'll join the objection, that's
25  an incomplete hypothetical.

---

Page 64

1  BY MR. NUTI:

4  audit?
5      MR. NICHOLSON: Objection. Calls for improper
6  lay opinion.
7      MS. WOODRUFF: And objection, calls for a legal
8  conclusion.
9      THE WITNESS: Again, I don't know if there are
10  other documents relating to this or not. It does
11  indicate a difference in dates. That's all that I can
12  gather for fact out of this.
13  BY MR. NUTI:
14     Q. Does it raise a question in your mind as you
15  sit here today, and I assume seeing these for the first
16  time, of the validity and the accuracy of Moss Adams
17  audit?
18     MR. NICHOLSON: Objection. Lacks foundation.
19     THE WITNESS: Again, I'm not here to give an
20  opinion as to validity and quality of the Moss Adams
21  audit. I've never seen these documents before, I don't
22  know whether documents might be involved to substantiate
23  whatever they did.
24  BY MR. NUTI:
25     Q. In a vacuum, would this tend to make you

---

Page 65

1  investigate further?
2      MR. NICHOLSON: Objection. Improper lay
3  opinion.
4      THE WITNESS: In a vacuum, yes, I might
5  investigate further.
6      MR. NUTI: Thank you. I don't have any
7  questions.
8      EXAMINATION BY MR. DREHER
9      Q. Just a quick follow-up question.
10     Mr. Dye, I believe you testified that your
11  firm's understanding of the purported November 1st, 2006
12  transfer of the ownership of the Australian subsidiary
13  out of SK Foods LP is based on the Moss Adams 2007 audit.
14  Is that correct?
15     MR. NICHOLSON: Objection. Vague and
16  ambiguous, compound, misstated the evidence also.
17  BY MR. DREHER:
18     Q. Do you understand my question?
19     A. I believe so. Our understanding of that
20  transaction is based on Moss Adams' audit and work papers
21  provided that are included in these documents produced.
22     Q. Thank you, and that's my clarification
23  question, because I've heard you use the term "work
24  papers" a few times over the past hour. What do you mean
25  when you say "work papers"? What are you referring to?

17 (Pages 62 to 65)

SCOTT DYE - 8/16/2011

---

Page 66

1    A. In performing an audit, to validate any account
2  you create work papers that support them. Some of these
3  documents here, for example, Exhibit 69 is presumably a
4  work paper. Something like that would validate the
5  18,262,000.
6        MR. NICHOLSON: On a lighter note, I also add
7  he's been answering questions for more than an hour.
8  BY MR. DREHER:
9    Q. Just to put the final point of clarification on
10 it, then, have you or your firm ever seen any work papers
11 supporting the purported November 1st, 2006 transfer of
12 the equity of the Australian subsidiary out of SK Foods
13 LP?
14   A. I believe so.
15   Q. Do you know if you've produced those documents?
16   A. I believe so.
17   Q. Can you show them to me?
18   A. If you go to our production, under SD000030
19 there is an adjusting journal entry there, number 35.
20       MR. CHRISTMAS: For clarification, which
21 production are you looking at? Does it have the space
22 between the numbers or not?
23       THE WITNESS: Our production, does not have a
24 space.
25       MR. NUTI: I'm sorry. It was number 30?

---

Page 67

1        THE WITNESS: Correct.
2  BY MR. DREHER:
3    Q. Okay. Specifically referring -- well, let me
4  ask you this before I ask you any further questions about
5  SD000030.
6        Is there any other work paper that you can
7  identify that also reflects or supports that transfer?
8    A. SD000027.
9        MS. WOODRUFF: Which, for the record, was
10 previously marked as...
11       THE WITNESS: Exhibit 69.
12       MS. WOODRUFF: Correct.
13 BY MR. DREHER:
14   Q. Are there any other documents that are work
15 papers that in your mind support or evidence that
16 transfer?
17   A. Well, there may be but these two adequately
18 support it in my mind.
19   Q. Looking at what's been marked as Exhibit 27,
20 which is --
21       MR. NICHOLSON: I think it's actually marked
22 Exhibit 69. It's Document 27.
23       MR. DREHER: You're correct.
24 BY MR. DREHER:
25   Q. Exhibit 69, do you have that in front of you,

---

Page 68

1  Mr. Dye?
2    A. I do.
3    Q. Just explain to me where on this work paper in
4  your mind that transfer is demonstrated or described?
5        MS. WOODRUFF: Objection. Vague and ambiguous
6  as to "that transfer."
7        THE WITNESS: At the bottom of the extended
8  column you will see in all capital letters "Investment in
9  SK Foods LLC, Investment in SK Foods Australia." To the
10 right of those is an amount for SK Foods LLC, $2,840,124.
11       To the right of Investment in SK Foods
12 Australia is the amount of 2,040,882.
13       You'll note that there are circled number 1s
14 next to those. Those are used to accumulate, and down
15 below you will see an amount of $4,881,006, and to the
16 left of that it says "Less investment distributed to the
17 partners." Okay?
18       If you'll then go to SD000030, you will see on
19 adjusting journal entry number 35 in the credit column a
20 4,881,006 amount taking off the investment in SK Foods
21 Australia as one line item for that amount, and debiting
22 the two capital accounts, one for S. Salyer revocable
23 trust, and the other capital account of SKPM Corp with a
24 description to distribute partnership interests.
25   Q. Okay. Do you know who prepared, I believe you

---

Page 69

1  were already asked this question on SD 69, but going back
2  and asking you about SD000030, do you know who prepared
3  that work paper?
4    A. I cannot tell you who prepared it.
5    Q. Okay. Sorry to jump around. Jumping back to
6  SD 69 on the top left, at least on my copy, there's what
7  appears to be the stamped letters PBC. Do you see that?
8    A. I do.
9    Q. What do you think that means?
10   A. Are you asking me to speculate?
11       MR. NICHOLSON: Objection. Calls for
12 speculation.
13       THE WITNESS: I would assume and guess that it
14 means Prepared By Client.
15 BY MR. DREHER:
16   Q. Why would you make that assumption?
17   A. Because that's the same initials we put on when
18 a document is prepared by a client during our audits.
19   Q. Do you believe that Exhibit 69 is something
20 that was prepared by SK Foods?
21   A. I have no idea who prepared it.
22   Q. Does your firm, or I guess if you know, Moss
23 Adams, but is it typical when an accounting firm is
24 auditing the financial statements of a company or a
25 business organization, is it typical for the accounting

---

18  (Pages 66 to 69)

SCOTT DYE – 8/16/2011

---

Page 70

1  firm or for the client to prepare adjusting journal

[redacted]

4  opinion.
5       THE WITNESS: It's not typical either way.
6  BY MR. DREHER:
7       Q. Okay. Could be either?
8       A. Could be either.
9       Q. In your experience?
10      A. Correct.
11      MR. DREHER: I don't have any other questions.
12      MR. CHRISTMAS: Just a couple of questions.
13      FURTHER EXAMINATION BY MR. CHRISTMAS
14      Q. In the Stoughton Davidson audit file do you
15  know if there are work papers supporting the intercompany
16  loan balance that's shown in the financial statements
17  prepared by Stoughton Davidson?
18      MR. NICHOLSON: Objection. Vague and
19  ambiguous.
20      MS. WOODRUFF: Which exhibit are you referring
21  to?
22      MR. CHRISTMAS: I'm just asking him about the
23  financial statements, without directing him to them.
24      THE WITNESS: I believe your Exhibit 38 is
25  responsive to that question.

---

Page 71

1  BY MR. CHRISTMAS:
2       Q. And does Exhibit 38 indicate what underlying
3  documents were reviewed by Stoughton Davidson to verify
4  the intercompany loan balance?
5       MR. NICHOLSON: Objection. Document speaks for
6  itself.
7       THE WITNESS: Which I would agree with
8  Mr. Nicholson's comment.
9  BY MR. CHRISTMAS:
10      Q. I'm just asking what you know.
11      A. It's in the legend as to what was done to
12  satisfy him that that was a valid number, the tick mark
13  legend.
14      Q. Do you know if any procedures were followed by
15  Stoughton Davidson in creating the financial statements
16  for June 30, 2008, to give effect to the alleged
17  distribution of equity to the partners of the Australian
18  and New Zealand entities?
19      MR. NICHOLSON: Objection. Vague and
20  ambiguous.
21      THE WITNESS: The answer is I would understand
22  it was that transaction took place before this year, and
23  therefore would not have any impact to these audit
24  financial statements.
25  ///

---

Page 72

1  BY MR. CHRISTMAS:

[redacted]

4  June 30, 2008 to give effect of that transaction that
5  were not posted in the prior year?
6       MR. NICHOLSON: Objection. Improper lay
7  opinion.
8  BY MR. CHRISTMAS:
9       Q. I'm asking for the fact of that. Do you know
10  if there were?
11      A. I don't believe there were any journal entries
12  posted for that note or the investments which had already
13  been distributed.
14      Q. And you're basing that understanding on what?
15      A. The fact that the note balance, 18,262,000
16  stayed the same. There was no change in that number.
17  And the other investments had already been cleared off
18  the books.
19      Q. Do you know if the client had to address any
20  adjusting journal entries in its books to give effect to
21  that distribution of the equity?
22      MS. WOODRUFF: Objection. Calls for
23  speculation, lacks foundation.
24      THE WITNESS: Not during the 6/30/2008 audit,
25  no. I don't believe were anything -- I believe that was

---

Page 73

1  all done prior.
2  BY MR. CHRISTMAS:
3       Q. But your question implies that you know from
4  having worked on the audit, and I thought you had no
5  involvement in the audit?
6       MR. NICHOLSON: Objection. Misstates his
7  testimony.
8       THE WITNESS: My testimony relates to my review
9  of these documents, such as this one you provided me
10  today, showing no entries made to that account.
11  BY MR. CHRISTMAS:
12      Q. But your knowledge of that is only based on the
13  document production. Is that correct?
14      A. That's correct. I did not work on the audit.
15      Q. Right, and you did not look at the audit file
16  to prepare for this examination?
17      A. I did not.
18      MS. WOODRUFF: Sorry, I'm going to object on
19  that that it misstates the testimony, because the witness
20  testified that he prepared for this deposition by
21  reviewing documents and talking to Ms. Garone.
22      MR. CHRISTMAS: Well, the testimony speaks for
23  itself. I think that mischaracterizes it as well.
24      Nothing.
25      MR. NICHOLSON: I just have a couple questions.

19 (Pages 70 to 73)

Page 74

1       EXAMINATION BY MR. NICHOLSON
2    Q. Mr. Dye, if I can refer you all the way back to
3 Exhibit 1, which it starts with a Notice of Deposition
4 heading, and I apologize there are no Bates-stamped pages
5 on this exhibit, but if you flip back to what is page --
6 starts at page 6 and overlaps onto page 7 of the combined
7 designation of matters for testimony pursuant to Federal
8 Rules Procedure 30(b)(6).
9    Did you have occasion to read these categories
10 during one of the breaks today?
11    A. Yes, I did.
12    Q. Do you believe that you are the person most
13 knowledgeable at Stoughton Davidson to testify about the
14 categories listed here?
15    A. I believe there is no one in the firm that has
16 any more knowledge than I have transferred to the parties
17 asking questions today than I do.
18    Q. And just to be clear, I'm referring to all
19 matters for examination between paragraphs -- starts with
20 number 1 and goes all the way down to 13 on page 7.
21    If I understood your testimony, you believe you
22 are the person most knowledgeable at Stoughton Davidson
23 regarding these matters?
24    A. Yes.
25    MR. NICHOLSON: No further questions.

Page 75

1    (The deposition of SCOTT DYE was concluded at
2 4:43 p.m.)
3
4
5    ---oOo---
6    I declare under penalty of perjury under the
laws of the State of California that the foregoing is
7 true and correct.
8 Executed at    , California on    ,
2011.
9
10
        SCOTT DYE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 76

1 STATE OF CALIFORNIA  )
          )
2 COUNTY OF FRESNO   )
3
4    I, AMANDA SCOTT, Certified Shorthand Reporter
5 licensed in the State of California, License No. 13226,
6 do hereby certify that the foregoing proceedings was
7 reported by me and was thereafter transcribed under my
8 direction into typewriting; that the foregoing is a full,
9 complete and true record of said proceeding.
10    I further certify that I am not of counsel or
11 attorney for either or any of the parties in the
12 foregoing proceeding and caption named, or in any way
13 interested in the outcome of the cause named in said
14 caption.
15    In witness whereof, I have hereunto set my hand
16 and affixed my seal this day.
17    Date: August 25, 2011
18
19
20
21
22    AMANDA SCOTT, CSR #13226
23
24
25

# EXHIBIT 120

Re: Year End Statement

Case5:11-mc-80133-EJD   Document38-6   Filed09/02/11   Page24 of 31
Case 2:10-cr-00061-LKK   Document 39-3   Filed 03/15/10   Page 18 of 142

**Subject:** Re: Year End Statement
**From:** Scott Salyer <fscott.salyer@gmail.com>
**Date:** Thu, 14 Jan 2010 14:02:32 -0800
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>

▮▮▮▮

Thank You .

Scott

On Thu, Jan 14, 2010 at 4:57 AM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Dear Scott,

Please find enclosed the year end statement.

Kind regards,



--
Jetzt kostenlos herunterladen: Internet Explorer 8 und Mozilla Firefox 3.5 -
sicherer, schneller und einfacher! http://portal.gmx.net/de/go/chbrowser

--
Scott Salyer

3/2/2010 11:13 AM

BMO 002214

SWIFT-CODE: ▓▓▓▓

05/01/2010 / 16:46:17

# PORTFOLIO VALUATION
## on the 31/12/2009

**Customer nr.** ▓▓▓▓
**Customer name** Fast Falcon LLC
**Valuation currency** USD

SWIFT-CODE: ▮▮▮

Page 1

05/01/2010 / 16:48:17

Customer nr.
Customer name   Fast Falcon LLC
Valuation currency   USD

**** Portfolio Valuation on the 31/12/2009 ****

## Portfolio summary

| Instrument | AUD | CHF | EUR | USD | TOTAL USD |
|---|---|---|---|---|---|
| Liquidities | | | | 2,124 | 2,124 |
| Straight Bonds & similars | 1,194,188 | | 37,409 | 50,267 | 368,977 |
| Time Deposits | | | | 3,838,000 | 3,838,000 |
| Equities & similars | | 19,338 | 15,408 | | 40,740 |
| Investment Funds | | | 20,064 | 112,497 | 141,236 |
| Guarantees/letter of cred | | | -50,000 | -50,000 | 0 |
| TOTAL | 83,994 | 19,338 | 22,880 | 3,952,888 | 4,382,077 |



Instrument group



Currency group

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.

Foreign Exchange Rate Used:
AUD=0.8987 / CHF=1.0358 / EUR=1.4323 / NOK=5.7949 / ZAR=7.3861

BMO 002216

| Customer nr. | | SWIFT-CODE: |
| --- | --- | --- |
| Customer name | Fast Falcon LLC | Page 2 |
| Valuation currency | USD | 05/01/2010 / 16:46:17 |

**** Portfolio Valuation on the 31/12/2009 ****

## SHORT TERM INVESTMENTS : ACCOUNTS

--- Liquidities

| CURRENCY | AMOUNT | DESCRIPTION | Maturity date | MARKET VALUE IN USD | % |
| --- | --- | --- | --- | --- | --- |
| USD | 2,123.95 | Current account | | 2,123.95 | 0.05% |
| TOTAL Liquidities | | | | 2,123.95 | |

Total SHORT TERM INVESTMENTS : ACCOUNTS  2,123.95

## OBLIGATIONEN

--- Straight Bonds & similars

| CURRENCY | Nominal | DESCRIPTION | COST FX | | ACTUAL PRICE | MARKET VALUE IN USD | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | TITLE | CURRENCY | PROFIT/LOSS | ACCR. INTEREST (incl. interest) | % |
| EUR | 35,000.00 | | 100.13 % | 1.5302 | 100.1400 % | 232.08    53,581.97 | 1.22% |
| France | | | | | 0.01 % | | |
| AUD | 40,000.00 | | 101.93 % | 0.9178 | 101.6450 % | 228.50    36,768.69 | 0.83% |
| United States | | | | | -0.28 % | | |

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.

Customer nr.         ▆▆▆▆
Customer name     Fast Falcon LLC
Valuation currency   USD

SWIFT-CODE: ▆▆▆▆
Page 3
05/01/2010 / 16:46:17

**** Portfolio Valuation on the 31/12/2009 ****



| CURRENCY | Nominal | DESCRIPTION | COST FX TITLE | COST FX CURRENCY | ACTUAL PRICE / PROFIT/LOSS | MARKET VALUE IN USD ACCR. INTEREST (incl. interest) | % |
|---|---|---|---|---|---|---|---|
| AUD France | 40,000.00 | | 103.74 % | 0.9178 | 103.2250 % / -0.5 % | 1,610.31 / 38,718.49 | 0.85% |
| USD Austria | 50,000.00 | | 101.15 % | | 100.0000 % / -1.13 % | 268.67 / 50,266.67 | 1.14% |
| NOK Norway | 250,000.00 | | 99.97 % | 5.7032 | 99.0550 % / -0.91 % | 520.06 / 43,253.77 | 0.95% |
| NOK Luxembourg | 250,000.00 | | 101.89 % | 5.7032 | 101.2300 % / -0.65 % | 1,087.40 / 44,769.43 | 1.00% |
| ZAR United States | 300,000.00 | | 100.82 % | 7.4507 | 100.4250 % / -0.39 % | 4,326.54 / 45,118.11 | 0.93% |
| ZAR Luxembourg | 350,000.00 | | 99.02 % | 7.4507 | 98.9380 % / -0.08 % | 629.01 / 47,612.20 | 1.07% |

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.

BMO 002218

Customer nr.
Customer name: **Fast Falcon LLC**
Valuation currency: **USD**

SWIFT-CODE: ██████

Page 4
05/01/2010 / 16:46:17

**** Portfolio Valuation on the 31/12/2009 ****

TOTAL Straight Bonds & similars — 8,900.57 — 359,977.33

**Total OBLIGATIONEN** — 8,900.57 — 359,977.33

## SHORT TERM INVESTMENTS: < 1 YEAR

### — Time Deposits

| CURRENCY | AMOUNT | DESCRIPTION | COST FX CURRENCY | ACCR. INTEREST | MARKET VALUE IN USD (incl. Interest) | % |
|---|---|---|---|---|---|---|
| USD | 3,838,000.00 | VOLKSBANK AG 18/09/2009 - 2 days to / towards / at 0.125% | | 0.00 | 3,838,000.00 | 87.58% |

TOTAL Time Deposits — 3,838,000.00

**Total SHORT TERM INVESTMENTS: < 1 YEAR** — 3,838,000.00

## STOCKS

### — Equities & similars

| CURRENCY | QUANTITY | DESCRIPTION | COST FX TITLE | CURRENCY | ACTUAL PRICE | MARKET VALUE IN USD | % |
|---|---|---|---|---|---|---|---|
| CHF | 110.00 | ROCHE HOLDING AG | 167.70 | 0.9844 | 175.5800 | 18,670.53 | 0.43% |
| Switzerland | | | | | | 4.83 % | |

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.

**Customer nr.** [redacted]
**Customer name** Fast Falcon LLC
**Valuation currency** USD

SWIFT-CODE: [redacted]

Page 5

05/01/2010 / 18:46:17

**** Portfolio Valuation on the 31/12/2009 ****

| CURRENCY | QUANTITY | DESCRIPTION | COST FX TITLE | CURRENCY | ACTUAL PRICE | MARKET VALUE IN USD | % |
|---|---|---|---|---|---|---|---|
| EUR | 870,00 | [redacted] | 16.98 | 1.5345 | 17.7100 | 22,069.12 | 0.50% |
| Italy | | | | | 4.42 % | | |

**TOTAL Equities & similars** 40,739.85

**Total STOCKS** 40,739.85

## INVESTMENT FUNDS

— Investment Funds

| CURRENCY | QUANTITY | DESCRIPTION | COST FX TITLE | CURRENCY | ACTUAL PRICE | MARKET VALUE IN USD | % |
|---|---|---|---|---|---|---|---|
| EUR | 200.00 | [redacted] | 96.34 | 1.5013 | 100.3200 | 28,738.54 | 0.66% |
| Luxembourg | | | | | 4.13 % | | |
| USD | 310.00 | [redacted] | 91.30 | | 94.0800 | 29,164.80 | 0.67% |
| Luxembourg | | | | | 3.04 % | | |
| USD | 230.00 | [redacted] | 126.60 | | 131.9400 | 30,346.20 | 0.69% |
| Luxembourg | | | | | 4.22 % | | |
| USD | 280.00 | [redacted] | 99.61 | | 99.0600 | 27,736.80 | 0.63% |
| Luxembourg | | | | | -0.55 % | | |
| USD | 16.00 | [redacted] | 1,882.63 | | 1,883.2900 | 25,249.35 | 0.58% |
| Switzerland | | | | | -10.59 % | | |

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.

SWIFT-CODE: ████

Page 6

05/01/2010 / 18:46:17

| Customer nr. | ████ |
|---|---|
| Customer name | Fast Falcon LLC |
| Valuation currency | USD |

**\* \* \* \* Portfolio Valuation on the 31/12/2009 \* \* \* \***

| | | | | MARKET VALUE IN USD | % |
|---|---|---|---|---|---|
| **TOTAL Investment Funds** | | | | 141,235.69 | |
| **Total INVESTMENT FUNDS** | | | | 141,235.69 | |

**POSSIBLE LIABILITIES**

—— Guarantees/letter of cred

| CURRENCY | AMOUNT | DESCRIPTION | Maturity date | | |
|---|---|---|---|---|---|
| EUR | -50,000.00 | Kartengarantie | 31/12/2099 | N / A | 0.00% |
| USD | -50,000.00 | Kartengarantie | 31/12/2099 | N / A | 0.00% |

**TOTAL Guarantees/letter of cred**

**Total POSSIBLE LIABILITIES**

| | | MARKET VALUE IN USD |
|---|---|---|
| **Total assets excluding accrued interest** | | 4,373,176.05 |
| **Total accrued interest** | | 8,900.57 |
| **TOTAL ASSETS INCLUDING ACCRUED INTEREST** | | 4,382,076.62 |

The documented individual items, balances, conditions etc. shall be deemed to have been approved, unless an objection is raised in writing within 4 weeks from receipt thereof.