# RJN
# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BANK OF MONTREAL, as administrative )
agent,                               )
                 Plaintiff,        )
                                )
            v.                      )         No. 09-CV-03479
                                )
SK FOODS, LLC., a Nevada limited     )
liability company,                   )
                 Defendant.        )

## DEFENDANT SK FOODS, LLC'S SECTION 1404(a) MOTION TO TRANSFER

NOW COMES Defendant, SK Foods, LLC, by and through its attorney, Scott M. Levin

of Defrees & Fiske LLC, and respectfully moves this Court pursuant to 28 UCS §1404(a), to

transfer this lawsuit to the District Court of the Eastern District of California for the reasons set

forth in the brief SK Foods, LLC has filed in support of this motion.

Respectfully submitted,

/s/ Scott M. Levin
Scott M. Levin

Scott M. Levin, ARDC #6185743
Defrees & Fiske LLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/456-3418

278084.1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANK OF MONTREAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-03479 |
| | ) | |
| SK FOODS, LLC, | ) | Honorable Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## NOTICE OF MOTION

To:     James M. Heiser
        Chapman and Cutler LLP
        111 West Monroe Street
        Chicago, Illinois 60603

PLEASE TAKE NOTICE THAT ON September 24, 2009, at 9:30 a.m., I shall present the attached **Defendant SK Foods, LLC's Motion to Transfer** before Judge Joan B. Gottschall in Courtroom 2325 of the U.S District Court for the Northern District of Illinois- Eastern Division, a copy of which is hereby served on you.

/s/ Scott M. Levin
Scott M. Levin

## CERTIFICATE OF SERVICE

I, Scott M. Levin, an attorney, affirm that I caused copies of the foregoing Notice of Motion and related document to be served on the above-referenced party(ies) via US Mail, correct postage prepaid, on September 14, 2009, on or before the hour of 5:00 p.m., or via the CM/ECF system, if applicable.

/s/ Scott M. Levin
Scott M. Levin

Scott M. Levin, ARDC #6185743
Douglas Giese, ARDC #6242975
Defrees & Fiske LLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/456-3418

278152.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BANK OF MONTREAL, as administrative )
agent,                               )
                    Plaintiff,       )
                                     )
            v.                       )       No. 09-CV-03479
                                     )
SK FOODS, LLC, a Nevada limited      )
liability company,                   )
                    Defendant.       )

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO TRANSFER VENUE**

NOW COMES Defendant, SK Foods, LLC, by and through its attorneys, Scott M. Levin

of Defrees & Fiske LLC, and in support of its Motion to Transfer this lawsuit to the District

Court for the Eastern District of California, states as follows:

SK Foods, L.P., a California limited partnership and RHM Industrial/Specialty Foods,

Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, "Borrowers"),

borrowed sums totaling over $190 million from lenders, including Bank of Montreal ("Bank of

Montreal") ("Lenders"). Bank of Montreal serves as agent for Lenders. The loan is evidenced

by certain documents including a credit agreement, dated September 28, 2007 ("Credit

Agreement") and several promissory notes ("Notes"). SK Foods, LLC ("Guarantor") signed the

Credit Agreement as guarantor of the debt.

On or about May 5, 2009, involuntary bankruptcy proceedings were instituted by Bank of

Montreal against Borrowers in the United States Bankruptcy Court for the Eastern District of

California in Case No. 09-29162 (the "Bankruptcy Case"). On May 8, 2009, Borrowers filed

voluntary Chapter 11 petitions in the same court. On June 12, 2009, the Chapter 11 Trustee,

Bradley D. Sharp ("Trustee"), filed an adversary complaint against certain non-debtor parties to

the Bankruptcy Case in Adversary Case No. 09-2342-D ("Adversary Case").  In the Adversary

Case, Trustee alleges that certain non-debtor defendants are the alter egos of Borrowers and

seeks to consolidate the assets of Borrowers and these certain non-debtor defendants for

purposes of the Bankruptcy Case.  Trustee also seeks to recover alleged fraudulent transfers

between Borrowers and certain non-debtor defendants.  Guarantor is one of the non-debtor

defendants whose assets Trustee seeks to consolidate.

On June 6, 2009, Bank of Montreal filed a complaint against Guarantor in the instant

lawsuit alleging breach of guaranty, seeking foreclosure of security interests and for other relief

(the "Complaint").  Although venue is proper in this district, litigating this action in California is

more appropriate given all of the circumstances.  Venue in California will serve the convenience

of the parties and witnesses and will promote the interest of justice.  Guarantor, therefore, seeks

to transfer this case to the District Court for the Eastern District of California.

**Factors Governing Transfer of Venue**

"For the convenience of parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought."

28 U. S.C.A. §1404(a).  "A section 1404(a) transfer will be granted if the moving party

establishes: (1) that venue is proper in the transferor district; (2) that venue and jurisdiction are

proper in the transferee district; and (3) that the transfer will serve the convenience of the parties

and witnesses and will promote the interest of justice."  *FUL Incorporated v. Unified School

District Number 204*, 839 F.Supp. 1307, 1310 (N.D.Ill. 1993).

**1. Venue is proper in the Northern District of Illinois**

In the Complaint, Bank of Montreal cites 28 U.S.C.A §1391(a)(2) and §1391(c) to

establish venue in the Northern District of Illinois.  Guarantor concedes that venue is proper in

the Northern District of Illinois, but solely because of a venue provision stated in Section 13.23 of the Credit Agreement. (Complaint, Exhibit 1, p. 87)

**2.  Venue and jurisdiction are proper in the Eastern District of California.**

Venue is also proper in the Eastern District of California pursuant to 28 U.S.C.A. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in California and a substantial part of the assets that make up the collateral is located in California. The Credit Agreement and Notes were executed in California. Borrowers are California entities and it is the actions and omissions of Borrowers that caused the default of the Credit Agreement and Notes for which Bank of Montreal is now seeking payment from Guarantor. Furthermore, the filing of bankruptcy proceedings, which also constitute a default under the Credit Agreement and Notes, occurred in California. These defaults give rise to Guarantor's obligations for payment under the Credit Agreement and Notes and constitute a substantial part of the actions and omissions involved in this lawsuit, which occurred in California.

Jurisdiction is proper in the Eastern District of California pursuant to 28 U.S.C.A §1332 because the amount in controversy exceeds $75,000.00 and the Bank of Montreal is a Canadian Chartered Bank and Guarantor is a Nevada Limited Liability Company.

The parties are subject to personal jurisdiction in the State of California pursuant to §410.10 of the California Code of Civil Procedure because the parties conducted business in California by entering a contract substantially connected to California.

**3.    Convenience of Witnesses and Interests of Justice**

**A.     Forum Selection Clause of Credit Agreement is not Dispositive of Venue**

Guarantor acknowledges that Section 13.23 of the Credit Agreement states that:

> "The Borrower and the Guarantors hereby submit to the *nonexclusive* jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois State court sitting in the City of Chicago for purposes of all legal proceedings arising out of or relating to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby.  The Borrowers and the Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which they may no or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum."  Emphasis added.  (Complaint, Exhibit 1, p. 87)

Section 13.23, however, is merely a factor to be considered by this Court and not dispositive of the issue of venue.  The use of the phrase "nonexclusive jurisdiction" allows for another court to have jurisdiction over this action or for venue in another federal court.  "What, pray tell, can the word 'nonexclusive' mean other than to scotch any possible argument of waiver?  Surely that contractual language tells us that courts other than those in Illinois may also have 'nonexclusive jurisdiction', and that is precisely the stuff to which the Section 1404(a) balancing process may address itself."  *Riviera Finance v. Trucking Services, Inc.*, 904 F.Supp. 837, 839 (N.D. Illinois 1995) (*discussing a forum selection clause stating "Client hereby consents to the nonexclusive jurisdiction of the local, state or federal court located within the State of Illinois"*).  As stated in *Riviera Finance*, "[t]hat choice-of-law provision is of course a factor to be weighed in the scale as prescribed by Section 1404(a) and the case law applying it, but it is far from a compelling factor."  *Id.*  In fact, the court in *Riviera Finance* granted the defendants' motion to transfer the case to the Northern District of Indiana, despite the presence of the forum selection clause, based on other factors in favor of litigating the case in Indiana.

*FUL Incorporated v. Unified School District Number 204*, 839 F.Supp. 1307, 1310 (N.D.Ill. 1993) also granted a defendant's motion to transfer the case to a jurisdiction other than the one specified in the forum selection clause in the parties' contract.  The forum selection

clause in *FUL Incorporated* stated, in relevant part, "Lessee consents to jurisdiction and venue in any federal, state, or local court located in Lake County, Illinois and Lessee hereby waives any defenses or objections thereto including defenses based on the Doctrine of Forum Non Conveniens."   Although the contract terms established jurisdiction and venue in Illinois and waived any objection to said jurisdiction and venue, the court in *FUL Incorporated* granted the motion to transfer after taking into consideration the convenience of third-party witnesses and the interest of justice.

Guarantor concedes it may not seek transfer of this case based on its own inconvenience. "The presence of a valid forum selection clause prevents a defendant from asserting its own inconvenience as a reason supporting its motion to transfer." *FUL Incorporated* at 1311.  "A valid forum selection clause only waives the convenience of the parties factor.  The Court must still determine whether the convenience of the witnesses or the interest of justice clearly support transferring this action…" *Id.*

**B.      Convenience of Third Party Witnesses**

"Most often the controlling factor for Section 1404(a) purposes is 'convenience of witnesses'." Riviera Finance at 839.  Many of the third-party witnesses reside in or near California and would experience fewer difficulties and disruptions if the case were litigated in the Eastern District of California.  As evidenced by the Declaration of Donald J. Putterman, attached hereto as Exhibit A and incorporated herein, third party witnesses, located in or close to California, would provide testimony concerning the negotiations and intent of the guarantee at issue; the duress applied by Bank of Montreal and lack of opportunity for negotiations caused by Bank of Montreal that compelled Borrowers and Guarantor to enter into forbearance agreements materially detrimental to their rights; the bad faith of Bank of Montreal in declaring Borrowers to

278104\2                                                5

be in default after Scott Sayler (the beneficiary of the a trust that is one of the two owners Guarantor) declined to enter into certain arrangements with Bank of Montreal that were intended solely to generate unnecessary fees and profits for Bank of Montreal; the control exercised by Bank of Montreal over the day-to-day operations of Borrowers; and conduct engaged in by Bank of Montreal to interfere with Borrowers' ability to generate funds to pay down the debt.

In defending the instant action against Bank of Montreal, Guarantor must elicit the testimony of numerous witnesses located in California. Because Borrowers are located in California, it makes sense that the majority of third parties having knowledge of the transactions at issue also reside in California. The convenience of these witnesses weighs heavily in favor of litigating this case in California.

### C.      The interest of justice is better served by litigating this case in California.

"The final section 1404(a) factor 'focuses on the efficient administration of the court system, rather than the private considerations of the litigants.' Interest of justice considerations include the necessity to apply state law, the conservation of judicial resources and the likelihood of an earlier trial. In addition, the availability of compulsory process over material witnesses weighs heavily in this analysis." *FUL Incorporated* at 1311.

State Law Application. Pursuant to Section 13.18 of the Credit Agreement, Illinois law governs the contract. Although this factor weighs in favor of maintaining the action in Illinois, it is only one factor and is not weighed nearly as heavily as other factors, such as compulsory process over material witnesses. The fact that Illinois law will apply to the Credit Agreements and the Notes is not of great significance. "Contract law tends to be more universal in its principles than most areas of substantive law, so that a federal judge sitting in one state is unlikely to encounter any real difficulty in researching and applying the contract doctrines that

will be involved under another state's laws." *Riviera Finance,* 904 F.Supp. at 840. In *FUL Incorporated*, the court transferred the case from the Northern District of Illinois despite the fact that Illinois law was the governing law of the contract at issue there.

Conservation of Judicial Resources. The related Bankruptcy Case weighs heavily in favor of transferring this case to the Eastern District of California. *FUL Incorporated* addressed an almost identical circumstance and considered the pending bankruptcy adversary action critical to its decision to transfer the case out of Illinois. The "issue of a related cause of action is critical…" *Id.* at 1313.

The Bankruptcy Case and related Adversary Case in the Eastern District of California present an equally critical consideration. While not identical in nature, the parties to the instant lawsuit are also parties to the Adversary Case. The transactions underlying and the outcome of the Adversary Case will affect the potential financial obligations of Guarantors in the Bankruptcy Case and, consequently, its ability to satisfy any obligations under the Credit Agreement and Notes. Given the fact that the Bankruptcy Case cannot be transferred and that the same operative facts will underlie issues in that case, the Adversary Case and this case, it would make no sense to have two proceedings resolving the exact same factual issues, thereby creating the possibility for inconsistent decisions.

The Bank of Montreal was one of the leading parties in filing the involuntary bankruptcy petition. Bank of Montreal knew full well that by filing that petition, it would be involved in litigation with Borrower and Guarantor in California.

Availability of Compulsory Process. "Because it is generally assumed that witnesses within the control of the party calling them, such as employees, will appear voluntarily, the court limits its discussion to potential non-party witnesses. Such non-party witnesses may lie beyond

the subpoena power of the transferor court, but may lie within the subpoena power of the transferee court." *Id.* at 1311-12.

The non-party witnesses in the Putterman Declaration will provide testimony concerning facts material and necessary to Guarantor's defense of this action. Such witnesses do not reside in Illinois and are thus not subject to this Court's subpoena power. As stated before, this factor is afforded greater weight in consideration of a 1404(a) motion to transfer and rightly so. Without the testimony of these witnesses, Guarantor would lack testimony concerning material facts and events such as the negotiation, execution, performance and/or breach of the Credit Agreement, Notes, subsequent forbearance agreements, communications between the parties, communications with third parties involved in the preparation of the contracts and knowledge of other third parties involved in the entities and transactions at issue.

Location of Documents. The documents relevant and material to this case are located in California and are in the possession and under the control of the Trustee. (Putterman Declaration, Par. 5) These documents have been seized by the Trustee and access to them will be difficult from Illinois. There are currently proceedings to obtain access to these documents, but even if the Trustee is ordered to grant access, the documents will be subject to tight controls and limited access. It would be difficult for this Court to exercise direction over documents which are the subject of the Adversary and Bankruptcy Cases in California.

Convenience of Bank of Montreal. On information and belief, almost all of Bank of Montreal's agents involved in the Credit Agreement and Notes are located in California. Its attorneys are located in Chicago, but one element that Congress did not choose to insert into the balancing equation under Section 1404(a) was "convenience of counsel." *Riviera Finance,* 904 F.Supp. at 840.

**Conclusion**

    The interest of justice weighs strongly in favor of transferring this case to the Eastern District of California.  The pending Bankruptcy Case and Adversary Case are currently being litigated in that district.  Furthermore, material witnesses and documents are located in California and outside the subpoena power of Illinois.  Both factors, and in particular the heavily weighted subpoena power factor, are strongly in favor of transferring this case to the Eastern District of California.  The Northern District of Illinois is only convenient for Bank of Montreal's attorneys, which is not relevant.

    WHEREFORE, the Defendant, SK Foods, LLC, respectfully requests that this Court grant its Motion to Transfer Venue Pursuant to 28 U.S.C.A §1404(a) and transfer this case to the Eastern District of California.

**SK FOODS, LLC**

                                                By: /s/ Scott M. Levin_____
                                                        One of its attorneys

Scott M. Levin, ARDC #6185743
Defrees & Fiske LLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/456-3418

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| BANK OF MONTREAL, AS ADMINISTRATIVE AGENT | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| SK FOODS, LLC., a Nevada Limited Liability Company | ) ) ) |
| Defendant. | ) ) |

No. 09 CV 3479
Judge Gottschall

Magistrate Judge Nolan

## DECLARATION OF DONALD J. PUTTERMAN

I, DONALD J. PUTTERMAN declare as follows:

1.  I am a member in good standing of the State Bar of California, a partner of Kasowitz, Benson, Torres & Friedman LLP and, pursuant to a general representation of Mr. Scott Salyer and those affiliated entities designated by him, counsel to Blackstone Ranch Corporation; Monterey Peninsula Farms, LLC; Salyer Management Company, LLC; SS Farms LLC; SSC Farming, LLC; SSC Farms I, LLC; SSC Farms II, LLC; and SSC Farms III, LLC, in connection with adversary proceedings and other matters arising from *In re: SK Foods, LP, a California limited partnership, et al., Debtors,* No. 09-29162-D-11 (Chapter 11), presently pending the United States Bankruptcy Court, E. D. Cal. (Sacramento Div.).

2.  SK Foods, LLC ("Guarantor"), the Defendant herein, is also a Defendant in a substantive consolidation adversary proceeding brought by the Chapter 11 Trustee in the aforementioned bankruptcy case, and styled as *Bradley Sharp, Chapter 11 Trustee v. Blackstone Ranch Corporation, et al.,* Adv. Proc. No. 09-2342-D. The Trustee's and his counsel's fees in connection with this adversary proceeding are being funded out of cash collateral by the Plaintiff herein, Bank of Montreal ("Agent"), as administrative agent for the bank lending group.

3.  I have reviewed and am familiar with the issues raised by the Complaint herein, and with the issues likely to be raised by Guarantor both in defense of the Complaint, and via Counter-Claims to be brought. I also am familiar with the identities of persons and entities knowledgeable about these issues (although not with all of their current address), and from whom discovery and/or testimony is likely to be sought by the

278148.1

parties hereto. I also have familiarity with the location and circumstances surrounding documents which Guarantor will both need to rely upon, and which no doubt the Agent herein will demand that Guarantor produce, during the course of this matter. The specific witnesses identified herein are to be the best of my knowledge located in Northern California (within either the Northern or Eastern Districts), and the documents in question likewise are located in either the Northern or Eastern Districts of California, as described more particularly herein.

4. I am informed and believe that the following witnesses have information and will provide testimony concerning the negotiations and intent of the guarantee at issue in this litigation; the lack of negotiations and duress applied by the Agent herein in compelling the Borrowers and the Guarantor to enter into forbearance agreements materially detrimental to their rights; the bad faith of the Agent in declaring the Borrowers to be in default after Mr. Salyer declined to enter into certain arrangements with Agent intended solely to generate exorbitant fees and profits for the administrative agent itself; the control exercised by the bank group over the day-to-day operations of the Borrowers and conduct engaged in by the bank group to interfere with the Borrowers' ability to generate funds to pay down the debt; and similar and related issues:

a. Shondale Seymour, Lisa Crist, Jeanne Johnston, Mark McCormack, Steve King, Allan Huey and Mark Grewal, who are all former officers or managers of the Borrowers and who all reside within either the Northern or Eastern Districts of California.

b. Brian Maschler, Esq. and Tad Devlin, Esq. of Gordon & Rees in San Francisco, California (and other Gordon & Rees attorneys whose identities are unknown to us but who may have assisted Messrs. Maschler and Devlin), Gerard Rose, Esq. of Carmel, California and Gary Perry, Esq. of Sacramento, California, all of whom provided services with regard to the underlying loan agreement, the guarantee and/or one or more forbearance agreements, on behalf of either Borrowers, the Guarantor or Mr. Salyer and his family and trusts (the direct or indirect owners of the Borrowers and the Guarantor);

c. Paul Forgue of Alvarez & Marsal, who I am informed and believe works out of San Francisco, California; Mr. Forgue and Alvarez & Marsal were agents and representatives of the bank lending group and its administrative agent to the Borrowers, and who were involved in reviewing and approving budgets and other matters on behalf of the bank lending group;

d. Andrew Hinkleman of FTI in San Francisco, hired to assist the former Chief Restructuring Officer ("CRO") of the Borrowers with accounting and budget services;

c. Steve Sebastian, former CRO of the Borrowers, who I am informed and believe lives in Southern California, but as to whose precise whereabouts I cannot testify;

278148.1

f.  Wayne Boos, CPA, of Boos & Associates in Fresno, California, and John Iacopi, CPA of Iacopi, Lanz & Co in Stockton, California, who provided accounting, tax and tax-related services to the Borrowers, to Mr. Salyer, members of his family and their trusts, and to the other entities affiliated with the Salyer family;

g.  Ken Macklin of HR Macklin & Co in Visalia, California, who performed appraisals at various times of assets of the Borrowers; in addition, Gordon Bergthol, formerly of HR Macklin & Co., who has retired to Tucson but who is available.

h.  Leonard Kam and Victor Choi of Wells Fargo Bank in San Francisco; and Patrick Bishop of Wells Fargo Bank in or near, I am informed and believe, Monterey, California

i.  Curt Coventon of Bank of the West in Fresno; Diane Miller of Bank of the West, who I am informed and believe is located in California although I cannot attest to her precise whereabouts..

5.  The Borrowers' documents, as well as Guarantor's documents, and documents of the other entities affiliated with the Salyer family as well as personal documents of members of the Salyer family are all under the control of the Trustee in Bankruptcy, because of prior shared administrative arrangements.  The Trustee has seized all such documents and refused to turn them over to their rightful owners.  The Trustee's right to, *inter alia*, seize and retain these documents is currently among the topics being actively litigated in the Bankruptcy proceedings; regardless of the outcome, however, it is highly likely that tight controls will be imposed on the location of and access to these documents.

6.  I am informed and believe, and thereon allege, that the relevant documents, including but not limited to the various forbearance agreements, were signed on behalf of the borrowers and SK Foods, LLC in California.

I declare the foregoing to be true and correct under penalty of perjury of the laws of the State of California and of the United States of America.

Executed on September 14, 2009 at San Francisco, California.

_____
Donald J. Putterman

278148.1

# RJN
# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BANK OF MONTREAL, AS ADMINISTRATIVE AGENT | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 09 CV 3479 |
| v. | ) Judge Gottschall |
| | ) |
| SK FOODS, LLC, a Nevada Limited Liability Company | ) Magistrate Judge Nolan |
| | ) |
| | ) |
| Defendant. | ) |

**MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Bank of Montreal, as Administrative Agent (the "*Agent*"), to respectfully move this Court for entry of summary judgment in its favor and against Defendant SK Foods LLC on its Complaint for Breach of Guaranty, Foreclosure of Security Interests, and for Other Relief (the "*Complaint*") pursuant to Federal Rule of Civil Procedure 56. In support of this Motion, the Agent states as follows:[1]

      1.     The Agent filed its Complaint [Docket No. 1] on June 9, 2009.

      2.     SK Foods LLC filed its Answer and Affirmative Defenses to Complaint for Breach of Guaranty, Foreclosure of Security Interests, and for Other Relief ("*Answer*") [Docket No. 19] on September 14, 2009.

      3.     In its Answer, the Defendant did not deny that it executed the Guaranty at issue in this matter, nor did it deny that it granted the Agent a security interest in the Collateral the Agent seeks to foreclose upon in this proceeding. It also admitted that it has failed to make payment to the Agent.

---

[1]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Complaint.

2727435.01.07.doc

4.      Instead, it raised three affirmative defenses: Duress (which was later withdrawn voluntarily), Mistake (*i.e.,* that some other entity was supposed to guarantee the indebtedness to the Agent) and Breach of the Implied Covenant of Good Faith and Fair Dealing.

5.      On September 21, 2009, the Agent brought its Motion to Strike Affirmative Defenses. Defendant then voluntarily withdrew its "duress" defense.

6.      On November 13, 2009, this Court issued its Memorandum Opinion & Order regarding the Motion to Strike Affirmative Defenses in which it, *inter alia*, acknowledged the withdrawal of the Duress affirmative defense and struck the Mistake affirmative defense. With respect to the alleged breach of the covenant of good faith, the Court stated that "Bank of Montreal has generally acted in a manner equally consistent with lawful behavior," that it is "more probable . . . that Bank of Montreal did not want to throw good money after bad," and that the defense seemed "implausible." *Memorandum Opinion and Order* at 7-8. However, given the liberal standards applicable to motions to strike, the Court declined to strike this defense so that the record can be more fully developed. *Id.*

7.      While the Agent's Motion to Strike Affirmative Defenses was necessarily confined to the pleadings, as set forth in the attached memorandum, the "bad faith" defense fails for at least five independent reasons. First, it has been released by the Defendant and the Borrowers in two forbearance agreements. Second, the Bankruptcy Court overseeing the Borrowers' bankruptcy has already ruled that the Agent acted in good faith toward the Borrowers, and that no lender liability or other claims may be brought by the Borrowers. As the Bankruptcy Court has found that the Borrowers have no claims against the Agent, the Guarantor defendant here is barred from relitigating this issue. Third, the Illinois Credit Agreement Act bars the defense in this instance. Fourth, the defense is barred by express contractual provisions, which cannot be overridden under the guise of "good faith." Finally, while Defendant has

- 2 -

misapplied the duty of good faith under Illinois law, the record shows that the Agent has acted in "good faith" in its dealings with the Defendant and the Borrowers in even the general sense posited by the Defendant.  Therefore, the Agent respectfully submits that it is entitled to summary judgment in this matter.

8.     As the Complaint, the Answer, the Affidavit of Lawrence Mizera and other materials filed contemporaneously herewith establish that there is no genuine issue as to any material fact as to the allegations of the Complaint, that the Agent is entitled to judgment as a matter of law.

9.     Contemporaneously herewith, the Agent has also filed its memorandum in support of this Motion, its Statement of Material Facts, and its supporting affidavits.

WHEREFORE, the Agent prays that this Court: (i) enter judgment in its favor and against SK Foods LLC on both counts the Complaint in the amount of $136,765,858.91 as of May 5, 2009, together with accrued and unpaid interest thereon at the applicable rate under the Credit Agreement and applicable law, and further accruing fees, advances, and other expenses which may be paid out by Plaintiff; (ii) order that the Collateral be assembled by Defendant and turned over to the Agent so that a sale pursuant to the provisions of the Illinois Commercial Code may be held; (iii)(a)(i) authorize the Agent, pursuant to the Power of Attorney contained in Section 9 of the Security Agreement, to execute any documents in the name of Defendant or perform any other act required to convey marketable title to all Subsidiary Interests pledged to the Agent in the Security Agreement, (including but not limited to SK Foods International, a New Zealand entity), to a purchaser in a sale pursuant to the Illinois Commercial Code; (iii)(a)(ii) order that if the Defendant has not surrendered all marketable shares of SK Foods International within five (5) business days of entry of this Court's judgment, that the Agent be deemed the owner of SK Foods International or, (b) in the alternative to the sale procedures

under the Illinois Commercial Code requested herein, order that a judicial sale be held under the Court's supervision with marketable title to all Collateral conveyed to the successful bidder; (iv) retain jurisdiction to enforce this Order and (v) grant such other relief as it deems proper.

Dated:  May 7, 2010

Respectfully submitted,

CHAPMAN AND CUTLER LLP

By  _____/s/ James Heiser_____
One of Its Attorneys

James E. Spiotto (ARDC #2690721)
James M. Heiser (ARDC #6280191)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANK OF MONTREAL, AS ADMINISTRATIVE AGENT | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 CV 3479 |
| v. | ) | Judge Gottschall |
| | ) | |
| SK FOODS, LLC, a Nevada Limited Liability Company | ) | Magistrate Judge Nolan |
| | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

SUMMARY .................................................................................................................. 1

BACKGROUND ........................................................................................................... 2

STANDARD OF REVIEW ............................................................................................ 4

ARGUMENT ............................................................................................................... 5

    I.    THE AGENT IS ENTITLED TO JUDGMENT ON THE GUARANTY ........................................... 5

    II.   THE AGENT IS ENTITLED TO FORECLOSE ON ITS COLLATERAL ..................................... 6

    III.  THE AGENT IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S
           "BAD FAITH" DEFENSE ............................................................................................... 7

          A.   The Borrowers Released All Defenses and Claims in Exchange
               for the Forbearance Agreements ............................................................... 8

          B.   The Bankruptcy Court Has Already Ruled That the Agent Acted
               in Good Faith Toward the Borrowers, Precluding Guarantors
               From Relitigating This Issue .................................................................... 9

          C.   The Defense Is Barred by the Illinois Credit Agreement Act .......................... 9

          D.   Defendant Cannot Use the Implied Covenant of Good Faith to
               Create a Duty to Extend Credit ................................................................ 10

          E.   The Parties Expressly Agreed That the Agent Had the Right to
               Terminate the Loan Commitments and that All of the
               Agent's Obligations to the Borrowers Had Terminated
               Permanently Before the Alleged "Bad Faith" Occurred ........................... 11

          F.   The Alleged Conduct Is Not "Bad Faith" Under Illinois Law ....................... 12

          G.   The Agent Acted in Good Faith Toward the Borrowers ............................... 13

CONCLUSION ........................................................................................................... 15

TABLE OF AUTHORITIES

## Cases

*AM Int. Inv. v. Graphic Mgmt. Assocs., Inc.*, 836 F.Supp. 487 (N.D. Ill. 1993) *aff'd* 44 F.3d 572 (7th Cir. 1995)........................................................................................................................ 12

*Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107 (7th Cir. 1990) ......................................... 5

*Brooklyn Bagel Boys v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373 (7th Cir. 2000) ............................................................................................................................................ 10

*Brown v. City of Chicago*, 599 F.3d 772 (7th Cir. 2010)................................................................ 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 4, 13

*Chrysler Credit Corp. v. Marino*, 63 F.3d 574 (7th Cir. 1995) ..................................................... 9

*Cont'l Bank v. Modansky*, 997 F.2d 309 (7th Cir. 1993) ............................................................ 12

*F.D.I.C. v. Rayman*, 1995 WL 505960, *8 (N.D.Ill. Aug 23, 1995) ........................................... 10

*Hotel 71 Mezz Lender LLC v. Mitchell*, 880 N.Y.S.2d 67 (N.Y.App.Div. 2009)........................ 11

*Kahm & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990)........ 12

*LaSalle Bus. Credit v. Lapides*, 2003 WL 722237 *15 (N.D. Ill. 2003) ..................................... 10

*LaSalle Nat. Bank v. Met. Life Ins. Co.*, 18 F.3d 1371 (7th Cir. 1994) ...................................... 12

*Marcus Dairy, Inc. v. Jacene Realty Corp.*, 225 A.D.2d 528 (N.Y.App.Div. 1996) ................... 11

*McAloon v. Northwest Bancorp, Inc.*, 274 Ill.App.3d 758 (Ill. App. Ct. 1995) ........................... 10

*Mid-City Indus. Supply Co. v. Horowitz*, 132 Ill.App.3d 476 (Ill. App. Ct. 1985)........................ 5

*Payne v. Mill Race Inn*, 152 Ill. App. 3d 269 (Ill. App. Ct. 1987) ................................................ 5

*Perez v. Citicorp Mortgage, Inc.*, 301 Ill.App.3d 413 (Ill. App. Ct. 1998) ................................. 10

*PPM Fin. v. Norandal USA, Inc.*, 297 F.Supp.2d 1072 (N.D. Ill. 2004) ..................................... 10

*Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105 (Ill.App.Ct. 1993) ............................. 12

*Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603 (7th Cir. 2005) ...................... 4

*Zeidler v. A & W Rests., Inc.*, 301 F.3d 572 (7th Cir. 2002)....................................................... 10

## Statutes

810 ILL. COMP. STATS. §5/9-609....................................................................................................... 7

## Other Authorities

*Hawkland & Cohen UCC Series* §9-609:5 (2009) ...................................................................... 7

## Rules

FED. R. CIV. P. 56(c)..................................................................................................................... 4, 5

NOW COMES the Plaintiff, Bank of Montreal, a Canadian chartered bank acting through its Chicago branch, as Administrative Agent for certain Lenders (the "*Agent*"), and for its Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (the "*Motion*") on its Complaint, respectfully states as follows:[1]

### SUMMARY

In its Answer, the Defendant admitted or did not deny the material allegations of the Complaint. Instead, it attempted to raise three affirmative defenses: duress, mistake and breach of the covenant of good faith and fair dealing. The Agent promptly brought a Motion to Strike these defenses and, in response, Defendant conceded its duress defense. In a Memorandum Opinion, the Court struck the mistake defense, leaving the "bad faith" defense as the sole remaining issue in this case. As described below, the Agent is entitled to summary judgment on this defense for at least five independent reasons. First, this defense was released by the Defendant and the Borrowers in certain forbearance agreements with the Agent described below. Second, the Bankruptcy Court overseeing the Borrowers' bankruptcy has already ruled that the Agent acted in good faith toward the Borrowers and that the Borrowers have no relevant claims against the Agent. Third, the Illinois Credit Agreement Act bars the defense. Fourth, the defense is barred by express contractual provisions which cannot be overridden under the guise of "good faith." Finally, while Defendant has misapplied the duty of good faith under Illinois law, the record shows that the Agent has acted in "good faith" in even the general sense posited by the Defendant, despite criminal indictments of members of the Borrowers' senior management, including agribusiness tycoon Scott Salyer. As there is no genuine issue of material fact as to the Agent's claims or the remaining affirmative defense, the Agent is entitled to summary judgment in this matter.[2]

---

[1]   Capitalized terms not defined herein shall have the meaning ascribed to them in the Complaint.

[2]   While this defense lacks merit, revelations in the criminal indictment raise serious issues about the purpose for which these defenses and the previously denied motion to transfer venue were interposed, and whether they were used to occasion a delay so that assets could be transferred beyond the reach of this Court. For example, as described below, the government alleges that in the period following the filing of this case, Salyer transferred millions of dollars offshore in support of his attempt to flee the country, including funds that were the property of SK Foods, LLC, the defendant here. Indeed, in ordering that Salyer be remanded into custody, Magistrate Judge Steven Gold remarked, "I have been doing this for a bit of time. This is one of the most elaborate schemes to flee that I have come across . . ." *Pretrial Detention Motion* at 3; *Heiser Dec.* ¶14.

## BACKGROUND

The SK Foods family of businesses were California-based producers and processors of tomato products. On September 28, 2007, SK Foods L.P. and RHM Industrial/Specialty Foods, Inc. (collectively, the *"Borrowers"*) entered into a Credit Agreement (described below) with the Agent whereby certain Lenders agreed to provide up to $200 million in financing to the Borrowers. The Defendant in this matter, SK Foods, LLC, guaranteed the Borrowers' obligations under this facility, and pledged all of its personal property, which consisted primarily of the stock of the foreign operations of the SK Foods "family" of companies, as collateral for its Guaranty.[3]

In the Spring of 2008, the Borrowers became the target of an investigation by federal authorities into allegations of mislabeling (relating in part to false certifications of the mold content in their products), commercial bribery and antitrust violations which, together with certain economic and other factors, caused the Borrowers to default on the Agent's loan. Initially, the Agent agreed to waive certain nonmonetary defaults and extend additional credit so that the Borrowers could attempt to reorganize or refinance. Despite these attempts, the impact of the criminal investigation widened throughout the remainder of 2008 and into 2009, as more senior members of the Borrowers' management became implicated in the scandal, including Scott Salyer, the ultimate owner of all of the SK Foods family of businesses, who was indicted on January 5, 2010 on numerous counts of mail and wire fraud, obstruction of justice, and violations of the RICO Act. A Superseding Indictment was filed on April 29, 2010, which charged Salyer with additional criminal conduct.[4]

The situation reached a crisis stage on March 1, 2009 when the Borrowers failed to make a required payment in excess of $35 million. At this time, significant "irregularities" were

---

[3]     The background facts set forth herein are set forth in greater detail in the Declarations of Lawrence Mizera and Paul Forgue, attached to the Exhibit Appendix as Exhibits B (*e.g.,* ¶¶ 56-75) and C-9, respectively.

[4]     While this is a straightforward breach-of-contract case at its core and Salyer has pleaded not guilty to the government's allegations, the Agent submits limited background information on Salyer's prosecution to show that even if the Court overlooks the numerous other flaws in this affirmative defense, it would still find that there is no genuine issue that the Agent acted reasonably toward the Borrowers under what was a fairly extraordinary set of circumstances.

revealed regarding the Borrowers' financial statements. For example, the Borrowers issued a "notice of non-reliance" on their 2008 financial statements, and withdrew them pending revision.

During this time, the Borrowers continued to use the Agent's collateral to fund operating "expenses," which often included payments to insiders and funding of the legal defense in the criminal investigation. For example, during 2008 and the first months of 2009, the Borrowers had paid, *inter alia*, almost $4 million in legal fees for the criminal investigation, $1.7 million for use of a private jet owned by SK Aviation (a related entity), and over $1 million in costs classified as "travel, entertainment and marketing." During this time, Salyer also increased his salary by 60% and the salary of his daughter by 225%. While the Agent was unable to analyze every transaction, approximately $16 million had been transferred out of the Borrowers to non-borrower affiliates, many of which are controlled by Salyer.[5]

The Spring 2009 time frame was critical because the 2009 tomato packing season was about to commence. Due to the seasonal nature of the tomato crop, SK Foods' business cycle was also seasonal. Each May and June, SK Foods would expend significant resources in preparing for the tomato packing season, which lasts from July through September. Therefore, if the Borrowers could not operate during the 2009 packing season, the value of their businesses would be dramatically lower. Chanin Capital Partners (*"Chanin"*), the Borrowers' restructuring advisor, determined that the best way to maximize the value of the Borrowers' businesses given the defaults was through a Section 363 sale in a bankruptcy proceeding, so that a new purchaser could operate the businesses for the 2009 packing season free of the taint of the criminal investigation. During this period, the Agent, the Borrowers and the Guarantor (Defendant here) entered into several Forbearance Agreements (described below) to temporarily permit the Borrowers to use the Agent's cash collateral to fund preparations for the 2009 packing season and facilitate the sale process. Between February 2009 and the filing of the Borrowers'

---

[5]     Salyer was recently apprehended at John F. Kennedy Airport in New York after a six-month odyssey during which he relocated abroad and attempted to gain residency in countries from which he could not be extradited to the United States in order to flee from prosecution. Subsequent revelations in Salyer's indictment indicate that he has transferred millions of dollars offshore to banks in Liechtenstein, the West Indies and other foreign jurisdictions from accounts of the tomato processing business. *Pretrial Detention Motion* at 17-22; *Heiser Dec.* ¶14.

bankruptcy cases on May 6, 2009, the Agent allowed over $20 million of its collateral to be used to fund operations and to facilitate the sale process.[6]

However, negotiations broke down when the Borrowers, through Mr. Salyer, made numerous demands of the Agent, apparently designed to benefit Mr. Salyer, including a release of the Guaranty at issue in this case, a "legal defense fund" of $2 million cash for Mr. Salyer and other officers, a $6 million cash payment, a release of liens on real estate in Hawaii and Lake Tahoe that was pledged to the Agent, and a "compensation plan" for current executives, among other demands.

As a result of these unreasonable demands and in light of the exigencies of the 2009 packing season, the Agent accelerated the loan on April 16, 2009 and demanded payment from the Borrowers and the Defendant, as it was entitled to do under the Loan Documents. Despite demand, the Borrowers and the Guarantor Defendant failed and refused to make payment. Subsequently, in May of 2009, the Borrowers filed petitions in bankruptcy. In June 2009, the Agent brought this proceeding seeking a judgment solely against the Defendant regarding its separate unpaid obligation under the Guaranty. In response, Defendant did not deny the material allegations of the Complaint. The Agent now brings this Motion to obtain judgment on the issue of liability and its right to possession of the Collateral and to address the substance of the remaining defense of "bad faith."

### STANDARD OF REVIEW

Summary judgment is properly granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Ruffin-Thompkins v. Experian Info. Solutions, Inc.,* 422 F.3d 603, 606-07 (7th Cir. 2005); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). While the moving party bears the initial burden, once that burden is met, the nonmoving party must go

---

6   The Defendant made a strange assertion in paragraph 13 of its defense that the Agent caused Chanin to "terminate its efforts" to sell the Borrowers assets. In fact, Chanin remained the Borrowers' restructuring advisor throughout the subsequent bankruptcy and it arranged a sale of the Borrowers' assets to Olam West Coast, Inc. with the approval of the Agent. *Order Approving Going Concern Sale,* Ex. A; *Heiser Dec.,* ¶6.

beyond the pleadings and set forth specific facts showing there is a genuine issue of fact for trial. FED.R.CIV.P. 56(c); *Becker v. Tenenbaum-Hill Assocs., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). Finally, Defendant bears the burden of proof regarding its affirmative defenses. *See Celotex,* 477 U.S. 317 (1986) at 323-25 (discussing burdens).

ARGUMENT

**I.    THE AGENT IS ENTITLED TO JUDGMENT ON THE GUARANTY**

To recover for breach of contract, a plaintiff need only show the existence of a contract between plaintiff and defendant, performance by plaintiff of the conditions of the contract, breach of the contract by defendant and damages as a result of the breach. *Payne v. Mill Race Inn,* 152 Ill.App.3d 269, 273 (Ill. App. Ct. 1987). A plaintiff establishes its case for enforcement of a guaranty "when the plaintiff enters proof of the original indebtedness, the debtor's default and the guarantee." *Mid-City Indus. Supply Co. v. Horowitz,* 132 Ill.App.3d 476, 483 (Ill. App. Ct. 1985). As there is no genuine material of fact with respect to the Agent's claim on the Guaranty, summary judgment is appropriate.

Here, Defendant has admitted in its Answer that the Borrowers borrowed over $190 million from the Agent. *Facts,* ¶5;[7] *Answer* ¶1. Defendant also admits that it executed the Credit Agreement and Guaranty. *Facts,* ¶6; *Answer,* ¶¶18, 118. Defendant also admitted it entered into the First and Second Forbearance Agreements. *Facts,* ¶7; *Answer,* ¶¶53, 60. In the April 3, 2009 Forbearance Agreements, the Defendant admits that the Borrower was indebted to the Agent in the amount of $192,781,886, together with fees and interest, plus other amounts justly and truly owing, as of March 31, 2009 *"without defense, offset or counterclaim." Second Forbearance Agmt.* at ¶2 (emphasis added); *see also Forbearance Agmts.* ¶¶B-D, ¶¶2&3 (admitting default generally) *Mizera Dec.,* ¶1(f) & ¶1(g). The Defendant also admitted that the Agent terminated the obligation to extend credit in the Loan Documents and accelerated all obligations thereunder. *Facts,* ¶8; *Answer* ¶¶82, 121. Defendant admits that the Borrowers failed to make payment when due under the Loan Documents. *Facts,* ¶9; *Answer* ¶¶82, 84, 86-

---

[7]    A copy of Plaintiff's Statement of Material Facts pursuant to Local Rule 56.1(a)(3) is attached to the Exhibit Appendix as Exhibit "A." A copy of the Mizera Declaration is attached to the Exhibit Appendix as Exhibit "B." For the convenience of the Court, a copy of Defendant's Answer is attached as Exhibit 1 to the Heiser Declaration, which is in the Exhibit Appendix as Exhibit "C."

90, 99, 106, 108-109, 122. Defendant further admits that it failed to make payment under the Guaranty. *Facts,* ¶10; *Answer,* ¶¶82, 100-101, 116. Defendant further admits that other defaults exist, such as the Borrowers' bankruptcies. *Facts,* ¶36-45; *Answer* ¶¶106, 108, 109, 112, 113, 116, 121, 122, 123. Under the Forbearance Agreements (and the Credit Agreement), the Borrowers and the Guarantor agreed to pay the costs and expenses of the Agent, together with its attorneys' fees. *Forbearance Agmts.* at ¶14; *Mizera Dec.,* ¶1(f) & ¶1(g).

Therefore, all of the elements of the Agent's cause of action against Defendant for breach of the Guaranty have been established by Defendant's admission that it and the Borrowers entered into and executed the Credit Agreement and Guaranty, that the Credit Agreement was breached, and that the Borrowers and Guarantor have failed to repay the Agent. Additionally, the Declaration of Lawrence Mizera further establishes the elements of the Agent's claim against Defendant. By virtue of these defaults, Defendant is indebted to the Agent in the amount of $136,765,858.91 as of April 28, 2010, the outstanding balance under the Credit Agreement after accounting for all credits for collateral that has been liquidated. *Mizera Dec.,* ¶¶41, 52. Thus, because the pleadings raise no genuine issue as to any material fact concerning Count I of the Complaint, this Court should enter an order granting the Agent summary judgment.

## II.   THE AGENT IS ENTITLED TO FORECLOSE ON ITS COLLATERAL

The Guarantor also does not deny any of the material allegations of Count II of the Complaint, seeking foreclosure of the security interest given to the Agent. The Guarantor duly executed a Security Agreement dated as of September 28, 2007 in favor of the Agent. *Facts,* ¶47; *Answer* ¶130. On November 1, 2006, the Agent duly filed a UCC Financing Statement covering all right, title and interest in and to all of the personal property and fixtures of the Guarantor, whether now owned or existing or hereafter created, acquired or arising. *Facts,* ¶48; *Answer* ¶133. The Guarantor is in default of one or more of its obligations under the Credit Agreement. *Facts,* ¶50; *Answer* ¶139. Despite demand, the Guarantor has failed and refused to surrender possession of the Collateral. *Facts,* ¶51; *Answer* ¶143.

Thus, since the Guarantor is in default, the Agent is entitled to enforce its rights under the Guaranty against the Collateral and to enforce its rights under the Security Agreement. Pursuant to the Illinois Commercial Code, the Agent is entitled to take possession of the Collateral and

may require the Guarantor to assemble the Collateral and make it available to the Agent. 810 ILL. COMP. STATS. §5/9-609(a) and (c). Also, pursuant to Section 10(c)(iv) of the Security Agreement, the Defendant agreed to assemble the Collateral and deliver it to the Agent at a place designated by the Agent. *Security Agmt.* §10(c)(iv); *Mizera Dec.,* ¶5. Additionally, pursuant to §9 of the Security Agreement, the Defendant granted the Agent an irrevocable Power of Attorney which allows the Agent to endorse the Collateral in blank to the Agent so that it can convey title to the Collateral if necessary. *Security Agmt.* §9, *Mizera Dec.,* ¶4 (Ex. 5). Therefore, the Agent is entitled to use judicial process to take possession of Collateral. 810 ILL. COMP. STATS. §5/9-609(b) (2010); *See also Hawkland & Cohen UCC Series* § 9-609:5 (2009) (stating "the secured party may seek a court's assistance to repossess collateral . . .").

Based on the foregoing, the Agent respectfully requests that this Court enter judgment in its favor and against the Defendant on Count II of the Complaint and require Defendant to assemble the Collateral and make it available to the Agent so that a UCC sale may be held, and find that the Agent is authorized to execute any necessary documents in the Guarantor's name to convey title to the Collateral to a purchaser in a UCC sale.

## III. THE AGENT IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S "BAD FAITH" DEFENSE

Defendant's remaining defense presents a laundry list of alleged acts of bad faith by the Agent. However, two key items outside the pleadings are fatal to this defense. First, Defendant executed a dispositive Release in the Forbearance Agreements, and second, the Bankruptcy Court has already found that the Agent acted in good faith in an Order agreed to and executed by the Borrowers.

On a more fundamental level, however, Defendant misunderstands the covenant of good faith and fair dealing. The covenant does not impose freestanding equitable obligations on contracting parties. Rather, it is only applicable where express contractual provisions vest a party with discretion to control another party's *performance* under the contract (*i.e.,* repayment of the loan in this case). Even if the Defendant's allegations were true, here, there is no express contractual provision granting the agent discretion which controls the Borrowers' repayment of the loan. Rather, as described below, this is controlled by other factors, such as the success of

the Borrowers' businesses. Here, the Loan Documents imposed no obligation to extend further credit, and the Defendant specifically acknowledged this in the Forbearance Agreements. The Defendant speculates that if the Agent had only extended more credit to the Borrowers "in good faith" that it could have turned around its operations and repaid the loan, but as set forth below, the covenant of good faith and fair dealing imposes no such requirement.

Further, even where it is applicable, the covenant cannot be used to override express contractual provisions. Here, the Loan Documents and the Forbearance Agreements expressly permitted the Agent to refuse to extend credit and to take many of the other alleged acts of "bad faith." Finally, the defense is barred by Illinois law, including the Illinois Credit Agreement Act. Thus, even if these allegations had merit - and they do not - summary judgment is appropriate.

### A. The Borrowers Released All Defenses and Claims in Exchange for the Forbearance Agreements

Subsequent to the Borrowers and Guarantor's initial defaults, the parties entered into two Forbearance Agreements on March 31, 2009 and April 3, 2009, respectively. *Mizera Dec.*, ¶1(f), ¶1(g). In exchange for forbearance, the Defendant and the Borrowers expressly agreed to release all claims and defenses against the Agent, and disclaimed any defense to liability. Section 12 of the Forbearance Agreements provides:

> *Release*. [T]he Borrowers hereby release the Administrative Agent and each Lender . . . of and from any and all demands, actions, causes of action . . . and other claims of every kind or nature whatsoever . . . and each Borrower further acknowledges that, as of the date hereof, it **does not have any counterclaim, set-off, or defense** against the Released Parties, each of which such Borrower hereby expressly waives.

*See Forbearance Agmts.* at ¶12 (emphasis added) *Mizera Dec.*, Exs. 1(f) & 1(g). As the Defendant and the Borrowers have expressly released all their claims and defenses, the bad faith defense cannot serve as a defense to liability on the Guaranty.[8]

---

[8] Defendant includes some allegations of bad faith relating to a customer, General Mills, wherein the Agent allegedly refused to show a "willingness to work" with the Borrowers. Even if true, these allegations would be covered by the Release and would also fail for the reasons set forth in §§III.C-E below. Additionally, Defendant makes some sporadic allegations of abuse of unspecified "confidential information" by certain unnamed Lenders in the bank group (but not the Agent). These are also covered by the Release, do not allege any "bad faith" against the Agent (who is the plaintiff here), and bear no logical relationship to the obligations under the Guaranty at issue here.

Additionally, the Defendant and the Borrowers also separately waived this defense in the Guaranty and the Credit Agreement. *See Credit Agreement* §12.5; *Mizera Dec.*, Ex. 1. This waiver bars the defense. *See, Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995) (finding Illinois courts consistently enforce clear and unambiguous waivers in guarantees). As such, the Agent is entitled to summary judgment on this defense.

**B.    The Bankruptcy Court Has Already Ruled That the Agent Acted in Good Faith Toward the Borrowers, Precluding Guarantors From Relitigating This Issue**

Any remaining doubt about the Agent's conduct with respect to the Borrowers was recently disposed of in a ruling by the Bankruptcy Court overseeing the Borrowers' bankruptcy, in which it ruled that the Agent acted in good faith regarding the extension of credit to the Borrowers. *See Cash Collateral Order,* ¶15; *Heiser Dec.*, Ex. 2. This was an *agreed order* that was signed by the Chapter 11 Trustee for the Borrowers and the Official Committee of Unsecured Creditors. *Id.* at p. 19. Additionally, the Court also entered a separate order finding that the consideration received by the Borrowers for the sale of substantially all of their assets was "fair and reasonable" and that the sale was negotiated "in good faith, from arms-length bargaining positions and for good and fair value." *See Order Approving Going Concern Sale,* ¶10, ¶16; *Heiser Dec.*, ¶6. This Order was also signed by counsel for Mr. Salyer. *Id.* at p. 11. Mr. Salyer directly or indirectly controls the Defendant. *Facts,* ¶¶13-15; *Answer* ¶¶32, 35, 42. Also, in the order approving the Tenth Stipulation, the Court ruled that the Borrowers have no relevant claims against the Agent. *Heiser Dec.*, ¶12. Therefore, as the Bankruptcy Court has already ruled (with the Borrowers' Agreement) in its Cash Collateral Order and the Tenth Stipulation that the Agent acted in good faith toward the Borrowers and that the sale of the Borrowers' businesses was in "good faith" for fair and reasonable consideration, the Guarantor Defendant cannot relitigate purported "bad faith" toward the Borrowers here. *See, e.g., Brown v. City of Chicago,* 599 F.3d 772, 773 (7th Cir. 2010) (party in privity cannot relitigate previously adjudicated issues).

**C.    The Defense Is Barred by the Illinois Credit Agreement Act**

Defendant's argument that the Agent should have extended the loan in "good faith" is barred by the Illinois Credit Agreement Act, which provides that unless an agreement to renew

or extend credit is reduced to a signed writing setting forth the relevant terms and conditions, no affirmative defense or counterclaim can be raised.  815 ILCS 160/3(3).  The Illinois Credit Agreement Act bars claims or defenses by a debtor relating to credit agreements absent a written agreement and is construed broadly to prohibit all claims regarding extra-contractual representations, omissions, or conduct in a credit relationship.  *See LaSalle Bus. Credit v. Lapides,* 2003 WL 722237 *15 (N.D. Ill. 2003); *McAloon v. Northwest Bancorp, Inc.,* 274 Ill.App.3d 758, 765 (Ill. App. Ct. 1995) (Act bars claims relating to any reliance upon oral agreements associated with a credit facility).  Defendant cannot withstand summary judgment unless it can show a specific agreement of the Agent under a written document to approve payments or otherwise extend credit.  Additionally, as described below, a written agreement of the parties actually *terminated* the Agent's obligation to extend credit.

### D.   Defendant Cannot Use the Implied Covenant of Good Faith to Create a Duty to Extend Credit

The law is well settled that the implied covenant of good faith and fair dealing is neither an independent cause of action nor does it create contractual duties independent of the contract. *Brooklyn Bagel Boys v. Earthgrains Refrigerated Dough Prods., Inc.,* 212 F.3d 373, 381 (7th Cir. 2000).  Rather, "bad faith" is a term of art in contract law, which refers to one party's manipulation of *express contractual terms* in order to take commercial advantage of another party in a way that could not have been foreseen at the time the contract was drafted. *Zeidler v. A & W Rests., Inc.,* 301 F.3d 572, 574-75 (7th Cir. 2002) (emphasis added).  In other words, the requirement of good faith and fair dealing is a gap filler. *F.D.I.C. v. Rayman,* 1995 WL 505960 *8 (N.D.Ill. Aug. 23, 1995)  (plaintiff did not act in bad faith in doing what the express terms of guaranty entitled it to do.)  Accordingly, where the disputed issue in a contract is governed by express terms, there is no gap to be filled, and the covenant of good faith and fair dealing is inapplicable.  Moreover, allegations of bad faith may not be used to overrule or modify express contractual terms, and "parties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith" in doing so.  *PPM Fin. v. Norandal USA, Inc.,* 297 F.Supp.2d 1072, 1094 (N.D. Ill. 2004) (citing *Perez v. Citicorp Mortgage, Inc.,* 301 Ill.App.3d 413, 423-24 (Ill. App. Ct. 1998)).  Here, all of the relevant allegations of "bad

faith" relate to the Agent's refusal to extend new credit to the Borrowers or proposing conditions thereon, not to any express contractual discretion that was abused. *See, e.g.,* ¶¶ 3-10, 14-17, 19. Thus, the covenant of good faith in fair dealing is not implicated.[9]

### E.    The Parties Expressly Agreed That the Agent Had the Right to Terminate the Loan Commitments and that All of the Agent's Obligations to the Borrowers Had Terminated Permanently Before the Alleged "Bad Faith" Occurred

Under both the First and Second Forbearance Agreements (which were executed by the Defendant), the Borrowers and the Guarantor acknowledged and agreed that the Agent was permitted to refuse to extend further credit to the Borrowers and that events of default had occurred:

> *Acknowledgment of Default(s).* The Existing Defaults constitute Events of Default under the Credit Agreement. The Borrowers acknowledge that, because of the Existing Defaults, the Lenders are permitted and entitled under Sections 7.1 and 9.2 of the Credit Agreement to decline to provide further credit to the Borrower, to terminate the Commitments, to accelerate the Obligations, to enforce Liens granted under the Collateral Documents, and to exercise any other rights or remedies that may be available under the Loan Documents or under applicable law.

*See First Forbearance Agmt.,* ¶3; *Mizera Dec.,* ¶4, Ex. 1(f).[10]   Additionally, while the Agent agreed to limited forbearance and temporary use of cash collateral, this did not change the fact that the parties mutually agreed to terminate their lending relationship and that no further Borrowings would occur under the Loan Documents. For example, the parties agreed that "[u]pon the execution and delivery hereof, the Lenders hereby terminate the Revolving Credit

---

[9]    Additionally, while Illinois courts have yet to reach the issue, sister jurisdictions have held that a guarantor's breach of the contract/breach of good faith and fair dealing affirmative defenses belong to and can be asserted by the borrower alone where the defenses were premised on allegations of misconduct by lender *vis-a-vis* borrower. *See, e.g., Hotel 71 Mezz Lender LLC v. Mitchell,* 880 N.Y.S.2d 67, 69 (N.Y. App. Div. 2009). Rather, "a guarantee agreement is separate and distinct from the contract between lender and borrower, and thus a party who enters into an unconditional guarantee of payment may not assert setoffs or defenses which arise independently from the guarantee." *Marcus Dairy, Inc. v. Jacene Realty Corp.,* 225 A.D.2d 528, 528-29 (N.Y. App. Div. 1996).

[10]    Moreover, the parties also expressly agreed that the Agent would have no further obligation to extend credit of any kind to the Borrowers, including use of cash collateral, beyond April 10, 2009. *See Second Forbearance Agmt.,* ¶9, ¶F (noting April 10, 2009 was the Scheduled Standstill Expiration Date); *Mizera Dec.,* ¶1(g).   Since any obligation to extend credit terminated automatically on April 10, 2009 (at the latest), by agreement of the parties, the Agent had no "good faith" obligation to extend additional credit to the Borrowers.

Commitments [and] the Borrowers shall have no further right to request any Borrowings." *See First Forbearance Agmt.*, ¶5; *Mizera Dec.*, Ex. 1(f).

Under Illinois law, there is "a strong presumption against rewriting a contract to add provisions that the parties could have easily included but did not." *AM Int. Inv. v. Graphic Mgmt. Assocs., Inc.*, 836 F.Supp. 487, 490 (N.D. Ill. 1993), *aff'd* 44 F.3d 572 (7th Cir. 1995); *Resolution Trust Corp. v. Holtzman*, 248 Ill.App.3d 105, 112-13 (Ill. App. Ct. 1993). ("Parties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith. Express covenants abrogate the operation of implied covenants so courts will not permit implied agreements to overrule or modify the express contract of the parties." (internal citations omitted.))  Here, Defendant's allegations of "bad faith" are simply improper attempts to rewrite the Loan Documents and the Forbearance Agreements in a way that is more favorable to the Defendant and include obligations to provide new credit that were rejected by the Agent.

**F.    The Alleged Conduct Is Not "Bad Faith" Under Illinois Law**

As a matter of law, the alleged "bad faith" conduct does not violate the covenant of good faith and fair dealing. *See Cont'l Bank v. Modansky,* 997 F.2d 309, 313 (7th Cir. 1993) (forcing business shutdowns, defaults, and bankruptcy by cutting off credit does not violate duty of good faith and fair dealing "as a matter of law").  This is because a creditor is entitled to enforce the terms of its agreement without consideration of the interests of the borrower or their other creditors. *See Kahm & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1358 (7th Cir. 1990) ("Although Bank's decision left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first.").  Here, if the Borrowers were unhappy with the terms proposed by the Agent, they were free to seek credit elsewhere. As the Seventh Circuit has stated, "the proper recourse is to walk away from the bargaining table, not sue for 'bad faith . . .'" *LaSalle Nat. Bank v. Met. Life Ins. Co.*, 18 F.3d 1371, 1375 (7th Cir. 1994). Yet that is what Defendant attempts to do here:  accept the benefits of the credit extended by the

Agent under the Forbearance Agreements and other Loan Documents, but escape repayment by claiming bad faith.

**G.   The Agent Acted in Good Faith Toward the Borrowers**

The Agent bears no burden to show that it acted in "good faith" to obtain summary judgment. *See Celotex,* 477 U.S. 317 (1986) (defendant bears burden on affirmative defenses). Thus, in its Motion, the Agent has focused on how the alleged acts of bad faith cannot sustain this defense as a matter of law or are barred or contradicted by written agreements executed by the parties. However, the Agent notes that the record demonstrates that the Agent acted in good faith, and as described in Section III.B, *supra,* the Bankruptcy Court has so held. Out of an abundance of caution however, the Agent addresses the substantive allegations of the defense.

After news of the criminal investigation of the Borrowers regarding antitrust and misbranding surfaced, the Agent granted the Borrowers and Guarantor two Limited Waivers dated April 25, 2008 and July 31, 2008 regarding the criminal investigation, as it was an event of default under Section 7.1 of the Credit Agreement. *Mizera Dec.,* ¶4, Exs. 1(b) and 1(c). The Agent also granted another waiver on August 31, 2008 regarding the failure to produce Financial Statements as required by Sections 8.5(b), 8.5(i) and 9.1 of the Credit Agreement. *Mizera Dec.,* Ex. 1(d). Further, the Agent entered into that certain Second Amendment to the Credit Agreement dated September 15, 2008 whereby the Agent extended additional credit to meet the Borrowers' needs. *Mizera Dec.,* Ex. 1(e). Finally, as the criminal investigation intensified and the Borrowers failed to make payment when due under the Credit Agreement, the Agent agreed to two Forbearance Agreements in which it permitted temporary use of its cash collateral so the Borrowers could operate while they explored sale opportunities. *Mizera Dec.,* Exs. 1(f) and 1(g).

Subsequently, despite the actions of Mr. Salyer, the Agent provided use of over $14 million in cash collateral from February 2009 through the May 6, 2009 bankruptcy filing, and continued to fund critical vendors and other costs throughout the bankruptcies, including payroll, aggregating in excess of $3 million. *Mizera Dec.,* ¶70. This funding continues to this day through the Agent's permitted use of its cash collateral to the Borrowers in their bankruptcy cases to fund a wind down of their businesses. None of these acts were required under the Credit

Agreement, but were undertaken by the Agent in a good faith attempt to reach an amicable resolution of this dispute.

Also, in order to correct the false assertions in the affirmative defense, the Agent submits paragraphs 56-78 of the Mizera Declaration which describe in detail the Agent's dealings with the Borrowers, the Agent's work out attempts with the Borrowers and certain bad faith conduct on the part of the Borrowers and Guarantor. The Mizera Declaration also details how former insiders of the Borrowers attempted to use the exigencies of the 2009 packing season to engage in acts of self-dealing in order to extract payments to benefit themselves individually. For example, Mr. Salyer made a host of completely unreasonable demands of the Agent including a release of the Guaranty at issue in this case, a "legal defense fund" of $2 million cash for Mr. Salyer and the other officers, a $6 million cash payment, a release of liens on real estate in Lake Tahoe and Hawaii that Mr. Salyer had caused to be pledged to the Agent as collateral, and a "compensation plan" for current executives, among other things. *Mizera Dec.,* ¶60 and Ex. 19. Mr. Salyer's subsequent indictment only reinforces the reasonableness of the Agent's conduct.[11]

The Agent also attaches the Declaration of Paul Forgue of Alvarez & Marsal, which was submitted on behalf of the Agent in the bankruptcy case. *Forgue Dec.,* ¶6-22 & Ex. A thereto. (*Heiser Dec., at Ex.* 9.) Mr. Forgue recounts the dire condition of the Borrowers, the lack of any reliable financial reporting by the Borrowers, attempts to negotiate with Mr. Salyer and other matters showing the Agent's good faith. *Id.* Yet, in a demonstration of how no good deed goes unpunished, Defendant now claims "bad faith" despite receiving over a year of waivers and forbearance, additional credit, and other relief from the Agent. Even though Illinois law does not

---

[11]   According to the Salyer indictment, at all relevant times during his dealings with the Agent, Salyer was engaged in a secret scheme to defraud SK Foods' customers, which involved bribing personnel in SK Foods' customers' purchasing departments to purchase SK Foods' products, which were often so full of mold that they were not salable in the United States. *FBI Aff.* ¶68-86; *Heiser Dec.* ¶13. When confronted by a subordinate about the introduction of the misbranded product into the food supply through this scheme, Salyer is alleged to have responded "You can take your ethics book and shove it up your ass. We have always manipulated inventory and will continue to. **We will lie to anyone outside the circle,** but not to each other." *Id.* at ¶78 (emphasis added). Yet the Defendant suggests that the Agent acted in "bad faith" by not giving in to Mr. Salyer's demands after the scandal broke. While the Agent does not seek to litigate the criminality of Mr. Salyer's conduct in this straightforward breach-of-contract case, and the defense is barred as a matter of law for the reasons set forth above, the Agent informs the Court of these criminal allegations to show that even if the other flaws in this defense were overlooked, no trier of fact could ever conclude that the Agent acted in "bad faith" under these circumstances.

require *any* forbearance, the fact that the Agent worked with and funded the Borrowers for over a year after the bribery and mislabeling scandal broke shows nothing but good faith.

CONCLUSION

All of the material allegations of the Complaint have been admitted or not denied in Defendant's Answer.  To raise a genuine issue on the "bad faith" affirmative defense, the Defendant must do more than simply show that there is some metaphysical dispute regarding the Agent's conduct.  Rather, Defendant must introduce admissible evidence establishing that the alleged "bad faith" is a cognizable defense to liability on the Guaranty.  As described above, for at least five independent reasons, the "bad faith" defense fails.  First, it has been released by the Defendant and the Borrowers in two forbearance agreements.  Second, the Bankruptcy Court overseeing the Borrowers' bankruptcy has already ruled that the Agent acted in "good faith." Third, the Illinois Credit Agreement Act bars the defense in this instance.  Fourth, the defense is barred by express contractual provisions, which cannot be overridden under the guise of "good faith."  Finally, while Defendant has misapplied the duty of good faith under Illinois law, the record shows that the Agent has acted in "good faith" in its dealings with the Defendant and the Borrowers in even the general sense posited by the Defendant despite numerous criminal allegations against the Borrowers and their principals.  Therefore, the Agent respectfully submits that it is entitled to summary judgment in this matter.

DATED this 7th day of May 2010.

Respectfully submitted,

CHAPMAN AND CUTLER LLP

By:_____/s/ James Heiser_____

James E. Spiotto (ARDC #2690721)
James M. Heiser (ARDC #6280191)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000
Attorneys for Bank of Montreal, as
Administrative Agent

# RJN
# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BANK OF MONTREAL, as administrative agent, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 09-CV-03479 |
| SK FOODS, LLC, a Nevada limited liability company, | ) ) ) | Judge Gottschall |
| Defendant. | ) | |

**ATTORNEY SCOTT M. LEVIN'S MOTION TO WITHDRAW
AS DEFENDANT'S COUNSEL**

NOW COMES Scott M. Levin and respectfully moves this Court for leave to withdraw his appearance on behalf of Defendant, SK Foods, LLC, pursuant to Local Rule 83.51.7, due to a professional conflict of interest, as detailed in the Declaration of Scott M. Levin submitted in support of this motion.

Respectfully submitted,

SK FOODS, LLC

/s/ Scott M. Levin
Scott M. Levin

Scott M. Levin, ARDC #6185743
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/456-3418

#1637901-v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

BANK OF MONTREAL, as administrative )
agent,                                )
              Plaintiff,           )
                           )
           v.                          )      No. 09-CV-03479
                           )
SK FOODS, LLC, a Nevada limited       )      Judge Gottschall
liability company,                    )
              Defendant.            )

## DECLARATION OF SCOTT M. LEVIN IN SUPPORT OF
## HIS MOTION TO WITHDRAW AS DEFENDANT'S COUNSEL

I, Scott M. Levin, state under the penalties of perjury as follows:

1.      I am a member of Howard & Howard Attorneys PLLC.  I was retained to represent Defendant, SK Foods, LLC in August 2009.

2.      On November 13, 2009, Plaintiff, Bank of Montreal's motion to strike affirmative defenses was granted in part and denied in part.  Subsequent to that date, the parties to this lawsuit and related entities involved in *In Re SK Foods, L.P.*, pending in the United States Bankruptcy Court for the Eastern District of California, were involved in negotiations to resolve all matters, including the instant action.

3.      On January 26, 2010, Scott C. Frost became a member of Howard & Howard Attorneys PLLC.  Attorney Frost had been representing Harris Bank, N.A., prior to his membership in Howard & Howard.  Attorney Frost and other attorneys have continued to represent Harris Bank.  I have never represented Harris Bank.

4.      While reviewing documents produced by Plaintiff in this matter, I saw references to Harris Bank.  On Thursday, July 22, 2010, I spoke with Attorney Frost who informed me that Plaintiff the parent company of Harris Bank, N.A. I immediately contacted Defendant to advise

#1637907-v1

of the conflict and Attorney Frost immediately communicated with Harris Bank. I advised Scott Salyer, a principal of Defendant, of the nature of the conflict and inquired if he wanted to waive the conflict. Malcolm Segal, an attorney representing Mr. Salyer on other matters, spoke with Mr. Salyer on Friday, July 23, 2010, after which Attorney Siegel told me that Defendant would make a final decision on Monday, July 26, 2010.

5. On the afternoon of July 26, 2010, Attorney Malcolm Siegel contacted me to communicate Defendant's direction that I withdraw as its attorney in this matter.

6. Pursuant to Local Rule 83.51.7, "Conflict of interest: General Rule," a lawyer shall not represent a client if the representation of that client will either be directly adverse to another client or may be materially limited by the lawyer's responsibilities to another client, without the consent of each client after disclosure. Defendant has refused its consent and I am required to withdraw.

Respectfully submitted,

SK FOODS, LLC

/s/ Scott M. Levin
Scott M. Levin

Scott M. Levin, ARDC #6185743
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/456-3418

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BANK OF MONTREAL, as administrative agent, | ) | |
| Plaintiff, | ) | |
| | ) | No. 09-CV-03479 |
| v. | ) | |
| | ) | Judge Gottschall |
| SK FOODS, LLC., a Nevada limited liability company, | ) | |
| Defendant. | ) | |

## MOTION TO WITHDRAW

NOW COMES Stephanie A.S. Stinton ("Stinton"), as attorney for Defendant SK Foods, LLC, respectfully requests that this Court grant her leave to withdraw as attorneys for Defendant. In support of this Motion, Counsel states as follows:

On October 21, 2009, Stinton filed her appearance on behalf of Defendant in the captioned matter.

Attorney Scott M. Levin of Howard & Howard Attorneys PLLC continues to represent Defendant in this matter, but Stinton no longer works on this case and wishes to withdraw her appearance as counsel on Defendant's behalf.

This motion is not being brought for the purpose of delay.

WHEREFORE, Stephanie A.S. Stinton respectfully moves this Court for leave to withdraw as attorney for Defendant SK Foods, LLC, and for such other relief as this Court deems appropriate and necessary.

HOWARD & HOWARD ATTORNEYS PLLC

/s/Stephanie A.S. Stinton
Stephanie A.S. Stinton

Stephanie A.S. Stinton (ARDC #6293894
Howard & Howard Attorneys LLC
200 S. Michigan Ave., Suite 1100
Chicago, Illinois  60604
Tel.: 312/372-4000

#1634738-v1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BANK OF MONTREAL,  )
                                                )
            Plaintiff,                    )
                                                )
      v.                                      )      Case No. 1:09-cv-03479
                                                )
SK FOODS, LLC,                    )      Honorable Joan B. Gottschall
                                                )
            Defendant.              )

## ORDER

This cause coming on to be heard on Stephanie A.S. Stinton's Motion to Withdraw, due notice having been given and the Court being fully advised in the premises,

IT IS HEREBY ORDERED that Stephanie A.S. Stinton is hereby granted leave to withdraw as counsel for SK Foods, LLC.

ENTERED:

_____

Judge

Date: _____, 2010

Stephanie A.S. Stinton (ARDC #6293894)
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel.: 312/372-4000

#1634768-v1

# RJN
# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANK OF MONTREAL, | ) | |
| as Administrative Agent, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 3479 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| SK FOODS, LLC, | ) | |
| a Nevada Limited Liability Company, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Bank of Montreal (the "Bank") brought this action as agent for several lenders (the "Lenders"), seeking to collect from SK Foods, LLC (the "Guarantor") over $190 million that the Bank loaned to SK Foods, L.P. and RHM Industrial/Specialty Foods, Inc. (collectively, the "Borrowers"). Presently before the court is the Bank's Motion for Summary Judgment. (Doc. 35.)

### I. BACKGROUND

The Bank filed its Motion for Summary Judgment on May 7, 2010. (*Id.*) The court set a briefing schedule in which it allowed the Guarantor until June 9, 2010 to file its response. (Doc. 41.) On the day before its response was due, the Guarantor moved for an extension of time, which the court granted, giving the Guarantor until July 16, 2010 to file its response, and indicating that no further extensions would be given. (Doc. 48.) On July 6, 2010, the Guarantor again moved for an extension of time, which the court granted, giving the Guarantor until July 26, 2010 to file its response. (Doc. 60.) On July 26, 2010, the Guarantor's lead counsel moved to withdraw, citing a conflict of

interest.  (Doc. 68)  The court granted the motion (Doc. 71), but noted that it would not extend the then-expired briefing schedule for the Guarantor to obtain new counsel.

Since then, the Guarantor has not appeared through new counsel, and has not made any attempt to file a response to the instant motion.  In compliance with Local Rule 56.1, the Bank filed with its motion a statement of material facts for which there is no genuine issue.  (Doc. 37.)  When the non-movant fails to respond to such a statement of fact, it is within the court's discretion to deem the facts admitted.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922-23 (7th Cir. 1994).  In light of the Guarantor's repeated failure to respond timely to the Bank's motion, the court deems the Bank's facts admitted.

On September 28, 2007, the Borrowers, the Bank, and the Guarantor all signed a Credit Agreement.  On the same day, the Borrowers and the Guarantor separately executed a Security Agreement, pledging substantially all of their assets to the Bank to secure their obligations under the Credit Agreement.  The parties entered into several amendments of the Credit Agreement, as well as several notes, pursuant to which the Borrowers borrowed over $190 million.  In March 2009, the Borrowers defaulted on the Credit Agreement but, the Guarantor, the Borrowers, and the Bank entered into a series of three forbearance agreements to give the Borrowers some time to pay back their debt.  On April 16, 2009, after the periods of forbearance expired without the Borrowers' satisfaction of their debt, the Bank terminated its obligation to extend credit to the Borrowers, accelerated all of the Borrowers' obligations, and demanded from the Borrowers and the Guarantor payments of all amounts due and owing under the Credit

Agreement. Both the Borrowers and the Guarantor refused payment and performance of the obligations. The Bank then brought this suit.

## II.  LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010); *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009). In evaluating a motion for summary judgment, the court must first determine whether the movant has demonstrated the absence of a genuine issue of material fact and so is entitled to judgment as a matter of law. *See Beard v. Banks*, 548 U.S. 521, 529 (2006). If the movant has done so, the court next inquires whether the non-movant has established a genuine issue of material fact precluding summary judgment. *Id.*; *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999). If not, then the court should enter judgment as a matter of law. *Beard*, 548 U.S. at 529. The defendant bears the burden of establishing its affirmative defense. *Zenith Elecs. Corp. v. Panalpina, Inc.*, 68 F.3d 197, 201 (7th Cir. 1995).

## III.  ANALYSIS

The Bank brought claims for breach of contract and foreclosure of security interest, and seeks summary judgment on each claim.

3

## A.     Breach of Guaranty

The Bank argues that it is entitled to a judgment for breach of the guaranty.  In analyzing the Bank's assertions, the court considers: (1) whether a contract existed; (2) whether the contract was breached; and (3) whether the guaranty also was breached.  As in other diversity cases, the court applies the law of the forum state, Illinois.  *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008).

### 1.     Existence of a Contract

An enforceable contract requires: "(1) offer and acceptance; (2) definite and certain terms; (3) consideration; and (4) performance of all required conditions."  *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 937 (Ill. App. Ct. 2007).  In this case, the parties agree that the Borrowers and the Guarantor executed the Credit Agreement (Stmt.[1] ¶ 6; Ex. B-1), which was subsequently amended and restated by later agreements (Stmt. ¶¶ 13-14), and the Security Agreement (Ex. B-5).  Each agreement sets forth definite terms.  The Borrowers then borrowed over $190 million from the Agent pursuant to the Credit Agreement.  (*Id.* ¶ 5.)  The evidence produced by the Bank also establishes that it completed all required conditions, and more, including agreeing to forbear from collecting on the Borrowers' default.  Thus, the Bank has established that it entered into an enforceable contract, the Credit Agreement and its amendments, with the Borrowers and the Guarantor.

### 2.     Breach of Contract

"To succeed on a claim for breach of contract, a plaintiff must plead and prove (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a

---

[1]     Citations to "Stmt." refer to the Bank's Statement of Material Facts, and citations to "Ex." refer to exhibits attached thereto.

breach by the defendant, and (4) damages as a result of the breach." *Roberts v. Adkins,*

921 N.E.2d 802, 810 (Ill. App. Ct. 2010).  As noted above, the Bank has established the

existence of a contract and that it has performed its necessary conditions.  The Bank also

has demonstrated that the Borrowers failed to make payments when due (Stmt. ¶ 9), and

that the Guarantor also failed to make payments (*id.* ¶ 10).  The uncontradicted evidence

further establishes that the Borrowers failed to make several additional payments that

they owed pursuant to loans executed pursuant to the Credit Agreement.  (*Id.* ¶¶ 29-32,

36-39.)  These failures constituted "Events of Default" within the meaning of the Credit

Agreement.  (*Id.* ¶ 33.)  Nevertheless, both the Borrowers and the Guarantor refused to

make payment on the amounts owing.  (*Id.* ¶¶ 34-35.)

     The Bank also has established that it loaned over $190 million to the Borrowers.

While, as explained within, it has not produced evidence of the specific value of its

damages, the Bank has established that the Borrowers breached the agreements, and that

the Bank suffered some damages by virtue of the Borrower's and the Guarantor's failure

to make payments when due.

     3.   <u>Breach of Guaranty</u>

     Last, the Bank seeks to establish that the Guarantor breached its obligation under

the Credit Agreement to provide a guaranty for the Borrowers' indebtedness.  Under

Illinois law, a suit on a guarantee requires that the plaintiff "enter[] proof of the original

indebtedness, the debtor's default and the guarantee." *Mid-City Indus. Supply Co. v.

Horwitz,* 476 N.E.2d 1271, 1277 (Ill. App. Ct. 1985); *see also Gen. Elec. Bus. Fin. Servs.,

Inc. v. Silverman,* No. 09 C 0364, 2010 U.S. Dist. Lexis 11622, at *6 (N.D. Ill. Feb. 10,

2010) (quoting *Mid-City*); *Fifth Third Bank (Chicago) v. Stocks,* No. 09 C 3463, 2010

WL 2654744, at * 2 (N.D. Ill. July 1, 2010) (quoting *Silverman*). Where, as here, the guaranty was executed at the same time as the original obligation, no separate consideration for the guaranty is required. *See Tower Investors, LLC*, 864 N.E.2d at 937 (citing, *inter alia*, Restatement (Third) of Suretyship and Guaranty § 9, Comment a, at 35 (1996) ("Typically, the consideration supporting the underlying obligation will also support the secondary obligation and no separate consideration is necessary.").) Here, as described above, the Bank has produced evidence of the original indebtedness (the valid, enforceable Credit Agreement and amendments thereto), and the Borrowers' default (due to non-payment and non-compliance with the forbearance agreements). The Bank also has produced evidence of the Guarantor's agreement to the guaranty by its execution of the Credit Agreement. Last, the Bank has produced evidence that the Guarantor failed to make payment on the guaranty when demanded. The Bank has established each of the elements of its breach of guaranty as a matter of law.

**B.     Foreclosure on Collateral**

The Bank also moves for summary judgment on its claim seeking foreclosure on its security interest in the Guarantor's property. According to the undisputed facts, in 2006 the Bank filed a UCC Financing Statement with the Nevada Secretary of State[2] "covering all right, title and interest in and to all of the personal property and fixtures of the Guarantor, whether now owned or existing or hereafter created, acquired, or arising." (Stmt. ¶ 48.) Then, on September 28, 2007, the same day that it executed the Credit Agreement, the Guarantor executed the Security Agreement in favor of the Bank, pledging substantially all its assets as security for its obligations under the Credit

---

[2]     The Guarantor is a Nevada limited liability company. (Stmt. ¶ 2.)

6

Agreement, the amendments thereto, and any notes executed pursuant to the Credit

Agreement. (*Id.* ¶ 47.) The Guarantor is in default on at least one of its obligations under

the Credit Agreement (*id.* ¶ 50), and has refused to surrender possession of the pledged

collateral despite the Bank's demand (*id.* ¶ 51).

> An Illinois appellate court recently explained:
>
> Illinois law defines a "security interest" as "an interest in personal
> property * * * which secures payment or performance of an obligation."
> 810 ILCS 5/1-201(37) (West 2006). By creating a security interest through
> a security agreement, a debtor provides that a creditor may, upon default,
> take or sell the property-or collateral-to satisfy the obligation for which the
> security interest is given. 810 ILCS 5/9-103(12) (West 2006)
> ("'Collateral' means the property subject to a security interest," and
> includes accounts and chattel paper which have been sold); *Smith v. The
> Cash Store Management, Inc.,* 195 F.3d 325, 329 (7th Cir.1999) (applying
> Illinois law).

*Randle v. AmeriCash Loans, LLC*, No. 1-09-2318, 2010 WL 3001366, at *4 (Ill. App. Ct.

July 30, 2010). After default, a secured party can seek judicial assistance in retaking

possession of collateral. 810 Ill. Comp. Stat. § 5/9-609. Here, the Borrowers and the

Guarantor, by executing the Security Agreement, gave the Bank a security interest in

substantially all their property. (*See generally* Ex. B-5.) The Borrowers and the

Guarantor then defaulted, entitling the Bank, which is a secured party, *see* 810 Ill. Comp.

Stat. § 5/9-102, to foreclose upon its security interest.

## C.   Bad Faith

In its answer, the Guarantor asserted affirmative defenses of duress, mistake, and

bad faith. The Guarantor subsequently withdrew its duress affirmative defense, and the

court struck the mistake affirmative defense. The Guarantor bears the burden at this

stage of demonstrating sufficient evidence to support its remaining affirmative defense of

bad faith. *Zenith Elecs.*, 68 F.3d at 201. By not responding to the motion for summary

judgment, the Guarantor has failed to produce any evidence of bad faith, and its lone remaining affirmative defense fails.

## IV.  CONCLUSION

For the foregoing reasons, the Bank's motion for summary judgment is granted in part.  The court enters judgment in favor of the Bank and against the Guarantor on Counts I and II of the Bank's complaint.  The court orders (1) the foreclosure of the Bank's interest in the collateral described in the Security Agreement, and (2) the Guarantor to assemble the collateral.  810 Ill. Comp. Stat. § 5/9-609(c).  The court also finds that the Bank has power of attorney to execute documents in the Guarantor's name, as the Security Agreement entitles it to do.  (Ex. B-5 at 16.)

However, the court declines to award further relief at this time due to deficiencies in the Bank's briefing.  For example, while the Bank prays for the entry of judgment in the amount of $136,765,858.91, it has produced no evidence regarding the specific amount of damages it has incurred.  Moreover, the Bank requests an award of attorneys' fees and costs, to which the Security Agreement entitles it, but produces no evidence of such fees.

This case is set for a status hearing on September 14, 2010.  If the Bank wishes to prove the amount of its judgment at that hearing, it must give at least three days notice to the Guarantor by the best means practicable, given the Guarantor's counsel's withdrawal.

ENTER:

                             /s/

                          JOAN B. GOTTSCHALL
                          United States District Judge

DATED: August 19, 2010

# RJN
# EXHIBIT E

1   IN RE:

2   SK FOODS, L.P.

3           Debtor.

4   BRADLEY SHARP,                          CIV. NO. S-10-1500 LKK

5           Plaintiff,

6           v.

7   SCOTT SALYER, et al.,                        O R D E R

8           Defendants.

9   _____/

10      Before the court are several appeals of an order of the

11  Bankruptcy Court denying Appellants' motion for a stay of

12  proceedings pending resolution of a related criminal matter also

13  before this court, U.S.A. v. Salyer, No. 2:10-cr-00061-LKK. The

14  Appellee moves to dismiss the appeal on jurisdictional grounds and

15  opposes the appeal on the merits. For the reasons described below,

16  the order of the Bankruptcy Court is reversed.

17                          I. BACKGROUND

18      A.    The Criminal Proceeding

19      On January 5, 2010, the government filed a sealed complaint

20  against Frederick Scott Salyer ("Salyer"). An arrest warrant was

21  issued by a magistrate judge later that day. On February 4,

22  2010, Federal Bureau of Investigations ("FBI") officers arrested

23  Salyer. On February 18, 2010, the U.S.A. filed an indictment.

24      On April 29, 2010, the government filed a superseding

25  indictment. It brings twelve counts and two forfeiture

26  allegations against Salyer. These include two counts under 18

                                3

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page56 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 128 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 4 of 23

1  U.S.C § 1962(c) for conducting and conspiring to conduct the

2  affairs of an enterprise though a pattern on racketeering

3  activity, three counts under 18 U.S.C. § 1343 for wire fraud,

4  one count under 18 U.S.C. § 1519 for destruction, alteration, or

5  falsification of records in a federal investigation, and five

6  counts under 15 U.S.C. § 1 for conspiracy in restraint of

7  trade.[1]

8       With respect to the first count of racketeering, the

9  government alleges that Salyer was the primary leader of SK

10 Foods. Superceding Indictment 3. It claims that Salyer was part

11 of an enterprise that, *inter alia*, "increas[ed] SK Foods'

12 profits by fraudulently inducing certain of SK Foods' customers

13 to pay for adulterated and misbranded processed tomato products

14 by causing the falsification of . . . grading factors and data

15 contained on the quality control documents that accompanied

16 customer-bound shipments of processed tomato products that were

17 produced, purchased, and sold by SK Foods . . . ." Id. at 10.

18 The U.S.A. alleges that Salyer engaged in these activities from,

19 approximately, January 1998 through April 2008. Id. at 13. The

20 government further alleges numerous acts that it claims

21 constitute a pattern of racketeering activity. These include

22 several claims of wire and mail fraud relating to the sale of

23 tomato products to various entities, including creditors in the

24

_____

25      [1] As is almost self evident the court has found the case
   complex within the meaning of the Speedy Trial Act, which results
26 in the case not subject to the time strictures of the act.

4

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page57 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 129 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 5 of 23

1   instant bankruptcy proceedings, and claims of bribery.

2        In the second count of racketeering, the government claims

3   that Salyer conspired with persons employed by and associated

4   with SK Foods to conduct the acts described above during the

5   same time period. Id. at 39-40.

6        The three counts of wire fraud include communications to

7   purchasers of SK Foods' tomato product. Id. at 40-49. Each

8   concerns allegations of bribery of certain employees of the

9   purchasing companies. These companies include creditors in the

10  instant bankruptcy proceedings.

11       With respect to the count of destruction, alteration, or

12  falsification of records in a federal investigation, the

13  government alleges that Salyer altered and falsified, or caused

14  others to alter and falsify, the minutes of a December 14, 2007

15  Board of Directors meeting for the SK Foods Entities. Id. at 51.

16  It claims that he caused the removal of references to Randy

17  Rahal as a Director and Officer of SK Foods several months after

18  Rahal pled guilty to a three count information in this court.

19  Id. at 50. The factual basis for Rahal's plea indicated that he

20  served on the SK Foods Board of Directors from 2004 to 2008 and

21  routinely paid bribes on behalf of SK Foods. Id. at 50-51.

22       The five counts of price fixing concern alleged

23  conspiratorial activity to fix the price of SK Foods tomato

24  products for several companies, including creditors in the

25  instant bankruptcy proceedings. Id. at 52-61.

26       The two forfeiture allegations seek recovery of all real

5

1   and personal property that constitute or is derived from the

2   proceeds traceable to the racketeering and wire fraud counts,

3   which would apparently include property and proceeds otherwise

4   subject to the bankruptcy proceeding.

5       **B.    The Bankruptcy Proceedings**

6       On appeal is an order of the Bankruptcy Court denying

7   Appellants' motion to stay proceedings in seven adversarial

8   actions. These include (1) an action to substantively

9   consolidate various non-debtor SK Foods entities with the SK

10  Foods estate, No. 10-02014; (2) an action to avoid a fraudulent

11  transfer of a drum line to CSSS, an Appellant entity, pursuant

12  to a written contract, No. 09-02543; (3) an action seeking title

13  to three parcels of real property on the grounds that SK Foods

14  provided funds for the purchase of the property and was not

15  repaid, No. 09-02692; (4) a claim of breach of fiduciary duty

16  against Salyer premised on the allegations in the previous three

17  actions, No. 10-02015; (5) an action to avoid allegedly

18  preferential and fraudulent transfers, No. 10-02016; (6) an

19  action to recover money that was allegedly loaned by SK Foods to

20  Salyer to pay for a life insurance policy, No 10-02017; and (7)

21  an action for substantive consolidation of the SK Foods and the

22  RHM Estates, No. 09-29162. The RHM Estates are not parties to

23  this appeal.

24      **C.    Procedural Posture**

25      On April 28, 2010, Salyer, the Scott Salyer Revocable

26  Trust, SK PM Corp., SKF Canning, LLC, Blackstone Ranch

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page59 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 131 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 7 of 23

1  Corporation, Monterey Peninsula Farms, LLC, Salyer Management

2  Company, LLC, SK Farms Services, LLC, SK Frozen Foods, LLC, SS

3  Farms, LLC, SSC Farms I, LLC, SSC Farms II, LLC, SSC Farms III,

4  LLC, SKF Aviation, LLC, CSSS, LP, Fred Salyer Irrevocable Trust,

5  and Gerard Rose as Trustee of Fred Salyer Irrevocable Trust

6  ("Appellants") filed a motion to stay the seven adversary

7  proceedings discussed above pending resolution of the criminal

8  proceedings against Salyer. They argued that a stay should be

9  issued, *inter alia*, to protect Salyer's Fifth Amendment rights

10  and the due process rights of the other Appellants who, they

11  contend, require Salyer's testimony to mount a defense to the

12  adversary proceedings. On May 4, 2010, Appellants filed in the

13  bankruptcy proceedings a request for judicial notice of the

14  Superceding Indictment of Salyer, which was filed on April 29,

15  2010. They did not attempt to amend or revise their motion in

16  light of the Superceding Indictment.

17    On May 12, 2010, the Official Committee of Unsecured

18  Creditors filed an opposition to Appellants' motion to stay.[2]

19  Also on May 12, 2010, Bradley Sharp, the Bankruptcy Trustee

20  ("Appellee" or "Trustee") filed a response to the motion to

21  stay. The Trustee argued, *inter alia*, that the indictment and

22  the adversary proceedings are not based on the same matter or

23  same or closely related facts, that prosecution of the adversary

24  proceedings will not impair Salyer's Fifth Amendment rights, and

25

26      [2] Only the Trustee has opposed the instant appeal.

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page60 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 132 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 8 of 23

1  that a stay is otherwise not appropriate.

2      On June 1, 2010, the Bankruptcy Court denied Appellants'

3  motion for a stay. It decided, *inter alia*, that, with one minor

4  exception, the factual allegations in the adversary proceedings

5  bear no significant relationship to the allegations in the

6  indictment. The court continued to balance the so-called Keating

7  factors, from which it determined that a stay of proceedings was

8  not proper. See infra Section III.B.1 (discussion of Keating

9  factors). This order was issued in all of the seven adversarial

10 proceedings discussed above.

11     On June 16, 2010, Appellants filed notices of appeal of

12 this order in each of the seven proceedings. On June 17, 2010,

13 Salyer filed in the criminal action an Emergency Application to

14 Enjoin and Stay Discovery of the bankruptcy proceedings. On June

15 18, 2010, the court temporarily stayed discovery in the

16 bankruptcy proceedings in light of the June 17, 2010 motion. On

17 August 3, 2010, the court held a hearing on the emergency

18 application. As a result of the hearing, the court continued the

19 stay until resolution of the instant appeals.

20     On August 4, 2010, Appellants filed an opening brief. They

21 argue that, *inter alia*, the criminal indictment and the

22 adversary proceedings overlap, that the denial of the stay

23 offends the due process rights of the non-debtor entities, and

24 that the Bankruptcy Court did not properly apply the Keating

25 factors. On August 19, 2010, the Trustee filed a brief in

26 opposition. He contended that the Appellants failed to show that

1    the Bankruptcy Court abused its discretion in denying the stay

2    of proceedings. Appellants filed a reply on August 3, 2010.

3         The Trustee also filed two motions relating to the appeals.

4    First, on August 16, 2010, the Trustee filed a motion to dismiss

5    the appeals on the grounds that the court lacks jurisdiction to

6    hear them. Second, the Trustee filed a motion to strike a

7    declaration filed in support of Appellants' brief on the ground

8    that the evidence was not presented to the Bankruptcy Court. The

9    court heard oral argument on the appeals and motions on October

10   12, 2010.

11                          **II. STANDARD**

12        The standard of review of bankruptcy court decisions by

13   district courts is well-established, and uncontested in the

14   instant action. See Appellants' Opening Brief re: Stay at 4;

15   Appellants' Opening Brief re: Preliminary Injunction at 2;

16   Appellee's Opening Brief re: Stay at 2-3. When reviewing

17   decisions of a bankruptcy court, district courts apply standards

18   of review applicable to the courts of appeals when reviewing

19   district court decisions. In re Baroff, 105 F.3d 439, 441 (9th

20   Cir. 1997); see also In re Fields, No. CIV. S-09-2930 FCD, 2010

21   WL 3341813, *2 (E.D. Cal. 2010) ("A district court's standard of

22   review over a bankruptcy court's decision is identical to the

23   standard used by circuit courts reviewing district court

24   decisions.") (citation omitted).

25        The bankruptcy court's conclusions of law are reviewed *de*

26   *novo*. In re Sunnymead Shopping Center Co., 178 B.R. 809, 814

9

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page62 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 134 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 10 of 23

1  (9th Cir. 1995) (citing In re Pecan Groves of Arizona, 951 F.2d

2  242, 244 (9th Cir. 1991)). District courts review the bankruptcy

3  court's findings of fact for clear error. In re Sunnymead

4  Shopping Center Co., 178 B.R. at 814 (citing In re Siriani, 967

5  F.2d 302, 303-04 (9th Cir. 1992)); see also Fed. R. Bank. P.

6  8013 ("Findings of fact, whether based on oral or documentary

7  evidence, shall not be set aside unless clearly erroneous . . .

8  .")

9        District courts review a "bankruptcy court's choice of

10 remedies . . . for an abuse of discretion, since it has broad

11 equitable remedial powers." In re Sunnymead Shopping Center Co.,

12 178 B.R. at 814 (citing In re Goldberg, 168 B.R. 382, 284 (9th

13 Cir. 1994) (other citations omitted.). The Ninth Circuit has

14 held that, "Under this standard, 'a reviewing court cannot

15 reverse unless it has a definite and firm conviction that the

16 court below committed a clear error of judgment in the

17 conclusion it reached upon a weighing of the relevant factors."

18 In re Sunnymead Shopping Center Co., 178 B.R. at 814 (quoting In

19 re Goldberg, 168 B.R. at 384). With respect to review of a

20 denial of a motion to stay, district courts review a bankruptcy

21 court's "ruling on a party's request to stay proceedings for an

22 abuse of discretion." Fed. Sav. & Loan Ins. Corp. v. Molinaro,

23 889 F.2d 899, 902 (9th Cir. 1989) (citing Mediterranean

24 Enterprises, Inc. v. Ssangyong Corp., 708 F.2d 1458, 1465 (9th

25 ////

26 ////

1   Cir. 1983)).[3]

2                           **III. ANALYSIS**

3       **A.   Motion to Dismiss**

4          The Trustee moves to dismiss the instant appeal on the

5   grounds that this court lacks jurisdiction to hear it.[4]

6   Specifically, the Trustee contends that the order denying the

7   stay is not a final order and is not appropriate for

8   interlocutory review. Appellants argue that this court has

9   jurisdiction because this order is final under the irreparable

10  injury doctrine and the pragmatic approach to assessing finality

11  in bankruptcy proceedings. They further argue that the appeal is

12  properly subject to interlocutory review.

13         Under 28 U.S.C. § 158(a), "district courts . . . have

14  jurisdiction to hear appeals . . . with leave of the court, from

15  interlocutory orders and decrees, of bankruptcy judges entered

16  in cases and proceedings referred to the bankruptcy judges under

17

18

19         [3] It appears to this court quite odd that district courts
    review decisions of bankruptcy courts in this manner given that
20  bankruptcy courts are a subsidiary division of district courts. It
    may be that the restricted standards of review are merely a way of
21  protecting both courts from unnecessary repetition of frivolous
    contentions, and that in more serious matters district courts
22  should not apply such a deferential review. Nonetheless, this court
    does not consider whether district courts may depart from this
23  standard of review in unusual circumstances because all parties
    agree as to the applicable standard and there appears to be no
24  support for that position, in any event.

25         [4] The Trustee has also moved to strike a declaration filed in
    support of the appeal. The court will consider this motion along
26  with its discussion of the merits of the appeal itself.

                                  11

1   section 157 of this title."[5] Section 157 allows district courts

2   to refer any or all cases under title 11 to a bankruptcy court.

3   The district court here so referred the instant matters on

4   appeal to the bankruptcy court. Accordingly, district courts

5   have "discretionary appellate jurisdiction over . . .

6   interlocutory order[s] of a bankruptcy court." In re Kassover,

7   343 F.3d 91, 94 (2d Cir. 2003); see Matter of Texas Extrusion

8   Corp., 844 F.2d 1142, 1156 (5th Cir. 1988) (same); In re

9   Laurent, 149 Fed. Appx. 833, 835 (11th Cir. 2005); see also

10   Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 441 n.1

11   (9th Cir. 1983) (interpreting similar language that was part of

12   28 U.S.C. § 1334(b) prior to 1984 modification).

13       This type of appellate jurisdiction differs significantly

14   from the jurisdiction granted to Courts of Appeal to hear

15   appeals of interlocutory orders. See In re Kassover, 343 F.3d at

16   94; Fondiller, 707 F.2d at 441 n.1. Specifically, the district

17   court maintains original jurisdiction over bankruptcy

18   proceedings, and merely refers such proceedings to bankruptcy

19   courts. In re Combustion Engineering, Inc., 391 F.3d 190, 225

20   (3d Cir. 2004) (citing 28 U.S.C. §§ 151, 157(a)); 28 U.S.C. §

21   1334(b) ("[T]he district courts shall have original but not

22

23       [5] The court notes that Appellants did not file a motion for
24   leave to appeal the denial of their motion for a stay of
proceedings. Under Fed. R. Bank. 8003(c), "If a required motion for
leave to appeal is not filed, but a notice of appeal is timely
25   filed, the district court . . . may consider the notice of appeal
as a motion for leave to appeal." The court so considers the notice
26   of appeal in this case.

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page65 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 137 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 13 of 23

1    exclusive jurisdiction of all civil proceedings arising under

2    title 11, or arising in or related to cases under title 11.");

3    28 U.S.C. § 157 ("Each district court may provide that any or

4    all cases under title 11 and any or all proceedings arising

5    under title 11 or arising in or related to a case under title 11

6    shall be referred to the bankruptcy judges for the district.").

7    Thus, a district court may decide to hear an interlocutory

8    appeal of any order of a bankruptcy court subject only to review

9    by the Court of Appeals for abuse of discretion.

10        In light of this broad authority to hear interlocutory

11   appeals, the court does not decide whether the order at issue is

12   final nor does it determine whether it falls within any of the

13   exceptions briefed by the parties. Rather, the court grants

14   Appellants leave to appeal the Bankruptcy Court's order on the

15   grounds that determining whether to stay the proceedings will

16   significantly effect the nature of the bankruptcy proceedings

17   and, conceivably, the criminal proceedings pending in this

18   court. Thus, the Trustee's motion to dismiss is denied.

19        **B.   Merits of the Appeal**

20             **1.   Standard to Stay Proceedings**

21        Stays of civil proceedings pending the outcome of criminal

22   proceedings are not ordinarily required by the Constitution.

23   Keating v. Office of Thrift Supervision, 45 F.3d 322, 324 (9th

24   Cir. 1995) (citations omitted). The Ninth Circuit has held that,

25   "[I]n the absence of substantial prejudice to the rights of the

26   parties involved, [simultaneous] parallel [civil and criminal]

                                    13

Case5:11-mc-80133-EJD Document41-1 Filed09/02/11 Page66 of 75

Case 2:11-cv-01839-LKK Document 1 Filed 07/13/11 Page 138 of 197
Case 2:10-cv-01492-LKK Document 56 Filed 12/10/10 Page 14 of 23

1   proceedings are unobjectionable under our jurisprudence." Id.

2   (quoting S.E.C. v. Dresser Indust., Inc., 628 F.2d 1368, 1374

3   (D.C. Cir. 1980)). A court may, however, decide in its

4   discretion to stay civil proceedings "when the interests of

5   justice seem [] to require such action." Id. (internal citations

6   omitted).

7       When deciding whether to stay civil proceedings, courts

8   should consider "the particular circumstances and competing

9   interests involved in the case[s]." Id. (quoting Federal Sav. &

10  Loan Ins. Corp. v. Molinaro, 889 F.2d 899, 902 (9th Cir. 1989)).

11  The Circuit has instructed the court to consider "the extent to

12  which the defendant's fifth amendment rights are implicated."

13  Id. (internal quotation omitted).

14      Additionally, courts "should generally consider the

15  following factors:

16      (1)   the interest of the plaintiffs in proceeding

17            expeditiously with this litigation or any particular

18            aspect of it, and the potential prejudice to

19            plaintiffs of a delay;

20      (2)   the burden which any particular aspect of the

21            proceedings may impose on defendants;

22      (3)   the convenience of the court in the management of its

23            cases, and the efficient use of judicial resources;

24      (4)   the interests of persons not parties to the civil

25            litigation; and

26  ////

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page67 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 139 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 15 of 23

1          (5)   the interest of the public in the pending civil and

2                criminal litigation."

3    Id. at 324-25 (citing Molinaro, 889 F.2d at 903).

4          The Ninth Circuit has cautioned, however, that, "A

5    defendant has no absolute right not to be forced to choose

6    between testifying in a civil matter and asserting his Fifth

7    Amendment privilege. Not only is it permissible to conduct a

8    civil proceeding at the same time as a related criminal

9    proceeding, even if that necessitates invocation of the Fifth

10   Amendment privilege, but it is even permissible for the trier of

11   fact to draw adverse inferences from the invocation of the Fifth

12   Amendment in a civil proceeding." Id. at 326. Despite the

13   generosity of the standard, it is nonetheless true that

14   permitting simultaneous proceedings may seriously undermine the

15   ability of a person presumed innocent to defend himself and may

16   provide the prosecution with an undue advantage because it will

17   have access to the evidence tendered in the bankruptcy

18   proceedings.

19          2.   **Factual Findings**

20          While this court reviews the Bankruptcy Court's decision to

21   deny the stay on an abuse of discretion standard, it may

22   nonetheless review the factual findings of the Bankruptcy Court

23   for clear error. Consequently, if the court finds any of the

24   Bankruptcy Court's findings of fact to be clearly erroneous, it

25   may reverse those findings and any order premised on the

26   findings.

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page68 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 140 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 16 of 23

1          In its order denying Appellants' motion for a stay, the

2   Bankruptcy Court made the following findings of fact:

3          (1)   That the adversary proceedings bear no significant

4                relationship to the allegations in the superceding

5                indictment against Salyer. Memorandum Opinion at 3-6.

6          (2)   That the court does not foresee any testimony Salyer

7                might give in the adversary proceedings that would

8                legitimately be subject to Salyer's Fifth Amendment

9                rights. Memorandum Opinion at 5.

10         (3)   That the longer the adversary proceedings are delayed,

11               the less likely it is that the Trustee will be able to

12               recover the assets he seeks because there is a real

13               risk that Appellants would dissipate the assets of the

14               debtor entities. Memorandum Opinion at 8-9.

15         (4)   That the public's interests in ensuring that aggrieved

16               persons are made whole as rapidly as possible and in

17               the prompt resolution of civil cases far outweighs the

18               public's interest in the integrity of criminal cases

19               here because the government has not sought to

20               intervene in these adversary actions.[6] Memorandum

21               Opinion at 10.

22   _____

23      [6]  The government has intervened in non-bankruptcy civil
     proceedings relating to U.S.A. v. Salyer, and a stay is in place
24   for those cases. See Morning Star Packing Company v. SK Foods LP,
     2:09-cv-00208-MCE (E.D. Cal.); Four In One Company, Inc. v. SK
25   Foods, LP, 2:08-cv-03017-MCE (E.D. Cal.). Stays are also in effect
     for two other non-bankruptcy civil case. See Brewer v. Salyer,
26   1:06-cv-01324-AWI-DLB (E.D. Cal.); Morning Star Packing Company v.
     SK Foods, Merced County Superior Court Case No. CU 151242.

1      (5)   That the interest of the Trustee and the creditors in

2             a speedy resolution of the adversary proceedings is of

3             prime importance in this case. Memorandum Opinion at

4             6.

5      (6)   That the joint plan of liquidation proposed by the

6             secured creditors and the unsecured creditors are

7             often fragile and, thus, any delays in the adversary

8             proceedings would "almost certainly be to the

9             detriment of creditors." Memorandum Opinion at 9-10.

10     The court finds that the fifth and sixth findings of fact

11 are not clearly erroneous. However, the court determines that

12 the first four findings are clearly erroneous in whole or in

13 part.

14            i.    **Relationship Between Adversary Proceedings
                   and Criminal Indictment, Implication of**

15                   **Fifth Amendment**

16     The Bankruptcy Court correctly noted that, "the strongest

17 case for deferring civil proceedings until after completion of

18 criminal proceedings is where a party under indictment for a

19 serious offense is required to defend a civil or administrative

20 action involving the same matter." <u>Dresser Indust., Inc.</u>, 628

21 F.2d at 1375-76. Specifically, "[t]he noncriminal proceeding, if

22 not deferred, might undermine the party's Fifth Amendment

23 privilege against self-incrimination, expand rights of criminal

24 discovery beyond the limits of Federal Rule of Criminal

25 Procedure 16(b), expose the basis of the defense to the

26 prosecution in advance of criminal trial, or otherwise prejudice

Case5:11-mc-80133-EJD    Document41-1    Filed09/02/11    Page70 of 75

Case 2:11-cv-01839-LKK    Document 1    Filed 07/13/11    Page 142 of 197
Case 2:10-cv-01492-LKK    Document 56    Filed 12/10/10    Page 18 of 23

1    the case." Id. at 1376. In Dresser, the Court of Appeals

2    reasoned that, "[t]he case at bar is a far weaker one for

3    staying the administrative investigation [because no indictment

4    has been filed and, thus,] no Fifth Amendment privilege

5    threatened." The Ninth Circuit adopted this reasoning in

6    Molinaro, where it held that the district court did not abuse

7    its discretion by deciding that the burden on the defendant's

8    Fifth Amendment privilege was negligible because no related

9    criminal indictments were pending against him at the time of its

10   ruling. 889 F.2d at 903.

11        Ultimately, when considering a motion to stay proceedings,

12   courts must determine "the extent to which the defendant's fifth

13   amendment rights are implicated." Id. at 902. Here, the

14   Bankruptcy Court conducted a technical comparison of the

15   specific allegations in the criminal indictment and the

16   adversary proceedings. Accordingly, it "conclude[d] that, with

17   one minor exception, the factual allegations in the adversary

18   proceedings bear no significant relationship to the allegations

19   in the indictment." Memorandum Opinion at 3. The Bankruptcy

20   Court continued to reject Appellants' contention that the

21   reference to an enterprise in some of the adversary complaints

22   is the same enterprise alleged in the criminal proceeding. It

23   found that the enterprise alleged in the indictment was premised

24   upon allegations of "mail fraud, wire fraud, and bribery with

25   respect to the prices charged and quality of product sold to its

26   customers, whereas the adversary complaints allege inter-company

18

Case5:11-mc-80133-EJD   Document41-1   Filed09/02/11   Page71 of 75

Case 2:11-cv-01839-LKK   Document 1   Filed 07/13/11   Page 143 of 197
Case 2:10-cv-01492-LKK   Document 56   Filed 12/10/10   Page 19 of 23

1   transfers among the Salyer entities themselves, commingling of

2   assets, common ownership, management, and control, intermingling

3   of business operations and activities, and so on." Id. at 4.

4       While the Bankruptcy Court may be correct that specific

5   allegations of the criminal indictment are, for the most part,

6   distinct from the specific allegations of the adversary

7   proceedings, its conclusion that these distinctions demonstrate

8   that Salyer's Fifth Amendment rights are not implicated is

9   clearly erroneous. As an initial matter, the assets sought in

10  the criminal forfeiture proceedings overlap to a significant

11  degree with the assets sought in the adversary proceedings.

12  Moreover, Salyer's Fifth Amendment rights are implicated any

13  time that he testifies or responds to discovery requests that

14  are admissible to prove that he engaged in the conduct alleged

15  in the indictment. This conduct can exceed the specific

16  allegations of the indictment. Specifically, under Fed. R. Evid.

17  404(b), evidence of crimes, wrongs, and acts not alleged in the

18  indictment, may be used to prove "motive, opportunity, intent,

19  preparation, plan, knowledge, identity, or absence of mistake or

20  accident." Under this rule, for example, evidence that Salyer

21  fraudulently transferred assets might be used to prove that

22  Salyer intended to commit the fraudulent acts alleged in the

23  indictment, or had a plan to conceal fraudulently obtained

24  assets. Indeed the asserted concealment of assets was a

25  predominant governmental theme relative to bail.

26      Put directly, even though the specific allegations of the

19

1  indictment and the adversary proceedings may differ, the

2  bankruptcy litigation seriously implicates Salyer's Fifth

3  Amendment rights. He has been criminally accused of engaging in

4  an enterprise though which he allegedly obtained assets, which

5  the Trustee is now seeking to recover and to prevent fraudulent

6  transfer of them. Accordingly, the Bankruptcy Court's finding

7  that the proceedings do not overlap and that Salyer's Fifth

8  Amendment rights are not implicated in the adversary proceedings

9  is clearly erroneous.[7]

10        **ii.  Risk that Appellants will Dissipate Assets**

11      When considering whether the Trustee and creditors would

12  suffer prejudice if a stay were to issue, the Bankruptcy Court

13  reasoned as follows:

> In the present case, the court has already been
> sufficiently persuaded of a . . . risk of dissipation
> of assets to issue a preliminary injunction against
> the defendants in the adversary proceedings, who are
> moving parties in this motion, from transferring
> assets previously transferred to them by or through
> the debtor. The moving parties now argue that the
> injunction would protect the trustee and creditors
> from any risk of further dissipation of assets during
> the pendency of a stay. The court concludes to the
> contrary - the findings and conclusions upon which the
> injunction is based persuade the court that a real
> risk continues to exist.

---

[7] The court notes that the Trustee objects to the declaration
of counsel for Appellants filed in support of the appeal on the
grounds that it was not raised before the Bankruptcy Court. The
Trustee is correct that this court should not consider evidence
that was not before the Bankruptcy Court. Appellants agree that the
evidence was not presented to the Bankruptcy Court, but rather was
provided to this court to provide an overview of matters of which
the Bankruptcy Court was aware. Because this court has not relied
on the affidavit in reaching its conclusions, the motion to strike
is granted.

1  Memorandum Opinion at 9. The Bankruptcy Court does not in any

2  way address why the entrance of the preliminary injunction will

3  not protect the Trustee and the creditors. Appellants raised

4  this serious concern before the Bankruptcy Court. Failure to

5  provide any explanation as to why the preliminary injunction is

6  insufficient to protect the Trustee and creditors from

7  dissipation of assets due to debtor conduct is clear error.[8]

8             **iii. Balance of Public Interests**

9      In applying the <u>Keating</u> test, the Bankruptcy Court was

10 tasked to evaluate the public interest. It explained that while

11 it recognizes the public's interest in the integrity of criminal

12 cases, that interest is relatively low in the instant case

13 because the government has chosen not to intervene in the

14 adversary proceedings. The court has been unable to find any

15 case to support the contention that the weight of the public's

16 interest in the integrity of criminal proceedings is somehow

17 influenced by the prosecutor's decision to intervene. <u>See, e.g.</u>,

18 <u>Taylor, Bean & Whitaker Mortg. Corp. v. Triduanum</u>, 2:09-cv-0954-

19 FCD-EFB, 2009 U.S. Dist. LEXIS 60849, at *10 (E.D. Cal. Jul. 15,

---

20

21     [8] The Bankruptcy Court may have been had in mind the Drum Line issue. But that itself requires testimony that may involve Salyer's

22 Fifth Amendment rights. While the court may share some of the same concern about that single incident, it is, at this stage, unclear

23 as to whether there was a violation of the temporary restraining order and, thus, relying on it seems misplaced in light of the

24 serious adverse consequences. Furthermore, the parties have represented that the only remaining assets are real property and

25 money. These assets, unlike the Drum Line, cannot be transferred without the approval of the Bankruptcy Court and, thereby, then

26 present little or no risk that they will be wrongfully transferred while the preliminary injunction is in effect.

1   2009) (Court does not mention intervention by government); James

2   v. Conte, No. C. 04-5312 SI, 2005 U.S. Dist. LEXIS 46962, *5

3   (N.D. Cal. Apr. 19, 2005) (same); Javier H. v. Garcia-Botello,

4   218 F.R.D. 72, 75-76 (W.D.N.Y 2003), (court simultaneously

5   granted a stay of proceedings and denied a motion to intervene

6   by the government). Indeed, it seems misplaced to suggest that

7   the prosecutor's view demonstrates the public interest in light

8   of the constitutionally protected right of presumed innocence

9   and the obligation of proof which falls only on the prosecution.

10  The Bankruptcy Court has not identified any other reasons why

11  the public interest in the integrity of this criminal case is

12  relatively low. This conclusion is also in clear error. There is

13  no factual basis to support the Bankruptcy Court's conclusion

14  that the public interest in the integrity of the criminal case

15  is "far outweighed in this case by the public's countervailing

16  interests in ensuring that aggrieved persons are made whole as

17  rapidly as possible . . . and by the public's interest in the

18  prompt resolution of civil cases." Memorandum Opinion at 10

19  (citations and internal quotations omitted).[9]

20          3.   **Reversal of Bankruptcy Court's Decision**

21      For the reasons discussed above, the court finds that the

22

23          [9] Appellants also argue that the Bankruptcy Court made an
    error of law in its application of the Keating factors.
24  Specifically, they argue that the court wrongly gave the interests
    of the creditors the weight of the interests of plaintiffs. Given
25  the court's conclusion that there were factual errors that demand
    reversal, the court need not address the merits of this argument.
26

                                22

1   Bankruptcy Court made several significant erroneous factual

2   findings in its application of the <u>Keating</u> factors. Based on

3   these clearly erroneous factual findings, the court determines

4   that the Bankruptcy Court abused its discretion in denying

5   Appellants' motion for a stay. The remaining question in this

6   appeal is, then, what order the court should issue. Remand with

7   instructions might well be appropriate because this court

8   reviews for abuse of discretion. However, the court finds that

9   it should craft an order staying proceedings in part because it

10  is responsible for the conduct of the criminal trial and is more

11  familiar with the values informing criminal proceedings.

12       Accordingly, the court orders a stay of all further

13  bankruptcy proceedings where Appellants make a credible showing

14  that discovery from or testimony of Scott Salyer or his criminal

15  counsel is relevant to the proceedings. The court wishes to be

16  clear, the orders heretofore issued on a preliminary basis are

17  unaffected by this order.

18                          **IV. CONCLUSION**

19       For the foregoing reasons the court REVERSES the decision

20  of the Bankruptcy Court denying Appellants motion to stay as

21  described above.

22       The court FURTHER ORDERS that the Trustee's motion to

23  dismiss is DENIED and the Trustee's motion to strike is GRANTED.

24       IT IS SO ORDERED.

25       DATED:  December 9, 2010.

26
                                    LAWRENCE K. KARLTON
                            23      SENIOR JUDGE
                                    UNITED STATES DISTRICT COURT